# Exhibit A



## STATE OF WASHINGTON

June 7, 2018

Annette L. Hayes
Acting United States Attorney
Western District of Washington
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271

Dan Sproul, Warden
Federal Detention Center - SeaTac
2425 South 200th Street
Seattle, Washington 98198

Bryan Wilcox
Acting Seattle Field Office Director
U.S. Immigration and Customs Enforcement
12500 Tukwila International Blvd.
Seattle, WA 98168

Dear Ms. Hayes, Mr. Sproul and Mr. Wilcox:

It has come to our attention that at least several dozen women who crossed the Southwest border seeking asylum were recently moved to a Bureau of Prisons detention center in SeaTac. Some of the women have apparently been separated from their young children, pursuant to the Trump Administration's outrageous new family separation policy.

We have serious concerns about the Trump Administration's treatment of these asylum seekers who are now here in Washington. As the chief executive and chief law enforcement officers for the State, we ask that you immediately share with us information about these asylum-seekers, including:

- Where are their children and who is caring for them?
- Why are these women being held in prison while their asylum claims are resolved?
- Have they been given information about their legal rights or access to attorneys, such as those from the Northwest Immigrant Rights Project?
- When and where will these women be released?
- When can they expect to be reunited with their young children?

June 7, 2018
Page 2


The Trump Administration's new family separation policy is inflicting intentional, gratuitous, and permanent trauma on young children who have done nothing wrong and on parents who often have valid claims for refugee or asylum status. We need to understand immediately what impacts this new policy is having on people here in our state.

Sincerely,


JAY INSLEE
Governor

BOB FERGUSON
Attorney General

JI/BF/jlg

# Exhibit B



## STATE OF WASHINGTON

**Sent by Electronic and U.S. Mail**

June 18, 2018

The Honorable Jeff Sessions
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530

The Honorable Kirstjen Nielsen
Secretary
Department of Homeland Security
Washington, D.C. 20528

Dear Attorney General Sessions and Secretary Nielsen:

We are writing regarding the Trump Administration's outrageous new family separation policy, which is inflicting intentional, gratuitous, and permanent trauma on young children who have done nothing wrong and on parents who often have valid claims for refugee or asylum status. We are writing with two requests.

First, we ask that you answer basic questions about people in Washington state who are being affected by this policy. Twelve days ago, we sent the enclosed letter to federal officials in western Washington asking about a large group of women – many of them separated from their children – being detained at the SeaTac Bureau of Prisons facility in our state. Since our letter, to which there has been no response, we learned that there are at least 170 women and more than 30 men detained at the prison. Many of these detainees are parents who were separated from their children by border officials, and many came to this country seeking asylum. We have the following questions:

- Where are the children of these parents, and who is caring for them?
- Why are these parents being held in prison while their asylum claims are resolved?
- Have these parents been given information about their legal rights or access to attorneys, such as those from the Northwest Immigrant Rights Project?
- When and where will these parents be released into the community?
- When can they expect to be reunited with their young children?

From media and other reports, we understand that at least several dozen of these parents crossed the border with their children, some as young as 16 months old. You and the Trump Administration took their kids away and are detaining them separately. You did not even have the decency to allow many parents to say goodbye to their children. Many parents have no idea where their children are. This is cruel and unconscionable.

The Honorable Jeff Sessions
The Honorable Kirstjen Nielsen
June 18, 2018
Page 2


Second, we ask that you and others in the Trump Administration stop lying about the family separation policy. On May 16, the President said "we have to break up families," a claim he has repeated personally and through his spokesperson, Sarah Huckabee Sanders. As you surely know, this is not accurate. Prior administrations have not systematically separated families seeking asylum, nor have prior administrations insisted on criminally prosecuting refugees or asylum-seekers for misdemeanor crimes. This Administration is solely responsible for this mean-spirited policy, but in the face of intense public backlash is attempting to blame others.

It is this deliberate manipulation of people at our border ports of entry and mass criminal misdemeanor prosecutions that allow ICE to tear children from their parents. The reality is that federal officials are abusing international law at our border and creating a humanitarian crisis by needlessly separating families. Even under these conditions, the Trump Administration could still choose not to separate families if it refrained from jailing parents while their misdemeanor charges are pending. This heartless policy was implemented by the Trump Administration as part of the President's ongoing assault on immigrants, not because of any legal requirement.

Presumably, the President is lying about the origins of this policy because even he recognizes that it is morally indefensible. But these lies cannot erase the stain of what this administration is doing. We cannot understand how you or the President can sleep at night knowing what is being done on your orders. The least you can do is be honest with the American people about who chose to implement this policy.

Sincerely,


JAY INSLEE
Washington State Governor

BOB FERGUSON
Washington State Attorney General

JI/BF/jlg
Enclosure

Exhibit C

**STATE OF NEW MEXICO**
OFFICE OF THE ATTORNEY GENERAL



**HECTOR H. BALDERAS**
**ATTORNEY GENERAL**

June 19, 2018

The Honorable Jeff Sessions                    The Honorable Kirstjen Nielsen
Attorney General                               Secretary
U.S. Department of Justice                      U.S. Department of Homeland Security
950 Pennsylvania Avenue, N.W.                   3801 Nebraska Avenue, N.W.
Washington, D.C. 20530                          Washington, D.C. 20528

Dear Attorney General Sessions and Secretary Nielsen:

The undersigned Attorneys General write to express our strong opposition to the Department of Justice's new "zero tolerance" policy of forcibly separating all families that cross the border illegally, including those seeking asylum. The policy is not only inhumane, but it also raises serious concerns regarding the violation of children's rights, constitutional principles of due process and equal protection, and the efforts of state law enforcement officials to stop crime. Because of these concerns, we demand that the Department of Justice immediately cease these draconian practices.

On April 6, 2018, the Attorney General announced a new "zero tolerance" policy, calling for the immediate criminal prosecution of all individuals who illegally enter the United States, including those seeking asylum. Under this policy, adults who enter the United States are brought to federal prisons, instead of immigrant detention centers, and their children are treated as "unaccompanied minors" and forcibly placed into the care of the Department of Health and Human Services' Office of Refugee Resettlement.

As you are aware, the fundamental rights of children are expressed in international, federal, and state bodies of law. Each of these laws is, at its core, designed to protect the best interests of children. These laws are representative of the views of millions of Americans that the government, in any process, should first and foremost seek to protect those interests. Almost universally, the statutory mandates and the litany of cases interpreting them overwhelmingly express that a child's best interests are served by remaining with his or her family, absent a rigorous judicial inquiry resulting in a finding that a parent is unfit or proof beyond a reasonable doubt that a crime has been committed. Policies that separate a child from his or her parent absent that level of inquiry, would not only be illegal under most state laws, but also may be contrary to the policy views of state legislatures and their constituents across this country.

These views are complemented by numerous laws and judicial precedent that mandate and hold that parents have a fundamental right to raise their children. This principle is affirmed in both state and federal law, by both statute and judicial precedent. The notion that the government should intrude into the rights of a parent to be with their child has historically been met with extremely high levels of scrutiny. Thus, the deliberate separation of families for the express purpose of furthering an immigration policy is contrary to our laws.

Not only is it highly concerning that current Department of Justice policies may be in contravention of the express purpose of these legal mandates, but these practices directly interfere with the efforts of our offices and other enforcement officials—locally, nationally, and internationally—to prevent and prosecute crime. In most states, Attorneys General are responsible for enforcing laws that include human trafficking, drug trafficking, and gang violence offenses. As you are keenly aware, these issues are rarely local in context; rather, they require the efforts and collaboration of law enforcement officials across both state and international borders to prevent the widespread and syndicated perpetration of these crimes. These efforts rely on reporting and cooperation from survivors of these crimes and victims of criminal organizations. The practice of mandatory family separation is both inhumane and contrary to the efforts of the law enforcement and others who dedicate their tireless efforts to stopping violent criminals.

Put simply, the deliberate separation of children and their parents who seek lawful asylum in America is wrong. This practice is contrary to American values and must be stopped. We demand that you immediately reverse these harmful policies, as it is in the best interests of the children and families affected.


Sincerely,


Hector Balderas
Attorney General of New Mexico

Xavier Becerra
Attorney General of California


George Jepsen
Attorney General of Connecticut

Matthew P. Denn
Attorney General of Delaware



Karl Racine
Attorney General for the District of Columbia

Russell Suzuki
Attorney General of Hawaii

Lisa Madigan
Attorney General of Illinois

Thomas J. Miller
Attorney General of Iowa

Janet Mills
Attorney General of Maine

Brian Frosh
Attorney General of Maryland

Maura Healy
Attorney General of Massachusetts

Lori Swanson
Attorney General of Minnesota

Gurbir Grewal
Attorney General of New Jersey

Barbara D. Underwood
Attorney General of New York

Josh Stein
Attorney General of North Carolina

Ellen Rosenblum
Attorney General of Oregon

Josh Shapiro
Attorney General of Pennsylvania

Peter F. Kilmartin
Attorney General of Rhode Island

Thomas J. Donovan, Jr.
Attorney General of Vermont

Mark R. Herring
Attorney General of Virginia

Bob Ferguson
Attorney General of Washington

cc:     Honorable Mitch McConnell
        Majority Leader, United States Senate

        Honorable Paul Ryan
        Speaker of the United States House of Representatives

# Exhibit D



# Exhibit E

**O**

1
2
3
4
5
6
7
8

# United States District Court
# Central District of California

9

GUSTAVO RODRIGUEZ CASTILLO;
GABRIELA M. LOPEZ; IMMIGRANT
DEFENDERS LAW CENTER,

             Plaintiffs-Petitioners,

    v.

KIRSTJEN NIELSEN, Secretary
Department of Homeland Security;
THOMAS HOMAN, Acting Director,
Immigration and Customs Enforcement;
DAVID MARIN, Field Office Director,
Los Angeles Field Office of ICE;
JEFFERSON BEAUREGARD
SESSIONS, U.S. Attorney General;
HUGH J. HURWITZ, Acting Director
Federal Bureau of Prisons; DAVID
SHINN, Warden of FCI Victorville
Medium I/II., in their official capacity
only,

             Defendants-Respondents.

Case No. 5:18-cv-01317-ODW-MAA

**TEMPORARY RESTRAINING
ORDER AND ORDER TO SHOW
CAUSE [4]**

## I.  INTRODUCTION

    Plaintiffs Gustavo Rodriguez Castillo, Gabriela M. Lopez, and Immigrant Defenders Law Center ("IDLC") bring this action challenging the policies and practices related to immigrant detainees ("detainees") held at FCI Victorville Medium Security Prison ("FCI Victorville"). Plaintiffs have applied ex parte for a temporary restraining order requiring Defendants to: (1) permit Lopez to meet with her client,

Castillo, by phone or in person; (2) permit other detainees at FCI Victorville to communicate, both in person or by phone, with immigration attorneys who wish to communicate with them; (3) permit IDLC to conduct "know your rights" trainings for the detainees at FCI Victorville; and (4) stop immigration proceedings of detainees at FCI Victorville, or deportation of any such detainees, until the detainees have had an opportunity to consult with an attorney and attend a training by IDLC.  (Appl., ECF No. 4.)  For the following reasons, the Court **GRANTS** Plaintiffs' Application.

## II.    BACKGROUND

Plaintiffs allege that on June 12, 2018, the federal government began transferring detainees to FCI Victorville from other parts of the country.  (Compl. ¶ 19, ECF No. 1.)  The detainees are incarcerated pending an initial screening known as a "credible fear" interview and, if found to have "credible fear," pending immigration court proceedings.  (*Id.* ¶ 20 (citing 8 C.F.R. § 208.30).)  Plaintiffs allege that, since their incarceration at FCI Victorville, detainees have been denied the ability to visit, consult with, or contact an attorney.  (*Id.* ¶ 22.)

Plaintiff Castillo is currently detained at FCI Victorville.  (Decl. of Gabriela Lopez ("Lopez Decl.") ¶ 10, ECF No. 4-4.)  Plaintiff Lopez is Castillo's attorney.  (*Id.* ¶ 3.)  On June 6, 2018, Castillo's aunt called Lopez seeking legal representation for her nephew.  (*Id.* ¶ 4.)  Castillo's aunt learned that Castillo had already had a credible fear interview and was awaiting further processing in the San Luis Regional Detention Center in San Luis, Arizona.  (*Id.* ¶ 5.)  Castillo told his aunt that he needed an attorney.  (*Id.*)  While in Arizona, Castillo was able to contact his aunt almost daily, until the phone calls abruptly stopped on June 6, 2018.  (*Id.*)  Castillo's aunt retained Lopez to investigate Castillo's case and assist in locating Castillo, who had stopped communicating with her.  (*Id.* ¶ 6.)

On June 14, 2018, Lopez discovered that Castillo was being held at FCI Victorville.  (*Id.* ¶ 11.)  Lopez called FCI Victorville numerous times on June 14 and 15, 2018, with no answer.  (*Id.*)  She then called Immigration Customs Enforcement

("ICE") at the Imperial Regional Detention Facility, and they were unable to assist. (*Id.*)  She called FCI Victorville another time, but there was, again, no response. (*Id.*)

On June 18, 2018, Lopez was able to learn Castillo's Bureau of Prisons ("BOP") ID number from ICE Officer Linares in Adelanto, California.  (*Id.* ¶ 12.) Officer Linares told Lopez that all inquiries and requests to speak with her client had to be directed to the BOP at Victorville. (*Id.*)  She called FCI Victorville, but no one answered. (*Id.*)  She emailed a contact listed on the Victorville BOP website and later that day received a call from Jess Pino, Public Information Officer at the Bureau of Prisons. (*Id.* ¶ 13.)  Pino told Lopez that ICE—not the BOP—would be handling calls and visits to Victorville. (*Id.* ¶ 14.)  Pino also informed her that BOP does not have a practice established for visitors, does not have visiting forms ready, and that BOP anticipates allowing visits for immediate family members only. (*Id.*)  Pino indicated that BOP was working with ICE to establish protocols but was unsure what the result would be. (*Id.*)

Since Castillo left San Luis, Arizona, he has had no contact with family. (*Id.* ¶ 16.)  He has not talked to his attorney since he was detained. (*Id.*)

Lindsay Toczylowski is the Executive Director of Plaintiff IDLC, a non-profit agency located in Los Angeles, California that provides pro bono legal representation and assistance to individuals in immigration court proceedings.  (Decl. of Lindsay Toczylowski ("Toczylowski Decl.") ¶ 2, ECF No. 4-3.)  IDLC representatives routinely visit immigration detention facilities to meet with and screen immigration detainees to determine whether they may be eligible to receive free legal representation in their removal proceedings. (*Id.*)

On June 8, 2018, Toczylowski learned that detainees had been transferred to FCI Victorville. (*Id.* ¶ 3.)  On June 11, 2018, Toczylowski called FCI Victorville three times to determine the guidelines for visiting detainees, but no one answered the phone. (*Id.* ¶ 4.)  On June 12, 2018, she drove to Victorville and arrived at the facility at approximately 10:00 a.m. (*Id.* ¶ 5.)  Toczylowski asked to meet with certain

detainees for pro bono representation. (*Id.* ¶ 6.) After being told by one officer that they were not sure of the procedure for such visits, Toczylowski met with one representative who told her that she could not meet with any detainees that day as the facility was not set up for visits. (*Id.* ¶ 8.) Toczylowski was told that there was a visitation ban in place, including attorney visits, because there was no space for attorneys to meet with detainees and because ICE had not authorized any visits. (*Id.*) The representative took the list of detainees with whom Toczylowski sought to meet and said that ICE would contact her shortly. (*Id.* ¶ 11.) On June 14, 2018, Toczylowski's paralegal submitted a formal visitation request to FCI Victorville. As of June 20, 2018, IDCL has not received a response. (*Id.* ¶ 16.)

Plaintiffs initiated this lawsuit and applied ex parte for a temporary restraining order on June 19, 2018. Defendants opposed Plaintiffs' Application on June 20, 2018. (Opp'n, ECF No. 7.)

Defendants argue that the relief Plaintiffs seek is either moot or unripe. ICE began transferring large groups of detainees to FCI Victorville between June 8, 2018, and June 12, 2018. (Decl. of Jess Pino ("Pino Decl.") ¶ 4, ECF No. 7-1.) BOP staff had to then conduct initial screening of the detainees to determine their name, obtain identifying information, and assign a register number to them. (*Id.*) BOP staff had to conduct medical screenings to prevent the potential spread of communicable diseases. (*Id.* ¶ 5.) Due to these administrative tasks, BOP was not able to finalize visitation procedures for the detainees until June 19, 2018. (*Id.* ¶ 6.)

