The Honorable Marsha J. Pechman

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON; et al., | 2:18-cv-00939-MJP |
| Plaintiffs, | **DEFENDANTS' OPPOSITION** |
| v. | **TO THE MOTION FOR** |
| THE UNITED STATES OF AMERICA; et al., | **EXPEDITED DISCOVERY AND** |
| | **REGULAR STATUS CONFERENCES** |
| Defendants. | NOTING DATE: July 13, 2018 |

DEFENDANTS' RESPONSE IN OPPOSITION TO STATES'
MOTION FOR EXPEDITED DISCOVERY AND REGULAR
STATUS CONFERENCES
*State of Washington, et al. v. United States, et al.,*
Case No. 2:18-cv-00939 (MJP)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

**INTRODUCTION**

Less than a week after filing their complaint, Plaintiffs—17 States and the District of Columbia ("the States")—move for full-blown, expedited merits discovery that would be sweeping, burdensome, and inappropriate given the many threshold justiciability issues their complaint suffers from. *See* Dkt. 15-1 at 1-2 (Appendix A). This Court should deny the States' motion. The States have not established good cause justifying such discovery, and the many threshold problems with this suit make any discovery—let alone sprawling, expedited discovery—inappropriate at this time.

First, there is no basis for the States' prime argument—that expedited discovery is needed now because, if this case proceeds past a motion to dismiss, evidence may have been "moved or difficult to track." Dkt. 15 at 9. The States offer no grounds for the speculation that the Government will shirk any duty to preserve evidence relevant to this case. Where, as here, a party provides no evidentiary basis for the assertion that evidence may be spoiled, there is no good cause for expedited discovery at this very preliminary stage of proceedings. *See, e.g., Wangson Biotech Grp., Inc. v. Tan Trading Co., Inc.*, No. C 08-04212 SBA, 2008 WL 4239155, at *7 (N.D. Cal. Sept. 11, 2008).

Second, all of the States' claims are non-justiciable. The States purport to represent the interests of parents separated from their children, but lack any legally cognizable interest to do so. Because the States cannot even bring this suit, they cannot obtain discovery in it.

Third, all of the States' claims must be dismissed because they are already being litigated. Each of the States' claims are being litigated in *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) ("*Ms. L.*"), where the individuals whose interests the States invoke have secured nationwide class certification and an injunction requiring reunification with their children and ongoing compliance requirements. And Claim V, regarding the asylum statute, also overlaps with pending litigation, *Al Otro Lado Inc. v. Nielsen*, No. 17- 2366 (S.D. Cal.) ("*AOL*"). So even if the States' claims are justiciable, they should be dismissed, transferred, or held in abeyance under principles of comity—any of which would make any discovery, let alone expedited discovery, inappropriate here.

Finally, given the many threshold justiciability issues this case presents, the Court should

DEFENDANTS' RESPONSE IN OPPOSITION TO STATES'
MOTION FOR EXPEDITED DISCOVERY AND REGULAR
STATUS CONFERENCES
*State of Washington, et al. v. United States, et al.*,
Case No. 2:18-cv-00939 (MJP)

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

decline to rule on any discovery motion until any motions to dismiss or transfer are adjudicated.[1]

## BACKGROUND

The States filed this suit for declaratory and injunctive relief on June 26, 2018. Dkt. 1 (Complaint). The States bring five claims—three constitutional, two statutory—challenging the separation of alien parents from their children. They allege: that Defendants have (1) committed procedural-due-process violations by separating parents from their children without showing that the parent is unfit or is otherwise endangering the child (Claim I); (2) committed substantive-due-process violations by depriving individuals of their liberty interests without due process of law (Claim II); (3) violated the Fifth Amendment Due Process Clause's equal-protection component by targeting individuals for discriminatory treatment based on their nationality or ethnicity (Claim III); (4) violated the Administrative Procedure Act ("APA") by applying a family-separation policy in a manner that conflicts with existing law (Claim IV); and (5) violated the asylum statute, 8 U.S.C. § 1158, by preventing would-be asylum seekers from presenting themselves at ports of entry and by prosecuting any would-be asylum seeker who illegally crosses into the United States between ports of entry (Claim V). The States claim to seek to protect the States' and their residents' interests. On July 2, less than a week after filing suit, the States moved for expedited discovery and regular status conferences, seeking sweeping, invasive, and burdensome discovery on 14 broad topics. *See* Dkt. 15.

The States' suit was filed well after the filing of two other suits, pending in the Southern District of California, that bear on the claims made and issues raised by the States. The first suit is *Ms. L v. U.S. ICE*, No. 18-cv-428 (S.D. Cal.). The States' motion for expedited discovery was filed six days after the district court in *Ms. L.*, on June 26, certified a nationwide class of migrant parents separated from their children and also granted a preliminary injunction motion that was based on the *Ms. L.* plaintiffs' claim that the federal government's separation of children from their parents violated the Fifth Amendment. *See* Defendants' Appendix A, Ex. 3-4 (attached hereto). The *Ms. L.* plaintiffs have made the following claims: (1) that the separation of the class members from their children violates procedural and substantive due process under the Fifth Amendment; (2) that the current practices

---

[1] Defendants are filing a motion to: (1) dismiss Counts I-V of the Complaint, (2) transfer those claims to the court overseeing *Ms. L.*, or (3) hold all outstanding claims in abeyance pending resolution of *Ms. L. See* Defendants' Motion to Dismiss, Transfer, or Hold this Case in Abeyance, Dkt 22.

DEFENDANTS' RESPONSE IN
OPPOSITION TO STATES' MOTION
FOR EXPEDITED DISCOVERY AND
REGULAR STATUS CONFERENCES
Case No. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

2

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

regarding separation of class members from their children is arbitrary and capricious, thus violating the APA; and (3) that the separation of families violates the federal laws that provide for asylum and other protections from removal and class members have a private right of action to challenge violations of their right to apply for asylum under 8 U.S.C. § 1158(a). *See* App. A, Ex. 5. In granting class relief, and as relevant here, the *Ms. L.* court's preliminary-injunction order requires that class members be reunified with their children within 14 days of the court's order for children under 5, and within 30 days of the court's order for all other children. *See* App. A, Ex. 4. The Government is implementing that injunction now. *See* App. A, Ex. 6. To that end, the *Ms. L.* court held a series of status conferences on July 6, 9, and 10, where the parties were required to provide the court with joint status reports. *See* App. A, Ex. 8-14. On July 10, 2018, the court ordered the parties to submit a further joint status report by 3:00 p.m. on July 12, 2018, to "provide an update on Defendants' compliance with the reunification deadline for children under age 5, and a status on the efforts to reunify the remaining members of the Class with their children over age 5." App. A, Ex. 14 at 5 (attached here as Appendix A). The Court also ordered the parties to appear at a further status conference on July 13, 2018. *Id.*

The second suit is *Al Otro Lado Inc. v. Nielsen*, No. 17-cv-2366 (S.D. Cal.) ("AOL"). The *AOL* plaintiffs allege, among other claim, that the Government violated the Immigration and Nationality Act (INA) by preventing the plaintiffs from accessing the statutorily prescribed asylum process at ports of entry along the U.S.-Mexico border. *See AOL*, No. 17-cv-05111 (C.D. Cal.).[2] In November 2017, the *AOL* plaintiffs filed a motion seeking class certification on behalf those who were not or would not be able to access the asylum process, including those turned away at ports of entry on the southern border. The plaintiffs sought declaratory and class injunctive relief to compel the Government to abide by the asylum process set forth in 8 U.S.C. §§ 1158 and 1225(b) (and accompanying regulations), to declare that Defendants lack authority under the INA to deny access to the asylum process, including turning away asylum seekers away at ports of entry, and to enjoin Defendants from denying class members access to the U.S. asylum process in violation of their procedural-due-process rights. The *AOL* court stayed the class-certification motion pending

---

[2] The case was subsequently transferred to the District Court for the Southern District of California.

DEFENDANTS' RESPONSE IN
OPPOSITION TO STATES' MOTION
FOR EXPEDITED DISCOVERY AND
REGULAR STATUS CONFERENCES
CASE NO. 2:18-cv-00939-MJP
*State of Washington, et al. v. United States, et al.,*

3

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

adjudication of the Government's motion to dismiss. The motion to dismiss remains pending.

### ARGUMENT

The States seek expedited discovery from Defendants on a broad range of topics that Plaintiffs contend are necessary to obtain and preserve evidence concerning the Government's alleged family-separation policy and other practices raised in the complaint. But their speculation that evidence may be difficult to track once discovery properly commences does not demonstrate a compelling need for the expedited discovery they seek. *See Wangson*, 2008 WL 4239155, at *7. And the States' motion has other threshold failings. The suit is non-justiciable because the States lack Article III standing to raise any of their claims. Moreover, as the States concede, the very individuals whose interests they wish to represent are already litigating the States' claims on their own behalf *in Ms. L.*—where a class has been certified and an injunction requiring reunification has been issued. Because a class has been certified, no individual member of that class, let alone any third party purporting to represent that individual's interest, may seek similar relief outside the confines of that class action, including discovery directed at issues already subject to litigation in *Ms. L. See* Dkt. 15 at at 2, 9–10; Dkt. 15-1; and Dkt. 15-6. Indeed, any discovery in this case will unduly burden the Government's ability to promptly comply with the *Ms. L.* injunction, and the States' claims are already being litigated in *Ms. L.* and *AOL.* Because of the threshold hurdles the States' complaint faces and the overlap with the *Ms. L.* and *AOL* litigations, the Court should stay its hand on discovery until it resolves any motion to dismiss, transfer or stay, as well as any Rule 12 motion to dismiss.

### I.    The States Have Not Shown Good Cause For The Expedited Discovery They Seek.

"Federal Rule of Civil Procedure 26(d) bars parties from seeking 'discovery from any source before the parties have conferred as required by Rule 26(f)." *Music Grp. Macao Commercial Offshore Ltd. v. John Does I-IX*, No. 14-CV-621 RSM, 2014 WL 11010724, at *1 (W.D. Wash. July 18, 2014). An order expediting discovery before responsive pleadings are filed is thus unusual and extraordinary—and should be granted only where the discovery requests are focused and narrowly tailored, and the plaintiffs have shown a high probability of success. "[C]ourts in this jurisdiction require that the moving party demonstrate that 'good cause' exists to deviate from the standard pretrial schedule" by demonstrating that "expedited discovery, in consideration of the administration of justice, outweighs

DEFENDANTS' RESPONSE IN
OPPOSITION TO STATES' MOTION
FOR EXPEDITED DISCOVERY AND
REGULAR STATUS CONFERENCES
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.*,

4

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

the prejudice to the responding party." *Id.* "Factors commonly considered in determining the reasonableness of expedited discovery include, but are not limited to: '(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made.'" *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009); *see Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 275 (N.D. Cal. 2002) ("it makes sense to examine the discovery request . . . on the entirety of the record to date and the *reasonableness* of the request in light of all the surrounding circumstances").

These factors confirm that the States' expedited discovery request should be denied. The States have not filed a preliminary-injunction motion, and it is indisputable that their discovery requests are extremely broad and burdensome in scope and have been made long in advance of the typical discovery process. The States have neither served Defendants with actual discovery requests, nor have they met and conferred with Defendants about the discovery they seek to propound. Rather, six days after filing their complaint, the States filed a motion and attached a list of 14 broad topics on which they desire to take expedited discovery in order to "obtain and preserve evidence." Dkt. 15-1 at 1. Their sole assertion of "good cause" is their speculation that "physical evidence, may be moved or difficult to track with the passage of time, thereby disadvantaging one or more parties to the litigation." Dkt. 15 at 9. That speculation does not establish good cause. Parties seeking expedited discovery on such a ground are expected to provide "evidence supporting their need, such as a custodian's practice of destroying records," that "spoilage or destruction will occur in the due course of business activities," or the need to "identify a Doe defendant for service." *Wangson*, 2008 WL 4239155, at *7; *see, e.g., Music Grp.*, 2014 WL 11010724, at *2 (rejecting discovery to identify unknown defendants because plaintiff did not demonstrate any "legitimate[] fear[] that information leading to their whereabouts faces imminent destruction").[3] Such requests must be "narrowly tailored" to the asserted good cause. *See, e.g., Music Grp.*, 2014 WL 11010724, at *2; *accord Fluke Elecs. Corp. v. CorDEX Instruments, Inc.*, No. C12-2082JLR, 2013 WL 566949, at *11 (W.D. Wash. Feb. 13, 2013) (similar).  The States' unsupported

---

[3] The sole case the States rely on, *Pod-Ners, LLC v. N. Feed & Bean of Lucerne Liab. Co.*, 204 F.R.D. 675, 676 (D. Colo. 2002), reached a similar holding.

DEFENDANTS' RESPONSE IN
OPPOSITION TO STATES' MOTION
FOR EXPEDITED DISCOVERY AND
REGULAR STATUS CONFERENCES
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.*,

5

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

speculation about a potential loss of evidence does not outweigh "the hardship [and] inequity" Defendants would suffer "in being required to go forward" with further-along duplicative litigation occurring in other district courts. *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962).

The States thus fail to show good cause for discovery and their motion should be denied.

## II.   The States' Claims Are Not Justiciable.

The States lack Article III standing to raise any of their claims, so they necessarily cannot seek discovery on those claims.[4] The States must show that they suffer an individualized injury to a "legally protected interest," that the injury is "fairly traceable" to Defendants' challenged conduct, and that the injury is redressable by a favorable decision. *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011). They cannot make that showing. The challenged federal policies and actions do not regulate the States, require them to do (or not do) anything, or restrict them in any way. As a legal matter, the States are expressing policy disagreements with the United States, which, even if "phrased in constitutional terms," "is not an injury sufficient to confer standing." *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485-86 (1982).

The States claim injury from incidental effects to their purported sovereign, quasi-sovereign, and proprietary interests that they allege will result from the actions challenged here. Dkt. 1. But, the Framers established a National Government with the power to act directly upon *individuals*, not upon the States. *See New York v. United States*, 505 U.S. 144, 162–66 (1992). Under that scheme, States have no legally protected interest in avoiding the incidental effects that are derivative of the federal government's actions affecting individuals subject to federal regulation who happen to be in that State. *Cf. Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923) ("[I]t is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as *parens patriae*."). In short, States lack any cognizable interest in "usurp[ing the] sovereign prerogative of the federal government" by "bring[ing] a suit seeking to protect individuals from a federal" action. *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011).

---

[4] If this Court retains jurisdiction over the complaint, Defendants will address standing and other threshold deficiencies with the complaint upon filing a motion to dismiss under Rule 12 at the appropriate time.

DEFENDANTS' RESPONSE IN
OPPOSITION TO STATES' MOTION
FOR EXPEDITED DISCOVERY AND
REGULAR STATUS CONFERENCES
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.*,

6

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

In any event, the States' standing claims fail for further reasons. To start, even if the States could establish an "injury" directly to *their* interest, such purported injuries cannot possibly be "certainly impending," where they are unlikely to "actually exist." *Spokeo Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). As the States acknowledge, the relief they seek has largely already been granted by the *Ms. L.* court, which enjoined the alleged family-separation policies challenged here, ordering the United States to reunite the persons concerned. *See* Dkt. 15 at 2, 9–10; *see also* App. A, Ex. 4 at 11–12. Moreover, the President has issued an Executive Order (EO) that directs family detention where permissible under the law. Exec. Order, Affording Congress an Opportunity to Address Family Separation, 2018 WL 3046068 (June 20, 2018). Thus, at least as to Plaintiffs' due process, equal protection, and APA claims, the States cannot establish that they will continue to suffer any injuries that they have alleged. Such injuries are not "certainly impending," as the Government has taken steps to modify its policies and practices in the light of the President's guidance in the Executive Order and the district court's injunction in *Ms. L.*

The States cannot overcome these barriers to standing. The States' claim that Defendants' actions *may* lead to more unaccompanied children in their States, which *may* lead to more people for whom the States' own laws obligate them to provide certain services, which *may* then harm the States' proprietary interests. Dkt. 1 ¶¶ 225-294. These allegations are speculative, attenuated, and, at most, only an incidental effect of the challenged actions of Defendants. *See Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (rejecting "as overly speculative those links [in a chain of allegations] which are predictions of future events (especially future actions to be taken by third parties)").

The States also contend that the arrival of alien children who have been separated from their parents within their boundaries harms their mandate to promote the various "best interests of the child" standards that apply in their jurisdictions. Dkt. 1 ¶¶ 173–224. But the "best interests" standard is a legal standard that courts apply to custody determinations, not a substantive interest in itself that would bind the *federal* government's separate exercise of its sovereign immigration authorities. *Best Interests of the Child*, Black's Law Dictionary (10th ed. 2014); *Best-Interests-of-the-Child Doctrine*, *id.* While States have an interest in promoting a child's welfare, it is a *parens patriae* interest, *Santosky v. Kramer*, 455 U.S. 745, 766 (1982), which, as explained, can provide no cause of action against the federal

DEFENDANTS' RESPONSE IN
OPPOSITION TO STATES' MOTION
FOR EXPEDITED DISCOVERY AND
REGULAR STATUS CONFERENCES
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

7

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

1    government.[5]

2        The States further rely on a purported quasi-sovereign interest in "protecting the health, safety,

3    and well-being of their residents." Dkt. 1 ¶ 295. But "a party 'generally must assert his own legal rights

4    and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"

5    *Kowlaski v. Tesmer*, 543 U.S. 125, 129 (2004). Third-party standing might exist only where a party

6    demonstrates a "close relationship with the person" whose rights it invokes and a "hindrance" to that

7    person's "ability to protect his own interests." *Id.* at 130. But the States cannot and do not allege any

8    close relationship with the individuals allegedly affected by Defendants' enforcement actions. The

9    mere fact that an individual *might* be housed within a State's territory does not create a legally sufficient

10   close relationship where those individuals are subject to *federal* custody. *See, e.g., Voigt v. Savell*, 70 F.3d

11   1552, 1565 (9th Cir. 1995) (no close relationship where plaintiff may "occasionally be in a position to

12   hire a non-resident").[6]

13       Nor can the States demonstrate a close relationship with possible future residents who may

14   "soon settle[] in their jurisdictions" or with unspecified parents and children placed in non-federal

15   detention centers in their States. Dkt. 1 ¶¶ 295, 299. The facilities and providers with which the federal

16   government contracts or provides grants to hold persons in *federal* custody. *See, e.g., Gleave v. Graham*,

17   954 F. Supp. 599, 608 (W.D.N.Y. 1997). The federal government enters into grant agreements

18   ("cooperative agreements") to house unaccompanied alien minors in foster care or long-term shelter

19   care, and the minors are considered to be in federal custody, regardless of their physical location in a

20   particular State. *See* 8 U.S.C. § 1232(b)(1) (the "care and custody of all unaccompanied alien children,

21   including responsibility for their detention, where appropriate, shall be the responsibility of the

22

---

23   [5] The States' claim that the federal government's June 21, 2018 application for a modification of the *Flores* Agreement in a

24   different lawsuit, to which they are not party, is somehow a "direct attack on the States' sovereign interests," Dkt. 15 at 7 n.13; Dkt. 1 ¶ 172, is baseless. The *Flores* Agreement addresses the procedures and practices that the parties agreed should

25   govern the former Immigration and Naturalization Service's ("INS") discretionary decisions to release or detain minors, and to whom they should or may be released. It also governs the conditions that must be maintained at facilities where

26   children are held in federal government custody. The States do not have a legally protected interest in arguments made by the federal government in a legal brief about an Agreement to which they are not a party.

27   [6] Indeed, the States, which are not the subject of the enforcement actions or policies they challenge, speculate as to purported injuries allegedly suffered by their residents and existing immigrant communities, *see, e.g.*, Dkt. 1 ¶¶ 297–98, who

28   are also not the subject of the actions challenged here. Such generalized grievances, made on behalf of individuals not party to this case who the States allege suffer injuries stemming from general immigration enforcement rather than any specific action or policy by Defendants, are far from the concrete and particularized harm that Article III requires.

DEFENDANTS' RESPONSE IN                          8                        U.S. DEPARTMENT OF JUSTICE
OPPOSITION TO STATES' MOTION                                           CIVIL DIVISION, OIL-DCS
FOR EXPEDITED DISCOVERY AND                                     P.O. BOX 868 BEN FRANKLIN STATION
REGULAR STATUS CONFERENCES                                    WASHINGTON, DC 20044
CASE NO. 2:18-CV-00939-MJP                                      TELEPHONE: (202) 305-0106
*State of Washington, et al. v. United States, et al.,*                  FACSIMILE: (202) 305-700

1   Secretary of Health and Human Services."); cf. *In re Tarble*, 80 U.S. 397, 407–08 (1871) (coequal

2   sovereigns are not responsible to each other). And the States cannot plausibly allege that any

3   individuals whose rights they seek to vindicate face any hindrance in vindicating their own rights given

4   that such individuals *are* in fact vindicating their own rights in *Ms. L*.

5     The States also assert injury to an alleged interest in preventing Defendants from turning away

6   asylum seekers at the Southwestern ports of entry, which they allege "encourages unlawful entry."

7   Dkt. 15 at 4. However, the States lack any such interest in federal immigration enforcement decisions,

8   and in any event, any putative harm to the States—such as a potential future increase in State spending

9   on social programs—resulting from alien families' unlawful entry would be caused by intervening and

10  unlawful actions by third parties too speculative and attenuated to support standing. *See Arpaio*, 797

11  F.3d at 21 (rejecting similar theory of standing). Moreover, the States' spending would be related to

12  the immigrants' presence, not the lawfulness of their entry: the State would still spend for resident

13  programs if the immigrants were lawfully admitted as asylees, which the States clearly wish to facilitate.

14  Because Article III requires that the causal connection between an asserted injury and the conduct

15  complained of be "fairly traceable" to the challenged action of Defendants and "not the result of the

16  independent action of some third party before the Court," Plaintiffs' standing theories fail. *See Lujan*

17  *v. Defenders of Wildlife, et al.*, 504 U.S. 505, 561 (1992).

18    Moreover, even assuming Defendants' enforcement actions result in an increase of

19  unaccompanied minors present in the Plaintiff States, the States fail to plausibly allege that children

20  separated from their parents at the border, as opposed to other unaccompanied children or children

21  living with their parents, will increase the States' alleged costs on education, healthcare, and "other

22  programs," Dkt. 1 ¶¶ 225–32, or that they suffer an economic injury directly attributable to

23  Defendants' actions. And as the States themselves point out, these are services the States have chosen

24  to provide to *all* unaccompanied undocumented minors. *See, e.g.*, Dkt. 1 ¶ 229. Washington, for

25  instance, alleges that as of April 30, 2018, it has "already received 278 unaccompanied children during

26  this fiscal year," Dkt. 1 ¶ 234, but does not suggest that any of these children arrived as a result of the

27  challenged policies or actions by Defendants. Indeed, Washington asserts that "ORR places hundreds

28  of unaccompanied minors with sponsors in the state of Washington *every year*." *Id.* (emphasis added).

DEFENDANTS' RESPONSE IN
OPPOSITION TO STATES' MOTION
FOR EXPEDITED DISCOVERY AND
REGULAR STATUS CONFERENCES
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.*,

9

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

The States' own allegations thus demonstrate that any alleged harm resulting from unaccompanied children being placed with sponsors cannot be fairly traced to the 2018 federal policies or actions challenged here, but are instead traceable to the States' own unilateral policy choices. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (no standing in such circumstances).

Given the absence of Article III standing, discovery is not warranted.[7]

## III.    Claims I–V Overlap With *Ms. L.* And Should Be Dismissed, Transferred, or Stayed.

This Court should not permit the States' third-party claims to go forward in this case where there is an ongoing, certified class action that is based on the same claims as the States' first four claims here. *Compare* Dkt. 1 p. at 115–19, *with* Ms. L., App. A, Ex. 5 at 15-17); Dkt. 22; *see*, e.g. *McNeil v. Guthrie*, 945 F.2d 1163, 1165-1166 (10th Cir. 1991) ("Individual suits for injunctive and equitable relief . . . cannot be brought where there is an existing class action. To permit them would allow interference with the ongoing class action."). This is because allowing these third-party claims would interfere with the administration of the *Ms. L.* class action by that district court, and would risk producing conflicting orders on the same claims by the same plaintiffs. *See* Dkt. 22; *e.g. Gillespie v. Crawford*, 858 F.2d 1101, 1103 (5th Cir. 1988) (en banc). This is particularly true here, where the court in *Ms. L.* has already issued a nationwide preliminary injunction generally enjoining Defendants from detaining adult migrants without their minor children, and requiring Defendants to reunify separated parents and children within weeks. *See* App. A, Ex. 4 at 23. This relief is identical to much of the relief that the States seek here. *See* Dkt 1 at 120–21. The *Ms. L.* court has ordered preliminary relief on behalf of the

---

[7] The States' asylum claim (Claim V) fails at the threshold for a second reason, and so cannot support discovery. The States' claim rests on 8 U.S.C. § 1158, which provides a mechanism for aliens to apply for asylum when present in the United States. It is settled law that "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001). Far from creating such a cause of action section 1158 explicitly says that no such private cause of action to enforce its provisions exists: "[n]othing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1158(d)(7); *see, e.g., Ivantchouk v. U.S. Att'y. Gen.*, 417 F. App'x 918, 921 (11th Cir. 2011) ("Nothing in § 1158(d) creates a private right of action against the government."); *Ms. L. v. ICE*, 302 F. Supp. 3d 1149, 1168 (S.D. Cal. 2018) (similar). If section 1158 does not imply a cause of action for the *individuals* who are subject to the statute, it certainly cannot provide third parties a "judicially cognizable interest" in those individuals' asylum applications. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see, e.g., Texas Health & Human Servs. Comm'n v. United States*, 193 F. Supp. 3d 733, 739 (N.D. Tex. 2016) (applying same analysis to 8 U.S.C. 1157, and holding that "the Refugee Act does not confer a private right of action for the States to enforce its" provisions); *Nw. Immigrant Rights Project v. USCIS*, 2016 WL 5817078, at *12 (W.D. Wash. Oct. 5, 2016) ("[statutory scheme is intended to protect individuals, not [third parties].]"). That is especially so where, as here, those individuals are already litigating on behalf of themselves.

DEFENDANTS' RESPONSE IN
OPPOSITION TO STATES' MOTION
FOR EXPEDITED DISCOVERY AND
REGULAR STATUS CONFERENCES
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

10

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

class that includes the people whose interests the States purport to represent, and Defendants have already undertaken extensive efforts towards compliance with the preliminary-injunction order. After receiving the *Ms. L.* court's preliminary-injunction order, Defendants immediately acted to implement and comply with it, and continue to work diligently on complying with the injunction's reunification directives. Defendants have dedicated immense resources and effort to reunifying families, and personnel at the highest levels of the agencies have been involved in implementing the *Ms. L.* court's directives. As explained in the declarations of Jonathan White and David W. Jennings (attached hereto as Defendants' Ex. 1 and Ex. 2, respectively), the Government has made extensive efforts to implement the injunction and reunify class members with their children. The declarations further explain that an order requiring Defendants to comply with extensive expedited discovery would necessarily require the Government to divert resources currently dedicated to the reunification efforts underway in *Ms. L. See* Defendants' Ex. 1 & Ex. 2.

As explained in the Government's concurrently filed motion to dismiss/transfer/hold, multiple doctrines of comity direct that dismissal, transfer, or holding a case in abeyance are appropriate when parallel, overlapping litigation is already underway in order "to avoid the waste of duplication, to avoid rulings which may trench upon the authority of other courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Panasonic Corp. v. Patriot Scientific Corp.*, No. 05-cv-4844, 2006 WL 709024, at *2 (N.D. Cal. Mar. 16, 2006); Dkt. 22 (collecting cases). These considerations are directly at issue here because the *Ms. L.* class has litigated the same merits issues presented by the States' complaint, and the *Ms. L.* court is conducting ongoing oversight of compliance with that injunction, including requiring the Government to regularly report on its compliance with the order to reunite parents and their children. An order from this Court issuing different or conflicting relief for the States would further interfere with that litigation, hinder the process in place, and would only serve to create unnecessary confusion. Indeed, the Ms. L. court has implemented a robust process with frequent status conferences and status reports to oversee the Government's implementation of the injunction. *See* Appendix A. Accordingly, this Court should decline to order the relief sought by the States, and should require the individuals for whom the States seek relief to proceed as part of the class in the *Ms. L.* case. And whatever disposition occurs in *Ms.*

DEFENDANTS' RESPONSE IN
OPPOSITION TO STATES' MOTION
FOR EXPEDITED DISCOVERY AND
REGULAR STATUS CONFERENCES
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

11

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

*L.* will likely provide substantial guidance to this Court and potential relief to the individuals whose interests the Plaintiffs in this case purport to represent. Simply put, proceeding with massive discovery would sap the Court's and parties' resources, invite inefficiency, and potentially result in inconsistent rulings and obligations.[8]

IV. **Discovery Should Not Proceed Until Threshold Motions Are Adjudicated.**

This Court should not enter an order granting expedited discovery before it determines whether any of the States' claims are justiciable and resolves the Government's motion to dismiss/transfer/hold, as well as any other threshold motion that the Government is permitted to file. Discovery—particularly sweeping, burdensome, and expedited discovery—is inappropriate where it may be nullified by a finding that the State's claims are non-justiciable, require transfer to the Southern District of California, or otherwise fail under Fed. R. Civ. P. 12. The States do not identify any emergency basis that requires entry of expedited discovery before the Court's determination of the Government's motion to dismiss, or, alternatively, transfer venue, or alternatively hold the case in abeyance. *Cf. Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990) ("before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue"). Requiring Defendants to engage in expedited discovery in a case that should be dismissed, transferred, or held in abeyance is unnecessary and inefficient, and the Government will be harmed by requiring it to redirect resources from complying with the *Ms. L.* injunction to respond to expedited and burdensome discovery requests in a case that likely cannot proceed as currently plead.

**CONCLUSION**

The Court should deny Plaintiffs' motion for expedited discovery.

---

[8]  Expedited discovery is further unwarranted here where the States' remaining asylum claim, Count V, which asserts that *Ms. L* class members are being deterred from applying for asylum and being asked to withdraw their asylum claims in order to be reunified with their children's, is the subject of a pending federal litigation in *both Ms. L* and *AOL*. Specifically, Count I in *AOL* claims that CBP violated the plaintiffs' right to seek asylum under the INA. And Count III in *Ms. L* alleges that family separation impedes class member's ability to apply for asylum. "As between federal district courts . . . the general principle is to avoid duplicative litigation." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976). As explained in the Government's motion to dismiss/transfer/hold, where, as here, one or more earlier filed cases, including a certified class action, raise the same or substantially similar claims and requests for relief, the later-filed case should be dismissed, transferred, or stayed, such that discovery on this claim is not warranted. Dkt. 22.

DEFENDANTS' RESPONSE IN
OPPOSITION TO STATES' MOTION
FOR EXPEDITED DISCOVERY AND
REGULAR STATUS CONFERENCES
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

12

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

1    DATED: July 11, 2018                        CHAD A. READLER
                                                 Acting Assistant Attorney General
2
                                                 AUGUST E. FLENTJE
3                                                Special Counsel to the Ass't Attorney General

4                                                WILLIAM C. PEACHEY
5                                                Director

6                                                EREZ REUVENI
                                                 Assistant Director
7
                                                 */s/ Nicole N. Murley*
8                                                NICOLE N. MURLEY
9                                                Trial Attorney

10                                               JOSHUA S. PRESS
11                                               Trial Attorney
                                                 United States Department of Justice
12                                               Civil Division
                                                 Office of Immigration Litigation
13                                               District Court Section
                                                 P.O. Box 868, Ben Franklin Station
14                                               Washington, DC 20044
                                                 Phone: (202) 616-0473
15                                               Nicole.Murley@usdoj.gov
16
17                                               *Attorneys for the United States of America*
                                                 *and the Federal Defendants*
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' RESPONSE IN                    13                    U.S. DEPARTMENT OF JUSTICE
OPPOSITION TO STATES' MOTION                                          CIVIL DIVISION, OIL-DCS
FOR EXPEDITED DISCOVERY AND                                      P.O. BOX 868 BEN FRANKLIN STATION
REGULAR STATUS CONFERENCES                                            WASHINGTON, DC 20044
Case No. 2:18-cv-00939-MJP                                           TELEPHONE: (202) 305-0106
*State of Washington, et al. v. United States, et al.,*              FACSIMILE: (202) 305-700

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2018, I electronically transmitted the foregoing document to the Clerk's Office using the U.S. District Court for the Western District of Washington's Electronic Document Filing System (ECF), which will serve a copy of this document upon all counsel of record.

By: _/s/ Nicole N. Murley_
NICOLE N. MURLEY

DEFENDANTS' RESPONSE IN
OPPOSITION TO STATES' MOTION
FOR EXPEDITED DISCOVERY AND
REGULAR STATUS CONFERENCES
CASE NO. 2:18-CV-00939-MJP
_State of Washington, et al. v. United States, et al.,_

14

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

Hon. Marsha J. Pechman

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| State of Washington, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 2:18-cv-00939 |
| The United States of America, *et al.*, | |
| Defendants. | |

# DEFENDANTS' APPENDIX A

APPENDIX A, DEFENDANTS' RESPONSE IN OPPOSITION
TO PLAINTIFFS; MOTION FOR EXPEDITED DISCOVERY
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

# INDEX OF APPENDIX A

| Exhibit | Title |
|---|---|
| 1 | Copy of Docket Sheet, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (Retrieved July 11, 2018) |
| 2 | Dkt. 71, Order on Defendants' Motion to Dismiss, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (June 6, 2018) |
| 3 | Dkt. 82, Order on Plaintiffs' Motion for Class Certification, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (June 26, 2018) |
| 4 | Dkt. 83, Order on Plaintiffs' Motion for Classwide Preliminary Injunction, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (June 26, 2018) |
| 5 | Dkt. 85, Plaintiffs' Second Amended Complaint, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 3, 2018) |
| 6 | Dkt. 86, Respondents' Notice on Compliance, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 5, 2018) |
| 7 | Dkt. 88, Declaration of Robert Guardian, Acting Deputy Assistant Director, Domestic Operations Division, Western Operations, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement, Department of Homeland Security, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 6, 2018) |
| 8 | Dkt. 91, Order Setting Further Status Conference, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 6, 2018) |
| 9 | Dkt. 95, Order Following Status Conference, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 9, 2018) |
| 10 | Dkt. 96, Joint Status Report Regarding Process for Release of UACs, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 9, 2018) |
| 11 | Dkt. 97, Joint Status Report Regarding Notice to Class Members, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 9, 2018) |
| 12 | Dkt. 98, Declaration of Michelle Brané, Attorney and Director of the Migrant Rights and Justice Program at the Women's Refugee Commission, and Jennifer Podkul, Attorney and Director of Policy at Kids in Need of Defense, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 9, 2018) |

APPENDIX A, DEFENDANTS' RESPONSE IN OPPOSITION
TO PLAINTIFFS; MOTION FOR EXPEDITED DISCOVERY
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

13          Dkt.  99, Joint Status Report Regarding Reunification, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 10, 2018)

14          Dkt.  101, Order Following Status Conference, *Ms. L v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 10, 2018)

APPENDIX A, DEFENDANTS' RESPONSE IN OPPOSITION
TO PLAINTIFFS; MOTION FOR EXPEDITED DISCOVERY
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

# Exhibit 1

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

# US District Court Civil Docket

## U.S. District - California Southern
## (San Diego)

## 3:18cv428

## Ms. L. v. U.S. Immigration And Customs Enforcement et al

### This case was retrieved from the court on Wednesday, July 11, 2018

| | |
|---|---|
| **Date Filed:** 02/26/2018 | |
| **Assigned To:** Judge Dana M. Sabraw | |
| **Referred To:** Magistrate Judge Mitchell D. Dembin | **Class Code:** OPEN |
| | **Closed:** |
| **Nature of suit:** Other Civil Rights (440) | **Statute:** 08:1158 |
| **Cause:** Immigration & Nationality Act, Section 208 (Asylum) | **Jury Demand:** None |
| | **Demand Amount:** $0 |
| **Lead Docket:** None | **NOS Description:** Other Civil Rights |
| **Other Docket:** None | |
| **Jurisdiction:** U.S. Government Defendant | |

| Litigants | Attorneys |
|---|---|
| Ms. L.<br>Petitioner | Anand Venkata Balakrishnan<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>ACLU Immigrants Rights Project<br>125 Broad Street 18th Floor<br>New York , NY  10004<br>USA<br>212-549-2618<br>Email:Abalakrishnan@aclu.Org<br><br>Bardis Vakili<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>ACLU Foundation of San Diego & Imperial Counties<br>P.O. Box 87131<br>San Diego , CA  92138-7131<br>USA<br>(619) 232-2121<br>Fax: (619) 232-0036<br>Email:Bvakili@aclusandiego.Org<br><br>Judy Rabinovitz<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>ACLU Immigrants Right Project<br>125 Broad Street 18th Floor<br>New York , NY  10004 |

USA
212-549-2618
Email:Jrabinovitz@aclu.Org

Lee Gelernt
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
ACLU Immigrants' Rights Project
125 Broad Street
New York , NY  10004
USA
242-549-2660 X2616
Fax: 212-549-2654
Email:Lgelernt@aclu.Org

Stephen B. Kang
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
American Civil Liberties Union Found. of Northern
California
39 Drumm Street
San Francisco , CA  94111
USA
415-343-0070 X0783
Fax: 415-395-0950
Email:Skang@aclu.Org

Spencer E. W. Amdur
ATTORNEY TO BE NOTICED
ACLU Immigants' Rights Project
39 Drumm Street
San Francisco , CA  94111
USA
415-343-1198
Fax: 415-395-0950
Email:Samdur@aclu.Org

Ms. C.
Petitioner

Stephen B. Kang
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
American Civil Liberties Union Found. of Northern
California
39 Drumm Street
San Francisco , CA  94111
USA
415-343-0070 X0783
Fax: 415-395-0950
Email:Skang@aclu.Org

Lee Gelernt
ATTORNEY TO BE NOTICED
ACLU Immigrants' Rights Project
125 Broad Street
New York , NY  10004
USA
242-549-2660 X2616
Fax: 212-549-2654
Email:Lgelernt@aclu.Org

U.S. Immigration And Customs Enforcement
(ICE)
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California

Civil Division 880 Front Street Suite 6253
San Diego , CA  92101
USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-616-0473
Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

U.S. Department of Homeland Security
(DHS)
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California
Civil Division 880 Front Street Suite 6253
San Diego , CA  92101
USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED

U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-616-0473
Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

U.S. Customs And Border Protection
(CBP)
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California
Civil Division 880 Front Street Suite 6253
San Diego , CA  92101
USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-616-0473
Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

U.S. Citizenship And Immigration Services
(USCIS)
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California
Civil Division 880 Front Street Suite 6253
San Diego , CA  92101
USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824

Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-616-0473
Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

U.S. Department of Health And Human Services
(HHS)
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California
Civil Division 880 Front Street Suite 6253
San Diego , CA  92101
USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA

202-616-0473
Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

| Office of Refugee Resettlement (ORR)<br>Respondent | U S Attorney CV<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U S Attorneys Office Southern District of California<br>Civil Division 880 Front Street Suite 6253<br>San Diego , CA  92101<br>USA<br>(619)557-5662<br>Fax: (619)557-7122<br>Email:Efile.Dkt.Civ@usdoj.Gov |
|---|---|

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-616-0473
Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530

USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

Thomas Homan
Acting Director of ICE
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California
Civil Division 880 Front Street Suite 6253
San Diego , CA  92101
USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-616-0473
Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

Greg Archambeault
San Diego Field Office Director, ICE
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California
Civil Division 880 Front Street Suite 6253

San Diego , CA  92101
USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-616-0473
Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

Joseph Greene
San Diego Assistant Field Office Director, ICE
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California
Civil Division 880 Front Street Suite 6253
San Diego , CA  92101
USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California

Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-616-0473
Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

Kirstjen Nielsen
Secretary of DHS
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California
Civil Division 880 Front Street Suite 6253
San Diego , CA  92101
USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian

LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-616-0473
Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

Jefferson Beauregard Sessions, III
Attorney General of the United States
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California
Civil Division 880 Front Street Suite 6253
San Diego , CA  92101
USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-616-0473
Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

Kevin K. Mcaleenan
Acting Commissioner of CBP
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California
Civil Division 880 Front Street Suite 6253
San Diego , CA  92101
USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-616-0473

Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

L. Francis Cissna               U S Attorney CV
Director of USCIS               LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Respondent                      U S Attorneys Office Southern District of California
                                Civil Division 880 Front Street Suite 6253
                                San Diego , CA  92101
                                USA
                                (619)557-5662
                                Fax: (619)557-7122
                                Email:Efile.Dkt.Civ@usdoj.Gov

                                Samuel William Bettwy
                                LEAD ATTORNEY;ATTORNEY TO BE NOTICED
                                U S Attorney's Office Southern District of California
                                Civil Division 880 Front Street
                                Room 6293
                                San Diego , CA  92101-8893
                                USA
                                (619) 546-7125
                                Fax: (619) 546-7751
                                Email:Samuel.Bettwy@usdoj.Gov

                                Sarah B. Fabian
                                LEAD ATTORNEY;ATTORNEY TO BE NOTICED
                                U.S. Department of Justice
                                Office Of Immigration Litigation
                                P. O. Box 868
                                Ben Franklin Station
                                Washington , DC  20044
                                USA
                                202-532-4824
                                Email:Sarah.B.Fabian@usdoj.Gov

                                Nicole N. Murley
                                ATTORNEY TO BE NOTICED
                                U.S. Department of Justice
                                P.O. Box 868
                                Ben Franklin Station
                                Washington , DC  20044
                                USA
                                202-616-0473
                                Fax: 202-305-7000
                                Email:Nicole.Murley@usdoj.Gov

                                Scott Grant Stewart
                                ATTORNEY TO BE NOTICED
                                U. S. Department of Justice
                                950 Pennsylvania Avenue Nw
                                Washington , DC  20530
                                USA

202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

Pete Flores
San Diego Field Director, CBP
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California
Civil Division 880 Front Street Suite 6253
San Diego , CA  92101
USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-616-0473
Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

Fred Figueroa
Warden, Otay Mesa Detention Center
[Term: 03/09/2018]
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California
Civil Division 880 Front Street Suite 6253
San Diego , CA  92101

USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

Alex Azar                                           U S Attorney CV
Secretary of the Department of Health and Human     LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Services                                            U S Attorneys Office Southern District of California
Respondent                                          Civil Division 880 Front Street Suite 6253
                                                    San Diego , CA  92101
                                                    USA
                                                    (619)557-5662
                                                    Fax: (619)557-7122
                                                    Email:Efile.Dkt.Civ@usdoj.Gov

                                                    Samuel William Bettwy
                                                    LEAD ATTORNEY;ATTORNEY TO BE NOTICED
                                                    U S Attorney's Office Southern District of California
                                                    Civil Division 880 Front Street
                                                    Room 6293
                                                    San Diego , CA  92101-8893
                                                    USA
                                                    (619) 546-7125
                                                    Fax: (619) 546-7751
                                                    Email:Samuel.Bettwy@usdoj.Gov

                                                    Sarah B. Fabian
                                                    LEAD ATTORNEY;ATTORNEY TO BE NOTICED
                                                    U.S. Department of Justice
                                                    Office Of Immigration Litigation
                                                    P. O. Box 868
                                                    Ben Franklin Station
                                                    Washington , DC  20044
                                                    USA
                                                    202-532-4824
                                                    Email:Sarah.B.Fabian@usdoj.Gov

                                                    Nicole N. Murley
                                                    ATTORNEY TO BE NOTICED
                                                    U.S. Department of Justice
                                                    P.O. Box 868
                                                    Ben Franklin Station
                                                    Washington , DC  20044
                                                    USA
                                                    202-616-0473
                                                    Fax: 202-305-7000
                                                    Email:Nicole.Murley@usdoj.Gov

                                                    Scott Grant Stewart
                                                    ATTORNEY TO BE NOTICED
                                                    U. S. Department of Justice
                                                    950 Pennsylvania Avenue Nw

Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

Scott Lloyd
Director of the Office of Refugee Resettlement
Respondent

U S Attorney CV
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorneys Office Southern District of California
Civil Division 880 Front Street Suite 6253
San Diego , CA  92101
USA
(619)557-5662
Fax: (619)557-7122
Email:Efile.Dkt.Civ@usdoj.Gov

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Nicole N. Murley
ATTORNEY TO BE NOTICED
U.S. Department of Justice
P.O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-616-0473
Fax: 202-305-7000
Email:Nicole.Murley@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

Hector A. Mancha Jr.
El Paso Field Director, CBP
Respondent

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California

Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

Adrian P. Macias
El Paso Field Director, ICE
Respondent

Samuel William Bettwy
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U S Attorney's Office Southern District of California
Civil Division 880 Front Street
Room 6293
San Diego , CA  92101-8893
USA
(619) 546-7125
Fax: (619) 546-7751
Email:Samuel.Bettwy@usdoj.Gov

Sarah B. Fabian
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. Department of Justice
Office Of Immigration Litigation
P. O. Box 868
Ben Franklin Station
Washington , DC  20044
USA
202-532-4824
Email:Sarah.B.Fabian@usdoj.Gov

Scott Grant Stewart
ATTORNEY TO BE NOTICED
U. S. Department of Justice
950 Pennsylvania Avenue Nw
Washington , DC  20530
USA
202-307-6482
Email:Scott.G.Stewart@usdoj.Gov

| | |
|---|---|
| Francis M. Jackson<br>El Paso Assistant Field Office Director, ICE<br>Respondent | Samuel William Bettwy<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U S Attorney's Office Southern District of California<br>Civil Division 880 Front Street<br>Room 6293<br>San Diego , CA  92101-8893<br>USA<br>(619) 546-7125<br>Fax: (619) 546-7751<br>Email:Samuel.Bettwy@usdoj.Gov<br><br>Sarah B. Fabian<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Office Of Immigration Litigation<br>P. O. Box 868<br>Ben Franklin Station<br>Washington , DC  20044<br>USA<br>202-532-4824<br>Email:Sarah.B.Fabian@usdoj.Gov<br><br>Scott Grant Stewart<br>ATTORNEY TO BE NOTICED<br>U. S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington , DC  20530<br>USA<br>202-307-6482<br>Email:Scott.G.Stewart@usdoj.Gov |
| Michael Wishnie, et Al., Amici Curiae<br>Amicus | Michael Shipley<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Kirkland & Ellis, LLP<br>333 South Hope Street<br>Los Angeles , CA  90071<br>USA<br>213-680-8222<br>Fax: 213-380-8500<br>Email:Michael.Shipley@kirkland.Com |
| Children's Rights., Inc., et Al., Amici Curiae<br>Amicus | Summer J Wynn<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Cooley Godward Kronish<br>4401 Eastgate Mall<br>San Diego , CA  92121-9109<br>USA<br>(858) 550-6030<br>Fax: (858) 550-6420<br>Email:Swynn@cooley.Com |

| Date | # | Proceeding Text | Source |
|---|---|---|---|
| 02/26/2018 | 1 | PETITION for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief against Greg Archambeault, Alex Azar, L. Francis Cissna, Fred Figueroa, Pete Flores, Joseph Greene, Thomas Homan, Scott Lloyd, Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health | |

|  |  | and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement ( Filing fee $ 400 receipt number 0974-10950244.), filed by Ms. L. (Attachments: # 1 Civil Cover Sheet)The new case number is 3:18-cv-428-DMS-MDD. Judge Dana M. Sabraw and Magistrate Judge Mitchell D. Dembin are assigned to the case. (Vakili, Bardis)(tcf)(jrd) (Entered: 02/26/2018) |
|---|---|---|
| 02/26/2018 | 2 | Summons Issued. Counsel receiving this notice electronically should print this summons and serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1. (tcf)(jrd) (Entered: 02/26/2018) |
| 02/27/2018 | 3 | MOTION to File Complaint Using Pseudonym (Vakili, Bardis). Modified on 2/28/2018 - No Proof of Service. QC Email sent to file Proof of Service (jah). Modified on 3/7/2018 - Corrected motion event (jah). (Entered: 02/27/2018) |
| 02/27/2018 | 4 | SEALED LODGED Proposed Document re: 3 MOTION to File Documents Under Seal. Document to be filed by Clerk if Motion to Seal is granted. (Vakili, Bardis). (jah). (Entered: 02/27/2018) |
| 02/27/2018 | 5 | SUMMONS Returned Executed by Ms. L.. Greg Archambeault, Alex Azar, L. Francis Cissna, Fred Figueroa, Pete Flores, Joseph Greene, Thomas Homan, Scott Lloyd, Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement served. (Vakili, Bardis). (aef). (Entered: 02/27/2018) |
| 02/27/2018 | 6 | CERTIFICATE OF SERVICE by Ms. L. re 3 MOTION to File Documents Under Seal, 4 Sealed Lodged Proposed Document (Vakili, Bardis) (aef). (Entered: 02/27/2018) |
| 02/28/2018 | 7 | Request to Appear Pro Hac Vice (Filing fee received: $ 206 receipt number 0974-10963954.)(Application to be reviewed by Clerk.) (Rabinovitz, Judy) (jrd) (Entered: 02/28/2018) |
| 02/28/2018 | 8 | PRO HAC APPROVED: Judy Rabinovitz appearing for Petitioner Ms. L. (no document attached) (ajs) (Entered: 02/28/2018) |
| 02/28/2018 | 9 | Request to Appear Pro Hac Vice, No payment Submitted. (Application to be reviewed by Clerk.) (Gelernt, Lee) (Entered: 02/28/2018) |
| 02/28/2018 | 10 | PRO HAC APPROVED: Lee Gelernt appearing for Petitioner Ms. L. (no document attached) (jrd) (Entered: 02/28/2018) |
| 02/28/2018 | 11 | Request to Appear Pro Hac Vice (Filing fee received: $ 206 receipt number 0974-10964160.)(Application to be reviewed by Clerk.) (Balakrishnan, Anand)(jrd) (Entered: 02/28/2018) |
| 02/28/2018 | 12 | PRO HAC APPROVED: Anand Venkata Balakrishnan appearing for Petitioner Ms. L. (no document attached) (jrd) (Entered: 02/28/2018) |
| 03/02/2018 | 13 | MOTION for Permanent Injunction by Ms. L.. (Attachments: # 1 Memo of Points and Authorities Memorandum in Support of Motion for Preliminary Injunction and Declarations)(Gelernt, Lee) (aef). (Entered: 03/02/2018) |
| 03/02/2018 | 14 | MOTION to Expedite Preliminary Injunction Schedule by Ms. L.. (Attachments: # 1 Memo of Points and Authorities Memorandum in Support of Motion to Expedite)(Gelernt, Lee) (aef). (Entered: 03/02/2018) |
| 03/02/2018 | 15 | MOTION to File Documents Under Seal (Gelernt, Lee). (jah). (Entered: 03/02/2018) |
| 03/02/2018 | 16 | SEALED LODGED Proposed Document re: 15 MOTION to File Documents Under Seal. Document to be filed by Clerk if Motion to Seal is granted. (Gelernt, Lee). (jah). (Entered: 03/02/2018) |
| 03/02/2018 | 17 | MOTION for Leave to File Brief by Amicus Curiae in Support of Plaintiff's Habeas Corpus Petition and Complaint for Declaratory Injunctive Relief by |

|            |    | Children's Rights, Inc.. (Attachments: # 1 Memo of Points and Authorities, # 2 Declaration of Linh Nguyen, # 3 Exhibit A to Declaration, # 4 Exhibit B to Declaration, # 5 Exhibit C to Declaration, # 6 Exhibit D to Declaration, # 7 Exhibit E to Declaration, # 8 Exhibit F to Declaration, # 9 Exhibit G to Declaration, # 10 Exhibit H to Declaration, # 11 Exhibit I to Declaration, # 12 Exhibit J to Declaration, # 13 Exhibit K to Declaration, # 14 Exhibit L to Declaration, # 15 Exhibit M to Declaration, # 16 Proof of Service)(Wynn, Summer)Attorney Summer J Wynn added to party Children's Rights, Inc. (pty:ip) (aef). (Entered: 03/02/2018) |
|------------|----|-------------|
| 03/02/2018 | 18 | CERTIFICATE OF SERVICE by Ms. L. re 13 MOTION for Permanent Injunction and Memorandum in Support of Preliminary Injunction (Gelernt, Lee) (aef). (Entered: 03/02/2018) |
| 03/02/2018 | 19 | CERTIFICATE OF SERVICE by Ms. L. re 14 MOTION to Expedite Preliminary Injunction Schedule and Memorandum in Support of Motion (Gelernt, Lee) (aef). (Entered: 03/02/2018) |
| 03/02/2018 | 20 | CERTIFICATE OF SERVICE by Ms. L. re 15 MOTION to File Documents Under Seal (Gelernt, Lee) (aef). (Entered: 03/02/2018) |
| 03/03/2018 | 21 | Amended MOTION for Preliminary Injunction by Ms. L.. (Attachments: # 1 Memo of Points and Authorities Memorandum in Support of Motion for Preliminary Injunction and Corrected Exhibits)(Gelernt, Lee) (aef). (Entered: 03/03/2018) |
| 03/03/2018 | 22 | CERTIFICATE OF SERVICE by Ms. L. re 21 Amended MOTION for Preliminary Injunction and Memorandum in Support of Preliminary Injunction (Gelernt, Lee) (aef). (Entered: 03/03/2018) |
| 03/04/2018 | 23 | Amicus Curiae Appearance entered by Michael Shipley on behalf of Michael Wishnie, et al., amici curiae. (Attachments: # 1 Memo of Points and Authorities Brief of Scholars of Immigration Law and Constitutional Law as Amici Curiae in Support of Ms. L.'s Motion for a Preliminary Injunction, # 2 Proof of Service)(Shipley, Michael) (aef). (Entered: 03/04/2018) |
| 03/05/2018 | 24 | NOTICE of Withdrawal of Documents by Ms. L. re 13 MOTION for Permanent Injunction (Vakili, Bardis) (aef). (Entered: 03/05/2018) |
| 03/05/2018 | 25 | CERTIFICATE OF SERVICE by Ms. L. re 24 Notice (Other) of Withdrawal of Documents (Vakili, Bardis) (aef). (Entered: 03/05/2018) |
| 03/06/2018 | 26 | ORDER granting Petitioner's 3 Motion to File Complaint Using Pseudonym. The Petitioner is granted leave to file the Complaint using only the Petitioner's initial. An unredacted copy of the Complaint will be received as a restricted document, only available to the parties in this litigation. The parties will not disclose the unredacted Complaint or Petitioner's true name to anyone other than parties to the litigation. Signed by Judge Dana M. Sabraw on 3/6/2018. (jah) (Entered: 03/07/2018) |
| 03/06/2018 | 27 | Unredacted Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief by Ms. L. re 1 Petition. (jah) (Entered: 03/07/2018) |
| 03/07/2018 | 28 | RESPONSE in Opposition re 14 MOTION to Expedite Preliminary Injunction Schedule filed by Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Scott Lloyd, Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. (Attachments: # 1 Declaration, # 2 Proof of Service) (Bettwy, Samuel) (aef). (Entered: 03/07/2018) |
| 03/07/2018 | 29 | NOTICE of Appearance by Spencer E. W. Amdur on behalf of Ms. L. (Amdur, Spencer)Attorney Spencer E. W. Amdur added to party Ms. L. (pty:pet) (aef). (Entered: 03/07/2018) |
| 03/08/2018 | 30 |  |

Minute Entry for proceedings held before Judge Dana M. Sabraw: Telephonic Status Conference held on 3/8/2018. Court to issue order. (Court Reporter/ECR Lee Ann Pence). (Plaintiff Attorney Lee Gelernt, Bardis Vakili). (Defendant Attorney Samuel Bettwy, Nicole Murley). (no document attached) (jak) (Entered: 03/08/2018)

| | | |
|---|---|---|
| 03/08/2018 | 31 | ORDER (1) Granting in part and Denying in part 14 Motion to Expedite and (2) Setting Briefing Schedule and Hearing Date on Motion for Preliminary Injunction and Motions for Leave to File Amicus Brief. Respondents-Defendants shall provide the results of the DNA testing to Petitioner-Plaintiff's counsel and the Court on or before March 14, 2018. Respondents-Defendants shall file their responses to the motions for preliminary injunction and to file amicus briefs on or before March 16, 2018. Petitioner-Plaintiff and Amici shall file their reply briefs on or before March 23, 2018. Absent a finding by theCourt that oral argument is unnecessary pursuant to Civil Local Rule 7.1(d)(1), the motions will be heard on March 29, 2018, at 1:30 p.m. Signed by Judge Dana M. Sabraw on 3/8/2018. (aef) (Entered: 03/08/2018) |
| 03/09/2018 | 32 | AMENDED COMPLAINT for Declaratory and Injunctive Relief with Class Action Allegations against Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Scott Lloyd, Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Hector A. Mancha Jr., Adrian P. Macias, Francis M. Jackson, filed by Ms. L., Ms. C..New Summons Requested. (Gelernt, Lee) (aef). (Entered: 03/09/2018) |
| 03/09/2018 | 33 | MOTION to File Documents Under Seal (Gelernt, Lee). (jah). (Entered: 03/09/2018) |
| 03/09/2018 | 34 | SEALED LODGED Proposed Document re: 33 MOTION to File Documents Under Seal. Document to be filed by Clerk if Motion to Seal is granted. (Gelernt, Lee). (jah) (Entered: 03/09/2018) |
| 03/09/2018 | 35 | ***DOCUMENT STRICKEN PER ECF 41 *** - MOTION to Certify Class by Ms. C., Ms. L.. (Attachments: # 1 Memo of Points and Authorities Memorandum in Support of Motion for Class Certification and Exhibits) (Gelernt, Lee) (Main Document 35 replaced on 3/9/2018) (aef). Modified on 3/9/2018 to strike document; motion termed (aef). (Entered: 03/09/2018) |
| 03/09/2018 | 36 | MOTION to File Documents Under Seal (Gelernt, Lee). (jah). (Entered: 03/09/2018) |
| 03/09/2018 | 37 | SEALED LODGED Proposed Document re: 36 MOTION to File Documents Under Seal. Document to be filed by Clerk if Motion to Seal is granted. (Gelernt, Lee). (jah). (Entered: 03/09/2018) |
| 03/09/2018 | 38 | CERTIFICATE OF SERVICE by Ms. C., Ms. L. re 33 MOTION to File Documents Under Seal, 34 Sealed Lodged Proposed Document (Gelernt, Lee) (aef). (Entered: 03/09/2018) |
| 03/09/2018 | 39 | CERTIFICATE OF SERVICE by Ms. C., Ms. L. re 35 MOTION to Certify Class and Memorandum in Support of Motion (Gelernt, Lee) (aef). (Entered: 03/09/2018) |
| 03/09/2018 | 40 | CERTIFICATE OF SERVICE by Ms. C., Ms. L. re 36 MOTION to File Documents Under Seal, 37 Sealed Lodged Proposed Document (Gelernt, Lee) (aef). (Entered: 03/09/2018) |
| 03/09/2018 | 41 | Notice of Document Discrepancies and Order Thereon by Judge Dana M. Sabraw Rejecting re 35 Motion to Certify Class , from Petitioners Ms. C., Ms. L. Non-compliance with local rule(s), Civil Local Rule 7.1.b. Counsel must obtain a hearing date from chambers prior to filing motions. IT IS HEREBY ORDERED: The document is rejected. It is ordered that the Clerk |

|            |    | STRIKE the document from the record, and serve a copy of this order on all parties. Signed by Judge Dana M. Sabraw on 3/9/2018.(aef) (Entered: 03/09/2018) |
|------------|----|----|
| 03/09/2018 | 42 | MOTION to Certify Class by Ms. C., Ms. L.. (Attachments: # 1 Memo of Points and Authorities Memorandum in Support of Motion for Class Certification and Exhibits)(Gelernt, Lee) (aef). (Entered: 03/09/2018) |
| 03/12/2018 | 43 | Summons Issued re 32 Amended Complaint. Counsel receiving this notice electronically should print this summons and serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1. (aef) (Entered: 03/12/2018) |
| 03/12/2018 | 44 | NOTICE of DNA Results by Alex Azar, Scott Lloyd, Office of Refugee Resettlement, U.S. Department of Health and Human Services re 31 Order on Motion to Expedite, (Attachments: # 1 Proof of Service)(Bettwy, Samuel)Attorney Samuel William Bettwy added to party Alex Azar (pty:res), Attorney Samuel William Bettwy added to party Scott Lloyd (pty:res), Attorney Samuel William Bettwy added to party Office of Refugee Resettlement(pty:res), Attorney Samuel William Bettwy added to party U.S. Department of Health and Human Services(pty:res) (aef). (Entered: 03/12/2018) |
| 03/16/2018 | 45 | NON Opposition re 17 MOTION for Leave to File Brief by Amicus Curiae in Support of Plaintiff's Habeas Corpus Petition and Complaint for Declaratory Injunctive Relief filed by Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. (Attachments: # 1 Proof of Service)(Bettwy, Samuel) (aef). (Entered: 03/16/2018) |
| 03/16/2018 | 46 | RESPONSE in Opposition re 21 Amended MOTION for Preliminary Injunction filed by Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. (Attachments: # 1 Declaration Ortiz, # 2 Declaration Banzon, # 3 Proof of Service)(Bettwy, Samuel) (aef). (Entered: 03/16/2018) |
| 03/16/2018 | 47 | MOTION to File Documents Under Seal (With attachments)(Bettwy, Samuel) QC mailer sent re missing proposed document (jjg). (Entered: 03/16/2018) |
| 03/19/2018 | 48 | MOTION for Preliminary Injunction for Classwide Relief by Ms. C., Ms. L.. (Attachments: # 1 Memo of Points and Authorities in Support of Classwide Preliminary Injunction and Exhibits)(Gelernt, Lee) (aef). (Entered: 03/19/2018) |
| 03/19/2018 | 49 | STATUS REPORT by Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Scott Lloyd, Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. (Attachments: # 1 Proof of Service)(Bettwy, Samuel) (aef). (Entered: 03/19/2018) |
| 03/19/2018 | 50 | SEALED LODGED Proposed Document re: 47 MOTION to File Documents Under Seal. Document to be filed by Clerk if Motion to Seal is granted. (With attachments)(Bettwy, Samuel) (jjg). (Entered: 03/19/2018) |

| | | |
|---|---|---|
| 03/21/2018 | 51 | Joint MOTION for Hearing (reset hearing date &amp; set briefing schedule) by Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Scott Lloyd, Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. (Attachments: # 1 Proof of Service)(Bettwy, Samuel) (aef). (Entered: 03/21/2018) |
| 03/22/2018 | 52 | ORDER (1) Granting 51 Joint Motion to Reset Hearing Date and Set Briefing Schedule and (2) Denying as Moot 21 Motion for Preliminary Injunction and Vacating Hearing Date Thereon. Signed by Judge Dana M. Sabraw on 3/22/2018. (aef) (Entered: 03/22/2018) |
| 03/23/2018 | 53 | ORDER Granting 17 , 23 Motions for Leave to File Amicus Briefs. Signed by Judge Dana M. Sabraw on 3/22/2018. (aef) (Entered: 03/23/2018) |
| 03/23/2018 | 54 | NOTICE of Appearance by Sarah B. Fabian on behalf of Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Scott Lloyd, Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement (Fabian, Sarah)Attorney Sarah B. Fabian added to party Greg Archambeault(pty:res), Attorney Sarah B. Fabian added to party Alex Azar (pty:res), Attorney Sarah B. Fabian added to party L. Francis Cissna (pty:res), Attorney Sarah B. Fabian added to party Pete Flores(pty:res), Attorney Sarah B. Fabian added to party Joseph Greene(pty:res), Attorney Sarah B. Fabian added to party Thomas Homan(pty:res), Attorney Sarah B. Fabian added to party Scott Lloyd(pty:res), Attorney Sarah B. Fabian added to party Kevin K. McAleenan(pty:res), Attorney Sarah B. Fabian added to party Kirstjen Nielsen(pty:res), Attorney Sarah B. Fabian added to party Office of Refugee Resettlement(pty:res), Attorney Sarah B. Fabian added to party Jefferson Beauregard Sessions, III(pty:res), Attorney Sarah B. Fabian added to party U.S. Citizenship and Immigration Services(pty:res), Attorney Sarah B. Fabian added to party U.S. Customs and Border Protection(pty:res), Attorney Sarah B. Fabian added to party U.S. Department of Health and Human Services(pty:res), Attorney Sarah B. Fabian added to party U.S. Department of Homeland Security(pty:res), Attorney Sarah B. Fabian added to party U.S. Immigration and Customs Enforcement(pty:res) (jpp). (Entered: 03/23/2018) |
| 03/27/2018 | 55 | NOTICE of Appearance by Nicole N. Murley on behalf of Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Scott Lloyd, Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement (Murley, Nicole)Attorney Nicole N. Murley added to party Greg Archambeault(pty:res), Attorney Nicole N. Murley added to party Alex Azar(pty:res), Attorney Nicole N. Murley added to party L. Francis Cissna(pty:res), Attorney Nicole N. Murley added to party Pete Flores (pty:res), Attorney Nicole N. Murley added to party Joseph Greene (pty:res), Attorney Nicole N. Murley added to party Thomas Homan (pty:res), Attorney Nicole N. Murley added to party Scott Lloyd(pty:res), Attorney Nicole N. Murley added to party Kevin K. McAleenan(pty:res), Attorney Nicole N. Murley added to party Kirstjen Nielsen(pty:res), Attorney Nicole N. Murley added to party Office of Refugee Resettlement (pty:res), Attorney Nicole N. Murley added to party Jefferson Beauregard Sessions, III(pty:res), Attorney Nicole N. Murley added to party U.S. Citizenship and Immigration Services(pty:res), Attorney Nicole N. Murley |

added to party U.S. Customs and Border Protection(pty:res), Attorney Nicole N. Murley added to party U.S. Department of Health and Human Services(pty:res), Attorney Nicole N. Murley added to party U.S. Department of Homeland Security(pty:res), Attorney Nicole N. Murley added to party U.S. Immigration and Customs Enforcement(pty:res) (aef). (Entered: 03/27/2018)

| | | |
|---|---|---|
| 04/06/2018 | 56 | MOTION to Dismiss for Lack of Jurisdiction and Lack of Venue, MOTION to Dismiss for Failure to State a Claim by Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. (Attachments: # 1 Memo of Points and Authorities)(Fabian, Sarah)Attorney Sarah B. Fabian added to party Francis M. Jackson(pty:res), Attorney Sarah B. Fabian added to party Adrian P. Macias(pty:res), Attorney Sarah B. Fabian added to party Hector A. Mancha Jr.(pty:res) (aef). (Entered: 04/06/2018) |
| 04/20/2018 | 57 | RESPONSE in Opposition re 48 MOTION for Preliminary Injunction for Classwide Relief filed by Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Fabian, Sarah) (aef). (Entered: 04/20/2018) |
| 04/20/2018 | 58 | RESPONSE in Opposition re 56 MOTION to Dismiss for Lack of Jurisdiction and Lack of Venue MOTION to Dismiss for Failure to State a Claim filed by Ms. C., Ms. L.. (Gelernt, Lee) (aef). (Entered: 04/20/2018) |
| 04/20/2018 | 59 | RESPONSE in Opposition re 42 MOTION to Certify Class filed by Greg Archambeault, Alex Azar, L. Francis Cissna, Fred Figueroa, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. (Murley, Nicole)(aef). (Entered: 04/20/2018) |
| 04/25/2018 | 60 | ORDER Granting Motion to File Amended Complaint Using Pseudonym. It is ORDERED that the Petitioners-Plaintiffs are granted leave to file the Amended Complaint using only the Petitioner-Plaintiff's initial. Signed by Judge Dana M. Sabraw on 4/24/2018.(aef) (Entered: 04/26/2018) |
| 04/27/2018 | 61 | REPLY to Response to Motion re 56 MOTION to Dismiss for Lack of Jurisdiction and Lack of Venue MOTION to Dismiss for Failure to State a Claim filed by Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Immigration and Customs Enforcement. (Fabian, Sarah) (aef). (Entered: 04/27/2018) |
| 04/27/2018 | 62 | REPLY to Response to Motion re 42 MOTION to Certify Class filed by Ms. C., Ms. L.. (Gelernt, Lee)(aef). (Entered: 04/27/2018) |
| 04/27/2018 | 63 | |

|            |    | REPLY to Response to Motion re 48 MOTION for Preliminary Injunction for Classwide Relief filed by Ms. C., Ms. L.. (Gelernt, Lee) (aef). (Entered: 04/27/2018) |
|------------|----|----|
| 04/27/2018 | 64 | MOTION to File Documents Under Seal (Gelernt, Lee) (aef). (Entered: 04/27/2018) |
| 04/27/2018 | 65 | SEALED LODGED Proposed Document re: 64 MOTION to File Documents Under Seal. Document to be filed by Clerk if Motion to Seal is granted. (Gelernt, Lee)(aef). (Entered: 04/27/2018) |
| 04/27/2018 | 66 | CERTIFICATE OF SERVICE by Ms. C., Ms. L. re 64 MOTION to File Documents Under Seal, 65 Sealed Lodged Proposed Document (Gelernt, Lee) (aef). (Entered: 04/27/2018) |
| 05/02/2018 | 67 | SUMMONS Returned Executed by Ms. L.. Greg Archambeault, Alex Azar, L. Francis Cissna, Fred Figueroa, Pete Flores, Joseph Greene, Thomas Homan, Scott Lloyd, Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement served. (Gelernt, Lee)(aef). (Entered: 05/02/2018) |
| 05/02/2018 | 68 | SUMMONS Returned Executed by Ms. L., Ms. C.. Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement served. (Gelernt, Lee) (aef). (Entered: 05/02/2018) |
| 05/04/2018 | 69 | Minute Entry for proceedings held before Judge Dana M. Sabraw: Motion Hearing held on 5/4/2018 re 42 MOTION to Certify Class filed by Ms. C., Ms. L., 48 MOTION for Preliminary Injunction for Classwide Relief filed by Ms. C., Ms. L. Court to issue order. (Court Reporter/ECR Lee Ann Pence). (Plaintiff Attorney Anana Balakrishnan, Lee Gelernt, Bardis Vakili). (Defendant Attorney Sara Fabian, Nicole Murley). (no document attached) (jak) (Entered: 05/04/2018) |
| 05/09/2018 | 70 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (Motion Hearing) held on 5/4/2018, before Judge Dana M. Sabraw. Court Reporter/Transcriber: Lee Ann Pence. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E-File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 5/30/2018. Redacted Transcript Deadline set for 6/11/2018. Release of Transcript Restriction set for 8/7/2018. (akr) (Entered: 05/09/2018) |
| 06/06/2018 | 71 | ORDER Granting in part and Denying in part 56 Defendants' Motion to Dismiss. The Court grants in part and denies in part Defendants' motion to dismiss. Specifically, the Court grants Defendants' motion to dismiss Plaintiffs' claims under the APA and the Asylum Statute, and denies Defendants' motion to dismiss Plaintiffs' due process claim. Although Plaintiffs did not request leave to amend in the event any portion of Defendants' motion was granted, the Court grants Plaintiffs leave to file a Second Amended Complaint that cures the pleading deficiencies set out above. If Plaintiffs wish to do so, they shall file their Second Amended Complaint on or before July 3, 2018. Signed by Judge Dana M. Sabraw on 6/6/2018. (aef) (Entered: 06/06/2018) |

| 06/08/2018 | 72 | NOTICE of Appearance by Stephen B. Kang on behalf of Ms. C., Ms. L. (Kang, Stephen)Attorney Stephen B. Kang added to party Ms. C.(pty:pet), Attorney Stephen B. Kang added to party Ms. L.(pty:pet) (aef). (Entered: 06/08/2018) |
|---|---|---|
| 06/20/2018 | 73 | ORDER Setting Status Conference. In light of the Executive Order issued today, June 20, 2018, entitled "Affording Congress an Opportunity to Address Family Separation," a telephonic status conference shall be held on June 22, 2018, at 12:00 p.m. Counsel for Defendants shall organize and initiate the call to the Court. Signed by Judge Dana M. Sabraw on 6/20/2018.(aef) (Entered: 06/20/2018) |
| 06/21/2018 | 74 | NOTICE of Dial-In Information. For purposes of the telephonic status conference scheduled for June 22, 2018, at 12:00 p.m., the Court has set up a dial in number for counsel and any members of the news media that wish to attend. This number is for counsel and media only, 877-873-8018. (aef) (Entered: 06/22/2018) |
| 06/22/2018 | 75 | Minute Entry for proceedings held before Judge Dana M. Sabraw: Telephonic Status Conference held on 6/22/2018. Plaintiff to file additional briefing by 6/25/2018. Defense to file response by 6/27/2018 4:30pm PST. (Court Reporter/ECR Lee Ann Pence). (Plaintiff Attorney Lee Gelernt, Vakili Bardis). (Defendant Attorney Sarah Fabian, Samuel Bettwy). (no document attached) (jak) (Entered: 06/22/2018) |
| 06/24/2018 | 76 | ORDER Amending Briefing Schedule. In light of the urgent nature of the motions currently pending before the Court, the Court finds good cause to advance the deadline for Defendants' supplemental brief. Accordingly, Defendants shall file their supplemental brief on or before June 26, 2018, at 9:00 a.m. Pacific Time. Signed by Judge Dana M. Sabraw on 6/24/2018.(aef) (Entered: 06/25/2018) |
| 06/25/2018 | 77 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (Telephonic Status Conference) held on 6/22/2018, before Judge Dana M. Sabraw. Court Reporter/Transcriber: Lee Ann Pence. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E-File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 7/16/2018. Redacted Transcript Deadline set for 7/26/2018. Release of Transcript Restriction set for 9/24/2018. (akr) (Entered: 06/25/2018) |
| 06/25/2018 | 78 | SUPPLEMENTAL BRIEFING by Petitioners Ms. C., Ms. L. re 48 MOTION for Preliminary Injunction for Classwide Relief and Additional Evidence. (Gelernt, Lee) (aef). (Entered: 06/25/2018) |
| 06/26/2018 | 79 | RESPONSE in Opposition re 48 MOTION for Preliminary Injunction for Classwide Relief Supplemental Brief filed by Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. (Attachments: # 1 Proof of Service)(Fabian, Sarah) (aef). (Entered: 06/26/2018) |
| 06/26/2018 | 80 | DECLARATION re 79 Response in Opposition to Motion,, by Respondents Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border |

|  |  | Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. (Attachments: # 1 Declaration)(Fabian, Sarah) (aef). (Entered: 06/26/2018) |
|---|---|---|
| 06/26/2018 | 81 | REPLY - Other re 79 Response in Opposition to Motion,, filed by Ms. C., Ms. L.. (Gelernt, Lee) (aef). (Entered: 06/26/2018) |
| 06/26/2018 | 82 | ORDER Granting In Part 42 Plaintiffs' Motion for Class Certification. Plaintiffs' motion for class certification is granted in part as to Plaintiffs' substantive due process claim. Plaintiffs are appointed as Class Representatives, and Counsel from the ACLU Immigrants' Rights Project and the ACLU of San Diego and Imperial Counties are appointed as counsel for this Class pursuant to Federal Rule of Civil Procedure 23(g). Signed by Judge Dana M. Sabraw on 6/26/2018. (aef) (Entered: 06/26/2018) |
| 06/26/2018 | 83 | ORDER Granting 48 Plaintiffs' Motion for Classwide Preliminary Injunction. The Court hereby GRANTS Plaintiffs' motion for classwide preliminary injunction. A status conference will be held on July 6, 2018, at 12:00 noon. Signed by Judge Dana M. Sabraw on 6/26/2018. (aef) (Entered: 06/26/2018) |
| 07/02/2018 | 84 | NOTICE of Dial-In Information. For purposes of the telephonic status conference scheduled for 7/6/2018 at 12:00 p.m., the Court has set up a dial in number for counsel and any members of the news media that wish to attend. (jdt) (Entered: 07/02/2018) |
| 07/03/2018 | 85 | SECOND AMENDED COMPLAINT against Greg Archambeault, Alex Azar, L. Francis Cissna, Fred Figueroa, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, filed by Ms. L., Ms. C. (Gelernt, Lee) (aef). (Entered: 07/03/2018) |
| 07/05/2018 | 86 | NOTICE Regarding Compliance by Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement (Attachments: # 1 Declaration, # 2 Exhibit, # 3 Exhibit)(Fabian, Sarah) (jpp). (Entered: 07/05/2018) |
| 07/06/2018 | 87 | NOTICE of Appearance by Scott Grant Stewart on behalf of Greg Archambeault, Alex Azar, L. Francis Cissna, Fred Figueroa, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement (Stewart, Scott)Attorney Scott Grant Stewart added to party Greg Archambeault(pty:res), Attorney Scott Grant Stewart added to party Alex Azar(pty:res), Attorney Scott Grant Stewart added to party L. Francis Cissna(pty:res), Attorney Scott Grant Stewart added to party Fred Figueroa(pty:res), Attorney Scott Grant Stewart added to party Pete Flores(pty:res), Attorney Scott Grant Stewart added to party Joseph Greene(pty:res), Attorney Scott Grant Stewart added to party Thomas Homan(pty:res), Attorney Scott Grant Stewart added to party Francis M. Jackson(pty:res), Attorney Scott Grant Stewart added to party Scott Lloyd (pty:res), Attorney Scott Grant Stewart added to party Adrian P. Macias |

(pty:res), Attorney Scott Grant Stewart added to party Hector A. Mancha Jr.(pty:res), Attorney Scott Grant Stewart added to party Kevin K. McAleenan(pty:res), Attorney Scott Grant Stewart added to party Kirstjen Nielsen(pty:res), Attorney Scott Grant Stewart added to party Office of Refugee Resettlement(pty:res), Attorney Scott Grant Stewart added to party Jefferson Beauregard Sessions, III(pty:res), Attorney Scott Grant Stewart added to party U.S. Citizenship and Immigration Services (pty:res), Attorney Scott Grant Stewart added to party U.S. Customs and Border Protection(pty:res), Attorney Scott Grant Stewart added to party U.S. Department of Health and Human Services(pty:res), Attorney Scott Grant Stewart added to party U.S. Department of Homeland Security (pty:res), Attorney Scott Grant Stewart added to party U.S. Immigration and Customs Enforcement(pty:res) (aef). (Entered: 07/06/2018)

| 07/06/2018 | 88 | DECLARATION re 86 Notice (Other),, ICE Declaration by Respondents Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. (Fabian, Sarah) (aef). (Entered: 07/06/2018) |

| 07/06/2018 | 89 | Minute Entry for proceedings held before Judge Dana M. Sabraw: Status Conference held on 7/6/2018. Status Conference set for 7/9/2018 10:00 AM in Courtroom 13A before Judge Dana M. Sabraw. (Court Reporter/ECR Lee Ann Pence). (Plaintiff Attorney Lee Gelernt, Bardis Vakili, Anand Balakrishnan). (Defendant Attorney Sarah Fabian, Scott Stewart). (no document attached) (jak) (Entered: 07/06/2018) |

| 07/06/2018 | 91 | ORDER Setting Further Status Conference. A Status Conference is set for 7/9/2018 at 10:00 AM before Judge Dana M. Sabraw. Signed by Judge Dana M. Sabraw on 7/6/2018.(aef) (Entered: 07/09/2018) |

| 07/08/2018 | 90 | Joint MOTION for Protective Order by Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. (Fabian, Sarah) (aef). (Entered: 07/08/2018) |

| 07/09/2018 | 92 | PROTECTIVE ORDER. (ECF 90 ) Signed by Judge Dana M. Sabraw on 7/8/2018. (aef) (Entered: 07/09/2018) |

| 07/09/2018 | 93 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (Status Conference) held on 7/6/2018, before Judge Dana M. Sabraw. Court Reporter/Transcriber: Lee Ann Pence. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E-File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 7/30/2018. Redacted Transcript Deadline set for 8/9/2018. Release of Transcript Restriction set for 10/9/2018. (akr) (Entered: 07/09/2018) |

| 07/09/2018 | 94 | Minute Entry for proceedings held before Judge Dana M. Sabraw: Status Conference held on 7/9/2018. (Further Status Conference set for 7/10/2018 11:00 AM in Courtroom 13A before Judge Dana M. Sabraw.) (Court Reporter/ECR Lee Ann Pence). (Plaintiff Attorney Lee Gelernt). (Defendant Attorney Sarah Fabian). (no document attached) (jak) (Entered: 07/09/2018) |

| | | |
|---|---|---|
| 07/09/2018 | 95 | ORDER Following Status Conference. A Status Conference is set for 7/10/2018 at 11:00 AM before Judge Dana M. Sabraw. Signed by Judge Dana M. Sabraw on 7/9/2018.(aef) (Entered: 07/09/2018) |
| 07/09/2018 | 96 | NOTICE Joint Notice of Parties Re Process for Release by Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement (Fabian, Sarah) (Entered: 07/09/2018) |
| 07/09/2018 | 97 | NOTICE Joint Notice of Parties re Notice to Class Members by Ms. C., Ms. L. (Attachments: # 1 Exhibit Government's Version, # 2 Exhibit Plaintiffs' Version)(Gelernt, Lee) (Entered: 07/09/2018) |
| 07/09/2018 | 98 | DECLARATION of Michelle Brane and Jennifer Podkul by Petitioners Ms. C., Ms. L.. (Gelernt, Lee) (Entered: 07/09/2018) |
| 07/10/2018 | 99 | NOTICE Joint Notice Re Compliance by Greg Archambeault, Alex Azar, L. Francis Cissna, Pete Flores, Joseph Greene, Thomas Homan, Francis M. Jackson, Scott Lloyd, Adrian P. Macias, Hector A. Mancha Jr., Kevin K. McAleenan, Kirstjen Nielsen, Office of Refugee Resettlement, Jefferson Beauregard Sessions, III, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Health and Human Services, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement (Fabian, Sarah) (Entered: 07/10/2018) |
| 07/10/2018 | 100 | Minute Entry for proceedings held before Judge Dana M. Sabraw: Status Hearing held on 7/10/2018. (Further Status Conference set for 7/13/2018 01:00 PM in Courtroom 13A before Judge Dana M. Sabraw.)(Court Reporter/ECR Lee Ann Pence). (Plaintiff Attorney Lee Gelernt, Bardis Vakili, Anand Balakrishnan, Stephen Kang). (Defendant Attorney Sarah Fabian, Scott Stewart). (no document attached) (jak) (Entered: 07/10/2018) |
| 07/10/2018 | 101 | ORDER Following Status Conference. A follow-up status conference was held on July 10, 2018. Counsel shall submit a further joint status report to the Court on or before 3:00 p.m. on July 12, 2018. A further Status Conference shall be held at 1:00 p.m. on July 13, 2018. Signed by Judge Dana M. Sabraw on 7/10/2018.(aef) (Entered: 07/10/2018) |
| 07/10/2018 | 102 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (Status Conference) held on 7/9/2018, before Judge Dana M. Sabraw. Court Reporter/Transcriber: Lee Ann Pence. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E-File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 7/31/2018. Redacted Transcript Deadline set for 8/10/2018. Release of Transcript Restriction set for 10/9/2018. (akr) (Entered: 07/10/2018) | Events since last full update |
| 07/10/2018 | 103 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (Status Conference) held on 7/10/2018, before Judge Dana M. Sabraw. Court Reporter/Transcriber: Lee Ann Pence. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E-File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction | Events since last full update |

Case 2:18-cv-00939-MJP   Document 21-1   Filed 07/11/18   Page 34 of 238

Request Statement due to Court Reporter/Transcriber 7/31/2018.
Redacted Transcript Deadline set for 8/10/2018. Release of Transcript
Restriction set for 10/9/2018. (akr) (Entered: 07/10/2018)

Copyright © 2018 LexisNexis CourtLink, Inc. All rights reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

# Exhibit 2

APPENDIX A, DEFENDANTS' RESPONSE IN OPPOSITION
TO PLAINTIFFS; MOTION FOR EXPEDITED DISCOVERY
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L.; et al., | Case No.: 18cv0428 DMS (MDD) |
| Petitioners-Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| U.S Immigration and Customs Enforcement ("ICE"); et al., | |
| Respondents-Defendants. | |

This case involves the Government's alleged practice of separating migrant parents and children held in immigration detention without a showing that the parent is unfit or presents a danger to the minor child. According to Plaintiffs, prior administrations detained migrant families, but did not have a practice of forcibly separating fit parents from their young children. Plaintiffs allege there are reports the Government may soon adopt a formal national policy of separating migrant families, and placing the children in government facilities for "unaccompanied minors" to deter others from coming to the United States. The Government denies it has a family separation policy and concedes such a policy would be "antithetical to the child welfare values" imposed on government actors responsible for the care and custody of migrant children who are separated from their parents as a result of the Government's enforcement of criminal and immigration law. Instead, the Government

1

asserts it considers each case on the facts available at the time a placement decision is made, and that when separation occurs, it is the result of the Government taking lawful immigration enforcement and detention actions.

Plaintiffs Ms. L. and Ms. C. allege immigration officials separated them from their minor children without determining they were unfit or presented a danger to their children, and that hundreds of other migrant families have been subjected to the same treatment. Plaintiffs, on behalf of themselves and putative class members, allege the conduct at issue violates their due process rights under the Fifth Amendment to the United States Constitution, the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and the Asylum Statute, 8 U.S.C. § 1158.

The Government's alleged practice has garnered the attention of numerous groups interested in child advocacy and welfare, immigration law and constitutional law, as evidenced by the *amicus* briefs filed in this case. Whether there is such a practice, and if so, whether that practice is lawful, is not presently before the Court. The only issues presently before the Court are whether this Court has jurisdiction to hear the case, whether this Court is the proper venue for the case, and whether Plaintiffs Ms. L. and Ms. C. have alleged sufficient facts and a sufficient legal basis to state a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). As explained below, the Court finds it has jurisdiction over the case and venue is proper in this Court. The Court also finds Plaintiffs have set forth sufficient facts and a sufficient legal basis to state a claim that separation from their children while they are contesting their removal and without a determination they are unfit or present a danger to their children violates due process. The Court further finds that Plaintiffs have failed to state a claim under the APA or the Asylum Statute.

## I.

## FACTUAL BACKGROUND

Plaintiff Ms. L. is a citizen of the Democratic Republic of the Congo. She is Catholic. On November 1, 2017, she and her then 6-year-old daughter S.S. arrived at the San Ysidro Port of Entry seeking asylum based on religious persecution. Ms. L. and her

18cv0428 DMS (MDD)

daughter were detained by immigration officials at the border, and housed together until November 5, 2017, at which time immigration officials "forcibly separated" S.S. from her mother and sent S.S. to Chicago—over a thousand miles away—where "she was housed in a detention facility for 'unaccompanied' minors run by the Office of Refugee Resettlement [ORR]." (Am. Compl. ¶ 42.) "When S.S. was taken away from her mother, she was screaming and crying, pleading with guards not to take her away from her mother." (*Id.* ¶ 43.) During their detention and while they were separated, Ms. L. was able to speak with her daughter only "approximately 6 times by phone, never by video." (*Id.* ¶ 44.) Each time they spoke, S.S. "was crying and scared." (*Id.* ¶ 43.) Ms. L. was "terrified that she would never see her daughter again." (*Id.* ¶ 45.)

After being separated from her daughter for nearly four months, Ms. L. filed the present case against numerous governmental entities and individual actors.[1] Five days after filing the original Complaint, Ms. L. filed a motion for preliminary injunction and motion to expedite hearing of the motion. Three days later, Ms. L. was "paroled," *i.e.*, released, from ICE detention. (*See infra* n.3 (discussing removal proceedings, asylum and parole)). In response to Ms. L.'s motion to expedite hearing of her motion for preliminary injunction, the Government stated it was attempting to "expeditiously resolve current doubts about whether [Ms. L.] is the mother of S.S. to the satisfaction of [ORR]." (Opp'n to Mot. to Expedite at 1.) That effort involved ORR taking a DNA saliva sample (or swab) from S.S., which it did on March 7, 2018. On March 8, 2018, the Court held a telephonic status

---

[1] Defendants include the U.S. Immigration and Customs Enforcement ("ICE"), U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Department of Health and Human Services ("HHS"), a non-law enforcement agency, ORR, a sub-agency of HHS, and a host of individuals, including the Attorney General of the United States. The Attorney General is named in his official capacity as he has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office of Immigration Review, is empowered to grant asylum or other relief, and is a legal custodian of Plaintiffs. (*Id.* ¶ 24.)

conference with counsel, and thereafter ordered the parties to collect a DNA sample from Ms. L. and to complete the DNA testing by March 14, 2018.  The testing was completed on March 12, 2018, and established maternity.  Four days later, and more than four months after they were separated, S.S. was released to her mother after ORR determined Ms. L. was capable of providing for S.S.'s physical and mental well-being.  (*See infra* n.2 (discussing child welfare provisions relating to immigrant children)).

While the DNA testing was underway, Ms. L. filed an Amended Complaint that realleges the claims in the original Petition/Complaint with minor modifications, and adds a new Plaintiff, Ms. C.  Ms. C. is a citizen of Brazil, and unlike Ms. L., she crossed into the United States with her 14-year-old son J. "between ports of entry[.]"  (Mem. of P. & A. in Supp. of Mot. to Dismiss at 5.)  Ms. C. and her son were apprehended by U.S. Border Patrol, and Ms. C. explained to the agent they were seeking asylum.  (Am. Compl. ¶ 55.)  Ms. C. was prosecuted for entering the country illegally, and J. was taken away from her and sent to an ORR facility in Chicago—hundreds of miles away—for "unaccompanied" children.  (*Id.* ¶ 56.)  Ms. C. was convicted of misdemeanor illegal entry and served 25 days in federal custody.  (*Id.* ¶ 57.)  She completed her sentence on September 22, 2017, and was then taken into ICE detention for removal proceedings and consideration of her asylum claim.  She was first held at the El Paso Processing Center before being transferred to the West Texas Detention Center.  (*Id.*)  Ms. C. was released on bond from ICE detention on April 9, 2018, after the Amended Complaint was filed, but she has yet to be reunited with her son.  During the five months she was detained, Ms. C. did not see her son, and they spoke on the phone only "a handful of times[.]"  (*Id.* ¶ 58.)  Ms. C. "is desperate" to be reunited with her son, "worries about him constantly and does not know when she will be able to see him."  (*Id.*)  "J. has been having a difficult time emotionally since being separated from his mother."  (*Id.* ¶ 59.)  Indeed, "[e]very day that J. is separated from his mother causes him greater emotional and psychological harm and could potentially lead to permanent emotional trauma."  (*Id.* ¶ 60.)  Plaintiffs allege "[t]he government has no legitimate interest in separating Ms. C. and her child[,]" there has been "no evidence, or

even accusation, that J. was abused or neglected by Ms. C.[,]" and "[t]here is no evidence that Ms. C. is an unfit parent or that she is not acting in the best interests of her child." (*Id.* ¶¶ 61-63.)

Together, Ms. L. and Ms. C. seek to represent the following nationwide class on all of their claims for relief:

> All adult parents nationwide who (1) are or will be detained in immigration custody by the Department of Homeland Security, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, absent a demonstration in a hearing that the parent is unfit or presents a danger to the child.

(*Id.* ¶ 65.) In their Amended Complaint, Plaintiffs seek, among other things, a preliminary and permanent injunction preventing Defendants from continuing to separate them and the other class members from their children, and an order requiring Defendants to either "release class members along with their children, or to detain them together in the same facility[.]" (*Id.* at 12.)

Three motions are pending before the Court: Defendants' motion to dismiss, and Plaintiffs' motion for class certification and motion for classwide preliminary injunction. These motions came on for hearing on May 4, 2018. Lee Gelernt, Anand Balakrishnan and Bardis Vakili appeared for Plaintiffs, and Sarah Fabian and Nicole Murley appeared for Defendants. This Order addresses Defendants' motion to dismiss. Plaintiffs' motions for class certification and preliminary injunction will be addressed in separate orders.

## II.

## DISCUSSION

Defendants raise a number of arguments in their motion to dismiss. First, they argue Ms. L.'s claims are moot because she has been released from ICE detention and reunited with her daughter. Second, Defendants assert the Court lacks jurisdiction over Ms. C.'s habeas claim and that venue is improper for Ms. C.'s other claims. Third, Defendants claim the Court lacks jurisdiction to review ICE's decision to detain rather than parole Plaintiffs, and also lacks jurisdiction to review ICE's decision about where to detain Plaintiffs or to

order ICE to detain Plaintiffs in a particular facility. Fourth, Defendants contend separation of Plaintiffs from their children does not violate the Fifth Amendment. Fifth, Defendants argue Plaintiffs have failed to state a claim under the APA. And finally, Defendants assert Plaintiffs have failed to state a claim under the Asylum Act.

**A.    Mootness**

Defendants' first argument in support of their motion to dismiss is that Ms. L.'s claims are moot in light of her release from detention and reunification with her daughter. Plaintiffs disagree that either of these events renders Ms. L.'s claims moot.

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)) (internal quotation marks omitted). The mootness doctrine is subject to certain exceptions, however. In this case, Plaintiffs invoke the voluntary cessation exception, which provides,

> that a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends.

*Id.*

Defendants argue the voluntary cessation exception does not apply because Ms. L. was released from detention and reunited with her daughter for reasons other than this litigation. Specifically, they assert Ms. L.'s release and reunification with her daughter "occurred through the operation of the applicable laws governing her detention and the custody of S.S.[,]" (Reply in Supp. of Mot. to Dismiss at 1), namely Ms. L.'s parole from

/ / /

/ / /

/ / /

6

ICE detention and the release of S.S. in accordance with ORR procedures and the Trafficking Victims Protection and Reauthorization Act ("TVPRA").[2] (*Id.* at 2.)

The Ninth Circuit has held that in order for the voluntary cessation exception to apply, "the voluntary cessation 'must have arisen *because of* the litigation.'" *Sze v. I.N.S.*, 153 F.3d 1005, 1008 (9th Cir. 1998) (quoting *Public Utilities Comm'n of State of Cal. v. Fed. Energy Regulatory Comm'n*, 100 F.3d 1451, 1460 (9th Cir. 1996)). *See also ACLU of Mass. v. United States Conf. of Catholic Bishops*, 705 F.3d 44, 55 (1st Cir. 2013) (quoting M. Redish, *Moore's Fed. Practice*, § 101.99[2]) ("'The voluntary cessation doctrine does not apply when the voluntary cessation of the challenged activity occurs because of reasons unrelated to the litigation.'"). Here, both sides offer competing explanations for Ms. L.'s parole from detention and reunification with her daughter, with Plaintiffs asserting these actions were the result of "Defendants' own decision to end" Ms. L.'s separation from her daughter "before this Court could rule[,]" (Opp'n to Mot. to Dismiss at 5), and Defendants arguing to the contrary.

Neither party has presented any evidence, however, as to the reason for Ms. L.'s parole from detention and reunification with her daughter. The timing of Ms. L.'s release and reunification with her daughter, both of which occurred after this case was filed and

---

[2] The TVPRA, Pub. L. No. 110-457 (Dec. 23, 2008), provides that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of" HHS and its sub-agency, ORR. 8 U.S.C. § 1232(b)(1). An "unaccompanied alien child" ("UAC") is a child under 18 years of age with no lawful immigration status in the United States who has neither a parent or legal guardian in the United States nor a parent or legal guardian in the United States "available" to care for them. 6 U.S.C § 279(g)(2). According to the TVPRA, a UAC "may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A).

7

after the Court ordered an expedited DNA test, support Plaintiffs' assertion. Defendants, meanwhile, have failed to present any evidence to support their assertion that they were simply complying with the statutes, and would have paroled Ms. L. and reunited her with her daughter pursuant to the TVPRA absent this litigation, such as declarations from individuals involved in those decisions who could attest that the decisions were in process prior to this litigation. *See ACLU of Mass.*, 705 F.3d at 55 (finding voluntary cessation exception did not apply where contract at issue "expired according to its terms. HHS did nothing to hasten its expiration, much less do so to terminate litigation; ... Moreover, the expiration date, options, and task order extension were all built into the contract's terms before this litigation began."). Defendants also have failed to offer any evidence to explain why DNA testing of Ms. L. and S.S. was not completed during the four months that Ms. L. and S.S. were detained and during which time Ms. L. consistently maintained parentage, but occurred only after the Court ordered it.

Because Defendants have not shown that Ms. L. was released from detention and reunited with her daughter for reasons other than this litigation, the Court finds the voluntary cessation exception applies to this case. Applying that exception, Ms. L.'s claims are not moot.

**B.  Habeas Jurisdiction**

Defendants' second argument in support of dismissal is that the Court lacks jurisdiction over Ms. C.'s habeas claim because she did not name the warden of the institution in which she was detained. "[L]ongstanding practice confirms that in habeas challenges to present physical confinement—'core challenges'—the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004). Here, Ms. C. is not raising a "core challenge." This is especially so now that she has been released on bond. Rather, her habeas claim, like her other claims, is directed to the continued separation from her child. (*See* Am. Compl. at 12) (asking the Court to "[o]rder defendants either to release class members along with their children, or

to detain them together in the same facility[.]").  Since Ms. C. is not raising a "core challenge," she is not subject to the default rule set out above.  Absent this showing, the Court has jurisdiction over Ms. C.'s habeas claim.

## C.     Venue

Defendants' third argument in support of dismissal is that this Court is the improper venue for adjudication of Ms. C.'s claims because Ms. C. does not reside in this district nor did the events giving rise to her claim occur in this district.  Plaintiffs respond that regardless of Ms. C.'s claims, this is the proper venue for Ms. L.'s claims, and that is sufficient in this putative class case against the Government.  Plaintiffs rely on 28 U.S.C. § 1391(e)(1) for the proposition that if any plaintiff resides in the district in which an action is brought against government entities, venue is proper in that district.  Section 1391(e)(1) states:

> A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e)(1).  In *Sidney Coal Co. v. Soc. Security Admin.*, 427 F.3d 336 (6th Cir. 2005), the court was asked to decide whether the term "the plaintiff" in subsection (C) of this statute referred to only one plaintiff or all plaintiffs.  *Id.* at 344.  After reviewing the "plethora of case law interpreting the statute," the court refused to interpret the statute to require all plaintiffs to reside in the relevant district, finding the statute "contains no requirement that all plaintiffs must reside in the same district."  *Id.*  The court found that to hold otherwise "would substantially limit the statute's breadth[.]"  *Id.*  It also found "[e]ach court faced with the same issue has interpreted 'the plaintiff' to mean 'any plaintiff,' finding that Congress intended to broaden the number of districts in which suits could be brought against government entities."  *Id.* at 344-45.  Ultimately, the court held "that the

residency requirement of [28 U.S.C. § 1391(e)(1)(C)] is satisfied if at least one plaintiff resides in the district in which the action has been brought." *Id.* at 345-46. This reasoning is persuasive.

There is no dispute Ms. L. was resident in this district when the original Complaint was filed. Thus, venue in this Court is proper under 28 U.S.C. § 1391(e)(1)(C).

**D.** **Jurisdiction to Review "Discretionary" Decisions**

Defendants' fourth argument in support of dismissal is that this Court lacks jurisdiction to review the Government's decision to either detain or parole Plaintiffs, and also lacks jurisdiction to review where Plaintiffs will be detained or to order ICE to detain Plaintiffs in a particular facility. Plaintiffs dispute that the Court lacks jurisdiction to review these decisions.

As to Defendants' first argument about the decision to detain or parole, Plaintiffs are not challenging that particular decision. (*See* Opp'n to Mot. to Dismiss at 12) (stating Amended Complaint "does not seek an injunction ordering Defendants to grant parole; rather, it seeks an injunction to *reunite* Plaintiffs with their children, 'either' by 'detain[ing] them together in the same facility,' *or* by 'releas[ing] class members along with their children.'").[3] Rather, Plaintiffs are challenging the Government's practice of separating

---

[3] There are sound reasons for not challenging this decision. Individuals in the expedited removal process who have not been found to have a "credible fear of persecution" for asylum purposes are subject to mandatory detention. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). These individuals may be released only if they are granted parole, *i.e.,* released under narrowly prescribed circumstances, such as "urgent humanitarian reasons or significant public benefit[,]" 8 U.S.C. § 1182(d)(5)(A), medical emergency or a "legitimate law enforcement objective." 8 C.F.R. § 235.3(b)(2)(iii). Furthermore, an alien who is subject to expedited removal and who is seeking to establish that he or she has a credible fear of persecution, is not eligible for release on bond. 8 C.F.R. §§ 235.3(c), 1003.19(h)(2)(i)(B). If the asylum officer or Immigration Judge ("IJ") determines that the alien has a credible fear of persecution, expedited removal proceedings are vacated and the alien is referred for removal proceedings before an IJ under 8 U.S.C. § 1229a. 8 C.F.R. § 208.30(f). These aliens may be released from detention through a grant of parole under narrowly prescribed

18cv0428 DMS (MDD)

minor children from their parents without legitimate reason, irrespective of the Government's general authority to detain or release. Defendants' argument, therefore, does not warrant dismissal of Plaintiffs' claims.

Next, Defendants argue the Court lacks jurisdiction to review where Plaintiffs will be detained or to order ICE to detain Plaintiffs in a particular facility. In support of this argument, Defendants rely on 8 U.S.C. § 1252(a)(2)(B)(ii) and 8 U.S.C. § 1231(g)(1). Section 1252(a)(2)(B)(ii) precludes courts from reviewing decisions of the Attorney General or Secretary of DHS if the conduct at issue is specified in the particular statute to be in their discretion. It states:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review— ...

> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is *specified* under this title *to be in the discretion* of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 208(a).

8 U.S.C. § 1252(a)(2)(B)(ii) (emphasis added). Defendants assert the Attorney General's decisions about where aliens will be detained falls within this statute. Specifically, they assert that 8 U.S.C. § 1231(g)(1), which provides, "The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal[,]" *id.*, grants the Attorney General discretion to make those decisions, and under § 1252(a)(2)(B)(ii), those decisions are not subject to review by the courts.

This is not the first time the Government has raised this argument. *See Aguilar v. United States Immig. & Customs Enf't Div. of the Dep't of Homeland Sec.*, 510 F.3d 1 (1st

---

circumstances, such as an "urgent humanitarian reason or significant public benefit." 8 U.S.C. § 1182(b)(5); 8 C.F.R. § 212.5(b).

Cir. 2007). In *Aguilar*, the court rejected the Government's "sprawling construction of section 1252(a)(2)(B)(ii)[,]" stating "so broad a reading is not evident from the statute's text." *Id.* at 20. Instead, the court found "section 1231(g)(1) fails to 'specify' that individualized transfer decisions are in the Attorney General's discretion." *Id.* The court contrasted the language of section 1231(g)(1) with "other sections of the [Immigration and Nationality Act ("INA")]" in which that discretion is explicitly provided, specifically 8 U.S.C. §§ 1157(c)(1), 1181(a)(9)(B)(v), 1184(c)(6)(F) and 1229b(b)(2)(D). *Id.* The court also cited to *Alaka v. Att'y Gen.*, 456 F.3d 88 (3d Cir. 2006), which states "there are no less than thirty-two additional provisions in the very subchapter of the INA referenced by 8 U.S.C. § 1252(a)(2)(B)(ii) that make explicit the grant of 'discretion' to the Attorney General or the Secretary of Homeland Security[.]" *Id.* at 97. In light of this authority, the *Aguilar* court held, "[i]f a statute does not explicitly specify a particular authority as discretionary, section 1252(a)(2)(B)(ii) does not bar judicial review of an ensuing agency action." 510 F.3d at 20; *see also Spencer Enters., Inc. v. United States*, 345 F.3d 683, 691 (9th Cir. 2003) (stating "the plain language of § 1252(a)(2)(B)(ii) requires that discretionary *authority* be *specified* by statute[.]"). Ultimately, the *Aguilar* court held "section 1252(a)(2)(B)(ii) does not strip the district courts of jurisdiction over substantive due process claims that are collateral to removal proceedings when those claims challenge decisions about the detention and transfer of aliens on family integrity grounds." 510 F.3d at 21.

Defendants do not explain why this reasoning should not apply here. Instead, they rely on a decision from the Ninth Circuit finding the Attorney General has broad discretion in deciding where to house deportable aliens. *See Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434 (9th Cir. 1986). That decision, however, predates 8 U.S.C. § 1252(a)(2)(B)(ii), which is the starting point for Defendants' jurisdiction-stripping argument. Moreover, in *Comm. of Cent. Am. Refugees*, the Ninth Circuit addressed the

/ / /

/ / /

12

merits of the plaintiffs' claim, which assumes jurisdiction. 795 F.2d at 1437-41.[4] *Aguilar*, by contrast, addresses 8 U.S.C. § 1252(a)(2)(B)(ii), the leading Supreme Court case interpreting that statute, *Kucana v. Holder*, 558 U.S. 233 (2010), and the other statute forming the basis for Defendants' argument, 8 U.S.C. § 1231(g)(1). The *Aguilar* court's analysis of these statutes is faithful to statutory text and persuasive. This Court, therefore, concludes it has jurisdiction to review the Government's conduct at issue.[5]

**E.    Due Process**

Next, Defendants argue Plaintiffs have failed to state a claim for violation of their due process rights. In reviewing this argument, the Court is bound to accept all well-pleaded factual allegations in the Amended Complaint as true, construe those allegations "in the light most favorable to the nonmoving party," *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008) (citation omitted), and "then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

The parties do not dispute the following bedrock principles. The Constitution protects everyone within the territory of the United States, regardless of citizenship. (Br. of Scholars of Immig. and Const. Law as *Amici Curiae* at 3, ECF No. 23-1) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 368-69(1886)). "Repeatedly and consistently, the Supreme Court and the Ninth Circuit have held that non-citizens physically on U.S. soil have constitutional rights, including the right to due process of law." (*Id.* at 4) (citing, among

---

[4] In *Comm. of Cent. Am. Refugees*, the Ninth Circuit held that the government's policy of transferring unrepresented aliens to remote detention facilities "did not violate the due process clause or any statutory privilege[,]" and "prudential considerations precluded interference with the Attorney General's [exercise of] discretion" in selecting the detention facilities where aliens are to be detained. 795 F.2d at 1439-40.

[5] Even if § 1252(a)(2)(B)(ii) acted as a statutory bar to Plaintiffs' claims, the Ninth Circuit has held "decisions that violate the Constitution cannot be 'discretionary,' so claims of constitutional violations are not barred by § 1252(a)(2)(B)." *Wong v. United States*, 373 F.3d 952, 963 (9th Cir. 2004). Plaintiffs have clearly alleged separation from their children violated their due process rights. Thus, this rule would apply, and would allow for judicial review.

other cases, *Matthews v. Diaz*, 426 U.S. 67, 77 (1976) (stating "there 'are literally millions of aliens within the jurisdiction of the United States'" and "'the Fifth Amendment . . . protects every one of these persons[.]'")). "Aliens," therefore, have substantive due process rights under the Constitution. *Id.* (collecting cases).[6]

Further, it has long been settled that the liberty interest identified in the Fifth Amendment provides a right to family integrity or to familial association. *See* U.S. Const. amend. V (stating no person shall "be deprived of life, liberty, or property, without due process of law."); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (stating "the relationship between parent and child is constitutionally protected."). Indeed, "[t]he liberty interest at issue in this case–the interest of parents in the care, custody, and control of their children–is perhaps the oldest of the fundamental liberty interests recognized by" the Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); s*ee also Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("The substantive due process right to family integrity or to familial association is well established."). In sum, there is no dispute the constitutional right to family integrity applies to aliens like Ms. L. and Ms. C.

Rather, the dispute here is twofold: (1) whether the substantive due process right to family integrity applies not to Plaintiffs, generally, but in the particular circumstances alleged; and (2) if so, whether the conduct attributed to the Government violates that right. It bears repeating that at this stage of the case, Plaintiffs need not prove either of these questions should be resolved in their favor. The only issue here is whether Plaintiffs have alleged sufficient facts and a cognizable legal theory giving rise to a "plausible claim for relief." *Iqbal*, 556 U.S. at 679. In this context, the Court addresses these two issues in turn.

---

[6] At oral argument, Government counsel conceded the point, "The Court: So you would agree that because these individuals [Ms. L. and Ms. C.] are present in the United States that substantive due process attaches[?] . . . [Gov't counsel]: That's correct[.]" (Rep.'s Tr. at 4-5, May 9, 2018, ECF No. 70.)

18cv0428 DMS (MDD)

1. <u>Does the Constitutional Right to Family Integrity Apply in the Circumstances Alleged?</u>

The constitutional right to family integrity "is entirely judge-made: it does not appear in the text of the Constitution itself." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018). Furthermore, the "right to family integrity has been recognized in only a narrow subset of circumstances." *Aguilar*, 510 F.3d at 23 (stating alien "petitioners have not demonstrated that this guarantee of substantive due process [the liberty interest in family integrity] encompasses their assertions."); *see also Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)) (noting courts must be "'reluctant to expand the concept of substantive due process.'"). Plaintiffs, therefore, must show that their generally held constitutional right to family integrity applies in the particular circumstances alleged here.

In determining whether the right to family integrity encompasses the circumstances alleged here, it is important to note what Plaintiffs do not challenge. They do not challenge the Government's initial separation of parent and child when the parent is arrested for violating the nation's criminal laws. Nor do Plaintiffs challenge the Government's decision to separate families when there are legitimate questions regarding parentage, fitness, or danger to the child. Nor do they challenge the Government's powers to deport or detain aliens. What Plaintiffs challenge is the Government's separation of migrant parents and their minor children when both are held in immigration detention and when there has been no showing the parent is unfit or poses a danger to the child. Plaintiffs assert separation of parents and minor children under such circumstances violates their due process rights.

Defendants argue the contours of the right to family integrity are different depending on the circumstances, and that under the circumstances of this case, which involve the Government's enforcement of criminal and immigration laws, there is no constitutional violation. Specifically, the Government argues that when a parent is detained for removal or criminal prosecution, the minor child becomes "unaccompanied" and must be placed in the "care and custody" of ORR. Separation of the family unit, therefore, is simply a

consequence of the lawful detention of the parent. In support of this argument, Defendants rely on a number of cases dealing with immigration detainees and convicts who have been separated from their families without constitutional implication, but those cases are distinguishable from this case. *See, e.g., Milan-Rodriguez v. Sessions*, No. 1:16-cv-01578-AWI-SAB-HC, 2018 WL 400317, at *10 (E.D. Cal. Jan. 12, 2018) (stating transfer of petitioner convicted of crime to remote facility is "ordinary incident of immigration detention" and does not violate right to familial association); *Gordon v. Mule*, 153 Fed. Appx. 39 (2d Cir. 2005) (stating right to family unity not violated when petitioner ordered removed after conviction of crime). Plaintiffs argue those cases involve challenges to a parent's detention and transfer away from children who were not themselves initially detained with their parents. According to Plaintiffs, the practice alleged here "is not a necessary incident of detention; it is the result of an *unnecessary* governmental action intended to separate family units who were arrested *together*[.]" (Opp'n to Mot. to Dismiss at 21.)

The Government also cites cases that subordinate the right to family integrity of citizen children when their non-citizen parents are deported. *See, e.g., Gallanosa by Gallanosa v. United States*, 785 F.2d 116 (4th Cir. 1986) (parents ordered deported after overstaying visa causing family separation). But Plaintiffs are not contesting the grounds for their potential removal—only their treatment by the Government *during* their immigration proceedings.

The Government also cites cases where interference with the right to family integrity was upheld in furtherance of identified safety or other penological interests. *See, e.g., Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) (upholding restrictions on family visitation of sentenced prisoners for security reasons and "to protect[ ] child visitors from exposure to sexual or other misconduct[.]"). However, Plaintiffs argue the Government is acting without determining parentage, fitness or danger to the child (or any other legitimate reason), let alone for a stated security reason.

The case that provides the most support for Defendants' argument that Plaintiffs' constitutional right to familial association is not implicated here is *Aguilar*. But it, too, is factually distinguishable. In that case, ICE agents conducted a raid of the plaintiffs' workplace as part of an investigation into the employment practices of a government contractor "suspected of employing large numbers of illegal aliens." *Aguilar*, 510 F.3d at 6. As part of the raid, ICE agents "took more than 300 rank-and-file employees into custody for civil immigration infractions." *Id.* In the days following the raid, approximately 200 of those employees were transferred from a holding facility in Massachusetts, where the raid took place, to detention centers in Texas for removal. *Id.* Because of the surprise nature of the raid, "a substantial number of the detainees' minor children were left for varying periods of time without adult supervision." *Id.* As a result, the plaintiffs filed a complaint in district court alleging "in essence that their immediate detention and swift transfer to distant [detention and removal operations centers] wreaked havoc with their right to make decisions about the care, custody, and control of their minor children, leaving many minors unattended." *Id.* at 22. The court in *Aguilar* looked to the nature of the right at issue, and expressed concern for expanding that right to the facts of the case, and concluded plaintiffs had not demonstrated that the right to family integrity "encompasse[d]" their claims. *Id.* at 23-24.

However, unlike Plaintiffs in this case, none of the plaintiffs in *Aguilar* were detained *with their children*. Instead, the plaintiffs in *Aguilar* appear to have been detained at the worksite while their children were elsewhere in the community.[7] Because the context

---

[7] The court in *Aguilar* noted, "ICE attempted to coordinate with social services agencies to assure the adequate care of dependent children[,] … took affirmative steps before and after the raid to attend to family needs[,] …[and] immediately released thirty-five persons who had been apprehended due to 'pressing humanitarian needs' (such as being the sole caregiver of one or more minor children)." 510 F.3d at 22 n.5 (citing findings of the district court). In light of the differences with *Aguilar*, Plaintiffs have disavowed that the class alleged in the Amended Complaint would include parents like those in *Aguilar*, suggesting

and details of the present case are different from those presented in *Aguilar*, that court's analysis of the plaintiffs' substantive due process rights has limited application here. *See id.* at 22 (quoting *DePoutot v. Raffaelly*, 424 F.3d 112, 119 (1st Cir. 2005)) (noting "the jurisprudence of substantive due process is an exercise that is 'highly dependent on context and detail.'").

Here, the Court is faced with Plaintiffs who present different circumstances, but each Plaintiff has demonstrated that the right to family integrity encompasses her particular situation. According to the allegations in the Amended Complaint, Ms. L. did everything right. She and her child presented at the port of entry and requested asylum. She passed a credible fear screening interview, was taken out of expedited removal proceedings, and placed in removal proceedings before an IJ to pursue her asylum claim. Ms. C., by contrast, did not do everything right. She committed a crime by entering the United States illegally, and was prosecuted and imprisoned for her transgression: 25 days in custody for misdemeanor violation of 8 U.S.C. § 1325 (illegal entry). However, having served her sentence, Ms. C. was then returned to ICE detention to pursue her asylum claim, as she too had passed a credible fear screening. Ms. C., therefore, is on equal footing with Ms. L. for purposes of pursuing her due process claim. Ms. L.'s claim is based on the initial separation from her child, while Ms. C.'s claim is based on the continued separation from her child. Both claims focus on government conduct in separating families during removal proceedings.

Although Plaintiffs do not limit this case to asylum seekers, that each of the named Plaintiffs is seeking asylum is important to the due process analysis. "U.S. asylum law arises largely out of international agreements that have been incorporated into immigration law." Kevin R. Johnson, *Understanding Immigration Law*, 2d. Ed. (2015), at 353. Those international agreements came about after World War II displaced millions of people and

---

that the facts in *Aguilar* are "more analogous to a pretrial criminal case." (Rep.'s Tr. at 35, May 9, 2018, ECF No. 70.)

created the need for international collaboration to address the refugee crisis. *See id.* In the early 1950s, the United Nations Convention Relating to Status of Refugees ("Convention") attempted to provide a uniform protocol for refugee policy, and the United States is now a signatory to that Convention. *See id.* According to the Convention, a "refugee" is someone who (1) is outside his or her country of nationality, (2) has fled that country and cannot return home because he or she faces the reality or the risk of persecution, and (3) faces persecution due to his or her political opinion, race, religion, nationality, or membership in a particular social group. *See id.* at 353-54. These concepts have been incorporated into U.S. law, specifically the INA. *See*, *e.g.*, INA § 101(a)(42) (adopting definition of refugee); 8 U.S.C. § 1101(a)(42).

Asylum "has been a formal part of U.S. domestic law for 38 years." Deborah Anker, *Law of Asylum, in the United States* § 1.1 (2018). The Refugee Act, PL 96-212, 94 Stat. 102 (1980), in particular, "codified provisions for persons to apply for asylum status[.]" *Id.* According to its provisions, "a person who applies for asylum protection must be physically present or 'arriving' in the United States." *Id.* at § 1.6 (citing 8 U.S.C. § 1158). The act of seeking *sanctuary* from persecution in accordance with our country's own asylum laws is significant given that due process is particularly concerned with "ordered liberty" and "fundamental fairness." *Lassiter v. Dep't of Soc. Servs. of Durham Cty., N.C.*, 452 U.S. 18, 24 (1981). Arriving on United States soil with one's minor child to pursue relief extended by U.S. law—as well as international law to which the United States has acceded—calls out for careful assessment of how governmental actors treat such people and whether constitutional protections should apply.

In this case, both Ms. L. and Ms. C. allege they are seeking asylum in the United States, and that they were separated from their children upon arriving at our nation's border without any determination they were unfit or presented a danger to their children. They allege they are victims of a wide-spread government practice to separate migrant families "for no legitimate reason and notwithstanding the threat of irreparable psychological damage that separation has been universally recognized to cause young children." (Am.

Compl. ¶ 1.)  They allege this practice may soon become "formal national policy" for purposes of deterring others from coming to the United States.  (*Id.* ¶ 34b;[8] *see also* Opp'n to Mot. to Dismiss at 2 & 16 n.12) (citations omitted)).

Notably, Plaintiffs' allegations are similar to those pointed out by the court in *Aguilar* as being sufficient to demonstrate that the guarantee of substantive due process encompasses their assertions:  "Were a substantial number of young children knowingly placed in harm's way, it is easy to imagine how viable [due process] claims might lie." 510 F.3d at 22.  The allegations here present that "narrow subset of circumstances[,]" *id.*, at 23, where the right to family integrity ought to apply.  The Court finds it does.

> 2.  <u>Does the Alleged Governmental Conduct "Shock the Conscience" and Violate the Right to Family Integrity?</u>

Where substantive due process applies to the particular circumstances alleged, as here, the "threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).  Plaintiffs dispute that the "shock the conscience" test applies, (*see* Opp'n to Mot. to Dismiss at 22), but they fail to explain what test should apply.  Plaintiffs appear to argue they have "[s]tated a substantive due process claim" simply by alleging facts that show the government is separating children from their parents "absent a clear demonstration that the parent is unfit or is otherwise endangering the child."  (*Id.* at 15-16.)  In support, Plaintiffs cite *Quilloin* for the settled principle that "the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family . . . without some showing of unfitness[.]'" 434 U.S. at 255 (quoting *Smith v. Organization of Foster Families*, 431 U.S. 816, 862-63 (1977)).  But the Supreme Court has also made clear that "the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be

---

[8]  The Amended Complaint lists Paragraphs 33 and 34 twice.  The Court refers to the second paragraphs as Paragraphs 33b and 34b.

characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Lewis,* 523 U.S. at 847 (quoting *Collins,* 503 U.S. at 128). *See also Aguilar,* 510 F.3d at 21 (applying "shock the conscience" standard to determine whether plaintiffs stated substantive due process claim based on government's separation of parents from minor children). Defendant has relied on that standard in arguing Plaintiffs have failed to state a substantive due process claim, and Plaintiffs have briefed why the alleged government conduct meets the standard (though they dispute the standard applies at all). On the present motion, the Court applies the "shocks the conscience" standard to determine whether Plaintiffs have alleged sufficient facts to state a plausible claim for violation of their substantive due process rights.[9]

The "touchstone of due process is protection of the individual against arbitrary action of government," *Wolf v. McDonnell*, 418 U.S. 539, 558 (1974), and the "exercise of power without any reasonable justification in the service of a legitimate governmental objective[.]" *Lewis*, 523 U.S. at 846. The due process guarantee bars certain offensive government actions "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). It targets governmental conduct that violates the "decencies of civilized conduct[,]" *Rochin v. California*, 342 U.S. 165, 173 (1952), interferes with rights "'implicit in the concept of ordered liberty[,]'" *id.* at 169 (quoting *Palko v. State of Conn.*, 302 U.S. 319, 325 (1937)), and is so "'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency[.]" *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957). Thus, substantive due process protects against government power arbitrarily and oppressively exercised. *Daniels,* 474 U.S. at 331. "Historically, this guarantee of due process has been applied to *deliberate* decisions

---

[9] The Court reserves on whether a different test might apply as the case develops and the issues are more clearly framed through discovery and other substantive motions. *See, e.g., Halet v. Wend Inv. Co.,* 672 F.2d 1305, 1310-11 (9th Cir. 1982) (policy precluding renting to families with children analyzed under strict scrutiny test).

of government officials to deprive a person of life, liberty, or property." *Id.* Accordingly, "the 'shock the conscience' standard erects a high hurdle for would-be claimants." *Aguilar*, 510 F.3d at 21. Plaintiffs have set forth sufficient facts to satisfy this requirement and to survive the present motion.

Plaintiffs allege they both suffered wrenching separation from their children for "no legitimate purpose" and in furtherance of a wide-spread government practice that soon may become "national policy." (Am. Compl. ¶¶ 31, 34b.) A policy of family separation to serve "ulterior law enforcement goals" admittedly would be "antithetical to the child welfare values" imposed on government actors by the TVPRA. (Opp'n to Mot. for Prelim. Inj. at 3, ECF No. 46.) Yet, Plaintiffs allege that practice is being implemented in full view of the "devastating negative impact" that separation has on a "child's well-being, especially where there are other traumatic factors at work, and that this damage can be permanent." (Am. Compl. ¶ 33.) (*See also* Br. by *Amici Curiae* in Supp. of Pl.'s Habeas Corpus Pet. and Compl. at 2-3, ECF No. 17-3 (describing psychological and emotional trauma that is visited upon young children when they are separated from their parents)). As for their own children, Plaintiffs allege S.S. was screaming, crying, and "pleading with guards not to take her away from her mother[,]" (Am. Compl. ¶ 43), and J. is struggling emotionally. (*Id.* ¶ 59.) Plaintiffs also allege they, themselves, are consumed by feelings of desperation and worry. (*Id.* ¶¶ 48, 58.)

These allegations call sharply into question the separations of Plaintiffs from their minor children. This is especially so because Plaintiffs allegedly came to the United States seeking shelter from persecution in their home countries, and are seeking asylum here. For Plaintiffs, the government actors responsible for the "care and custody" of migrant children have, in fact, become their persecutors. This is even more problematic given Plaintiffs' allegations and assertions that there is a government practice, and possibly a forthcoming policy, to separate parents from their minor children in an effort to deter others from coming to the United States. This alleged practice is being implemented even when parents like Ms. L. and Ms. C. have passed credible fear interviews, and therefore, are positioned

to present asylum claims meriting consideration by an IJ in their removal proceedings. These allegations sufficiently describe government conduct that arbitrarily tears at the sacred bond between parent and child, and is emblematic of the "exercise of power without any reasonable justification in the service of an otherwise legitimate governmental objective[.]" *Lewis*, 523 U.S. at 846. Such conduct, if true, as it is assumed to be on the present motion, is brutal, offensive, and fails to comport with traditional notions of fair play and decency. At a minimum, the facts alleged are sufficient to show the government conduct at issue "shocks the conscience" and violates Plaintiffs' constitutional right to family integrity. Accordingly, Defendants' motion to dismiss Plaintiffs' due process claim is denied.[10]

## F.     The APA

Next, Defendants argue Plaintiffs have not stated a claim under the APA. Defendants assert the APA does not provide for judicial review of discretionary decisions. Defendants also contend their decisions to separate Plaintiffs from their minor children was not arbitrary or capricious, those decisions do not constitute "final agency actions," and there are other adequate remedies available.

Under the APA, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5

---

[10]  The above discussion is focused on whether Plaintiffs have stated a claim for violation of their substantive due process rights. Plaintiffs also allege a claim for violation of their procedural due process rights in light of the Government's practice of "separating families without any process to determine whether the separation is justified by parental abuse, unfitness, or any other reason." (Opp'n to Mot. to Dismiss at 23.) Defendants move to dismiss on the ground there is no substantive due process right to familial association under these circumstances, and assert Plaintiffs' procedural due process argument "is really [a] 'substantive due process argument recast in procedural terms.'" (Mem. of P. & A. in Supp. of Mot. to Dismiss at 18) (quoting *Reno v. Flores,* 507 U.S. 292, 293 (1993)) (internal quotation marks omitted). In light of the above discussion, the Court declines to address further Plaintiffs' procedural due process claim.

U.S.C. § 704. The conduct at issue in this case, separation of parents from their minor children when both are in immigration detention and when there is no showing the parent is unfit or presents a danger to the child, is not reviewable by statute. Thus, the issue is whether this conduct is a "final agency action for which there is no other adequate remedy in a court." There are two conditions that:

> must be satisfied for agency action to be "final" under the APA. "First, the action must mark the consummation of the agency's decisionmaking process - it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."

*United States Army Corps of Engineers v. Hawkes Co.*, ___ U.S. ___, 136 S.Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Here, Plaintiffs have not alleged separation from their children satisfies either of these requirements. Nor did they address these requirements in their opposition brief. Furthermore, since the filing of the Complaint Ms. L. has been reunited with her daughter, and the Government claims in its briefing that it is in the process of deciding whether to reunify Ms. C. and her son pursuant to the TVPRA. Under these circumstances, Plaintiffs have failed to allege facts sufficient to show "final agency action" subject to review under the APA. Based on this failure, the Court grants Defendants' motion to dismiss this claim.

## G. The Asylum Act

Finally, Defendants argue Plaintiffs have failed to state a claim under the Asylum Act. Defendants assert Plaintiffs lack standing to bring a claim under the Act, and have failed to allege sufficient facts to state a claim under the Act.

Initially, it is unclear what portion of the Asylum Statute Plaintiffs are relying on as the basis for this claim. They cite 8 U.S.C. § 1158 in their Amended Complaint, and allege separation from their children violates the statute "because it impedes their ability to pursue their asylum claims." (Am. Compl. ¶ 85.) However, 8 U.S.C. § 1158(d), which sets out the procedure for applying for asylum, states: "Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable

by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1158(d)(7). Although no party addressed this subsection of the statute on the present motion, it is unclear to the Court whether Plaintiffs have a private right of action under the Asylum Statute in the first instance. Absent any authority that a private right of action exists, the Court grants Defendants' motion to dismiss this claim.

## III.

## CONCLUSION AND ORDER

For the reasons set out above, the Court grants in part and denies in part Defendants' motion to dismiss. Specifically, the Court grants Defendants' motion to dismiss Plaintiffs' claims under the APA and the Asylum Statute, and denies Defendants' motion to dismiss Plaintiffs' due process claim. Although Plaintiffs did not request leave to amend in the event any portion of Defendants' motion was granted, the Court grants Plaintiffs leave to file a Second Amended Complaint that cures the pleading deficiencies set out above. If Plaintiffs wish to do so, they shall file their Second Amended Complaint on or before July 3, 2018.

**IT IS SO ORDERED**.

Dated: June 6, 2018

Hon. Dana M. Sabraw
United States District Judge

18cv0428 DMS (MDD)

# Exhibit 3

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

9
10

| | |
|---|---|
| Ms. L.; et al., | Case No.: 18cv0428 DMS (MDD) |
| Petitioners-Plaintiffs, | |
| v. | **ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| U.S Immigration and Customs Enforcement ("ICE"); et al., | |
| Respondents-Defendants. | |

11
12
13
14
15
16
17
18

Pending before the Court is Plaintiffs' motion for class certification. Plaintiffs, on behalf of themselves and putative class members, allege the Government has a widespread practice or policy of separating migrant families, and placing the children in facilities for "unaccompanied minors." Recent developments validate Plaintiffs' allegations. Plaintiffs seek to certify a class of similarly situated individuals for whom injunctive relief can be entered prohibiting separation of migrant parents from their minor children without first determining they are unfit parents or otherwise present a risk of danger to their children, as well as an injunction requiring reunification of migrant parents who are returned to immigration custody upon completion of any criminal proceedings, absent a determination that the parent is unfit or presents a danger to the child.

19
20
21
22
23
24
25
26
27
28

1

On June 6, 2018, the Court entered an order finding Plaintiffs had stated a claim for violation of their substantive due process rights to family integrity under the Fifth Amendment to the United States Constitution based on claims that the Government had separated them from their minor children while Plaintiffs were held in immigration detention without a showing that they were unfit parents or otherwise presented a danger to their children. *Ms. L. v. U.S. Immigration & Customs Enf't*, 302 F. Supp. 3d 1149, 2018 WL 2725736, at *9-12 (S.D. Cal. June 6, 2018). Since the issuance of that Order, the practice of family separation has intensified and become a matter of intense national debate.

The Attorney General of the United States announced a "zero tolerance" policy.[1] Under that policy, all adults entering the United States illegally would be subject to criminal prosecution, and if accompanied by a minor child, the child would be separated from the parent. Over the ensuing weeks, hundreds of migrant children were separated from their parents, further stoking the flames of nationwide protest. On June 20, 2018, the President of the United States signed an Executive Order ("EO") to "maintain family unity" by keeping migrant families together during criminal and immigration proceedings to the extent permitted by law, while maintaining "rigorous[]" enforcement of immigration laws. *See* Executive Order, Affording Congress an Opportunity to Address Family Separation § 1, 2018 WL 3046068 (June 20, 2018). On Saturday, June 23, 2018, the Department of Homeland Security ("DHS") issued a "Fact Sheet" outlining the Government's efforts to "ensure that those adults who are subject to removal are reunited with their children for the purposes of removal."[2]

---

[1] *See* U.S. Att'y Gen., *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration* (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[2] *See* U.S. Dep't of Homeland Sec*., Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applicants* (June 23, 2018),

18cv0428 DMS (MDD)

Following issuance of the EO, a status conference was held on June 22, 2018, at which time Lee Gelernt and Bardis Vakili appeared for Plaintiffs, and Sarah Fabian and Samuel Bettwy appeared for Defendants. After hearing from counsel and considering the parties' supplemental briefing, Plaintiffs' motion for class certification is granted in part for the reasons set forth below.

# I.

## DISCUSSION[3]

Plaintiff Ms. L. and her minor child S.S. arrived lawfully at one of our nation's ports of entry seeking asylum. Ms. L. and her child were detained together for several days, and later "forcibly separated" by immigration officials without a determination that Ms. L. was unfit or presented a danger to her child. S.S., then six years old, was placed in a government facility for "unaccompanied minors" over a thousand miles away from Ms. L. Ms. L. and S.S. were separated for nearly five months.

Plaintiff Ms. C. and her minor child J. entered the United States illegally between ports of entry. Upon apprehension by a Border Patrol agent, Ms. C. made a claim for asylum. She was arrested, charged with misdemeanor illegal entry under 8 U.S.C. § 1325(a) ("criminal improper entry" under EO § 1), and served 25 days in custody. After serving her criminal sentence, Ms. C. was returned to immigration detention to contest removal and pursue her asylum claim. Ms. C.'s minor son was also placed in a government facility for "unaccompanied minors," hundreds of miles away from his mother. Undisputed news reports reflect the two were reunited earlier this month, after being

---

https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.

[3] The factual background set out herein is abbreviated. A full discussion of the facts relevant to this lawsuit is set out in the Order granting Plaintiffs' motion for classwide preliminary injunction filed concurrently herewith and Order granting in part and denying in part Defendants' motion to dismiss. *Ms. L.*, 2018 WL 2725736, at *1-3.

18cv0428 DMS (MDD)

separated for over eight months.[4]  Plaintiffs allege Defendants failed to reunite Ms. C. and her son during this period of time even though Ms. C.'s fitness as a parent was never questioned by government officials.  Plaintiffs do not challenge the initial separation of Ms. C. from her child, as the separation resulted from prosecution for illegal entry and placement in criminal custody.[5]  Rather, Ms. C. challenges the Government's failure to reunify her with her son after she completed her 25-day criminal sentence and was returned to immigration detention.

Ms. L.'s claim is based on the initial separation from her child while in immigration detention; Ms. C.'s claim is based on the failure to reunite her with her child after serving her criminal sentence and being returned to immigration detention.  Both claims focus on government conduct separating parents from minor children while the parent is detained pending immigration proceedings without a showing the parent is unfit or presents a danger to the child.  Plaintiffs allege separation from their children under these circumstances

---

[4]  *See* Tom Llamas et al., *Brazilian Mother Reunites with 14-year-old son 8 Months After Separation at U.S. Border*, ABC NEWS (June 5, 2018, 6:50 PM), https://abcnews.go.com/US/brazilian-mother-reunites-14-year-son-months-separation/story?id=55666724.

[5]  In their Supplemental Briefing, Plaintiffs point out that when a parent is prosecuted for illegal entry, separation is not required.  "If the parent is being prosecuted but is nonetheless being held in a DHS facility, then there is no need to separate the family, because DHS can house families."  (Pls.' Suppl. Br. at 8.)  The EO in fact provides for "family unity" by directing DHS "to maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings[,]" to the extent permitted by law.  EO § 3. This is a new development.  Plaintiffs argue the confusion is the result of the "government's shifting practice regarding the detention of parents facing criminal prosecution."  (Pls.' Suppl. Br. at 8.)  For purposes of defining the class, however, the Court will carve out parents who fall within the EO.  EO § 2(a) (defining "Alien family").  The EO provides for "family unity" and detaining "family units" together, *id.* §§ 1, 3, so further relief may be unnecessary.  The EO also employs its own standard for determining detention of alien families.  *Id.* § 3(b).  To avoid potential conflict with the standard employed by the EO and that used by the Court, the class definition will not include such individuals.  (*See* Defs.' Suppl. Br. at 3.)  The Court reserves on other issues that might arise given these recent developments.

violates their right to family integrity under the Due Process Clause of the Fifth Amendment to the United States Constitution.  In the Complaint, Plaintiffs alleged that hundreds of other migrant families had been subjected to the same treatment and that this had become a widespread practice of the current Administration.  They cited numerous reports that the Government would soon adopt a formal national policy of separating migrant families and placing the children in government facilities for "unaccompanied minors." The Government initially denied it had such a practice or policy, but has since distanced itself from that position in light of recent developments—including the zero tolerance policy which touted family separation.

Plaintiffs, on behalf of themselves and putative class members, request certification of the following class:

> All adult parents nationwide who (1) are or will be detained in immigration custody by the Department of Homeland Security, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, absent a demonstration in a hearing that the parent is unfit or presents a danger to the child.

(Am. Compl. ¶ 65; Mem. in Supp. of Mot. at 1.)  Plaintiffs argue this proposed class meets the requirements of Federal Rule of Civil Procedure 23(a) and (b)(2).  Defendants dispute these requirements are met.  The only claim currently at issue and subject to certification is Plaintiffs' due process claim.[6]  Plaintiffs' pending motion for classwide preliminary injunction is addressed in a separate order.

**A.**     **Legal Standard**

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.

---

[6]  The Court expresses no opinion on whether Plaintiffs are entitled to certification on any other claim that may be asserted in Plaintiffs' Second Amended Complaint.  At the hearing on June 22, 2018, Plaintiffs' counsel indicated an amended pleading would be forthcoming, but requested the Court to rule on the presently pending motions.

338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). To qualify for the exception to individual litigation, the party seeking class certification must provide facts sufficient to satisfy the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1308-09 (9th Cir. 1977). "The Rule 'does not set forth a mere pleading standard.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Dukes*, 564 U.S. at 350). "Rather, a party must not only 'be prepared to provide that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims of defenses, and adequacy of representation, as required by Rule 23(a). The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)[.]" *Id.* (quoting *Dukes*, 564 U.S. at 350) (internal citation omitted).

Federal Rule of Civil Procedure 23(a) sets out four requirements for class certification—numerosity, commonality, typicality, and adequacy of representation. A showing that these requirements are met, however, does not warrant class certification. The plaintiff also must show that one of the requirements of Rule 23(b) is met. Here, Plaintiffs assert they meet the requirements of Rule 23(b)(2).

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). Because the relief requested in a (b)(2) class is prophylactic, enures to the benefit of each class member, and is based on accused conduct that applies uniformly to the class, notice to absent class members and an opportunity to opt out of the class is not required. *See Dukes*, 564 U.S. at 361-62 (noting relief sought in a (b)(2) class "perforce affect[s] the entire class at once" and thus, the class is "mandatory" with no opportunity to opt out).

The district court must conduct a rigorous analysis to determine whether the prerequisites of Rule 23 have been met. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). It is a well-recognized precept that "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's

cause of action.'" *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (quoting *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555, 558 (1963)). However, "[a]lthough some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a), it is improper to advance a decision on the merits to the class certification stage." *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 480 (9th Cir. 1983) (citation omitted); *see also Nelson v. United States Steel Corp.*, 709 F.2d 675, 680 (11th Cir. 1983) (plaintiff's burden "entails more than the simple assertion of [commonality and typicality] but less than a prima facie showing of liability") (citation omitted). Rather, the court's review of the merits should be limited to those aspects relevant to making the certification decision on an informed basis. *See* Fed. R. Civ. P. 23 advisory committee notes. If a court is not fully satisfied that the requirements of Rule 23(a) and (b) have been met, certification should be refused. *Falcon*, 457 U.S. at 161.

**B.    Rule 23(a)**

Rule 23(a) and its prerequisites for class certification—numerosity, commonality, typicality, and adequacy of representation—are addressed in turn.

1.    Numerosity

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003). The plaintiff need not state the exact number of potential class members; nor is a specific minimum number required. *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994). Rather, whether joinder is impracticable depends on the facts and circumstances of each case. *Id.*

Here, Plaintiffs asserted in their motion that there were as many as 700 families that fell within the proposed class. In support of this assertion, Plaintiffs presented declarations from a number of attorneys that provide legal services to immigrant families in border States. (*See* Mem. in Supp. of Mot., Exs. 13-15.) Those attorneys declared they had seen hundreds of situations of children separated from their parents after being apprehended by DHS officials. (*See id.*, Ex. 13 ¶ 4; Ex. 14 ¶¶ 3-5; Ex. 15 ¶ 2.) One of those attorneys also

stated separations were occurring even when there was no "substantiated reason to suspect that the adult and child are not in fact related, or reason to suspect that the child is in imminent physical danger from the adult[.]" (*Id.*, Ex. 14 ¶ 6;) (*see also id.*, Ex. 15 ¶ 3) (stating "parents have been forcibly separated from their children and placed in detention for extended periods of time without any information regarding their whereabouts, safety, or wellbeing."). This evidence is sufficient to show the numerosity requirement is met here. Accordingly, Plaintiffs have satisfied the first requirement of Rule 23(a).[7]

### 2. Commonality

The second element of Rule 23(a) requires the existence of "questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). This element has "'been construed permissively,' and '[a]ll questions of fact and law need not be common to satisfy the rule.'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)). "However, it is insufficient to merely allege any common question[.]" *Id.* Instead, the plaintiff must allege the existence of a "common contention" that is of "such a nature that it is capable of classwide resolution[.]" *Dukes*, 564 U.S. at 350. As summarized by the Supreme Court:

> What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of commons answers.

---

[7] Notably, Defendants do not challenge whether the numerosity requirement is met, and at the May 4, 2018 hearing on this motion, they did not dispute Plaintiffs' approximation of the number of families that had been separated. Since the hearing, DHS has stated that "1,995 minors were separated from their 'alleged adult guardians' at the southern border in just over a month long period." *See* Brian Naylor, *DHS: Nearly 2,000 Children Separated from Adults at Border in 6 Weeks*, NPR (June 16, 2018, 7:01 AM), https://www.npr.org/2018/06/16/620451012/dhs-nearly-2-000-children-separated-from-adults-at-border-in-six-weeks. On June 23, 2018, DHS indicated in its Fact Sheet that as of June 20 it had 2,053 separated minors in HHS funded facilities. U.S. Dep't of Homeland Sec., *supra* note 2.

*Id.* (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)).

In this case, Plaintiffs assert there are a number of questions common to the class. First, they assert they are alleging the same legal claim, namely whether Defendants' practice of separating putative class members from their minor children and continued separation without a hearing and determination that they are unfit parents or present a danger to their children violates their right to family integrity under the Due Process Clause. Second, Plaintiffs contend the facts underlying their claims are the same: each was detained with their child by government actors, who then separated them from their children, or failed to reunite them, without a showing they were unfit or presented a danger to the child. Third, Plaintiffs assert they suffered the same injury, namely separation from their children in violation of their constitutional rights. Fourth, Plaintiffs contend they are challenging the same government practice regarding separation of parents and children or the refusal to reunite parents and children absent a showing the parent is unfit or presents a danger to the child. Finally, Plaintiffs claim they are seeking the same relief: a declaration that the conduct at issue is unlawful, and injunctions (1) preventing the separation of such parents and children without a showing the parent is unfit or presents a danger to the child, and (2) requiring reunification of the families already separated absent similar findings.

Defendants argue these questions cannot be answered on a classwide basis because the circumstances surrounding each separation of parent and child are different. In support of this argument, Defendants point to the circumstances giving rise to the separations of Plaintiffs and their children in this case, which are indisputably different. Ms. L. was separated from her daughter because the Government allegedly could not confirm parentage (though a DNA test taken several months after Ms. L. was separated from her child confirmed the relationship), while Ms. C. was separated from her son when she was apprehended near the border, charged with illegal entry, and placed in custody pending resolution of her criminal case.

9

In addition, at oral argument Government counsel set forth another scenario that could result in family separation, namely parents with criminal history that prevents them from being released into the community along with their child or housed together in a detention center with other families.[8] Obviously, these parents would be situated differently from Ms. L. and Ms. C., neither of whom presented this situation. Unlike with Ms. L. and Ms. C., the Government would have a legitimate interest in continuing detention of individuals who posed a flight risk or danger to the community or others in a family detention facility because of that person's criminal history. A parent with some kind of communicable disease could also raise legitimate safety concerns.

Plaintiffs concede a parent with a communicable disease might be separately detained, but disagree that criminal history can serve as a generalized exception to the Government's new policy of "family unity." Criminal history comes in all gradations, from minor misdemeanors to violent felony offenses. Some types of criminal history would clearly justify separate detention of the parent, while other criminal history might not—and the exercise of governmental discretion to separately detain that individual might be challenged. Whether separate detention of such parents violates substantive due process could raise individualized inquiries.

In addition, Plaintiffs' proposed class definition could include migrant families apprehended in the interior of the country. The number of such families is presently unknown and not part of the record before the Court. This group could include families present in the country for quite some time, with established family roots and connections. These parents also might have both citizen and alien children. The application of

_____

[8] At oral argument on May 4, 2018, Government counsel pointed out that one of the declarations submitted by a putative class member involved a "mother who had a significant criminal history, so ICE [Immigration and Customs Enforcement] was unable to place her in the family residential center because … [such] centers are a very open setting. There is [sic] sort of pods. Families are housed together…. There is free movement. It is not a dententive setting." (ECF No. 70, at 21-22.)

18cv0428 DMS (MDD)

substantive due process to this potential group has not been briefed, and presents issues that Plaintiffs have indicated they are prepared to address at a later time.

The focus of the present litigation has always been on migrant families entering the United States at or between designated ports of entry. Most of these families are seeking asylum but not all. (*See* Am. Compl. ¶ 4) ("[A]lmost all of these individuals have fled persecution and are seeking asylum in the United States."). Thus, although Plaintiffs' proposed class does not exclude parents with criminal history or communicable disease, or those in the interior of the country, the Court finds it appropriate to carve them out of the proposed class. *See Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 546 (9th Cir. 2013) (stating Federal Rule of Civil Procedure 23 "provides district courts with broad authority at various stages in the litigation … to redefine … classes as appropriate.") (citation omitted). Accordingly, the Court excepts from the class definition—without prejudice to redefining the class on a more fulsome record—parents with criminal history or communicable disease, or those apprehended in the interior of the country.[9]

As discussed, the focus of this litigation is on the Government's practice of separating migrant parents and children without any showing the parent is unfit or presents a danger to the child, and the continued separation of migrant families without any showing the parent is unfit or presents a danger to the child even after the parents have completed their criminal proceedings and are returned to immigration detention. Those circumstances

---

[9] At oral argument on May 4, 2018, Government counsel also argued that lack of "bed space" could cause family separation. At that time, the "total capacity in residential centers [was] less than 2,700[,]" according to counsel. (ECF No. 70, at 9.) And there was only one such center for migrant fathers and children, which has "84 or 86 beds." (*Id.* at 43-44.) Recent events, however, have overtaken that argument. The Government is actively constructing or converting facilities, even military facilities, to manage the growing population of migrant families. The EO directs federal agencies to marshal resources to support family custody. *See* EO § 3(c) ("The Secretary of Defense shall take all legally available measure to provide to the Secretary [of Homeland Security], upon request, any existing facilities available for the housing and care of alien families, and shall construct such facilities if necessary and consistent with law.").

18cv0428 DMS (MDD)

are present in the cases of Ms. L. and Ms. C.  Ms. L. lawfully arrived at a port of entry and was separated from her daughter for nearly five months without any showing she was unfit or presented a danger to her, and Ms. C.'s separation from her son continued even after she was returned to immigration custody and despite any showing she was unfit or presented a danger to him.  The circumstances of Plaintiffs and their children in this case and the situations described in the declarations submitted in support of this motion are evidence there is a common practice at issue here, namely separating migrant parents and children and failing to reunite them without a showing the parent is unfit or presents a danger to the child.  (*See* Mem. in Supp. of Mot., Exs. 12-15; Reply in Supp. of Mot., Exs. 21-26) (five declarations of parents arriving at designated point of entry, and one declaration of a parent apprehended between ports of entry).  Whether that practice violates substantive due process is a question common to the class, and the answer to that question is "apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quoting *Nagareda*, *supra*, at 132).

"[C]ommonality only requires a single significant question of law or fact[,]" *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012) (citing *Dukes*, 564 U.S. at 359), and that is particularly so where a suit "challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001).  The Ninth Circuit's decision in *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), is instructive.  In that case, the court was faced with a commonality question similar to the one presented here.  That case involved a claim that certain policies and practices of the Arizona Department of Corrections ("ADC") violated the Eighth Amendment's proscription against cruel and unusual punishment.  *Id.* at 662-63.  The defendants in *Parsons*, similar to Defendants here, argued the commonality requirement was not met because the plaintiffs' claims were simply "'a collection of individual constitutional violations,' each of which hinges on 'the particular facts and circumstances of each case.'" *Id.* at 675 (quoting Defs.' Reply Br. at 9-10).  The Ninth Circuit disagreed.  It found the defendants' argument "rest[ed] upon a misunderstanding of the plaintiffs' allegations." *Id.* at 676.  Contrary to the defendants' interpretation of the claim, the court stated, "The

18cv0428 DMS (MDD)

Complaint does not allege that the care provided on any particular occasion to any particular inmate (or group of inmates) was insufficient, but rather that ADC policies and practices of statewide and systemic application expose all inmates in ADC custody to a substantial risk of serious harm." *Id.* (internal citation omitted). The court then went on to state:

> These policies and practices are the "glue" that holds together the putative class …; either each of the policies and practices is unlawful as to every inmate or it is not. That inquiry does not require us to determine the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination.

*Id.* at 678.

Here, as in *Parsons*, Plaintiffs' claims do not rest on the individual circumstances of each separation of parent and child. Rather, Plaintiffs are challenging the Government's practice of separating migrant parents and children and keeping them separate without a showing the parent is unfit or presents a danger to the child. Under these circumstances, the reasoning of *Parsons* applies here, and that reasoning compels the same conclusion, namely that the commonality requirement is met.

### 3. Typicality

The next requirement of Rule 23(a) is typicality, which focuses on the relationship of facts and issues between the class and its representatives. "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal quotation marks omitted). The typicality requirement will occasionally merge with the commonality requirement, *Parsons*, 754 F.3d at 687, because "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named

plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 349 n.5.

Here, Plaintiffs rely on the arguments raised on commonality to support a showing of typicality, and Defendants rely on the arguments raised in response thereto to show the typicality requirement is also not met. For the reasons set out above, however, the Court finds Plaintiffs' claims are typical of the claims of absent class members.

Both Plaintiffs were separated or remained separated from their children without any showing they were unfit or presented a danger to their child. By definition, each member of the proposed class will have been subject to this same practice. Furthermore, Plaintiffs' claims are the same as those raised by absent class members, namely the Government's practice of separating parents and children under the circumstances set out above violates their right to due process. Finally, the injuries suffered by the named Plaintiffs are the same as those suffered by members of the proposed class: separation from their children. *See Parsons*, 754 F.3d at 685 (finding typicality requirement met where named plaintiffs "allege 'the same or [a] similar injury' as the rest of the putative class; they allege that this injury is a result of a course of conduct that is not unique to any of them; and they allege that the injury follows from the course of conduct at the center of the class claims."). Certainly, the claims of the named Plaintiffs and the claims of class members "are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 349 n.5. The typicality requirement is therefore met.

### 4. Adequacy of Representation

The final requirement of Rule 23(a) is adequacy. Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is grounded in constitutional due process concerns; "absent class members must be afforded adequate representation before entry of a judgment which binds them." *Hanlon*, 150 F.3d at 1020 (citing *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940)). In reviewing this issue, courts must resolve two questions: "(1) do

the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.* (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)). The named plaintiffs and their counsel must have sufficient "zeal and competence" to protect the interests of the rest of the class. *Fendler v. Westgate-California Corp.*, 527 F.2d 1168, 1170 (9th Cir. 1975).

As to the named Plaintiffs, Defendants argue they are not adequate representatives of the proposed class because both Plaintiffs' claims are moot and the Court lacks venue over Ms. C.'s claims. For the reasons set out in the Court's Order on Defendants' motion to dismiss, the Court rejects these arguments as a basis for finding Plaintiffs to be inadequate representatives. Rather, Plaintiffs have shown they do not have any conflicts of interest with other class members and that they will protect the interests of the class. Accordingly, Plaintiffs are adequate representatives for the class.

Plaintiffs have also demonstrated their counsel are adequate. There is no conflict between Plaintiffs' counsel and the members of the proposed class, and counsel have demonstrated they will prosecute the case vigorously on behalf of the class. Accordingly, the requirement of Rule 23(a)(4) is met.

## C. Rule 23(b)

Having satisfied the requirements of Rule 23(a), the next issue is whether Plaintiffs have shown that at least one of the requirements of Rule 23(b) is met. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614-15 (1997). Here, Plaintiffs assert they have met the prerequisites of certification for a class under Rule 23(b)(2).

Under Rule 23(b)(2), class certification may be appropriate where a defendant acted or refused to act in a manner applicable to the class generally, rendering injunctive and declaratory relief appropriate to the class as a whole. Fed. R. Civ. P. 23(b)(2). The parties agree:

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can

15

be enjoined or declared unlawful only as to all of the class members or as to none of them." [citation omitted]  In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.

*Dukes*, 564 U.S. at 360.

Plaintiffs here argue this case is particularly suited for certification under Rule 23(b)(2) because they are presenting a civil rights challenge to a practice that applies to all members of the proposed class, and that practice can be declared lawful or unlawful as to the class as a whole.  *See Walters v. Reno*, 145 F.3d 1032, 1046-47 (9th Cir. 1998) (stating Rule 23(b)(2) "was adopted in order to permit the prosecution of civil rights actions[,]" and is satisfied "if class members complain of a pattern or practice that is generally applicable to the class as a whole."); *see also Parsons*, 754 F.3d at 686 (same).

Defendants assert individual inquiries would be necessary to determine who falls within the class definition, which precludes certification under Rule 23(b)(2).  Defendants point out the proposed class only includes the time period "'while a parent is in immigration custody, and not the period of separation while the parent is in jail for criminal conviction.'"  (Opp'n to Mot. at 14) (quoting ECF No. 35-1, at 11.)  Defendants argue the problem with Plaintiffs' proposed class definition is found in the case of Ms. C.: "It is unclear at what point Ms. C. would become a member of Plaintiffs' proposed class— whether at the point she was referred for prosecution by CBP [Customs and Border Protection], or later when she was released from criminal custody and detained by ICE in an immigration detention facility." (*Id.*)

However, the problem posed, namely, when someone becomes a member of the class, is easily resolved.  As Plaintiffs explain, a person becomes a member of the class when they are held in immigration detention without their children.  (Reply Br. at 7.) Defendants are correct that this determination may involve some individualized inquiries,

but those inquiries do not detract from the "indivisible" nature of the claim alleged and the relief sought in this case. *Dukes*, 564 U.S. at 360.

Contrary to Defendants' argument, Plaintiffs have demonstrated that certification under Rule 23(b)(2) is appropriate here. As stated above, the crux of this case is the Government's practice of separating migrant parents from their minor children and continuing to separate them without any showing the parent is unfit or presents a danger to the child. Based on the record before the Court, the Government has "acted ... in a manner applicable to the class generally, rendering injunctive and declaratory relief appropriate to the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). A determination regarding whether the practice of family separation and failure to reunify such families violates due process and warrants injunctive relief would apply to each class member and drive resolution of the litigation. Accordingly, Rule 23(b)(2) is satisfied.

## II.

## CONCLUSION AND ORDER

For these reasons, Plaintiffs' motion for class certification is granted in part as to Plaintiffs' substantive due process claim. Specifically, the Court certifies the following class under Federal Rule of Civil Procedure 23(b)(2), with the exceptions noted above and as modified:

> All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child.[10]

---

[10] As discussed in text, *infra*, the class does not include migrant parents with criminal history or communicable disease, or those who are in the interior of the United States or subject to the EO.

18cv0428 DMS (MDD)

Plaintiffs are appointed as Class Representatives, and Counsel from the ACLU Immigrants' Rights Project and the ACLU of San Diego and Imperial Counties are appointed as counsel for this Class pursuant to Federal Rule of Civil Procedure 23(g).

**IT IS SO ORDERED.**

Dated:  June 26, 2018

Hon. Dana M. Sabraw
United States District Judge

# Exhibit 4

APPENDIX A, DEFENDANTS' RESPONSE IN OPPOSITION
TO PLAINTIFFS; MOTION FOR EXPEDITED DISCOVERY
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L.; et al., | Case No.: 18cv0428 DMS (MDD) |
| Petitioners-Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION** |
| v. | |
| U.S Immigration and Customs Enforcement ("ICE"); et al., | |
| Respondents-Defendants. | |

Eleven weeks ago, Plaintiffs leveled the serious accusation that our Government was engaged in a widespread practice of separating migrant families, and placing minor children who were separated from their parents in government facilities for "unaccompanied minors." According to Plaintiffs, the practice was applied indiscriminately, and separated even those families with small children and infants—many of whom were seeking asylum. Plaintiffs noted reports that the practice would become national policy. Recent events confirm these allegations. Extraordinary relief is requested, and is warranted under the circumstances.

On May 7, 2018, the Attorney General of the United States announced a "zero tolerance policy," under which all adults entering the United States illegally would be subject to criminal prosecution, and if accompanied by a minor child, the child would be

1

separated from the parent.[1]  Over the ensuing weeks, hundreds of migrant children were separated from their parents, sparking international condemnation of the practice.  Six days ago on June 20, 2018, the President of the United States signed an Executive Order ("EO") to address the situation and to require preservation of the "family unit" by keeping migrant families together during criminal and immigration proceedings to the extent permitted by law, while also maintaining "rigorous[]" enforcement of immigration laws.  *See* Executive Order, Affording Congress an Opportunity to Address Family Separation § 1, 2018 WL 3046068 (June 20, 2018).  The EO did not address reunification of the burgeoning population of over 2,000 children separated from their parents.  Public outrage remained at a fever pitch.  Three days ago on Saturday, June 23, 2018, the Department of Homeland Security ("DHS") issued a "Fact Sheet" outlining the government's efforts to "ensure that those adults who are subject to removal are reunited with their children for the purposes of removal."[2]

Plaintiffs assert the EO does not eliminate the need for the requested injunction, and the Fact Sheet does not address the circumstances of this case.  Defendants disagree with those assertions, but there is no genuine dispute that the Government was not prepared to accommodate the mass influx of separated children.  Measures were not in place to provide for communication between governmental agencies responsible for detaining parents and those responsible for housing children, or to provide for ready communication between separated parents and children.  There was no reunification plan in place, and families have been separated for months.  Some parents were deported at separate times and from

---

[1]  *See* U.S. Att'y. Gen., *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration* (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[2]  *See* U.S. Dep't of Homeland Sec*., Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applicants* (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.

18cv0428 DMS (MDD)

different locations than their children.  Migrant families that lawfully entered the United States at a port of entry seeking asylum were separated.  And families that were separated due to entering the United States illegally between ports of entry have not been reunited following the parent's completion of criminal proceedings and return to immigration detention.

This Court previously entered an order finding Plaintiffs had stated a legally cognizable claim for violation of their substantive due process rights to family integrity under the Fifth Amendment to the United States Constitution based on their allegations the Government had separated Plaintiffs from their minor children while Plaintiffs were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children.  *See Ms. L. v. U.S. Immigration & Customs Enf't*, 302 F. Supp. 3d 1149, 2018 WL 2725736, at \*7-12 (S.D. Cal. June 6, 2018).  A class action has been certified to include similarly situated migrant parents.  Plaintiffs now request classwide injunctive relief to prohibit separation of class members from their children in the future absent a finding the parent is unfit or presents a danger to the child, and to require reunification of these families once the parent is returned to immigration custody unless the parent is determined to be unfit or presents a danger to the child.

Plaintiffs have demonstrated a likelihood of success on the merits, irreparable harm, and that the balance of equities and the public interest weigh in their favor, thus warranting issuance of a preliminary injunction.  This Order does not implicate the Government's discretionary authority to enforce immigration or other criminal laws, including its decisions to release or detain class members.  Rather, the Order addresses only the circumstances under which the Government may separate class members from their children, as well as the reunification of class members who are returned to immigration custody upon completion of any criminal proceedings.

/ / /

/ / /

/ / /

18cv0428 DMS (MDD)

# I.

# BACKGROUND

This case started with the filing of a Complaint by Ms. L., a Catholic citizen of the Democratic Republic of the Congo fleeing persecution from her home country because of her religious beliefs. The specific facts of Ms. L.'s case are set out in the Complaint and this Court's June 6, 2018 Order on Defendants' motion to dismiss. *See Ms. L.*, 2018 WL 2725736, at *1-3. In brief, Ms. L. and her then-six-year-old daughter S.S., lawfully presented themselves at the San Ysidro Port of Entry seeking asylum based on religious persecution. They were initially detained together, but after a few days S.S. was "forcibly separated" from her mother. When S.S. was taken away from her mother, "she was screaming and crying, pleading with guards not to take her away from her mother." (Am. Compl. ¶ 43.) Immigration officials claimed they had concerns whether Ms. L. was S.S.'s mother, despite Ms. L.'s protestations to the contrary and S.S.'s behavior. So Ms. L. was placed in immigration custody and scheduled for expedited removal, thus rendering S.S. an "unaccompanied minor" under the Trafficking Victims Protection and Reauthorization Act ("TVPRA"), Pub. L. No. 110-457 (Dec. 23, 2008), and subjecting her to the "care and custody" of the Office of Refugee Resettlement ("ORR").[3] S.S. was placed in a facility in

---

[3] The TVPRA provides that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of" HHS and its sub-agency, ORR. 8 U.S.C. § 1232(b)(1). An "unaccompanied alien child" ("UAC") is a child under 18 years of age with no lawful immigration status in the United States who has neither a parent nor legal guardian in the United States nor a parent nor legal guardian in the United States "available" to care for them. 6 U.S.C § 279(g)(2). According to the TVPRA, a UAC "may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A).

18cv0428 DMS (MDD)

Chicago over a thousand miles away from her mother. Immigration officials later determined Ms. L. had a credible fear of persecution and placed her in removal proceedings, where she could pursue her asylum claim. During this period, Ms. L. was able to speak with her daughter only "approximately 6 times by phone, never by video." (Am. Compl. ¶ 45.) Each time they spoke, S.S. "was crying and scared." (*Id.* ¶ 43.) Ms. L. was "terrified that she would never see her daughter again." (*Id.* ¶ 45.) After the present lawsuit was filed, Ms. L. was released from ICE detention into the community. The Court ordered the Government to take a DNA saliva sample (or swab), which confirmed that Ms. L. was the mother of S.S. Four days later, Ms. L. and S.S. were reunited after being separated for nearly five months.

In an Amended Complaint filed on March 9, 2018, this case was expanded to include another Plaintiff, Ms. C. She is a citizen of Brazil, and unlike Ms. L., she did not present at a port of entry. Instead, she and her 14-year-old son J. crossed into the United States "between ports of entry," after which they were apprehended by U.S. Border Patrol. Ms. C. explained to the agent that she and her son were seeking asylum, but the Government, as was its right under federal law, charged Ms. C. with entering the country illegally and placed her in criminal custody. This rendered J. an "unaccompanied minor" and he, like S.S., was transferred to the custody of ORR, where he, too, was housed in a facility in Chicago several hundred miles away from his mother. Ms. C. was thereafter convicted of misdemeanor illegal entry and served 25 days in criminal custody. After completing that sentence, Ms. C. was transferred to immigration detention for removal proceedings and consideration of her asylum claim, as she too had passed a credible fear screening. Despite being returned to immigration custody, Ms. C. was not reunited with J. During the five months she was detained, Ms. C. did not see her son, and they spoke on the phone only "a handful of times[.]" (*Id.* ¶ 58.) Ms. C. was "desperate" to be reunited with her son, worried about him constantly and did not know when she would be able to see him. (*Id.*) J. had a difficult time emotionally during the period of separation from his mother. (*Id.* ¶ 59.) Ms. C. was eventually released from immigration detention on bond, and only recently reunited

with J.  Their separation lasted more than eight months despite the lack of any allegations or evidence that Ms. C. was unfit or otherwise presented a danger to her son.[4]

Ms. L. and Ms. C. are not the only migrant parents who have been separated from their children at the border.  Hundreds of others, who have both lawfully presented at ports of entry (like Ms. L.) and unlawfully crossed into the country (like Ms. C.), have also been separated.  Because this practice is affecting large numbers of people, Plaintiffs sought certification of a class consisting of similarly situated individuals.  The Court certified that class with minor modifications,[5] and now turns to the important question of whether Plaintiffs are entitled to a classwide preliminary injunction that (1) halts the separation of class members from their children absent a determination that the parent is unfit or presents a danger to the child, and (2) reunites class members who are returned to immigration custody upon completion of any criminal proceedings absent a determination that the parent is unfit or presents a danger to the child.

Since the present motion was filed, several important developments occurred, as previously noted.  First, on May 7, 2018, the Government announced its zero tolerance policy for all adult persons crossing the border illegally, which resulted in the separation of hundreds of children who had crossed with their parents.  This is what happened with Ms. C., though she crossed prior to the public announcement of the zero tolerance policy.

_____

[4]  As stated in the Court's Order on Defendants' motion to dismiss, Plaintiffs do not challenge Ms. C.'s initial separation from J. as a result of the criminal charge filed against her.  Plaintiffs' only complaint with regard to Ms. C. concerns the Government's failure to reunite her with J. after she was returned to immigration custody.

[5]  The class is defined to include: "All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the [DHS], and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody absent a determination that the parent is unfit or presents a danger to the child."  (See Order Granting in Part Mot. for Class Cert. at 17.)  The class does not include parents with criminal history or communicable disease, or those apprehended in the interior of the country or subject to the EO.  (See id. at 4 n.5.)

She is not alone. There are hundreds of similarly situated parents, and there are more than 2,000 children that have now been separated from their parents.

When a parent is charged with a criminal offense, the law ordinarily requires separation of the family. This separation generally occurs regardless of whether the parent is charged with a state or federal offense. The repercussions on the children, however, can vary greatly depending on status. For citizens, there is an established system of social service agencies ready to provide for the care and well-being of the children, if necessary, including child protective services and the foster care system. This is in addition to any family members that may be available to provide shelter for these minor children. Grandparents and siblings are frequently called upon. Non-citizens may not have this kind of support system, such as other family members who can provide shelter for their children in the event the parent is detained at the border. This results in immigrant children going into the custody of the federal government, which is presently not well equipped to handle that important task.

For children placed in federal custody, there are two options. One of those options is ORR, but it was established to address a different problem, namely minor children who were apprehended at the border without their parents, *i.e.*, true "unaccompanied alien children." It was not initially designed to address the problem of migrant children detained with their parents at the border and who were thereafter separated from their parents. The second option is family detention facilities, but the options there are limited. Indeed, at the time of oral argument on this motion, Government counsel represented to the Court that the "total capacity in [family] residential centers" was "less than 2,700." (Rep. Tr. at 9, May 9, 2018, ECF No. 70.) For male heads of households, *i.e.*, fathers traveling with their children, there was only one facility with "86 beds." (*Id.* at 43.)

The recently issued EO confirms the government is inundated by the influx of children essentially orphaned as a result of family separation. The EO now directs "[h]eads of executive departments and agencies" to make available "any facilities … appropriate" for the housing and care of alien families. EO § 3(d). The EO also calls upon the *military*

by directing the Secretary of Defense to make available "any existing" facility and to "construct such facilities[,]" if necessary, *id.* § 3(c), which is an extraordinary measure. Meanwhile, "tent cities" and other make-shift facilities are springing up. That was the situation into which Plaintiffs, and hundreds of other families that were separated at the border in the past several months, were placed.

This situation has reached a crisis level. The news media is saturated with stories of immigrant families being separated at the border. People are protesting. Elected officials are weighing in. Congress is threatening action. Seventeen states have now filed a complaint against the Federal Government challenging the family separation practice. *See State of Washington v. United States*, Case No. 18cv0939, United States District Court for the Western District of Washington. And the President has taken action.

Specifically, on June 20, 2018, the President signed the EO referenced above. The EO states it is the Administration's policy "to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources." *Id.* § 1.[6] In furtherance of that policy, the EO indicates that parents and children who are apprehended together at the border will be detained together "during the pendency of any criminal improper entry or immigration proceedings" to the extent permitted by law. *Id.* § 3. The language of the EO is not absolute, however, as it states that family unity shall be maintained "where appropriate and consistent with law and available resources[,]" *id.* § 1, and "to the extent permitted by law and subject to the availability of appropriations[.]" *Id.* § 3. The EO also indicates rigorous enforcement of illegal border crossers will continue. *Id.* § 1 ("It is the policy of this Administration to rigorously enforce our immigration laws."). And finally, although the Order speaks to a policy of "maintain[ing] family unity,"

---

[6] The Order defines "alien family" as "any person not a citizen or national of the United States who has not been admitted into, or is not authorized to enter or remain in, the United States, who entered this country with an alien child or alien children at or between designated ports of entry and who was detained[.]" *Id.* § 2(a)(i).

8

it is silent on the issue of reuniting families that have already been separated or will be separated in the future." *Id.*

In light of these recent developments, and in particular the EO, the Court held a telephonic status conference with counsel on June 22, 2018. During that conference, the Court inquired about communication between ORR and DHS, and ORR and the Department of Justice ("DOJ"), including the Bureau of Prisons ("BOP"), as it relates to these separated families. Reunification procedures were also discussed, specifically whether there was any affirmative reunification procedure for parents and children after parents were returned to immigration detention following completion of criminal proceedings. Government counsel explained the communication procedures that were in place, and represented, consistent with her earlier representation to the Court, that there was no procedure in place for the reunification of these families.[7]

The day after the status conference, Saturday, June 23, DHS issued the Fact Sheet referenced above. This document focuses on several issues addressed during the status conference, *e.g.*, processes for enhanced communication between separated parents and children, but only "for the purposes of removal." It also addresses coordination between and among three agencies, CBP, ICE, and HHS agency ORR, but again for the purpose of removal. The Fact Sheet does not address reunification for other purposes, such as immigration or asylum proceedings, which can take months. It also does not mention other vital agencies frequently involved during criminal proceedings: DOJ and BOP.

At the conclusion of the recent status conference, the Court requested supplemental briefing from the parties. Those briefs have now been submitted. After thoroughly

---

[7] The Court: "Is there currently any affirmative reunification process that the government has in place once parent and child are separated? Government counsel: I would say … when a parent is released from criminal custody and taken into ICE custody is the practice to reunite them in family detention[?] And at that [previous hearing] I said no, that that was not the practice. I think my answer on that narrow question would be the same." (Rep. Tr. at 29-30, June 22, 2018, ECF No. 77.)

18cv0428 DMS (MDD)

considering all of the parties' briefs and the record in this case, and after hearing argument from counsel on these important issues, the Court grants Plaintiffs' motion for a classwide preliminary injunction.

## II.

## DISCUSSION

Plaintiffs seek classwide preliminary relief that (1) enjoins Defendants' practice of separating class members from their children absent a determination that the parent is unfit or presents a danger to their child, and (2) orders the government to reunite class members with their children when the parent is returned to immigration custody after their criminal proceedings conclude, absent a determination that the parent is unfit or presents a danger to the child. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To meet that showing, Plaintiffs must demonstrate "'[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).[8]

---

[8] The Ninth Circuit applies separate standards for injunctions depending on whether they are prohibitory, *i.e.*, whether they prevent future conduct, or mandatory, *i.e.*, "they go beyond 'maintaining the status quo[.]'" *Hernandez v. Sessions*, 872 F.3d 976, 997 (9th Cir. 2017). The standard set out above applies to prohibitory injunctions, which is what Plaintiffs seek here. To the extent Plaintiffs are also requesting mandatory relief, that request is "subject to a higher standard than prohibitory injunctions," namely that relief will issue only "when 'extreme or very serious damage will result' that is not capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Id.* at 999 (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). The Ninth Circuit recognizes that application of these different standards "is controversial[,]" and that other Circuits have questioned this approach. *Id.* at 997-98. This Court need not, and does not, address that discrepancy here. Suffice it to say that to the extent some portion of Plaintiffs' requested relief is subject to a standard higher than

18cv0428 DMS (MDD)

Before turning to these factors, the Court addresses directly Defendants' argument that an injunction is not necessary here in light of the EO and the recently released Fact Sheet. Although these documents reflect some attempts by the Government to address some of the issues in this case, neither obviates the need for injunctive relief here. As indicated throughout this Order, the EO is subject to various qualifications. For instance, Plaintiffs correctly assert the EO allows the government to separate a migrant parent from his or her child "where there is a *concern* that detention of an alien child with the child's alien parent would pose a risk to the child's welfare." EO § 3(b) (emphasis added). Objective standards are necessary, not subjective ones, particularly in light of the history of this case. Furthermore, the Fact Sheet focuses on reunification "at time of removal[,]" U.S. Dep't of Homeland Sec., *supra*, note 2, stating that the parent slated for removal will be matched up with their child at a location in Texas and then removed. It says nothing about reunification during the intervening time between return from criminal proceedings to ICE detention or the time in ICE detention prior to actual removal, which can take months. Indeed, it is undisputed "ICE has no plans or procedures in place to reunify the parent with the child other than arranging for them to be deported together after the parent's immigration case is concluded." (Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 31 ¶ 11.) Thus, neither of these directives eliminates the need for an injunction in this case. With this finding, the Court now turns to the *Winter* factors.

**A.    Likelihood of Success**

"The first factor under *Winter* is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). While Plaintiffs carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at the preliminary injunction stage but only such portions that enable them to obtain the injunctive relief they seek. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

---

the traditional standard for injunctive relief, Plaintiffs have met their burden for the reasons set out below.

11

18cv0428 DMS (MDD)

Here, the only claim currently at issue is Plaintiffs' due process claim.[9]  Specifically, Plaintiffs contend the Government's practice of separating class members from their children, and failing to reunite those parents who have been separated, without a determination that the parent is unfit or presents a danger to the child violates the parents' substantive due process rights to family integrity under the Fifth Amendment to the United States Constitution.  To prevail on this claim, Plaintiffs must show that the Government practice "shocks the conscience."  In the Order on Defendants' motion to dismiss, the Court found Plaintiffs had set forth sufficient facts to support that claim.  *Ms. L.*, 2018 WL 2725736, at *7-12.  The evidence submitted since that time supports that finding, and demonstrates Plaintiffs are likely to succeed on this claim.

As explained in the Court's Order on Defendants' motion to dismiss, the "shocks the conscience" standard is not subject to a rigid list of established elements.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) (stating "[r]ules of due process are not … subject to mechanical application in unfamiliar territory.")  On the contrary, "an investigation into substantive due process involves an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements[.]"  *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998).

Here, each Plaintiff presents different circumstances, but both were subjected to the same government practice of family separation without a determination that the parent was unfit or presented a danger to the child.  Ms. L. was separated from her child without a determination she was unfit or presented a danger to her child, and Ms. C. was not reunited with her child despite the absence of any finding that she was unfit or presented a danger

---

[9]  In their supplemental brief, Defendants assert Plaintiffs are raising new claims based on events that transpired after the Complaints were filed, *e.g.*, the announcement of the zero tolerance policy and the EO.  The Court disagrees.  Plaintiffs' claims are not based on these events, but are based on the practice of separating class members from their children.  The subsequent events are relevant to Plaintiffs' claim, but they have not changed the claim itself, which remains focused on the practice of separation.

to her child. Outside of the context of this case, namely an international border, Plaintiffs would have a high likelihood of success on a claim premised on such a practice. *See D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016) (citing cases finding due process violation where state action interfered with rights of fit parents); *Heartland Academy Community Church v. Waddle*, 595 F.3d 798, 808-811 (8th Cir. 2010) (finding removal of children from religious school absent evidence the students were "at immediate risk of child abuse or neglect" was violation of clearly established constitutional right); *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000) (citing *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d 1123, 1126 (3d Cir. 1997) ("courts have recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.")

The context of this case is different. The Executive Branch, which is tasked with enforcement of the country's criminal and immigration laws, is acting within its powers to detain individuals lawfully entering the United States and to apprehend individuals illegally entering the country. However, as the Court explained in its Order on Defendants' motion to dismiss, the right to family integrity still applies here. The context of the family separation practice at issue here, namely an international border, does not render the practice constitutional, nor does it shield the practice from judicial review.

On the contrary, the context and circumstances in which this practice of family separation were being implemented support a finding that Plaintiffs have a likelihood of success on their due process claim. First, although parents and children may lawfully be separated when the parent is placed in criminal custody, the same general rule does not apply when a parent and child present together lawfully at a port of entry seeking asylum. In that situation, the parent has committed no crime, and absent a finding the parent is unfit or presents a danger to the child, it is unclear why separation of Ms. L. or similarly situated class members would be necessary. Here, many of the family separations have been the result of the Executive Branch's zero tolerance policy, but the record also reflects that the

13

practice of family separation was occurring before the zero tolerance policy was announced, and that practice has resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally. Ms. L. is an example of this family separation practice expanding beyond its lawful reach, and she is not alone. (*See, e.g.*, Pls.' Reply Br. in Supp. of Mot. for Class Cert., Exs. 22-23, 25-26) (declarations from parents attesting to separation at border after lawfully presenting at port of entry and requesting asylum); Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 32 ¶¶ 9, 10b, 11a (listing parents who were separated from children after presenting at ports of entry)).

As set out in the Court's prior Order, asylum seekers like Ms. L. and many other class members may be fleeing persecution and are entitled to careful consideration by government officials. Particularly so if they have a credible fear of persecution. We are a country of laws, and of compassion. We have plainly stated our intent to treat refugees with an ordered process, and benevolence, by codifying principles of asylum. *See, e.g.,* The Refugee Act, PL 96-212, 94 Stat. 102 (1980). The Government's treatment of Ms. L. and other similarly situated class members does not meet this standard, and it is unlikely to pass constitutional muster.

Second, the practice of separating these families was implemented without any effective system or procedure for (1) tracking the children after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and children after the parents are returned to immigration custody following completion of their criminal sentence. This is a startling reality. The government readily keeps track of personal property of detainees in criminal and immigration proceedings. Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainees' release, at all levels—state and federal, citizen and alien. Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children. The unfortunate reality is that under the present system migrant children are not

1  accounted for with the same efficiency and accuracy as *property*.  Certainly, that cannot

2  satisfy the requirements of due process.  *See Santosky v. Kramer*, 455 U.S. 745, 758-59

3  (1982) (quoting *Lassiter v. Dept. of Soc. Services of Durham County, N.C.*, 452 U.S. 18,

4  (1981)) (stating it is "'plain beyond the need for multiple citation' that a natural parent's

5  'desire for and right to the companionship, care, custody, and management of his or her

6  children' is an interest far more precious than any property right.")  (internal quotation

7  marks omitted).

8        The lack of effective methods for communication between parents and children who

9  have been separated has also had a profoundly negative effect on the parents' criminal and

10  immigration proceedings, as well as the childrens' immigration proceedings.  *See United*

11  *States v. Dominguez-Portillo*, No:EP-17-MJ-4409-MAT, 2018 WL 315759, at *1-2 (W.D.

12  Tex. Jan. 5, 2018) (explaining that criminally charged defendants "had not received any

13  paperwork or information concerning the whereabouts or well-being of" their children).  In

14  effect, these parents have been left "in a vacuum, without knowledge of the well-being and

15  location of their children, to say nothing of the immigration proceedings in which those

16  minor children find themselves."  *Id.* at *14.  This situation may result in a number of

17  different scenarios, all of which are negative – some profoundly so.  For example, "[i]f

18  parent and child are asserting or intending to assert an asylum claim, that child may be

19  navigating those legal waters without the benefit of communication with and assistance

20  from her parent; that defendant, too, must make a decision on his criminal case with total

21  uncertainty about this issue."  *Id.*  Furthermore, " a defendant facing certain deportation

22  would be unlikely to know whether he might be deported before, simultaneous to, or after

23  their child, or whether they would have the opportunity to even discuss their

24  deportations[.]"  *Id.*  Indeed, some parents have already been deported without their

25  children, who remain in government facilities in the United States.[10]

───────────────

27

28  [10]  *See*, *e.g.*, Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 32 ¶ 16k, Ex. 36 ¶ 7a;
    Nelson Renteria, *El Salvador demands U.S. return child taken from deported father*,

The absence of established procedures for dealing with families that have been separated at the border, and the effects of that void on the families involved, is borne out in the cases of Plaintiffs here. Ms. L. was separated from her child when immigration officials claimed they could not verify she was S.S.'s mother, and detained her for expedited removal proceedings. That rendered S.S. "unaccompanied" under the TVPRA and subject to immediate transfer to ORR, which accepted responsibility for S.S. There was no further communication between the agencies, ICE and ORR. The filing of the present lawsuit prompted release and reunification of Ms. L. and her daughter, a process that took close to five months and court involvement. Ms. C. completed her criminal sentence in 25 days, but it took nearly eight months to be reunited with her son. She, too, had to file suit to regain custody of her son from ORR.

These situations confirm what the Government has already stated: it is not affirmatively reuniting parents like Plaintiffs and their fellow class members for purposes other than removal. Outside of deportation, the onus is on the parents, who, for the most part, are themselves in either criminal or immigration proceedings, to contact ORR or otherwise search for their children and make application for reunification under the TVPRA. However, this reunification procedure was not designed to deal with the present circumstances. (*See* Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 33 ¶¶ 6-9.) Rather, "ORR's reunification process was designed to address the situation of children who come to the border or are apprehended outside the company of a parent or legal guardian." (*Id.* ¶ 6.) Placing the burden on the parents to find and request reunification with their children under the circumstances presented here is backwards. When children are

---

REUTERS (June 21, 2018, 4:03 PM), https://www.reuters.com/article/us-usa-immigration-el-salvador/el-salvador-demands-us-return-child-taken-from-deported-father-idUSKBN1JH3ER; Miriam Jordan, *'I Can't Go Without My Son': A Deported Mother's Plea*, N.Y. TIMES (June 17, 2018), https://www.nytimes.com/2018/06/17/us/immigration-deported-parents.html.

18cv0428 DMS (MDD)

1  separated from their parents under these circumstances, the Government has an affirmative

2  obligation to track and promptly reunify these family members.

3      This practice of separating class members from their minor children, and failing to

4  reunify class members with those children, without any showing the parent is unfit or

5  presents a danger to the child is sufficient to find Plaintiffs have a likelihood of success on

6  their due process claim.  When combined with the manner in which that practice is being

7  implemented, *e.g.*, the lack of any effective procedures or protocols for notifying the

8  parents about their childrens' whereabouts or ensuring communication between the parents

9  and children, and the use of the children as tools in the parents' criminal and immigration

10  proceedings, (*see* Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 29 ¶¶ 8, 14), a

11  finding of likelihood of success is assured.  A practice of this sort implemented in this way

12  is likely to be "so egregious, so outrageous, that it may fairly be said to shock the

13  contemporary conscience," *Lewis*, 523 U.S. at 847 n.8, interferes with rights "'implicit in

14  the concept of ordered liberty[,]'" *Rochin v. Cal.*, 342 U.S. 165, 169 (1952) (quoting *Palko*

15  *v. State of Conn.*, 302 U.S. 319, 325 (1937)), and is so "'brutal' and 'offensive' that it

16  [does] not comport with traditional ideas of fair play and decency." *Breithaupt v. Abram*,

17  352 U.S. 432, 435 (1957).

18      For all of these reasons, the Court finds there is a likelihood of success on Plaintiffs'

19  due process claim.

20  **B.  Irreparable Injury**

21      Turning to the next factor, Plaintiffs must show they are "'likely to suffer irreparable

22  harm in the absence of preliminary relief.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th

23  Cir. 2017) (quoting *Winter*, 555 U.S. at 20).  "'It is well established that the deprivation of

24  constitutional rights unquestionably constitutes irreparable injury.'"  *Id.* (quoting

25  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks

26  omitted).  As explained, Plaintiffs have demonstrated the likelihood of a deprivation of

27  their constitutional rights, and thus they have satisfied this factor.

28

18cv0428 DMS (MDD)

The injury in this case, however, deserves special mention. That injury is the separation of a parent from his or her child, which the Ninth Circuit has repeatedly found constitutes irreparable harm. *See Leiva–Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying "separated families" as an irreparable harm).

Furthermore, the record in this case reflects that the separations at issue have been agonizing for the parents who have endured them. One of those parents, Mr. U., an asylum seeker from Kyrgyzstan, submitted a declaration in this case in which he stated that after he was told he was going to be separated from his son he "felt as though [he] was having a heart attack." (Reply in Supp. of Mot. for Class Cert., Ex. 21 ¶ 4.) Another asylum-seeking parent from El Salvador who was separated from her two sons writes,

> The separation from my sons has been incredibly hard, because I have never been away from them before. I do not want my children to think that I abandoned them. [My children] are so attached to me. [One of my children] used to sleep in bed with me every night while [my other child] slept in his own bed in the same room.… It hurts me to think how anxious and distressed they must be without me.

(Reply in Supp. of Mot. for Class Cert., Ex. 24 ¶ 9.) And another asylum-seeking parent from Honduras described having to place her crying 18-month old son in a car seat in a government vehicle, not being able to comfort him, and her crying as the officers "took [her] son away." (Reply in Supp. of Mot. for Class Cert., Ex. 25 ¶ 7.) There has even been a report that one father committed suicide in custody after being separated from his wife and three-year-old child. *See* Molly Hennessy-Fiske, *Honduran Migrant Who Was Separated From Family is Found Dead in Texas Jail in an Apparent Suicide*, L.A. TIMES (June 9, 2018, 5:35 PM), http://www.latimes.com/nation/la-na-border-patrol-suicide-20180609-story.html.

The parents, however, are not the only ones suffering from the separations. One of the *amici* in this case, Children's Defense Fund, states,

18cv0428 DMS (MDD)

there is ample evidence that separating children from their mothers or fathers
leads to serious, negative consequences to children's health and development.
Forced separation disrupts the parent-child relationship and puts children at
increased risk for both physical and mental illness.... And the psychological
distress, anxiety, and depression associated with separation from a parent
would follow the children well after the immediate period of separation—
even after eventual reunification with a parent or other family.

(ECF No. 17-11 at 3.) Other evidence before the Court reflects that "separating children
from parents is a highly destabilizing, traumatic experience that has long term
consequences on child well-being, safety, and development." (ECF No. 17-13 at 2.) That
evidence reflects:

Separation from family leaves children more vulnerable to exploitation and
abuse, no matter what the care setting. In addition, traumatic separation from
parents creates toxic stress in children and adolescents that can profoundly
impact their development. Strong scientific evidence shows that toxic stress
disrupts the development of brain architecture and other organ systems, and
increases the risk for stress-related disease and cognitive impairment well into
adult years. Studies have shown that children who experience such traumatic
events can suffer from symptoms of anxiety and post-traumatic stress
disorder, have poorer behavioral and educational outcomes, and experience
higher rates of poverty and food insecurity.

(ECF No. 17-13 at 2.) And Martin Guggenheim, the Fiorello LaGuardia Professor of
Clinical Law at New York University School of Law and Founding Member of the Center
for Family Representation, states:

Children are at risk of suffering great emotional harm when they are removed
from their loved ones. And children who have traveled from afar and made
their way to this country to seek asylum are especially at risk of suffering
irreversible psychological harm when wrested from the custody of the parent
or caregiver with whom they traveled to the United States.

(Mem. in Supp. of Classwide Prelim. Inj., Ex. 17 ¶ 16.) All of this evidence, combined
with the constitutional violation alleged here, conclusively shows that Plaintiffs and the

class members are likely to suffer irreparable injury if a preliminary injunction does not issue.

**C.     Balance of Equities**

Turning to the next factor, "[t]o obtain a preliminary injunction, a plaintiff must also demonstrate that 'the balance of equities tips in his favor.'" *Hernandez*, 872 F.3d at 995 (quoting *Winter*, 555 U.S. at 20).  As with irreparable injury, when a plaintiff establishes "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

Plaintiffs here assert the balance of equities weighs in favor of an injunction in this case.  Specifically, Plaintiffs argue Defendants would not suffer any hardship if the preliminary injunction is issued because the Government "cannot suffer harm from an injunction that merely ends an unlawful practice[.]" *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Arizona Dream Act Coalition*, 757 F.3d at 1069 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)) (stating balance of equities favors "'prevent[ing] the violation of a party's constitutional rights.'").  When the absence of harm to the Government is weighed against the harms to Plaintiffs set out above, Plaintiffs argue this factor weighs in their favor.  The Court agrees.

The primary harm Defendants assert here is the possibility that an injunction would have a negative impact on their ability to enforce the criminal and immigration laws.  However, the injunction here—preventing the separation of parents from their children and ordering the reunification of parents and children that have been separated—would do nothing of the sort.  The Government would remain free to enforce its criminal and immigration laws, and to exercise its discretion in matters of release and detention consistent with law. *See EO* §§ 1, 3(a) & (e) (discussing *Flores v. Sessions*, CV 85-4544); *see also Comm. of Cent. Am. Refugees v. I.N.S.,* 795 F.2d 1434, 1439-40 (9th Cir. 1986) (stating "prudential considerations preclude[] interference with the Attorney General's [exercise of] discretion" in selecting the detention facilities where aliens are to be

detained). It would just have to do so in a way that preserves the class members' constitutional rights to family association and integrity. *See Rodriguez*, 715 F.3d at 1146 ("While ICE is entitled to carry out its duty to enforce the mandates of Congress, it must do so in a manner consistent with our constitutional values.") Thus, this factor also weighs in favor of issuing the injunction.

## D. Public Interest

The final factor for consideration is the public interest. *See Hernandez*, 872 F.3d at 996 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)) ("When, as here, 'the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction.'") To obtain the requested relief, "Plaintiffs must demonstrate that the public interest favors granting the injunction 'in light of [its] *likely* consequences,' i.e., 'consequences [that are not] too remote, insubstantial, or speculative and [are] supported by evidence.'" *Id.* (quoting *Stormans*, 586 F.3d at 1139). "'Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.'" *Id.* (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).

This case involves two important public interests: the interest in enforcing the country's criminal and immigration laws and the constitutional liberty interest "of parents in the care, custody, and control of their children[,]" which "is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Both of these interests are valid and important, and both can be served by the issuance of an injunction in this case.

As stated, the public's interest in enforcing the criminal and immigration laws of this country would be unaffected by issuance of the requested injunction. The Executive Branch is free to prosecute illegal border crossers and institute immigration proceedings against aliens, and would remain free to do so if an injunction were issued. Plaintiffs do not seek to enjoin the Executive Branch from carrying out its duties in that regard.

18cv0428 DMS (MDD)

What Plaintiffs do seek by way of the requested injunction is to uphold their rights to family integrity and association while their immigration proceedings are underway. This right, specifically, the relationship between parent and child, is "constitutionally protected," *Quillion v. Walcott*, 434 U.S. 246, 255 (1978), and "well established." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011). The public interest in upholding and protecting that right in the circumstances presented here would be served by issuance of the requested injunction. *See Arizona Dream Act Coalition*, 757 F.3d at 1069 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("'[I]t is clear that it would not be equitable or in the public's interest to allow the state … to violate the requirements of federal law, especially when there are no adequate remedies available.'") Accordingly, this factor, too, weighs in favor of issuing the injunction.

## III.

## CONCLUSION

The unfolding events—the zero tolerance policy, EO and DHS Fact Sheet—serve to corroborate Plaintiffs' allegations. The facts set forth before the Court portray reactive governance—responses to address a chaotic circumstance of the Government's own making. They belie measured and ordered governance, which is central to the concept of due process enshrined in our Constitution. This is particularly so in the treatment of migrants, many of whom are asylum seekers and small children. The extraordinary remedy of classwide preliminary injunction is warranted based on the evidence before the Court. For the reasons set out above, the Court hereby GRANTS Plaintiffs' motion for classwide preliminary injunction, and finds and orders as follows:

(1) Defendants, and their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them, are preliminarily enjoined from detaining Class Members in DHS custody without and apart from their minor children, absent a determination that the parent is unfit or presents a danger to the

child, unless the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child in DHS custody.[11]

(2)    If Defendants choose to release Class Members from DHS custody, Defendants, and their officers, agents, servants, employees and attorneys, and all those who are in active concert or participation with them, are preliminary enjoined from continuing to detain the minor children of the Class Members and must release the minor child to the custody of the Class Member, unless there is a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child.

(3)    Unless there is a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child:

(a)    Defendants must reunify all Class Members with their minor children who are under the age of five (5) within fourteen (14) days of the entry of this Order; and

(b)    Defendants must reunify all Class Members with their minor children age five (5) and over within thirty (30) days of the entry of this Order.

(4)    Defendants must immediately take all steps necessary to facilitate regular communication between Class Members and their children who remain in ORR custody, ORR foster care, or DHS custody. Within ten (10) days, Defendants must provide parents telephonic contact with their children if the parent is not already in contact with his or her child.

---

[11] "Fitness" is an important factor in determining whether to separate parent from child. In the context of this case, and enforcement of criminal and immigration laws at the border, "fitness" could include a class member's mental health, or potential criminal involvement in matters other than "improper entry" under 8 U.S.C. § 1325(a), (*see* EO § 1), among other matters. Fitness factors ordinarily would be objective and clinical, and would allow for the proper exercise of discretion by government officials.

(5)     Defendants must immediately take all steps necessary to facilitate regular communication between and among all executive agencies responsible for the custody, detention or shelter of Class Members and the custody and care of their children, including at least ICE, CBP, BOP, and ORR, regarding the location and well-being of the Class Members' children.

(6)     Defendants, and their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them, are preliminarily enjoined from removing any Class Members without their child, unless the Class Member affirmatively, knowingly, and voluntarily declines to be reunited with the child prior to the Class Member's deportation, or there is a determination that the parent is unfit or presents a danger to the child.

(7)     This Court retains jurisdiction to entertain such further proceedings and to enter such further orders as may be necessary or appropriate to implement and enforce the provisions of this Order and Preliminary Injunction.

A status conference will be held on **July 6, 2018**, at **12:00 noon**, to discuss all necessary matters. A notice of teleconference information sheet will be provided in a separate order.

**IT IS SO ORDERED.**

Dated: June 26, 2018

Hon. Dana M. Sabraw
United States District Judge

24

18cv0428 DMS (MDD)

# Exhibit 5

APPENDIX A, DEFENDANTS' RESPONSE IN OPPOSITION
TO PLAINTIFFS; MOTION FOR EXPEDITED DISCOVERY
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

*Attorneys for Petitioner-Plaintiff*          *Admitted Pro Hac Vice*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. and Ms. C.,<br><br>*Petitioner-Plaintiff,*<br>v.<br><br>U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement,<br><br>*Respondents-Defendants.* | Case No. 18-cv-00428-DMS-MDD<br><br>Date Filed: July 3, 2018<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>CLASS ACTION |

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

## **INTRODUCTION**

1.     This case challenges the United States government's forcible separation of parents from their young children for no legitimate reason and notwithstanding the threat of irreparable damage that separation has been universally recognized to cause young children.

2.     Plaintiff Ms. L. is the mother of a seven (7) year-old daughter, who was ripped away from her, and then sent halfway across the country to be detained alone. Plaintiff Ms. C. is the mother of a fourteen (14) year-old son, who was also forcibly separated from his mother and detained more than a thousand miles away.

3.     Ms. L. and Ms. C. bring this action on behalf of themselves and thousands of other parents whom the government has forcibly separated from their children. Like Ms. L. and Ms. C., many of these individuals have fled persecution and are seeking asylum in the United States. Without any allegations of abuse, neglect, or parental unfitness, and with no hearings of any kind, the government is separating these families and detaining their young children, alone and frightened, in facilities often thousands of miles from their parents.

4.     Forced separation from parents causes severe trauma to young children, especially those who are already traumatized and are fleeing persecution in their home countries. The resulting cognitive and emotional damage can be permanent.

5.     Defendants have ample ways to keep Plaintiffs together with their children, as they have done for decades prior to their current practice. There are shelters that house families (including asylum-seekers) while they await the final adjudication of their immigration cases. If, however, the government lawfully continues detaining these parents and young children, it must at a minimum detain them together in one of its immigration family detention centers.

6.     The Due Process Clause of the Fifth Amendment does not permit the government to forcibly take young children from their parents, without justification or even a hearing. That separation also violates the asylum statutes, which guarantee a meaningful right to apply for asylum, and the Administrative Procedure Act (APA), which prohibits unlawful and arbitrary government action.

## JURISDICTION

7.     This case arises under the Fifth Amendment to the United States Constitution, federal asylum statutes, and the APA. The court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 2241 (habeas jurisdiction); and Art. I., § 9, cl. 2 of the United States Constitution ("Suspension Clause"). Plaintiffs are in custody for purposes of habeas jurisdiction.

## VENUE

8.     Venue is proper under 28 U.S.C. § 1391(e) because Ms. L. was detained in this District when this action commenced, Defendants reside in this District, and a substantial portion of the relevant facts occurred within this District, including the Defendants' implementation of their practice of separating immigrant parents from their children for no legitimate reason.

## PARTIES

9.     Plaintiff Ms. L. is a citizen of the Democratic Republic of the Congo (the "Congo" or "DRC").  She is the mother of 7 year-old S.S.

10.    Plaintiff Ms. C. is a citizen of Brazil.  She is the mother of 14 year-old J.

11.    Defendants U.S. Department of Homeland Security ("DHS") has responsibility for enforcing the immigration laws of the United States.

12.    Defendant U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

13. Defendant U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens who are apprehended near the U.S. border.

14. Defendant U.S. Department of Health and Human Services (HHS) is a department of the executive branch of the U.S. government which has been delegated authority over "unaccompanied" noncitizen children.

15. Defendant Office of Refugee Resettlement ("ORR") is the component of HHS which provides care of and placement for "unaccompanied" noncitizen children.

16. Defendant Thomas Homan is sued in his official capacity as the Director of ICE, and is a legal custodian of Plaintiffs.

17. Defendant Greg Archambeault is sued in his official capacity as the ICE San Diego Field Office Director, and is a legal custodian of Plaintiff Ms. L.

18. Defendant Joseph Greene is sued in his official capacity as the ICE San Diego Assistant Field Office Director for the Otay Mesa Detention Center, and is a legal custodian of Plaintiff Ms. L.

19. Defendant Adrian P. Macias is sued in his official capacity as the ICE El Paso Field Office Director, and is a legal custodian of Plaintiff Ms. C.

20. Defendant Frances M. Jackson is sued in his official capacity as the ICE El Paso Assistant Field Office Director for the West Texas Detention Facility, and is a legal custodian of Plaintiff Ms. C.

21. Defendant Kirstjen Nielsen, is sued in her official capacity as the Secretary of the Department of Homeland Security. In this capacity, she directs each of the component agencies within DHS: ICE, USCIS, and CBP. As a result, Respondent Nielsen has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, is empowered to grant asylum or other relief, and is a legal custodian of the Plaintiffs.

22.     Defendant Jefferson Beauregard Sessions III is sued in his official capacity as the Attorney General of the United States. In this capacity, he has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office of Immigration Review, is empowered to grant asylum or other relief, and is a legal custodian of the Plaintiffs.

23.     Defendant L. Francis Cissna is sued in his official capacity as the Director of USCIS.

24.     Defendant Kevin K. McAleenan is sued in his official capacity as the Acting Commissioner of CBP.

25.     Defendant Pete Flores is sued in his official capacity as the San Diego Field Director of CBP.

26.     Defendant Hector A. Mancha Jr. is sued in his official capacity as the El Paso Field Director of CBP.

27.     Defendant Alex Azar is sued in his official capacity as the Secretary of the Department of Health and Human Services.

28.     Defendant Scott Lloyd is sued in his official capacity as the Director of the Office of Refugee Resettlement.

## FACTS

29.     Over the past year, the government has separated thousands of migrant families for no legitimate purpose.  The government's true purpose in separating these families was to deter future families from seeking refuge in the United States.

30.     Many of these migrant families fled persecution and are seeking asylum. Although there are no allegations that the parents are unfit or abusing their children in any way, the government has forcibly separated them from their young children and detained the children, often far away, in facilities for "unaccompanied" minors.

31.     There is overwhelming medical evidence that the separation of a young child from his or her parent will have a devastating negative impact on the

4

child's well-being, especially where there are other traumatic factors at work, and that this damage can be permanent.

32. The American Association of Pediatrics has denounced the Administration's practice of separating migrant children from their parents, noting that: "The psychological distress, anxiety, and depression associated with separation from a parent would follow the children well after the immediate period of separation—even after the eventual reunification with a parent or other family."

33. Prior Administrations detained migrant families, but did not have a practice of forcibly separating fit parents from their young children.

34. There are non-governmental shelters that specialize in housing and caring for families—including asylum seeking families—while their immigration applications are adjudicated.

35. There are also government-operated family detention centers where parents can be housed together with their children, should the government lawfully decide not to release them. The government previously detained, and continues to detain, numerous family units at those facilities.

36. In April 2018, the New York Times reported that more than "700 children have been taken from adults claiming to be their parents since October [of 2016], including more than 100 children under the age of 4." Caitlin Dickerson, *Hundreds of Children Have Been Taken from Parents at U.S. Border*, N.Y. Times, Apr. 20, 2018.

37. On May 7, 2018, Defendant Sessions announced "a new initiative" to refer "100 percent" of immigrants who cross the Southwest border for criminal immigration prosecutions, also known as the "zero-tolerance policy." Defendant Sessions stated that as part of that prosecution, all parents who are prosecuted would be separated from their children. U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks to the Association of State Criminal Investigative Agencies 2018 Spring Conference (May 7, 2018). The purpose of this new policy

was to separate families in the hope that it would deter other families from seeking refuge in the United States.

38.     At a Senate Judiciary Committee hearing in May, a deputy chief of Defendant U.S. Customs and Border Protection testified that between May 6 and May 19 alone, a total of 658 children were separated from their family members pursuant to this policy. The Washington Post reported that in the city of McAllen, Texas, 415 children were taken from their parents during a two week period.[1] And in June 2018, the Department of Homeland Security reported that in the six weeks between April 19 and May 31, the administration took almost 2,000 children away from their parents.[2]

39.     Defendant Sessions and other government officials, including Defendant Nielsen, have repeatedly defended the separation of children from their parents in speeches and interviews with various media outlets. Among other justifications for the practice, they have stated that separating families would be a way to "discourage parents from bringing their children here illegally,"[3] and that it would help "deter more movement" to the United States by asylum seekers and other migrants.[4]  Administration officials told the New York Times in May, "[t]he president and his aides in the White House had been pushing a family separation policy for weeks as a way of deterring families from trying to cross the border illegally."[5]

---

[1] https://www.washingtonpost.com/world/national-security/trumps-zero-tolerance-at-the-border-is-causing-child-shelters-to-fill-up-fast/2018/05/29/7aab0ae4-636b-11e8-a69c-b944de66d9e7_story.html?utm_term=.d52d94c37d05.

[2] https://ca.reuters.com/article/topNews/idCAKBN1JB2SF-OCATP.

[3] http://transcripts.cnn.com/TRANSCRIPTS/1801/16/cnr.04.html.

[4] https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/

[5] https://www.nytimes.com/2018/05/10/us/politics/trump-homeland-security-secretary-resign.html

40.     Even if the separated child is released from custody and placed in a community setting or foster care, the trauma of the ongoing separation continues.

41.     By taking away their children, Defendants are coercing class members into giving up their claims for asylum and other legal protection. Numerous class members have been told by CBP and ICE agents that they will see their children again sooner if they withdraw their asylum applications and accept earlier deportation.[6]

42.     Many class members have given up their asylum claims and stipulated to removal as a way to be reunited with their children faster.

43.     For class members who have not been coerced into giving up their asylum claims, separation from their children has made those applications much more difficult. Separation prevents parents from helping their children apply for asylum and navigate removal proceedings. Separation also makes it harder for parents to present facts involving their children which support their own asylum claims.

44.     The trauma of separation also renders asylum-seeking class members too distraught to effectively pursue their asylum applications. *See, e.g.*, Angelina Chapin, *Separated Parents Are Failing Asylum Screenings Because They're So Heartbroken*, Huffington Post (June 30, 2018).[7]

---

[6] This practice has been widely reported. *See, e.g.*, Dara Lind, *Trump Will Reunite Separated Families—But Only if They Agree to Deportation*, Vox.com (June 25, 2018), https://www.vox.com/2018/6/25/17484042/children-parents-separate-reunite-plan-trump; Jay Root & Shannon Najmabadi, *Kids in Exchange for Deportation: Detained Migrants Say They Were Told They Could Get Kids Back on Way Out of U.S.*, Texas Tribune (June 24, 2018), https://www.texastribune.org/2018/06/24/kids-exchange-deportation-migrants-claim-they-were-promised-they-could/?utm_campaign=trib-social&utm_medium=social&utm_source=twitter&utm_content=1529859032.

[7] https://www.huffingtonpost.com/entry/separated-parents-too-grief-stricken-to-seek-asylum-experts-say_us_5b379974e4b08c3a8f6ad5d9.

45.     Defendants have deported class members without their separated children. Their children are now stranded in the United States alone. Many of these parents are now struggling to make contact with their children, who are being detained thousands of miles away across multiple international borders. *See* Miriam Jordan, *"I Can't Go Without My Son," a Mother Pleaded as She Was Deported to Guatemala*, N.Y. Times (June 17, 2018).[8]

46.     On June 20, 2018, President Trump signed an Executive Order ("EO") purporting to end certain family separations going forward.[9] The EO directs DHS to "maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings."

47.     The EO directs DHS to separate families any time DHS determines that separation would protect "the child's welfare."  It does not, however, set forth how that standard will be applied.  In prior cases the government has applied that standard in a manner that is inconsistent with the child's best interest, including in Ms. L's case.

48.     The EO makes no provision for reunifying the thousands of families who were separated prior to its issuance.

49.     The EO makes no provision for returning separated children to parents who have been already been deported without their children.

## **NAMED PLAINTIFFS**

50.      Ms. L. and her daughter S.S. are one of the many families that have recently been separated by the government.

---

[8] https://www.nytimes.com/2018/06/17/us/immigration-deported-parents.html. *See also* Nelson Renteria, *El Salvador Demands U.S. Return Child Taken from Deported Father*, Reuters (June 21, 2018), https://www.reuters.com/article/us-usa-immigration-el-salvador/el-salvador-demands-us-return-child-taken-from-deported-father-idUSKBN1JH3ER.

[9] https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/.

51.     Ms. L. and her daughter are seeking asylum in the United States.

52.     Ms. L. is Catholic and sought shelter in a church until she was able to escape the Congo with S.S.

53.     Upon reaching the United States, Ms. L. and S.S. presented themselves at the San Ysidro, California Port of Entry on November 1, 2017.  Although their native language is Lingala, they were able to communicate to the border guards that they sought asylum.

54.     Based on her expression of a fear of returning to the Congo, Ms. L. was referred for an initial screening before an asylum officer, called a "credible fear interview." She subsequently passed the credible fear screening but, until March 6, 2018, remained detained in the Otay Mesa Detention Center in the San Diego area.

55.     On or about November 5, immigration officials forcibly separated then-6 year-old S.S. from her mother and sent S.S. to Chicago. There she was housed in a detention facility for "unaccompanied" minors run by the Office of Refugee Resettlement (ORR).

56.     When S.S. was taken away from her mother, she was screaming and crying, pleading with guards not to take her away from her mother. While detained, Ms. L. spoke to her daughter approximately 6 times by phone, never by video.  For months she was terrified that she would never see her daughter again. The few times Ms. L. was able to speak to her daughter on the phone, her daughter was crying and scared.

57.     In December, S.S. turned 7 and spent her birthday in the Chicago facility, without her mother.

58.     In detention, Ms. L. was distraught and depressed because of her separation from her daughter. As a result, she did not eat properly, lost weight, and was not sleeping due to worry and nightmares.

59.     In one moment of extreme despair and confusion, Ms. L. told an immigration judge that she wanted to withdraw her application for asylum,

9

realizing her mistake only a few days later. She is seeking to reopen her case before the Board of Immigration Appeals.

60.    The government had no legitimate interest in separating Ms. L. and her child.

61.    There has been no evidence, or even accusation, that S.S. was abused or neglected by Ms. L.

62.    There is no evidence that Ms. L. is an unfit parent or that she is not acting in the best interests of her child.

63.    After Ms. L. filed this lawsuit and moved for a preliminary injunction, Defendants abruptly released her from custody on March 6, 2018, due to the filing of the lawsuit. Defendants informed her that she would be released mere hours in advance, with no arrangements for where she would stay. S.S. was released to Ms. L.'s custody several days later. Both are now pursuing their claims for legal protection.

64.    Ms. C. and her 14 year-old son, J., are another one of the families who have been separated by the government. Like Ms. L. and her daughter, Ms. C. and her son are seeking asylum in the United States.

65.    Ms. C. and J. fled Brazil and came to the United States to seek asylum. A few feet after Ms. C. entered the United States, a border guard approached her, and she explained that she was seeking asylum. Ms. C. subsequently passed a credible fear interview, and was put in removal proceedings, where she is applying for asylum.

66.    Despite having communicated her fear of persecution to border guards, the government prosecuted Ms. C. for entering the country illegally, took her son J. away from her, and sent him to a facility for "unaccompanied" children in Chicago.

67.    The government continued to separate Ms. C. from her son even after she completed serving her criminal misdemeanor sentence on September 22, 2017, and was sent to an immigration detention facility, the El Paso Processing Center. In

early January 2018, she was transferred again, to another immigration facility, the West Texas Detention Facility (also known as Sierra Blanca), but still was not reunited with her son. Even after Ms. C was released from immigration detention on April 5, 2018, the government did not reunify her with her son for another two months, until June 9.

68.     While separated from J., Ms. C. was desperate to be reunited with him. She worried about him constantly and did not know when she would be able to see him. They spoke on the phone only a handful of times while they were separated by Defendants.

69.     J. had a difficult time emotionally during the months he was separated from his mother.

70.     The government had no legitimate interest for the separation of Ms. C. and her child.

71.     There is no evidence, or even accusation, that J. was abused or neglected by Ms. C.

72.     There is no evidence that Ms. C. is an unfit parent or that she is not acting in the best interests of her child.

## CLASS ALLEGATIONS

73.     Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) on behalf of themselves and a nationwide class of all other persons similarly situated.

74.     Plaintiffs seek to represent the following class:

All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child.

75.     Ms. L. and Ms. C. are each adequate representatives of the proposed class.

76.     The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable. There are at a minimum hundreds of parents who fit within the class.

77.     The class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). The members of the class are subject to a common practice: forcibly separating detained parents from their minor children absent any determination that the parent is unfit or presents a danger to the child. By definition, all class members have experienced that practice, and none has been given an adequate hearing regarding the separation. The lawsuit raises numerous questions of law common to members of the proposed class, including: whether Defendants' family separation practice violates class members' substantive due process right to family integrity; whether the practice violates class members' procedural due process rights; whether the practice violates the federal asylum statute; and whether these separations are unlawful or arbitrary and capricious under the APA.

78.     The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3), because the claims of the representative Plaintiffs are typical of the claims of the class. Ms. L., Ms. C., and the proposed class members are all individuals who have had or will have their children forcibly taken away from them despite there being no proven allegations of abuse, neglect, or any other danger or unfitness. Plaintiffs and the proposed class also share the same legal claims, which assert the same substantive and procedural rights under the Due Process Clause, the asylum statute, and the APA.

79.     The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). The representative Plaintiffs seek the same relief as the other members of the class—namely, an order that they be reunified with their children, whether through release or in family detention facilities. In defending their

own rights, Ms. L. and Ms. C. will defend the rights of all proposed class members fairly and adequately.

80.    The proposed class is represented by counsel from the American Civil Liberties Union Immigrants' Rights Project and the ACLU of San Diego and Imperial Counties. Counsel have extensive experience litigating class action lawsuits and other complex cases in federal court, including civil rights lawsuits on behalf of noncitizens.

81.    The members of the class are readily ascertainable through Defendants' records.

82.    The proposed class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the class by unlawfully separating parents from their young children. Injunctive and declaratory relief is thus appropriate with respect to the class as a whole.

## **CAUSES OF ACTION**

### **COUNT I**

### **(Violation of Due Process: Right to Family Integrity)**

83.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

84.    The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and thus applies to Ms. L., Ms. C., their children S.S. and J., and all proposed class members.

85.    Plaintiffs, their children, and all class members have liberty interests under the Due Process Clause in remaining together as families.

86.    The separation of the class members from their children violates substantive due process because it furthers no legitimate purpose and was designed to deter.

87.    The separation of the class members from their children also violates procedural due process because it was undertaken without any hearing.

**COUNT II**

**(Administrative Procedure Act: Arbitrary and Capricious Practice)**

88.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

89.    The APA prohibits agency action that is arbitrary and capricious or violates a person's legal or constitutional rights.

90.    Defendants' separation practice is final agency action for which there is no other adequate remedy in a court. Defendants' decision to separate parents is not tentative or interlocutory, because Defendants have *already* separated thousands of families and continue to do so, and the policy was announced by high-level officials. And Defendants' decision to separate gravely impacts class members' rights to remain together as families.

91.    Defendants' separation of Ms. L., Ms. C., and the other class members from their children without any explanation or legitimate justification is arbitrary and capricious and accordingly violates the APA. 5 U.S.C. § 706.

92.    Among other things, Defendants failed to offer adequate reasons for adopting their unprecedented new separation practice; they failed to explain why they were not using alternatives to separation, including supervised release and family detention; and for parents like Ms. L., Defendants have never explained why they cannot verify parentage *before* imposing traumatic separation on both parent and child.

**COUNT III**

**(Violation of Right to Seek Protection Under the Asylum and Withholding of Removal Statutes, and the Convention Against Torture)**

93.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

94.    Under United States law, noncitizens with a well-founded fear of persecution shall have the opportunity to apply for asylum in the United States. 8

14

U.S.C. § 1158(a). In addition, noncitizens have a mandatory statutory entitlement to withholding of removal where they would face a probability of persecution if removed to their country of nationality, 8 U.S.C. § 1231(b)(3), or withholding or deferral of removal where they would face a probability of torture. Foreign Affairs Reform and Restructuring Act ("FARRA"), Pub. L. No. 105-277, Div. G., Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C.§ 1231).

95.   Class members have a private right of action to challenge violations of their right to apply for asylum under § 1158(a). That right is not barred by 8 U.S.C. § 1158(d)(7), which applies to only certain procedural requirements set out in Section 1158(d).

96.   Defendants' separation of families violates federal law that provides for asylum and other protection from removal, as well as their due process right to seek such relief. Separation severely impedes their ability to pursue their asylum and other protection claims in a number of ways, including by denying them the ability to coordinate their applications with their children, present facts related to their children, and creating trauma that hinders their ability to navigate the complex process.

97.   The government is also using the trauma of separation to coerce parents into giving up their asylum and protection claims in order to be reunited with their children.

## **PRAYER FOR RELIEF**

Plaintiffs request that the Court enter a judgment against Defendants and award the following relief:

A. Certify a class of all adult parents nationwide who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or

DHS custody, absent a determination that the parent is unfit or presents a danger to the child.

B. Name Ms. L. and Ms. C. as representatives of the class, and appoint Plaintiffs' counsel as class counsel;

C. Declare the separation of Ms. L., Ms. C., and the other class members from their children unlawful;

D. Preliminarily and permanently enjoin Defendants from continuing to separate the class members from their children;

E. Order Defendants either to release class members along with their children, or to detain them together in the same facility;

F. Enjoin Defendants from removing any class members from the country who have received final removal orders until they are reunited with their children, unless the class members knowingly and voluntarily decide that they do not want their children removed with them;

G. Enjoin Defendants from removing any class member who received a final removal order prior to the issuance of this Court's preliminary injunction on June 26, 2018, or prior to receiving notice of their rights under the injunction, until they have had an opportunity to consult with class counsel, or a delegate of class counsel, to insure that these class members have knowingly and voluntarily chosen to forego any further challenges to removal, rather than feeling coerced into doing so as a result of separation from their children.

H.  Require Defendants to pay reasonable attorneys' fees and costs;

I. Order all other relief that is just and proper.

Dated: July 3, 2018                          Respectfully Submitted,

                                             /s/Lee Gelernt
Bardis Vakili (SBN 247783)                   Lee Gelernt*
ACLU FOUNDATION OF SAN                       Judy Rabinovitz*
DIEGO & IMPERIAL COUNTIES                    Anand Balakrishnan*
P.O. Box 87131                               AMERICAN CIVIL LIBERTIES
San Diego, CA 92138-7131                     UNION FOUNDATION

1    T: (619) 398-4485
     F: (619) 232-0036
2    bvakili@aclusandiego.org

3    Stephen B. Kang (SBN 292280)
     Spencer E. Amdur (SBN 320069)
4    AMERICAN CIVIL LIBERTIES
     UNION FOUNDATION
5    IMMIGRANTS' RIGHTS PROJECT
     39 Drumm Street
6    San Francisco, CA 94111
     T: (415) 343-1198
7    F: (415) 395-0950
     skang@aclu.org
8    samdur@aclu.org

     IMMIGRANTS' RIGHTS PROJECT
     125 Broad St., 18th Floor
     New York, NY 10004
     T: (212) 549-2616
     F: (212) 549-2654
     lgelernt@aclu.org
     jrabinovitz@aclu.org
     abalakrishnan@aclu.org

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 6

APPENDIX A, DEFENDANTS' RESPONSE IN OPPOSITION
TO PLAINTIFFS; MOTION FOR EXPEDITED DISCOVERY
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation

U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al., | Case No. 18cv428 DMS MDD |
| Petitioners-Plaintiffs, | |
| vs. | **RESPONDENTS' NOTICE REGARDING COMPLIANCE AND REQUEST FOR CLARIFICATION AND/OR RELIEF** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

## I.    NOTICE REGARDING COMPLIANCE

On June 26, 2018, this Court issued orders granting Plaintiffs' motion to certify a class, ECF No. 82, and ordering a preliminary injunction on behalf of that class, ECF No. 83. After receiving the Court's preliminary-injunction order, Defendants immediately acted to implement and comply with it. As a result of that prompt action, Defendants believe that they are in compliance with all aspects of the Court's injunctive order regarding the forward-looking policies on separation and communication. Defendants have been working diligently on complying with the Court's reunification directives. Defendants understand the urgent concerns underpinning the Court's order. Defendants have dedicated immense resources and effort to reunifying families, and personnel at the highest levels of the agencies have been involved in implementing the Court's directives. Defendants are submitting declarations to explain the extensive efforts of the U.S. Department of Health and Human Services ("HHS") (declaration attached hereto) and U.S. Immigration and Customs Enforcement ("ICE") (declaration to follow) to identify class members and their children and to reunify class members with their children.

In the preliminary-injunction order, the Court set a status conference for July 6. *Id.* Defendants have plans to comply with the injunction, and are prepared to discuss those plans at the conference. To fully implement these plans, however, Defendants may need clarification on or relief from certain parts of the order, so that Defendants can safely reunite families. Among other issues, Defendants need

this Court's guidance on issues that arise because of HHS's understanding of its statutory obligations to ensure the safety of children before transferring them out of HHS custody. The processes that HHS has developed in order to fulfill its statutory obligations are critical to protecting children against the well-documented risk of trafficking or abuse, but they also require HHS to follow procedures that are time-consuming, even in this unique context. Defendants thus seek confirmation about the Court's intent in its order as it relates to those procedures and, as appropriate, relief from the Court's deadlines.[1] Defendants also seek clarification regarding the definition of the class certified by this Court.

## II.     REQUEST FOR CLARIFICATION AND/OR RELIEF

The Government respectfully requests the Court's prompt resolution of several critical implementation issues, at or soon after the July 6 status conference. The Government anticipates that additional clarification or relief may be requested as its implementation of the Court's injunction proceeds. The Government will bring any additional such requests to the Court's attention promptly.

---

[1] The Government also has advised the court in *Flores v. Sessions*, No. 85-4544 (C.D. Cal.), that the Flores Settlement Agreement permits the Government to use ICE family residential centers to hold families together while in Government custody. *See Flores*, ECF No. 447 (attached).

A. <u>Releasing Children From HHS Custody.</u>

As this Court is aware, the class definition includes "[a]ll adult parents who enter the United States," whether at or between ports of entry, "who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody." Class-Certification Order, ECF No. 82 at 17. The class excludes parents if there is "a determination that the parent is unfit or presents a danger to the child." *Id*. It also excludes parents "with criminal history that prevents them from being released into the community along with their child or housed together in a [family] detention center," parents "with some kind of communicable disease" raising safety concerns, or "parents who fall within the [Family Separation Executive Order]." *Id.* at 4 n.5, 10. The Court's preliminary injunction, in turn, directs Defendants to "reunify all Class members with their minor children" within 14 days for children under age 5 and within 30 days for minor children age 5 and over, "[u]nless there is a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child." Preliminary-Injunction Order, ECF No. 83 at 23 ¶ (3).

As explained in the attached declaration of Jonathan White, HHS understands the Court's order in light of its statutory mission, which requires HHS

to ensure child welfare and the safety of minors released from its custody. More specifically, considering the order in light of its statutory obligations relating to the release of unaccompanied alien children (UACs), *see* 6 U.S.C. § 279; 8 U.S.C. § 1232, HHS understands the order to require three distinct findings before a child can be released.

First, to confirm that an individual is, in fact, a class member as well as a "parent" within the meaning of 6 U.S.C. § 279(g)(2), HHS first must determine that the individual is the parent of the child with whom he or she seeks to be reunified. White Declaration ¶¶ 20-26. HHS believes that this requirement applies regardless of whether the parent is in federal custody or has been released into the interior. To determine parentage, HHS is using DNA swab testing because it is a reasonably prompt and efficient method for determining biological parentage in a significant number of cases. White Declaration ¶¶ 21, 25. HHS is working diligently to minimize the burdens of confirming parentage, and is expediting DNA verification. White Declaration ¶¶ 20-24. But given the possibility of false claims of parentage, confirming parentage is critical to ensure that children are returned to their parents, not to potential traffickers. White Declaration ¶ 25. Although HHS is moving expeditiously to undertake these DNA tests, that process takes meaningful time, even when it is expedited—as this Court has implicitly recognized. *See* Order on Motion to Dismiss 3-4, 8 (noting that on March 8, 2018,

the Court ordered that a DNA test for Ms. L. be completed by March 14—which the Court described as "order[ing] an expedited DNA test").

In many cases involving parents who are detained, this process will not interfere with the Government's ability to reunify families within the timelines provided by the Court. In some cases, however, this process may not be conclusive in establishing parentage, and further evaluation of available documentation may be required. White Declaration ¶¶ 20, 45. Confirming parentage for adults who have already been released may also take additional time, including for the parent to appear for DNA testing or other confirmation. In those cases, it may be harder to reunify some families within the Court's timeline.

Accordingly, the Government respectfully requests clarification from the Court as to whether the process for confirming parentage implemented by HHS is consistent with the Court's understanding of its mandate, and seeks clarification that in cases where parentage cannot be confirmed quickly, HHS will not be in violation of the Court's order if reunification occurs outside of the timelines provided by the Court. The Government can for the Court's consideration prepare a proposal for an alternative timeline.

Second, to confirm that an individual is neither "unfit [n]or presents a danger to the child," that the parent is "available to provide care and physical custody," 6 U.S.C. § 279(g)(2), and that the parent "has not engaged in any activity that would

18cv428 DMS MDD

indicate a potential risk to the child," 8 U.S.C. §1232(c)(3)(A), ICE and HHS must confirm whether an individual has any criminal history, including a history indicative of abuse. White Declaration ¶¶ 27, 29. To expedite those determinations in the unusual context of reunification following government separation, the agencies are relying on summaries of criminal background checks run by ICE, which are in turn shared with HHS. White Declaration ¶ 29. That process is not currently anticipated to delay reunification.

Third, before releasing any child to a class member who is not in government custody, HHS understands that the determination that a parent is not "unfit or presents a danger to the child," Preliminary-Injunction Order at 23 ¶ 2, must be read in conjunction with the TVPRA, 8 U.S.C. § 1232, which imposes additional safety requirements before "plac[ing]" a child with someone outside federal custody. Specifically, a UAC "may not be placed with a person or entity unless [HHS] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being," which must include "an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A). HHS believes that, in the context of reunifying a parent with a child following government separation, when the parent has since been released into the interior and the child remains in HHS custody, HHS remains obligated to apply existing HHS procedures under the

TVPRA. *See* White Declaration ¶¶ 33-44 for an explanation of such procedures. The processes involved in applying these provisions have developed to ensure that HHS does not inadvertently release a child in its custody into a situation that will expose him or her to trafficking or abuse. White Declaration ¶¶ 45-46.

HHS has worked diligently to expedite these processes to enable the Government to comply with the timelines in the Court's order. HHS anticipates, however, in some instances it will not be able to complete the additional processes within the timelines the Court prescribed, particularly with regard to class members who are already not in Government custody (*e.g.*, because they have previously been paroled or released). White Declaration ¶¶ 45-46.

Accordingly, HHS seeks clarification from this Court that it intended for HHS to follow such procedures in the somewhat unique context of reunification following government separation, and in particular for reunification with class members who have been released into the interior. If the Court intended for HHS to follow a different approach, the Government requests clarification regarding the precise inquiry that HHS should be making in these circumstances.[2]

---

[2] HHS's aim it to comply with the Court's injunction, while also following its normal processes under the TVPRA that HHS has implemented to ensure the safety of children upon placement by HHS with a parent or other sponsor. Accordingly, HHS asks that if the Court concludes that HHS must truncate those normal TVPRA processes to meet court-ordered deadlines, then the Court should so order in a manner that provides HHS full clarity with regard to its court-ordered obligations.

Further, if the Court concludes that HHS is properly proceeding in light of the Court's order and the relevant statutory provisions, then HHS seeks partial relief from the timelines in the Court's order to allow HHS to comply with these obligations and to safely achieve the reunifications that the order directs, particularly for parents who have previously been released. The Government does not wish to unnecessarily delay reunifications or burden class members. At the same time, however, the Government has a strong interest in ensuring that any release of a child from Government custody occurs in a manner that ensures the safety of that child. The Government can, for the Court's consideration, prepare a proposal for an alternative timeline that that takes HHS's procedures into account.

Thus, Defendants seek clarification to ensure that the Government can comply with and implement the Court's order consistent with federal laws protecting child safety in implementing reunification plans.

B. ICE's Obligations Under Paragraph (1) Of The Preliminary Injunction.

As described in the Government's declarations, the reunification process implemented by ICE and HHS for parents who are now in ICE custody requires extensive and careful coordination between the two agencies so that HHS can reunify the child with his or her parent in ICE custody. White Declaration ¶¶ 13-14, 29. HHS is able to reunify families in such cases much faster than it is able to do so for class members who have already been released from ICE custody. *Id.*

Paragraph (1) of the Court's preliminary-injunction order prohibits ICE "from detaining Class Members in DHS custody without and apart from their minor children." Preliminary-Injunction Order at 22 ¶ (1). Consistent with that command, reunification could occur in ICE custody in a family residential center, or by reunifying the parent and child at release. But this paragraph could potentially be read to require that if HHS has not been able to reunify a child with a parent in ICE custody by the deadlines ordered by the Court, ICE would still be required to release the parent from custody before that deadline even without reunification. Such a requirement would, in most cases, delay reunification because release of a parent before HHS completes its suitability determination would trigger additional obligations for HHS to comply with the procedures it has developed to ensure safe release in accordance with the TVPRA. White Declaration ¶¶ 33-45.

If, as discussed above, the Court determines that HHS should continue to follow its TVPRA procedures in making its release decisions, then the Government further asks the Court to clarify whether: (a) Paragraph (1) of the preliminary-injunction order requires that ICE release the parent by the compliance deadlines even if HHS has not completed its processes and where such release might slow reunification; or (b) ICE may continue to hold parents beyond the current deadlines until HHS's processes are complete.

9

### C. Scope Of The Class Definition.

The Government also respectfully requests clarification on the scope of the Court's class definition.

First, as issued, the class definition contains no date limitations. It thus could be read to cover individuals who were separated from their children long before this case began, and long before the May 2018 policy that prompted the Court's injunction. The absence of any date limitations, moreover, makes it difficult for the Government to ensure that it has identified all class members.

Accordingly, the Government respectfully requests that the Court clarify a start date for separations that would result in class membership for the separated parent. The Government proposes that the Court use March 9, 2018, as the starting point for the reunification requirement, because that is the date of filing for Plaintiffs' amended complaint which added the class claims in this case.

Relatedly, the class definition does not specify whether it includes parents who had been removed from the United States prior to the issuance of the Court's class-certification order. The order itself does not address such individuals, nor did either named Plaintiff experience such a situation. Moreover, the timelines for the relief ordered by the Court could not encompass such a scenario given the complexities involved in locating individuals who have been removed, determining whether they wish to be reunified with their child, and facilitating such a

reunification outside of the United States. Accordingly, the Government requests that the Court clarify that such individuals are not included within the class definition or, if the Court believes that they are, that the Court allow the Government the opportunity to brief the matter or that the Court at least provide the Government relief from the timelines in the order with regard to the reunification of such individuals, and instead allow the Government the opportunity to propose a timeline to pursue reunifications for removed individuals.

18cv428 DMS MDD

1    DATED: July 5, 2018                Respectfully submitted,

2

3                                  CHAD A. READLER
                                 Acting Assistant Attorney General

4                                  SCOTT G. STEWART
                                 Deputy Assistant Attorney General

5                                  WILLIAM C. PEACHEY
                                 Director

6                                  WILLIAM C. SILVIS

7                                  Assistant Director

8                                  */s/ Sarah B. Fabian*

9                                  SARAH B. FABIAN
                                 Senior Litigation Counsel

10                               NICOLE MURLEY

11                               Trial Attorney

12                               Office of Immigration Litigation
                              Civil Division

13                               U.S. Department of Justice

14                               P.O. Box 868, Ben Franklin Station
                              Washington, DC 20044

15                               (202) 532-4824

16                               (202) 616-8962 (facsimile)
                              sarah.b.fabian@usdoj.gov

17

18                               ADAM L. BRAVERMAN
                              United States Attorney

19                               SAMUEL W. BETTWY

20                               Assistant U.S. Attorney

21                               *Attorneys for Respondents-Defendants*

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L., et al. | Case No. 18-cv-428 DMS MDD |
| Petitioner-Plaintiff, | |
| vs. | **CERTIFICATE OF SERVICE** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 450 Fifth Street, NW, Washington, DC 20001. I am not a party to the above-entitled action. I have caused service of the accompanying RESPONDENTS' NOTICE REGARDING COMPLIANCE AND REQUEST FOR CLARIFICATION AND/OR RELIEF on all counsel of record, by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically provides notice.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: July 5, 2018

> */s/ Sarah B. Fabian*
> SARAH B. FABIAN
> Senior Litigation Counsel
> Office of Immigration Litigation
> Civil Division, U.S. Department of Justice
>
> *Attorney for Respondents-Defendants*

CHAD A. READLER
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation (OIL)
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director, OIL District Court Section
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

Attorneys for Federal Respondents-Defendants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al., | Case No. 18cv428 DMS MDD |
| Petitioners-Plaintiffs, | |
| vs. | **DECLARATION OF JONATHAN WHITE** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

I, Jonathan White, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and depose as follows, based on my personal knowledge and information provided to me in the course of my official duties:

1. I am a career officer in the United States Public Health Service Commissioned Corps and have served in the Department of Health & Human Services in three Administrations. I am presently assigned to the Office of the Assistant Secretary for Preparedness and Response, and previously served as the Deputy Director of the Office of Refugee Resettlement for the Unaccompanied Alien Children's Program.

2. I have been involved directly in the actions which HHS has taken to implement Executive Order (EO) 13841 ("Affording Congress an Opportunity to Address Family Separation") and comply with the orders in *Ms. L., et al., v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 18-cv-428 (S.D.Cal.). President Trump issued EO 13841 on June 20, 2018, and the Court issued its orders on June 26, 2018.

**KEY HHS ACTIONS ON REUNIFICATION**

3. Focus on Child Safety: The Secretary of Health and Human Services has directed HHS to take all reasonable actions to comply with the Court's orders and to prioritize child safety and well-being when doing so.

4. Deployment of Additional Personnel: On June 22, 2018, the Secretary of Health and Human Services directed ASPR to deploy personnel and resources to help the Office of Refugee Resettlement (ORR) of the Administration for Children and Families (ACF) of HHS reunify children in ORR custody with parents.

5. Determination of Class Members: HHS has worked closely with U.S. Department of Homeland Security (DHS)—including U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE)—to try to determine all individuals who meet the

Court's criteria for class members. The determination of class membership involves real-time, inter-agency collection and analysis of facts and data to: verify parentage; determine location of DHS apprehension and separation; determine parental fitness; and evaluate whether reunification would present a danger to the child. Class membership is not static; it can change due to transfers of putative parents from ICE to the Bureau of Prisons (BOP) (or vice-versa), and newly-acquired information.

6. <u>Facilitation of Regular Communication Between Class Members and Children in ORR Custody</u>: HHS has deployed field personnel to help putative class members communicate with children in ORR care.

**DEPLOYMENT OF ADDITIONAL PERSONNEL**

7. As noted above, on June 22, 2018, the Secretary of Health and Human Services activated ASPR to augment the resources that ORR had already devoted to expeditiously discharge children from ORR care. ORR has had to continue performing core program functions for minors who cross the border without parents (and who far outnumber separated children in ORR care). The augmenting of resources has helped ORR continue performing those core functions.

8. The activating of ASPR included the Secretary's Operation Center (SOC), which is a command center that operates 24 hours per day, 365 days per year. The mission of the SOC is to synthesize critical public health and medical information for the U.S. Government. While typically used for a public health emergency or natural disaster (e.g., Hurricane Maria in Puerto Rico), the SOC can also serve as a communications hub for large, data-intensive, inter-departmental operations.

9. ASPR activated an Incident Management Team. As of July 3, 2018, the Incident Management Team had 33 members (in addition to the permanent staff of the SOC). It works full-time to provide logistical and administrative support.

10. ASPR has also dispatched approximately 115 personnel to the field to engage directly with putative class members in DHS custody. Those personnel—who are organized into four field

teams— are from ACF, ASPR, the US Public Health Service Commissioned Corps, and the National Disaster Medical System's Disaster Medical Assistance Team (DMAT).  The DMAT is a cadre of trained health and medical professionals and para-professionals that augments ASPR's capabilities during public emergencies.

11.     Finally, HHS has executed a contract with BCFS Health and Human Services, Inc. ("BCFS"), to provide an additional 100 reunification case managers, plus approximately 40 staff for logistical and administrative support. HHS has trained the case managers from BCFS, and is deploying them on Thursday, July 5, and Friday, July 6, 2018, to augment existing field operations. They too will engage directly with putative class members in ICE custody.

## DETERMINATION OF CLASS MEMBERS

12.     ORR has a process for placing unaccompanied alien children (UAC) with parents or other sponsors that is designed to comply with the 1997 Flores Settlement Agreement, the Homeland Security Act of 2002 (HSA), and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), as described in more detail below.  This process ensures the care and safety of children who are apprehended in the United States and then referred to HHS as unaccompanied children.

13.     HHS has modified and expedited its ordinary process so that it can determine class membership using the Court's criteria and, to the extent possible, reunify class members and their children within the Court's deadlines.

14.     Under its modified process, HHS identifies putative class members with children in ORR custody and verifies parentage.  Also, HHS determines the putative class member's immigration history to confirm where they were apprehended and separated from their child.  Finally, HHS collects and analyzes criminal, medical (e.g., communicable disease), and other information to

18cv428 DMS MDD

determine the parental fitness of the putative class member and confirm that reunification would not present a danger to the child. HHS generally performs these checks concurrently.

15. Putative class members who are not verified as parents are not included in the class by HHS. Putative class members apprehended in the interior, who have relevant criminal history, have a communicable disease, or are otherwise parentally unfit or present a danger to a child, are not included in the class either.

16. In general, HHS knows the names and locations of all children who are in ORR care and custody at all times because ORR maintains that data in its online case management portal. The ORR portal includes data about each child that DHS provided when DHS transferred the child to ORR custody. It also includes health and social data collected or entered by ORR personnel, grantees, or contractors. While the ORR portal may contain some data about the child's parents, the ORR portal was not designed to determine class membership or facilitate reunification under the criteria and deadlines established by the Court's Order. Some of the data required to determine the class membership of a putative class member resides with DHS, while HHS must collect some data directly from the putative class member.

17. The data collection, sharing, and analysis required to determine class membership is extraordinarily time and resource intensive. There are myriad reasons for this. For instance, DHS has different information systems, and those systems were not designed to neatly capture and readily share all of the data required to determine class membership. The departments must therefore map their data manually. Also, the class potentially encompasses parents who were separated from their children *before* the Administration implemented the zero-tolerance policy, and those groups may not have received the same family unit identifiers from DHS as the groups separated *after* the Administration implemented the zero-tolerance policy. Absent reliable and consistent identifiers, HHS must glean the separations of class members and children (and related details) from the case

18cv428 DMS MDD

management files on the ORR portal. On top of these variables, a parent's class membership can change if the parent is transferred between ICE and the Bureau of Prisons (BOP), or if information obtained directly from the parent affects the class membership analysis.

18. To ensure that every separated child in ORR custody who belongs to a class member is identified and reunified, HHS has had each grantee at one of ORR's approximately 110 shelters certify the separated children who the grantee reasonably believes are in its care. HHS has also conducted a full manual review of the case management file for each one of the approximate 11,800 children in ORR custody—the substantial majority of whom were not separated from a putative parent at the border—to confirm or rule out any indicia of separation. The manual review was conducted by dozens of HHS personnel working nights and over the weekend. The results of both the manual review and the grantee certifications are undergoing validation.

19. As of July 5, 2018, we have identified approximately 101 minors under age 5, within ORR care, whose records contain indicia of separation. Class membership analysis for putative class members associated with the larger group of minors 5 through 18 is ongoing. Also, some of the identified minors may have been separated prior to crossing the border, or there may be other factors that need to be explored that would not make their parents members of the class. HHS has received confirmation from DHS that approximately 40 parents of children in the under-5 group are in DHS custody and another 9 are in U.S. Marshal's custody. The class membership analysis for putative class members associated with the remaining children in the group of 101 is ongoing.

Verifying Parentage

20. HHS is using DNA testing to try to verify parentage of _all_ putative class members, as well as all children in ORR custody who ORR reasonably believes were separated from a putative class member. HHS is conducting the DNA testing concurrent with collecting and reviewing

5

18cv428 DMS MDD

documentation of parentage, interviewing putative class members and family members, and observing communications or interactions between putative class members and children.

21. DNA testing is a faster but costlier method for confirming parentage than collecting and assessing documentation and anecdotal information. When ORR implements its safety and suitability policies in the ordinary course of administering its program, it confirms parentage through DNA testing as a last resort. HHS has dual-tracked global DNA testing to ensure child safety and to expedite parentage verifications to try to comply with the deadlines in the Court's order.

22. ORR grantees are swabbing the cheeks of the children in ORR custody, while DHS personnel or the field teams deployed by HHS are swabbing the cheeks of the putative class members in ICE custody. The cheek swabs are then sent to a third-party laboratory services provider to complete the DNA testing. The results are then transmitted electronically to the Incident Management Team at the SOC, which shares them with the grantees. HHS will use the results only for verifying parentage.

23. The DNA testing process takes nearly one week to complete for each putative class member and child. Once HHS has made a data match between a putative class member and child, it may take the field teams and grantees up to two days to further validate the match and swab cheeks. It may then take up to three days for laboratory services provider to collect the sample and conduct the test. Once the laboratory services provider completes the testing, it may take up to 24 hours for the Incident Management Team to receive and transmit the results back to the grantees and field teams.

24. The field teams are concurrently facilitating the completion of reunification applications by putative class members. The packets seek medical and social data that bear on the criteria for class membership, including parentage, parental fitness, and child endangerment. A copy of a blank reunification application is attached at Tab 1.

25.     My opinion is that DNA testing is the method of parental verification most likely to protect children from harm given the compressed timeframe imposed by the court's order.  The risk of placing children with adults who are not their parents is a real and significant child welfare concern for HHS because the experience of ORR is that children are smuggled across the border or trafficked by adults who fraudulently hold themselves out as parents.  The children may not disclose the situation to CBP, ICE, or ORR because they may fear retaliation by the adults who brought them across the border.  In some instances, they may fear retaliation by their parents in their home country, who have given them to the smuggler or trafficker so that they may earn money in the United States.  My opinion is that DNA testing mitigates the risk of the United States Government placing children back with adults who are not their parents and who would endanger them.

26.     If, however, HHS concludes that it can reliably and more quickly determine the parentage of a putative class member based on documentation or anecdotal information collected from the putative class member, then HHS will make that determination to try to comply with the Court's reunification deadlines.

Background Checks for Parental Fitness

27.     HHS is assessing the backgrounds of putative class members by reviewing summaries of prior criminal background checks provided by ICE.  Already such background check information has come back with two results that show that two putative parents of children under five may endanger the child (charges of kidnapping/rape and child cruelty), and 12 more need to be further assessed.

Parental Fitness and Child Endangerment

28.     As discussed below, HHS' ordinary process for placing children with sponsors involves a safety and suitability analysis, as well as a home study in certain circumstances.  These checks can sometimes take weeks or months.

29.     HHS has modified and expedited its ordinary process when further assessing parental fitness and potential child endangerment for a potential reunification with a putative class member in DHS custody.  For potential reunifications with putative class members in DHS custody, any further assessment of parental fitness and potential child endangerment involves only the review of the case management records (which includes, for example, case review notes and other electronic files) and the putative class member's completed reunification packet for indicia of child abuse or neglect.  If there are no such indicia, then HHS will not conduct further assessment.

30.     When further assessing parental fitness and potential child endangerment for potential reunifications of putative class members who are no longer in DHS custody, HHS is modifying and expediting its ordinary process on a case-by-case basis to try to comply with court-ordered deadlines in ways that do not endanger child welfare.

31.     For example, when placing a child with a putative parental sponsor who is no longer in DHS custody, HHS would ordinarily verify the potential sponsor's residential address and conduct background checks of adult cohabitants to try to ensure that the potential sponsor is capable of providing shelter and care – and that the potential sponsor's cohabitants do not endanger the child— after placement. To try to comply with the Court's deadlines, HHS will likely need to streamline its address verification process for putative class members.  But HHS does not believe that it can streamline background checks.

32.     UAC sponsors have always included the parents of UACs , and close to half of the sponsors to whom ORR ordinarily releases UACs are parents.

33.     The *Flores* settlement agreement ("FSA") prioritizes release to parents, if they are available, and also specifically provides for ORR to ensure the suitability of such releases, and to protect the child from danger.  *See* FSA paragraphs 14-18.

8                                    18cv428 DMS MDD

34.     The FSA describes a variety of criteria to consider before the government releases a UAC to a parent (or other sponsor). *See* FSA paragraphs 14-18. These factors include:

- Verifying the identity of the parent;

- Verifying the identity and employment of the individuals offering support to the parent and minor;

- Receiving information from their address and any future change of address;

- Ensuring the parent will provide for the minor's physical, mental, and financial well-being;

- Investigating the living conditions in which the minor would be placed and the standard of care he would receive;

- Interviewing the members of the household where the parent will live with the child, and in some cases a home visit; and

- Requiring the parent to ensure the minor's presence at all future immigration proceedings.

35.     Furthermore, under the HSA and TVPRA, HHS has developed a series of safety and suitability requirements that ensure child welfare, upon release, is protected. These policies, many of which were refined after Congressional oversight, are contained in Section 2 of the ORR Policy Guide: Children Entering the United States Unaccompanied, available at: https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.1 .

36.     The policies include identifying the sponsor; submitting the application for release and supporting documentation; evaluating the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child; background checks; and in some cases home studies; and planning for post-release.

9

18cv428 DMS MDD

37.     ORR requires all potential sponsors, including parents, to undergo fingerprinting in order to ensure the safety and suitability of release.  The fingerprints are used to run background checks of databases involving criminal history. ORR also checks sexual abuse information, child abuse information, and other public record sources.

38.     ORR also requires that, if there are other adults living in the household with a sponsor (including a parent), those adults also undergo background checks.  This ensures the child will not be endangered if, for example, those household members have a history of child abuse or sexual abuse that ORR must further consider before approving the release.

39.     ORR also requires that sponsors, including parents, identify an alternative caregiver, who will be able to provide care in the event the original sponsor is unavailable.  These adult caregivers must also be identified and undergo background checks.

40.     To ensure safety and suitability for children, ORR considers the following factors when evaluating release of a UAC to parents, other family members, and other potential sponsors in the community:

a.  The nature and extent of the sponsor's previous and current relationship with the child or youth and the unaccompanied alien child's family, if a relationship exists.

b.  The sponsor's motivation for wanting to sponsor the child or youth.

c.  The UAC's parent or legal guardian's perspective on the release to the identified potential sponsor (for cases in which the parent or legal guardian is not  the sponsor).

d.  The child or youth's views on the release and whether he or she wants to be released to the individual.

e.  The sponsor's understanding of the unaccompanied alien child's needs, as identified by ORR and the care provider.

18cv428 DMS MDD

f.   The sponsor's plan to provide adequate care, supervision, access to community resources, and housing.

g.   The sponsor's understanding of the importance of ensuring the unaccompanied alien child's presence at all future hearings or proceedings, including immigration court proceedings, and the sponsor's receipt of Legal Orientation Program for Custodians information that ORR provides to all potential sponsors.

h.   The linguistic and cultural background of the child or youth and the sponsor, including cultural, social, and communal norms and practices for the care of children.

i.   The sponsor's strengths, resources, and mitigating factors in relation to any risks or special concerns of the child or sponsor, such as a criminal background, history of substance abuse, mental health issues, or domestic violence and child welfare concerns.

j.   The unaccompanied alien child's current functioning and strengths in relation to any risk factors or special concerns, such  as children or youth who are victims of human trafficking; are a parent or are pregnant; have special needs, disabilities or medical or mental health issues; have a history of criminal, juvenile justice, or gang involvement; or a history of behavioral issues.

41.   In certain cases, the TVPRA requires a home study, prior to release.  8 U.S.C. § 1232(c)(3)(B) states: "A home study shall be conducted for a child who is a victim of a severe form of trafficking in persons, a special needs child with a disability (as defined in section 12102 of title 42), a child who has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened, or a child whose proposed sponsor clearly presents a risk of abuse, maltreatment, exploitation, or trafficking to the child based on all available objective evidence."  In circumstances in which a home study is not required by the TVPRA or ORR policy, the Case Manager and an independent third party Case

11

18cv428 DMS MDD

Coordinator may recommend that a home study be conducted if they agree that the home study will provide additional information required to determine that the sponsor is able to care for the health, safety and well-being of the child.

42.    ORR does not disqualify potential sponsors on the basis of their immigration status, but does require sponsors (including parents) to complete a sponsor care plan.  Among other things, the care plan identifies the adult caregiver who will act for the sponsor, should the sponsor become unavailable, and how such caregiver will be notified of such situation.  It also includes a safety plan in some circumstances.

43.    Throughout the release process, care providers work with the child and sponsor so that they can plan for the child's after care needs. This involves working with the sponsor and the unaccompanied alien child to prepare them for post-ORR custody, assess the sponsor's ability to access community resources, and provide guidance regarding safety planning, sponsor care plans, and accessing services for the child.  The care provider explains the U.S. child abuse and neglect standards and child protective services that are explained on https://www.childwelfare.gov, human trafficking indicators and resources, and basic safety and how to use the 9-1-1 number in emergency situations.

44.    Once the assessment is complete and a sponsor has been approved, the sponsor enters into an agreement with the Federal government in which he or she agrees to:

a.   Provide for the physical and mental well-being of the child, including but not limited to, food, shelter, clothing, education, medical care and other services as needed.

b.   Attend a legal orientation program provided under the Department of Justice/Executive Office for Immigration Review's (EOIR) Legal Orientation Program for Custodians (Sponsors), if available where he or she resides.

c.   Depending on where the unaccompanied alien child's immigration case is pending, notify the local Immigration Court or the Board of Immigration Appeals within 5 days of any change of address or phone number of the child (Form EOIR-33). (If applicable, file a Change of Venue motion on the child's behalf.10 A "change of venue" is a legal term for moving an immigration hearing to a new location.)

d.   Notify the DHS/U.S. Citizenship and Immigration Services within 10 days of any change of address by filing an Alien's Change of Address Card (AR-11) or electronically at http://www.uscis.gov/ar-11.

e.   Ensure the unaccompanied alien child's presence at all future proceedings before the DHS/Immigration and Customs Enforcement (ICE) and the DOJ/EOIR.

f.   Ensure the unaccompanied alien child reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.

g.   Notify local law enforcement or state or local Child Protective Services if the child has been or is at risk of being subjected to abuse, abandonment, neglect or maltreatment or if the sponsor learns that the child has been threatened, has been sexually or physically abused or assaulted, or has disappeared. (Notice should be given as soon as it is practicable or no later than 24 hours after the event or after becoming aware of the risk or threat.)

h.   Notify the National Center for Missing and Exploited Children at 1-800-843-5678 if the unaccompanied alien child disappears, has been kidnapped, or runs away. (Notice should be given as soon as it becomes practicable or no later than 24 hours after learning of the child's disappearance.)

13

i.  Notify ICE at 1-866-347-2423 if the unaccompanied alien child is contacted in any way by an individual(s) believed to represent an alien smuggling syndicate, organized crime, or a human trafficking organization. (Notice should be provided as soon as possible or no later than 24 hours after becoming aware of the information.)

j.  In case of an emergency, such as serious illness, destruction of home, etc., temporarily transfer physical custody of the child to another person who will comply with the terms of the Sponsor Care Agreement.

k.  In the event that a sponsor who is not the child's parent or legal guardian is no longer able and willing to care for the unaccompanied alien child and is unable to temporarily transfer physical custody, notify ORR using the ORR National Call Center, at 1-800-203-7001.

45.  If HHS cannot reasonably complete processes that are material to ensuring the welfare of the children presently in ORR custody within the deadlines ordered by the Court, then HHS has no choice but to make class membership determinations with incomplete information. The use of incomplete information increases the risk of not only incorrect class membership determinations, but also reunifications that endanger the welfare of the children presently in ORR care.

46.  My opinion is that some relaxing of the Court's deadlines is needed to allow HHS, on a case-by-case basis, to complete processes that HHS determines are necessary to make informed class membership determinations and to protect the welfare of the children presently in ORR custody.

**FACILITATION OF CLASS MEMBER COMMUNIATIONS**

47.  HHS has facilitated communication between putative class members by helping putative class members connect with case managers. HHS has directed field staff to help facilitate a conversation between a putative class member and his or her child. For example, field staff may call

14

a case manager in a minor's shelter and ask the case manager to call or contact the detained parent. In other instances, the detained adult may be given the shelter case manager's telephone number.

48.   The ORR Helpline is a bilingual call center that ordinarily works with ORR grantees to facilitate communications between potential sponsors and the children in the care of the grantees. *See* https://www.acf.hhs.gov/orr/about/ucs/contact-info (last visited July 5, 2018).  Potential sponsors who call the ORR Helpline provide their name, contact information, relationship to the child, and other information to the ORR Helpline representative, who communicates the information to the ORR grantee caring for the child.  The ORR grantee then responds to the potential sponsor and facilitates direct communications with the child and a case worker.  The ORR Helpline does not verify parentage or make determinations regarding parental fitness or child endangerment.

49.   HHS operates with the goal of facilitating communications between putative class members and children in ORR custody twice a week.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 5, 2018.

Jonathan White,

18cv428 DMS MDD

# Please wait...

If this message is not eventually replaced by the proper contents of the document, your PDF viewer may not be able to display this type of document.

You can upgrade to the latest version of Adobe Reader for Windows®, Mac, or Linux® by visiting  http://www.adobe.com/go/reader_download.

For more assistance with Adobe Reader visit  http://www.adobe.com/go/acrreader.

Windows is either a registered trademark or a trademark of Microsoft Corporation in the United States and/or other countries. Mac is a trademark of Apple Inc., registered in the United States and other countries. Linux is the registered trademark of Linus Torvalds in the U.S. and other countries.

CHAD A. READLER
Acting Assistant Attorney General
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
COLIN KISOR
Deputy Director
SARAH B. FABIAN
Senior Litigation Counsel
U.S. Department of Justice
Office of Immigration Litigation
District Court Section
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | Case No. CV 85-4544-DMG |
| Plaintiffs, | **DEFENDANTS' NOTICE OF COMPLIANCE** |
| v. | |
| JEFFERSON B. SESSIONS III, Attorney General of the United States; *et al.*, | |
| Defendants. | |

The Government's June 21, 2018, ex parte application explained that the Flores Agreement—as interpreted by this Court and the Ninth Circuit—put the Government in the difficult position of having to separate families if it decides it should detain parents for immigration purposes. Defendants wish to inform the Court that, following the filing of our application to this Court, a federal district court in the Ninth Circuit held that such separation likely violates substantive due process under the Fifth Amendment. *Ms. L v. U.S. Immigration and Customs Enforcement*, No. 18-428 (S.D. Cal. June 26, 2018) (attached as exhibit). The *Ms. L* court certified a class and entered a class-wide preliminary injunction requiring reunification—both for parents released into the interior of the United States and for parents in DHS custody— and barring future separations for families in DHS custody.

Defendants are submitting this notice of compliance to explain how the government is applying the Flores Agreement in light of this injunction. To comply with the *Ms. L* injunction barring parents in DHS custody from being separated from their children, the Government will not separate families but detain families together during the pendency of immigration proceedings when they are apprehended at or between ports of entry. As explained below, we believe that the Flores Agreement permits the Government to detain families together to comply with the nationwide order in *Ms. L*. We nevertheless continue to believe that an

1

amendment of the Flores Agreement is appropriate to address this issue. Until that amendment, this submission sets out the Government's interpretation and application of the Agreement in light of *Ms. L.*

**A.** There are many legitimate justifications for detaining arriving aliens under the immigration laws, including well-established rules that allow arriving aliens at the border to be detained pending a determination of whether they may legally be admitted to the United States. Such detention, which Congress has made mandatory in many circumstances under 8 U.S.C. § 1225(b), is essential to protecting our southwest border, discouraging families that are not entitled to remain in this country from making the dangerous journey to the border, and returning families promptly when they are not entitled to relief in this country. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018); *cf. Demore v. Kim*, 538 U.S. 510, 526 (2003) (discussing the Supreme Court's "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings").

We have explained over a period of years that one impact of the *Flores* requirements, if applied to minors that come into DHS custody accompanied by their parents, would be the separation of parents from their children. In construing the Flores Agreement, over the government's objection, to apply to children taken into custody with their families, the Ninth Circuit understood that the separation of

2

Case 3:18-cv-04025-JCS Document 66-1 Filed 07/02/18 Page 4 of 12
Case 3:18-cv-04025-JCS Document 66-1 Filed 07/02/18 Page 4 of 12
#:18002

parents from their children was a direct consequence of its holding. *Flores v. Lynch*, 828 F.3d 898, 908-09 (9th Cir. 2016). But the Ninth Circuit also made clear that neither the Flores Agreement nor court rulings applying it impose any legal barrier on the critical authority of DHS to detain adults who come into immigration custody at the border with their children. *Flores*, 828 F.3d at 908-09.

The *Ms. L* court reached the same conclusion in considering the situation of the separation of accompanied children from their parents, this time from the point of view of the parents, who were not parties to the *Flores* case or the Settlement Agreement. The *Ms. L* court issued class-wide relief requiring that, in most circumstances, parents be kept with their children during the pendency of immigration proceedings. Notably, like the Ninth Circuit, the court in *Ms. L* recognized the authority of DHS to detain parents in immigration custody pending resolution of their immigration cases. As the court emphasized, even in light of the court's injunction requiring families to be kept together and reunified, the "Government would remain free to enforce its criminal and immigration laws, and to exercise its discretion in matters of release and detention consistent with law." Order at 20; *see also id.* at 3 ("Order does not implicate the Government's discretionary authority to enforce immigration laws . . . including its decision to release or detain class members."). Thus, while the Government must keep families together when it chooses to exercise its discretion to detain or release a

parent under the INA, the court cited the *Flores* in explaining that the Government otherwise remains "free" to exercise "discretion in matters of release and detention." *Id* at 20 (citing *Flores*); *see id*. at 7 (for "children placed in federal custody, there are two options," the first option is separating the family and placing the child alone in ORR custody and "the second option is family detention").

**B.** Reading the Flores Agreement together with the subsequent nationwide order in *Ms. L*, we understand the courts to have provided that minors who are apprehended with families may not be separated from their parents where it is determined that continued detention is appropriate for the parent. The Flores Agreement allows this result for two reasons.

*First*, the Agreement's express terms accommodate court orders like the one recently issued in *Ms. L*. Paragraph 12A of the Flores Agreement provides for the release of minors to a parent (or others) when possible under Paragraph 14 or, alternatively, transfer to an appropriate facility with a licensed program under Paragraph 19. *See Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016) ("Settlement creates a presumption in favor of releasing minors and requires placement of those not released in licensed, non-secure facilities that meet certain standards"). But these provisions include exceptions to releasing or transferring minors to accommodate a ruling like that in *Ms. L* requiring families to be kept together, and those exceptions permit family detention in these circumstances.

4

*Release provision.* In Paragraph 14, the Flores Agreement specifies that a minor should be "release[d] from its custody *without unnecessary delay*" to a parent or other relative. Flores Agreement ¶ 14 (emphasis added). The court's order in *Ms. L*, which requires that the minor be kept with the parent, makes delay necessary in these circumstances. The minor cannot be released under Paragraph 14 without separating him or her from their parent, as such a separation would violate the injunction issued in *Ms. L. See Ms. L* Order at 22 (DHS is "enjoined from detaining Class Members in DHS custody without and apart from their minor children"). Under those circumstances, the release of the minor from custody must be "delay[ed]" pursuant to the Agreement during the period the parent is detained by DHS. Flores Agreement ¶ 14. Indeed, the court's order in *Ms. L* envisions that a parent would be "reunited with the child *in DHS custody*" and that a child would be released only "*[i]f Defendants choose* to release Class Members [*i.e.*, parents] from DHS custody" or if a parent consents. Order at 23 (emphasis added). This application of the Flores Agreement is also consistent with another aspect of Paragraph 14 of the Agreement – which sets placing the minor with "a parent" as the first "order of preference." Flores Agreement ¶ 14; *id.* ¶ 18 (requiring "continuous efforts . . . *toward family reunification* and . . . release") (emphasis added); *see Flores*, 828 F.3d at 903 ("[t]he settlement creates a presumption in favor of release *and favors family reunification*") (emphasis added).

5

*Transfer provision.*  The Flores Agreement also permits transfer of a child to a licensed program under Paragraph 19.  *See* Flores Agreement ¶ 12A.  Under Paragraph 12A, during an influx DHS is required to transfer a minor for placement in a licensed program "as expeditiously as possible."  *Id.* ¶ 12A.3.  But the obligation to transfer applies "except . . . as otherwise required by any court decree or court-approved settlement."  *Id.* ¶ 12A.2.  Here, the court decree in *Ms. L* prohibits the transfer of the minor to a licensed program, because such a transfer would separate the child from his or her parent.  *Ms. L* Order at 22.  A transfer therefore cannot occur consistent with that court decree.[1]

**Second**, both *Ms. L* and *Flores* expressly envision that adults who arrive at the United States with children are properly subject to detention – a critical aspect of border enforcement.  Given that express conclusion in each decision, it would be remarkable to read the orders together as mandating the opposite conclusion – that detention may never occur.  Doing so would undermine the express holdings in both cases.  *Ms. L*, for its part, held that DHS would retain the same authority to detain the parent as it had before – it simply required that such detention be of the

---

[1] The issue regarding how the Flores Agreement licensing provisions apply to family detention centers is the subject of ongoing litigation.  But to the extent that family detention centers are treated as licensed consistent with the Flores Agreement, a transfer under this provision could occur consistent with *Ms. L.*  We have also asked this Court to modify the Agreement to permit the transfer of families together to family residential centers without requiring a state license.

family as a unit. *See Ms. L* Order at 3 ("Order does not implicate the Government's discretionary authority to enforce immigration laws . . . including its decision to release or detain class members"); *id.* at 22 (DHS may "choose to release" class members).

Likewise, the Ninth Circuit ruling in *Flores* held that the "settlement does not require the government to release parents." *Flores*, 828 F.3d at 908; *see also Bunikyte v. Chretoff*, 2007 WL 1074070, at *16 (W.D. Tex. 2007) (rejecting argument that Flores Agreement required release of both minors and parents). As the Ninth Circuit explained, providing rights to minors under the agreement "does not mean that the government must also make a parent available" by releasing the parent with the child. *Flores*, 828 F.3d at 908; *id.* at 909 ("parents were not plaintiffs in the *Flores* action, nor are they members of the certified class," and the settlement "therefore provides no affirmative releases rights for parents"). Because the Flores Agreement does not require the release of parents, and *Ms. L* requires DHS to keep parents and children together when the parents are in detention, the rulings work together to permit detention of parents with their minor children with whom they are apprehended.

**C.** No other aspect of the Flores Agreement or *Ms. L* require the United States to release all individuals held in border-related detention when they arrive at the border with children. Instead, other aspects of the rulings lead to the opposite

conclusion. The *Ms. L* ruling addresses reunification of children with their parents, and specifically requires reunification "when the parent is returned to immigration custody" after a release from criminal custody. Order at 10; *see id*. at 11 (court order provides for "reunification during intervening . . . ICE detention prior to actual removal, which can take months"). But this aspect of the *Ms. L* ruling would make little sense if that reunification would necessitate an immediate release of the parents from immigration custody under the Flores Agreement.

The *Ms. L* decree also provides that the parent may consent to the release of the child without the parent. Order at 23 (parent may "affirmatively, knowingly, and voluntarily decline[] to be reunited with the child in DHS custody"). This authority permits the continued operation of the provisions of the Flores Agreement governing release of the child – albeit with the accompanying parent's consent before they go into effect. Relying on a parent's consent in these circumstances where the family is together makes sense, particularly because plaintiffs in this case have always agreed that detention of the family together is permissible if the parent consents. *See Flores*, Transcript at 37-38 (April 24, 2015) (in response to question whether the "agreement allows[s] for an accommodation to . . . a parent who wishes to remain in the [family residential] facility," "the plaintiffs' positions is . . . a class member is entitled to waive those rights" and that waiver may "parents speak for children all the time") (relevant

pages attached as exhibit); *see also*

https://www.npr.org/2018/06/22/622678753/the-history-of-the-flores-settlement-and-its-effects-on-immigration (June 22, 2018) (last visited June 29, 2018)

(counsel for plaintiffs explaining that "choice" to remain in family detention "is not something the Flores settlement itself addresses or prevents"). That is a preference expressed by other plaintiffs who have challenged family separation.[2] This aspect of the *Ms. L* order – allowing release of the child with the consent of the parent – would make little sense if the Government was under an affirmative obligation to release the entire family together.

**D.** Accordingly, for the reasons explained, the Flores Agreement permits the Government to detain families together given the nationwide order in *Ms. L* that bars the separation of families in DHS custody. To comply with the *Ms. L* injunction, the government will not separate families but detain families together during the pendency of immigration proceedings when they are apprehended at or between ports of entry and therefore subject to the *Ms. L* injunction.

---

[2] *See Mejia-Mejia v. ICE*, No. 18-1445, Complaint ¶ 4 (D.D.C. filed June 19, 2018) ("If, however, the government feels compelled to continue detaining these parents and young children, it should at a minimum detain them together in one of its immigration family detention centers"); *Padilla v. ICE*, NO. 18-928 (W.D. Wash), Complaint ¶ 12 ("If, however, the government insists on continuing to detain these parents and children, it must at a minimum detain them together in one of its immigration family detention centers.").

DATED:     June 29, 2018                    Respectfully submitted,


                                           CHAD A. READLER
                                           Acting Assistant Attorney General

                                           /s/ August E. Flentje
                                           AUGUST E. FLENTJE
                                           Special Counsel to the Assistant Attorney
                                           General
                                           Civil Division

                                           WILLIAM C. PEACHEY
                                           Director
                                           COLIN KISOR
                                           Deputy Director
                                           SARAH B. FABIAN
                                           Senior Litigation Counsel
                                           U.S. Department of Justice
                                           Office of Immigration Litigation
                                           District Court Section
                                           Box 868, Ben Franklin Station
                                           Washington, DC 20442
                                           Telephone: (202) 532-4824
                                           Fax: (202) 616-8962



                                           *Attorneys for Defendants*

CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2018, I served the foregoing pleading on all

counsel of record by means of the District Clerk's CM/ECF electronic filing

system.

/s/ August E. Flentje
August E. Flentje
Attorney for Defendants

# Exhibit 7

APPENDIX A, DEFENDANTS' RESPONSE IN OPPOSITION
TO PLAINTIFFS; MOTION FOR EXPEDITED DISCOVERY
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

CHAD A. READLER
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation (OIL)
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director, OIL District Court Section
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

Attorneys for Federal Respondents-Defendants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al., | Case No. 18-cv-428 DMS MDD |
| Petitioners-Plaintiffs, | **Declaration of Robert Guadian** |
| vs. | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

## DECLARATION OF ROBERT GUADIAN

I, Robert Guadian, hereby make the following declaration with respect to the above-caption matter:

1. I am currently serving as the Acting Deputy Assistant Director (DAD), Domestic Operations Division, Western Operations, Enforcement and Removal Operations (ERO), U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS), a position I have held since April 2018. In this capacity, I oversee, direct, and coordinate the ERO field operations in 12 of the 24 ERO field offices.

2. I have been employed by ICE, and the former Immigration and Naturalization Service before it, since 1997. I was promoted to the position of Supervisory Detention and Deportation Officer in the San Antonio Field Office in 2005 and Assistant Field Office Director in 2009. In January of 2014, I was named Chief of Staff for the San Antonio Field Office Director. I have been the Deputy Field Office Director for the Dallas Field Office since March 2016.

3. In my current role as Acting DAD, I am aware of the preliminary injunction issued by this Court on June 26, 2018, *Ms. L v. I.C.E.*, ---F. Supp. 3d---, 2018 WL 3129486 (S.D. Cal. June 26, 2018), and I have been personally involved in the management of implementing this Court's order.

4. In order to effectuate the reunification of class members and their minor children, pursuant to the requirements of the preliminary injunction, ICE is working closely with U.S. Customs and Border Protection (CBP) and the U.S. Department of Health and Human Services (HHS), Office of Refugee Resettlement (ORR).

5. Immediately after the order was issued, ICE's senior leadership met internally and with leadership from across the federal government to

1                                                          18cv428 DMS MDD

determine the various ways in which implementation could be achieved. For ICE, implementation requires several labor intensive steps, such as, but not limited to providing guidance to ERO's field offices, gathering data from other agencies within and outside DHS, conducting case-by-case reviews of all potential class members, transferring class members of children four years of age and younger to detention facilities near their children, developing a reunification plan for class members with children five years of age and over, facilitating access of HHS employees to detention facilities to conduct DNA testing, facilitating communication between class members and their children, communicating with HHS about each case, and providing details about criminal history and location of detention or location of class members who had been released from ICE custody.

6. The first step toward reunifying separated families was the difficult and time-consuming task of identifying potential class members. The data necessary to determine class membership is not maintained as part of ICE's regular business process. Rather, ICE had to create a new dataset using information collected from CBP and HHS. To create an initial dataset for consideration, ICE had to reconcile CBP data against HHS data manually and new methodologies were developed by ICE to identify separated parents. This data was then sent to the relevant ERO field offices so immigration officers could review available information for each case in order to determine whether the particular alien qualifies as a class member.

7. 19 of ERO's 26 field offices have been affected by this order. Field Office Directors (FODs) around the country have reassigned officers from other duties, such as fugitive operations and case management, to review cases of each potential class member, which includes reviewing available DHS databases, the alien file, and the National Crime Information Center database.

18cv428 DMS MDD

As class members are identified, FODs have also had to reassign officers to track these cases, arrange transfers from detention facilities across the United States, share information with HHS, and facilitate communication between separated alien parents and their children.

8. Employees within ERO's Custody Management Division have also committed significant resources to ensuring compliance with the order. They have deployed two deportation officers and six other ERO staff to three detention facilities in which a significant percentage of separated parents are detained to provide surge support related to identification of family units, identification of the location of separated parents and their respective children, responding to detainee inquiries, and facilitating telephone calls between parents and their children. ERO also deployed three dedicated policy/data analysts to HHS's Special Operations Center, which was established to address the operational challenges of coordinating family reunification across different departments.

9. As of today, our information indicates that potential class members with children under five years of age are detained in 23 facilities across 13 states.

10. As of July 5, 2018, ICE has confirmed that all individuals detained in DHS custody and known by ICE to be parents separated from a minor child age four and under who is detained in ORR custody, ORR foster care, or DHS custody, have had telephonic contact with their children. ICE continues to work to ensure that all remaining class members have had such contact.

11. For those individuals detained in ICE custody for whom it is determined that a minor child has been separated and is in HHS custody, ICE has directed its field offices to review and prepare summaries of the adult alien's criminal and immigration histories, as well as indicators of gang membership. These summaries are sent to HHS. To date, ICE has completed approximately 300

such summaries. Based upon currently available information, ICE has approximately 1400 more summaries to complete for potential class members.

12. ICE will need to complete the same criminal and immigration history reviews for the remaining individuals. ICE and HHS will also need to facilitate reunification for the class members.

13. Based upon this information, ICE and/or HHS, depending upon the circumstances, will determine whether the separated alien parent is excluded from the class due to criminal history. Based upon available information ICE has determined that some alien parents of children age four and under have convictions that would exclude them from the class. These convictions include drug offenses, aggravated assault, rape, robbery, kidnapping, and domestic violence.

14. In order to facilitate the reunification process, ICE has taken steps to move the detained parents of children four years of age or under to a detention facility in the area of responsibility (AOR) close to the location of the minor child in HHS custody. To date, ICE has moved 23 such individuals from across the country on commercial airlines, which requires officer escorts. Some class members who were recently identified have not been transferred at the request of HHS, so that HHS can more efficiently take DNA samples of the parents.

15. ICE must carry out a similar process to reunify detained parents of children five years of age or over. For these class members, ICE is considering using a few dedicated staging facilities for reunification purposes.

16. Upon HHS's completion of vetting and a determination of suitability for reunification in accordance with law and the injunction, in many cases, ICE will release the parent on Alternatives to Detention (ATD) to enable

18cv428 DMS MDD

1     reunification to be completed. Because ICE does not have authority to

2     transport the parent once released from its custody, reunification will

3     generally occur at the detention facility concurrent with the parent's release.

4     17. In accordance with longstanding practices for alien parents, ICE has removed

5     class members who have administratively final orders of removal. This is

6     done after the class member has had an opportunity to request relief. He or

7     she may request to be reunited with his or her minor child prior to removal or

8     he or she can request to be removed without his or her minor child who will

9     then remain in the United States to pursue available relief.

10     18. Class members who are still pursuing claims for relief or protection and,

11     therefore, do not have administratively final orders of removal, will be

12     reunited with their children, where appropriate, pursuant to the process

13     describe above in this declaration.

16     Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is

17     true and correct.

18     Executed this 5th day of July 2018, in Washington, D.C.

21     Robert Guadian

22     Acting Deputy Assistant Director

23     Enforcement and Removal Operations
    U.S. Immigration and Customs Enforcement

# Exhibit 8

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L.; et al.,

     Petitioners-Plaintiffs,

v.

U.S Immigration and Customs
Enforcement ("ICE"); et al.,

     Respondents-Defendants.

Case No.:  18cv0428 DMS (MDD)

**ORDER SETTING FURTHER STATUS CONFERENCE**

  A status conference was held on July 6, 2018.  Lee Gelernt appeared and argued for Plaintiffs and Sarah Fabian appeared and argued for Defendants.  After consulting with counsel and being advised of the status of the case, IT IS HEREBY ORDERED:

1. On or before **July 7, 2018**, at **5:00 p.m.**, the Government shall provide to Plaintiffs a list of the 101 children discussed at the conference that identifies each child and explains the status of each child's reunification with his or her parent.

2. Counsel shall meet and confer about the list, and shall also meet and confer on the ORR policies and procedures in dispute.

3. To the extent counsel reach an agreement on these issues, they should submit a joint motion and proposed order for the Court's review and signature.  Otherwise, counsel

1

should be prepared to discuss these issues at a further status conference scheduled for **July 9, 2018**, at **10:00 a.m.**

The Court has set up a dial in number for counsel and any members of the news media that wish to attend. ***This number is for counsel and media only***, who should follow the steps below to connect to the conference call:

1. Dial the toll free number: **877-873-8018**;

2. Enter the Access Code: **9911153** (Participants will be put on hold until the Court activates the conference call);

3. Enter the Participant Security Code **07090428** and Press # (The security code will be confirmed);

4. Once the Security Code is confirmed, participants will be prompted to Press 1 to join the conference or Press 2 to re-enter the Security Code.

Dated:  July 6, 2018

Hon. Dana M. Sabraw
United States District Judge

18cv0428 DMS (MDD)

# Exhibit 9

APPENDIX A, DEFENDANTS' RESPONSE IN OPPOSITION
TO PLAINTIFFS; MOTION FOR EXPEDITED DISCOVERY
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L.; et al.,<br><br>                    Petitioners-Plaintiffs,<br><br>v.<br><br>U.S Immigration and Customs Enforcement ("ICE"); et al.,<br><br>                    Respondents-Defendants. | Case No.:  18cv0428 DMS (MDD)<br><br>**ORDER FOLLOWING STATUS CONFERENCE** |

A status conference was held on July 9, 2018.  Lee Gelernt appeared and argued for Plaintiffs and Sarah Fabian appeared and argued for Defendants.  After consulting with counsel and being advised of the status of the case, IT IS HEREBY ORDERED:

1.     On or before **6:00 p.m.** on **July 9, 2018**, counsel shall submit the following documents to the Court:

a.     A joint status report on the issue of the procedures to be followed for the reunification of children and Class Members who have been released from ICE custody.  To the extent counsel have agreed on the procedures, they should submit a joint motion and proposed order for the Court's review.  To the extent there is disagreement, each side should set out its respective proposal and specify the disagreements that require court resolution

b.    A proposed notice to be provided to the Class.

2.    On or before **10:00 a.m.** on **July 10, 2018**, counsel shall submit a joint status report setting forth how many Class Members have been or will be reunited with their children by the court-imposed deadline, and how many Class Members may not be reunited with their children by the court-imposed deadline due to legitimate logistical impediments that render timely compliance impossible or excusable, *e.g.*, detention of the Class Member in criminal custody or removal of the Class Member from the United States.  For the latter group, counsel should explain why reunification may not be completed, and provide a timeframe for those reunifications.

3.    A further status conference shall be held at **11:00 a.m.** on **July 10, 2018**.

4.    The Court has set up a dial in number for counsel and any members of the news media that wish to attend. ***This number is for counsel and media only***, who should follow the steps below to connect to the conference call. Members of the general public may appear in person.

1.    Dial the toll free number: **877-873-8018**;

2.    Enter the Access Code: **9911153** (Participants will be put on hold until the Court activates the conference call);

3.    Enter the Participant Security Code **07100428** and Press # (The security code will be confirmed);

4.    Once the Security Code is confirmed, participants will be prompted to Press 1 to join the conference or Press 2 to re-enter the Security Code.

Dated:  July 9, 2018

_Dana M. Sabraw_
Hon. Dana M. Sabraw
United States District Judge

2

18cv0428 DMS (MDD)

# Exhibit 10

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

               Petitioners-Plaintiffs,

      vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

               Respondents-Defendants.

Case No. 18cv428 DMS MDD

**JOINT STATUS REPORT
REGARDING SUITABILITY
PROCESS FOR RELEASE OF UAC
TO POTENTIAL PLAINTIFFS IN THE
GENERAL PUBLIC**

## I.    JOINT STATUS REPORT

On July 9, 2018, this Court instructed the parties to confer on the processes

bearing on the reunification of class members with their children. The parties

submit this joint status report in compliance with the Court's instruction. In areas

where the parties disagree, the federal government requests clear guidance from

the Court on those steps that must be taken prior to reunification so that it can

comply with the Court's order on timing consistent with its statutory and

regulatory obligations under existing law. Each of these actions will affect the

speed with which the government can reunify families. The actions concern the

following:

- First, may HHS conduct DNA testing in every case to confirm each parent-
  child relationship?

1

18cv428 DMS MDD

- Second, must HHS use only information already obtained prior to the reunification deadlines to determine if the parent will put the child at an imminent risk of danger, abuse, or neglect?

- Third, may HHS run fingerprint background checks on unrelated adults in the anticipated domicile of the child, before placing a child with a released parent?

- Fourth, may HHS require released parents to submit proof of address and a sponsor care plan?

- Fifth, may HHS require released parents to sign a Sponsor Care Agreement and attend legal orientation trainings?

- Sixth, must HHS reunify children who are themselves determined to present a danger?

## II.    ISSUES ON WHICH THE PARTIES AGREE

### 1.    Vetting Parent-Child Relationships

The parties agree that the federal government may screen a putative class members to confirm that he or she is, in fact, the parent of the child(ren) with whom he or she seeks to reunify. The parties also agree that when HHS conducts DNA testing to verify parentage, the federal government will not use the DNA samples or test results for any purpose besides verifying parentage, and will ensure that the DNA samples and test results are destroyed afterwards. The parties have

not been able to agree on whether HHS can use DNA testing in every case concurrent with other methods of verifying parentage to try to complete the verification process within the court's deadlines.

### 2. Background Checks on Purported Parents

The parties agree HHS may conduct fingerprint background checks on potential class members while parentage is being verified, to ensure that the person is actually a class member without pertinent criminal history as set forth in the Court's class definition, and to ensure that the parent is neither unfit nor presents a danger to the child presenting an obstacle to release. The parties further agree that HHS will in all possible cases use information already obtained by ICE when it collected the fingerprints of the potential class members and ran checks on them. HHS cannot, however, exclude the possibility that in a small number of cases HHS will need to collect potential class members' fingerprints again to run the checks necessary to ensure child safety and sponsor suitability. HHS believes that fingerprinting may be appropriate in some situations to ensure child welfare where there are objective indications of child endangerment.

### 3. Home Studies

The parties agree that HHS will conduct home studies for purposes of reunification only when required by the TVPRA. The TVPRA states that home studies:

shall be conducted for a child who is a victim of a severe form of trafficking in persons, a special needs child with a disability (as defined in section 12102 of title 42), a child who has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened, or a child whose proposed sponsor clearly presents a risk of abuse, maltreatment, exploitation, or trafficking to the child based on all available objective evidence.

8 U.S.C. § 1232(c)(3)(B).

## III.    ISSUES ON WHICH THE PARTIES DISAGREE

### A. **Plaintiffs' Position**

The crux of Plaintiffs' position is that the Government should not be allowed to delay reunification to conduct procedures that would not have been used if the child had not been forcibly taken from the parent. If a Class Member parent and child had showed up at the border together, and had *not* been separated, then the parent would not be required to undergo the extensive procedures proposed by the Government to maintain custody of the child.

Plaintiffs thus believe that streamlined procedures are appropriate and lawful in this unique context. The TVPRA, by its terms, does not mandate any particular procedures for reunification, except for a small subset of cases where home studies are required because there have been, inter alia, indications of abuse or trafficking. 8 U.S.C. 1232(c)(3)(B). There are also no regulations that ORR has promulgated pursuant to the TVPRA that address reunification procedures. The Government, however, as a matter of policy has created procedures for vetting sponsors (the

"normal" reunification process). The Court need not, however, decide whether these normal reunification procedures are required by the TVPRA. Even assuming that these procedures are required by the TVPRA for certain children who come to the United States without their parents, the TVPRA plainly does not preclude the use of streamlined procedures in this unique context, where the Government has forcibly taken children from their parents and is simply being asked to return children to their parents.

Indeed, the purpose of the TVPRA is to promote the best interests of the child and to reunite families. Delayed reunification, especially for babies and toddlers, is not in the best interests of the child.

In short, there is nothing in the language or purpose of the TVPRA that precludes this Court from ordering that in this unique context, and only for purposes of this case, the Government use the streamlined procedures suggested by Plaintiffs. The procedures that Plaintiffs are proposing—parental verification and pursuing any red flags known to the Government at the time of the reunification deadline—are entirely consistent with the TVPRA.[1]

### 1. DNA Vetting of All Families.

---

[1] Plaintiffs' position that streamlined procedures are both appropriate and lawful in this unique context, and not precluded by the TVPRA, is supported by the Women's Refugee Commission and Kids in Need of Defense ("KIND"), who have years of experience working with unaccompanied children and the reunification process. They will be submitting a declaration in conjunction with this filing, and have both previously filed declarations in this case.

Plaintiffs' position with respect specifically to DNA testing is that the Government should use DNA testing to verify parentage only where necessary, meaning that there is no other reliable documentary, testimonial, or other evidence of parentage.  That way no further delays in reunification will occur as a result of the need to DNA test every family.  Had the families not been separated, they would not routinely have been subjected to DNA testing.[2]

In addition to any delays caused by DNA testing of every class member, the Class Members and their children also have powerful interests in the privacy of their DNA information. As the Ninth Circuit has said, "[o]ne can think of few subject areas more personal and more likely to implicate privacy interests than that of one's health or genetic make-up." *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998).

The circumstances of this case also render it inherently coercive for the Government to require parents to submit to DNA testing to get back the children that were unlawfully taken from them. Parents should not have to sacrifice their privacy rights, and face the risk of having their DNA information collected in a Government database, to be reunified with their children. Moreover, the

---

[2] The Government states that three individuals were identified as non-parents during the HHS verification process, but does not state that DNA testing was the basis for that determination, and in fact notes that the adults actually told the Government they were not the parents.

18cv428 DMS MDD

Government proposes routine DNA testing of young children, some of whom are mere weeks or months old.

If, however, the Court concludes that the Government may use DNA testing of parents and children to effectuate the injunction, at the absolute minimum the Court should order the Government to:

(1)  exhaust first all other means of establishing or verifying parent-child relationships, including through the use of techniques commonly used by U.S. courts to determine family relationship—including official documents, representations from a witness, parent, and/or child, and/or observation of behaviors of the adult and child toward each other;

(2) only conduct a DNA test on those adults who have agreed to undergo a test;

(3) to ensure that all samples and data collected are not shared with any other federal agency outside of HHS and that all such samples, data, and any results are destroyed upon completion of the required matching tests and, in any event within 7 days.

(4) To the extent that the Government employs outside contractors or medical providers to conduct the DNA tests, such contractors must also be forbidden from retaining any results and test samples and must destroy them within seven days of producing a testing result. This will prevent the Government from maintaining a database of samples and will ensure that any results are

7

not used for any purposes other than facilitating reunification pursuant to the Court's injunction.

Finally, the Court should also make clear that the lack of a DNA match is not conclusive proof of the lack of a parent-child relationship, in recognition that many parents are not the biological parents of their children. For example, some parents may not be aware that they have no biological relationship to their child in cases of undisclosed rape or adultery.

## 2. Restrictions on HHS Information Gathering and Decision Making about Child Welfare

Plaintiffs' position is that if the Government becomes aware of evidence *prior to the reunification deadline* that the parent is abusive, neglectful, or otherwise poses a risk of danger to the child, Plaintiffs have no objection to the Government taking additional time to verify the fitness of the parent before releasing the child to his or her custody. For example, as set forth above, Plaintiffs have no objection to the Government using information obtained from already-performed fingerprint and background checks on Class Members to evaluate parental fitness. In addition, if ORR workers have spoken with the child during the child's custody and learned information that calls the parent's fitness into question, that could be a basis to delay reunification. What Plaintiffs object to is permitting the Government to drag out the reunification process by imposing procedures or conducting additional investigation that is not required by statute.

8

Plaintiffs acknowledge that any evaluation of parental fitness must rely to some extent on "professional judgment." But in the context of this case, and in light of constitutional standards governing the separation of children from their parents, that judgment must be based on actual, verifiable *facts* – not the untested and subjective opinions of unknown Government case workers. Given that the Government has already forcibly separated Class Members from their children, it should be subjected to a rigorous burden to justify maintaining that separation. The government should not be permitted to delay reunification any longer to conduct a background check that would not have occurred had the parents not been separated from their children. (Criminal background checks would of course already have been done at the time of apprehension when the parent was initially fingerprinted.)

### 3. Background Checks on Other Adults in the Household

Nothing in the TVPRA requires the Government to conduct background checks of nonparent adults in the household, or alternate care givers, before releasing a child from ORR custody. And the Government cites no applicable statutory provision that so requires. Nor does the *Flores* Agreement contain any language demanding that the agencies fingerprint and run checks on individuals who live in the parent's household.

9

Requiring these background checks will impose needless delay on the process by requiring household members to submit to checks. Moreover, DHS has recently revised its regulations to allow information it collects from ORR during the sponsor reunification process, including background checks of household members, for the purposes of conducting immigration enforcement activities. As a result, those household members may rightfully have concerns about sharing information with DHS in light of its stated intent to use that information to come after them.

In sum, nothing in the statute requires background checks of other adults or alternate care givers, and it will only add further needless delay to this process. If the Government had *not* separated Class Members from their children, they would not have been required to undergo any of these procedures prior to obtaining release. There is no reason to make them go through those processes here. [3]

### 4. Proof of Address, Sponsor Care Plans and Alternate Care Givers

Plaintiffs do not object to Class Members submitting a proof of address of where they will live with the child. But Plaintiffs object to any requirement that the Plaintiff provide a "sponsor care plan" or identify alternate care givers prior to

---

[3] Indeed, the government itself recognizes that this procedure is not required. They are currently planning on reuniting parents and children tomorrow without conducting background checks on all household members, even assuming the Class Member knows at this point where she will be living and with whom.

10

obtaining release of their children.  Reunification should not be delayed because of these unnecessary procedures.

The key here is in the first sentence of the Government's position—"in the *ordinary* operation of the UAC program." Nothing about this particular context is "ordinary," and the Government is wrong to apply procedures that were developed for an entirely separate context to this one.

The Government cites Section 1232(c)(3)(A), but that statute merely requires ORR to make a "determination" that the proposed custodian is capable of caring for the child. The statute does not compel that "determination" to be made in a certain way, much less that this determination must take the same form in all cases. Thus, there is nothing in the statute that precludes the Government from adopting, in the unique circumstances of this case, streamlined procedures to return separated children to their parents' care.

The Government wants parents—whose children were unlawfully taken from them—to fill out long paper applications and identify other caregivers for them before it returns their children. The TVPRA was not intended to inhibit family reunification—in fact, just the opposite. The Government cannot use it as a sword to prohibit or delay reunification by throwing up such needless bureaucratic roadblocks.

**5. Legal Orientation and Sponsor Care Agreement**

Plaintiffs do not object to requesting Class Members to attend legal orientation programs or sign "sponsor care agreements" that are consistent with the requirements set forth in Plaintiffs' positions above, so long as reunification by the Court's deadlines is not made contingent on fulfilling those conditions. For example, there is no reason why Class Members cannot sign streamlined sponsor care agreements as the child is released to their care pursuant to the Court's deadlines. In addition, Class Members can attend legal orientation programs after reuniting with their children. But reunification of children should not be delayed past the Court's deadlines by requiring attendance at a legal orientation program or the signing of a sponsor care agreement.[4]

### 6. Children Presenting a Danger

Plaintiffs respectfully request additional time to respond to this point, unless the Government represents that there are children under five years old who fall into this category and present risks to the safety of themselves or others.

### B. <u>Defendants' Positions</u>

### 1.      Vetting Parent-Child Relationships

Despite the points of agreement noted above on this issue, the parties have not been able to agree on the necessity of using DNA testing overall. In particular,

---

[4] Plaintiffs note, however, that if the parents had never been separated from their children, they would not have to sign sponsor care agreements or attend legal orientation program to maintain custody of their children.

18cv428 DMS MDD

HHS believes that, to reliably verify parentage and to do so within or close to the Court's deadlines, HHS must be able to use DNA testing generally to determine parentage.

Sound verification of parentage is critical. HHS is charged with faithfully implementing the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA). To do so, HHS must be sure in all cases that a putative class member is a child's parent, including through DNA testing, before it forever releases the child to the custody and care of that person. As HHS stated previously, ORR's experience is that children are smuggled across the border or trafficked by adults who fraudulently or inaccurately hold themselves out as parents. *See* White Dec. ¶ 25. Consistent with that experience, HHS reports that it found that three putative class members seeking release of children aged 0–4 were not the parents of the children. Indeed, some of the putative class members admitted as much during HHS's verification-of-parentage process.

To verify parentage of a potential sponsor claiming to be a parent, HHS commonly uses overlapping methods of comparing documents submitted by the sponsor, consulting with the consulate of the home country, interviewing the prospective sponsor and child, and obtaining results from DNA tests. To more quickly implement the Court's order, HHS has coordinated between its staff, its grantees, and ICE, to obtain DNA test results on all the possible plaintiffs and

18cv428 DMS MDD

children through cheek swabs. HHS is simultaneously checking documents and conducting interviews, but many potential plaintiffs do not have adequate documentation, and HHS does not control how fast other countries' consulates will provide documentation. The normal length of stay of a UAC in HHS custody before release is 28 days, which is almost twice as long as the time the Court has given HHS to complete reunifications with some class members.

In short, HHS does not believe that it can both expedite its processes and ensure parentage if it foregoes the use of DNA testing to help verify parentage. Nor would it be a good use of agency resources for HHS to spend more hours per case reviewing documents only to find that DNA tests are ultimately required to resolve questions arising from poor documentation. HHS thus respectfully submits that Plaintiffs' restriction of "necessity" does not promote the aims of the Court's order.

### 2. Restrictions on HHS Information Gathering and Decision Making about Child Welfare

HHS believes that it is important for the Court to permit it to evaluate all reasonably available and relevant information to allow HHS to make sound judgments about child welfare.

It would therefore be a mistake, in HHS's view, to adopt Plaintiffs' proposed limitation on the information that HHS can consider only evidence that it obtains prior to the reunification deadline. This restriction could endanger children welfare by preventing HHS from considering information material to assessing parental

fitness. As discussed below, HHS may need additional information from prospective sponsors to ensure child safety and sponsor suitability, and HHS believes this to be the case even where the prospective sponsor is a parent. HHS should not be prevented from obtaining this information simply because a reunification deadline has passed.

HHS also does not believe that the Court should adopt the restriction that it must release the UAC unless its finding of child endangerment is based on "actual, verifiable facts." The test is attractive in formulation, but unworkable given the critical calls of professional judgment that HHS must make in promoting child safety and wellbeing. The test that Congress chose for HHS is the interests of the child. 6 U.S.C. § 279(b)(1)(B). HHS determines what is in the interests of the child based on common forms of information used in child welfare contexts, including interviews and assessments of children by ORR and clinicians, interviews by ORR of relatives and friends, documents, background checks, and information presented by the prospective sponsor. These determinations necessarily rest on sound professional judgment, and do not lend themselves to easy review by wooden resort to "actual, verifiable" information. HHS believes that the better approach is for HHS to make informed decisions about an individual child's interest, and for Plaintiffs to petition this Court if they believe HHS has denied a release on grounds that do not actually show danger to that child. This would accommodate the

competing interests—and would provide a critical safety valve for the affected children.

### 3. Background Checks on Other Adults in the Household

In the interests of child welfare, HHS believes that the Court should allow for sound background checks of non-sponsor adults with whom a UAC may be released to live. HHS has implemented the TVPRA by requiring background checks—including fingerprinting of other adults in the household and alternate care givers where a sponsor parent will take a UAC to live. The importance of background checks was borne out in the past week, during HHS' screening of potential class members for reunification of the separated children aged 0–4. HHS reports that the checks showed three parents with criminal histories involving human smuggling, child cruelty and narcotics convictions, and alleged murder, respectively. When a parent plans to house a child with one or more other adults, who might not even be relatives, those adults are no less likely to have significant criminal histories.

Plaintiffs ask the Court to require HHS to release children directly into such a situation without first running fingerprint background checks on those adults. HHS submits that this would needlessly risk these children's safety and wellbeing. The Flores Settlement Agreement (see paragraphs 14–18) has long authorized the government to conduct safety and suitability assessments before releasing UACs to

18cv428 DMS MDD

parents in the general public who seek sponsorship. Legislating on this background, the TVPRA requires HHS "to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity," and to "make[] a determination that the proposed custodian is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(1) & (c)(3)(A). The TVPRA in turn requires HHS to "establish policies … to ensure" these child safety measures are satisfied. *Id.* at 1232(c)(1). HHS has established those policies in ORR's UAC Policy Guide, "Children Entering the United States Unaccompanied, Section 2: Safe and Timely Release from ORR Care."[5] The guide requires "[p]roof of identify of adult household members and adult care givers identified in a sponsor care plan." *Id.* "In order to ensure the safety of an unaccompanied alien child and consistent with the statutory requirements under the TVPRA, ORR requires a background check of all potential sponsors and household members. The background check takes place as soon as the potential sponsor and adult household members have completed the Authorization for Release of Information form, submitted fingerprints, and provided a copy of a valid government issued photo identification." *Id.* HHS has

---

[5] Available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.1

18cv428 DMS MDD

conducted background checks of adult household members since January 2016,

when the Senate Committee on Homeland Security and Government Affairs,

Permanent Subcommittee on Investigations, majority and minority staff report,

concluded that failing to require background checks on non-sponsor adult

household members or on backup sponsors led to child abuse and exploitation,

including when the sponsor was a parent.[6]

For these reasons, HHS respectfully submits that the Court should permit

HHS to continue to require background checks of other household adults where the

released parent will take the UAC to live.

### 4. Proof of Address, Sponsor Care Plans and Alternate Care Givers

HHS believes that the Court should, in accordance with the ordinary

operation of the UAC program, permit HHS to require released sponsor parents to

submit proof of address and a sponsor care plan. Consistent with the statutory

requirement that "the proposed custodian [be] capable of providing for the child's

physical and mental well-being," 8 U.S.C. § 1232(c)(3), proof of address and a

sponsor care plan ensures the child will not be homeless or live in harmful

---

[6] Available at
https://www.hsgac.senate.gov/imo/media/doc/Majority%20&%20Minority%20Staff%20Report%20-%20Protecting%20Unaccompanied%20Alien%20Children%20from%20Trafficking%20and%20Other%20Abuses%202016-01-282.pdf

18cv428 DMS MDD

conditions (it is easy to imagine many such conditions). And because class members are likely to be without immigration status at this time, the sponsor care plan is particularly appropriate so the parent would identify an alternate care giver in the event that the parent, but not the child, is removed or deported. Fingerprints and background checks are also required for those alternate care givers. HHS understands that Plaintiffs' proposal would preclude these child safety measures. This would be a mistake.

### 5. Legal Orientation and Sponsor Care Agreement

The TVPRA declares that before release of a UAC to a sponsor in the general public, "[t]he Secretary of Health and Human Services shall cooperate with the Executive Office for Immigration Review to ensure that custodians receive legal orientation presentations provided through the Legal Orientation Program administered by the Executive Office for Immigration Review." 8 U.S.C. § 1232(c)(4). The Homeland Security Act of 2002 requires that before HHS releases a UAC, it "shall … ensure" that UACs "(i) are likely to appear for all hearings or proceedings in which they are involved; (ii) are protected from smugglers, traffickers, or others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity; and (iii) are placed in a setting in which they are not likely to pose a danger to themselves or others." 6 U.S.C. § 279(b)(2). HHS's policy guide thus requires sponsors—including verified

parents—to sign a sponsor care agreement to ensure UAC attend their immigration and other proceedings and follow certain guidance in case the UAC runs away or an emergency occurs. These statutory requirements are important—including for released class members—and so should be retained here.

### 6. Children Presenting a Danger

The parties disagree on whether HHS may decline to release a UAC to a class member based on danger presented by the UAC to himself or herself. HHS believes that it should retain its ability to protect children and the community in these circumstances.

Since before the Flores Settlement Agreement, the government has held a small percentage of UACs in secure custody because of the UAC's own history demonstrating they present a risk to the safety of themselves or others. In reviewing the files of separated children over age five, HHS has identified children with serious issues that would support a finding of dangerousness for that child. Under cases implementing the Flores Settlement Agreement, any UAC in secure custody with ORR is entitled to a bond hearing with an administrative law judge, if the UAC contends that he or she is not a danger and should not be held in secure custody.

HHS's position is that if a UAC is in secure custody, and has not asked for a bond hearing, or has had a bond hearing and lost the right to leave secure custody,

then that child is properly detained. And the government does not have facilities for detaining children who are security risks together with their parents. HHS submits that it would be a particular mistake to order HHS to release such a UAC into the general public when the UAC is already being provided with a bond hearing on that issue under the implementation of the Flores Settlement Agreement.

DATED: July 9, 2018                    Respectfully submitted,

                                       /s/ Lee Gelernt
                                       Lee Gelernt*
                                       Judy Rabinovitz*
                                       Anand Balakrishnan*
                                       AMERICAN CIVIL LIBERTIES UNION
                                       FOUNDATION
                                       125 Broad St., 18th Floor
                                       New York, NY 10004
                                       T:  (212) 549-2660
                                       F:  (212) 549-2654
                                       *lgelernt@aclu.org*
                                       *jrabinovitz@aclu.org*
                                       *abalakrishnan@aclu.org*

                                       Bardis Vakili (SBN 247783)
                                       ACLU FOUNDATION OF SAN DIEGO
                                       & IMPERIAL COUNTIES
                                       P.O. Box 87131
                                       San Diego, CA 92138-7131
                                       T: (619) 398-4485
                                       F: (619) 232-0036
                                       *bvakili@aclusandiego.org*

                                       Stephen B. Kang (SBN 292280)
                                       Spencer E. Amdur (SBN 320069)
                                       AMERICAN CIVIL LIBERTIES UNION
                                       FOUNDATION
                                       39 Drumm Street
                                       San Francisco, CA 94111
                                       T:  (415) 343-1198
                                       F:  (415) 395-0950
                                       *skang@aclu.org*
                                       *samdur@aclu.org*

                                       *Attorneys for Petitioners-Plaintiffs*
                                           *\*Admitted Pro Hac Vice*

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
sarah.b.fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

# Exhibit 11

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*\*Admitted Pro Hac Vice*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

        Petitioners-Plaintiffs,

   vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

        Respondents-Defendants.

Case No. 18cv428 DMS MDD

**JOINT STATUS REPORT
REGARDING NOTICE TO CLASS
MEMBERS**

On July 9, 2018, the Court held a status conference with the parties. At that status conference the parties submitted that they would jointly submit to the Court their proposal regarding class notice.  The parties hereby state that they have agreed that the first page of the attached Exhibit (Notice)[1] will be posted in ICE detention facilities in which Class Members are detained as of July 10, 2018. To facilitate such posting, Plaintiffs will provide to Defendants a copy of the Notice that contains the information contained therein in both English and Spanish.

The parties further agree that the second page, or Exhibit (Election Page) will be provided only to Class Members subject to a final order of removal in order to ensure that the Class Member has the opportunity to make an affirmative, knowing, and voluntary decision whether to be removed with or without the Class

---

[1] The attached Notice is final except that the Parties seek a decision by the Court regarding the inclusion of one additional provision discussed below.

18cv428 DMS MDD

Member's child or children. At the time the Election Page is provided, Plaintiffs will also hand to the Class Member a copy of the Notice.

The parties have two points of clarification for resolution by this Court. First, the parties agree that for Class Members with a final order of removal who are asked to consider their rights under this Notice, Defendants will allow a specified time period between the provision of the Notice and the removal of any class members to allow time for that Class Member to consult with a lawyer or otherwise consider his or her exercise of these rights. Defendants propose that this time period be 24-hours, which is consistent with other situations in which a court order requires a delay in removal in order to permit an alien to consider his or her options. *See*, *e.g.*, *Orantes-Hernandez v. Gonzales*, 504 F. Supp. 2d 825 (C.D. Cal. 2007) (requiring 24 hours' notice prior to removal). This time period is therefore consistent with Defendants' current operations related to any notification of rights prior to removal.

Plaintiffs propose a 48-hour time period. Plaintiffs' believe this time period is necessary because of the confusion surrounding this case for months and the fact that there are more than 2,000 Class Members. Given the number of Class Members, it will be nearly impossible to get attorneys to them within 24 hours.

Second, Plaintiffs also seek inclusion in the Notice language advising non-Class Members that they may nonetheless have a right to reunification and should

18cv428 DMS MDD

contact an attorney. Plaintiffs believe this language is necessary because parents

may wrongly assume that if they are not Class Members, they have lost their

children forever. As the Court has made clear, individuals with criminal

convictions are not part of the Class, but may still be entitled to reunification with

their children under the Due Process Clause if their conviction does not bear on

their fitness to provide care for their children. Under the Government's version of

the Notice, however, Class Members will likely be confused that their right to

reunification hinges solely on whether they are Class Members. Plaintiffs do not

believe that Defendants are in any way prejudiced by the inclusion of this short

addition to the Notice. Given what is at stake for these families, Plaintiffs believe

that it is appropriate to include this language.

Defendants object to the inclusion of such language, as the Notice is

intended to explain the rights of Class Members pursuant to the preliminary

injunction issued by this court. Defendants are concerned that the inclusion of an

advisal for individuals outside the class would be inappropriate and may lead to

confusion. In fact, the inclusion of such an advisal in the Notice may lead the non-

Class Members to believed that they are represented by Class Counsel, and that the

same is legal advice.

The parties ask this Court to resolve these two issues either through written

order or on the record at the status conference set for July 10, 2018.

DATED: July 9, 2018                    Respectfully submitted,

                                       /s/ Lee Gelernt
                                       Lee Gelernt*
                                       Judy Rabinovitz*
                                       Anand Balakrishnan*
                                       AMERICAN CIVIL LIBERTIES UNION
                                       FOUNDATION
                                       125 Broad St., 18th Floor
                                       New York, NY 10004
                                       T:  (212) 549-2660
                                       F:  (212) 549-2654
                                       *lgelernt@aclu.org*
                                       *jrabinovitz@aclu.org*
                                       *abalakrishnan@aclu.org*

                                       Bardis Vakili (SBN 247783)
                                       ACLU FOUNDATION OF SAN DIEGO
                                       & IMPERIAL COUNTIES
                                       P.O. Box 87131
                                       San Diego, CA 92138-7131
                                       T: (619) 398-4485
                                       F: (619) 232-0036
                                       *bvakili@aclusandiego.org*

                                       Stephen B. Kang (SBN 292280)
                                       Spencer E. Amdur (SBN 320069)
                                       AMERICAN CIVIL LIBERTIES UNION
                                       FOUNDATION
                                       39 Drumm Street
                                       San Francisco, CA 94111
                                       T:  (415) 343-1198
                                       F:  (415) 395-0950
                                       *skang@aclu.org*
                                       *samdur@aclu.org*

                                       *Attorneys for Petitioners-Plaintiffs*
                                            *\*Admitted Pro Hac Vice*

                                       CHAD A. READLER

Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
sarah.b.fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

**Notice of Potential Rights for
Certain Detained Alien Parents Separated from their Minor Children**

On June 26, 2018, a federal court issued a nationwide preliminary injunction in the case of *Ms. L v. I.C.E.*, ---F. Supp. 3d---, 2018 WL 3129486 (S.D. Cal. June 26, 2018).

You may be a class member who has rights under this lawsuit if:

- You are or were detained in custody by the U.S. Department of Homeland Security (DHS); and
- Your minor child was separated from you by DHS and is detained in the custody of the U.S. Department of Health and Human Services, Office of Refugee Resettlement (ORR), ORR foster care, or DHS custody.

If you are determined to be a class member:

- The government must reunify you with your child.
- You do NOT need to take any action to be reunified with your child.
- The government must reunify you by the following dates unless otherwise ordered by the Court:
    a.  If your child is younger than 5 years old, he or she must be reunified with you by July 10, 2018.
    b.  If your child is 5 or older, he or she must be reunified with you by July 26, 2018.
- You do NOT need to agree to removal from the United States in order to be reunified with your child.  You may continue to fight your case.  You should NOT be pressured to agree to removal in order to be reunified with your child.

You are not a class member and do not have rights under this lawsuit if:

- You were apprehended by DHS in the interior of the United States;
- You have a criminal history other than illegal entry;
- You have a communicable disease;
- A determination is or has been made that you are unfit or present a danger to your minor child.

If you have any questions about your potential rights, please contact the lawyers for the case at 646-905-8892 or write to the lawyers at this address:

Ms. L. Class Counsel
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004

IMPORTANT

**Instructions:** This information on this page must be read to the alien parent in a language that he/she understands. The Notice must be given to the alien parent at the same time as this form. The alien parent should indicate which option he/she is choosing by signing the appropriate box below.

You DO NOT have to agree to removal from the United States in order to be reunified with your child. Even if you continue to fight your case, the government must still reunify you.

IF YOU LOSE YOUR CASE AND THE GOVERNMENT IS GOING TO REMOVE YOU FROM THE UNITED STATES, you must decide at that time whether you want your child to leave the United States with you.

**Parent Name / Nombre de Padre:** _____

**Parent A # / A # de Padre:** _____

**Country of Citizenship / Pais de Ciudadania:** _____

**Detention Facility / El Centro de Detención:** _____

**Child(ren) Name(s) / Nombre de Hijo:** _____

**Child(ren) A # / A # de Hijo:** _____

CHOOSE ONE OPTION:

_____ If I lose my case and am going to be removed, I would like to take my child with me.

_____ If I lose my case and am going to be removed, I do NOT want to take my child with me.

---

**Certificate of Service**

I hereby certify that this form was served by me at_____
                                                                          (Location)

on _____ on _____, and the contents of this
          (Name of Alien)                              (Date of Service)

notice were read to him or her in the _____ language.
                                                            (Language)

_____          _____
     Name and Signature of Officer              Name or Number of Interpreter (if applicable)

**Notice of Potential Rights for**
**Certain Detained Alien Parents Separated from their Minor Children**

On June 26, 2018, a federal court issued a nationwide preliminary injunction in the case of *Ms. L v. I.C.E.*, ---F. Supp. 3d---, 2018 WL 3129486 (S.D. Cal. June 26, 2018).

You may be a class member who has rights under this lawsuit if:

- You are or were detained in custody by the U.S. Department of Homeland Security (DHS); and
- Your minor child was separated from you by DHS and is detained in the custody of the U.S. Department of Health and Human Services, Office of Refugee Resettlement (ORR), ORR foster care, or DHS custody.

If you are determined to be a class member:

- The government must reunify you with your child.
- You do NOT need to take any action to be reunified with your child.
- The government must reunify you by the following dates unless otherwise ordered by the Court:
  a. If your child is younger than 5 years old, he or she must be reunified with you by July 10, 2018.
  b. If your child is 5 or older, he or she must be reunified with you by July 26, 2018.
- You do NOT need to agree to removal from the United States in order to be reunified with your child. You may continue to fight your case. You should NOT be pressured to agree to removal in order to be reunified with your child.

You are not a class member ~~and do not have rights under this lawsuit~~ if: | **Comment [A1]:** Plaintiffs would remove this language.

- You were apprehended by DHS in the interior of the United States;
- You have a criminal history other than illegal entry;
- You have a communicable disease;
- A determination is or has been made that you are unfit or present a danger to your minor child.

**IMPORTANT: Even if you are not a class member, if you were separated from your children, you may still have a right to be reunified with your child, and should contact the lawyers in this case by phone or by writing a letter.** | **Comment [A2]:** Plaintiffs would add this language.

If you have any questions about your potential rights, please contact the lawyers for the case at 646-905-8892 or write to the lawyers at this address:

Ms. L. Class Counsel
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004

**IMPORTANT**

**Instructions:** This information on this page must be read to the alien parent in a language that he/she understands. The Notice must be given to the alien parent at the same time as this form. The alien parent should indicate which option he/she is choosing by signing the appropriate box below.

You DO NOT have to agree to removal from the United States in order to be reunified with your child. Even if you continue to fight your case, the government must still reunify you.

IF YOU LOSE YOUR CASE AND THE GOVERNMENT IS GOING TO REMOVE YOU FROM THE UNITED STATES, you must decide at that time whether you want your child to leave the United States with you.

**Parent Name / Nombre de Padre:** _____
**Parent A # / A # de Padre:** _____
**Country of Citizenship / Pais de Ciudadania:** _____
**Detention Facility / El Centro de Detención:** _____
**Child(ren) Name(s) / Nombre de Hijo:** _____
**Child(ren) A # / A # de Hijo:** _____

CHOOSE ONE OPTION:

_____ If I lose my case and am going to be removed, I would like to take my child with me.

_____ If I lose my case and am going to be removed, I do NOT want to take my child with me.

_____ **I do not have a lawyer, and I want to talk with a lawyer before deciding whether I want my child removed with me.** _____

> **Comment [A3]:** Plaintiffs believe there should be 48 hours to consult with a lawyer; Defendants believe it should be 24 hours.

---

**Certificate of Service**

I hereby certify that this form was served by me at_____
                                                                                              (Location)

on _____ on _____, and the contents of this
                (Name of Alien)                                      (Date of Service)

notice were read to him or her in the _____ language.
                                                                            (Language)

_____          _____
        Name and Signature of Officer                         Name or Number of Interpreter (if applicable)

# Exhibit 12

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

1   Lee Gelernt*                          Bardis Vakili (SBN 247783)
    Judy Rabinovitz*                      ACLU FOUNDATION OF SAN
2   Anand Balakrishnan*                   DIEGO & IMPERIAL COUNTIES
    AMERICAN CIVIL LIBERTIES              P.O. Box 87131
3   UNION FOUNDATION                      San Diego, CA 92138-7131
    125 Broad St., 18th Floor             T: (619) 398-4485
4   New York, NY 10004                    F: (619) 232-0036
    T: (212) 549-2660                     bvakili@aclusandiego.org
5   F: (212) 549-2654
    lgelernt@aclu.org                     Stephen B. Kang (SBN 292280)
6   jrabinovitz@aclu.org                  Spencer E. Amdur (SBN 320069)
    abalakrishnan@aclu.org                AMERICAN CIVIL LIBERTIES
7                                         UNION FOUNDATION
                                          39 Drumm Street
8                                         San Francisco, CA 94111
    Attorneys for Petitioners-Plaintiffs  T: (415) 343-1198
9   *Admitted Pro Hac Vice                F: (415) 395-0950
                                          skang@aclu.org
10                                        samdur@aclu.org

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L., et al., | |
|       *Petitioners-Plaintiffs*, | Case No. 18-cv-00428-DMS-MDD |
|    v. | **DECLARATION OF MICHELLE BRANÉ AND JENNIFER PODKUL** |
| U.S. Immigration and Customs Enforcement ("ICE"), et al., | |
|       *Respondents-Defendants*. | CLASS ACTION |

1.      We, Michelle Brané and Jennifer Podkul, make the following declaration based on our personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2.      Michelle Brané is an attorney and the Director of the Migrant Rights and Justice Program at the Women's Refugee Commission ("WRC").  She has previously submitted three declarations in this case.

3.      Jennifer Podkul is an attorney and the Director of Policy at Kids In Need of Defense ("KIND").  She has previously submitted two declarations in this case.

4.      We have read the Plaintiffs' submission in the joint statement of issues regarding reunification procedures for children who have been separated from their parents.

5.      We believe that the Plaintiffs' procedures for reunification adequately protect child welfare in the unique context of this case, where children were forcibly taken from fit parents and must now be returned.  We also believe that the Plaintiffs' procedures are consistent with the Trafficking Victims Protection Reauthorization Act ("TVPRA").

6.      We declare under penalty of perjury that the foregoing is true and correct, based on our personal knowledge.

18cv0428

Executed on July 9, 2018.

_____
MICHELLE BRANÉ

_____
JENNIFER PODKUL

# Exhibit 13

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*\*Admitted Pro Hac Vice*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

Petitioners-Plaintiffs,

vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

Respondents-Defendants.

Case No. 18cv428 DMS MDD

**JOINT STATUS REPORT
REGARDING REUNIFICATION**

On July 9, 2018, this Court held a status conference, and ordered the parties to file a joint report on July 10, 2018, "setting forth how many Class Members have been or will be reunited with their children by the court-imposed deadline, and how many Class Members may not be reunited with their children by the court-imposed deadline due to legitimate logistical impediments that render timely compliance impossible or excusable . . . ." ECF No. 95 at 2. The parties submit this joint status report in accordance with the Court's instruction.

I.    **COMPLIANCE**

      **A. Defendants' Position**

      As previously reported to the Court, Defendants have identified 102 children under age 5 who, upon initial review by the U.S. Department of Health and Human Services ("HHS") were determined potentially to have been separated from a parent, and who therefore were potentially the children of class members. Upon

1

further review, and based on the latest available information at the time of filing, Defendants report the following regarding the reunification scenarios for those 102 children.

### *Not Eligible For Reunification*

- 14 are not eligible for reunification because their parents are not class members.
  - 8 parents had serious criminal history discovered during background checks (criminal histories identified include child cruelty and narcotics, human smuggling, a warrant for murder, and robbery).
  - 5 adults were determined not to be the parent of the accompanying child.
  - 1 parent faces credible evidence of child abuse.

- 2 are not eligible for reunification because their parents are not class members at this time.
  - 1 parent has been determined to present a danger to the child at this time because an adult in the household where the parent plans to live with the child has an outstanding warrant for aggravated criminal sexual abuse against a 10 year old girl. This determination can be reconsidered if the parent identifies a different living situation.
  - 1 parent detained in ICE custody is currently being treated for a communicable disease. When the parent no longer has a communicable disease, the reunification process can proceed.

- 10 are not eligible for reunification at this time. They will be assessed for reunification after they are released from criminal custody, provided that Defendants are made aware of that release.
  - 8 parents are in the custody of U.S. Marshals Service. They will be assessed for reunification after they are released from criminal custody and are transferred to U.S. Immigration and Customs Enforcement ("ICE") custody.
  - 2 additional parents are in state or county custody. They will be assessed for reunification after they are released from criminal

custody, provided that Defendants are made aware of that release.

- 1 child cannot be reunified at this time because the parent's location has been unknown for more than a year. Defendants are unable to conclusively determine whether the parent is a class member, and records show the parent and child might be U.S. citizens.

*Likely Eligible For Reunification*

- 4 children were reunified with family members before the July 10 deadline.
  - o 1 was released to a parent that ICE released into the U.S.
  - o 1 was released to a parent in the U.S. with the other parent being deported.
  - o 1 was released to a parent in the U.S. with the other parent being still in ICE custody
  - o 1 voluntarily departed with the child's adult sibling, with the consent of the parent who is still in ICE custody.

- 51 are eligible for reunification with a parent who is currently in ICE detention.
  - o 34 parents have cleared a criminal background check and parentage has been verified through a positive DNA match. They are expected to be reunified on July 10, 2018.
  - o 16 parents have cleared a criminal background check but the process for verifying parentage has not yet been completed. They are expected to be reunified on July 10, 2018, or as soon thereafter as parentage can be verified.
  - o 1 parent has criminal background check results that are still in question and are being resolved today.

- 20 are eligible for reunification but cannot be reunified by July 10 due to legitimate logistical impediments that render timely compliance impossible or excusable.
  - o 12 of those parents were removed from the United States. The Government will work with Plaintiffs' counsel to contact these 12 parents and determine whether they wish to have their child reunified with them in their home country. The parties'

proposals regarding the process to be followed for these individuals are laid out below.
  o 8 parents were previously released into the United States and are undergoing safety and suitability screening in accordance with the TVPRA.

Defendants contend that the above numbers show that Defendants are in compliance with the Court's order. Of the 75 children eligible for reunification, Defendants have already reunified 4, and expect to reunify 34 by the July 10 deadline, and 16 soon thereafter pending confirmation of eligibility. Of the remaining 20, 8 will be reunified as soon as HHS can determine that the parent is not unfit or a danger to the child in accordance with its existing procedures under the TVPRA, and the remaining 12 may be reunified if their parents can be located and if those parents request reunification, and reunification is otherwise proper under the Court's order. Moreover, of the 27 children not currently eligible for reunification, 14 have parents who are not class members, and the remaining 13 may be reunified if and when their parents no longer present a danger, have a communicable disease, or are in criminal custody so long as ICE is aware of their release, and it is otherwise determined that they meet the criteria for reunification. Thus, any children not being reunified by the July 10 deadline are not being reunified because of legitimate logistical impediments that render timely compliance impossible or excusable, and so Defendants are complying with the Court's order.

18cv428 DMS MDD

**B. Plaintiffs' Position**

Plaintiffs do not agree that Defendants have fully complied with the initial reunification deadlines in the Court's preliminary injunction order. Plaintiffs received Defendants' updated numbers within the past hour, and have no independent verification that these numbers are accurate, or that there are not additional children under five who should be on the government's list. Plaintiffs, however, can state the following: By today's deadline, Defendants only plan to reunify about half of the parents with children under five years old. Plaintiffs recognize that Defendants cannot yet reunify the parents who are currently being held in criminal custody. But as to all other Class Members with children under five, the government is not in compliance with the clear deadline ordered by the Court.

1. For the Class Members who were deported without their children, Defendants have not even tried to contact them or facilitate their reunification by today. Their children are stranded in this country because of Defendants' actions, and yet Defendants have apparently done nothing to facilitate their reunification.

2. For the Class Members who have been released from custody, Defendants have not explained why they could not facilitate their reunification by the deadline. Defendants have all of these parents' contact information, and there are apparently only 8 of them. To the extent Defendants have chosen to subject

these parents to ORR's lengthy sponsorship process, Plaintiffs do not believe those procedures are required.  Moreover, even if Defendants believed those procedures would prevent them from reunifying 8 parents in two weeks, they should have informed the Court far earlier than last Friday's status conference, a mere four days before the deadline.

3. There are Class Members that Defendants do not currently plan to release today, because Defendants have not yet completed their DNA tests. Defendants have not explained why they could not complete these tests or verify parentage through other means by today's deadline.

4. There is one child for whom Defendants have not even identified a parent.  They have not explained what steps they have taken to find this Class Member.

## II. DEADLINES

- **Removed Parents:** Defendants have provided to Plaintiffs the date of removal and country of removal for all known removed parents with children under 5. Defendants will provide to Plaintiffs the location of the ICE detention facility where each removed parent was last held. Plaintiffs' counsel will seek to locate those removed parents and provide them with notice of their right to be reunified. If any parent expresses that he or she wishes to be reunified with his or her child then Defendants will facilitate that reunification.

    - <u>Plaintiffs' Position</u>: Plaintiffs believe that once Defendants are notified that a removed parent wishes to be reunified with his or her child, reunification should occur within 7 days.

      o  <u>Defendants' Position</u>: Defendants ask the Court to allow a more flexible time period because there are several issues that may impact the timing of removal for these children. For example, Defendants would need to obtain travel documents for the child, and any ongoing removal proceedings for that child would have to be terminated which might require separate waiver from the parents and/or approval from an immigration judge. Moreover, if the child has already obtained relief and is in lawful status, then Defendants would not have the ability to facilitate reunification with a parent abroad. Because pieces of this process are out of Defendants hands, Defendants request that the Court allow for a flexible schedule for such removals that considers the need to complete these steps prior to removal for reunification.

- **Reunification To Released Parents**: This issue will be determined, at least in part, by the Court's ruling on the parties' joint submission on the procedures to be followed by HHS under the Court's order. Accordingly, the parties will meet and confer following that ruling and will submit a proposal, or respective positions, on this issue for the Court's consideration.

DATED: July 10, 2018            Respectfully submitted,

                           /s/ Lee Gelernt
                           Lee Gelernt*
                           Judy Rabinovitz*
                           Anand Balakrishnan*
                           AMERICAN CIVIL LIBERTIES UNION
                           FOUNDATION
                           125 Broad St., 18th Floor
                           New York, NY 10004
                           T: (212) 549-2660
                           F: (212) 549-2654
                           *lgelernt@aclu.org*
                           *jrabinovitz@aclu.org*
                           *abalakrishnan@aclu.org*

18cv428 DMS MDD

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN DIEGO
& IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*\*Admitted Pro Hac Vice*


CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
Civil Division

8

U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
sarah.b.fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

# Exhibit 14

APPENDIX A, DEFENDANTS' RESPONSE IN OPPOSITION
TO PLAINTIFFS; MOTION FOR EXPEDITED DISCOVERY
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L.; et al.,<br><br>           Petitioners-Plaintiffs,<br><br>v.<br><br>U.S Immigration and Customs Enforcement ("ICE"); et al.,<br><br>           Respondents-Defendants. | Case No.: 18cv0428 DMS (MDD)<br><br>**ORDER FOLLOWING STATUS CONFERENCE** |

    A status conference was held on July 9, 2018, after which the parties submitted two Joint Status Reports. In the first of those Reports, the parties identified some disagreements about the processes to be followed prior to reunification of Class Members and their children, with a particular eye toward the reunifications of children under age 5 by the court-ordered deadline of July 10, 2018. The second Report provided more detailed information about these parents, *i.e.*, those with children under the age of 5, and set out which of those parents were ineligible for reunification, which parents were ineligible for reunification by the July 10, 2018 deadline, how many parents had already been reunified with their children, which parents were eligible for reunification by the July 10, 2018 deadline, and which parents were eligible for reunification, but not by the July 10, 2018 deadline.

1

1    A follow-up status conference was held on July 10, 2018, to discuss these issues
2  with counsel.  During that conference, the Court explained ICE's past procedure for dealing
3  with parents and children who entered ICE custody together.  That procedure was geared
4  toward resolving "any doubt about whether they are parent and child, and second, whether
5  there is information that causes a concern about the welfare [of] the child, such as the adult
6  having a significant criminal history."  (Decl. of Mario Ortiz in Supp. of Opp'n to Am.
7  Mot. for Prelim. Inj. ¶¶ 3, ECF No. 46-1.))  If there were no "concerns about the family
8  relationship or welfare of the child, the [parent and child would] be detained at a family
9  residential center or, if appropriate, released to a sponsor or non-governmental
10  organization."  (*Id.*)  If there were concerns, the child would "be transferred to the U.S.
11  Department of Health and Human Services Office of Refugee Resettlement (ORR) for care
12  and placement consideration."  (*Id.*)  The Court explained this procedure had been in effect
13  for many years, and had been effective in ensuring the safety and well-being of children
14  processed through ICE custody.

15    The Court contrasted this procedure with the procedure for vetting sponsors for
16  "unaccompanied minors" under the TVPRA.  As explained during the hearing, and in
17  previous orders in this case, the TVPRA was promulgated to address a different situation,
18  namely, what to do with alien children who were apprehended *without their parents* at the
19  border or otherwise.  In that situation, the lengthy and intricate vetting process makes sense
20  because arguably the Government is not dealing with a parent, but is instead dealing with
21  perhaps another relative or even a foster-type parent.  That detailed vetting process was not
22  meant to apply to the situation presented in this case, which involves parents and children
23  who were apprehended together and then separated by government officials.  Rather, it
24  appears ICE had a more streamlined procedure for that situation, as set out above.

25    Both of these procedures, at their core, aim to promote the best interests of the
26  children who are taken into government custody.  This Court also seeks to serve that
27  interest, and has attempted to do so by focusing on the two issues set out in ICE's past
28  procedure:  Ensuring the adult is the parent of the accompanied child, and ensuring the

parent does not present a danger to the child's welfare. Both of these concepts are built into the definition of the class certified by the Court, as well as the preliminary injunction. And in the context of this case, both of these concerns can be addressed by a process similar to the one previously used by ICE in dealing with parents and children apprehended together. Accordingly, in this case, the Government need not comply with the onerous policies for vetting child sponsors under the TVPRA prior to reunifying Class Members with their children.[1] Rather, the Government need only comply with the more streamlined procedure set out during the hearing.

As explained therein, that procedure allows for DNA testing of adult and child, but only when necessary to verify a legitimate, good-faith concern about parentage or to meet a reunification deadline. To the extent DNA testing is warranted under those circumstances, it should be completed in accordance with Plaintiffs' proposal in the Joint Status Report at pages 7-8. (*See* ECF No. 96.)

On the dispute surrounding follow-up background checks of parents, the Court agrees with Plaintiffs that those background checks should not delay reunification. Certainly, if the Government has performed a background check on a parent prior to reunification, and that background check indicates the parent may pose a danger to the child, reunification need not occur unless and until those concerns are resolved. However, the Government must have a good faith belief that further background investigation is warranted before delaying reunification on that basis. In general, background investigations of the type contemplated by the TVPRA are not required here, and the Government's inability to complete that type of background investigation prior to a reunification deadline will not be a valid reason for delaying reunification past a court-imposed deadline. Presumably, the Government has performed or will perform a

---

[1] The Court notes the vetting process and procedure set out by the Government here is a matter of ORR policy. The process and procedure are not mandated by statute or regulation.

3

background check on all parents who could fall within the Class, and those background checks will be completed well in advance of the reunification deadlines, which will obviate the need for any delays on this ground.

The next dispute concerns background checks on other adults in the household where the Class Member and his or her child will reside. As with the preceding issue, these background checks are part of the TVPRA procedures, and they are not necessary here where the child is being reunited with a parent. As Plaintiffs' counsel pointed out during the hearing, the touchstone here is the interest of the parent in making decisions for their child, and presumably the parent has the child's best interest in mind.

The next dispute concerns "sponsor care plans," which is another procedure contemplated by the TVPRA.[2] As with the procedures discussed above, the Court declines to require Class Members to submit these plans prior to or as a condition of reunification with their children.

Next, the parties dispute whether Class Members must sign "sponsor care agreements" and attend legal orientation programs, again both of which are policies contemplated by the TVPRA. Here, as above, Plaintiffs do not object to executing these agreements or attending these orientation programs, provided those procedures do not delay reunification of Class Members and their children. The Court agrees with Plaintiffs, and thus declines to impose these requirements as a condition to reunification.

The final dispute concerns children who may pose a danger to themselves or others. This concern is not applicable to the children under age 5 who are scheduled for reunification today. To the extent this concern is relevant to the older children, the parties may raise that issue in a further status report.

/ / /

/ / /

---

[2] The parties indicated there was also a dispute about whether Class Members must provide a proof of address. However, Plaintiffs do not object to that requirement.

18cv0428 DMS (MDD)

With these rulings, the Court anticipates the Government will be reuniting fifty-nine (59) Class Members with their children by the end of the day today. This will be in addition to the four (4) parents and children that have already been reunified.

Counsel shall submit a further joint status report to the Court on or before **3:00 p.m. on July 12, 2018**. That report should provide an update on Defendants' compliance with the reunification deadline for children under age 5, and a status on the efforts to reunify the remaining members of the Class with their children over age 5. A further status conference shall be held at **1:00 p.m.** on **July 13, 2018**. The Court has set up a dial in number for counsel and any members of the news media that wish to attend. ***This number is for counsel and media only***, who should follow the steps below to connect to the conference call. Members of the general public may appear in person.

1. Dial the toll free number: **877-873-8018**;

2. Enter the Access Code: **9911153** (Participants will be put on hold until the Court activates the conference call);

3. Enter the Participant Security Code **07130428** and Press # (The security code will be confirmed);

4. Once the Security Code is confirmed, participants will be prompted to Press 1 to join the conference or Press 2 to re-enter the Security Code.

**IT IS SO ORDERED**.

Dated: July 10, 2018

Hon. Dana M. Sabraw
United States District Judge

18cv0428 DMS (MDD)

# Exhibit 1

EXHIBITS, DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS; MOTION FOR EXPEDITED DISCOVERY
CASE NO. 2:18-CV-00939-MJP
*State of Washington, et al. v. United States, et al.,*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| **STATE OF WASHINGTON, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No.: 2:18-cv-00939-MJP** |
| ) | |
| **THE UNITED STATES OF AMERICA;** ) | **DECLARATION OF JONATHAN** |
| **DONALD TRUMP, in his official capacity** ) | **WHITE** |
| **as President of the United States of** ) | |
| **America, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

I, Jonathan White, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and

depose as follows, based on my personal knowledge and information provided to me in the

course of my official duties:

1.      I am a career officer in the United States Public Health Service Commissioned

Corps and have served in the Department of Health & Human Services in three Administrations.

I am presently assigned to the Office of the Assistant Secretary for Preparedness and Response,

and previously served as the Deputy Director of the Office of Refugee Resettlement for the

Unaccompanied Alien Children's Program. I serve as the Federal Health Coordinating Official

managing the HHS reunification mission for separated UAC.

2.       I have been involved directly in the actions which HHS has taken to implement

Executive Order (EO) 13841 ("Affording Congress an Opportunity to Address Family

Separation") and comply with the orders in *Ms. L., et al., v. U.S. Immigration and Customs

Enforcement, et al.*, Case No. 18-cv-428 (S.D.Cal.).

1

3.      President Trump issued EO 13841 on June 20, 2018, and the Court issued its orders on June 26, 2018.  On June 22, 2018, the Secretary of Health and Human Services directed ASPR to deploy personnel and resources to help the Office of Refugee Resettlement (ORR) of the Administration for Children and Families (ACF) of HHS with its mission and expeditiously discharge children to appropriate sponsors.

4.      HHS has been working closely with U.S. Department of Homeland Security ("DHS")—including U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE")—to try to determine all individuals who meet the Court's criteria for class members.  The determination of class membership involves real-time, inter-agency collection and analysis of facts and data to: verify parentage; assess immigration history; determine parental fitness; and evaluate whether reunification would present a danger to the child.  Class membership is not static; it can change due to transfers of putative parents from ICE to the Bureau of Prisons ("BOP") (or vice-versa), and newly-acquired information.

5.      After the Secretary's June 22, 2018 order, ASPR activated an Incident Management Team.  As of July 3, 2018, the Incident Management Team had 33 members.  The Team works full-time to provide logistical and administrative support (including the intensive data work required to determine class membership).

6.      ASPR has also dispatched approximately 115 personnel to the field to engage directly with putative class members in DHS custody.  Those personnel—who are organized into four field teams— are from ACF, ASPR, the US Public Health Service Commissioned Corps, and the National Disaster Medical System's Disaster Medical Assistance Team (DMAT).  The DMAT is a cadre of trained health and medical professionals and para-professionals that augments ASPR's capabilities during public emergencies.

2

7.      Finally, HHS has executed a contract with BCFS Health and Human Services, Inc., to provide an additional 100 reunification case managers, plus approximately 40 staff for logistical and administrative support.  HHS has trained the case managers from BCFS, and is deploying them on Thursday, July 5, and Friday, July 6, 2018, to augment existing field operations.  They too will engage directly with putative class members in ICE custody.

8.      All such staff work directly with the Secretary's Operations Center to work to accomplish family reunification under the Court's order.

9.      Staff have been working around-the-clock, including through the night and on weekends to reconcile data, verify parent-child relationships, and accomplish reunification in accordance with the Court's order.

10.      Should HHS be required to respond to expedited discovery in this case, the very same staff working on family reunification in order to comply with the injunction issued by another federal court in California would be required to spend time gathering data to provide answers to the questions being presented, or to gather documents.

11.      For example, I understand that the expedited discovery request requires the number of "separated children,"[1] placed by ORR in each of the Plaintiff states from January 1, 2018 to present, by month and facility (or for individual sponsor placements, county).

12.      I also understand that the request asks for individualized data on a child-by-child basis, including current location, contact information, location of parents, plans for reunification, and circumstances and progress made for such reunification.

---

[1] "Separated Child" or "Separated Children," is defined in the plaintiff request as "any child under the age of 18 who was traveling with an adult family member, who entered the United States along the Southwestern border in the company of such family member, and who the Department of Homeland Security (DHS) or any other Defendant separated from their family member thereafter."

3

13.     These are not the only requests. There are also requests regarding fingerprinting to reunify separated children, payment for flights, paperwork required; in some cases, on a case-by-case basis.

14.     Gathering such individualized data, such as how often each and every "separated child" has been in telephone contact with parents, would require interviewing case managers at each of ORR's 100 plus grantee shelters to determine where in the process each separated child might be.

15.     HHS currently estimates that there is an upper bound of 3,000 children for whom identification and reunification efforts might be made, and the *Ms. L.* court order requires a 30-day limit from June 26, 2018 to ensure such reunification.

16.     Part of this reunification effort is ensuring that HHS and the Department of Homeland Security are able to match data sets to match parents and children, track the location of each party, ensure the parent-child relationship to guard against trafficking or smuggling, and to ensure the children are safe and secure and protected from those who might seek to victimize them, should reunification occur.

17.     Our staff has been working diligently to locate each and every separated child, including those who may have been separated prior to announcement of the "zero tolerance policy."

18.     Further, creating additional data, such as data sets per month, per facility, cannot occur by just the "push of a button."  Rather, staff would be required to consult multiple data sets, all in different formats to manually pull data from each set, organize, and then reconcile appropriately.  In some cases, staff would have to download documents, one-by-one from a UAC portal, which would result in multiple hours of downloading and then analyzing documents.  I

would need to require staff to stop working on data to reunify parents and children, in order to start working on these expedited discovery analyses; thus potentially jeopardizing compliance with the *Ms. L.* order and delaying reunification.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 9, 2018.

_____

Jonathan White

5

Scanned by CamScanner

# Exhibit 2

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 616-0473
FACSIMILE: (202) 305-7000

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 2:18-cv-00939-MJP |
| | ) | |
| THE UNITED STATES OF AMERICA; | ) | DECLARATION OF DAVID W. JENNINGS |
| DONALD TRUMP, in his official capacity | ) | |
| as President of the United States of | ) | |
| America, et al., | ) | |
| | ) | |
| Defendants. | ) | |

I, David W. Jennings, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and

depose as follows, based on my personal knowledge and information provided to me in the

course of my official duties:

1. I am currently serving as the Acting Assistant Director (AD), Field Operations,

   Enforcement and Removal Operations (ERO), U.S. Immigration and Customs

   Enforcement (ICE), Department of Homeland Security (DHS), a position I have held

   since April 2018.  In this capacity, I oversee, direct, and coordinate field operations in 24

   ERO field offices.

2. Previously, I was the Acting Deputy Assistant Director (DAD), Western Operations for

   ERO, a position I held from October 2017 to March 2018.

3. In June 2016, I was named Field Office Director for the San Francisco Field Office.  I

   served as the Field Office Director for the Los Angeles Field Office from June 2014 until

   June 2016 and as the Houston Field Office Director from May 2012 to June 2014.

1

4. In my current role as Acting AD, I have been involved directly in ICE's efforts to implement Executive Order (EO) 13841 ("Affording Congress an Opportunity to Address Family Separation") and comply with the orders in *Ms. L v. I.C.E.*, ---F. Supp. 3d---, 2018 WL 3129486 (S.D. Cal. June 26, 2018) ("*Ms. L order*" or "order").

5. In order to effectuate the reunification of class members and their minor children, pursuant to the requirements of the preliminary injunction, ICE is working closely with U.S. Customs and Border Protection (CBP) and the U.S. Department of Health and Human Services (HHS), Office of Refugee Resettlement (ORR).

6. Immediately after the *Ms. L* order was issued, ICE's senior leadership met internally and with leadership from across the federal government to determine the various ways in which implementation could be achieved. For ICE, implementation requires several labor intensive steps, such as, but not limited to providing guidance to ERO's field offices, gathering data from other agencies within and outside DHS, conducting case-by-case reviews of all potential class members, transferring class members of children four years of age and younger to detention facilities near their children, developing a reunification plan for class members with children five years of age and over, facilitating access of HHS employees to detention facilities to conduct DNA testing, facilitating communication between class members and their children, communicating with HHS about each case, and providing details about criminal history and location of detention or location of class members who had been released from ICE custody.

7. The first step toward reunifying separated families was the difficult and time-consuming task of identifying potential class members. The data necessary to determine class membership is not maintained as part of ICE's regular business practice. Rather, ICE had

2

to create a new dataset using information collected from CBP and HHS. To create an initial dataset for consideration, ICE had to reconcile CBP data against HHS data manually and new methodologies were developed by ICE to identify separated parents. This data was then sent to the relevant ERO field offices so immigration officers could review available information for each case in order to determine whether the particular alien qualifies as a class member.

8. 19 of ERO's 24 field offices have been affected by this order. Field Office Directors (FODs) around the country have reassigned officers from other duties, such as fugitive operations and case management, to review cases of each potential class member, which includes reviewing available DHS databases, the alien file, and the National Crime Information Center database. As class members are identified, FODs have also had to reassign officers to track these cases, arrange transfers from detention facilities across the United States, share information with HHS, and facilitate communication between separated alien parents and their children.

9. Employees within ERO's Custody Management Division have also committed significant resources to ensuring compliance with the order. They have deployed two deportation officers and six other ERO staff to three detention facilities in which a significant percentage of separated parents are detained to provide surge support related to identification of family units, identification of the location of separated parents and their respective children, responding to detainee inquiries, and facilitating telephone calls between parents and their children. ERO also deployed three dedicated policy/data analysts to HHS's Special Operations Center, which was established to address the operational challenges of coordinating family reunification across different departments.

10. As of July 6, 2018, our information indicates that potential class members with children under five years of age were detained in 23 facilities across 13 states.

11. For those individuals detained in ICE custody for whom it is determined that a minor child has been separated and is in HHS custody, ICE has directed its field offices to review and prepare summaries of the adult alien's criminal and immigration histories, as well as indicators of gang membership. These summaries are sent to HHS. To date, ICE has completed approximately 300 such summaries. Based upon currently available information, ICE has approximately 1400 more summaries to complete for potential class members.

12. ICE will need to complete the same criminal and immigration history reviews for the remaining individuals. ICE and HHS will also need to facilitate reunification for the class members.

13. Based upon this information, ICE and/or HHS, depending upon the circumstances, must also determine whether the separated alien parent is excluded from the class due to criminal history.

14. In order to facilitate the reunification process, ICE has taken steps to move the detained parents of children four years of age or under to a detention facility in the area of responsibility (AOR) close to the location of the minor child in HHS custody. ICE has moved approximately 23 detained aliens from across the country on commercial airlines, which requires officer escorts. Some class members who were more recently identified have not been transferred at the request of HHS, so that HHS can more efficiently take DNA samples of the parents.

15. ICE must carry out a similar process to reunify detained parents of children five years of age or over. For these class members, ICE is considering using a few dedicated staging facilities for reunification purposes.

16. Upon HHS's completion of vetting and a determination of suitability for reunification in accordance with law and the injunction, in many cases, ICE may release the parent on Alternatives to Detention (ATD) to enable reunification to be completed. Because ICE does not have authority to transport the parent once released from its custody, reunification will generally occur at the detention facility or an ERO Field Office concurrent with the parent's release.

17. Given all of the resources being expended by ICE to accomplish reunification and the time sensitive nature of the Court order, any expedited request for discovery of the same or similar information will only serve to interfere with this process. For example, any request seeking the A-files of affected individuals may hold up the transfer process. Likewise, any additional requests for data will slow down the identification of affected class members who must be transferred soon. Also, the same staff handling implementation of the *Ms. L* order, would also be required to respond to expedited discovery, which would hamper reunification efforts.

18. Consequently, any expedited request for documents and data relating to a similar or same set of individuals will substantially interfere with ICE's ability to reunify these parents to their minor children.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

July 9, 2018.


David W. Jennings
Acting Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

6