Defendants now claim that such visitation procedures have been implemented. (*Id.* ¶ 7.) Social and legal visits may take place Tuesday through Friday, other than Federal Holidays, from 8:30 a.m. through 3:00 p.m. (*Id.*) Attorneys must present a valid form of non-expired identification, a valid bar card or other credential showing their active status, and provide the name and either Alien number or Register number of the detainee with whom they wish to visit. (*Id.*) The attorney must also provide two standard BOP forms, a Visiting Attorney Statement and an Application to Enter

Institution as Representative (if a non-lawyer is also present). (*Id.*) Attorneys must also fill out the "Notification to Visitor" form prior to being admitted. (*Id.*) Defendants state that one attorney visit was allowed with a detainee on June 20, 2018, and they are in the process of updating their website to include information regarding detainee attorney visits. (*Id.* ¶ 8.)

Defendants also explain that a few exceptions to the visitation policies apply; namely that detainees placed on medical quarantine may not leave their housing until the quarantine is lifted and that visitation is only allowed Tuesday through Friday, because federal inmates also housed in Victorville have visitation Saturdays, Sundays, Mondays, and Federal Holidays.

Due to the implementation of these procedures, Defendants argue that Plaintiffs' requests for relief regarding access to attorney visits are moot. (Opp'n 5– 6.) Additionally, Defendants argue that Plaintiffs' request for relief regarding the "know your rights" training session is not ripe, because Plaintiffs have not shown that they have complied with the proper protocol or that they have specifically requested to conduct such trainings and were then denied. (*Id.* at 6.)

## III.    LEGAL STANDARD

The standard for issuing a temporary restraining order is "substantially identical" to that for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008)).

# IV. DISCUSSION

Plaintiffs meet their burden, and establish they are entitled to a temporary restraining order. Despite Defendants' representations regarding the new visitation procedures, Plaintiffs still maintain that injunctive relief is necessary.

First, Plaintiffs argue that Defendants' new protocol does not address phone calls, which are particularly important because of the limited time permitted for visitation for the 800+ detainees. (Reply 1, ECF No. 8.) The Court agrees that the lack of any protocols regarding phone calls, when the proposed visitation schedule provides such a limited time frame for a large number of detainees, is troubling.

Second, Plaintiffs argue that they would be happy to follow any reasonable protocols and clearances to become a "Legal Orientation Provider" in order to conduct "know your rights" clinics, but that they did not have an opportunity to even begin that process until June 19, 2018. Additionally, Plaintiffs explain that Defendants have not affirmatively stated that they would allow such trainings to take place in a prison.

Further, the parties do not dispute that many of the detainees were without access to legal communication for as many as to 9 to 13 days, possibly longer as in Castillo's case. Defendants have made no representations regarding the status of removal proceedings for those detainees who have not had access to counsel. The Court finds these circumstance the most concerning.

The Court finds that Plaintiffs will suffer irreparable harm if injunctive relief is not granted. The Court also finds that such relief is in the public interest. Therefore, the Court **ORDERS** as follows:

(1)   Defendants-Respondents shall permit Attorney Lopez to conduct an attorney-client conversation, either in person or by phone (as she prefers), with Castillo;

(2)   Defendants-Respondents shall permit other detainees held at FCI Victorville to communicate, both in person and by phone, with other immigration attorneys who wish to communicate with them—the in-

person visitations may proceed according to the protocol Defendants set forth in their Opposition (ECF No. 7);

(3)    No later than **July 9, 2018**, Defendants-Respondents shall implement a protocol to permit Plaintiff Immigrant Defenders Law Center to conduct "know your rights" trainings for the immigration detainees at FCI Victorville; and

(4)    Defendants-Respondents shall not proceed with the immigration proceedings of immigration detainees at FCI Victorville, nor shall it deport any such detainees, until the detainees have had an opportunity to consult with an attorney or attend a "know your rights" training by Plaintiff Immigrant Defenders Law Center or another immigration legal service provider.

Defendants are hereby **ORDERED TO SHOW CAUSE** why a preliminary injunction shall not issue. Any declarations, affidavits, points and authorities, or other submissions in opposition to the issuance of such a preliminary injunction shall be filed with the Court no later than 8:00 p.m. on June 22, 2018. Any reply shall be filed no later than 9:00 a.m. June 25, 2018. The hearing on the order to show cause shall be on **June 25, 2018 at 1:30 p.m**. The briefing and hearing dates on the Court's Order to Show Cause can be continued if Defendants consent to the temporary restraining order remaining in effect until the new date scheduled for the hearing. Indeed, the Court encourages the parties to meet and confer to attempt to reach an amicable resolution of this dispute. The next available hearing date after June 25, 2018, is July 9, 2018.

## IV.    CONCLUSION

For the reasons discussed above, the Court **GRANTS** Plaintiffs' Ex Parte Application for a Temporary Restraining Order.  (ECF No. 4.)  The hearing on the order to show cause shall be on **June 25, 2018, at 1:30 p.m**.

**IT IS SO ORDERED.**

June 21, 2018

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

# Exhibit F

Case 2:18-cv-00939-MJP Document 16-1 Filed 07/02/18 Page 24 of 122

## The New York Times

# *More Than 500 Migrant Children Reunited With Adults, Government Says*

**By Jennifer Jett and Mihir Zaveri**

June 24, 2018

The United States government has reunited 522 migrant children who were separated from adults as part of President Trump's "zero tolerance" immigration policy, the Department of Homeland Security said late Saturday.

The government "knows the location of all children in its custody and is working to reunite them with their families," the department said in a statement.

After weeks of public pressure, Mr. Trump signed an executive order on Wednesday meant to end the separation of families at the border by detaining them together for an indefinite period instead.

The separations began after the federal government announced in April that it would pursue a "zero tolerance" policy of criminally prosecuting every adult who illegally crossed the border or tried to do so.

While adults were sent to jail or indefinite detention, more than 2,300 children were separated and sent to government-licensed shelters or temporary foster care.

Government efforts to match separated migrant children with their guardians face considerable obstacles. Additionally, the process of reuniting families as well as the indefinite detention they face once they're back together could have psychological consequences for parents and children alike, experts said.

The department said in the statement that 16 more children were expected to be reunited with adults within 24 hours. Earlier attempts for those children were delayed because of weather conditions that affected their ability to travel.

Some children will remain separated from the adults they were traveling with if a family relationship cannot be established or if there are concerns about the children's safety with those adults, the department said.

As of Wednesday, there were 2,053 separated children being held in federal Department of Health and Human Services facilities, the statement said. Children can talk by telephone or video to a parent or guardian twice a week.

Case 2:18-cv-00939-MJP   Document 16-1   Filed 07/02/18   Page 25 of 122

Children who were separated from adults at border crossings make up 17 percent of all minors in the agency's custody, officials said, with the rest having arrived in the United States unaccompanied.

Federal employees, some of whom were conflicted about Mr. Trump's policy, have been working overtime in an effort to reunite the thousands of children and parents who were separated at the border over a period of several weeks this spring.

The federal Office of Refugee Resettlement has a toll-free number set up for parents looking for their children.

But parents said they had gained little information using the number, while some have discovered that their children are being held several states away. Other parents have already been deported and are trying to locate their children from abroad. Officials said that parents who are deported from the United States can ask that their minor children leave with them.

Critics also said that many migrants in federal detention do not have a phone number where agencies can call them back.

Exhibit G

Case 2:18-cv-00939-MJP    Document 16-1    Filed 07/02/18    Page 27 of 122

# POLITICO

# POLITICO



A migrant mother walks with her two daughters on their way to the port of entry to ask for asylum in the U.S. on June 21 in Tijuana, Mexico. | Mario Tama/Getty Images

## Feds don't have enough beds for migrant families

By **TED HESSON** and **WESLEY MORGAN** | 06/21/2018 06:04 PM EDT | Updated 06/21/2018 07:08 PM EDT

The Trump administration has pledged to warehouse migrant families together. But at the moment, it has no place to put them.

An executive order signed by President Donald Trump on Wednesday calls for the Homeland Security Department to keep migrant children in custody with their parents during criminal proceedings for illegal entry and subsequent immigration proceedings. But the cases of asylum-seekers caught at the border can take months or years to resolve — and the federal government has only 3,326 beds for detained families in three facilities, according to a 2017 watchdog report.

The Border Patrol arrested 9,485 family members in May alone.

The hurdles are "pretty significant," said John Sandweg, former acting ICE director under President Barack Obama. "They're going to have to build some family detention centers quickly."

Trump's executive order calls on the Defense Department to "take all legally available measures" to provide detention space for the families. But Pentagon spokesman Lt. Col. Jamie Davis said Thursday that no formal request had been made.

"Until they say they want this, we're not going to be doing anything," he said. "If they put forth a request, we will support it."

Even before Trump ordered children to be held indefinitely along with their parents, the system was at capacity: Family bed space is 78 percent full, based on figures provided by U.S. Immigration and Customs Enforcement.

ADVERTISING



Put another way, only a little more than 700 beds for families are available — with thousands of migrant family members arriving every month.

The Defense Department notified congressional offices Thursday of a request by the Health and Human Resources Department to house 20,000 unaccompanied children between now and the end of the year. HHS would provide care for the children, "including supervision, meals, clothing, medical services, transportation or other daily needs," according to the memo sent to lawmakers.

But that doesn't explain what will happen to families, who are supposed to be detained today.

DoD did not respond to a request to confirm the expanded space for migrant children.

"The Defense Department is charged with protecting our national security. They're not a child welfare agency," said Wendy Young, president of the nonprofit Kids in Need of Defense, a DC-based nonprofit.

A major impediment to assembling quick family detention space will be a 1997 settlement agreement that outlines standards of care for children in immigration detention.

## Morning Shift newsletter

✉ ...he latest on employment and immigration, every weekday morning — in your inbox.

Your email...

By signing up you agree to receive email newsletters or alerts from POLITICO. You can unsubscribe at any time.

The so-called Flores settlement requires children to be released from custody within 20 days, which raises the question of whether it would be worth the effort for the Homeland Security Department to build facilities.

The Justice Department filed a motion in the 9th Circuit Court of Appeals on Thursday seeking to modify the settlement to allow for indefinite detentions of children with parents, along with other changes.

In addition, the Flores agreement sets standards for care for children in a detention setting. Some advocates question whether facilities like the "tent city" the Trump administration opened for migrant children in Tornillo, Texas, would meet the criteria.

"If that was the model used for families, it would be pretty atrocious," said Kevin Landy, who directed ICE detention policy during the Obama administration.

"It's hard to imagine that these temporary tent structures would meet even the minimal requirements," said Victoria Lopez, senior staff attorney with the American Civil Liberties Union. "Even the longer-term facilities that are set up currently for the purpose of family detention don't necessarily meet the require of the Flores settlement."

ICE officials were stunned Wednesday to learn of the president's executive order to detain migrant families together, according to a former DHS official. "A bomb dropped on them," the official said. "They had no idea this was coming."

Homeland Security Secretary Kirstjen Nielsen huddled Thursday afternoon with senior leaders from ICE and U.S. Customs and Border Protection and other top officials at the Ronald Reagan Building and International Trade Center in downtown D.C., according to the official.

DHS did not immediately respond to a request for comment.

The largest family detention facility is the South Texas Family Residential Center in Dilley, Texas, with space for 2,400 detainees. The facility held 2,000 people in early June, according to ICE.

The agency also maintains two smaller facilities, a 830-bed center in Karnes City, Texas, and 96-bed center in Berks County, Pa. The Berks facility has the potential capacity to house 200 people, according to a 2016 DHS advisory committee report.

The military has been used to house migrants in the past, but Trump's "zero tolerance" policy will create fresh challenges. Under the president's order, DHS will be required to reimburse DoD for the cost of the family facilities — and it won't be cheap.

## GOP delays immigration vote in last-ditch push for passage
By **JOHN BRESNAHAN**, **RACHAEL BADE** and **HEATHER CAYGLE**

The estimated cost of detention bed space varies, but family facilities tend to cost more. In its fiscal year 2019 budget request, ICE put the average daily cost of a standard adult detention bed at $124. By contrast, family beds were projected at an average of $319 per day.

The last large-scale example of a military mobilization to house migrants occurred in 2014, when tens of thousands of Central American unaccompanied minors and families arrived at the southwest border.

The surge overwhelmed the shelter system for unaccompanied minors, which is operated by the Health and Human Services Department.

Without adequate space for children, HHS established facilities at three military bases in Texas, Oklahoma and California, housing nearly 8,000 unaccompanied kids over a period of several months.

Examples of migrants being housed on military bases stretch even further back.

In 1980, President Jimmy Carter sent more than 20,000 Cuban refugees to Fort Chafee, Ark., where some of them rioted and others fled the base. The military has also sometimes housed Cuban refugees at the Guantanamo Bay Naval Base in Cuba.

The U.S. Northern Command, based in Colorado, is responsible for providing military support to civil authorities like DHS and HHS, as it would be during a natural disaster, terrorist attack or any other domestic incident requiring military assistance.

But "no action" has been taken there except "some back-end planning about what we could do if asked," said a military official who was not authorized to speak on the record.

Defense Secretary Jim Mattis told reporters at the Pentagon on Wednesday, shortly before the new White House order, that the military would "respond if requested" by the domestic agencies and "support whatever they need."

"We have housed refugees. We have housed people thrown out of their homes by earthquakes and hurricanes. We do whatever is in the best interest of the country," Mattis added when asked if that could include housing families or children on military bases.

The presidential executive order released shortly after Mattis' remarks directed the Pentagon to provide to Homeland Security, "upon request, any existing facilities available for the housing and care of alien families," and to "construct such facilities if necessary and consistent with law," with reimbursement from Homeland Security.

Feds don't have enough beds for migrant families / POLITICO

Landy said any quickly made detention facilities would likely be "very rudimentary" and not suitable for family detention, even over a short period of time.

Landy views the executive order as a way to press Congress to bend to Trump's immigration demand.

"They don't have a solution," he told POLITICO. "I think the point of the executive order is to point fingers."

*Lorraine Woellert contributed to this report.*

ADVERTISING



inRead invented by Teads

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

RSS

Site Map

Terms of Service

Privacy Policy

───────────

© 2018 POLITICO LLC

# Exhibit H

Case 2:18-cv-00939-MJP   Document 16-1   Filed 07/02/18   Page 35 of 122

Politics

# Border Patrol Halts Prosecution of Families Crossing Illegally

By Shannon Pettypiece and Toluse Olorunnipa

June 25, 2018, 3:12 PM PDT

- ▶ Agency chief says he ordered criminal referrals suspended

- ▶ Says cases cannot be prosecuted without separating families



Reporting From the Border: Confusion Remains for Immigrants

The nation's top border enforcement official said Monday that his agency has halted criminal prosecutions of adults who illegally cross the border with children in order to stop separating families.

Kevin McAleenan, commissioner of Customs and Border Protection, told reporters at a detention center in McAllen, Texas, that he instructed the agency to temporarily stop sending prosecutors the cases of parents charged with illegally entering the country in response to President Donald Trump's executive order last week ending family separations, according to the Associated Press.

A Customs and Border Patrol spokeswoman, Stephanie Malin, said the agency "is taking temporary action until Congress can find a lasting solution to family separation." She didn't immediately explain what she meant by temporary action.

McAleenan said the administration's "zero tolerance" policy on criminal prosecution of illegal border crossings remains in effect but he was unable to refer parents for prosecution without separating them from their children. He said the agency is working on a plan to resume criminal referrals.

The border patrol commissioner spoke shortly after Attorney General Jeff Sessions told an audience in Reno, Nevada, that the Justice Department would maintain Trump's "zero tolerance" policy prosecuting all those who cross illegally.

To do otherwise, Sessions said " would encourage more adults to bring more children illegally on a dangerous journey that puts these children at great risk."

White House Press Secretary Sarah Huckabee Sanders said McAleenan's halt to referrals is "a temporary solution" that "isn't going to last." She called on Congress to "fix" the immigration system.

"We're not changing the policy. We're simply out of resources," she added.

– *With assistance by Jennifer Epstein*

## In this article

125749Z
**ASSOCIATED PRESS/THE**
Private Company USD

# Exhibit I



PRESS BRIEFINGS

# Press Briefing by Press Secretary Sarah Sanders

Issued on: **June 25, 2018**

★ ★ ★

James S. Brady Press Briefing Room

3:53 P.M. EDT

SANDERS:  Good afternoon.  Many by now have heard that I was asked to leave a restaurant this weekend where I attempted to have dinner with my family.  My husband and I politely left and went home.  I was asked to leave because I work for President Trump.

We are allowed to disagree, but we should be able to do so freely and without fear of harm.  And this goes for all people regardless of politics.  Some have chosen to push hate and vandalism against the restaurant that I was asked to leave from.  A Hollywood actor publicly encouraged people to kidnap my children.

And this weekend, a member of Congress called for people to "push back" and make clear to those serving their country in this administration that they are not welcome anywhere, anytime, for anything.

Healthy debate on ideas and political philosophy is important, but the calls for harassment and push for any Trump supporter to avoid the public is unacceptable.

America is a great country, and our ability to find solutions despite those disagreements is what makes us unique.

That is exactly what President Trump has done for all Americans by building a booming economy, with record low unemployment for African Americans and Hispanics, the defeat of

ISIS, and the ongoing work to achieve peace on the Korean Peninsula.

Earlier today, the President spoke with the new President of Colombia and congratulated him on his recent electoral victory. President Trump noted the strong partnership between our two countries and discussed the security challenges the new Colombian government will face as he enters office.

We are also working to set up a call between the President and the President of Turkey to reaffirm our strong bond. We encourage Turkey to take steps to strengthen its democracy and continue progress toward resolving issues in the bilateral relationship.

Lastly, and on a slightly lighter and more positive note, it should be an exciting national championship at the College World Series since the Arkansas Razorbacks will be playing and take on Oregon State starting tonight in Omaha. So, go Hogs.

And with that, I'll take your questions. Jonathan.

Q   Sarah, I want to ask you about the President's tweet over the weekend, where he said that people who cross the border illegally should be sent back with no court cases, no judges. Does the President believe that undocumented immigrants have no due process rights whatsoever?

SANDERS: Virtually all Americans agree that it makes no sense that an illegal alien sets one foot on American soil and then they would go through a three- to five-year judicial process to be removed the country. Thousands of illegal aliens are removed every month without seeing an immigration judge as a result of procedures in current law, including voluntary removal and expedited removal. Just because you don't see a judge, doesn't mean you aren't receiving due process.

The President is focused on securing our borders and reforming our immigration system to prevent the crisis at the border from getting worse.

Q   But he's saying no judges, no court cases. So no opportunity to claim asylum, no opportunity to have their cases heard before a judge?

SANDERS: No, like I just said, just because you don't see a judge, doesn't mean you aren't receiving due process. Also, the President would like to see us stop people from illegally entering the country at all. We'd like to have secure borders. The Democrats are the ones that

want open borders.  The President would like us to secure the borders and have a very legal and easy immigration process so people can come here the right way, not the wrong way.

John.

Q   Just in addition to what Jon was asking, under current law — and you spoke to this — contiguous countries to the United States, like Mexico and Canada, where people can be removed on an expedited basis, they can basically just be taken to the nearest border crossing and sent back.  Does the President want to implement that type of policy for people from noncontiguous countries?  Is that what he's looking for here?

SANDERS: The President would certainly like to see more expedited removal.  But ultimately, the President would like to see our border secured so that we don't have all of these problems to begin with.  The President wants to fix our immigration system completely, and not just tinker with it.  He actually wants us to have a system that works, and he wants to have a secure border.

He doesn't believe in the philosophy that Democrats do, that we should have open borders.  He wants to stop that.  He wants to stop the crime that comes into this country.  And that's what we're hoping to do, and we'd like to see Congress step up and work with us.

Blake.

Q   The President also said in the Oval Office that people have proposed adding 5,000 judges.  Who's proposed to add 5,000 judges?  I've seen 750 as a max number.

SANDERS: There have been a number of different proposals; quite a few that we've seen.  We've laid out what we would like to see, and hopefully Congress will work with us to make that happen.

Blake.

Q   Sarah, thank you.  Let me ask you about a couple statements on trade.  What is the President's reaction to the Harley-Davidson announcement today?  Does he still feel that tariffs are the way to go?SANDERS: The President's trade and economic policies have been a huge benefit to the American economy, and this includes the creation of over 300,000 manufacturing jobs.  Unemployment is at 3.8 percent, the lowest since 2000.  And manufacturing confidence is at historic highs.

The European Union is attempting to punish U.S. workers with unfair and discriminatory trade policies. And President Trump will continue to push for free, fair, and reciprocal trade and hopes that the EU will join us in that.

Q   And on the story about Chinese investments — curtailing possible Chinese tech investments — the Treasury Secretary, Steve Mnuchin, said five hours ago that a statement would be forthcoming, and we still don't have it. When might that be coming? Or what exactly is that administration's stance on this?

SANDERS: Again, as the Secretary said, a statement would go out that targets all countries that are trying to steal our technology, and we expect that to be out soon. We'll keep you posted.

John.

Q   Thanks a lot, Sarah. Back on immigration. In terms of what the President envisions for the immigration policy that he'd like to see put in place, should asylum-seekers be able to get their case heard before an immigration judge?

SANDERS: Certainly there is a process in order to go through. There are points of entry that asylum seekers should go to, and we encourage them to work through the system and not come across the border illegally.

In fact, anyone that goes to a port of entry seeking asylum will not be prosecuted, and we would encourage people to use the correct system and not try to break the law.

Q   And one more, on trade, and following up on what Blake asked about Harley-Davidson. They announced in an SEC filing they're moving a significant amount of their operations to Europe because of the EU tariffs that were placed on Harley-Davidson motorcycles. Is this what the President envisioned for what the impact would be by placing tariffs on the EU and the retaliation the EU has put on the U.S.?

SANDERS: Again, the European Union is trying to punish U.S. workers because they have engaged repeatedly in unfair trade practices, and the President is saying enough is enough. We'd like to work with the EU to work on a level playing field.

Sorry, Steve, I did come to you. Go ahead.

Q   Yes.  The President today in the Oval Office, sitting next to the King of Jordan, mentioned some progress in the Middle East peace process, but he didn't give us any specifics.  There's been quite a bit of shuttle diplomacy going on in the last few days in the Middle East with Jared Kushner and Jason Greenblatt.  Do you have anything concrete to tell us about any sort of positive movement whatsoever from all of this?

SANDERS:  Again, we think that the meetings that took place over the last week with Senior Advisor Jared Kushner and Special Representative Jason Greenblatt, they met with a number of officials and principals in Saudi Arabia, Jordan, Egypt, Israel, and Qatar last week.

They discussed the situation in Gaza as well as the next stages of the peace effort.  We're going to continue those conversations and we're committed to the peace effort, and we're going to keep working forward.  But those conversations were productive.

Julie.

Q   Sarah, the Commissioner of Customs and Border Protection said today that they're no longer going to be referring people who cross the border without authorization for criminal charges if they're traveling with children, which is essentially returned to the Obama administration practice and administrations before that.  Does the President support that approach?  And if so, does he regret trying to push forward on a zero-tolerance approach in the first place?

Q   No, the President certainly supports keeping families together, which he has outlined several times over the last week, but he's also called on Congress to actually fix the system.  They're the only ones that ultimately have the ability to change the law.  The President's executive order has given a temporary solution to the problem, but it's not permanent and we need Congress to step up.  We need Democrats to stop playing political games, do their jobs, work with this President, and let's fix the problem at the border.

Q   Can you talk about why you tweeted from your official account about the episode that you had the restaurant on Friday night?

SANDERS:  Sure.  I was responding to a number of news stories.  I'd been reached out to by over a dozen reporters and there were multiple news stories that had already been issued.  It was considered news of the day, so I responded in the way I would to any other news-of-the-day story.

Jeff.

Q   Sarah, you said just because you don't see a judge doesn't mean you don't get due process. Can you explain what you mean by that, specifically, and how the President envisions that this would work while still maintaining what the Constitution upholds in having a swift immigration system?

SANDERS:  Again, there are other ways for removal.  There are thousands of illegal aliens that are removed every month that don't see judges.  Sometimes that's through voluntary removal, and sometimes that's through expedited removal.  Again, the President's ultimate goal would be that we have actually a secure border and people aren't coming into the country illegally, but that we have a system that works and the people that come into the country come in through a legal system.

Q   What is the President doing specifically this week to ensure that Congress passes a bill?  He spent all week in Nevada talking about — or all weekend, excuse me, on Saturday — talking about how Democrats want open borders and crime.  But specifically, has he made phone calls to Republican members in the House where the bill is pending?  Has he tried to bring Democrats together?  What is he doing specifically to try and get a new law passed specifically, other than just railing against the current law?

SANDERS:  The President met with a number of lawmakers last week, talked with several over the weekend, some that he was with while he was traveling.  Last week, he made an open invitation to Democrat lawmakers that they were welcome to come to the White House to discuss what they'd like to see, because the President wants solutions.  We have yet to have any of them show up, actually willing to have those conversations, actually willing to fix the problem.  Instead, they'd rather rant and rave about not allowing members of the Trump administration to step foot in public.

The President wants to see solutions.  That's what we're focused on.  It's Congress's job to do that, and we've laid out very clearly that we want to be part of that and what we'd like to see in that package.

Q   Is Congress doing its job on this?

SANDERS:  Clearly, they aren't.  If they haven't passed a law to fix the system, then they haven't. Republicans have laid out a number of proposals that they support.  The President has voiced

his support for those.

Q    The bills are going to probably fail this week though.  The Republican bills will probably fail this week.

SANDERS:  That's because no Democrat will get on board and actually support a solution.

Q    (Inaudible) a Republican issue.  Republicans cannot pass these Republican bills.  What is the President doing as the leader of the party to try to get Republican —

SANDERS:  Jeff, these aren't Republican bills.  These are bills that fix a broken system.  They may have Republican sponsors, but these should be bipartisan.  This shouldn't be complicated. Look, the House has already passed over 500 pieces of legislation, but they can't get through the Senate because Democrats refuse to actually find solutions.  We have 50 bills that passed just last week to address the opioid crisis that passed through the House.  The Senate still hasn't taken then up.  Hopefully, they will.  And if they do, that will show that we actually can come up with bipartisan solutions.  And that's what we'd like to see them do on immigration as well.

Jill.

Q    Can I follow up on Julie's question about the zero-tolerance policy?  The President said last week, after signing the executive order, that he believed that zero tolerance was still important. You guys made a point of the fact that the EO did not actually get rid of the policy.  How does that square with the fact that CBP is now saying that they are no longer referring for prosecution any adults who come in with children?

SANDERS:  Again, this is a temporary solution.  This isn't going to last.  Congress still has to step up.  They still have to do their job.  This will only last a short amount of time, because we're going to run out of space, we're going to run out of resources in order to keep people together. And we're asking Congress to provide those resources and do their job.

Q    Some sort of a temporary solution.  Does that mean at some point you're going to change that policy back?

SANDERS:  We're not changing the policy.  We're simply out of resources.  And at some point, Congress has to do what they were elected to do, and that is secure our border, that is stop the crime coming into our country.  The country has made extremely clear that they don't want

open borders. And Democrats need to understand that, and they need to work with Republicans and find some solutions.

Q   And then just another one. Other people had several.

SANDERS: Sorry, Jill. I'm going to keep going. Annie, go ahead.

Q   Sarah, you mentioned the state of resources and running out of them. Can you be specific about what the resources are right now for housing parents and children together? Is there enough housing right now? Is the Pentagon stepping in? Like, what's being done about the resources?

SANDERS: Again, we're looking at every option available. We have asked the Pentagon to help with additional space. But a lot of that will depend on our ability to stop people coming into the country illegally. And we, again, encourage people to go through ports of entry instead of crossing the border illegally.

We've requested through legislation — we're working with Congress, hopefully — to provide more resources and the ability to actually enforce the law.

Ayesha.

Q   I just want to see if you can kind of narrow down exactly what the President actually intends to do when it comes to this idea of not having judges. You say that there are instances where people don't have judges. But my understanding is that if you do ask for asylum, you do have certain rights. So is there going to be a change in that policy? Or what is this administration planning to do to make it so you don't have to see a judge (inaudible)?

SANDERS: I've addressed this a couple of times. There are multiple instances in where you wouldn't: voluntary removal, certain cases of expedited removal. If somebody comes through a port of entry seeking asylum, those cases and that process will be heard. But at the same time, the President's ultimate goal is to secure the border and stop illegal immigration.

Q   I understand that. But so what does that mean practically? Like, is the President planning to do anything differently, or you're just saying he doesn't like the way things work now?

SANDERS:  The President has laid out what he'd like to see.  We've put out the things that we want to see in an immigration package months ago.  We're still waiting on Congress to give us the ability to do that.

Q   So unless Congress acts, nothing is actually going to change?  The administration is not changing anything right now when it comes to judges?

SANDERS:  You mean, are we walking around making up laws?  No.  Because we're not the Obama administration.  We're actually trying to enforce the laws that are on the books.  We're actually asking Congress to do their part in the process and pass new legislation that will fix our immigration system.

Q   So, but nothing is actually changing on the ground?  So this is — the President is complaining about judges and saying that we shouldn't have all these judges, and people who come over should just be put out, but nothing is actually going to change?  He's just saying — he's just complaining about the process as it stands now?

SANDERS:  Things that we have the ability to do administratively we are working to do.  But again, Congress is the only one that has the ability to write law, and we hope they'll do that this week.

Steve.

Q   Honing in on that point, I'm trying to understand what it is the President understands about the current policy.  Because as you've explained, expedited removal allows the government to remove hundreds of thousands of illegal immigrants a year without seeing judges.  Did the President know that when he issued the tweets?

SANDERS:  Yeah, but there are still thousands that go through a very lengthy process.  We'd like to see the process consolidated.  We'd like to see the backlog stopped.  We'd like to see our border secured.

Q   Well, just to follow up — under current law —

SANDERS:  Sorry, Steve, I'm going to keep moving.

Q   — there are a couple of things that the President could do.  He could expand that policy. You've said that he would like to see more expedited removal.  Does the President intend to expand it to the full two-year limit under the current statute?

SANDERS:  Again, we would like to see more expedited removal.  But ultimately, we would like to see the border secured and people stop coming into the country illegally.  That seems pretty simple to me.  And it would stop a lot of the problems, and would eliminate the need for so many of these additional laws.

Q   Thanks, Sarah.  You began the briefing talking about the importance of civility.  Do you consider it a civil policy to separate more than two-thirds of children from their parents?

SANDERS:  We consider enforcing the law the role that the administration has to play.  Certainly the President has taken an executive action to the furthest that he has the ability to do to minimize the separation of families.  We're working hard to make sure families get to stay together, and we're calling on Congress to help us in that effort.  And we're continuing to focus on the reunification and making sure that the families, again, stay together and that Congress will give us a permanent solution to fix that.

Q   Would you say that they're working to make families stay together?  It was your administration that separated them in the first place.

SANDERS:  It wasn't our administration that created these laws, but it is our administration's job to enforce it, and we've done that.  If someone breaks the law, it's our job to enforce it.  If somebody doesn't like the law, then they need to lobby Congress and ask them to change it.

Anita.

Q   I have one immigration question and wanted to clarify one thing.  So, I understand that not every adult with a child is going to be prosecuted.  If there are families that are being held together, detained together somewhere, and 20 days goes by, what is going to happen then?  I didn't get an answer about that last week.  I don't understand.  The law says you can't keep them together or keep the children — even with parents — for longer than 20 days.  So then what happens?

SANDERS:  Hopefully, Congress will pass a law and fix the problem.

Q   In the next 20 days?

SANDERS:  Well, why should it be so hard?  They all say that they don't want to separate families.  Seems like it should be pretty simple to me.

Q   I said I had a clarification.

SANDERS:  Go ahead.

Q   So Jeff asked you a question about Congress and the bill.  Were you, in your response, referring to just a standalone bill that deals with family separation?  Or were you referring to the bigger immigration bill that the House is supposed to take up this week?

SANDERS:  Our preference would be a bill that addresses all of the pillars that we've laid out that we'd like to see addressed in an immigration package.  And that's what our focus is right now, is there's a bill that does that on the table.  If that doesn't happen, then we'll talk about other pieces of legislation at that point.

Q   So the President still wants that bill to go forward even though he said they don't want to — they shouldn't waste their time?

SANDERS:  Look, Democrats in the Senate have made clear they're not going to support this.  And because we need at least some Democrats to get on board, they've made it very clear that they don't want to work with the President, that they don't want to fix our immigration system; that they'd rather have open borders and rampant crime than work with the President to create solutions.

Until they change their mind, we're going to continue looking at the best ways that we can fix these problems, but we need Congress to help us.

John.

Q   Thank you, Sarah.  This President is the first in the television age who has yet to address the American public on nationwide television from the Oval Office.  Many Republican consultants have said he might have a stronger hand in influencing Congress if he made a nationally televised address on immigration and what changes he'd like to see, to explain it.  Is that something that's on the table within the administration?

SANDERS: Certainly don't want to take anything off the table or any tool away from the President. He does address the American people in a number of different venues and formats. And I'll certainly pass along that suggestion to him.

Nadia.

Q   Just a follow-up on the Middle East. In the recent (inaudible), Mr. Kushner said that if President Abbas is not willing to negotiate, he's going to proceed with the deal. Can you explain how the White House is hoping to achieve any progress in the Middle East peace talks if the principal party is not taking part in it?

SANDERS: We're going to continue meeting with the other partners in the region. And again, we're going to continue pushing forward in the peace process. We had productive meetings over the last week, and we're going to continue those conversations.

I'll take one last question. Saagar.

Q   Thanks, Sarah. To follow up on the judges — on the issue of immigration judges, why is the President so opposed to an increase in the number of immigration judges when it would expedite the asylum processing — the asylum process and expedite deportation?

SANDERS: We're not opposed to the speeding up the process. What the President would like to see, once again, is that we stop the problem at the very beginning. He'd like to see us secure the border and people work through the system, through the ports of entry, so that we're not dealing with things on the back end. We'd like to stop the problem before it starts, and that's what the President's focus has been all along, is on securing the border. And that's what we're going to continue to do.

Thanks so much guys. Have a great day.

END

4:14 P.M. EDT

Exhibit J

6/29/2018     Donald J. Trump on Twitter: "We cannot allow all of these people to invade our Country. When somebody comes in, we must immedi…

Case 2:18-cv-00939-MJP    Document 16-1    Filed 07/02/18    Page 51 of 122

✕

 **Donald J. Trump** ✓
@realDonaldTrump

Follow ⌄

We cannot allow all of these people to invade our Country. When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came. Our system is a mockery to good immigration policy and Law and Order. Most children come without parents...

8:02 AM - 24 Jun 2018

**31,561** Retweets   **122,305** Likes

💬 48K    ⟲ 32K     122K

---

**jude** @Jude4America · Jun 24     ⌄
Replying to @realDonaldTrump
Absolutely! We cannot allow laws to be disregarded and eliminating the resouce drain of related court cases is brilliant! ▓▓▓ @POTUS The kind of thinking that gets my vote!!! ▓▓▓

💬 271    ⟲ 36     226

**chvrch lights** @ChvrchLights · Jun 24     ⌄
Supreme Court of the United States: "the Due Process Clause applies to all persons within the United States, including aliens, whether their presence is lawful, unlawful, temporary, or permanent" Zadvydas v. Davis (2001)

💬 65    ⟲ 318     2.3K

**Piec Pisano** @PiecP · Jun 25     ⌄
You might want to check that one Again, more carefully. One example of question and application is pretty flimsy.

💬    ⟲

**VOTE REPUBLICAN**    @Army_Of_Trump · Jun 24     ⌄
Replying to @realDonaldTrump
Yessssssssss! THIS! Mr. President, we want this. We are being INVADED and it is unlawful - so why should we accommodate the people who are crossing unlawfully? We shouldn't! Just turn them around and send them OUT! They can

# Exhibit K

# Congress of the United States
## Washington, DC 20515

June 22, 2018

Dear Inspectors General Kelly and Levinson:

We are deeply concerned about the Department of Justice's so-called "zero-tolerance" policy that has led to the systematic separation of immigrant children from their parents. Moreover, we are gravely disturbed about reports on children being separated from their parents and the possibility that they will never be reunited again. We are alarmed by the quality of recordkeeping for these families by the Departments of Homeland Security and Health and Human Services.

A *New York Times* article reported that Elsa Johana Ortiz Enriquez was deported without her son. "An immigration officer handed her a handwritten note on a pink slip of paper with the words, 'Call Shelter Son' and a telephone number. ...[but] she was deported before she could use it." This is an example of what appears to be a lack of quality recordkeeping to reunite parents with their children.

Therefore, we urge you to conduct an immediate investigation on DHS' and HHS' recordkeeping of children and parents who are being separated. Specifically, we would like the following questions to be answered in the report:

1. Do DHS and HHS keep separate records or is it one system to track the parents and their children? How are DHS and HHS keeping records of parents and children? What system(s) are the Departments using?
2. How quickly (average time) can DHS and/or HHS locate a child's parent? Is there an electronic database? Is it a paper file?
3. What is the process for DHS and HHS to reunite parents with their children? Which is the lead Department to reunite the families?
4. If parents are deported without their children, what is the process of reuniting the parents with their children?
5. Can every separated child be accounted for in DHS' and/or HHS' recordkeeping linking them to their parent, so that they can be reunited?

Given the time-sensitive nature of this ongoing matter, we urge you to begin a timely and complete review of the Departments' record-keeping of immigrant families. Please provide us with a response confirming that your respective offices will be reviewing DHS and HHS recordkeeping by the close of business on Friday, June 29th.

Sincerely,

_[signatures]_

Michael E. Capuano

Katherine M. Clark

Ed Perlmutter

Tulsi Gabbard

Tony Cárdenas

Ron A Brady

Kathy Castor

Yvette D. Clarke

David Price

Terri Sewell

_(signatures)_

A. Donald McEachin

Fil Vela

Jim McGovern

Mark L. Harding

Joe Courtney

David Leichlin

Thomas R. Suozzi

D. Ryan Jr.

Alan Lowenthal

Joe Kessen

Denny Heck

Jamie Raskin

Suzanne Bonamici

Dan Satt

Judy Chu

Nita M. Lowey

Kim F. King

Dan Kildee

Eric Swalwell

NC-01

_Elizabeth H. Esty_

_Brendan F. Boyle_

_Joe E. Sury_

_Clubur_

# Exhibit L

TREY GOWDY, SOUTH CAROLINA
CHAIRMAN

ONE HUNDRED FIFTEENTH CONGRESS

ELIJAH E. CUMMINGS, MARYLAND
RANKING MINORITY MEMBER

# Congress of the United States
## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY   (202) 225–5074
MINORITY   (202) 225–5051

http://oversight.house.gov

June 22, 2018

The Honorable Kirstjen M. Nielsen
Secretary
Department of Homeland Security
245 Murray Lane SW
Washington, D.C. 20528

The Honorable Alex M. Azar II
Secretary
Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

The Honorable Jeff Sessions
Attorney General
Department of Justice
950 Pennsylvania Aveneue, NW
Washington, D.C. 20530

Dear Secretary Nielsen, Secretary Azar, and Attorney General Sessions:

The Trump Administration's policy of separating children from their parents at the border has been a travesty at all levels. Although President Trump now claims to have reversed this inhumane policy, he has not explained how thousands of children will be reunited with their families. You have a moral responsibility to remedy these grave mistakes and reunite these children with their parents immediately.

We are writing to demand an accounting of every baby, infant, toddler, and child that you stripped from his or her parents. We also insist that you immediately provide Congress with a coordinated, interagency plan to ensure that every child is returned to his or her parents and that no parents are deported while their children remain in custody in the United States.

The Trump Administration reportedly separated 2,342 children from 2,206 parents between May 5 and June 9 of 2018—a rate of 65 children a day.[1]

Multiple reports indicate that, before implementing this new policy, your agencies failed to put in place adequate protocols to reunite children and their parents at the resolution of these proceedings:

---

[1] *New Statistics: The Government is Separating 65 Children a Day from Parents at the Border*, Vox (June 19, 2018) (online at www.vox.com/2018/6/19/17479138/how-many-families-separated-border-immigration).

The Honorable Kirstjen Nielsen
The Honorable Alex M. Azar II
The Honorable Jeff Sessions
Page 2

No protocols have been put in place for keeping track of parents and children concurrently, for keeping parents and children in contact with each other while they are separated, or for eventually reuniting them. [2]

Multiple reports also indicate that your agencies have been deporting parents without their children:

On Wednesday, the President signed an executive order that he claimed would halt the separations, but it made no mention of the families who had already been split up. They have been left in limbo. Some parents have already been deported, while their children remain in the U.S.[3]

Former Immigration and Customs Enforcement Acting Director John Sandweg recently warned that because of your failures, "there is a very high risk" that some of these children could be separated "permanently" if their parents are deported without them.[4]

Intentionally and permanently separating children from their families is simply not an outcome we can accept as Americans.

For these reasons, we request that you produce, by June 28, 2018, the following information for each child separated from his or her parents pursuant to the Trump Administration's "zero tolerance" policy:

(1)     the name, age, gender, country of origin, and alien identification number, if any, of the separated child;

(2)     all locations and facilities in which the separated child has been, and is currently being, detained, and the dates on which the child was in each facility;

(3)     if the separated child is awaiting transfer to a different facility, the name and location of the facility and the date of the planned transfer;

(4)     the name, age, gender, and country of origin, and alien identification number, if any, of the parent or parents of the separated child;

---

[2] *The Government Has no Plan for Reuniting the Immigrant Families It is Tearing Apart*, New Yorker (June 18, 2018) (online at www.newyorker.com/news/news-desk/the-government-has-no-plan-for-reuniting-the-immigrant-families-it-is-tearing-apart).

[3] *Mothers in a New Mexico Prison Do Not Know How to Find Their Children,* New Yorker (June 21, 2018) (online at www.newyorker.com/news/dispatch/mothers-in-a-new-mexico-prison-do-not-know-how-to-find-their-children).

[4] *'I Can't Go Without My Son,' a Mother Pleaded as She Was Deported to Guatemala*, New York Times (June 17, 2018) (online www.nytimes.com/2018/06/17/us/immigration-deported-parents.html).

The Honorable Kirstjen Nielsen
The Honorable Alex M. Azar II
The Honorable Jeff Sessions
Page 3

    (5)    the date and location of the detainment and arrest of the parent or parents of the separated child;

    (6)    all locations and facilities in which the parent or parents of the separated child have been, and are currently being, detained, and the dates on which the parent or parents were in each facility;

    (7)    the date and location of the separation of the child from his or her parents;

    (8)    the date and location of family reunification, if it has occurred;

    (9)    whether the parent or parents of the separated child presented themselves to U.S. officials for asylum, and if so, the status of the asylum case;

    (10)    if the parent or parents of the separated child were deported, the date, location, and destination of the deportation; and

    (11)    if the separated child has a sibling in the United States, the detention facility, shelter, foster home, or other facility in which the sibling has been, or is currently being, detained.

In addition to producing this information, we request that you provide a briefing by June 28, 2018, detailing the specific processes you will utilize to reunite each and every one of these separated children with his or her parents, as well as the manner in which you will ensure that parents are not deported without their children.

Thank you for your prompt attention to this request.

Sincerely,

The Honorable Kirstjen Nielsen
The Honorable Alex M. Azar II
The Honorable Jeff Sessions
Page 4

cc:    The Honorable Trey Gowdy, Chairman

# Exhibit M

# Congress of the United States
## Washington, DC 20515

June 27, 2018

Secretary Alex M. Azar II
The U.S. Department of Health & Human Services
Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C. 20201

Director Scott Lloyd
Office of Refugee Resettlement
Administration for Children and Families
U.S. Department of Health & Human Services
Mary E. Switzer Building
330 C ST SW
Washington DC 20201

Dear Secretary Azar and Director Lloyd:

We are deeply concerned by recent reports that the Office of Refugee Resettlement (ORR) is allegedly mistreating children in custody. We understand that these are allegations, and we want to give you the opportunity to refute and explain what is happening to children in your care. We also are willing to visit shelters, meet with staff and meet children in these facilities.

We understand that more than 10,000 migrant children currently reside in ORR custody. Many of these children are at critical stages in their development and many are under the age of thirteen. Also, a majority of these children enter ORR with a history of stress and trauma. After forced displacement from their home country due to uncontrolled gang and gender violence, travel to the United States with exposures to temperature extremes, injury, sleep deprivation and sometimes violence or kidnapping, these children are vulnerable and fragile.

We are deeply troubled by the Trump Administration's family separation policy. There is absolutely no reason why these children, who have already been traumatized, should be forced to experience the worst trauma possible, the loss of a parent or caregiver. Stress is worsened when children are removed from their families and placed in inappropriate custody arrangements. According to the American Academy of Pediatrics, "highly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health. This type of prolonged exposure to serious stress - known as toxic stress - can carry lifelong consequences for children."[i]

There are several documented cases of abuse and mismanagement at ORR shelters. According to an NPR account, a former shelter employee of a Southwest Key shelter in Tucson reported that the shelter lacked trained staff to handle the influx of younger, more traumatized children. The NPR account also described cases at a Texas shelter where children were being denied human contact and comfort even though human contact and emotional support are essential to child development.[ii][iii] A Texas Tribune report described immigrant children being forcibly injected with drugs at the Shiloh Treatment Center in Manvel, Texas.[iv] It also found that private companies received more than $1.5 billion in the past four years to operate immigrant youth

shelters, even though these shelters were accused of serious lapses in care, including neglect and sexual and physical abuse. In nearly all these cases, the Tribune report found that the federal government still continued contracts with the companies after these allegations were raised.

There are also documented cases of abuse and mismanagement at ORR-affiliated facilities. According to the Associated Press, migrant children held at the Shenandoah Valley Juvenile Center in Staunton, Virginia are suffering from severe mistreatment and abuse at the hands of guards. These children are reportedly routinely beaten while shackled at the hands and legs, subject to long periods of solitary confinement, and "stripped…of their clothes and strapped…to chairs with bags placed over their heads."[v] Such allegations of abusive treatment are particularly disturbing since, according to the Shenandoah Valley Juvenile Center, many of these children— as young as 14 years of age—suffer from severe mental health issues related to the trauma faced in their home countries.

Abuse of children is never acceptable and we are concerned that these immigrant children, with their existing vulnerabilities, are falling prey to neglect and intentional harm. We look forward to hearing the ways in which ORR is responding to these allegations and the steps you are taking to revoke government contracts when appropriate.

We would also like to understand the steps ORR is taking to reunite children with parents who were forcibly separated at the Southern border. We are concerned that ORR is failing to effectively coordinate with DHS to ensure communication and reunification for separated children and their parents.[vi] Many parents do not know where their children are detained, or how they will reconnect and reunite with them.[vii] Advocates and lawyers also report that an April DHS-HHS Memorandum of Agreement[viii] mandating continuous information sharing has both exacerbated family separation and undermined protections for children.

The memorandum has made it difficult for ORR to secure sponsors because it requires potential sponsors' fingerprints, the fingerprints of all adults living in the potential sponsor's home, and other data be sent to ICE. ICE has publicly stated its intent to use that information to identify people subject to immigration arrest and deportation.[ix] The collective operation of these policies keeps children apart from parents and family members for weeks, months, or even years longer than they might have otherwise, exacerbating family separation.

We are concerned that ORR, an office within the Department of Health and Human Services, is failing to protect the health of these children and is actively working in ways that harm children. We ask that ORR work with the American Academy of Pediatrics, Save the Children, and UNICEF to ensure that children are treated appropriately.  We look forward to reviewing your response to these important concerns in a prompt fashion.

Sincerely,

Donald S. Beyer Jr.

Jared Polis

Ed Perlmutter

Adriano Espaillat

Suzan K. DelBene

Henry C. "Hank" Johnson, Jr.

Darren Soto

Gerald E. Connolly

Barbara Lee

Zoe Lofgren

Sheila Jackson Lee

Jamie Raskin

Jimmy Panetta

G. K. Butterfield

Grace Meng

Eleanor Holmes Norton

Ben Ray Luján

Michelle Lujan Grisham

Alan Lowenthal

Bill Foster

Luis V. Gutiérrez

Salud Carbajal

Debbie Wasserman Schultz

Terri A. Sewell

Ro Khanna

Michael E. Capuano

Cheri Bustos

Gwen Moore

Pramila Jayapal

Nanette Diaz Barragán

James P. McGovern

Karen Bass

Albio Sires

Steve Cohen

Eddie Bernice Johnson

Carolyn B. Maloney

Joseph P. Kennedy, III

John Lewis

John Yarmuth

Diana DeGette

Pete Aguilar

Dwight Evans

Earl Blumenauer

A. Donald McEachin

Daniel T. Kildee

Sean Patrick Maloney

Seth Moulton

Judy Chu

Jim Cooper

J. Luis Correa

Bill Pascrell, Jr.

Suzanne Bonamici

Mark Pocan

Sander Levin

Peter Welch

Gregory W. Meeks

Anthony G. Brown

Scott H. Peters

Dina Titus

José E. Serrano

Grace F. Napolitano

Ruben J. Kihuen

Alcee L. Hastings

Donald M. Payne, Jr.

Eliot L. Engel

Rick Larsen

Doris Matsui

Jimmy Gomez

Mark Takano

Cedric L. Richmond

Adam Smith

Carol Shea Porter

Jared Huffman

Ted W. Lieu

Raúl M. Grijalva

Robin L. Kelly

Mike Quigley

[i] "AAP Statement Opposing Separation of Children and Parents at the Border." *American Academy of Pediatrics*, May 5, 2018. https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/StatementOpposingSeparationofChildrenandParents.aspx; Goudarzi, Sara. "Separating Families May Cause Lifelong Health Damage." *Scientific American,* June 20, 2018. https://www.scientificamerican.com/article/separating-families-may-cause-lifelong-health-damage/; "About the CDC-Kaiser ACE Study." *CDC.* https://www.cdc.gov/violenceprevention/acestudy/about.html

[ii] "Doctors Concerned About 'Irreparable Harm' To Separated Migrant Children." NPR, June 15, 2018. https://www.npr.org/2018/06/15/620254326/doctors-warn-about-dangers-of-child-separations; Goudarzi, Sara. "Separating Families May Cause Lifelong Health Damage." *Scientific American,* June 20, 2018. https://www.scientificamerican.com/article/separating-families-may-cause-lifelong-health-damage/;

[iii] Evan L Ardiel, Catharine H Rankin. "The importance of touch in development." Paediatr Child Health. 2010 Mar; 15(3): 153–156. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2865952/

[iv] Smith, Matt, Aura Bogado. "Immigrant children forcibly injected with drugs at Texas shelter, lawsuit claims." *The Texas Tribune,* June 20, 2018. https://www.texastribune.org/2018/06/20/immigrant-children-forcibly-injected-drugs-lawsuit-claims/

[v] Biesecker, Michael, Pearson, Jake, Garance Burke. "Governor orders probe of abuse claims by immigrant children." *Associated Press,* June 21, 2018. https://apnews.com/afc80e51b562462c89907b49ae624e79

[vi] Nussbaum, Matthew, Johnson, Eliana, Nancy Cook. "Trump's herky-jerky immigration moves sow confusion." *Politico,* June 21, 2018. https://www.politico.com/story/2018/06/21/trump-administration-family-separations-conflicting-statements-662618

[vii] Domonoske, Camila, Richard Gonzales. "What We Know: Family Separation And 'Zero Tolerance' At The Border." *NPR,* June 19, 2018. https://www.npr.org/2018/06/19/621065383/what-we-know-family-separation-and-zero-tolerance-at-the-border; Blitzer, Jonathan. "The Government Has No Plan for Reuniting the Immigrant Families it is Tearing Apart." *The New Yorker,* June 18, 2018. https://www.newyorker.com/news/news-desk/the-government-has-no-plan-for-reuniting-the-immigrant-families-it-is-tearing-apart

[viii] https://www.scribd.com/document/380771850/HHS-DHS-MOA-signed-2018-04-13-1?campaign=SkimbitLtd&ad_group=66960X1516588X042e8fb5fc66fefd94e882d0a950ef95&keyword=660149026&source=hp_affiliate&medium=affiliate; Nilsen, Ella. "Kids who cross the border meet with therapists and social workers. What they say can be used against them." *Vox,* June 19, 2018. https://www.vox.com/policy-and-politics/2018/6/18/17449150/family-separation-policy-immigration-dhs-orr-health-records-undocumented-kids; Palma, Bethania. "Agreement Between Refugee Agency and ICE to Share Sensitive Information Raises Concerns." *Snopes,* June 2, 2018. https://www.snopes.com/news/2018/06/02/agreement-refugee-agency-ice-share-sensitive-information-raises-concerns/; https://www.federalregister.gov/documents/2018/05/08/2018-09902/privacy-act-of-1974-system-of-records

[ix] https://www.regulations.gov/document?D=DHS-2018-0013-0001

Exhibit N

6/29/2018      Separated families: Why it's so difficult to reunite migrant parents with their children - The Washington Post

Case 2:18-cv-00939-MJP   Document 16-1   Filed 07/02/18   Page 76 of 122

 The Washington Post

The Americas

The chaotic effort to reunite immigrant parents with their separated kids

by Kevin Sieff June 21  ✉Email the author

BROWNSVILLE, Tex. — Each of the mothers had a different memory of the moment she was separated from her child. For some, it was outside a Border Patrol station just north of the Rio Grande, shortly after being apprehended. For others, it was after an interrogation by federal authorities in a bitterly cold air-conditioned office.

Jodi Goodwin, an attorney in Harlingen, Tex., has heard more than two dozen variations of those stories from Central American mothers who have been detained for days or weeks without their children. So far, she has not been able to locate a single one of their offspring.

"It's just a total labyrinth," she said.

Even though the Trump administration has halted its policy of separating illegal border crossers from their children, many of the over 2,300 youths removed from migrant parents since May 5 remain in shelters and foster homes across the country. The U.S. government has done little to help with the reunifications, attorneys say, prompting them to launch a frantic, improvised effort to find the children — some of them toddlers.

One legal aid organization, the Texas Civil Rights Project, is representing more than 300 parents and has been able to track down only two children.

"Either the government wasn't thinking at all about how they were going to put these families back together, or they decided they just didn't care," said Natalia Cornelio, with the organization.

*[Border Patrol will stop referring migrant parents with children for prosecution, official says]*

Government officials say they have given detained parents a flier with a toll-free number for the Office of Refugee Resettlement, the U.S. agency that is usually in charge of providing shelter for unaccompanied immigrant children. But not a single one of Goodwin's clients had received one, she said. Lawyers maintain that when they have called the number, often no one answered. In some cases, when someone did pick up, that person refused to offer details of where children had been taken, the lawyers said.

"You wait and wait for no information," said Jerry Wesevich, an attorney at Texas Rio Grande Legal Aid who is suing the government over the family separations.

Further complicating matters are bureaucratic errors that could leave government officials unaware that a child's parent is detained in the United States. Attorneys also worry that some toddlers, or children who speak indigenous languages, might not have been able to give officials their parents' complete names.

Because of such complications, attorneys and former U.S. officials have begun speaking about the possibility of "permanent separations."

In the case of one Guatemalan family, the Border Patrol failed to note in its apprehension report that a mother and daughter crossed the border together, according to Wesevich. Without that information, government officials might not be aware that the child's parent is detained in the United States.

In other cases, Cornelio said, children arrive at shelters without the facility knowing that they have been separated from their parents, meaning they could be considered unaccompanied minors rather than children in need of reunification.

*[Trump didn't invent family separation, but his administration was willing to try it]*

The Office of Refugee Resettlement typically tries to find family members, foster parents or sponsors to take in children in its care. But it can take weeks before such people are approved to receive the children. That process normally applies to children who arrived in the United States without a relative.

"For the minors currently in the unaccompanied alien children program, the sponsorship process will proceed as usual," Kenneth Wolfe, a spokesman for the Department of Health and Human Services, said in a statement on Wednesday. The refugee resettlement office is part of HHS.

The U.S. government spent months developing the family-separation system, but authorities were struggling on Thursday to figure out how to reunite detained parents with children. There was no system for Immigration and Customs

6/29/2018  Separated families: Why it's so difficult to reunite migrant parents with their children - The Washington Post

Case 2:18-cv-00939-MJP  Document 16-1  Filed 07/02/18  Page 77 of 122

Enforcement, which handled the parents' cases, to work on the issue with the refugee resettlement office, which is responsible for the children.

Spokesmen at the Office of Refugee Resettlement did not immediately respond to requests for comment.

Attorneys have described heart-wrenching meetings with their clients, who ask again and again for information about their children, often weeping in South Texas detention centers.

"We have to say, 'We don't know where your child is. The government is responsible for keeping your child safe,'" Wesevich said. "No parent would be satisfied with that."

Goodwin said: "I tell them, 'I'm not going to lie to you if I don't know where your child is.' "

Some attorneys have been able to confirm with the government that their client's child is in custody, but even in those cases, government authorities have often been unwilling to arrange phone calls between the two, or provide details about where the child is held, lawyers said.

"Reunification is obviously the goal, but they won't even set up a phone call, so a parent can know that a child is safe," said Rochelle Garza, an attorney in Brownsville, Tex.

In the absence of government assistance, attorneys have developed their own ad hoc system of tracking down the children of their clients. They ask the parents for the children's names and then pass those along to legal organizations — many of them federally funded — that are representing the undocumented children.

But because the children's lawyers are overwhelmed by their caseloads, responses can take days or weeks.

On Thursday morning, Goodwin began training a "rapid-response team" of volunteer lawyers who arrived from Washington, D.C., to help with the reunifications and asylum claims. Other lawyers waited outside a detention center in Brownsville, Tex., to meet some of the parents.

In some cases, there's an especially urgent need for reunifications. On Thursday morning, the cases of 17 undocumented parents were dismissed in a federal court in McAllen, Tex., a possible shift away from the Trump administration's zero-tolerance policy.

"But the children are still detained and there's no reunification plan," Cornelio said.

Erik Hanshew, an assistant public defender in El Paso, described dealing with the refugee resettlement office as a "chaotic and byzantine" process in an op-ed for The Washington Post this week.

"Some of our investigators have waited nearly an hour just to get a person on the line. And once they find someone, their inquiries are met with vague statements that the child is in the United States," he wrote.

**Read more**

As border crossings surge, a Mexican couple tests Trump's policies

El Salvador warns migrants against traveling to the U.S.

A 10-year-old with Down syndrome was taken from her immigrant mom, Mexico says

Today's coverage from Post correspondents around the world

Like Washington Post World on Facebook and stay updated on foreign news

 **5.5k Comments**

 **Kevin Sieff**
Kevin Sieff has been The Washington Post's Latin America correspondent since 2018. He served previously as the paper's Africa bureau chief and Afghanistan bureau chief. Follow 🐦

6/29/2018 Separated families: Why it's so difficult to reunite migrant parents with their children - The Washington Post

Case 2:18-cv-00939-MJP Document 16-1 Filed 07/02/18 Page 78 of 122

# Exhibit O

Case 2:18-cv-00939-MJP Document 16-1 Filed 07/02/18 Page 80 of 122

# The New York Times

## *Teenager Is Missing After Walking Away From Migrant Children's Center in Texas*

**By Mihir Zaveri and Manny Fernandez**

June 24, 2018

A 15-year-old migrant boy who was housed in a large shelter near the southern tip of Texas walked off its premises on Saturday and disappeared into the borderland, officials said.

The shelter, a former Walmart in Brownsville, Tex., that was repurposed as the largest migrant child care center in the country, has come under intense scrutiny as children who were separated from their parents under President Trump's "zero tolerance" policy began being housed there.

On Sunday, the nonprofit group Southwest Key Programs, which operates the center known as Casa Padre, confirmed that the teenager was missing.

The news of a teenager's departure came as company officials sought to reassure members of Congress and the news media who had toured the center that the roughly 1,500 boys living there, aged 10 to 17, were well cared for and closely monitored.

A spokesman for Southwest Key, Jeff Eller, said on Sunday it could not legally require children to stay on the premises if they sought to leave, and that "from time to time" children had left several of its 27 shelters for immigrant children.

"We are not a detention center," Mr. Eller said in a statement. "We talk to them and try to get them to stay. If they leave the property, we call law enforcement."

Federal officials echoed that position, saying they could not stop a child who attempted to leave. The officials did not respond to a question about how many children had walked away from migrant centers nationwide.

Mr. Eller said that less than 1 percent of all of the children who have come through Southwest Key's centers have left, though he declined to provide specific numbers.

The revelation that children can leave such centers on their own raised a host of questions about the shelter system: What happens to their immigration proceedings; how family members can reunite; whether they can sidestep the lengthy process of being approved for release to a parent or sponsor; and who is responsible for their safety, especially in an area like the Rio Grande Valley, one of the busiest corridors for human trafficking.

Michelle Brané, the director of the migrant rights and justice program at the Women's Refugee Commission, a research and advocacy organization, said that while groups like Southwest Key cannot act in a law enforcement capacity and lacked the authority to "tackle a kid and restrain them," officials there must call the authorities when children leave the premises because they are technically in federal custody.

It is possible the children who leave simply want to "go find their parents," she said, adding, "If children are running away, that raises questions about the care that's being provided."

Mr. Eller said the teenager left Casa Padre at 3 p.m. on Saturday and did not return. Staff members tried to keep the boy there, as they do with all children who want to leave, he said.

"It's a conversation, a conversation that we're here to help you, we're here to help you get back with your family," he said. "We can't help you if you decide to leave."

The teenager's leaving was reported to the police in Brownsville, who did not respond to requests for comment on Sunday.

Federal officials said the boy had presented himself at the border alone. If the teenager is found, he will go back into the custody of the Department of Homeland Security and be referred again to the Office of Refugee Resettlement, officials said.

Tony Martinez, the mayor of Brownsville, said he could not recall a previous case of a child walking away from Casa Padre.

"If the facility was such a great idea, why are they trying to get out?" he said on Sunday. "Most of the people that escape, they escape from jails. They escape from prisons, because it's not a fun place to be at. I can just imagine what might be going through that young man's head, at 15 years old: 'What am I doing here?'"

Representative Filemon B. Vela Jr., a Democrat who represents Brownsville, toured Casa Padre with other Democrats and said it was "difficult to comprehend how a child could escape the facility."

"For now, we can only pray for the child's well-being and hope that authorities are able to find him," he said.

Controversy over Mr. Trump's immigration policy erupted after the federal government announced that it would pursue a "zero tolerance" policy of prosecuting every adult who illegally crossed the border or tried to.

After intense public pressure, Mr. Trump signed an executive order on Wednesday meant to end the separation of families at the border by detaining them together for an indefinite period instead.

Case 2:18-cv-00939-MJP Document 16-1 Filed 07/02/18 Page 82 of 122

On Saturday, the government said it had reunited 522 migrant children who were separated from adults, and was seeking to reunite the more than 2,000 other children in federal custody who were also separated.

The Casa Padre shelter, a state-licensed child care facility, houses two sets of undocumented youth — those who were separated from their relatives by the Trump administration's family-separation policy and those, like the missing teenager, who had illegally crossed the border unaccompanied by a parent or guardian. The majority were unaccompanied youth.

Melissa Gomez and Matt Stevens contributed reporting.

A version of this article appears in print on June 24, 2018, on Page A13 of the New York edition with the headline: Migrant Boy Slips Away From a Shelter in Texas

# Exhibit P

CHAD A. READLER
Acting Assistant Attorney General
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
COLIN KISOR
Deputy Director
SARAH B. FABIAN
Senior Litigation Counsel
U.S. Department of Justice
Office of Immigration Litigation
District Court Section
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | Case No. CV 85-4544-DMG |
| Plaintiffs, | **DEFENDANTS' NOTICE OF COMPLIANCE** |
| v. | |
| JEFFERSON B. SESSIONS III, Attorney General of the United States; *et al.*, | |
| Defendants. | |

The Government's June 21, 2018, ex parte application explained that the Flores Agreement—as interpreted by this Court and the Ninth Circuit—put the Government in the difficult position of having to separate families if it decides it should detain parents for immigration purposes. Defendants wish to inform the Court that, following the filing of our application to this Court, a federal district court in the Ninth Circuit held that such separation likely violates substantive due process under the Fifth Amendment. *Ms. L v. U.S. Immigration and Customs Enforcement*, No. 18-428 (S.D. Cal. June 26, 2018) (attached as exhibit). The *Ms. L* court certified a class and entered a class-wide preliminary injunction requiring reunification—both for parents released into the interior of the United States and for parents in DHS custody— and barring future separations for families in DHS custody.

Defendants are submitting this notice of compliance to explain how the government is applying the Flores Agreement in light of this injunction. To comply with the *Ms. L* injunction barring parents in DHS custody from being separated from their children, the Government will not separate families but detain families together during the pendency of immigration proceedings when they are apprehended at or between ports of entry. As explained below, we believe that the Flores Agreement permits the Government to detain families together to comply with the nationwide order in *Ms. L.* We nevertheless continue to believe that an

1

amendment of the Flores Agreement is appropriate to address this issue.  Until that amendment, this submission sets out the Government's interpretation and application of the Agreement in light of *Ms. L.*

**A.**  There are many legitimate justifications for detaining arriving aliens under the immigration laws, including well-established rules that allow arriving aliens at the border to be detained pending a determination of whether they may legally be admitted to the United States.  Such detention, which Congress has made mandatory in many circumstances under 8 U.S.C. § 1225(b), is essential to protecting our southwest border, discouraging families that are not entitled to remain in this country from making the dangerous journey to the border, and returning families promptly when they are not entitled to relief in this country.  *See Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018); *cf. Demore v. Kim*, 538 U.S. 510, 526 (2003) (discussing the Supreme Court's "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings").

We have explained over a period of years that one impact of the *Flores* requirements, if applied to minors that come into DHS custody accompanied by their parents, would be the separation of parents from their children.  In construing the Flores Agreement, over the government's objection, to apply to children taken into custody with their families, the Ninth Circuit understood that the separation of

parents from their children was a direct consequence of its holding.  *Flores v. Lynch*, 828 F.3d 898, 908-09 (9th Cir. 2016).  But the Ninth Circuit also made clear that neither the Flores Agreement nor court rulings applying it impose any legal barrier on the critical authority of DHS to detain adults who come into immigration custody at the border with their children.  *Flores*, 828 F.3d at 908-09.

The *Ms. L* court reached the same conclusion in considering the situation of the separation of accompanied children from their parents, this time from the point of view of the parents, who were not parties to the *Flores* case or the Settlement Agreement.  The *Ms. L* court issued class-wide relief requiring that, in most circumstances, parents be kept with their children during the pendency of immigration proceedings.  Notably, like the Ninth Circuit, the court in *Ms. L* recognized the authority of DHS to detain parents in immigration custody pending resolution of their immigration cases.  As the court emphasized, even in light of the court's injunction requiring families to be kept together and reunified, the "Government would remain free to enforce its criminal and immigration laws, and to exercise its discretion in matters of release and detention consistent with law." Order at 20; *see also id*. at 3 ("Order does not implicate the Government's discretionary authority to enforce immigration laws . . . including its decision to release or detain class members.").  Thus, while the Government must keep families together when it chooses to exercise its discretion to detain or release a

parent under the INA, the court cited the *Flores* in explaining that the Government otherwise remains "free" to exercise "discretion in matters of release and detention." *Id* at 20 (citing *Flores*); *see id*. at 7 (for "children placed in federal custody, there are two options," the first option is separating the family and placing the child alone in ORR custody and "the second option is family detention").

**B.** Reading the Flores Agreement together with the subsequent nationwide order in *Ms. L*, we understand the courts to have provided that minors who are apprehended with families may not be separated from their parents where it is determined that continued detention is appropriate for the parent. The Flores Agreement allows this result for two reasons.

*First*, the Agreement's express terms accommodate court orders like the one recently issued in *Ms. L*. Paragraph 12A of the Flores Agreement provides for the release of minors to a parent (or others) when possible under Paragraph 14 or, alternatively, transfer to an appropriate facility with a licensed program under Paragraph 19. *See Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016) ("Settlement creates a presumption in favor of releasing minors and requires placement of those not released in licensed, non-secure facilities that meet certain standards"). But these provisions include exceptions to releasing or transferring minors to accommodate a ruling like that in *Ms. L* requiring families to be kept together, and those exceptions permit family detention in these circumstances.

*Release provision.*  In Paragraph 14, the Flores Agreement specifies that a minor should be "release[d] from its custody *without unnecessary delay*" to a parent or other relative.  Flores Agreement ¶ 14 (emphasis added).  The court's order in *Ms. L*, which requires that the minor be kept with the parent, makes delay necessary in these circumstances.  The minor cannot be released under Paragraph 14 without separating him or her from their parent, as such a separation would violate the injunction issued in *Ms. L.  See Ms. L* Order at 22 (DHS is "enjoined from detaining Class Members in DHS custody without and apart from their minor children").  Under those circumstances, the release of the minor from custody must be "delay[ed]" pursuant to the Agreement during the period the parent is detained by DHS.  Flores Agreement ¶ 14.  Indeed, the court's order in *Ms. L* envisions that a parent would be "reunited with the child *in DHS custody*" and that a child would be released only "*[i]f Defendants choose* to release Class Members [*i.e.*, parents] from DHS custody" or if a parent consents.  Order at 23 (emphasis added).  This application of the Flores Agreement is also consistent with another aspect of Paragraph 14 of the Agreement – which sets placing the minor with "a parent" as the first "order of preference."  Flores Agreement ¶ 14; *id.* ¶ 18 (requiring "continuous efforts . . . *toward family reunification* and . . .  release") (emphasis added); *see Flores*, 828 F.3d at 903 ("[t]he settlement creates a presumption in favor of release *and favors family reunification*") (emphasis added).

*Transfer provision*.  The Flores Agreement also permits transfer of a child to a licensed program under Paragraph 19.  *See* Flores Agreement ¶ 12A.  Under Paragraph 12A, during an influx DHS is required to transfer a minor for placement in a licensed program "as expeditiously as possible."  *Id*. ¶ 12A.3.  But the obligation to transfer applies "except . . . as otherwise required by any court decree or court-approved settlement."  *Id*. ¶ 12A.2.  Here, the court decree in *Ms. L* prohibits the transfer of the minor to a licensed program, because such a transfer would separate the child from his or her parent.  *Ms. L* Order at 22.  A transfer therefore cannot occur consistent with that court decree.[1]

**Second**, both *Ms. L* and *Flores* expressly envision that adults who arrive at the United States with children are properly subject to detention – a critical aspect of border enforcement.  Given that express conclusion in each decision, it would be remarkable to read the orders together as mandating the opposite conclusion – that detention may never occur.  Doing so would undermine the express holdings in both cases.  *Ms. L*, for its part, held that DHS would retain the same authority to detain the parent as it had before – it simply required that such detention be of the

---

[1] The issue regarding how the Flores Agreement licensing provisions apply to family detention centers is the subject of ongoing litigation.  But to the extent that family detention centers are treated as licensed consistent with the Flores Agreement, a transfer under this provision could occur consistent with *Ms. L*.  We have also asked this Court to modify the Agreement to permit the transfer of families together to family residential centers without requiring a state license.

family as a unit. *See Ms. L* Order at 3 ("Order does not implicate the

Government's discretionary authority to enforce immigration laws . . . including its

decision to release or detain class members"); *id*. at 22 (DHS may "choose to

release" class members).

Likewise, the Ninth Circuit ruling in *Flores* held that the "settlement does

not require the government to release parents." *Flores*, 828 F.3d at 908; *see also*

*Bunikyte v. Chretoff*, 2007 WL 1074070, at *16 (W.D. Tex. 2007) (rejecting

argument that Flores Agreement required release of both minors and parents). As

the Ninth Circuit explained, providing rights to minors under the agreement "does

not mean that the government must also make a parent available" by releasing the

parent with the child. *Flores*, 828 F.3d at 908; *id*. at 909 ("parents were not

plaintiffs in the *Flores* action, nor are they members of the certified class," and the

settlement "therefore provides no affirmative releases rights for parents"). Because

the Flores Agreement does not require the release of parents, and *Ms. L* requires

DHS to keep parents and children together when the parents are in detention, the

rulings work together to permit detention of parents with their minor children with

whom they are apprehended.

**C.** No other aspect of the Flores Agreement or *Ms. L* require the United

States to release all individuals held in border-related detention when they arrive at

the border with children. Instead, other aspects of the rulings lead to the opposite

conclusion.  The *Ms. L* ruling addresses reunification of children with their parents,

and specifically requires reunification "when the parent is returned to immigration

custody" after a release from criminal custody.  Order at 10; *see id*. at 11 (court

order provides for "reunification during intervening . . . ICE detention prior to

actual removal, which can take months").  But this aspect of the *Ms. L* ruling

would make little sense if that reunification would necessitate an immediate release

of the parents from immigration custody under the Flores Agreement.

The *Ms. L* decree also provides that the parent may consent to the release of

the child without the parent.  Order at 23 (parent may "affirmatively, knowingly,

and voluntarily decline[] to be reunited with the child in DHS custody").  This

authority permits the continued operation of the provisions of the Flores

Agreement governing release of the child – albeit with the accompanying parent's

consent before they go into effect.  Relying on a parent's consent in these

circumstances where the family is together makes sense, particularly because

plaintiffs in this case have always agreed that detention of the family together is

permissible if the parent consents.  *See Flores*, Transcript at 37-38 (April 24,

2015) (in response to question whether the "agreement allows[s] for an

accommodation to . . . a parent who wishes to remain in the [family residential]

facility," "the plaintiffs' positions is . . . a class member is entitled to waive those

rights" and that waiver may "parents speak for children all the time") (relevant

pages attached as exhibit); *see also*

https://www.npr.org/2018/06/22/622678753/the-history-of-the-flores-settlement-

and-its-effects-on-immigration (June 22, 2018) (last visited June 29, 2018)

(counsel for plaintiffs explaining that "choice" to remain in family detention "is

not something the Flores settlement itself addresses or prevents").  That is a

preference expressed by other plaintiffs who have challenged family separation.[2]

This aspect of the *Ms. L* order – allowing release of the child with the consent of

the parent – would make little sense if the Government was under an affirmative

obligation to release the entire family together.

    **D.**  Accordingly, for the reasons explained, the Flores Agreement permits

the Government to detain families together given the nationwide order in *Ms. L*

that bars the separation of families in DHS custody.  To comply with the *Ms. L*

injunction, the government will not separate families but detain families together

during the pendency of immigration proceedings when they are apprehended at or

between ports of entry and therefore subject to the *Ms. L* injunction.

---

[2] *See Mejia-Mejia v. ICE*, No. 18-1445, Complaint ¶ 4 (D.D.C. filed June 19,
2018) ("If, however, the government feels compelled to continue detaining these
parents and young children, it should at a minimum detain them together in one of
its immigration family detention centers"); *Padilla v. ICE*, NO. 18-928 (W.D.
Wash), Complaint ¶ 12 ("If, however, the government insists on continuing to
detain these parents and children, it must at a minimum detain them together in one
of its immigration family detention centers.").

DATED:     June 29, 2018          Respectfully submitted,


CHAD A. READLER
Acting Assistant Attorney General

/s/ August E. Flentje
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney
General
Civil Division

WILLIAM C. PEACHEY
Director
COLIN KISOR
Deputy Director
SARAH B. FABIAN
Senior Litigation Counsel
U.S. Department of Justice
Office of Immigration Litigation
District Court Section
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962


*Attorneys for Defendants*

10

CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2018, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ August E. Flentje
August E. Flentje
Attorney for Defendants

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L.; et al., | Case No.:  18cv0428 DMS (MDD) |
| Petitioners-Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION** |
| v. | |
| U.S Immigration and Customs Enforcement ("ICE"); et al., | |
| Respondents-Defendants. | |

Eleven weeks ago, Plaintiffs leveled the serious accusation that our Government was engaged in a widespread practice of separating migrant families, and placing minor children who were separated from their parents in government facilities for "unaccompanied minors."   According to Plaintiffs, the practice was applied indiscriminately, and separated even those families with small children and infants—many of whom were seeking asylum.  Plaintiffs noted reports that the practice would become national policy.  Recent events confirm these allegations.  Extraordinary relief is requested, and is warranted under the circumstances.

On May 7, 2018, the Attorney General of the United States announced a "zero tolerance policy," under which all adults entering the United States illegally would be subject to criminal prosecution, and if accompanied by a minor child, the child would be

separated from the parent.[1]  Over the ensuing weeks, hundreds of migrant children were separated from their parents, sparking international condemnation of the practice.  Six days ago on June 20, 2018, the President of the United States signed an Executive Order ("EO") to address the situation and to require preservation of the "family unit" by keeping migrant families together during criminal and immigration proceedings to the extent permitted by law, while also maintaining "rigorous[]" enforcement of immigration laws.  *See* Executive Order, Affording Congress an Opportunity to Address Family Separation § 1, 2018 WL 3046068 (June 20, 2018).   The EO did not address reunification of the burgeoning population of over 2,000 children separated from their parents.  Public outrage remained at a fever pitch.  Three days ago on Saturday, June 23, 2018, the Department of Homeland Security ("DHS") issued a "Fact Sheet" outlining the government's efforts to "ensure that those adults who are subject to removal are reunited with their children for the purposes of removal."[2]

Plaintiffs assert the EO does not eliminate the need for the requested injunction, and the Fact Sheet does not address the circumstances of this case.  Defendants disagree with those assertions, but there is no genuine dispute that the Government was not prepared to accommodate the mass influx of separated children.  Measures were not in place to provide for communication between governmental agencies responsible for detaining parents and those responsible for housing children, or to provide for ready communication between separated parents and children.  There was no reunification plan in place, and families have been separated for months.  Some parents were deported at separate times and from

---

[1]  *See* U.S. Att'y. Gen., *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration* (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.
[2]  *See* U.S. Dep't of Homeland Sec.*, Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applicants* (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.

different locations than their children.  Migrant families that lawfully entered the United States at a port of entry seeking asylum were separated.  And families that were separated due to entering the United States illegally between ports of entry have not been reunited following the parent's completion of criminal proceedings and return to immigration detention.

This Court previously entered an order finding Plaintiffs had stated a legally cognizable claim for violation of their substantive due process rights to family integrity under the Fifth Amendment to the United States Constitution based on their allegations the Government had separated Plaintiffs from their minor children while Plaintiffs were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children.  *See Ms. L. v. U.S. Immigration & Customs Enf't*, 302 F. Supp. 3d 1149, 2018 WL 2725736, at *7-12 (S.D. Cal. June 6, 2018).  A class action has been certified to include similarly situated migrant parents.  Plaintiffs now request classwide injunctive relief to prohibit separation of class members from their children in the future absent a finding the parent is unfit or presents a danger to the child, and to require reunification of these families once the parent is returned to immigration custody unless the parent is determined to be unfit or presents a danger to the child.

Plaintiffs have demonstrated a likelihood of success on the merits, irreparable harm, and that the balance of equities and the public interest weigh in their favor, thus warranting issuance of a preliminary injunction.  This Order does not implicate the Government's discretionary authority to enforce immigration or other criminal laws, including its decisions to release or detain class members.  Rather, the Order addresses only the circumstances under which the Government may separate class members from their children, as well as the reunification of class members who are returned to immigration custody upon completion of any criminal proceedings.

/ / /

/ / /

/ / /

18cv0428 DMS (MDD)

# I.

# BACKGROUND

This case started with the filing of a Complaint by Ms. L., a Catholic citizen of the Democratic Republic of the Congo fleeing persecution from her home country because of her religious beliefs. The specific facts of Ms. L.'s case are set out in the Complaint and this Court's June 6, 2018 Order on Defendants' motion to dismiss. *See Ms. L.*, 2018 WL 2725736, at *1-3. In brief, Ms. L. and her then-six-year-old daughter S.S., lawfully presented themselves at the San Ysidro Port of Entry seeking asylum based on religious persecution. They were initially detained together, but after a few days S.S. was "forcibly separated" from her mother. When S.S. was taken away from her mother, "she was screaming and crying, pleading with guards not to take her away from her mother." (Am. Compl. ¶ 43.) Immigration officials claimed they had concerns whether Ms. L. was S.S.'s mother, despite Ms. L.'s protestations to the contrary and S.S.'s behavior. So Ms. L. was placed in immigration custody and scheduled for expedited removal, thus rendering S.S. an "unaccompanied minor" under the Trafficking Victims Protection and Reauthorization Act ("TVPRA"), Pub. L. No. 110-457 (Dec. 23, 2008), and subjecting her to the "care and custody" of the Office of Refugee Resettlement ("ORR").[3] S.S. was placed in a facility in

---

[3] The TVPRA provides that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of" HHS and its sub-agency, ORR. 8 U.S.C. § 1232(b)(1). An "unaccompanied alien child" ("UAC") is a child under 18 years of age with no lawful immigration status in the United States who has neither a parent nor legal guardian in the United States nor a parent nor legal guardian in the United States "available" to care for them. 6 U.S.C § 279(g)(2). According to the TVPRA, a UAC "may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A).

18cv0428 DMS (MDD)

Chicago over a thousand miles away from her mother.  Immigration officials later determined Ms. L. had a credible fear of persecution and placed her in removal proceedings, where she could pursue her asylum claim.  During this period, Ms. L. was able to speak with her daughter only "approximately 6 times by phone, never by video." (Am. Compl. ¶ 45.)  Each time they spoke, S.S. "was crying and scared." (*Id.* ¶ 43.)  Ms. L. was "terrified that she would never see her daughter again." (*Id.* ¶ 45.)  After the present lawsuit was filed, Ms. L. was released from ICE detention into the community.  The Court ordered the Government to take a DNA saliva sample (or swab), which confirmed that Ms. L. was the mother of S.S.  Four days later, Ms. L. and S.S. were reunited after being separated for nearly five months.

In an Amended Complaint filed on March 9, 2018, this case was expanded to include another Plaintiff, Ms. C.  She is a citizen of Brazil, and unlike Ms. L., she did not present at a port of entry.  Instead, she and her 14-year-old son J. crossed into the United States "between ports of entry," after which they were apprehended by U.S. Border Patrol.  Ms. C. explained to the agent that she and her son were seeking asylum, but the Government, as was its right under federal law, charged Ms. C. with entering the country illegally and placed her in criminal custody.  This rendered J. an "unaccompanied minor" and he, like S.S., was transferred to the custody of ORR, where he, too, was housed in a facility in Chicago several hundred miles away from his mother.  Ms. C. was thereafter convicted of misdemeanor illegal entry and served 25 days in criminal custody.  After completing that sentence, Ms. C. was transferred to immigration detention for removal proceedings and consideration of her asylum claim, as she too had passed a credible fear screening.  Despite being returned to immigration custody, Ms. C. was not reunited with J.  During the five months she was detained, Ms. C. did not see her son, and they spoke on the phone only "a handful of times[.]" (*Id.* ¶ 58.)  Ms. C. was "desperate" to be reunited with her son, worried about him constantly and did not know when she would be able to see him.  (*Id.*)  J. had a difficult time emotionally during the period of separation from his mother.  (*Id.* ¶ 59.)  Ms. C. was eventually released from immigration detention on bond, and only recently reunited

with J. Their separation lasted more than eight months despite the lack of any allegations or evidence that Ms. C. was unfit or otherwise presented a danger to her son.[4]

Ms. L. and Ms. C. are not the only migrant parents who have been separated from their children at the border. Hundreds of others, who have both lawfully presented at ports of entry (like Ms. L.) and unlawfully crossed into the country (like Ms. C.), have also been separated. Because this practice is affecting large numbers of people, Plaintiffs sought certification of a class consisting of similarly situated individuals. The Court certified that class with minor modifications,[5] and now turns to the important question of whether Plaintiffs are entitled to a classwide preliminary injunction that (1) halts the separation of class members from their children absent a determination that the parent is unfit or presents a danger to the child, and (2) reunites class members who are returned to immigration custody upon completion of any criminal proceedings absent a determination that the parent is unfit or presents a danger to the child.

Since the present motion was filed, several important developments occurred, as previously noted. First, on May 7, 2018, the Government announced its zero tolerance policy for all adult persons crossing the border illegally, which resulted in the separation of hundreds of children who had crossed with their parents. This is what happened with Ms. C., though she crossed prior to the public announcement of the zero tolerance policy.

_____

[4] As stated in the Court's Order on Defendants' motion to dismiss, Plaintiffs do not challenge Ms. C.'s initial separation from J. as a result of the criminal charge filed against her. Plaintiffs' only complaint with regard to Ms. C. concerns the Government's failure to reunite her with J. after she was returned to immigration custody.

[5] The class is defined to include: "All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the [DHS], and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody absent a determination that the parent is unfit or presents a danger to the child." (See Order Granting in Part Mot. for Class Cert. at 17.) The class does not include parents with criminal history or communicable disease, or those apprehended in the interior of the country or subject to the EO. (See id. at 4 n.5.)

18cv0428 DMS (MDD)

She is not alone. There are hundreds of similarly situated parents, and there are more than 2,000 children that have now been separated from their parents.

When a parent is charged with a criminal offense, the law ordinarily requires separation of the family. This separation generally occurs regardless of whether the parent is charged with a state or federal offense. The repercussions on the children, however, can vary greatly depending on status. For citizens, there is an established system of social service agencies ready to provide for the care and well-being of the children, if necessary, including child protective services and the foster care system. This is in addition to any family members that may be available to provide shelter for these minor children. Grandparents and siblings are frequently called upon. Non-citizens may not have this kind of support system, such as other family members who can provide shelter for their children in the event the parent is detained at the border. This results in immigrant children going into the custody of the federal government, which is presently not well equipped to handle that important task.

For children placed in federal custody, there are two options. One of those options is ORR, but it was established to address a different problem, namely minor children who were apprehended at the border without their parents, *i.e.*, true "unaccompanied alien children." It was not initially designed to address the problem of migrant children detained with their parents at the border and who were thereafter separated from their parents. The second option is family detention facilities, but the options there are limited. Indeed, at the time of oral argument on this motion, Government counsel represented to the Court that the "total capacity in [family] residential centers" was "less than 2,700." (Rep. Tr. at 9, May 9, 2018, ECF No. 70.) For male heads of households, *i.e.*, fathers traveling with their children, there was only one facility with "86 beds." (*Id.* at 43.)

The recently issued EO confirms the government is inundated by the influx of children essentially orphaned as a result of family separation. The EO now directs "[h]eads of executive departments and agencies" to make available "any facilities … appropriate" for the housing and care of alien families. EO § 3(d). The EO also calls upon the *military*

by directing the Secretary of Defense to make available "any existing" facility and to "construct such facilities[,]" if necessary, *id.* § 3(c), which is an extraordinary measure. Meanwhile, "tent cities" and other make-shift facilities are springing up. That was the situation into which Plaintiffs, and hundreds of other families that were separated at the border in the past several months, were placed.

This situation has reached a crisis level. The news media is saturated with stories of immigrant families being separated at the border. People are protesting. Elected officials are weighing in. Congress is threatening action. Seventeen states have now filed a complaint against the Federal Government challenging the family separation practice. *See State of Washington v. United States*, Case No. 18cv0939, United States District Court for the Western District of Washington. And the President has taken action.

Specifically, on June 20, 2018, the President signed the EO referenced above. The EO states it is the Administration's policy "to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources." *Id.* § 1.[6] In furtherance of that policy, the EO indicates that parents and children who are apprehended together at the border will be detained together "during the pendency of any criminal improper entry or immigration proceedings" to the extent permitted by law. *Id.* § 3. The language of the EO is not absolute, however, as it states that family unity shall be maintained "where appropriate and consistent with law and available resources[,]" *id.* § 1, and "to the extent permitted by law and subject to the availability of appropriations[.]" *Id.* § 3. The EO also indicates rigorous enforcement of illegal border crossers will continue. *Id.* § 1 ("It is the policy of this Administration to rigorously enforce our immigration laws."). And finally, although the Order speaks to a policy of "maintain[ing] family unity,"

---

[6] The Order defines "alien family" as "any person not a citizen or national of the United States who has not been admitted into, or is not authorized to enter or remain in, the United States, who entered this country with an alien child or alien children at or between designated ports of entry and who was detained[.]" *Id.* § 2(a)(i).

18cv0428 DMS (MDD)

it is silent on the issue of reuniting families that have already been separated or will be separated in the future." *Id.*

In light of these recent developments, and in particular the EO, the Court held a telephonic status conference with counsel on June 22, 2018. During that conference, the Court inquired about communication between ORR and DHS, and ORR and the Department of Justice ("DOJ"), including the Bureau of Prisons ("BOP"), as it relates to these separated families. Reunification procedures were also discussed, specifically whether there was any affirmative reunification procedure for parents and children after parents were returned to immigration detention following completion of criminal proceedings. Government counsel explained the communication procedures that were in place, and represented, consistent with her earlier representation to the Court, that there was no procedure in place for the reunification of these families.[7]

The day after the status conference, Saturday, June 23, DHS issued the Fact Sheet referenced above. This document focuses on several issues addressed during the status conference, *e.g.*, processes for enhanced communication between separated parents and children, but only "for the purposes of removal." It also addresses coordination between and among three agencies, CBP, ICE, and HHS agency ORR, but again for the purpose of removal. The Fact Sheet does not address reunification for other purposes, such as immigration or asylum proceedings, which can take months. It also does not mention other vital agencies frequently involved during criminal proceedings: DOJ and BOP.

At the conclusion of the recent status conference, the Court requested supplemental briefing from the parties. Those briefs have now been submitted. After thoroughly

---

[7] The Court: "Is there currently any affirmative reunification process that the government has in place once parent and child are separated? Government counsel: I would say … when a parent is released from criminal custody and taken into ICE custody is the practice to reunite them in family detention[?] And at that [previous hearing] I said no, that that was not the practice. I think my answer on that narrow question would be the same." (Rep. Tr. at 29-30, June 22, 2018, ECF No. 77.)

9

considering all of the parties' briefs and the record in this case, and after hearing argument from counsel on these important issues, the Court grants Plaintiffs' motion for a classwide preliminary injunction.

## II.

## DISCUSSION

Plaintiffs seek classwide preliminary relief that (1) enjoins Defendants' practice of separating class members from their children absent a determination that the parent is unfit or presents a danger to their child, and (2) orders the government to reunite class members with their children when the parent is returned to immigration custody after their criminal proceedings conclude, absent a determination that the parent is unfit or presents a danger to the child. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To meet that showing, Plaintiffs must demonstrate "'[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).[8]

---

[8] The Ninth Circuit applies separate standards for injunctions depending on whether they are prohibitory, *i.e.*, whether they prevent future conduct, or mandatory, *i.e.*, "they go beyond 'maintaining the status quo[.]'" *Hernandez v. Sessions*, 872 F.3d 976, 997 (9th Cir. 2017). The standard set out above applies to prohibitory injunctions, which is what Plaintiffs seek here. To the extent Plaintiffs are also requesting mandatory relief, that request is "subject to a higher standard than prohibitory injunctions," namely that relief will issue only "when 'extreme or very serious damage will result' that is not capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Id.* at 999 (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). The Ninth Circuit recognizes that application of these different standards "is controversial[,]" and that other Circuits have questioned this approach. *Id.* at 997-98. This Court need not, and does not, address that discrepancy here. Suffice it to say that to the extent some portion of Plaintiffs' requested relief is subject to a standard higher than

1    Before turning to these factors, the Court addresses directly Defendants' argument

2  that an injunction is not necessary here in light of the EO and the recently released Fact

3  Sheet.  Although these documents reflect some attempts by the Government to address

4  some of the issues in this case, neither obviates the need for injunctive relief here.  As

5  indicated throughout this Order, the EO is subject to various qualifications.  For instance,

6  Plaintiffs correctly assert the EO allows the government to separate a migrant parent from

7  his or her child "where there is a *concern* that detention of an alien child with the child's

8  alien parent would pose a risk to the child's welfare."  EO § 3(b) (emphasis added).

9  Objective standards are necessary, not subjective ones, particularly in light of the history

10 of this case.  Furthermore, the Fact Sheet focuses on reunification "at time of removal[,]"

11 U.S. Dep't of Homeland Sec., *supra*, note 2, stating that the parent slated for removal will

12 be matched up with their child at a location in Texas and then removed.  It says nothing

13 about reunification during the intervening time between return from criminal proceedings

14 to ICE detention or the time in ICE detention prior to actual removal, which can take

15 months.  Indeed, it is undisputed "ICE has no plans or procedures in place to reunify the

16 parent with the child other than arranging for them to be deported together after the parent's

17 immigration case is concluded."  (Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex.

18 31 ¶ 11.)  Thus, neither of these directives eliminates the need for an injunction in this case.

19 With this finding, the Court now turns to the *Winter* factors.

20 **A.    Likelihood of Success**

21    "The first factor under *Winter* is the most important—likely success on the merits."

22 *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015).  While Plaintiffs carry the burden

23 of demonstrating likelihood of success, they are not required to prove their case in full at

24 the preliminary injunction stage but only such portions that enable them to obtain the

25 injunctive relief they seek.  *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

26 _____

27

28 the traditional standard for injunctive relief, Plaintiffs have met their burden for the reasons
   set out below.

1      Here, the only claim currently at issue is Plaintiffs' due process claim.[9] Specifically,

2 Plaintiffs contend the Government's practice of separating class members from their

3 children, and failing to reunite those parents who have been separated, without a

4 determination that the parent is unfit or presents a danger to the child violates the parents'

5 substantive due process rights to family integrity under the Fifth Amendment to the United

6 States Constitution. To prevail on this claim, Plaintiffs must show that the Government

7 practice "shocks the conscience." In the Order on Defendants' motion to dismiss, the Court

8 found Plaintiffs had set forth sufficient facts to support that claim. *Ms. L.*, 2018 WL

9 2725736, at *7-12. The evidence submitted since that time supports that finding, and

10 demonstrates Plaintiffs are likely to succeed on this claim.

11      As explained in the Court's Order on Defendants' motion to dismiss, the "shocks the

12 conscience" standard is not subject to a rigid list of established elements. *See County of*

13 *Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) (stating "[r]ules of due process are not …

14 subject to mechanical application in unfamiliar territory.") On the contrary, "an

15 investigation into substantive due process involves an appraisal of the totality of the

16 circumstances rather than a formalistic examination of fixed elements[.]" *Armstrong v.*

17 *Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998).

18      Here, each Plaintiff presents different circumstances, but both were subjected to the

19 same government practice of family separation without a determination that the parent was

20 unfit or presented a danger to the child. Ms. L. was separated from her child without a

21 determination she was unfit or presented a danger to her child, and Ms. C. was not reunited

22 with her child despite the absence of any finding that she was unfit or presented a danger

23

24

25 [9] In their supplemental brief, Defendants assert Plaintiffs are raising new claims based on
events that transpired after the Complaints were filed, *e.g.*, the announcement of the zero
26 tolerance policy and the EO. The Court disagrees. Plaintiffs' claims are not based on these
events, but are based on the practice of separating class members from their children. The
27 subsequent events are relevant to Plaintiffs' claim, but they have not changed the claim
28 itself, which remains focused on the practice of separation.

18cv0428 DMS (MDD)

to her child. Outside of the context of this case, namely an international border, Plaintiffs would have a high likelihood of success on a claim premised on such a practice. *See D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016) (citing cases finding due process violation where state action interfered with rights of fit parents); *Heartland Academy Community Church v. Waddle*, 595 F.3d 798, 808-811 (8th Cir. 2010) (finding removal of children from religious school absent evidence the students were "at immediate risk of child abuse or neglect" was violation of clearly established constitutional right); *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000) (citing *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d 1123, 1126 (3d Cir. 1997) ("courts have recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.")

The context of this case is different. The Executive Branch, which is tasked with enforcement of the country's criminal and immigration laws, is acting within its powers to detain individuals lawfully entering the United States and to apprehend individuals illegally entering the country. However, as the Court explained in its Order on Defendants' motion to dismiss, the right to family integrity still applies here. The context of the family separation practice at issue here, namely an international border, does not render the practice constitutional, nor does it shield the practice from judicial review.

On the contrary, the context and circumstances in which this practice of family separation were being implemented support a finding that Plaintiffs have a likelihood of success on their due process claim. First, although parents and children may lawfully be separated when the parent is placed in criminal custody, the same general rule does not apply when a parent and child present together lawfully at a port of entry seeking asylum. In that situation, the parent has committed no crime, and absent a finding the parent is unfit or presents a danger to the child, it is unclear why separation of Ms. L. or similarly situated class members would be necessary. Here, many of the family separations have been the result of the Executive Branch's zero tolerance policy, but the record also reflects that the

practice of family separation was occurring before the zero tolerance policy was announced, and that practice has resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally.  Ms. L. is an example of this family separation practice expanding beyond its lawful reach, and she is not alone.  (*See, e.g.*, Pls.' Reply Br. in Supp. of Mot. for Class Cert., Exs. 22-23, 25-26) (declarations from parents attesting to separation at border after lawfully presenting at port of entry and requesting asylum); Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 32 ¶¶ 9, 10b, 11a (listing parents who were separated from children after presenting at ports of entry)).

As set out in the Court's prior Order, asylum seekers like Ms. L. and many other class members may be fleeing persecution and are entitled to careful consideration by government officials.  Particularly so if they have a credible fear of persecution.  We are a country of laws, and of compassion.  We have plainly stated our intent to treat refugees with an ordered process, and benevolence, by codifying principles of asylum.  *See, e.g.,* The Refugee Act, PL 96-212, 94 Stat. 102 (1980).  The Government's treatment of Ms. L. and other similarly situated class members does not meet this standard, and it is unlikely to pass constitutional muster.

Second, the practice of separating these families was implemented without any effective system or procedure for (1) tracking the children after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and children after the parents are returned to immigration custody following completion of their criminal sentence.  This is a startling reality.  The government readily keeps track of personal property of detainees in criminal and immigration proceedings.  Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainees' release, at all levels—state and federal, citizen and alien.  Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children.  The unfortunate reality is that under the present system migrant children are not

18cv0428 DMS (MDD)

accounted for with the same efficiency and accuracy as *property*. Certainly, that cannot satisfy the requirements of due process. *See Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982) (quoting *Lassiter v. Dept. of Soc. Services of Durham County, N.C.*, 452 U.S. 18, (1981)) (stating it is "'plain beyond the need for multiple citation' that a natural parent's 'desire for and right to the companionship, care, custody, and management of his or her children' is an interest far more precious than any property right.") (internal quotation marks omitted).

The lack of effective methods for communication between parents and children who have been separated has also had a profoundly negative effect on the parents' criminal and immigration proceedings, as well as the childrens' immigration proceedings. *See United States v. Dominguez-Portillo*, No:EP-17-MJ-4409-MAT, 2018 WL 315759, at *1-2 (W.D. Tex. Jan. 5, 2018) (explaining that criminally charged defendants "had not received any paperwork or information concerning the whereabouts or well-being of" their children). In effect, these parents have been left "in a vacuum, without knowledge of the well-being and location of their children, to say nothing of the immigration proceedings in which those minor children find themselves." *Id.* at *14. This situation may result in a number of different scenarios, all of which are negative – some profoundly so. For example, "[i]f parent and child are asserting or intending to assert an asylum claim, that child may be navigating those legal waters without the benefit of communication with and assistance from her parent; that defendant, too, must make a decision on his criminal case with total uncertainty about this issue." *Id.* Furthermore, " a defendant facing certain deportation would be unlikely to know whether he might be deported before, simultaneous to, or after their child, or whether they would have the opportunity to even discuss their deportations[.]" *Id.* Indeed, some parents have already been deported without their children, who remain in government facilities in the United States.[10]

_____

[10] *See, e.g.*, Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 32 ¶ 16k, Ex. 36 ¶ 7a; Nelson Renteria, *El Salvador demands U.S. return child taken from deported father*,

15

1    The absence of established procedures for dealing with families that have been

2 separated at the border, and the effects of that void on the families involved, is borne out

3 in the cases of Plaintiffs here.  Ms. L. was separated from her child when immigration

4 officials claimed they could not verify she was S.S.'s mother, and detained her for

5 expedited removal proceedings.  That rendered S.S. "unaccompanied" under the TVPRA

6 and subject to immediate transfer to ORR, which accepted responsibility for S.S.  There

7 was no further communication between the agencies, ICE and ORR.  The filing of the

8 present lawsuit prompted release and reunification of Ms. L. and her daughter, a process

9 that took close to five months and court involvement.  Ms. C. completed her criminal

10 sentence in 25 days, but it took nearly eight months to be reunited with her son.  She, too,

11 had to file suit to regain custody of her son from ORR.

12    These situations confirm what the Government has already stated: it is not

13 affirmatively reuniting parents like Plaintiffs and their fellow class members for purposes

14 other than removal.  Outside of deportation, the onus is on the parents, who, for the most

15 part, are themselves in either criminal or immigration proceedings, to contact ORR or

16 otherwise search for their children and make application for reunification under the

17 TVPRA.  However, this reunification procedure was not designed to deal with the present

18 circumstances.  (*See* Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 33 ¶¶ 6-9.)

19 Rather, "ORR's reunification process was designed to address the situation of children who

20 come to the border or are apprehended outside the company of a parent or legal guardian."

21 (*Id.* ¶ 6.)  Placing the burden on the parents to find and request reunification with their

22 children under the circumstances presented here is backwards.  When children are

23

24    _____

25

26 REUTERS (June 21, 2018, 4:03 PM),  https://www.reuters.com/article/us-usa-immigration-
el-salvador/el-salvador-demands-us-return-child-taken-from-deported-father-

27 idUSKBN1JH3ER; Miriam Jordan, *'I Can't Go Without My Son': A Deported Mother's
Plea*, N.Y. TIMES (June 17, 2018), https://www.nytimes.com/2018/06/17/us/immigration-

28 deported-parents.html.

separated from their parents under these circumstances, the Government has an affirmative obligation to track and promptly reunify these family members.

This practice of separating class members from their minor children, and failing to reunify class members with those children, without any showing the parent is unfit or presents a danger to the child is sufficient to find Plaintiffs have a likelihood of success on their due process claim.  When combined with the manner in which that practice is being implemented, *e.g.*, the lack of any effective procedures or protocols for notifying the parents about their childrens' whereabouts or ensuring communication between the parents and children, and the use of the children as tools in the parents' criminal and immigration proceedings, (*see* Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 29 ¶¶ 8, 14), a finding of likelihood of success is assured.  A practice of this sort implemented in this way is likely to be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *Lewis*, 523 U.S. at 847 n.8, interferes with rights "'implicit in the concept of ordered liberty[,]'" *Rochin v. Cal.*, 342 U.S. 165, 169 (1952) (quoting *Palko v. State of Conn.*, 302 U.S. 319, 325 (1937)), and is so "'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency."  *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957).

For all of these reasons, the Court finds there is a likelihood of success on Plaintiffs' due process claim.

**B.  Irreparable Injury**

Turning to the next factor, Plaintiffs must show they are "'likely to suffer irreparable harm in the absence of preliminary relief.'"  *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 20).  "'It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.'"  *Id.* (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted).  As explained, Plaintiffs have demonstrated the likelihood of a deprivation of their constitutional rights, and thus they have satisfied this factor.

18cv0428 DMS (MDD)

The injury in this case, however, deserves special mention. That injury is the separation of a parent from his or her child, which the Ninth Circuit has repeatedly found constitutes irreparable harm. *See Leiva–Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying "separated families" as an irreparable harm).

Furthermore, the record in this case reflects that the separations at issue have been agonizing for the parents who have endured them. One of those parents, Mr. U., an asylum seeker from Kyrgyzstan, submitted a declaration in this case in which he stated that after he was told he was going to be separated from his son he "felt as though [he] was having a heart attack." (Reply in Supp. of Mot. for Class Cert., Ex. 21 ¶ 4.) Another asylum-seeking parent from El Salvador who was separated from her two sons writes,

> The separation from my sons has been incredibly hard, because I have never been away from them before. I do not want my children to think that I abandoned them. [My children] are so attached to me. [One of my children] used to sleep in bed with me every night while [my other child] slept in his own bed in the same room.… It hurts me to think how anxious and distressed they must be without me.

(Reply in Supp. of Mot. for Class Cert., Ex. 24 ¶ 9.) And another asylum-seeking parent from Honduras described having to place her crying 18-month old son in a car seat in a government vehicle, not being able to comfort him, and her crying as the officers "took [her] son away." (Reply in Supp. of Mot. for Class Cert., Ex. 25 ¶ 7.) There has even been a report that one father committed suicide in custody after being separated from his wife and three-year-old child. *See* Molly Hennessy-Fiske, *Honduran Migrant Who Was Separated From Family is Found Dead in Texas Jail in an Apparent Suicide*, L.A. Times (June 9, 2018, 5:35 PM), http://www.latimes.com/nation/la-na-border-patrol-suicide-20180609-story.html.

The parents, however, are not the only ones suffering from the separations. One of the *amici* in this case, Children's Defense Fund, states,

18

there is ample evidence that separating children from their mothers or fathers leads to serious, negative consequences to children's health and development. Forced separation disrupts the parent-child relationship and puts children at increased risk for both physical and mental illness....  And the psychological distress, anxiety, and depression associated with separation from a parent would follow the children well after the immediate period of separation— even after eventual reunification with a parent or other family.

(ECF No. 17-11 at 3.)  Other evidence before the Court reflects that "separating children from parents is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development." (ECF No. 17-13 at 2.)  That evidence reflects:

Separation from family leaves children more vulnerable to exploitation and abuse, no matter what the care setting.  In addition, traumatic separation from parents creates toxic stress in children and adolescents that can profoundly impact their development.  Strong scientific evidence shows that toxic stress disrupts the development of brain architecture and other organ systems, and increases the risk for stress-related disease and cognitive impairment well into adult years.  Studies have shown that children who experience such traumatic events can suffer from symptoms of anxiety and post-traumatic stress disorder, have poorer behavioral and educational outcomes, and experience higher rates of poverty and food insecurity.

(ECF No. 17-13 at 2.)  And Martin Guggenheim, the Fiorello LaGuardia Professor of Clinical Law at New York University School of Law and Founding Member of the Center for Family Representation, states:

Children are at risk of suffering great emotional harm when they are removed from their loved ones.  And children who have traveled from afar and made their way to this country to seek asylum are especially at risk of suffering irreversible psychological harm when wrested from the custody of the parent or caregiver with whom they traveled to the United States.

(Mem. in Supp. of Classwide Prelim. Inj., Ex. 17 ¶ 16.)  All of this evidence, combined with the constitutional violation alleged here, conclusively shows that Plaintiffs and the

18cv0428 DMS (MDD)

1 class members are likely to suffer irreparable injury if a preliminary injunction does not
2 issue.

3 **C.    Balance of Equities**

4       Turning to the next factor, "[t]o obtain a preliminary injunction, a plaintiff must also
5 demonstrate that 'the balance of equities tips in his favor.'" *Hernandez*, 872 F.3d at 995
6 (quoting *Winter*, 555 U.S. at 20).  As with irreparable injury, when a plaintiff establishes
7 "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also
8 established that both the public interest and the balance of the equities favor a preliminary
9 injunction." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

10      Plaintiffs here assert the balance of equities weighs in favor of an injunction in this
11 case.   Specifically, Plaintiffs argue Defendants would not suffer any hardship if the
12 preliminary injunction is issued because the Government "cannot suffer harm from an
13 injunction that merely ends an unlawful practice[.]" *Rodriguez v. Robbins*, 715 F.3d 1127,
14 1145 (9th Cir. 2013); *see also Arizona Dream Act Coalition*, 757 F.3d at 1069 (quoting
15 *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)) (stating balance of equities favors
16 "'prevent[ing] the violation of a party's constitutional rights.'").  When the absence of harm
17 to the Government is weighed against the harms to Plaintiffs set out above, Plaintiffs argue
18 this factor weighs in their favor.  The Court agrees.

19      The primary harm Defendants assert here is the possibility that an injunction would
20 have a negative impact on their ability to enforce the criminal and immigration laws.
21 However, the injunction here—preventing the separation of parents from their children and
22 ordering the reunification of parents and children that have been separated—would do
23 nothing of the sort.  The Government would remain free to enforce its criminal and
24 immigration laws, and to exercise its discretion in matters of release and detention
25 consistent with law.  *See* EO §§ 1, 3(a) & (e) (discussing *Flores v. Sessions*, CV 85-4544);
26 *see also Comm. of Cent. Am. Refugees v. I.N.S.,* 795 F.2d 1434, 1439-40 (9th Cir. 1986)
27 (stating "prudential considerations preclude[] interference with the Attorney General's
28 [exercise of] discretion" in selecting the detention facilities where aliens are to be

18cv0428 DMS (MDD)

detained).   It would just have to do so in a way that preserves the class members'
constitutional rights to family association and integrity.  *See Rodriguez*, 715 F.3d at 1146
("While ICE is entitled to carry out its duty to enforce the mandates of Congress, it must
do so in a manner consistent with our constitutional values.")  Thus, this factor also weighs
in favor of issuing the injunction.

**D.    Public Interest**

The final factor for consideration is the public interest.  *See Hernandez*, 872 F.3d at
996 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)) ("When, as
here, 'the impact of an injunction reaches beyond the parties, carrying with it a potential
for public consequences, the public interest will be relevant to whether the district court
grants the preliminary injunction.'")  To obtain the requested relief, "Plaintiffs must
demonstrate that the public interest favors granting the injunction 'in light of [its] *likely*
consequences,' i.e., 'consequences [that are not] too remote, insubstantial, or speculative
and [are] supported by evidence.'"  *Id.* (quoting *Stormans*, 586 F.3d at 1139).  "'Generally,
public interest concerns are implicated when a constitutional right has been violated,
because all citizens have a stake in upholding the Constitution.'"  *Id.* (quoting *Preminger
v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).

This case involves two important public interests: the interest in enforcing the
country's criminal and immigration laws and the constitutional liberty interest "of parents
in the care, custody, and control of their children[,]" which "is perhaps the oldest of the
fundamental liberty interests recognized by" the Supreme Court.  *Troxel v. Granville*, 530
U.S. 57, 65 (2000).  Both of these interests are valid and important, and both can be served
by the issuance of an injunction in this case.

As stated, the public's interest in enforcing the criminal and immigration laws of this
country would be unaffected by issuance of the requested injunction.  The Executive
Branch is free to prosecute illegal border crossers and institute immigration proceedings
against aliens, and would remain free to do so if an injunction were issued.  Plaintiffs do
not seek to enjoin the Executive Branch from carrying out its duties in that regard.

21

What Plaintiffs do seek by way of the requested injunction is to uphold their rights to family integrity and association while their immigration proceedings are underway. This right, specifically, the relationship between parent and child, is "constitutionally protected," *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978), and "well established." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011). The public interest in upholding and protecting that right in the circumstances presented here would be served by issuance of the requested injunction. *See Arizona Dream Act Coalition*, 757 F.3d at 1069 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("'[I]t is clear that it would not be equitable or in the public's interest to allow the state … to violate the requirements of federal law, especially when there are no adequate remedies available.'") Accordingly, this factor, too, weighs in favor of issuing the injunction.

## III.

## CONCLUSION

The unfolding events—the zero tolerance policy, EO and DHS Fact Sheet—serve to corroborate Plaintiffs' allegations. The facts set forth before the Court portray reactive governance—responses to address a chaotic circumstance of the Government's own making. They belie measured and ordered governance, which is central to the concept of due process enshrined in our Constitution. This is particularly so in the treatment of migrants, many of whom are asylum seekers and small children. The extraordinary remedy of classwide preliminary injunction is warranted based on the evidence before the Court. For the reasons set out above, the Court hereby GRANTS Plaintiffs' motion for classwide preliminary injunction, and finds and orders as follows:

(1) Defendants, and their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them, are preliminarily enjoined from detaining Class Members in DHS custody without and apart from their minor children, absent a determination that the parent is unfit or presents a danger to the

1  child, unless the parent affirmatively, knowingly, and voluntarily declines to be
2  reunited with the child in DHS custody.[11]

3  (2)  If Defendants choose to release Class Members from DHS custody, Defendants, and
4  their officers, agents, servants, employees and attorneys, and all those who are in
5  active concert or participation with them, are preliminary enjoined from continuing
6  to detain the minor children of the Class Members and must release the minor child
7  to the custody of the Class Member, unless there is a determination that the parent
8  is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and
9  voluntarily declines to be reunited with the child.

10  (3)  Unless there is a determination that the parent is unfit or presents a danger to the
11  child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited
12  with the child:

13  (a)  Defendants must reunify all Class Members with their minor children who are
14  under the age of five (5) within fourteen (14) days of the entry of this Order; and

15  (b)  Defendants must reunify all Class Members with their minor children age five
16  (5) and over within thirty (30) days of the entry of this Order.

17  (4)  Defendants must immediately take all steps necessary to facilitate regular
18  communication between Class Members and their children who remain in ORR
19  custody, ORR foster care, or DHS custody. Within ten (10) days, Defendants must
20  provide parents telephonic contact with their children if the parent is not already in
21  contact with his or her child.

---

[11] "Fitness" is an important factor in determining whether to separate parent from child. In the context of this case, and enforcement of criminal and immigration laws at the border, "fitness" could include a class member's mental health, or potential criminal involvement in matters other than "improper entry" under 8 U.S.C. § 1325(a), (*see* EO § 1), among other matters. Fitness factors ordinarily would be objective and clinical, and would allow for the proper exercise of discretion by government officials.

(5)    Defendants must immediately take all steps necessary to facilitate regular communication between and among all executive agencies responsible for the custody, detention or shelter of Class Members and the custody and care of their children, including at least ICE, CBP, BOP, and ORR, regarding the location and well-being of the Class Members' children.

(6)    Defendants, and their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them, are preliminarily enjoined from removing any Class Members without their child, unless the Class Member affirmatively, knowingly, and voluntarily declines to be reunited with the child prior to the Class Member's deportation, or there is a determination that the parent is unfit or presents a danger to the child.

(7)    This Court retains jurisdiction to entertain such further proceedings and to enter such further orders as may be necessary or appropriate to implement and enforce the provisions of this Order and Preliminary Injunction.

A status conference will be held on **July 6, 2018**, at **12:00 noon**, to discuss all necessary matters. A notice of teleconference information sheet will be provided in a separate order.

**IT IS SO ORDERED.**

Dated: June 26, 2018

Hon. Dana M. Sabraw
United States District Judge

24

18cv0428 DMS (MDD)

1

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3                          ---

 4           HONORABLE DOLLY M. GEE, JUDGE PRESIDING

 5                          ---

 6

 7

 8   JENNY L. FLORES, et al.,            )
                                         )
 9                                       )
                                         )
10                    Plaintiffs,        )
                                         )No. 85-4544DMG
11           VS                          )
                                         )
12   EDWIN MEESE, et al.,                )
                                         )
13                                       )
                      Defendants.        )
14   _____)

15

16            Reporter's Transcript of Proceedings
      Plaintiffs' Motion to Enforce Settlement of Class Action
17       Defendant's motion to Modify Settlement Agreement
                    Los Angeles, California
18                 FRIDAY, APRIL 24, 2015

19

20

21

22

23            ANNE KIELWASSER, CRR, RPR, CSR
                Federal Official Court Reporter
24             312 North Spring Street, Room 432
                Los Angeles, California 90012
25               Telephone: (213) 894-2969
                    anne.kielwasser@gmail.com
                       AKtranscripts.com
```

1   housing in situations where there is a search, such that they

2   could be housed there pending a determination as to where

3   they should be sent?

4        **MR. HOLGUIN:**  Yes, Your Honor.  The settlement --

5   the settlement contemplates, and when there is a large number

6   of individuals, then they can be housed in noncompliant

7   facilities.  But the government must be making efforts to

8   either release or transfer the minors to properly licensed

9   facilities.

10        And -- and that is something that we can work

11   out if we're talking about with the -- with the defendants

12   about how those facilities -- how long people could be kept

13   there and so forth.  As long as there is a good faith effort

14   to minimize the amount of time that children spend in

15   detention.  That's the whole purpose of the settlement.  And

16   to keep them in properly licensed facilities.

17        And as long as the government is moving in

18   that direction, the plaintiffs are willing to be reasonable

19   in providing some kind of accommodations to allow the

20   transition to take place in an orderly fashion.

21        **THE COURT:**  And does the agreement as it stands

22   allow for an accomodation to either a minor or a parent who

23   wishes to remain in the facility?

24        **MR. HOLGUIN:**  Your Honor, our -- the plaintiffs'

25   position is, and we can provide authority to this, if we

1    haven't already done, I believe we have, is that whenever

2    there is a settlement that confers rights on a class member,

3    a class member is entitled to waive those rights.

4                    Mothers and parents speak for children all

5    the time.  I don't really consider this to be an unusual

6    situation or one that sets up some untenable chain of order

7    where there's a conflict between a parent and a child.

8                    I have children of my own, and the law is

9    quite clear when I get to make decisions for them and when

10   they get -- when they reach the age of maturity, when they're

11   able to make their decisions.

12                   So, this is -- this is something that I think

13   can also be worked out.

14           **THE COURT:**  All right, anything further?

15           **MR. HOLGUIN:**  No, Your Honor.

16           **THE COURT:**  Mr. Fresco?

17           **MR. FRESCO:**  Just -- just a couple of notes, Your

18   Honor, quickly.  Plaintiffs' Exhibit 10, Paragraph 6 from

19   their affidavit of Brigit Cambria, it says quote/unquote:

20   "Berks is clearly a secure facility."

21                   So, any evidence they're going to have now to

22   be opposite will be in conflict with that statement, Your

23   Honor.

24                   Second of all, Your Honor, there is no

25   dispute that Berks has been operating since 2001 as a secure