1

The Honorable Marsha J. Pechman

2

3

4

5

6

7
**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

8

9
STATE OF WASHINGTON, et al.,

NO. 2:18-cv-00939-MJP

Plaintiffs,

10

v.

11

12
THE UNITED STATES OF AMERICA;
DONALD TRUMP, in his official capacity as
President of the United States of America,
et al.,

DECLARATION OF
MEGAN D. LIN IN
SUPPORT OF STATES' REPLY
RE: MOTION FOR EXPEDITED
DISCOVERY AND REGULAR
STATUS CONFERENCES

13

14

Defendants.

15

16
I, Megan D. Lin, declare as follows:

17
1.      I am over the age of 18 and have personal knowledge of all the facts stated herein.

18
2.      I am an Attorney Fellow with the Washington Solicitor General's Office and

19
counsel of record for the State of Washington in this matter.

20
3.      Attached hereto as **Exhibit Q** is a true and correct copy of the June 26, 2018

21
Order Granting Plaintiffs' Motion for Classwide Preliminary Injunction entered in *Ms. L., et al.*

22
*v. ICE, et al.*, Case No. 18cv-0428 DMS (MDD) (S.D. Cal.), Dkt. 83.

23
4.      Attached hereto as **Exhibit R** is a true and correct copy of a July 10, 2018 Daily

24
Beast article, *Government Told Immigrant Parents to Pay for DNA Tests to Get Kids Back,*

DECLARATION OF
MEGAN D. LIN
2:18-cv-00939-MJP

1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

*Advocate Days*, authored by Justin Glawe and Adam Rawnsley.

5.     Attached hereto as **Exhibit S** is a true and correct copy of the July 9, 2018 Order Denying Defendants' "*Ex Parte* Application for Limited Relief from Settlement Agreement" in *Flores, et al. v. Sessions, et al.*, Case No. CV 85-4544-DMG (AGRx) (C.D. Cal.), Dkt. 455.

6.     Attached hereto as **Exhibit T** is a true and correct copy of the July 10, 2018 tweet of @CNNSitRoom.

7.     Attached hereto as **Exhibit U** is a true and correct copy of the July 10, 2018 Politico article, *Trump's solution for reunifying migrant families: 'Don't come to our country illegally'*, authored by Louis Nelson.

8.     Attached hereto as **Exhibit V** is a true and correct copy of the July 10, 2018 11:00 a.m. hearing transcript for the Status Conference in *Ms. L., et al. v. ICE, et al.*, Case No. 18cv-0428 DMS (MDD) (S.D. Cal.).

9.     Attached hereto as **Exhibit W** is a true and correct copy of the U.S. Immigration and Customs Enforcement – Enforcement and Removal Operations Separated Parent's Removal Form.

10.    Attached hereto as **Exhibit X** is a true and correct copy of the July 10, 2018 Joint Status Report Regarding Reunification entered in *Ms. L., et al. v. ICE, et al.*, Case No. 18cv-0428 DMS (MDD) (S.D. Cal.), Dkt. 99.

11.    Attached hereto as **Exhibit Y** is a true and correct copy of the U.S. Department of Homeland Security's Fact Sheet: Zero-Tolerance Prosecution and Family Reunification release issued June 23, 2018.

12.    Attached hereto as **Exhibit Z** is a true and correct copy of the Declaration of Jonathan White filed on July 5, 2018 with Respondents' Notice Regarding Compliance and

DECLARATION OF
MEGAN D. LIN
2:18-cv-00939-MJP

2

Request for Clarification and/or Relief in *Ms. L., et al. v. ICE, et al.*, Case No. 18cv-0428 DMS (MDD) (S.D. Cal.), Dkt. 86-1.

13.     Attached as **Exhibit AA** is a true and correct copy of the July 9, 2018 Order Following Status Conference entered in *Ms. L., et al. v. ICE, et al.*, Case No. 18cv-0428 DMS (MDD) (S.D. Cal.), Dkt. 95.

14.     Attached hereto as **Exhibit BB** is a true and correct copy of the July 6, 2018 Order Setting Further Status Conference entered in *Ms. L., et al. v. ICE, et al.*, Case No. 18cv-0428 DMS (MDD) (S.D. Cal.), Dkt. 91.

15.     Attached hereto as **Exhibit CC** is a true and correct copy of the Declaration of Francisco Serrano in Support of Plaintiffs' Motion for Expedited Discovery.  Mr. Serrano's declaration was previously filed on July 2, 2018 as Exhibit 36 (Dkt. 15-4 at 12-63) to the States' Motion for Expedited Discovery and Regular Status Conferences (Dkt. 15), but did not contain the Certification of Translation at page 6 of that Declaration.  Exhibit CC merely corrects that oversight; Mr. Serrano's declaration is otherwise the same as previously filed.

16.     Attached hereto as **Exhibit DD** is a true and correct copy of the July 6, 2018 letter from Governors Jay Inslee, Andrew Cuomo, Daniel Malloy, Phil Murphy, Tom Wolfe and Kate Brown directed to the Secretaries of the U.S. Departments of Health and Human Services and Homeland Security.

17.     Attached hereto as **Exhibit EE** is a true and correct copy of the Declaration of Jennifer Florian-Vega.

18.     Attached hereto as **Exhibit FF** is a true and correct copy of the Declaration of Ibis Guzman Colindres.

DECLARATION OF
MEGAN D. LIN
2:18-cv-00939-MJP

3

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

19.     Attached hereto as **Exhibit GG** is a true and correct copy of the Declaration of Dunia Garcia Ramirez.

20.     Attached hereto as **Exhibit HH** is a true and correct copy of the Declaration of Sindy Rosales-Coreas.

21.     Attached hereto as **Exhibit II** is a true and correct copy of the Declaration of Lesley Martinez Soriano.

22.     Attached hereto as **Exhibit JJ** is true and correct copy of the July 1, 2018 New York Times Article, *Sponsors of Migrant Children Face Steep Transport Fees and Red Tape*, authored by Miriam Jordan.

23.     Attached hereto as **Exhibit KK** is a true and correct copy of the July 12, 2018 Joint Status Report Regarding Reunification entered in *Ms. L., et al. v. ICE, et al.*, Case No. 18cv-0428 DMS (MDD) (S.D. Cal.), Dkt. 104.

24.     Attached hereto as **Exhibit LL** is a true and correct copy of the July 10, 2018 Slate article, *Trump's Office of Refugee Resettlement is Budgeting for a Surge in Child Separations*, authored by Mark Joseph Stern.

25.     Attached hereto as **Exhibit MM** is a true and correct copy of the Second Amended Complaint filed July 3, 2018 in *Ms. L., et al. v. ICE, et al.*, Case No. 18cv-0428 DMS (MDD) (S.D. Cal.), Dkt. 85.

26.      Attached hereto as **Exhibit NN** is a true and correct copy of the Joint Motion Regarding Scope of the Court's Preliminary Injunction in *Ms. L., et al. v. ICE, et al.*, Case No. 18cv-0428 DMS (MDD) (S.D. Cal.), Dkt. 105.

1        I declare under penalty of perjury under the laws of the State of Washington and the United

2 States of America that the foregoing is true and correct.

3        DATED this 13th day of July, 2018, at Olympia, Washington.

4

5                                 */s/ Megan D. Lin*
                                Megan D. Lin

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DECLARATION OF
MEGAN D. LIN
2:18-cv-00939-MJP

5

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1

**<u>DECLARATION OF SERVICE</u>**

2      I hereby certify that on July 13, 2018, I electronically filed the foregoing document with

3 the Clerk of the Court using the CM/ECF system, which will serve a copy of this document upon

4 all counsel of record.

5      DATED this 13th day of July, 2018, at Olympia, Washington.

6

7                                   */s/ Rebecca Glasgow*_____
                                   REBECCA GLASGOW
                                   Deputy Solicitor General

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DECLARATION OF
MEGAN D. LIN
2:18-cv-00939-MJP

6

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue. Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

# Exhibit Q

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L.; et al.,<br><br>               Petitioners-Plaintiffs,<br><br>v.<br><br>U.S Immigration and Customs Enforcement ("ICE"); et al.,<br><br>               Respondents-Defendants. | Case No.:  18cv0428 DMS (MDD)<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION** |

Eleven weeks ago, Plaintiffs leveled the serious accusation that our Government was engaged in a widespread practice of separating migrant families, and placing minor children who were separated from their parents in government facilities for "unaccompanied minors."  According to Plaintiffs, the practice was applied indiscriminately, and separated even those families with small children and infants—many of whom were seeking asylum.  Plaintiffs noted reports that the practice would become national policy.  Recent events confirm these allegations.  Extraordinary relief is requested, and is warranted under the circumstances.

On May 7, 2018, the Attorney General of the United States announced a "zero tolerance policy," under which all adults entering the United States illegally would be subject to criminal prosecution, and if accompanied by a minor child, the child would be

separated from the parent.[1]  Over the ensuing weeks, hundreds of migrant children were separated from their parents, sparking international condemnation of the practice.  Six days ago on June 20, 2018, the President of the United States signed an Executive Order ("EO") to address the situation and to require preservation of the "family unit" by keeping migrant families together during criminal and immigration proceedings to the extent permitted by law, while also maintaining "rigorous[]" enforcement of immigration laws.  *See* Executive Order, Affording Congress an Opportunity to Address Family Separation § 1, 2018 WL 3046068 (June 20, 2018).  The EO did not address reunification of the burgeoning population of over 2,000 children separated from their parents.  Public outrage remained at a fever pitch.  Three days ago on Saturday, June 23, 2018, the Department of Homeland Security ("DHS") issued a "Fact Sheet" outlining the government's efforts to "ensure that those adults who are subject to removal are reunited with their children for the purposes of removal."[2]

Plaintiffs assert the EO does not eliminate the need for the requested injunction, and the Fact Sheet does not address the circumstances of this case.  Defendants disagree with those assertions, but there is no genuine dispute that the Government was not prepared to accommodate the mass influx of separated children.  Measures were not in place to provide for communication between governmental agencies responsible for detaining parents and those responsible for housing children, or to provide for ready communication between separated parents and children.  There was no reunification plan in place, and families have been separated for months.  Some parents were deported at separate times and from

---

[1]  *See* U.S. Att'y. Gen., *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration* (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[2]  *See* U.S. Dep't of Homeland Sec.*, Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applicants* (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.

different locations than their children. Migrant families that lawfully entered the United States at a port of entry seeking asylum were separated. And families that were separated due to entering the United States illegally between ports of entry have not been reunited following the parent's completion of criminal proceedings and return to immigration detention.

This Court previously entered an order finding Plaintiffs had stated a legally cognizable claim for violation of their substantive due process rights to family integrity under the Fifth Amendment to the United States Constitution based on their allegations the Government had separated Plaintiffs from their minor children while Plaintiffs were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children. *See Ms. L. v. U.S. Immigration & Customs Enf't*, 302 F. Supp. 3d 1149, 2018 WL 2725736, at *7-12 (S.D. Cal. June 6, 2018). A class action has been certified to include similarly situated migrant parents. Plaintiffs now request classwide injunctive relief to prohibit separation of class members from their children in the future absent a finding the parent is unfit or presents a danger to the child, and to require reunification of these families once the parent is returned to immigration custody unless the parent is determined to be unfit or presents a danger to the child.

Plaintiffs have demonstrated a likelihood of success on the merits, irreparable harm, and that the balance of equities and the public interest weigh in their favor, thus warranting issuance of a preliminary injunction. This Order does not implicate the Government's discretionary authority to enforce immigration or other criminal laws, including its decisions to release or detain class members. Rather, the Order addresses only the circumstances under which the Government may separate class members from their children, as well as the reunification of class members who are returned to immigration custody upon completion of any criminal proceedings.

/ / /

/ / /

/ / /

# I.

## BACKGROUND

This case started with the filing of a Complaint by Ms. L., a Catholic citizen of the Democratic Republic of the Congo fleeing persecution from her home country because of her religious beliefs. The specific facts of Ms. L.'s case are set out in the Complaint and this Court's June 6, 2018 Order on Defendants' motion to dismiss. *See Ms. L.*, 2018 WL 2725736, at *1-3. In brief, Ms. L. and her then-six-year-old daughter S.S., lawfully presented themselves at the San Ysidro Port of Entry seeking asylum based on religious persecution. They were initially detained together, but after a few days S.S. was "forcibly separated" from her mother. When S.S. was taken away from her mother, "she was screaming and crying, pleading with guards not to take her away from her mother." (Am. Compl. ¶ 43.) Immigration officials claimed they had concerns whether Ms. L. was S.S.'s mother, despite Ms. L.'s protestations to the contrary and S.S.'s behavior. So Ms. L. was placed in immigration custody and scheduled for expedited removal, thus rendering S.S. an "unaccompanied minor" under the Trafficking Victims Protection and Reauthorization Act ("TVPRA"), Pub. L. No. 110-457 (Dec. 23, 2008), and subjecting her to the "care and custody" of the Office of Refugee Resettlement ("ORR").[3] S.S. was placed in a facility in

---

[3] The TVPRA provides that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of" HHS and its sub-agency, ORR. 8 U.S.C. § 1232(b)(1). An "unaccompanied alien child" ("UAC") is a child under 18 years of age with no lawful immigration status in the United States who has neither a parent nor legal guardian in the United States nor a parent nor legal guardian in the United States "available" to care for them. 6 U.S.C § 279(g)(2). According to the TVPRA, a UAC "may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being. Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A).

Chicago over a thousand miles away from her mother. Immigration officials later determined Ms. L. had a credible fear of persecution and placed her in removal proceedings, where she could pursue her asylum claim. During this period, Ms. L. was able to speak with her daughter only "approximately 6 times by phone, never by video." (Am. Compl. ¶ 45.) Each time they spoke, S.S. "was crying and scared." (*Id.* ¶ 43.) Ms. L. was "terrified that she would never see her daughter again." (*Id.* ¶ 45.) After the present lawsuit was filed, Ms. L. was released from ICE detention into the community. The Court ordered the Government to take a DNA saliva sample (or swab), which confirmed that Ms. L. was the mother of S.S. Four days later, Ms. L. and S.S. were reunited after being separated for nearly five months.

In an Amended Complaint filed on March 9, 2018, this case was expanded to include another Plaintiff, Ms. C. She is a citizen of Brazil, and unlike Ms. L., she did not present at a port of entry. Instead, she and her 14-year-old son J. crossed into the United States "between ports of entry," after which they were apprehended by U.S. Border Patrol. Ms. C. explained to the agent that she and her son were seeking asylum, but the Government, as was its right under federal law, charged Ms. C. with entering the country illegally and placed her in criminal custody. This rendered J. an "unaccompanied minor" and he, like S.S., was transferred to the custody of ORR, where he, too, was housed in a facility in Chicago several hundred miles away from his mother. Ms. C. was thereafter convicted of misdemeanor illegal entry and served 25 days in criminal custody. After completing that sentence, Ms. C. was transferred to immigration detention for removal proceedings and consideration of her asylum claim, as she too had passed a credible fear screening. Despite being returned to immigration custody, Ms. C. was not reunited with J. During the five months she was detained, Ms. C. did not see her son, and they spoke on the phone only "a handful of times[.]" (*Id.* ¶ 58.) Ms. C. was "desperate" to be reunited with her son, worried about him constantly and did not know when she would be able to see him. (*Id.*) J. had a difficult time emotionally during the period of separation from his mother. (*Id.* ¶ 59.) Ms. C. was eventually released from immigration detention on bond, and only recently reunited

with J.  Their separation lasted more than eight months despite the lack of any allegations or evidence that Ms. C. was unfit or otherwise presented a danger to her son.[4]

Ms. L. and Ms. C. are not the only migrant parents who have been separated from their children at the border.  Hundreds of others, who have both lawfully presented at ports of entry (like Ms. L.) and unlawfully crossed into the country (like Ms. C.), have also been separated.  Because this practice is affecting large numbers of people, Plaintiffs sought certification of a class consisting of similarly situated individuals.  The Court certified that class with minor modifications,[5] and now turns to the important question of whether Plaintiffs are entitled to a classwide preliminary injunction that (1) halts the separation of class members from their children absent a determination that the parent is unfit or presents a danger to the child, and (2) reunites class members who are returned to immigration custody upon completion of any criminal proceedings absent a determination that the parent is unfit or presents a danger to the child.

Since the present motion was filed, several important developments occurred, as previously noted.  First, on May 7, 2018, the Government announced its zero tolerance policy for all adult persons crossing the border illegally, which resulted in the separation of hundreds of children who had crossed with their parents.  This is what happened with Ms. C., though she crossed prior to the public announcement of the zero tolerance policy.

---

[4]  As stated in the Court's Order on Defendants' motion to dismiss, Plaintiffs do not challenge Ms. C.'s initial separation from J. as a result of the criminal charge filed against her.  Plaintiffs' only complaint with regard to Ms. C. concerns the Government's failure to reunite her with J. after she was returned to immigration custody.

[5]  The class is defined to include: "All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the [DHS], and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody absent a determination that the parent is unfit or presents a danger to the child."  (*See* Order Granting in Part Mot. for Class Cert. at 17.)  The class does not include parents with criminal history or communicable disease, or those apprehended in the interior of the country or subject to the EO.  (*See id.* at 4 n.5.)

She is not alone. There are hundreds of similarly situated parents, and there are more than 2,000 children that have now been separated from their parents.

When a parent is charged with a criminal offense, the law ordinarily requires separation of the family. This separation generally occurs regardless of whether the parent is charged with a state or federal offense. The repercussions on the children, however, can vary greatly depending on status. For citizens, there is an established system of social service agencies ready to provide for the care and well-being of the children, if necessary, including child protective services and the foster care system. This is in addition to any family members that may be available to provide shelter for these minor children. Grandparents and siblings are frequently called upon. Non-citizens may not have this kind of support system, such as other family members who can provide shelter for their children in the event the parent is detained at the border. This results in immigrant children going into the custody of the federal government, which is presently not well equipped to handle that important task.

For children placed in federal custody, there are two options. One of those options is ORR, but it was established to address a different problem, namely minor children who were apprehended at the border without their parents, *i.e.*, true "unaccompanied alien children." It was not initially designed to address the problem of migrant children detained with their parents at the border and who were thereafter separated from their parents. The second option is family detention facilities, but the options there are limited. Indeed, at the time of oral argument on this motion, Government counsel represented to the Court that the "total capacity in [family] residential centers" was "less than 2,700." (Rep. Tr. at 9, May 9, 2018, ECF No. 70.) For male heads of households, *i.e.*, fathers traveling with their children, there was only one facility with "86 beds." (*Id.* at 43.)

The recently issued EO confirms the government is inundated by the influx of children essentially orphaned as a result of family separation. The EO now directs "[h]eads of executive departments and agencies" to make available "any facilities … appropriate" for the housing and care of alien families. EO § 3(d). The EO also calls upon the *military*

by directing the Secretary of Defense to make available "any existing" facility and to "construct such facilities[,]" if necessary, *id.* § 3(c), which is an extraordinary measure. Meanwhile, "tent cities" and other make-shift facilities are springing up. That was the situation into which Plaintiffs, and hundreds of other families that were separated at the border in the past several months, were placed.

This situation has reached a crisis level. The news media is saturated with stories of immigrant families being separated at the border. People are protesting. Elected officials are weighing in. Congress is threatening action. Seventeen states have now filed a complaint against the Federal Government challenging the family separation practice. *See State of Washington v. United States*, Case No. 18cv0939, United States District Court for the Western District of Washington. And the President has taken action.

Specifically, on June 20, 2018, the President signed the EO referenced above. The EO states it is the Administration's policy "to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources." *Id.* § 1.[6] In furtherance of that policy, the EO indicates that parents and children who are apprehended together at the border will be detained together "during the pendency of any criminal improper entry or immigration proceedings" to the extent permitted by law. *Id.* § 3. The language of the EO is not absolute, however, as it states that family unity shall be maintained "where appropriate and consistent with law and available resources[,]" *id.* § 1, and "to the extent permitted by law and subject to the availability of appropriations[.]" *Id.* § 3. The EO also indicates rigorous enforcement of illegal border crossers will continue. *Id.* § 1 ("It is the policy of this Administration to rigorously enforce our immigration laws."). And finally, although the Order speaks to a policy of "maintain[ing] family unity,"

---

[6] The Order defines "alien family" as "any person not a citizen or national of the United States who has not been admitted into, or is not authorized to enter or remain in, the United States, who entered this country with an alien child or alien children at or between designated ports of entry and who was detained[.]" *Id.* § 2(a)(i).

18cv0428 DMS (MDD)

it is silent on the issue of reuniting families that have already been separated or will be separated in the future." *Id.*

In light of these recent developments, and in particular the EO, the Court held a telephonic status conference with counsel on June 22, 2018. During that conference, the Court inquired about communication between ORR and DHS, and ORR and the Department of Justice ("DOJ"), including the Bureau of Prisons ("BOP"), as it relates to these separated families. Reunification procedures were also discussed, specifically whether there was any affirmative reunification procedure for parents and children after parents were returned to immigration detention following completion of criminal proceedings. Government counsel explained the communication procedures that were in place, and represented, consistent with her earlier representation to the Court, that there was no procedure in place for the reunification of these families.[7]

The day after the status conference, Saturday, June 23, DHS issued the Fact Sheet referenced above. This document focuses on several issues addressed during the status conference, *e.g.*, processes for enhanced communication between separated parents and children, but only "for the purposes of removal." It also addresses coordination between and among three agencies, CBP, ICE, and HHS agency ORR, but again for the purpose of removal. The Fact Sheet does not address reunification for other purposes, such as immigration or asylum proceedings, which can take months. It also does not mention other vital agencies frequently involved during criminal proceedings: DOJ and BOP.

At the conclusion of the recent status conference, the Court requested supplemental briefing from the parties. Those briefs have now been submitted. After thoroughly

---

[7] The Court: "Is there currently any affirmative reunification process that the government has in place once parent and child are separated? Government counsel: I would say … when a parent is released from criminal custody and taken into ICE custody is the practice to reunite them in family detention[?] And at that [previous hearing] I said no, that that was not the practice. I think my answer on that narrow question would be the same." (Rep. Tr. at 29-30, June 22, 2018, ECF No. 77.)

18cv0428 DMS (MDD)

considering all of the parties' briefs and the record in this case, and after hearing argument from counsel on these important issues, the Court grants Plaintiffs' motion for a classwide preliminary injunction.

## II.

## DISCUSSION

Plaintiffs seek classwide preliminary relief that (1) enjoins Defendants' practice of separating class members from their children absent a determination that the parent is unfit or presents a danger to their child, and (2) orders the government to reunite class members with their children when the parent is returned to immigration custody after their criminal proceedings conclude, absent a determination that the parent is unfit or presents a danger to the child. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To meet that showing, Plaintiffs must demonstrate "'[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).[8]

---

[8] The Ninth Circuit applies separate standards for injunctions depending on whether they are prohibitory, *i.e.*, whether they prevent future conduct, or mandatory, *i.e.*, "they go beyond 'maintaining the status quo[.]'" *Hernandez v. Sessions*, 872 F.3d 976, 997 (9th Cir. 2017). The standard set out above applies to prohibitory injunctions, which is what Plaintiffs seek here. To the extent Plaintiffs are also requesting mandatory relief, that request is "subject to a higher standard than prohibitory injunctions," namely that relief will issue only "when 'extreme or very serious damage will result' that is not capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Id.* at 999 (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). The Ninth Circuit recognizes that application of these different standards "is controversial[,]" and that other Circuits have questioned this approach. *Id.* at 997-98. This Court need not, and does not, address that discrepancy here. Suffice it to say that to the extent some portion of Plaintiffs' requested relief is subject to a standard higher than

Before turning to these factors, the Court addresses directly Defendants' argument that an injunction is not necessary here in light of the EO and the recently released Fact Sheet. Although these documents reflect some attempts by the Government to address some of the issues in this case, neither obviates the need for injunctive relief here. As indicated throughout this Order, the EO is subject to various qualifications. For instance, Plaintiffs correctly assert the EO allows the government to separate a migrant parent from his or her child "where there is a *concern* that detention of an alien child with the child's alien parent would pose a risk to the child's welfare." EO § 3(b) (emphasis added). Objective standards are necessary, not subjective ones, particularly in light of the history of this case. Furthermore, the Fact Sheet focuses on reunification "at time of removal[,]" U.S. Dep't of Homeland Sec., *supra*, note 2, stating that the parent slated for removal will be matched up with their child at a location in Texas and then removed. It says nothing about reunification during the intervening time between return from criminal proceedings to ICE detention or the time in ICE detention prior to actual removal, which can take months. Indeed, it is undisputed "ICE has no plans or procedures in place to reunify the parent with the child other than arranging for them to be deported together after the parent's immigration case is concluded." (Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 31 ¶ 11.) Thus, neither of these directives eliminates the need for an injunction in this case. With this finding, the Court now turns to the *Winter* factors.

**A.     Likelihood of Success**

"The first factor under *Winter* is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). While Plaintiffs carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at the preliminary injunction stage but only such portions that enable them to obtain the injunctive relief they seek. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

the traditional standard for injunctive relief, Plaintiffs have met their burden for the reasons set out below.

11

18cv0428 DMS (MDD)

Here, the only claim currently at issue is Plaintiffs' due process claim.[9] Specifically, Plaintiffs contend the Government's practice of separating class members from their children, and failing to reunite those parents who have been separated, without a determination that the parent is unfit or presents a danger to the child violates the parents' substantive due process rights to family integrity under the Fifth Amendment to the United States Constitution. To prevail on this claim, Plaintiffs must show that the Government practice "shocks the conscience." In the Order on Defendants' motion to dismiss, the Court found Plaintiffs had set forth sufficient facts to support that claim. *Ms. L.*, 2018 WL 2725736, at *7-12. The evidence submitted since that time supports that finding, and demonstrates Plaintiffs are likely to succeed on this claim.

As explained in the Court's Order on Defendants' motion to dismiss, the "shocks the conscience" standard is not subject to a rigid list of established elements. *See County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) (stating "[r]ules of due process are not … subject to mechanical application in unfamiliar territory.") On the contrary, "an investigation into substantive due process involves an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements[.]" *Armstrong v. Squadrito*, 152 F.3d 564, 570 (7th Cir. 1998).

Here, each Plaintiff presents different circumstances, but both were subjected to the same government practice of family separation without a determination that the parent was unfit or presented a danger to the child. Ms. L. was separated from her child without a determination she was unfit or presented a danger to her child, and Ms. C. was not reunited with her child despite the absence of any finding that she was unfit or presented a danger

---

[9] In their supplemental brief, Defendants assert Plaintiffs are raising new claims based on events that transpired after the Complaints were filed, *e.g.*, the announcement of the zero tolerance policy and the EO. The Court disagrees. Plaintiffs' claims are not based on these events, but are based on the practice of separating class members from their children. The subsequent events are relevant to Plaintiffs' claim, but they have not changed the claim itself, which remains focused on the practice of separation.

18cv0428 DMS (MDD)

to her child.  Outside of the context of this case, namely an international border, Plaintiffs would have a high likelihood of success on a claim premised on such a practice.  *See D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016) (citing cases finding due process violation where state action interfered with rights of fit parents); *Heartland Academy Community Church v. Waddle*, 595 F.3d 798, 808-811 (8th Cir. 2010) (finding removal of children from religious school absent evidence the students were "at immediate risk of child abuse or neglect" was violation of clearly established constitutional right); *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000) (citing *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d 1123, 1126 (3d Cir. 1997) ("courts have recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.")

The context of this case is different.  The Executive Branch, which is tasked with enforcement of the country's criminal and immigration laws, is acting within its powers to detain individuals lawfully entering the United States and to apprehend individuals illegally entering the country.  However, as the Court explained in its Order on Defendants' motion to dismiss, the right to family integrity still applies here.  The context of the family separation practice at issue here, namely an international border, does not render the practice constitutional, nor does it shield the practice from judicial review.

On the contrary, the context and circumstances in which this practice of family separation were being implemented support a finding that Plaintiffs have a likelihood of success on their due process claim.  First, although parents and children may lawfully be separated when the parent is placed in criminal custody, the same general rule does not apply when a parent and child present together lawfully at a port of entry seeking asylum.  In that situation, the parent has committed no crime, and absent a finding the parent is unfit or presents a danger to the child, it is unclear why separation of Ms. L. or similarly situated class members would be necessary.  Here, many of the family separations have been the result of the Executive Branch's zero tolerance policy, but the record also reflects that the

13

practice of family separation was occurring before the zero tolerance policy was announced, and that practice has resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally.  Ms. L. is an example of this family separation practice expanding beyond its lawful reach, and she is not alone.  (*See, e.g.*, Pls.' Reply Br. in Supp. of Mot. for Class Cert., Exs. 22-23, 25-26) (declarations from parents attesting to separation at border after lawfully presenting at port of entry and requesting asylum); Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 32 ¶¶ 9, 10b, 11a (listing parents who were separated from children after presenting at ports of entry)).

As set out in the Court's prior Order, asylum seekers like Ms. L. and many other class members may be fleeing persecution and are entitled to careful consideration by government officials.  Particularly so if they have a credible fear of persecution.  We are a country of laws, and of compassion.  We have plainly stated our intent to treat refugees with an ordered process, and benevolence, by codifying principles of asylum.  *See, e.g.,* The Refugee Act, PL 96-212, 94 Stat. 102 (1980).  The Government's treatment of Ms. L. and other similarly situated class members does not meet this standard, and it is unlikely to pass constitutional muster.

Second, the practice of separating these families was implemented without any effective system or procedure for (1) tracking the children after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and children after the parents are returned to immigration custody following completion of their criminal sentence.  This is a startling reality.  The government readily keeps track of personal property of detainees in criminal and immigration proceedings.  Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainees' release, at all levels—state and federal, citizen and alien.  Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children.  The unfortunate reality is that under the present system migrant children are not

18cv0428 DMS (MDD)

accounted for with the same efficiency and accuracy as *property*. Certainly, that cannot satisfy the requirements of due process. *See Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982) (quoting *Lassiter v. Dept. of Soc. Services of Durham County, N.C.*, 452 U.S. 18, (1981)) (stating it is "'plain beyond the need for multiple citation' that a natural parent's 'desire for and right to the companionship, care, custody, and management of his or her children' is an interest far more precious than any property right.") (internal quotation marks omitted).

The lack of effective methods for communication between parents and children who have been separated has also had a profoundly negative effect on the parents' criminal and immigration proceedings, as well as the childrens' immigration proceedings. *See United States v. Dominguez-Portillo*, No:EP-17-MJ-4409-MAT, 2018 WL 315759, at *1-2 (W.D. Tex. Jan. 5, 2018) (explaining that criminally charged defendants "had not received any paperwork or information concerning the whereabouts or well-being of" their children). In effect, these parents have been left "in a vacuum, without knowledge of the well-being and location of their children, to say nothing of the immigration proceedings in which those minor children find themselves." *Id.* at *14. This situation may result in a number of different scenarios, all of which are negative – some profoundly so. For example, "[i]f parent and child are asserting or intending to assert an asylum claim, that child may be navigating those legal waters without the benefit of communication with and assistance from her parent; that defendant, too, must make a decision on his criminal case with total uncertainty about this issue." *Id.* Furthermore, " a defendant facing certain deportation would be unlikely to know whether he might be deported before, simultaneous to, or after their child, or whether they would have the opportunity to even discuss their deportations[.]" *Id.* Indeed, some parents have already been deported without their children, who remain in government facilities in the United States.[10]

---

[10] *See*, *e.g.*, Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 32 ¶ 16k, Ex. 36 ¶ 7a; Nelson Renteria, *El Salvador demands U.S. return child taken from deported father*,

The absence of established procedures for dealing with families that have been separated at the border, and the effects of that void on the families involved, is borne out in the cases of Plaintiffs here. Ms. L. was separated from her child when immigration officials claimed they could not verify she was S.S.'s mother, and detained her for expedited removal proceedings. That rendered S.S. "unaccompanied" under the TVPRA and subject to immediate transfer to ORR, which accepted responsibility for S.S. There was no further communication between the agencies, ICE and ORR. The filing of the present lawsuit prompted release and reunification of Ms. L. and her daughter, a process that took close to five months and court involvement. Ms. C. completed her criminal sentence in 25 days, but it took nearly eight months to be reunited with her son. She, too, had to file suit to regain custody of her son from ORR.

These situations confirm what the Government has already stated: it is not affirmatively reuniting parents like Plaintiffs and their fellow class members for purposes other than removal. Outside of deportation, the onus is on the parents, who, for the most part, are themselves in either criminal or immigration proceedings, to contact ORR or otherwise search for their children and make application for reunification under the TVPRA. However, this reunification procedure was not designed to deal with the present circumstances. (*See* Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 33 ¶¶ 6-9.) Rather, "ORR's reunification process was designed to address the situation of children who come to the border or are apprehended outside the company of a parent or legal guardian." (*Id.* ¶ 6.) Placing the burden on the parents to find and request reunification with their children under the circumstances presented here is backwards. When children are

REUTERS (June 21, 2018, 4:03 PM), https://www.reuters.com/article/us-usa-immigration-el-salvador/el-salvador-demands-us-return-child-taken-from-deported-father-idUSKBN1JH3ER; Miriam Jordan, *'I Can't Go Without My Son': A Deported Mother's Plea*, N.Y. TIMES (June 17, 2018), https://www.nytimes.com/2018/06/17/us/immigration-deported-parents.html.

18cv0428 DMS (MDD)

separated from their parents under these circumstances, the Government has an affirmative obligation to track and promptly reunify these family members.

This practice of separating class members from their minor children, and failing to reunify class members with those children, without any showing the parent is unfit or presents a danger to the child is sufficient to find Plaintiffs have a likelihood of success on their due process claim. When combined with the manner in which that practice is being implemented, *e.g.*, the lack of any effective procedures or protocols for notifying the parents about their childrens' whereabouts or ensuring communication between the parents and children, and the use of the children as tools in the parents' criminal and immigration proceedings, (*see* Pls.' Supp. Mem. in Supp. of Classwide Prelim. Inj., Ex. 29 ¶¶ 8, 14), a finding of likelihood of success is assured. A practice of this sort implemented in this way is likely to be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *Lewis*, 523 U.S. at 847 n.8, interferes with rights "'implicit in the concept of ordered liberty[,]'" *Rochin v. Cal.*, 342 U.S. 165, 169 (1952) (quoting *Palko v. State of Conn.*, 302 U.S. 319, 325 (1937)), and is so "'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency." *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957).

For all of these reasons, the Court finds there is a likelihood of success on Plaintiffs' due process claim.

**B.    Irreparable Injury**

Turning to the next factor, Plaintiffs must show they are "'likely to suffer irreparable harm in the absence of preliminary relief.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 20). "'It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.'" *Id.* (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted). As explained, Plaintiffs have demonstrated the likelihood of a deprivation of their constitutional rights, and thus they have satisfied this factor.

The injury in this case, however, deserves special mention. That injury is the separation of a parent from his or her child, which the Ninth Circuit has repeatedly found constitutes irreparable harm. *See Leiva–Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying "separated families" as an irreparable harm).

Furthermore, the record in this case reflects that the separations at issue have been agonizing for the parents who have endured them. One of those parents, Mr. U., an asylum seeker from Kyrgyzstan, submitted a declaration in this case in which he stated that after he was told he was going to be separated from his son he "felt as though [he] was having a heart attack." (Reply in Supp. of Mot. for Class Cert., Ex. 21 ¶ 4.) Another asylum-seeking parent from El Salvador who was separated from her two sons writes,

> The separation from my sons has been incredibly hard, because I have never been away from them before. I do not want my children to think that I abandoned them. [My children] are so attached to me. [One of my children] used to sleep in bed with me every night while [my other child] slept in his own bed in the same room.… It hurts me to think how anxious and distressed they must be without me.

(Reply in Supp. of Mot. for Class Cert., Ex. 24 ¶ 9.) And another asylum-seeking parent from Honduras described having to place her crying 18-month old son in a car seat in a government vehicle, not being able to comfort him, and her crying as the officers "took [her] son away." (Reply in Supp. of Mot. for Class Cert., Ex. 25 ¶ 7.) There has even been a report that one father committed suicide in custody after being separated from his wife and three-year-old child. *See* Molly Hennessy-Fiske, *Honduran Migrant Who Was Separated From Family is Found Dead in Texas Jail in an Apparent Suicide*, L.A. TIMES (June 9, 2018, 5:35 PM), http://www.latimes.com/nation/la-na-border-patrol-suicide-20180609-story.html.

The parents, however, are not the only ones suffering from the separations. One of the *amici* in this case, Children's Defense Fund, states,

18cv0428 DMS (MDD)

1  there is ample evidence that separating children from their mothers or fathers
2  leads to serious, negative consequences to children's health and development.
3  Forced separation disrupts the parent-child relationship and puts children at
   increased risk for both physical and mental illness....  And the psychological
4  distress, anxiety, and depression associated with separation from a parent
5  would follow the children well after the immediate period of separation—
   even after eventual reunification with a parent or other family.

6

7  (ECF No. 17-11 at 3.)  Other evidence before the Court reflects that "separating children

8  from parents is a highly destabilizing, traumatic experience that has long term

9  consequences on child well-being, safety, and development."  (ECF No. 17-13 at 2.)  That

10  evidence reflects:

11     Separation from family leaves children more vulnerable to exploitation and
12     abuse, no matter what the care setting.  In addition, traumatic separation from
       parents creates toxic stress in children and adolescents that can profoundly
13     impact their development.  Strong scientific evidence shows that toxic stress
14     disrupts the development of brain architecture and other organ systems, and
       increases the risk for stress-related disease and cognitive impairment well into
15     adult years.  Studies have shown that children who experience such traumatic
16     events can suffer from symptoms of anxiety and post-traumatic stress
       disorder, have poorer behavioral and educational outcomes, and experience
17     higher rates of poverty and food insecurity.

18

19  (ECF No. 17-13 at 2.)  And Martin Guggenheim, the Fiorello LaGuardia Professor of

20  Clinical Law at New York University School of Law and Founding Member of the Center

21  for Family Representation, states:

22     Children are at risk of suffering great emotional harm when they are removed
23     from their loved ones.  And children who have traveled from afar and made
       their way to this country to seek asylum are especially at risk of suffering
24     irreversible psychological harm when wrested from the custody of the parent
25     or caregiver with whom they traveled to the United States.

26  (Mem. in Supp. of Classwide Prelim. Inj., Ex. 17 ¶ 16.)  All of this evidence, combined

27  with the constitutional violation alleged here, conclusively shows that Plaintiffs and the

28

18cv0428 DMS (MDD)

1  class members are likely to suffer irreparable injury if a preliminary injunction does not
2  issue.

3  **C.     Balance of Equities**

4        Turning to the next factor, "[t]o obtain a preliminary injunction, a plaintiff must also
5  demonstrate that 'the balance of equities tips in his favor.'" *Hernandez*, 872 F.3d at 995
6  (quoting *Winter*, 555 U.S. at 20).  As with irreparable injury, when a plaintiff establishes
7  "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also
8  established that both the public interest and the balance of the equities favor a preliminary
9  injunction." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

10       Plaintiffs here assert the balance of equities weighs in favor of an injunction in this
11  case.  Specifically, Plaintiffs argue Defendants would not suffer any hardship if the
12  preliminary injunction is issued because the Government "cannot suffer harm from an
13  injunction that merely ends an unlawful practice[.]" *Rodriguez v. Robbins*, 715 F.3d 1127,
14  1145 (9th Cir. 2013); *see also Arizona Dream Act Coalition*, 757 F.3d at 1069 (quoting
15  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)) (stating balance of equities favors
16  "'prevent[ing] the violation of a party's constitutional rights.'").  When the absence of harm
17  to the Government is weighed against the harms to Plaintiffs set out above, Plaintiffs argue
18  this factor weighs in their favor.  The Court agrees.

19       The primary harm Defendants assert here is the possibility that an injunction would
20  have a negative impact on their ability to enforce the criminal and immigration laws.
21  However, the injunction here—preventing the separation of parents from their children and
22  ordering the reunification of parents and children that have been separated—would do
23  nothing of the sort.  The Government would remain free to enforce its criminal and
24  immigration laws, and to exercise its discretion in matters of release and detention
25  consistent with law.  *See* EO §§ 1, 3(a) & (e) (discussing *Flores v. Sessions*, CV 85-4544);
26  *see also Comm. of Cent. Am. Refugees v. I.N.S.,* 795 F.2d 1434, 1439-40 (9th Cir. 1986)
27  (stating "prudential considerations preclude[] interference with the Attorney General's
28  [exercise of] discretion" in selecting the detention facilities where aliens are to be

1    detained).  It would just have to do so in a way that preserves the class members'

2    constitutional rights to family association and integrity.  *See Rodriguez*, 715 F.3d at 1146

3    ("While ICE is entitled to carry out its duty to enforce the mandates of Congress, it must

4    do so in a manner consistent with our constitutional values.")  Thus, this factor also weighs

5    in favor of issuing the injunction.

6    **D.    Public Interest**

7         The final factor for consideration is the public interest.  *See Hernandez*, 872 F.3d at

8    996 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)) ("When, as

9    here, 'the impact of an injunction reaches beyond the parties, carrying with it a potential

10   for public consequences, the public interest will be relevant to whether the district court

11   grants the preliminary injunction.'")  To obtain the requested relief, "Plaintiffs must

12   demonstrate that the public interest favors granting the injunction 'in light of [its] *likely*

13   consequences,' i.e., 'consequences [that are not] too remote, insubstantial, or speculative

14   and [are] supported by evidence.'"  *Id.* (quoting *Stormans*, 586 F.3d at 1139).  "'Generally,

15   public interest concerns are implicated when a constitutional right has been violated,

16   because all citizens have a stake in upholding the Constitution.'"  *Id.* (quoting *Preminger*

17   *v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).

18        This case involves two important public interests: the interest in enforcing the

19   country's criminal and immigration laws and the constitutional liberty interest "of parents

20   in the care, custody, and control of their children[,]" which "is perhaps the oldest of the

21   fundamental liberty interests recognized by" the Supreme Court.  *Troxel v. Granville*, 530

22   U.S. 57, 65 (2000).  Both of these interests are valid and important, and both can be served

23   by the issuance of an injunction in this case.

24        As stated, the public's interest in enforcing the criminal and immigration laws of this

25   country would be unaffected by issuance of the requested injunction.  The Executive

26   Branch is free to prosecute illegal border crossers and institute immigration proceedings

27   against aliens, and would remain free to do so if an injunction were issued.  Plaintiffs do

28   not seek to enjoin the Executive Branch from carrying out its duties in that regard.

What Plaintiffs do seek by way of the requested injunction is to uphold their rights to family integrity and association while their immigration proceedings are underway. This right, specifically, the relationship between parent and child, is "constitutionally protected," *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978), and "well established." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011). The public interest in upholding and protecting that right in the circumstances presented here would be served by issuance of the requested injunction. *See Arizona Dream Act Coalition*, 757 F.3d at 1069 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("'[I]t is clear that it would not be equitable or in the public's interest to allow the state … to violate the requirements of federal law, especially when there are no adequate remedies available.'") Accordingly, this factor, too, weighs in favor of issuing the injunction.

## III.

## CONCLUSION

The unfolding events—the zero tolerance policy, EO and DHS Fact Sheet—serve to corroborate Plaintiffs' allegations. The facts set forth before the Court portray reactive governance—responses to address a chaotic circumstance of the Government's own making. They belie measured and ordered governance, which is central to the concept of due process enshrined in our Constitution. This is particularly so in the treatment of migrants, many of whom are asylum seekers and small children. The extraordinary remedy of classwide preliminary injunction is warranted based on the evidence before the Court. For the reasons set out above, the Court hereby GRANTS Plaintiffs' motion for classwide preliminary injunction, and finds and orders as follows:

(1)     Defendants, and their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them, are preliminarily enjoined from detaining Class Members in DHS custody without and apart from their minor children, absent a determination that the parent is unfit or presents a danger to the

18cv0428 DMS (MDD)

child, unless the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child in DHS custody.[11]

(2)  If Defendants choose to release Class Members from DHS custody, Defendants, and their officers, agents, servants, employees and attorneys, and all those who are in active concert or participation with them, are preliminary enjoined from continuing to detain the minor children of the Class Members and must release the minor child to the custody of the Class Member, unless there is a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child.

(3)  Unless there is a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child:

(a)  Defendants must reunify all Class Members with their minor children who are under the age of five (5) within fourteen (14) days of the entry of this Order; and

(b)  Defendants must reunify all Class Members with their minor children age five (5) and over within thirty (30) days of the entry of this Order.

(4)  Defendants must immediately take all steps necessary to facilitate regular communication between Class Members and their children who remain in ORR custody, ORR foster care, or DHS custody. Within ten (10) days, Defendants must provide parents telephonic contact with their children if the parent is not already in contact with his or her child.

---

[11] "Fitness" is an important factor in determining whether to separate parent from child. In the context of this case, and enforcement of criminal and immigration laws at the border, "fitness" could include a class member's mental health, or potential criminal involvement in matters other than "improper entry" under 8 U.S.C. § 1325(a), (see EO § 1), among other matters. Fitness factors ordinarily would be objective and clinical, and would allow for the proper exercise of discretion by government officials.

(5)  Defendants must immediately take all steps necessary to facilitate regular communication between and among all executive agencies responsible for the custody, detention or shelter of Class Members and the custody and care of their children, including at least ICE, CBP, BOP, and ORR, regarding the location and well-being of the Class Members' children.

(6)  Defendants, and their officers, agents, servants, employees, attorneys, and all those who are in active concert or participation with them, are preliminarily enjoined from removing any Class Members without their child, unless the Class Member affirmatively, knowingly, and voluntarily declines to be reunited with the child prior to the Class Member's deportation, or there is a determination that the parent is unfit or presents a danger to the child.

(7)  This Court retains jurisdiction to entertain such further proceedings and to enter such further orders as may be necessary or appropriate to implement and enforce the provisions of this Order and Preliminary Injunction.

A status conference will be held on **July 6, 2018**, at **12:00 noon**, to discuss all necessary matters. A notice of teleconference information sheet will be provided in a separate order.

**IT IS SO ORDERED.**

Dated: June 26, 2018

Hon. Dana M. Sabraw
United States District Judge

24

18cv0428 DMS (MDD)

# Exhibit R

FOLLOW

LOG IN

CHEAT SHEET   POLITICS   ENTERTAINMENT   WORLD NEWS   HALF FULL   ARTS AND CULTURE   U.S. NEWS   TECH   HUNT FOR THE CURE   SCIENCE   SCOUTED

PLAY HOT ARTISTS
ELLA MAI
BOO'D UP
FULL TRACK



EXCLUSIVE

PHOTO ILLUSTRATION BY THE DAILY BEAST

EXCLUSIVE

WE BROKE IT, YOU BUY IT

## Government Told Immigrant Parents to Pay for DNA Tests to Get Kids Back, Advocate Says

Authorities separated families and took their documents, leaving genetic tests as the only way to verify who they are. And a secret contractor is doing the work.

JUSTIN GLAWE, ADAM RAWNSLEY 07.10.18 8:00 PM ET

   





EXCLUSIVE

PHOTO ILLUSTRATION BY THE DAILY BEAST

DALLAS—U.S. government officials recently told four immigrant women that they must pay for DNA tests in order to be reunited with their children, according to the shelter that housed the women.

The tests are the latest ad hoc effort by the Trump administration to reunite families it had separated—in some cases because authorities took documents from adults proving they are related to their children. The tests are being administered by a private contractor on behalf of the Department of Health and Human Services' Office of Refugee Resettlement, which oversees the care and housing of children. HHS has refused to name the contractor, which may be a violation of federal law.

"None of them have the money [for the tests], so it's going to fall back on us to push back on that," said Ruben Garcia, the director of Annunciation House, an immigrant shelter in El Paso where the women are staying.

Three of the women are mothers of the children, Garcia said, and the fourth is attempting to reunite with her brother, a three and half-year-old boy.

Garcia said that the tests likely cost money that many immigrants entering the country with little more than the clothes on their backs don't have. Iliana Holguin, an immigration attorney in El Paso who works with Annunciation House, said the government made some of her clients pay between $700 to $800 to prove their relationship to a relative as part of their citizenship cases.

"The government wants the parents to foot the bill for the DNA testing when they're the ones that caused the need for DNA testing," Holguin said. "It's incredible."

The Office of Refugee Resettlement, responsible for the DNA testing, told The Daily Beast it "provides DNA testing at no cost to verify parentage."

**Solution for Self-Imposed Problem**

RELATED IN U.S. NEWS



Trump's Order Does Nothing for Families He Broke Up



Nearly 3,000 Separated Migrant Kids Remain in U.S. Custody



Contractor Won't Say How Many Kids It's Transporting

ORR requires DNA testing in some cases to verify adult immigrants are related to children in ORR's custody, before the children can be released to the adults who have either been paroled or are to be deported. The tests are often required, according Garcia, when parents' had had their paperwork regarding their children taken by Customs and Border Patrol or Immigration and Customs Enforcement. (CBP and ICE did not immediately respond to requests for comment.)

"When these families come in, Customs and Border Protection takes away the documents from parents and puts them in their file," Garcia said. "In the cases where they've been separated from their children, ORR then says, 'You're going to need to provide the documents that CBP took.'"

And when the immigrants can't, Garcia said, ORR tells parents they must take a DNA test.

It's unclear how many immigrants have been told they'd have to pay for DNA tests. Other immigration attorneys reached by The Daily Beast said their clients had not been asked to pay for DNA tests.

Greg Chen of the American Immigration Lawyers Association called the tests a "delay tactic" by a government that is "primarily interested in detaining the children and parents to put pressure on them to accept deportation before they have the opportunity to get a fair hearing on their asylum claims and other claims for relief."

**GET THE BEAST IN YOUR INBOX!**

Enter your email address
By clicking "Subscribe," you agree to have read the Terms of Use and Privacy Policy

SUBSCRIBE

"In a specific case when there's evidence of fraud DNA testing may be warranted, but it should not be done across the board especially when proof of familial relationship can be demonstrated in other ways," Chen said.

Those other ways include the government documents that are taken from immigrants once they're caught for crossing the border, verification that a simple phone call from ORR to CBP or ICE could achieve, Garcia said.

"But when I go to ORR, they say, 'We don't talk to immigration [authorities],'" he said.

**Government Keeps Contractor Secret**

HHS has refused to reveal the identity of the contractor who is performing the DNA tests. A search of federal contract databases showed no recent contracts for DNA work with the HHS office which oversees ORR.

"DNA contract information is not available in a readily reportable format," HHS' Administration of Children and Families office told The Daily Beast in a statement. A day earlier, that same office said on its website it had "not consulted with the contractor" to get permission to release the contract."

Under federal law, government agencies have 30 days from the date of award to release certain basic contract information to a federal database online.

"Agencies don't need permission from contractors to publicize info on the contract. This is the public's business and taxpayers dollars are being used," Nick Schwellenbach of the Project on Government Oversight told The Daily Beast. "Agencies often make this information available immediately."

Meanwhile, the American Civil Liberties Union and the government agreed in a court filing on Monday "the federal government will not use the DNA samples or test results for any purpose besides verifying parentage, and will ensure that the DNA samples and test results are destroyed afterwards." In a posting on its website, HHS pledged to destroy DNA swabs and test results after parental relationships had been confirmed.

**Roots in the Obama Administration**

The Trump administration isn't the first to use DNA tests to verify relationships between immigrants or refugees. Under the Obama administration, the Department of Homeland Security and State Department initiated a DNA testing pilot program for refugees from certain African countries in the "Priority Three" program that reunited refugees already inside the U.S. with relatives still abroad. Reports of widespread fraud in the Priority Three program (preliminary testing showed only 20 percent of tested immigrants had a biological relationship with claimed relatives abroad) prompted the closure of the program in 2008 before it was reopened in 2012.

A 2010 public notice warned that applicants to the Priority Three program would be responsible for the cost of DNA testing, but "successful applicants may be eligible for reimbursement of DNA test costs."

Garcia said he has heard that test fees can be waived, but has yet to hear specifically from ORR how to apply for those waivers.

"I don't know if it's a situation where if you don't ask about the waivers they don't tell you," he said.

DNA tests continued in 2014, when a wave of unaccompanied children began fleeing from gang violence in Central and South America and arriving at the southern border. Then, the Obama administration instituted another initiative similar to Priority Three called the Central American Minors (CAM) program. Many refugee children arrived looking to reunite with parents or relatives already inside the U.S. The CAM program sought to provide a safer alternative to the often dangerous journey unaccompanied children took through Central America and to the border by allowing family members to apply for reunification legally.

The program required DNA testing to prove a biological relationship with migrant children. As an HHS fact sheet noted, parents inside the U.S. would pay for the cost of testing up front and would "be reimbursed for testing costs ONLY if ALL claimed and tested biological relationships are confirmed by DNA test results."

The Trump administration ended the program in 2017.

For now, the tests being performed on immigrants caught up in Trump's "zero tolerance" policy are just another obstacle for mothers and fathers who have already faced plenty of them in order to be reunited with their children, Garcia said.

"Here's what I want from ORR: it's my understanding that DNA test results can be quick or slow, depending on whichever you want. So why don't you take the responsibility, ORR, and get this done quickly and get these kids back with their parents. Don't give me this, 'There's too many to do and it's going to take a while,' or 'There's a big long line,' because you're the one who took the kids away in the first place, so fix it."

**Justin Glawe**  🐦 @JustinGlawe
**Adam Rawnsley**  ✉ adam.rawnsley@thedailybeast.com

Got a tip? Send it to The Daily Beast here.

### Sponsored Stories

Recommended by



**How to Remove Dark Spots**
JUVETRESS



**These Underwear Styles Are Taking Over Men's Drawers**
GET.MEUNDIES.COM



**7 Surprising Facts About HIV**
HEALTHGRADES



**Living with HIV | Top 10 Questions About Living With HIV**
HEALTHGRADES



**If You Have Good Credit, This Card Is For You**
CREDIT.COM



**Chiropractors Baffled: Simple Stretch Relieves Years of Back Pain (Watch)**
HEALTHHACKTIPS.COM



**A Car Like No Other: The New Subaru Forester Explored**
EDMUNDS



**This Radical Woman Will Become The Next U.S. President in 2020**
ASSETS.STANSBERRYRESEARCH.COM

Politics  Entertainment  World News  Half Full  Arts and Culture  U.S. News  Tech  Hunt for the Cure  Science  Scouted  Travel

About  Contact  Tips  Jobs  Help  Privacy  Code of Ethics & Standards  Terms & Conditions  Copyright & Trademark  Sitemap

Advertise With Us

© 2018 The Daily Beast Company LLC

Exhibit S

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 9, 2018 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 1 of 7 |
|---|---|---|---|

Present: The Honorable    DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings: IN CHAMBERS - ORDER DENYING DEFENDANTS' "*EX PARTE* APPLICATION FOR LIMITED RELIEF FROM SETTLEMENT AGREEMENT" [435]**

On June 20, 2018, President Donald J. Trump issued an Executive Order requiring "[t]he Attorney General [to] promptly file a request with [this Court] to modify the [*Flores* Agreement], in a manner that would permit the Secretary [of Homeland Security], under present resource constraints, to detain alien families together throughout the pendency of criminal proceedings for improper entry or any removal or other immigration proceedings." *See* Affording Congress an Opportunity to Address Family Separation, Exec. Order No. 13841, 83 Fed. Reg. 29435, 29435 (June 20, 2018) [hereinafter Exec. Order No. 13841]. On June 21, 2018, Defendants filed an *Ex Parte* Application seeking the following "limited" relief: (1) an exemption from the *Flores* Agreement's release provisions so that Immigration and Customs Enforcement ("ICE") may detain alien minors who have arrived with their parent or legal guardian together in ICE family residential facilities, and (2) an exemption from the *Flores* Agreement's state licensure requirement. [Doc. # 435.] Defendants claim that such relief is warranted under Federal Rules of Civil Procedure 60(b)(5) and 60(b)(6). *See Ex Parte* Appl. at 10 [Doc. # 435-1].[1]

Although Defendants did not notice their *Ex Parte* Application for a hearing, they seek "a prompt hearing on [their] request for immediate relief, together with any additional proceedings the Court believes appropriate." *See id.* at 21. Plaintiffs filed an opposition to the *Ex Parte* Application [Doc. # 450], as did the American Civil Liberties Union ("ACLU") [Doc. # 451] and the City of Los Angeles, the City of Chicago, the City of New York, and the City & County of San Francisco ("The Cities") [Doc. # 453] as *amici curiae*.

Defendants' *Ex Parte* Application is a thinly veiled motion for reconsideration without any meaningful effort to comply with the requirements of Local Rule 7-18. On July 24, 2015,

---

[1] All page references herein are to page numbers inserted by the CM/ECF system.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 9, 2018 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 2 of 7 |
|---|---|---|---|

the Court denied Defendants' motion seeking to modify the *Flores* Agreement on the same grounds now raised anew in Defendants' *Ex Parte* Application. *See* Defs.' Motion to Amend at 13, 17–21, 27–28, 30–33 [Doc. # 120]; July 24, 2015 Order at 19–25 [Doc. # 177]; *Ex Parte* Appl. at 15–16 [Doc. # 435-1] (repeating Defendants' position that detaining family units in unlicensed family residential facilities deters others from unlawfully entering the country). In short, Defendants have run afoul of Local Rule 7-18 because the *Ex Parte* Application "repeat[s] . . . oral or written argument made in support of" the earlier Motion to Amend. C.D. Cal. L.R. 7-18.

Even if Local Rule 7-18 did not bar Defendants' *Ex Parte* Application, it would still fail under a Rule 60(b) analysis. The Court's July 24, 2015 Order analyzed in great detail the relevant *Flores* Agreement language and applicable legal authorities, responding to the same issues raised in Defendants' current *Ex Parte* Application. In the absence of a showing of changed circumstances that the parties could not have foreseen at the time of their Agreement, it is unnecessary to replow the same familiar territory. *See Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992) ("Ordinarily, . . . modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree. . . . [A] party seeking modification of a consent decree [under Rule 60(b)(5)] bears the burden of establishing that a significant change in circumstances warrants revision of the decree."); *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993) ("[Rule 60(b)(6)] is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment.").

At bottom, Defendants' arguments rest in part on the premise that the July 24, 2015 Order resulted in a "3 to 5-fold increase in the number of illegal family border crossings" because it led arriving families to believe that Defendants would rather release them than separate the children from their families. *See, e.g.*, *Ex Parte* Appl. at 3 [Doc. # 435-1]. Assuming *arguendo* that Defendants' representations regarding the increase in border crossings are correct (*i.e.*, 68,445 apprehensions in 2014; 39,838 in 2015; 77,674 in 2016; and 75,622 in 2017), they do not establish that the Court's July 24, 2015 Order in any way caused this "surge." *See id.* at 3, 9. Defendants' reasoning suffers from the "'logical fallacy of *post hoc, ergo propter hoc*' . . . literally, 'after this, therefore because of this[.]'" *See Kozulin v. INS*, 218 F.3d 1112, 1117 (9th Cir. 2000) (quoting *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000)). Any number of other factors could have caused the increase in illegal border crossings, including civil strife, economic degradation, and fear of death in the migrants' home countries. *See, e.g.*, Govindaiah Decl. at ¶¶ 1–3 (between July 1, 2017 and June 16, 2018, RAICES provided legal assistance to 5,177 family units detained at Karnes County Residential Center; approximately 5,000 of those family units received positive credible fear determinations from an asylum officer

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 9, 2018 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 3 of 7 |

or an immigration judge) [Doc. # 451-1]; Adam Cox & Ryan Goodman, *Detention of Migrant Families as "Deterrence": Ethical Flaws & Empirical Doubts*, justsecurity.org (June 22, 2018), https://www.justsecurity.org/58354/detention-migrant-families-deterrence-ethical-flaws-empirical-doubts/ (concluding that "there's not even a correlational relationship between [the July 24, 2015 Order] and family migration," and pointing out that the apprehension patterns for accompanied and unaccompanied minors after the decision did not differ from one another). As it did before, the Court finds Defendants' logic "dubious" and unconvincing.[2] *See* July 24, 2015 Order at 11 [Doc. # 177].

Moreover, the *Flores* Agreement has required accompanied minors to be placed in licensed facilities since 1997. *See Flores* Agreement at ¶ 19 [Doc. # 101]. Defendants did not request an alteration of their legal obligations until many years later in 2015 and again now. The Court's July 24, 2015 Order merely reaffirmed Defendants' pre-existing obligations under the Agreement, and could not have caused the surge in border crossings any more than the implementation of the *Flores* Agreement itself caused the numerous surges that occurred after 1997. *See Ex Parte* Appl. at 3 [Doc. # 435-1].

Additionally, the relief Defendants seek is improper because their proposed modifications are not "*suitably* tailored to the changed circumstance[,]" if any. *Rufo*, 502 U.S. at 391 (emphasis added). Instead, Defendants seek to light a match to the *Flores* Agreement and ask this Court to upend the parties' agreement by judicial fiat.

The *Flores* Agreement allows Defendants up to **five days** to place minors in licensed programs if they are apprehended in districts that do not have those programs, or "as expeditiously as possible" if there is an "influx of minors into the United States[.]" *See Flores* Agreement at ¶ 12.A. In 2015, the Court found that the *Flores* Agreement could accommodate Defendants' request for a 20-day deadline during an influx.[3] Yet, Defendants now seek to hold

---

[2] Because Defendants fail to show that the *Flores* Agreement and the July 24, 2015 Order are responsible for the so-called "surge" in illegal family border crossings, the Court need not address Plaintiffs' and the ACLU's argument that general deterrence is not a permissible purpose of civil detention. *See* Pls.' Opp'n at 11 [Doc. # 450]; ACLU's Opp'n at 8–11 [Doc. # 451]; *see also* July 24, 2015 Order at 24 n.11 (declining to address this issue because Defendants failed to show that detaining families would deter future illegal border crossings) [Doc. # 177].

[3] Paragraph 12.A provides in pertinent part that "[t]he INS will transfer a minor . . . to a [licensed program] . . . within five (5) days [if the minor is apprehended in a district that does not have a licensed program with space available], except . . . in the event of an emergency or influx of minors into the United States, in which case the INS shall place all minors [into licensed placements] as expeditiously as possible[.]" The Court previously observed that, during an influx, a 20-day delay in placement may comply with Paragraph 12.A if that is "as fast as Defendants, in good faith and in the exercise of due diligence, can possibly go in screening family members for

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 9, 2018 |
|----------|----------------------------|------|--------------|

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 4 of 7 |
|-------|-----------------------------------------------------------------|------|--------|

minors in *indefinite* detention in unlicensed facilities, which would constitute a fundamental and material breach of the parties' Agreement. *Cf. Flores v. Lynch*, 828 F.3d 898, 910 (9th Cir. 2016) (holding that exempting accompanied minors from the *Flores* Agreement was not a suitably tailored response to the influx in family units crossing the border).

Defendants also assert that "families frequently fail to appear at the required proceedings" if they are released from custody. *See Ex Parte* Appl. at 2–3 (citing Homan Decl. at ¶ 30 (attesting that from July 2014 to July 2015, there were 41,297 cases involving family apprehensions and 11,976 removal orders issued *in absentia*) [Doc. # 184-1]) [Doc. # 435-1]. *But see* Ingrid Eagly, *et al.*, *Detaining Families: A Study of Asylum Adjudication in Family Detention*, 106 Calif. L. Rev. 785, 847–48 (2018), *available at* http://www.californialawreview.org/wp-content/uploads/2018/06/4-Eagly_Shafer_Whalley.pdf (Executive Office of Immigration Review data shows that between 2001 and 2016, 86% of family detainees attended all of their court hearings). The evidentiary record is unclear as to the accuracy of Defendants' assertion. Even assuming Defendants are correct, however, this risk was plainly contemplated by the parties when they executed the *Flores* Agreement in 1997. *See, e.g.*, *Flores* Agreement at ¶ 24.A (providing that a minor in deportation proceedings shall be afforded a bond redetermination hearing). It does not support a blanket non-release policy or warrant the Agreement's modification or abrogation.

After submitting their *Ex Parte* Application, Defendants filed a "Notice of Compliance[,]" wherein they contend that a preliminary injunction recently entered in *Ms. L v. U.S. Immigration & Customs Enforcement*, No. CV 18-0428 DMS (MDD), 2018 WL 3129486 (S.D. Cal. June 26. 2018), allows them to nullify the release and state licensure provisions of the *Flores* Agreement. *See* Notice of Compl. at 5–8 [Doc. # 447]. *Ms. L* concluded that a class of certain parents would likely succeed on the merits of their due process challenge to the "practice of separating [certain parents] from their minor children, and failing to reunify [parents] with those children, without any showing the parent is unfit or presents a danger to the child[.]" *See Ms. L*, 2018 WL 3129486, at *7. The District Court ordered ICE and other governmental officers and agencies to reunite these parents with their children (the former of whom were in Department of Homeland Security ("DHS") custody) within 14 to 30 days of that Order, unless (*inter alia*) "the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child in DHS custody." *See id.* at *11–12.

---

reasonable or credible fear[.]" *See* Order re Resp. to Order to Show Cause at 10 [Doc. # 189]. The 20-day deadline arose from Defendants' *own* request for that additional time to comply with their contractual obligations during an influx. *See* Def.'s Resp. to Order to Show Cause at 14, 23–24, 34 n.33 [Doc. # 184].

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 9, 2018 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 5 of 7 |

Defendants advance a tortured interpretation of the *Flores* Agreement in an attempt to show that the *Ms. L* preliminary injunction permits them to suspend the *Flores* release and licensure provisions. They claim that detaining *Flores* Class Members with their parents complies with Paragraph 14's command that Class Members be "release[d] from . . . custody *without unnecessary delay*" because separating a Class Member from a parent would violate the *Ms. L* Order. *See* Notice of Compl. at 6 (emphasis in original) (quoting *Flores* Agreement at ¶ 14 [Doc. # 101]) [Doc. # 447]. Similarly, Defendants contend that indefinite detention in ICE unlicensed family residential facilities is consistent with: (1) their obligation to transfer minors to licensed placements "as expeditiously as possible" if there is an influx of minors, and (2) Paragraph 12.A's proviso that such transfer is unnecessary when "any court decree or court-approved settlement" provides otherwise. *See id.* at 7 n.1 (quoting *Flores* Agreement at ¶ 12.A.2–3 [Doc. # 101]). The Court rejects this strained construction of the *Flores* Agreement it renders meaningless paragraph 12.A (deadlines for transfers to licensed placements), paragraph 14 (persons to whom Class Members may be released), paragraph 18 (efforts toward release and reunification), and paragraph 19 (placement of Class Members in licensed programs).[4]  *See Pinel v. Aurora Loan Servs., LLC*, 814 F. Supp. 2d 930, 943 (N.D. Cal. 2011) ("Courts must interpret contractual language in a manner [that] gives force and effect to every provision, and not in a way [that] renders some clauses nugatory, inoperative or meaningless." (alteration in original) (quoting *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 473 (1998))); *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) ("[T]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." (internal quotation marks omitted) (quoting *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992))).

To the extent Defendants claim that the *Ms. L* Order supports their request for modification, their argument fares no better because they have not shown that *Ms. L* required Defendants to violate the *Flores* Agreement or that compliance with the *Ms. L* Order would "directly conflict" with the *Flores* Agreement's release and state licensure provisions. *See Flores v. Sessions*, 862 F.3d 863, 874 (9th Cir. 2017) (noting that this is the standard for modifying a decree on change of law grounds). Absolutely nothing prevents Defendants from reconsidering their current blanket policy of family detention and reinstating prosecutorial discretion. *See* Exec. Order No. 13841, 83 Fed. Reg. at 29435; *see also* 8 U.S.C. § 1226(a)(2)(A) (providing that the Attorney General has the discretion to release certain aliens

---

[4] There is yet another flaw in Defendants' reasoning—*i.e.*, they seek to indefinitely detain *all* migrant children who have arrived with their parents or legal guardians, *see Ex Parte* Appl. at 21 [Doc. # 435-1], even though the *Ms. L* preliminary injunction by its terms excludes a number of family units from its scope, including those who are subject to Executive Order 13841, *see Ms. L*, 2018 WL 3129486, at *3 n.5.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 9, 2018 |
| --- | --- | --- | --- |

| Title | *Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.* | Page | 6 of 7 |
| --- | --- | --- | --- |

on a bond of at least $1,500); 8 U.S.C. § 1182(d)(5)(A) (providing that the Attorney General has the discretion to parole certain aliens).

Further, detained parents who are entitled to reunification under the *Ms. L* Order may "affirmatively, knowingly, and voluntarily decline[] to be reunited" with their children, *see Ms. L.*, 2018 WL 3129486, at *11, and all parties admit that these parents may also affirmatively waive their children's rights to prompt release and placement in state-licensed facilities, *see* Notice of Compl. at 9 ("[P]laintiffs in this case have always *agreed* that detention of the family together is permissible if the parent consents." (emphasis added)) [Doc. # 447]; Pls.' Opp'n to *Ex Parte* Appl. at 7 (asserting that Class Members' have the right—"*subject to opt out by a parent*—to be released or placed under the terms of the Agreement" (emphasis added)) [Doc. # 450]; *see also Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204 (9th Cir. 2005) ("[T]he right of parents to make decisions concerning the care, custody, and control of their children is a fundamental liberty interest protected by the Due Process Clause."); *Wyler Summit P'ship v. Turner Broad. Sys.*, 135 F.3d 658, 662 (9th Cir. 1998) ("It is a well settled maxim that a party may waive the benefit of any condition or provision made in his behalf, no matter to what manner it may have been made or secured." (emphasis omitted) (quoting *Knarston v. Manhattan Life Ins. Co.*, 140 Cal. 57, 63 (1903))); *Jeffrey Kavin, Inc. v. Frye*, 264 Cal. App. 4th 35, 45 (2012) ("It is well settled a contracting party may waive conditions placed in a contract solely for that party's benefit." (quoting *Sabo v. Fasano*, 154 Cal. App. 3d 502, 505 (1984)) (internal quotation marks omitted)). Given the situation arising from Defendants' earlier family separation policy, detained parents may choose to exercise their *Ms. L* right to reunification or to stand on their children's *Flores* Agreement rights. Defendants may not make this choice for them.[5]

Lastly, Defendants have known for *years* that there is "no state licensing readily available for facilities that house both adults and children." *See* Defs.' Motion to Amend at 32 (filed on Feb. 27, 2015) [Doc. # 120]. Yet, Defendants have not shown that they made any efforts to resolve this issue since July 2015, let alone 1997, nor have they demonstrated that any such attempt would be futile. To the contrary, certain local governments charged with enforcing state child welfare laws have indicated their "strong interest . . . in the continued licensed regulation of Defendants' child welfare programs." *See* The Cities' Opp'n at 13 [Doc. # 453]. Given that the *Flores* Agreement has "unambiguously applie[d] both to accompanied and unaccompanied minors" for over 20 years, *see Flores*, 828 F.3d at 901, Defendants cannot now complain that the

---

[5] The Court also observes that there is no inconsistency between the *Flores* Agreement and Executive Order No. 13841. *See* Exec. Order No. 13841, 83 Fed. Reg. at 29435 ("The Secretary of Homeland Security . . . shall, *to the extent permitted by law* . . . maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members." (emphasis added)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544-DMG (AGRx)** | Date | July 9, 2018 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jefferson B. Sessions, III, et al.*** | Page | 7 of 7 |
|---|---|---|---|

Agreement leaves them no choice but to separate parents from their children and violate the *Ms. L* Order.

It is apparent that Defendants' Application is a cynical attempt, on an *ex parte* basis, to shift responsibility to the Judiciary for over 20 years of Congressional inaction and ill-considered Executive action that have led to the current stalemate. The parties voluntarily agreed to the terms of the *Flores* Agreement more than two decades ago. The Court did not force the parties into the agreement nor did it draft the contractual language. Its role is merely to interpret and enforce the clear and unambiguous language to which the parties agreed, applying well-established principles of law. Regardless, what is certain is that the children who are the beneficiaries of the *Flores* Agreement's protections and who are now in Defendants' custody are blameless. They are subject to the decisions made by adults over whom they have no control. In implementing the Agreement, their best interests should be paramount.

In sum, Defendants have not shown that applying the *Flores* Agreement "prospectively is no longer equitable[,]" *see* Fed. R. Civ. P. 60(b)(5), or that "manifest injustice" will result if the Agreement is not modified, *see United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993). Of course, the parties are always free to meet and confer regarding any contractual amendments on which they can mutually agree. This is basic contract law.

In light of the foregoing, the Court **DENIES** the *Ex Parte* Application because it is procedurally improper and wholly without merit.

**IT IS SO ORDERED**.

Exhibit T



# Exhibit U

**POLITICO**

# POLITICO





## Trump's solution for reunifying migrant families: 'Don't come to our country illegally'

By **LOUIS NELSON** | 07/10/2018 09:23 AM EDT

President Donald Trump said Tuesday that the solution to the government's failure to meet a deadline for reunifying separated undocumented parents with their children is for such migrants to stop entering the U.S. illegally in the first place.

"Well, I have a solution. Tell people not to come to our country illegally. That's the solution. Don't come to our country illegally. Come like other people do. Come legally," he told reporters on the White House's south lawn Tuesday morning as he departed for his

weeklong trip to Europe. "I'm saying this very simply: We have laws. We have borders. Don't come to our country illegally. It's not a good thing."

The president and his administration have come under heavy bipartisan criticism in recent weeks over their policy of referring for criminal prosecution all people crossing the border illegally, a practice that led to the separation of thousands of children from their parents. After initially defending the practice and falsely insisting that only Congress could end it, the president bowed to public pressure and signed an executive order mandating that families be kept together.

## The most reliable politics newsletter.

Sign up for POLITICO Playbook and get the latest news, every morning — in your inbox.

| Your email... |
|---|

By signing up you agree to receive email newsletters or alerts from POLITICO. You can unsubscribe at any time.

Despite the president's order, the status of the already separated families remains unclear, and the Trump administration on Monday missed a court-mandated deadline for reunifying roughly 100 children under the age of 5 with their parents. Sen. Ron Johnson (R-Wis.), who chairs the Senate Homeland Security Committee, told CNN on Monday that the lack of progress on reunifying families "boggles my mind."

The family separations have prompted calls from some Democrats to abolish U.S. Immigration and Customs Enforcement, the agency whose charges include deportations. Trump, in his Tuesday morning remarks to reporters, slammed calls to do away with ICE.

"The people that are fighting ICE, it's a disgrace. These people go into harm's way. There is nobody under greater danger than the people from ICE," he said. "We ought to support ICE, not do what the Democrats are doing. Democrats want open borders, and they don't mind crime. We want no crime, and we want borders where borders mean something, all right?"

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

RSS

Site Map


Terms of Service

Privacy Policy

_____

© 2018 POLITICO LLC

# Exhibit V

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

```
_____
                                        )
MS. L. AND MS. C.,                      )
                                        )CASE NO. 18CV0428-DMS
              PETITIONERS-PLAINTIFFS,   )
                                        )
VS.                                     )
                                        )SAN DIEGO, CALIFORNIA
U.S. IMMIGRATION AND CUSTOMS            )TUESDAY JULY 10, 2018
ENFORCEMENT ("ICE"); U.S. DEPARTMENT    ) 11:00 A.M. CALENDAR
OF HOMELAND SECURITY ("DHS"); U.S.      )
CUSTOMS AND BORDER PROTECTION ("CBP");  )
U.S. CITIZENSHIP AND IMMIGRATION        )
SERVICES ("USCIS"); U.S. DEPARTMENT     )
OF HEALTH AND HUMAN SERVICES ("HHS");   )
OFFICE OF REFUGEE RESETTLEMENT ("ORR"); )
THOMAS HOMAN, ACTING DIRECTOR OF ICE;   )
GREG ARCHAMBEAULT, SAN DIEGO FIELD      )
OFFICE DIRECTOR, ICE; ADRIAN P. MACIAS, )
EL PASO FIELD DIRECTOR, ICE; FRANCES M. )
JACKSON, EL PASO ASSISTANT FIELD        )
OFFICE DIRECTOR, ICE; KIRSTJEN NIELSEN, )
SECRETARY OF DHS; JEFFERSON BEAUREGARD  )
SESSIONS III, ATTORNEY GENERAL OF THE   )
UNITED STATES; L. FRANCIS CISSNA,       )
DIRECTOR OF USCIS; KEVIN K.             )
MCALEENAN, ACTING COMMISSIONER OF       )
CBP; PETE FLORES, SAN DIEGO FIELD       )
DIRECTOR, CBP; HECTOR A. MANCHA JR.,    )
EL PASO FIELD DIRECTOR, CBP;            )
ALEX AZAR, SECRETARY OF THE             )
DEPARTMENT OF HEALTH AND HUMAN          )
SERVICES; SCOTT LLOYD, DIRECTOR         )
OF THE OFFICE OF REFUGEE RESETTLEMENT,  )
                                        )
              RESPONDENTS-DEFENDANTS.   )
-----------------------------------------
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS
STATUS CONFERENCE

```
COUNSEL APPEARING:

FOR PLAINTIFF:                  LEE GELERNT, ESQ.
                                ACLU IMMIGRANT RIGHTS PROJECT
                                125 BROAD STREET 18TH FLOOR
                                NEW YORK, NEW YORK 10004

                                BADIS VAKILI, ESQ.
                                ACLU FOUNDATION OF SAN DIEGO
                                AND IMPERIAL COUNTIES
                                P.O. BOX 87131
                                SAN DIEGO, CALIFORNIA 92138

                                STEPHAN B. KANG, ESQ.
                                ACLU OF NORTHERN CALIFORNIA
                                39 DRUMM STREET
                                SAN FRANCISCO, CALIFORNIA 94111

FOR DEFENDANT:                  SARAH B. FABIAN, ESQ.
                                U.S. DEPARTMENT OF JUSTICE
                                OFFICE OF IMMIGRATION LITIGATION
                                P.O. BOX 868
                                BEN FRANKLIN STATION
                                WASHINGTON, DC 20044

                                ADAM L. BRAVERMAN
                                INTERIM UNITED STATES ATTORNEY
                                BY:  SAM BETTWY
                                ASSISTANT U.S. ATTORNEY
                                880 FRONT STREET
                                SAN DIEGO, CALIFORNIA 92101




REPORTED BY:                    LEE ANN PENCE,
                                OFFICIAL COURT REPORTER
                                UNITED STATES COURTHOUSE
                                333 WEST BROADWAY, ROOM 1393
                                SAN DIEGO, CALIFORNIA 92101
```

<u>1  SAN DIEGO, CALIFORNIA — TUESDAY, JULY 10, 2018 — 11:07 A.M.</u>

2                              *  *  *

3              **THE CLERK:**  NO. 1 ON CALENDAR, CASE NO.18CV0428,

4  MS. L. VERSUS U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; ON FOR

5  STATUS CONFERENCE.

6              **THE COURT:**  GOOD MORNING.

7              MAY I HAVE APPEARANCES, PLEASE?

8              **MR. GELERNT:**  GOOD MORNING, YOUR HONOR.  LEE

9  GELERNT, FROM THE ACLU, FOR PLAINTIFFS.

10             **MR. KANG:**  STEPHAN KANG, YOUR HONOR, FOR PLAINTIFFS.

11             **MR. BALAKRISHNAN:**  GOOD MORNING, YOUR HONOR. ANAND

12  BALAKRISHNAN FOR PLAINTIFFS.

13             **THE COURT:**  THANK YOU.

14             **MR. VAKILI:**  GOOD MORNING, YOUR HONOR.  BARDIS

15  VAKILI FOR PLAINTIFFS.

16             **MS. FABIAN:**  GOOD MORNING, YOUR HONOR.  SARAH

17  FABIAN, WITH THE DEPARTMENT OF JUSTICE, FOR DEFENDANTS.

18             **MR. STEWART:**  GOOD MORNING, YOUR HONOR.  SCOTT

19  STEWART FOR THE DEPARTMENT OF JUSTICE.

20             **THE COURT:**  THANK YOU.  AND GOOD MORNING.

21             I HAVE READ ALL OF THE BRIEFING THAT WAS SUBMITTED,

22  WHICH I APPRECIATE.

23             WHAT I WOULD LIKE TO DO IS PROVIDE A NUMBER OF

24  RULINGS FROM THE BENCH SO THAT THE PARTIES HAVE THE BENEFIT OF

25  THE COURT'S DETERMINATIONS AND CAN PROCEED ACCORDINGLY.  AND

 1   THEN I WILL ISSUE A SHORT WRITTEN ORDER LATER TODAY SETTING

 2   OUT THE DETERMINATIONS THAT I AM GOING TO MAKE IN A MOMENT.

 3          ON THE CLASS NOTICE ISSUE, I AM GOING TO ADOPT THE

 4   PLAINTIFFS' VERSION, SO THAT NOTICE MAY ISSUE IN ACCORDANCE

 5   WITH THE PLAINTIFFS' PROPOSAL.

 6          ON THE BALANCE OF THE ISSUES, I INTEND TO STAND ON

 7   THE DEADLINE ON MOST OF THE INDIVIDUALS WHO HAVE BEEN

 8   IDENTIFIED OF THE UNDER-FIVE GROUP, AND WOULD BE ADOPTING IN

 9   SIGNIFICANT PART A STREAMLINED APPROACH.

10          AND THE REASONS FOR THAT IS, WHEN ONE LOOKS TO THE

11   MANNER IN WHICH ICE MAKES THESE CONSIDERATIONS, SO IF WE STEP

12   BACK IN TIME AND WE LOOK AT THE CASES OF MS. L. AND MS. C.

13   SPECIFICALLY, THESE INDIVIDUALS GO INTO ICE DETENTION.  THEY

14   ARRIVE AS A FAMILY UNIT, AND ICE MAKES DETERMINATIONS AS TO

15   WHETHER TO KEEP THE FAMILY TOGETHER OR TO SEPARATE THEM.

16          AND WHEN THIS CASE WAS INITIATED, MR. ORTIZ, MARIO

17   ORTIZ, FILED A DECLARATION WITH THE COURT ON MARCH 15, 2018.

18   AND MR. ORTIZ IS A DETENTION OFFICER FOR THE SAN DIEGO

19   DISTRICT OF ICE, THE ENFORCEMENT AND REMOVAL OPERATIONS

20   DIVISION, SINCE 1996.  HE SET OUT IN HIS DECLARATION THE

21   PROCEDURES THAT ERO SAN DIEGO FAMILY UNIT CURRENTLY FOLLOWS.

22   AND THAT FAMILY UNIT ENDEAVORS TO DO PRECISELY WHAT WE ARE

23   TRYING TO DO IN A CONTEXT THAT IS IMPORTANT BECAUSE THE

24   CONTEXT, AGAIN, IS THE APPREHENSION OF FAMILY UNITS, AND THEN

25   A DETERMINATION AT THAT TIME WITH THE INFORMATION THAT IS

1   AVAILABLE AT THAT TIME WHETHER TO SEPARATE OR NOT.

2          AND WHAT HE SAYS IS THE FOLLOWING, AND I AM GOING TO

3   QUOTE FROM HIS DECLARATION IN PERTINENT PARTS:  WHEN ALIENS

4   WHO ENTER ICE CUSTODY CLAIM TO BE PARENT AND CHILD, THEY ARE

5   REFERRED TO THE FAMILY UNIT.  THE MISSION OF THE FAMILY UNIT

6   IS TO MAKE APPROPRIATE PLACEMENT DECISIONS FOR ALIENS

7   TRAVELING WITH CHILDREN WHO CLAIM FAMILY RELATIONSHIPS.  WHEN

8   ALIENS CLAIMING A PARENT-CHILD RELATIONSHIP ARE ENCOUNTERED,

9   MY UNIT'S PRIMARY CONSIDERATIONS ARE, FIRST, WHETHER THERE IS

10  ANY DOUBT ABOUT WHETHER THEY ARE PARENT AND CHILD AND, SECOND,

11  WHETHER THERE IS INFORMATION THAT CAUSES A CONCERN ABOUT THE

12  WELFARE OF THE CHILD SUCH AS THE ADULT HAVING A SIGNIFICANT

13  CRIMINAL HISTORY.  BASED ON THE INFORMATION AVAILABLE IN A

14  SPECIFIC CASE, IF THERE ARE NOT CONCERNS ABOUT THE FAMILY

15  RELATIONSHIP OR WELFARE OF THE CHILD, THE ALIENS MAY BE

16  DETAINED IN A FAMILY RESIDENTIAL CENTER OR, IF APPROPRIATE,

17  RELEASED TO A SPONSOR OR NONGOVERNMENT ORGANIZATION.  IF THERE

18  ARE CONCERNS, THE CHILD MAY BE TRANSFERRED TO O.R.R.

19          AND I THINK, GIVEN THE EVIDENCE BEFORE THE COURT,

20  THERE IS NO INDICATION THAT THIS PRACTICE THAT ICE HAS USED

21  FOR MANY YEARS HAS NOT WORKED SUCCESSFULLY.  THEY HAVE BEEN

22  MAKING THESE KINDS OF DETERMINATIONS FOR YEARS.  THEY HAVE NOT

23  BEEN SUBJECT TO THE TVPRA, WHICH IS AN ENTIRELY DIFFERENT

24  STATUTORY CONSTRUCT THAT IS DESIGNED FOR A DIFFERENT

25  SITUATION.

JULY 10, 2018

```
 1              THE TVPRA, AS WE HAVE DISCUSSED THROUGHOUT THIS

 2   LITIGATION, IT WAS PRINCIPALLY PROMULGATED TO DEAL WITH

 3   UNACCOMPANIED CHILDREN WHO CROSSED ON THEIR OWN, WERE

 4   APPREHENDED, AND THEN THE GOVERNMENT HAD TO TAKE CUSTODY AND

 5   CARE OF THOSE CHILDREN.

 6              AND IN FULFILLING THAT OBLIGATION IT WAS FUNCTIONING

 7   MUCH LIKE FOSTER CARE FACILITIES DO OR STATE AND COUNTY

 8   GOVERNMENTAL AGENCIES THAT ARE LOOKING AFTER THE WELFARE OF A

 9   CHILD, IT WAS FUNCTIONING AS A CHILD WELFARE AGENCY.  AND IN

10   MAKING PLACEMENTS OFTENTIMES THERE ARE NOT PARENTS AVAILABLE

11   BECAUSE THESE ARE CHILDREN WHO CAME OVER ON THEIR OWN, SO THEY

12   ARE LOOKING TO PLACE CHILDREN OFTENTIMES WITH NONPARENT

13   CUSTODIANS.  AND IT ONLY MAKES SENSE THAT THEY WOULD NEED TO

14   FULFILL THOSE OBLIGATIONS CAREFULLY, THROUGH A RELATIVELY

15   TIME-INTENSIVE PROCESS OF INTERVIEWING SPONSORS, LOOKING INTO

16   THE FAMILY SITUATION, RUNNING BACKGROUND CHECKS; ALL OF THOSE

17   THINGS THAT YOU WOULD EXPECT WHEN YOU PLACE A CHILD IN LIKE A

18   FOSTER HOME TYPE ENVIRONMENT.  THAT'S NOT THE CONTEXT HERE.

19              WHAT'S IMPORTANT TO RECOGNIZE IS THE CONTEXT IN

20   WHICH THE SEPARATIONS OCCURRED, AND THAT IS GOING BACK TO THE

21   CLASS DEFINITION THAT THESE ARE CHILDREN WHO ARRIVED WITH A

22   PARENT.

23              AND SO, NECESSARILY, THE DETERMINATION OUGHT TO BE,

24   AND IN PARTICULAR IN LIGHT OF THE CLAIMS IN THIS CASE THAT

25   THESE FAMILIES WERE IMPROPERLY SEPARATED, THE DETERMINATION
```

JULY 10, 2018

1    OUGHT TO BE WHETHER THERE IS ANYTHING ABOUT THE PARENT THAT

2    RENDERS THAT PARENT UNFIT OR A DANGER.  THIS, OF COURSE,

3    ASSUMES THEY ARE THE PARENT.  AND THOSE CONSIDERATIONS CAN BE

4    MADE CONSISTENT WITH WHAT ICE HAS BEEN DOING ALL ALONG.

5         IT IS NOT NECESSARY TO ADOPT WHOLESALE THE TVPRA AND

6    PLUG IT INTO THIS CONTEXT, WHICH IS COMPLETELY DISSIMILAR TO

7    THE UNACCOMPANIED MINOR SITUATION.

8         THE GOVERNMENT, BECAUSE OF THE MANNER IN WHICH THE

9    FAMILIES WERE SEPARATED, HAS AN AFFIRMATIVE OBLIGATION TO

10   REUNIFY, TO DO IT EFFICIENTLY AND TO DO IT SAFELY.  THE

11   CHILD'S INTEREST IS PARAMOUNT.  BUT IT CAN BE DONE WITHOUT A

12   WHOLESALE ADOPTION OF THE TVPRA PROCEDURES.

13        AND I AM MAKING THESE ASSUMPTIONS, GIVEN THE BENEFIT

14   OF THE BRIEFING, THAT WHAT IS AT ISSUE ARE A NUMBER OF POLICY

15   CONSIDERATIONS.  IT IS NOT THE STATUTE ITSELF, IT IS NOT

16   RULE-MAKING AUTHORITY.  SO THE COURT IS NOT INTERVENING IN ANY

17   WAY WITH A FEDERAL STATUTE OR RULES THAT HAVE BEEN PROMULGATED

18   THROUGH THE APA AND OTHER FORMALIZED PROCEDURES.  THESE ARE

19   POLICIES THAT THE HHS HAS ADOPTED, IS THE UNDERSTANDING I HAVE

20   FROM THE BRIEFING, TO FULFILL ITS MISSION UNDER THE TVPRA FOR

21   UNACCOMPANIED MINOR CHILDREN.

22        THAT'S THE ESSENTIAL BACKGROUND.

23        HERE THE PARTIES HAVE INDICATED THAT THERE IS ONLY

24   ONE STATUTORY PROVISION WHICH WOULD APPLY, AND THAT IS WHERE

25   THE TVPRA REQUIRES HOME STUDIES WHERE THERE ARE INDICATIONS OF

```
1    TRAFFICKING OR ABUSE UNDER 8, USC, SECTION 1232(C)(3)(B), AND
2    THAT WOULD BE LEFT UNINTERRUPTED BY TODAY'S PROCEEDINGS AND
3    THE INJUNCTION THAT IS IN PLACE.  AND IN ADDITION THOSE
4    CONSIDERATIONS, IF THERE IS EVIDENCE OF TRAFFICKING OR ABUSE,
5    THOSE PARENTS ARE NOT GOING TO BE IN THIS CLASS, IN ANY EVENT.
6              SO I THINK WHAT'S IN PLACE WITH THE CLASS DEFINITION
7    AND THE PROPOSALS THAT THE PLAINTIFFS HAVE SET OUT, BY AND
8    LARGE, AND THAT ICE HAS USED FOR MANY YEARS, IS COMPLETELY
9    CONSISTENT WITH THE GOALS OF THE TVPRA; BUT IS MUCH MORE
10   SUITABLE FOR THE SPECIFIC CONTEXT OF THIS CASE, AND THAT IS
11   FAMILY SEPARATION AT THE BORDER, FAMILY UNITS ARRIVING
12   TOGETHER.
13             WITH THAT BACKGROUND, LET ME RUN THROUGH THE AREAS
14   OF DISPUTE.  AND WITH AN INDICATION THAT THERE IS STILL MUCH
15   TIME LEFT TODAY, THAT THESE REUNIFICATIONS OCCUR.  THAT THESE
16   ARE FIRM DEADLINES, THEY ARE NOT ASPIRATIONAL GOALS.  AND AS
17   WE GO THROUGH I CAN BE MORE SPECIFIC AS TO WHO IS IN THE CLASS
18   AND WHO IS NOT, AND WHICH PARENTS AND CHILDREN WE WOULD BE
19   FOCUSING ON FOR PURPOSES OF REUNIFICATION TODAY.
20             THE FIRST AREA OF DISPUTE RELATES TO DNA.  THE
21   GOVERNMENT IS INDICATING THAT IT WOULD LIKE TO TAKE DNA CHEEK
22   SWABS FROM EVERYONE.
23             AND HERE THAT RELATES -- ACCORDING TO THE PRESENT
24   NUMBERS, 34 FAMILIES ARE READY TO BE REUNITED TODAY.  17
25   OTHERS ARE LIKELY TO BE REUNITED.  16 ARE PENDING CONFIRMATION
```

 1   OF PARENTAGE, AND SO THAT MAY BE THE GROUP THAT THIS DNA

 2   TESTING RELATES TO.

 3            BUT AS TO THAT AREA OF DISPUTE, I WOULD PERMIT DNA

 4   TESTING, WHEN NECESSARY, WHEN THERE IS A LEGITIMATE, GOOD

 5   FAITH CONCERN ABOUT PARENTAGE, OR IF THERE IS A LEGITIMATE

 6   CONCERN THAT THE GOVERNMENT WILL NOT MEET THE REUNIFICATION

 7   DEADLINE, AND THAT MAY BE THE SITUATION WE ARE HERE IN TODAY.

 8   THEN THE GOVERNMENT, WITH THE CONSENT OF THE PARENT, CAN TAKE

 9   A DNA SAMPLE, SUBJECT TO THE PROTECTIVE ORDER THAT IS PROPOSED

10   BY THE PARTIES.

11            I THINK THE PROTECTIVE ORDER COMPLETELY PROVIDES THE

12   NECESSARY PROTECTION WITH RESPECT TO HOW DNA SAMPLING MAY BE

13   USED.  THERE HAS TO BE CONSENT BY THE PARENT, AND THEN THE

14   SAMPLING IS DESTROYED WITHIN SEVEN DAYS AND IT IS NOT USED FOR

15   ANY OTHER PURPOSE.

16            SO WITH THAT, IT SEEMS TO ME THAT IF THE GOVERNMENT

17   IS USING THE DNA TESTING ONLY WHEN NECESSARY AND/OR WHEN

18   NECESSARY TO MEET COURT-IMPOSED DEADLINES, THAT IT MAY BE

19   DONE, SUBJECT TO THE PROTECTIVE ORDER.

20            **MS. FABIAN:**  CAN I ASK A POINT OF CLARIFICATION?

21            **THE COURT:**  LET ME RUN THROUGH THESE, AND THEN WE

22   CAN GO BACK AND CLARIFY AS NECESSARY.

23            THE SECOND AREA RELATES TO RESTRICTIONS ON HHS

24   INFORMATION-GATHERING ABOUT CHILD WELFARE.

25            HERE, I WOULD ADOPT A STREAMLINE APPROACH, NOT THE

10

1   TVPRA STANDARD.  THAT, IN THIS CONTEXT, IS BACKWARDS, BECAUSE

2   THE TVPRA, FROM ITS INCEPTION, IS ALL ABOUT A CUSTODIAN

3   APPLYING AND SEEKING APPROVAL TO BE A SPONSOR OR A RECOGNIZED

4   CUSTODIAN; THIS IS NOT THAT SITUATION.

5           THE GOVERNMENT HAS AN OBLIGATION TO REUNIFY CHILD

6   WITH PARENT.  THE IDEA OF AN APPLICATION PROCESS DOESN'T FIT

7   IN THIS CONTEXT.  THE PARENT HAS A RIGHT TO BE REUNIFIED AND

8   IT IS THE GOVERNMENT'S OBLIGATION TO MAKE IT SO, UNLESS THERE

9   ARE ISSUES OF FITNESS OR DANGER.

10          SO ON ADDITIONAL INFORMATION-GATHERING, THAT WOULD

11  NOT BE NECESSARY IN THE UNIQUE CONTEXT OF THIS CASE.  THIS IS

12  NOT THE ORDINARY TVPRA TYPE OF CASE.

13          IN ADDITION, IF THE GOVERNMENT IS AWARE OF

14  INFORMATION BEFORE THE COURT-IMPOSED DEADLINE THAT RAISES

15  ISSUES OF FITNESS OR DANGER -- AND THERE ARE MANY EXAMPLES

16  THAT HAVE BEEN SET OUT IN THE PARTIES' FILINGS TODAY OF

17  PARENTS THAT PRESENT ISSUES OF FITNESS OR DANGER --

18  REUNIFICATION DOES NOT HAVE TO OCCUR TODAY.  THE GOVERNMENT

19  CAN WITHHOLD REUNIFICATION, AGAIN ASSUMING ABSOLUTE GOOD FAITH

20  AND ARTICULABLE REASONS FOR IT.  AND THAT INFORMATION IS

21  THEN -- WILL THEN BE IMMEDIATELY PROVIDED TO PLAINTIFFS'

22  COUNSEL SO THAT THEY HAVE AN OPPORTUNITY TO CONTEST THE

23  GOVERNMENT'S DETERMINATION.

24          AND I WILL COME TO THE PROCESS BY WHICH WE WILL

25  RESOLVE ANY OF THESE DISPUTES, BUT I AM OPTIMISTIC THAT MOST

JULY 10, 2018

```
1   ALL WILL RESOLVE THROUGH THE MEET-AND-CONFER PROCESS.

2           THE THIRD AREA RELATES TO BACKGROUND CHECKS ON OTHER

3   ADULTS IN THE HOUSEHOLD.  THIS GOES TO THIS IDEA OF IF WE ARE

4   GOING TO PLACE AN UNACCOMPANIED MINOR WHO SHOWED UP ON HIS OWN

5   AND WAS APPREHENDED, WE ARE NOT GOING TO PUT HIM OR HER IN A

6   HOME UNLESS WE KNOW ABOUT EVERYONE IN THE HOME.

7           THAT IS VERY DIFFERENT FROM THE GOVERNMENT NEEDING

8   TO RETURN A CHILD TO HIS OR HER PARENT, ASSUMING THE PARENT IS

9   FIT AND NOT A DANGER.  THESE PARENTS ARE RESPONSIBLE FOR THEIR

10  OWN CHILDREN, AND MANY OF THESE DETERMINATIONS, WE MUST

11  ASSUME, ARE SUBJECT TO THE PARENTS' JUDGMENT AND

12  CONSIDERATION.

13          SO I WOULD ADOPT A STREAMLINE APPROACH HERE.

14          AND THERE MAY BE INDIVIDUALS -- THE GOVERNMENT HAS

15  IDENTIFIED SEVERAL PUTATIVE CLASS MEMBERS WHO HAVE CRIMINAL

16  HISTORY:  ONE IS ALIEN SMUGGLING, ANOTHER IS CHILD

17  ENDANGERMENT, ANOTHER IS NARCOTICS TRAFFICKING, ANOTHER HAS A

18  PENDING OR AN ALLEGED HOMICIDE.  THESE INDIVIDUALS FALL

19  OUTSIDE OF THE CLASS.  SO THE CLASS DEFINITION WILL

20  NECESSARILY ADDRESS MANY OF THE GOVERNMENT'S LEGITIMATE

21  CONCERNS ABOUT PROTECTING THE WELFARE OF CHILDREN.

22          AND IF THE GOVERNMENT HAS SPECIFIC INFORMATION THERE

23  IS -- FOR EXAMPLE, THERE IS AN IDENTIFICATION OF A PARENT, A

24  SITUATION WHERE AN INDIVIDUAL IN ONE OF THE HOUSEHOLDS HAS AN

25  OUTSTANDING WARRANT FOR AGGRAVATED CRIMINAL SEXUAL ABUSE.  THE
```

JULY 10, 2018

1    GOVERNMENT HAS A LOT OF INFORMATION, A LOT OF RESOURCES

2    AVAILABLE.  WHEN THAT KIND OF INFORMATION COMES FORWARD THERE

3    IS NOT A NEED TO REUNIFY.  THAT WOULD BE AN EXAMPLE OF THE

4    GOVERNMENT PROPERLY WITHHOLDING REUNIFICATION, ADDRESSING IT

5    WITH PLAINTIFFS' COUNSEL.  AND THEN, IF NECESSARY, IF IT

6    CANNOT BE RESOLVED BETWEEN THE PARTIES, BRINGING IT TO THE

7    ATTENTION OF THE COURT FOR RESOLUTION.

8          BUT THE TVPRA PROCESS OF THE FULL BACKGROUND CHECK

9    OF EVERYONE IN THE HOUSEHOLD IS NOT NECESSARY UNDER THESE

10   UNIQUE CIRCUMSTANCES.

11         NUMBER FOUR IS PROOF OF ADDRESS, SPONSOR CARE PLANS,

12   AND ALTERNATE CAREGIVERS.  THERE IS NO OBJECTION.  MANY OF

13   THESE AREAS ARE NOT OBJECTED TO IN PART.  HERE THERE IS NO

14   OBJECTION TO PROVIDING PROOF OF ADDRESS BUT THERE IS OBJECTION

15   TO A SPONSOR CARE PLAN.  AND I WOULD AGREE OR SUSTAIN THAT

16   OBJECTION.

17         HERE AGAIN, THE PARENTS ARE NOT APPLYING FOR -- THEY

18   DON'T HAVE TO PROVE THAT THEY ARE GOING TO BE A GOOD SPONSOR.

19   WHAT THE GOVERNMENT HAS TO LOOK TO IS WHETHER THE PARENT IS

20   UNFIT OR A DANGER, SO IT IS GOING ABOUT IT A DIFFERENT WAY.

21         THE TVPRA, WITH RESPECT TO THESE INDIVIDUAL CLASS

22   MEMBERS, IS BACKWARDS.  AND FOR THOSE REASONS I WOULD AGREE

23   WITH PLAINTIFFS ON A STREAMLINED APPROACH.

24         AND HERE AGAIN, IF THERE IS ANY INFORMATION THAT THE

25   GOVERNMENT HAS THAT GIVES CONCERNS, IT CAN BE PROPERLY BROUGHT

JULY 10, 2018

1  TO THE ATTENTION OF PLAINTIFFS' COUNSEL AND THE COURT AT A

2  LATER TIME.

3         THE FIFTH AREA RELATES TO LEGAL ORIENTATION AND

4  SPONSOR CARE AGREEMENT.  THERE IS NO OBJECTION TO ATTENDING

5  LEGAL ORIENTATION PROGRAMS AND/OR SIGNING A SPONSOR CARE

6  AGREEMENT SO LONG AS IT DOES NOT DELAY REUNIFICATION.  AND I

7  AGREE WITH THAT.

8         SO REUNIFICATION WOULD BE PRIMARY, AND THEN SIGNING

9  ON TO LEGAL ORIENTATION AND SPONSOR CARE AGREEMENTS CAN BE

10 DONE AT A LATER TIME, AFTER REUNIFICATION.

11        THE FINAL AREA IS WHERE A CHILD MAY PRESENT A DANGER

12 TO HIM OR HERSELF OR TO OTHERS.

13        THIS IS NOT A CONCERN FOR CHILDREN UNDER AGE FIVE,

14 IT IS A CONCERN FOR CHILDREN OVER AGE FIVE.  AND PROBABLY THE

15 TARGET GROUP HERE WOULD BE CHILDREN OVER AGE 12.  BUT I WOULD

16 INVITE THE PARTIES TO MEET AND CONFER ON THAT.

17        HERE AGAIN, IF THE GOVERNMENT HAS ARTICULABLE

18 REASONS OF A CHILD -- AND WHAT COMES TO MIND WOULD BE A

19 TEENAGER WHO PRESENTS A DANGER TO HIMSELF OR OTHERS.  THE

20 GOVERNMENT OUGHT TO BE FREE TO MAKE THOSE DETERMINATIONS,

21 PROPERLY SO, AND TO KEEP THAT CHILD IN SECURE CUSTODY, NOT BE

22 REUNIFIED.

23        BUT HERE AGAIN WHAT I WOULD EXPECT IS THE PARTIES

24 MEET AND CONFER.  THERE WOULD LIKELY BE AGREEMENT.  IF NOT,

25 THE PARTIES CAN BRING THE MATTER TO THE COURT'S ATTENTION.

JULY 10, 2018

14

```
 1   AND AS FAR AS THE PROCESS, I WOULD LIKE THE PROCESS TO
 2   CONTINUE, OF COURSE, AS EXPEDITIOUSLY AS IT HAS BEEN.  AND OF
 3   COURSE WITH A PARAMOUNT FOCUS BEING ON THE CHILDREN'S WELFARE.
 4   BUT THAT CAN BE DONE IN THE MANNER WHICH THE COURT HAS
 5   ADDRESSED THESE ISSUES.
 6         IT IS IMPORTANT THAT COUNSEL BE AVAILABLE FROM HERE
 7   THROUGH THE REUNIFICATION PROCESS.  THE COURT WILL BE
 8   AVAILABLE.  I WOULD LIKE TO CONTINUE TO HAVE REGULAR STATUS
 9   REPORTS AND STATUS CONFERENCES.  AND I WOULD LIKE TO DO THAT
10   IN OPEN COURT.
11         IT DOESN'T HAVE TO BE YOU, MS. FABIAN, OR YOU, MR.
12   GELERNT, IT COULD BE SOME OF THESE ABLE BODIES NEXT TO YOU.
13   BUT I WOULD LIKE A PERSON IN COURT WHO CAN STAND UP AND MAKE
14   REPRESENTATIONS, AND OTHERS CAN PARTICIPATE TELEPHONICALLY.
15   BUT I WOULD LIKE TO DO THAT ON A REGULAR BASIS.
16         THERE IS A LOT OF WORK TO DO WITH RESPECT TO THE
17   OVER-FIVE GROUP.  AND I AM ANTICIPATING THAT A LOT OF THAT
18   WORK IS WELL UNDERWAY, AND IT WILL CONTINUE ALONG THE LINES
19   THAT WE HAVE SET OUT HERE WITH THE UNDER-FIVE GROUP.
20         WHAT I AM CONTEMPLATING IS THAT AS WE GO THROUGH
21   THIS PROCESS -- AND IT WOULD START WITH BOTH THE UNDER-FIVE
22   AND THEN THE OVER-FIVE GROUP -- IS WHERE THE PARTIES MEET AND
23   CONFER.  IF THERE IS SOME DISPUTE, YOU CAN SUBMIT BRIEFING UP
24   TO FIVE PAGES.  IT DOESN'T HAVE TO BE FANCY, IT CAN BE A
25   LETTER BRIEF.  IT CAN JUST GET RIGHT TO THE ISSUES SETTING OUT
```

JULY 10, 2018

15

```
1   THE PARTIES' BASIC POSITIONS.  I WOULD REQUEST A JOINT FILING

2   ON ANY DISPUTE, SO UP TO TEN PAGES TOTAL, FIVE AND FIVE.

3          AND THE COURT WOULD EITHER CONVENE A STATUS

4   CONFERENCE TELEPHONICALLY OR I WOULD SIMPLY RULE ON THE BRIEF

5   THAT IS SUBMITTED, AND WE CAN GO CASE BY CASE.

6          BUT I AM VERY OPTIMISTIC THAT THAT WILL BE SELDOMLY

7   USED.  THAT WOULD BE MY EXPECTATION.  EVERYONE IS ROWING IN

8   THE SAME DIRECTION HERE, AND IT IS JUST A MATTER OF, I THINK,

9   STREAMLINING THE PROCESS AND PROVIDING CLEAR DIRECTION AS TO

10  HOW THE GOVERNMENT WILL PROCEED.

11         I HAVE JUST A FEW FINAL COMMENTS, AND THEN WE CAN

12  ANSWER ANY QUESTIONS OR NEED FOR CLARIFICATION.

13         THERE ARE, DEPENDING ON HOW ONE COUNTS, EITHER 101

14  OR 102 IN THIS UNDER-FIVE GROUP.  BY MY COUNT, BASED ON

15  TODAY'S SUBMISSION, 75 OF THIS GROUP ARE ELIGIBLE FOR

16  REUNIFICATION.  63 ARE ELIGIBLE FOR REUNIFICATION TODAY.

17         14 PARENTS ARE NOT IN THE CLASS.  EIGHT HAVE

18  CRIMINAL HISTORY THAT PRECLUDES THEM, FIVE ARE NOT THE

19  PARENTS, AND ONE THE GOVERNMENT CLAIMS IT HAS CREDIBLE

20  EVIDENCE OF CHILD ABUSE AND IS THEREFORE A DANGER OR UNFIT AND

21  WOULD FALL OUTSIDE OF THE CLASS.  THAT'S 14.

22         THERE ARE 12 OTHERS THAT FALL -- WELL, THERE ARE TWO

23  OTHERS THAT PRESENTLY FALL OUT OF THE CLASS.  ONE IS

24  CHARACTERIZED AS PRESENTING A DANGER, ONE AS HAVING A

25  COMMUNICABLE DISEASE.  THE ONE WITH THE COMMUNICABLE DISEASE,
```

1    THE PARTIES RECOGNIZE WHEN THAT MATTER IS ADDRESSED, HOPEFULLY

2    SUCCESSFULLY FROM A MEDICAL STANDPOINT, THEN REUNIFICATION CAN

3    OCCUR AT AN APPROPRIATE TIME.

4         TEN MEMBERS OF THE CLASS ARE IN CRIMINAL CUSTODY,

5    STATE OR FEDERAL.  THEY ARE NOT ELIGIBLE FOR REUNIFICATION AT

6    THIS POINT IN TIME, BUT THEY WOULD BE ONCE THEY ARE RELEASED

7    TO ICE DETENTION.  SO THEY WOULD HAVE TO WAIT.

8         THERE ARE 12 THAT HAVE BEEN REMOVED.  THEY ARE PART

9    OF THE CLASS, THEY WOULD BE SUBJECT TO REUNIFICATION, BUT AT A

10   LATER TIME.  THAT REQUIRES A SEPARATE DISCUSSION, AND THERE

11   ARE MORE COMPLICATING ISSUES THAT HAVE TO BE ADDRESSED WITH

12   THOSE 12.  BUT THEY ARE PART OF THE CLASS AND THEY DO DESERVE

13   TO BE REUNITED, ABSENT THEIR CONSENT OTHERWISE.

14        SO THAT LEAVES 63.

15        THE GOVERNMENT HAS INDICATED -- AND TO RESTATE THIS.

16   OF THE GROUP OF 101 OR 102, 75 ARE SUBJECT TO BEING REUNITED.

17   12 OF THOSE ARE REMOVED AND WILL TAKE SOME TIME.

18        THERE ARE 63 THAT I WOULD LIKE TO FOCUS ON TODAY.

19        THE GOVERNMENT HAS INDICATED THAT 34 ARE READY, AND

20   THEY WILL BE REUNITED TODAY.

21        THERE ARE 17 OTHERS THAT ARE IN ICE DETENTION.  16

22   NEED CONFIRMATION OF PARENTAGE, AND ONE HAS CRIMINAL HISTORY

23   PENDING.

24        AND IT SEEMS TO ME WITH THE PROCEDURES SET OUT TODAY

25   THAT THOSE 17 CAN BE ADDRESSED AND REUNITED TODAY, OR WITHIN

1   THE IMMEDIATE PROXIMITY OF TODAY.

2          THERE ARE EIGHT THAT HAVE BEEN RELEASED FROM ICE,

3   AND IT SEEMS TO ME THAT THEY CAN BE REUNITED TODAY, AS WELL.

4          AND SO IN THAT REGARD WHAT I WOULD LIKE TO DO IS

5   MEET AGAIN THIS FRIDAY AT 1:00 O'CLOCK, WITH THE PARTIES TO

6   SUBMIT A STATUS REPORT THURSDAY BY 3:00 P.M., PACIFIC TIME,

7   GIVING AN UPDATE ON COMPLIANCE WITH THE UNDER-FIVE GROUP AND

8   GIVING A STATUS ON THE OVER-FIVE GROUP, WHICH IS -- THAT'S

9   GOING TO BE A SIGNIFICANT UNDERTAKING.  AND WE NEED TO HAVE

10  CONCRETE INFORMATION BY THURSDAY SO THAT MR. GELERNT AND

11  OTHERS CAN MAKE INTELLIGENT AND INFORMED DECISIONS AS TO

12  WHETHER THERE IS COMPLIANCE AND WHAT NEEDS TO BE DONE TO MAKE

13  REUNIFICATION HAPPEN.

14         WE NEED ANOTHER LIST OF THE OVER-FIVE GROUP.  THAT'S

15  GOING TO BE A SIGNIFICANT UNDERTAKING.  IT MAY BE AN

16  INDIVIDUAL LIST, IT MAY BE BY CATEGORY.  I WILL JUST SIMPLY

17  HAVE THE PARTIES MEET AND CONFER IN THAT REGARD.

18         IF THERE IS A FAILURE TO COMPLY WITH THE UNDER-FIVE

19  GROUP THEN, MR. GELERNT, WHAT I ASK THAT YOU DO IS PUT THAT IN

20  THE THURSDAY SUBMISSION AND WE CAN ADDRESS IT ON FRIDAY.  AND

21  IF YOU BELIEVE THERE IS A FAILURE TO COMPLY -- AND HERE I AM

22  REALLY FOCUSING ON THE 63.

23         **MR. GELERNT:**  RIGHT.

24         **THE COURT:**  IF THERE IS A FAILURE TO COMPLY I WOULD

25  LIKE TO KNOW WHAT IT IS AND WHAT YOU ARE SEEKING BY WAY OF

JULY 10, 2018

```
 1   REMEDY.
 2           AND WITH THAT, MR. GELERNT, DO YOU HAVE ANY
 3   QUESTIONS?
 4           MR. GELERNT:  I THINK THE GOVERNMENT MAY HAVE MORE
 5   QUESTIONS, YOUR HONOR.  THAT ALL SEEMS FINE TO US.  I THINK I
 6   HAD A COUPLE OF JUST CLARIFYING QUESTIONS.
 7           WHEN YOU WERE SAYING 101 OR 102 WAS THAT BECAUSE OF
 8   THE ONE CHILD WHO THEY HAVEN'T IDENTIFIED?
 9           THE COURT:  YES.  THANK YOU FOR MENTIONING THAT.
10           DO WE HAVE ANY -- THE INFORMATION YOU HAVE IS WHAT
11   THE GOVERNMENT PUT IN ITS LAST BRIEFING?
12           MR. GELERNT:  RIGHT.  AND WE ARE TRYING TO MOBILIZE
13   EVERYONE WE CAN JUST TO FIGURE IT OUT.
14           I DON'T KNOW IF THE GOVERNMENT HAS MORE INFORMATION
15   ABOUT THAT ONE CHILD THAT THEY GOT THIS MORNING THAT WE ARE
16   NOT AWARE OF.
17           THE COURT:  THERE WAS INFORMATION THAT THAT CHILD
18   MAY BE A U.S. CITIZEN.  IS THERE ANY ADDITIONAL INFORMATION?
19           MS. FABIAN:  MY UNDERSTANDING IS THE PARENT MAY BE A
20   U.S. CITIZEN AND THERE WAS A CRIMINAL HISTORY WITH THE PARENT.
21   BUT THAT -- BASED ON THAT IT MAY BE THAT THE CHILD IS ALSO A
22   U.S. CITIZEN.  SO THAT IS -- I THINK THE CLIENTS ARE LOOKING
23   INTO THAT.
24           SO IT MAY BE THAT THE PARENT IS NOT A CLASS MEMBER,
25   BUT IN ANY EVENT THEY ARE LOOKING INTO THE SITUATION WITH THE
```

JULY 10, 2018

19

```
 1    CHILD TO RESOLVE IT, EVEN OUTSIDE OF THIS LITIGATION.

 2         THE COURT:  IS THERE A LINK-UP; SO, IN OTHER WORDS,

 3    DO YOU KNOW WHO THE PARENT IS?

 4         MS. FABIAN:  YEAH.  I BELIEVE SO.  THAT THEY HAVE

 5    NOW IDENTIFIED THE PERSON THEY BELIEVE IS THE PARENT, AND THAT

 6    IS SORT OF -- THAT'S WHY WE WERE ABLE TO GIVE THE ADDITIONAL

 7    INFORMATION IN TODAY'S FILING.

 8         THE COURT:  SO ON THAT CHILD I WILL SIMPLY WAIT AND

 9    WE WILL ADDRESS IT ON FRIDAY.

10         MR. GELERNT:  THAT'S FINE, YOUR HONOR.

11         WE WOULD JUST ASK THAT YOU GIVE US AND LATEST

12    INFORMATION ON THAT, WHENEVER YOU HAVE IT.  OBVIOUSLY IF IT IS

13    A U.S. CITIZEN THEY SHOULD BE -- RIGHT.

14         MS. FABIAN:  SURE.  WE ARE LOOKING INTO THAT

15    SITUATION.  IT MAY NOT THEN BE INVOLVED IN THIS LITIGATION,

16    BUT BECAUSE WE ARE AWARE OF IT, OF COURSE WE WILL TRY TO

17    RESOLVE IT IN THE CORRECT WAY.

18         THE COURT:  YES.

19         MS. FABIAN:  AND IF THE CHILD IS A U.S. CITIZEN THEY

20    ARE NOT ELIGIBLE TO STAY IN O.R.R. CUSTODY SO THEY -- WE WOULD

21    DO THE PROPER PROCEDURE FOR A RELEASE.

22         THE COURT:  MS. FABIAN, ANY QUESTIONS ABOUT WHAT WE

23    HAVE COVERED?

24         MS. FABIAN:  I HAVE A COUPLE OF QUESTIONS.

25         THE COURT:  YES.
```

JULY 10, 2018

1          **MS. FABIAN:**  AND THEN MR. STEWART DOES -- WE HAVE

2    ONE ISSUE THAT WE WANTED TO RAISE TO THE COURT TODAY THAT HAS

3    COME UP IN LIGHT OF JUDGE GEE'S RULING IN THE FLORES CASE, SO

4    MR. STEWART WILL SPEAK TO THAT.

5          **THE COURT:**  YES.

6          **MS. FABIAN:**  BUT I WANTED TO RAISE A COUPLE OF

7    ISSUES JUST TO MAKE SURE THAT I AM UNDERSTANDING THE COURT'S

8    RULING.

9          THE DNA, YOUR HONOR HAD NOTED THAT IT SHOULD BE

10   CONDUCTED WHEN NECESSARY.  BASED ON THE DEADLINE OF TODAY, YOU

11   HAD ALSO EXPRESSED THAT IT COULD BE -- IT WOULD BE PERMISSIBLE

12   WHEN NECESSARY TO MEET THE DEADLINE.

13         FOR THE 16 WHO ARE STILL PENDING DNA THEY HAVE -- IT

14   IS MY UNDERSTANDING THAT THEY HAVE IN FACT BEEN TESTED BUT THE

15   TEST RESULTS HAVE NOT BEEN RECEIVED.

16         SO THE QUESTION -- I WANT TO CLARIFY THAT I

17   EXPECT -- SOME OF THOSE HAVE COME IN OVER THE COURSE OF THE

18   MORNING AND FOLKS HAVE MOVED INTO THE RELEASE-TODAY GROUP.  MY

19   EXPECTATION WOULD BE THAT WE WOULD CONTINUE TO DO THAT AS

20   THOSE RESULTS COME IN.  ASSUMING THAT THEY ARE POSITIVE, THAT

21   THEY WOULD MOVE INTO THAT GROUP.  THAT MIGHT BE TODAY, IT

22   MIGHT BE TOMORROW.  I WANTED TO CONFIRM THAT THAT IS

23   CONSISTENT WITH YOUR HONOR'S RULING TODAY.

24         **THE COURT:**  I AM ASSUMING THOSE ARE RELATIVELY

25   STRAIGHTFORWARD, SIMPLE TESTS, THAT THEY CAN BE PROVIDED OVER

JULY 10, 2018

```
 1   TO THE GOVERNMENT AND DETERMINATIONS CAN BE MADE TODAY.  IF
 2   THEY ARE PARENTS AND ALL OF THE OTHER CRITERIA ARE MET, THEN I
 3   WOULD EXPECT REUNIFICATION TODAY.
 4          IF THERE IS A FAILURE, THEN IT WOULD NEED TO BE
 5   ADDRESSED IN THE THURSDAY STATUS REPORT.  AND, OF COURSE, WHAT
 6   I AM LOOKING FOR IS GOOD FAITH, LEGITIMATE, ARTICULABLE
 7   REASONS FOR ANY FAILURE TO COMPLY.  AND SO THAT'S WHAT I WOULD
 8   BE SEEKING.
 9          MS. FABIAN:  AND IT IS MY UNDERSTANDING THERE IS
10   JUST SORT OF A TIME PERIOD BETWEEN WHEN THE SWABS ARE TAKEN
11   AND THEY ARE SENT TO THE COMPANY DOING THE TESTS.
12          THE COURT:  YES.
13          MS. FABIAN:  AND RECEIVING THE RESULTS.  SO WE HAVE
14   NOT RECEIVED RESULTS FOR THOSE 16.
15          THE COURT:  THEY NEED TO RESPOND.  SO THIS IS NOT AN
16   INVITATION FOR THEM TO TAKE TIME DOING THE SWAB, THEY CAN DO
17   IT, THEY CAN DO IT QUICKLY.
18          SO THEY NEED TO BE -- AND I AM SURE THEY ARE AWARE
19   OF THE DEADLINE.  SO I WOULD EXPECT THAT THESE TESTS WILL BE
20   PROVIDED TODAY; AND, IF NOT, THEN OF COURSE I WILL KEEP AN
21   OPEN MIND AS TO WHAT THE EXPLANATION IS.
22          MS. FABIAN:  OKAY.  I WILL FIND OUT WHAT THE DELAY
23   IS.
24          I GUESS THE CORE QUESTION IS, IF THEY ARE NOT
25   RECEIVED TODAY IS YOUR HONOR ORDERING THAT THOSE CHILDREN BE
```

JULY 10, 2018

1    RELEASED, REGARDLESS OF RECEIVING THOSE RESULTS TODAY, OR

2    WOULD YOU PREFER WAIT PENDING RESULTS BUT GIVE YOU AN

3    EXPLANATION FOR THAT DELAY?

4            **THE COURT:**  YES.  BECAUSE THE IMPORTANT THING IS NOT

5    TO LOSE SIGHT OF THE CRITERIA, AND I THINK THE CRITERIA ARE

6    VERY CLEAR, THEY ARE OBJECTIVE, AND THEY HAVE BEEN IN PLACE

7    SINCE THE INJUNCTION WAS ISSUED, ABOUT PARENTAGE, FITNESS,

8    DANGER.  THOSE CATEGORIES I THINK ARE CLEAR.

9            **MS. FABIAN:**  UNDERSTOOD, YOUR HONOR.

10           **MR. GELERNT:**  YOUR HONOR, COULD I JUST ADDRESS THAT?

11           **THE COURT:**  YES.

12           **MR. GELERNT:**  THE ONE THING WE WOULD ASK IS IT

13   SOUNDS -- I AM NOT SURE BUT COUNSEL FOR GOVERNMENT MAY BE

14   SUGGESTING THAT THEY ARE NOT GOING TO GET ALL OF THE DNA TESTS

15   TODAY AND I DON'T -- OR AT LEAST IS NOT ABLE TO PROMISE THAT

16   HERE NOW.

17           THE ONE THING I WOULD SAY IS, YOUR HONOR HAS MADE

18   CLEAR THAT DNA TESTING DOESN'T NEED TO BE DONE IN EVERY CASE,

19   IT SHOULD BE DONE WHEN NECESSARY.  SO IF THOSE 16 KIDS, THOSE

20   PARENTS HAD SUBMITTED BIRTH CERTIFICATES AND OTHER

21   DOCUMENTATION, THEN I WOULD SUGGEST THAT THOSE KIDS CAN BE

22   RELEASED.  BECAUSE THE GOVERNMENT IS DOING THE DNA TEST, NOW

23   THE COURT HAS SAID THOSE AREN'T NECESSARY IN EVERY CASE.  IF

24   YOU HAVE DOCUMENTATION THAT THE PARENT IS THE PARENT AND THERE

25   IS ALSO -- THE CASE MANAGER WITH THE KID WILL LIKELY HAVE SOME

JULY 10, 2018

1   SENSE OF IT, AS WELL.

2          WE WOULD ASK THAT IT NOT BE DELAYED IF THE 16 DNA

3   VERIFICATIONS DON'T COME IN TODAY IF YOU HAVE OTHER WAYS OF

4   VERIFYING THE PARENTAGE.

5          **THE COURT:**  I AGREE.

6          **MS. FABIAN:**  I AGREE WITH THAT AS WELL, YOUR HONOR.

7   AND I SHOULD HAVE SAID THAT.  I BELIEVE THAT THAT IS ANOTHER

8   PROCESS THAT IS ONGOING TODAY.

9          SO WHAT I UNDERSTAND IS, IF THERE IS NOT OTHER

10  DOCUMENTATION AND NO RECEIPT OF DNA, THAT WE SHOULD WAIT UNTIL

11  COMPLETION OF THAT PROCESS EVEN IF THAT BRINGS US TO TOMORROW,

12  BUT PROVIDE A DETAILED EXPLANATION TO THE COURT AND TO

13  PLAINTIFFS AS TO WHY THAT WAS.

14         **MR. GELERNT:**  I WAS JUST GOING TO SAY I DON'T --

15  THIS MAY BE JUST MORE OF A QUESTION FOR THE GOVERNMENT.

16         IS THE GOVERNMENT USING ONE DNA SERVICE?  BECAUSE I

17  KNOW THAT THERE ARE A LOT OF DNA SERVICES WHO ARE REACHING OUT

18  AND SAYING THEY WILL DO THIS, THEY WILL DO IT PRO BONO.

19         IF THINGS ARE GETTING BOTTLED-NECKED BECAUSE THERE

20  IS ONLY ONE DNA SERVICE THE GOVERNMENT IS USING, THAT WOULD

21  ALSO BE SOMETHING I WOULD LIKE TO RAISE.

22         IT MAY BE NOT AN ISSUE GOING FORWARD BECAUSE THE

23  COURT HAS SAID ONLY USE DNA WHEN NECESSARY IF THERE IS NO

24  OTHER VERIFICATION PROCESS THAT CAN BE -- THAT CAN BE USED.

25  BUT EVEN IF FOR NOW, I JUST DON'T KNOW WHETHER THERE IS A

JULY 10, 2018

24

```
 1   BOTTLE-NECK OF ONE.

 2           THAT IS MORE A QUESTION OF GOVERNMENT COUNSEL.

 3           THE COURT:  ON THAT ISSUE, I WILL LET YOU MEET AND

 4   CONFER.

 5           MR. GELERNT:  OKAY.

 6           THE COURT:  WE ARE DEEP IN THE WEEDS, BUT I DON'T

 7   WANT TO GO THAT DEEP.  SO YOU CAN WORK A LOT OF THOSE ISSUES

 8   OUT WITH COUNSEL.

 9           MS. FABIAN:  I AGREE, YOUR HONOR.

10           THE ONE OTHER CLARIFICATION POINT I WANTED TO MAKE,

11   AND I THINK I KNOW THE ANSWER BUT I WANT TO BE SURE.

12           THERE WAS -- YOUR HONOR HAD SAID THAT THE PROCESS OF

13   REVIEW OF HOUSEHOLD MEMBERS IS A PROCESS THAT YOUR HONOR FEELS

14   IS NOT NECESSARY UNDER THE REQUIREMENTS OF THE ORDER.

15           ONE OF THE INDIVIDUALS THAT WE HAD IDENTIFIED,

16   BECAUSE THEY WERE ALREADY IN THE REUNIFICATION PROCESS, THE

17   HOUSEHOLD MEMBER WAS DETERMINED TO HAVE A BACKGROUND OF

18   SERIOUS SEXUAL ABUSE.  AND I THINK YOU WILL SEE THAT THAT

19   PERSON IS NOW ON THE LIST AS NOT ELIGIBLE FOR REUNIFICATION

20   BECAUSE THAT WAS AN IDENTIFIED DANGER.

21           DOES YOUR HONOR -- SHOULD WE MOVE THAT PERSON INTO

22   THE CATEGORY FOR RELEASE BECAUSE THAT WAS IDENTIFIED THROUGH

23   THE PROCEDURE THAT IS BEING REMOVED, OR IS IT ACCEPTABLE TO

24   LEAVE THEM IN THIS CATEGORY SINCE WE HAVE AT THIS TIME

25   IDENTIFIED THAT AS A POTENTIAL DANGER?
```

 1          THE COURT:  I THINK BECAUSE IT HAS BEEN IDENTIFIED

 2   AS A POTENTIAL DANGER THAT THAT PERSON WOULD -- THE

 3   REUNIFICATION WOULD NOT GO FORWARD ABSENT A DIFFERENT

 4   PLACEMENT.

 5          BUT THAT WOULD BE AN ISSUE -- THAT IS THE KIND OF

 6   ISSUE THAT I WOULD LIKE THE PARTIES TO MEET AND CONFER, AND

 7   THEN IF THERE IS DISAGREEMENT TO RAISE IT WITH THE COURT.

 8          BUT FOR PURPOSES OF THE DEADLINE TODAY, THAT PERSON

 9   WOULD NOT FALL WITHIN THE REUNIFICATION GROUP BECAUSE THE

10   GOVERNMENT HAS MADE A PROFFER THAT THERE IS A DANGER TO THE

11   CHILD, AND SO IT WOULD NOT FALL WITHIN THE REUNIFICATION

12   CATEGORY.

13          MR. GELERNT:  YOUR HONOR, I THINK THAT IS SOMETHING

14   WHERE WE CAN MEET AND CONFER BECAUSE IF THE INFORMATION IS

15   WRONG ABOUT THE HOUSEHOLD MEMBER WE WOULD WANT TO TELL YOU.

16   IF THE INFORMATION IS CORRECT, WE WOULD WANT TO TAKE STEPS TO

17   GET THAT MOTHER AND CHILD OUT.

18          THE COURT:  RIGHT.

19          MR. GELERNT:  SO THAT IS SOMETHING I HOPE THAT WE

20   CAN CONFER ABOUT TODAY AND TRY AND CLEAR THAT UP.  AND IF IT

21   TURNS OUT THE INFORMATION IS CORRECT WE WILL TAKE STEPS TO GET

22   THAT MOTHER AND CHILD OUT.

23          THE COURT:  BETWEEN THE TWO, THERE IS ENORMOUS

24   RESOURCES, WITH THE GOVERNMENT, AND MR. GELERNT HAS MARSHALED

25   AN ARMY OF NGO'S, FAITH-BASED GROUPS, CITIZENS ALL OVER THE

```
 1   COUNTRY WHO WANT TO HELP OUT.  AND SO MUCH OF THIS CAN BE

 2   WORKED OUT THROUGH A MEET-AND-CONFER PROCESS.

 3            THE GOAL, OF COURSE, IS TIMELY AND SAFE

 4   REUNIFICATION.  AND BETWEEN THE TWO PARTIES IT SEEMS TO ME

 5   THAT THAT CAN HAPPEN, ON TIME AND IN THE SPIRIT OF THE COURT'S

 6   ORDER.

 7            MR. GELERNT:  YES, YOUR HONOR.

 8            MS. FABIAN:  I DON'T HAVE ANY OTHER REQUESTS FOR

 9   CLARIFICATION, EXCEPT THAT I NOTE THAT THE PARTIES DID HAVE A

10   QUESTION ABOUT THE TIME FRAMES FOR REMOVED PARENTS.  I DON'T

11   -- THAT MAY NOT BE AN ISSUE TODAY SO MAYBE IT IS ONE THAT WE

12   ADDRESS IN FUTURE STATUS CONFERENCES WHEN WE HAVE REAL

13   EXAMPLES.

14            THE COURT:  YES.  THAT IS AN ISSUE THAT HAS SOME

15   COMPLEXITY TO IT, AND I THINK BOTH SIDES INDICATED YOU WOULD

16   LIKE ADDITIONAL TIME TO CONSIDER IT.  I WOULD ALSO, WITH THE

17   BENEFIT OF MORE INFORMATION, BRIEFING ON THAT.

18            MR. GELERNT:  IS THAT SOMETHING WE COULD PUT IN THE

19   THURSDAY SUBMISSION?

20            THE COURT:  YES.

21            MR. GELERNT:  SO WE COULD CONFER ABOUT THAT.  I

22   THINK WE ARE -- I THINK NEED TO FIGURE OUT HOW MUCH TIME THE

23   GOVERNMENT NEEDS ONCE THE PERSON IS FOUND.  WE OBVIOUSLY CAN'T

24   PUT A DEADLINE ON FINDING THE PERSON WHO HAS BEEN REMOVED, BUT

25   WE MIGHT BE ABLE TO TRY TO PUT A DEADLINE ON ONCE THE PARENT
```

JULY 10, 2018

```
 1   IS FOUND THEN HOW MUCH TIME SHOULD THERE BE TO REUNIFY.

 2               THE COURT:  YES.

 3               MR. GELERNT:  SO THAT IS WHAT WE WOULD TRY AND DO.

 4               THE COURT:  THIS IS GOING TO BE A BIG ISSUE, IT

 5   APPEARS, BECAUSE IF WE HAVE 12 OUT OF 101 OR 102, WHEN WE LOOK

 6   AT THE NEXT 28, 2900 INDIVIDUALS I AM ASSUMING THERE IS GOING

 7   TO BE A COMMENSURATE NUMBER OF PARENTS WHO HAVE BEEN REMOVED.

 8               MR. GELERNT:  RIGHT.

 9               THE COURT:  SO IT IS ONE THAT I WOULD LIKE THE

10   PARTIES TO CONSIDER CAREFULLY.

11               MR. GELERNT:  RIGHT.

12               THE COURT:  AND WE CAN ADDRESS THAT AT THE NEXT

13   STATUS CONFERENCE.

14               MS. FABIAN:  I THINK AN IMPORTANT ISSUE ON THAT WILL

15   BE THAT THE CHILDREN MAY BE IN THEIR OWN PROCEEDINGS AT THAT

16   TIME, AND THERE WOULD BE ADDITIONAL WAIVERS OF THE PARENTS TO

17   REMOVE THEM FROM THOSE PROCEEDINGS AND HAVE THOSE CLOSED.

18               AND SOME OF THEM MAY EVEN HAVE -- BECAUSE SOME OF

19   THESE REMOVALS MAY BE ONES THAT OCCURRED ACTUALLY SOME LENGTH

20   OF TIME AGO, AND SO SOME OF THOSE PARENTS -- OR SOME OF THOSE

21   CHILDREN MAY HAVE OBTAINED STATUS.  AND IT WOULD BE OUTSIDE OF

22   THE GOVERNMENT'S ABILITY TO THEN REMOVE THEM FROM THE UNITED

23   STATES.

24               THERE ARE ISSUES LIKE THOSE.  BUT I THINK IT IS

25   IMPORTANT -- I THINK IF WE CAN IDENTIFY SOME OF THOSE WITH
```

1    REGARD TO REAL SITUATIONS WE CAN BETTER TEE THEM UP FOR THE

2    JUDGE -- FOR THE COURT TO DECIDE.

3          **MR. GELERNT:**  THAT SEEMS RIGHT TO ME, YOUR HONOR.

4          I KNOW THAT YOUR CO-COUNSEL WANTS TO RAISE SOMETHING

5    ABOUT THE FLORES ISSUE.

6          BUT I WAS GOING TO RAISE TWO OTHER QUICK POINTS IF

7    THAT IS OKAY, YOUR HONOR.

8          **THE COURT:**  YES.

9          **MR. GELERNT:**  ONE IS WE WERE SEEKING CLARIFICATION

10   FROM THE GOVERNMENT, I THINK, ON WHETHER A PARENT ONLY MEANS

11   BIOLOGICAL PARENT.  I MEAN, SOMETIMES A PARENT MAY NOT EVEN

12   KNOW THEY ARE NOT THE BIOLOGICAL PARENT, BUT OTHER TIMES IT

13   MAY BE THAT THEY HAVE BEEN RAISING THE PARENT -- THE CHILD

14   SINCE THEY ARE TWO MONTHS THROUGH ADOPTION OR SOMETHING.

15         AND SO I -- WHEN THE GOVERNMENT SAYS THEY ARE NOT

16   THE PARENT DOES THAT MEAN THEY ARE NOT THE BIOLOGICAL PARENT

17   OR THEY DON'T -- THEY ARE NOT EVEN A PARENT STATUS?

18         **MS. FABIAN:**  THIS IS THE FIRST I AM HEARING THIS

19   QUESTION SO I WILL ANSWER FROM WHAT I KNOW, AND CAN LOOK INTO

20   IT MORE.

21         IN THE SITUATIONS THAT I IDENTIFIED YESTERDAY, I

22   BELIEVE AT LEAST ONE, IT TURNED OUT, WAS THE GRANDMOTHER.  AND

23   ANOTHER -- THE INDIVIDUAL ADMITTED PRIOR TO DNA TESTING THAT

24   HE WAS NOT THE PARENT.

25         SO IT IS NOT -- WE WOULD AGREE THAT AN ADOPTIVE

JULY 10, 2018

29

1   PARENT WOULD -- WITH THE PROPER DOCUMENTATION, LEGAL

2   DOCUMENTATION, WOULD BE A PARENT.

3            THAT'S THE TYPE OF SITUATION WHERE DNA TESTING WOULD

4   NOT BE USEFUL AND THAT PAPERWORK WOULD BE NECESSARY, AND THAT

5   MIGHT TAKE SOME TIME TO GET THE PROPER PAPERWORK FROM THE

6   CONSULATES.

7            **MR. GELERNT:**  THAT IS HELPFUL.  I APOLOGIZE.  I WAS

8   NOT MEANING FOR YOU TO HAVE TO TELL ME FOR EACH PARENT SO FAR

9   WHETHER THEY WERE BIOLOGICAL, JUST WHAT THE GOVERNMENT'S

10  POSITION WAS GOING FORWARD.  AND IT SOUNDS LIKE WE ARE IN

11  AGREEMENT THAT, IF THERE IS AN ADOPTIVE PARENT, DNA WOULDN'T

12  PROVE THAT BUT IF THEY HAD LEGAL PAPERS SHOWING THEY WERE THE

13  ADOPTIVE PARENT WE WOULD CONSIDER THEM A PARENT WITHIN THE

14  CLASS.

15           SO THAT IS HELPFUL.  THANK YOU.

16           **MS. FABIAN:**  I THINK LEGAL STATUS AS A PARENT WOULD

17  BE RECOGNIZED IN THIS CONTEXT.  OBVIOUSLY WITH QUESTIONS OF

18  SOME INTERNATIONAL LAW THAT MAY HAVE TO BE WORKED OUT WITH

19  CONSULATES, BUT THAT IS NOT -- WE DON'T DISPUTE THAT LEGAL

20  PARENTAGE APPLIES HERE.

21           **MR. GELERNT:**  THEN THE ONLY OTHER QUESTION I WAS

22  GOING TO RAISE, YOUR HONOR, IS I THINK ONE THAT YOU TOUCHED

23  ON, IS THAT THERE HAVE BEEN THE 12 PARENTS WHO HAVE BEEN

24  REMOVED, AND THERE ARE ADDITIONAL PARENTS THAT HAVE BEEN

25  REMOVED FOR THE OVER-FIVE AND ARE STILL BEING REMOVED.

JULY 10, 2018

```
 1              I BELIEVE THE GOVERNMENT HAS VERIFIED THIS, BUT THE
 2    MEDIA IS REPORTING THAT THERE ARE GOING TO BE A NUMBER OF
 3    GUATEMALAN PARENTS WITH THEIR CHILDREN REMOVED TODAY, AND THEY
 4    APPEAR TO BE CLASS MEMBERS.  WE ARE NOT SURE, WE DON'T HAVE
 5    THE LIST YET OF THE FIVE AND OVER.
 6              WE ARE VERY CONCERNED THAT ANYBODY WHO HAS AGREED TO
 7    REMOVAL BEFORE THIS NOTICE HAS GOTTEN -- AND NOW THAT YOUR
 8    HONOR HAS SIGNED OFF ON THE NOTICE I AM HOPEFUL THAT WE CAN
 9    GET IT OUT TODAY TO THE DETENTION CENTERS.
10              BUT THE FORM THE GOVERNMENT HAD BEEN USING
11    PREVIOUSLY, IN OUR VIEW, WAS MISLEADING AND MAY HAVE SUGGESTED
12    TO THE PARENTS THE ONLY WAY TO GET YOUR CHILD BACK IS TO WAIVE
13    YOUR RIGHT TO CONTEST REMOVAL.
14              NOW, MANY OF THOSE PARENTS MAY HAVE KNOWINGLY WAIVED
15    IT AND HAD NO CLAIMS, BUT MANY OTHERS MAY HAVE HAD A SHOT AT
16    ASYLUM OR SOME OTHER CLAIM.
17              AND SO, YOU KNOW, FOR THE ONES WHO HAVE BEEN REMOVED
18    WE ARE GOING TO HAVE TO CONTACT THEM.  BUT WE WOULD ASK THAT
19    NO FURTHER REMOVALS OF CLASS MEMBERS OCCUR UNTIL THEY HAVE
20    BEEN ABLE TO SIGN THE NEW NOTICE THAT MAKES IT VERY CLEAR THAT
21    YOUR HONOR'S RULING DIDN'T MAKE GETTING YOUR CHILD BACK
22    CONTINGENT UPON WAIVING YOUR RIGHT TO CONTEST REMOVAL OR APPLY
23    FOR ASYLUM.
24              THE COURT:  ISN'T THAT ALREADY IN PLACE?  BECAUSE
25    THERE IS A CLASS DEFINITION, THERE IS AN INJUNCTION IN PLACE,
```

JULY 10, 2018

1   DOESN'T THAT COVER THIS SITUATION?

2          **MR. GELERNT:**  WELL, IT DOES, YOUR HONOR, EXCEPT THAT

3   I DON'T KNOW THAT THE CLASS MEMBERS ON THE GROUND UNDERSTAND

4   ALL OF THEIR RIGHTS.  AND THAT IS WHY WE THINK IT IS CRITICAL

5   TO GET THEM NOTICE THAT HAS IT IN VERY PLAIN LANGUAGE YOU MAY

6   GET YOUR CHILD BACK, UNDER YOUR HONOR'S RULING, AND IT DOES

7   NOT MEAN YOU HAVE TO AGREE TO REMOVAL.

8          WE BELIEVE THE FORM THAT THE GOVERNMENT WAS USING UP

9   UNTIL NOW, SINCE THE RULING, AND MAYBE EVEN A LITTLE BIT

10  BEFORE, DIDN'T MAKE IT CRYSTAL CLEAR, BY ANY MEANS, THAT YOU

11  COULD CONTINUE TO SEEK ASYLUM OR CONTEST YOUR REMOVAL AND

12  STILL HAVE YOUR CHILD BACK.

13         SO THAT IS OUR CONCERN IS THAT GOING FORWARD WE

14  THINK IT IS GOING TO BE FINE BECAUSE THE NOTICE IS CLEAR, IT

15  HAS BOXES TO CHECK AND IT IS IN VERY CLEAR AND SIMPLE

16  LANGUAGE.  BUT I THINK IT IS THE INDIVIDUALS WHO HAVE NOW

17  AGREED TO REMOVAL -- GOTTEN THEIR CHILD BACK AND AGREED TO

18  REMOVAL THAT WE ARE CONCERNED WITH.

19         SO I THINK IF THE GOVERNMENT CAN GO BACK AND GIVE

20  THEM THE NEW NOTICE AND HAVE THEM SIGN THE NEW NOTICE RATHER

21  THAN RELYING ON THE OLD GOVERNMENT FORM, THAT IS WHAT WE WOULD

22  BE ASKING OF YOUR HONOR.

23         **THE COURT:**  DO YOU OBJECT?

24         **MS. FABIAN:**  I DO OBJECT, YOUR HONOR.  THE NOTICE

25  THAT -- THE GOVERNMENT DID CREATE A NOTICE IMMEDIATELY

```
 1    FOLLOWING YOUR HONOR'S ORDER.  I KNOW THAT PLAINTIFFS BELIEVE
 2    IT IS UNCLEAR, WE DISAGREE BUT WE WERE WILLING TO WORK UP A
 3    FORM THAT WAS -- THAT WORKED FOR THEM.  AND SO WE DID WORK
 4    TOGETHER ON THAT NOTICE THAT YOUR HONOR APPROVED TODAY.
 5            THE FORM -- THE INDIVIDUALS, I THINK, THAT ARE BEING
 6    REFERENCED -- AND I CAN'T -- I DON'T HAVE THE NUMBERS IF CLASS
 7    MEMBERS HAVE BEEN REMOVED SO FAR OR REALLY WHERE THEY ARE.  WE
 8    WILL LEARN MORE ABOUT THAT AS WE -- I WILL LEARN MORE ABOUT
 9    THAT AS WE COMPILE INFORMATION AND SHARE INFORMATION ABOUT THE
10    REST OF THE CLASS.
11            BUT THE INDIVIDUALS SCHEDULED FOR REMOVAL TODAY ALL
12    HAVE FINAL ORDERS OF REMOVAL.  SOME WERE OBTAINED BEFORE AN
13    IMMIGRATION JUDGE, SOME ARE EXPEDITED REMOVAL ORDERS.  NONE OF
14    THEM CLAIMED FEAR, AND SO THEY ARE PROPERLY SUBJECT TO
15    REMOVAL.  THEY DON'T HAVE AVENUES FOR -- TO CONTEST THAT
16    REMOVAL.  THEY ALL REQUESTED TO BE REMOVED WITH THEIR CHILD
17    AND SIGNED A FORM REQUESTING TO BE REMOVED WITH THEIR CHILD.
18    AND THEREFORE THE REMOVALS THAT I UNDERSTAND, AT LEAST AS OF
19    YESTERDAY WERE SCHEDULED FOR TODAY, ARE ALL FINAL ORDER
20    INDIVIDUALS WHO REQUESTED TO BE REMOVED WITH THEIR CHILD.  AND
21    THAT IS IN ACCORDANCE WITH THE COURT'S INJUNCTION.
22            **MR. GELERNT:**  YOUR HONOR, AND WE HAVE NO REASON,
23    OBVIOUSLY, TO DISPUTE, AND WE HAVE NO BASIS.  YOU KNOW, IT MAY
24    BE TRUE THAT THEY ALL SIGNED THE FORM, I THINK THE DISPUTE IS
25    WHETHER THE FORM WAS MISLEADING.
```

JULY 10, 2018

1        THE OTHER THING I WOULD JUST NOTE, WHEN THE

2   GOVERNMENT SAYS THERE IS A FINAL ORDER, I THINK THEY ARE

3   MEANING THERE IS AN ADMINISTRATIVELY FINAL ORDER.  IT DOESN'T

4   MEAN ALL AVENUES FOR CHALLENGING REMOVAL ARE GONE, BECAUSE YOU

5   COULD GO TO FEDERAL COURT TO CHALLENGE YOUR REMOVAL ORDER TO

6   THE EXTENT THOSE AVENUES ARE POSSIBLE.  YOU COULD SEEK

7   RECONSIDERATION FROM THE AGENCY.

8        SO I THINK THE FACT -- AND IT MAY BE THAT ALL 13 OF

9   THOSE WHEN THEY GET THE NEW NOTICE WILL SAY -- IF THESE

10  REMOVALS HAVE ALREADY OCCURRED THIS MORNING THEY HAVE

11  OCCURRED, BUT TOMORROW BEFORE THE NOTICE, I MEAN, THERE IS NO

12  REASON TO RELY ON THE OLD FORMS NOW THAT THE NEW NOTICE IS

13  THERE.

14       IF THE PARENTS GENUINELY WANT TO BE REMOVED AND KNEW

15  WHAT THEY WERE DOING THEY ARE JUST SIMPLY GOING TO CHECK THE

16  NEW NOTICE FORM BOX.  SO I DON'T THINK THERE IS GOING TO BE

17  ANY PREJUDICE TO THE GOVERNMENT.

18       **THE COURT:**  HOW MANY PARENTS, DO YOU KNOW, ARE

19  SCHEDULED TO BE REMOVED TODAY?

20       **MR. GELERNT:**  THE MEDIA IS REPORTING 13 GUATEMALAN

21  FAMILIES WITH THEIR CHILDREN.  WE HAVE NO INDEPENDENT

22  VERIFICATION OF THAT.  I THINK WE WERE GOING TO MAYBE TRY TO

23  REACH OUT TO THE GUATEMALAN CONSULATE.

24       **THE COURT:**  IS IT YOUR REPRESENTATION THAT YOU

25  BELIEVE THESE 13, WHATEVER THE NUMBER IS, ARE CLASS MEMBERS,

JULY 10, 2018

```
1   AND YOU WOULD LIKE THEM NOT TO BE REMOVED UNTIL THEY HAVE SEEN
2   THE CLASS NOTICE AND AGREED.
3            MR. GELERNT:  YOUR HONOR, I WANT TO BE CLEAR.  WE
4   HAVE NO BASIS FOR KNOWING IF THEY ARE ALL 13 CLASS MEMBERS OR
5   NOT BECAUSE WE HAVE NO INFORMATION.  I AM ASSUMING THAT THEY
6   PROBABLY ARE GIVEN THE TIMING AND THEY JUST RECEIVED THEIR
7   CHILDREN.
8            IF THE GOVERNMENT KNOWS THAT THE 13 ARE NOT CLASS
9   MEMBERS, FOR WHATEVER REASON, EITHER CRIMINAL CONVICTIONS OR
10  THEY WERE NOT PARENTS WHO HAD THEIR CHILDREN TAKEN AWAY FROM
11  THEM, THEN THAT WOULD -- WE WOULD, YOU KNOW, ACCEPT THAT
12  REPRESENTATION.
13           BUT IF THEY ARE CLASS MEMBERS AND IF THEY HAVEN'T
14  BEEN REMOVED WE WOULD ASK THAT THEY BE GIVEN THE NOTICE BEFORE
15  THEY ARE REMOVED.
16           THE COURT:  ON THAT ISSUE, I WOULD DECLINE TO ISSUE
17  ANY ORDER.  AS I UNDERSTAND IT, YOU ARE ASKING ME TO RULE FROM
18  THE BENCH AND ISSUE AN INJUNCTION WHERE THE GOVERNMENT WOULD
19  BE PRECLUDED FROM REMOVING THOSE 13 INDIVIDUALS, AND I AM NOT
20  PREPARED TO DO THAT UNLESS THERE IS A REPRESENTATION THAT
21  THESE ARE CLASS MEMBERS.
22           MR. GELERNT:  OKAY.  YOUR HONOR, THEN, NO, I
23  UNDERSTAND.  AND I CANNOT, IN GOOD FAITH, MAKE THAT
24  REPRESENTATION BECAUSE I AM RELYING IN SIGNIFICANT PART ON THE
25  MEDIA.  IF THE GOVERNMENT, YOU KNOW, WERE TO TELL US RIGHT NOW
```

JULY 10, 2018

 1    THAT SOME OF THEM ARE CLASS MEMBERS, THAT MIGHT BE DIFFERENT.

 2         BUT I THINK THAT THERE COULD BE REMOVALS TOMORROW OR

 3    THE NEXT DAY WHERE EVEN THOUGH YOU HAVE SIGNED OFF ON THE

 4    NOTICE TODAY THE GOVERNMENT IS STILL RELYING ON THE SIGNATURE

 5    FOR AN OLD FORM.  AND THOSE SEEM LIKE NOW THE PERSON COULD BE

 6    ASKED TO SIGN THE NEW FORM BEFORE THE REMOVAL TAKES PLACE,

 7    GOING FORWARD.

 8         **MS. FABIAN:**  I AM HAPPY TO AGREE TO GET THAT FORM

 9    OUT AS QUICKLY AS POSSIBLE.

10         **THE COURT:**  YES.

11         AND THIS, OF COURSE, DOESN'T PRECLUDE THE GOVERNMENT

12    FROM ELECTING NOT TO REMOVE THESE 13 PARENTS TODAY.  IF THERE

13    IS ANY DOUBT, THE GOVERNMENT MAY EXERCISE DISCRETION AND HOLD

14    THE FLIGHTS OR WHATEVER THE TRANSPORTATION METHOD IS PENDING

15    FURTHER CLARIFICATION.

16         BUT SO WE ARE CLEAR, I WOULD DECLINE THE INVITATION

17    TO ISSUE AN INJUNCTION AS TO THOSE 13 OR SO INDIVIDUALS.

18         THERE WAS -- I THINK THERE WAS GOING TO BE SOME

19    DISCUSSION ON THE JUDGE GEE IN FLORES.

20         **MR. STEWART:**  YES.  THANK YOU, YOUR HONOR.

21         I AM SCOTT STEWART IN FROM DC, YOUR HONOR.

22         **THE COURT:**  YES.

23         **MR. STEWART:**  I AM WITH THE MAIN JUSTICE DEPARTMENT,

24    I HEAD THE OFFICE OF IMMIGRATION LITIGATION.  I AM VERY GLAD

25    TO BE HERE ON BEHALF OF THE CIVIL DIVISION.

                              JULY 10, 2018

1        AS YOU CAN UNDERSTAND, YOU HAVE SEEN, THIS IS AN

2   EXTRAORDINARILY IMPORTANT CASE TO THE GOVERNMENT, AND WE

3   APPRECIATE YOUR HONOR'S OPTIMISM, ENCOURAGEMENT, AND

4   RECOGNITION OF THE GOVERNMENT'S PROGRESS AND EFFORTS TO DATE.

5        I WANTED TO, AS MENTIONED, YOUR HONOR, TO ADDRESS AN

6   IMPORTANT POINT ABOUT THE GOVERNMENT'S UNDERSTANDING OF

7   COMPLIANCE WITH ANOTHER PIECE OF THIS COURT'S ORDER IN LIGHT

8   OF LAST NIGHT'S ORDER BY THE FLORES COURT.

9        IT SHOULDN'T TAKE ME LONG TO GET THROUGH, BUT I JUST

10  WANT TO MAKE SURE I LAY THE GROUNDWORK CLEARLY FOR YOUR HONOR.

11       **THE COURT:**  YES.

12       **MR. STEWART:**  LAST NIGHT, YOUR HONOR, THE FLORES

13  COURT ISSUED AN ORDER REGARDING THE GOVERNMENT'S OBLIGATION

14  UNDER THE FLORES AGREEMENT.  IN SHORT, THE COURT CONCLUDED

15  THAT THE FLORES AGREEMENT CONTINUES TO REQUIRE THE RELEASE OF

16  A CHILD UNDER THE AGREEMENT EVEN WHERE THIS COURT'S INJUNCTION

17  PRECLUDES SEPARATION OF THE FAMILY.

18       IN ORDER TO READ THOSE TWO INJUNCTIONS TOGETHER,

19  YOUR HONOR, THE FLORES COURT EXPLAINED -- AS WE UNDERSTAND IT,

20  YOUR HONOR, THE FLORES COURT EXPLAINED THAT THE PARENT COULD

21  WAIVE THIS FLORES RIGHT AND CHOSE TO REMAIN TOGETHER, AND

22  OBSERVED THAT SUCH A WAIVER WAS PERMITTED UNDER THIS COURT'S

23  INJUNCTION.

24       IF I CAN JUST BRIEFLY EXPLAIN, YOUR HONOR.  AS YOU

25  UNDERSTAND, THE GOVERNMENT MUST NOW IMPLEMENT TWO EXISTING

JULY 10, 2018

1   INJUNCTIONS, YOUR HONOR'S AND THE FLORES COURT'S.  AND WE WANT

2   TO PROVIDE JUST NOTICE ON HOW WE INTERPRET OUR COMPLIANCE WITH

3   YOUR INJUNCTION, YOUR HONOR.

4          AS VERY QUICK BACKGROUND, THE FLORES COURT STATED

5   THAT FLORES RIGHTS COULD BE WAIVED BY A PARENT AND THAT,

6   QUOTE, DETAINED PARENTS MAY CHOOSE TO EXERCISE THEIR MS. L.

7   RIGHT TO REUNIFICATION OR TO STAND ON THEIR CHILDREN'S FLORES

8   AGREEMENT RIGHTS, END QUOTE.

9          LIKEWISE, YOUR ORDER, YOUR HONOR, ALLOWS EXCEPTIONS

10  TO REUNIFICATION, SEPARATION PROVISIONS IF THERE IS, QUOTE,

11  AFFIRMATIVE, KNOWING, AND VOLUNTARY WAIVER BY THE PARENT.

12         YOUR HONOR HAS ALSO EMPHASIZED, ON FRIDAY IN

13  PARTICULAR, AS I RECALL A COUPLE TIMES, THAT THE ATTORNEY

14  GENERAL MAKES HIS OWN DETERMINATION AS TO WHETHER OR NOT TO

15  DETAIN OR PAROLE OR RELEASE SOMEONE.  YOUR ORDER -- OR THE

16  ORDER YOUR HONOR SAID DOESN'T IMPACT IN ANY WAY THOSE

17  DECISIONS, AND YOU WERE NOT SUGGESTING, YOUR HONOR SAID, THAT

18  THE ATTORNEY GENERAL MUST RELEASE OR MUST DETAIN OR WHEN HE

19  CAN RELEASE OR DETAIN.  THOSE ARE WITHIN THE GOVERNMENT'S

20  PREROGATIVE, CONSISTENT WITH LAW.

21         AND NOW I AM GETTING TO THE KEY POINT HERE, YOUR

22  HONOR, WHICH IS SORT OF THREE-FOLD.

23         FIRST, IN LIGHT OF THE FLORES RULING YESTERDAY, YOUR

24  HONOR, WE, THE GOVERNMENT, INTERPRET YOUR ORDER TO PERMIT US

25  TO PROVIDE FAMILIES DETAINED TOGETHER WITH ONE OF TWO OPTIONS.

JULY 10, 2018

```
1            FIRST, THE FAMILY -- THE FAMILY -- THE ADULT MAY
2    CHOSE TO REMAIN IN DHS CUSTODY WITH THE FAMILY TOGETHER.
3    UNDER THIS COURT'S INJUNCTION, SUBJECT TO THE NORMAL RULES ON
4    WHEN AN ALIEN WOULD BE RELEASED FROM CUSTODY, SUCH AS PAROLE,
5    SO THE FAMILY COULD STAY DETAINED.  AND AS THIS FIRST OPTION
6    THE PARENT WOULD BE ABLE TO WAIVE THE CHILD'S FLORES RIGHTS SO
7    THE CHILD COULD STAY WITH THE PARENT, REUNIFIED, CONSISTENT
8    WITH YOUR COURT'S ORDER.
9            THE SECOND OPTION THE GOVERNMENT CAN GIVE YOUR HONOR
10   IS THAT THE FAMILY, THROUGH THE PARENT, CAN AGREE TO RELEASE
11   THE CHILD TO O.R.R. CUSTODY, IN WHICH CASE THE FAMILY WOULD BE
12   SEPARATED, BUT WITH THE PARENT'S CONSENT, AS YOUR HONOR
13   ALLOWED.  AND THE CHILD WOULD BE PLACED THROUGH O.R.R. AND
14   CONSISTENT WITH FLORES.  SO THAT WOULD BE EXERCISING A FLORES
15   RIGHT.  SO ONE OR THE OTHER, THE ADULT, YOUR HONOR, WOULD BE
16   ABLE TO, YOU KNOW, CONSISTENT WITH YOUR COURT'S INJUNCTION,
17   EITHER EXERCISE THE CHILD'S FLORES RIGHT OR WAIVE THAT FLORES
18   RIGHT SO THEY COULD STAY TOGETHER.
19           THE KEY POINT THERE AND THE KEY REASON FOR THOSE TWO
20   CHOICES -- AND THIS IS WHY I READ THE INJUNCTION THIS WAY,
21   YOUR HONOR.  IS THAT IN NEITHER CIRCUMSTANCE WOULD THE PARENT
22   BE ABLE TO USE THIS COURT'S ORDER, TOGETHER WITH THE FLORES
23   COURT'S ORDER, TO BOOTSTRAP A RIGHT TO RELEASE, A RIGHT TO
24   HINDER, YOU KNOW, OR FORCE THE GOVERNMENT TO ALLOW PAROLE,
25   THAT SORT OF THING.  AGAIN, THIS IS CONSISTENT, I BELIEVE,
```

JULY 10, 2018

```
 1    WITH YOUR HONOR'S ORDER, WITH THE LAW, AND JUST AUTHORITIES TO
 2    DETAIN.
 3            BUT, ANYWAY, I JUST WANTED TO CLARIFY THAT -- YOU
 4    KNOW, INFORM THE COURT THAT THAT IS HOW THE GOVERNMENT
 5    UNDERSTANDS YOUR HONOR'S ORDER, TO BE ABLE TO GIVE THE PARENTS
 6    THOSE TWO OPTIONS.  AND IN NEITHER CASE IS THE GOVERNMENT
 7    FORCED TO RELEASE SOMEONE UNDER YOUR COURT'S ORDER, YOUR
 8    HONOR.
 9            AND THIS IS, AS YOU CAN UNDERSTAND, YOUR HONOR, AND
10    YOU, I THINK, HAVE UNDERSTOOD IT IN PREVIOUS HEARINGS IN THIS
11    REGARD.  THE AUTHORITY TO DETAIN AND TO PAROLE ARE CRITICAL TO
12    THE GOVERNMENT.  THERE ARE MANY CIRCUMSTANCES IN WHICH, YOU
13    KNOW, THE GOVERNMENT IS ALLOWED TO DETAIN IN IMMIGRATION
14    CUSTODY THESE PARENTS.  SO ANY READING OF THE COURT'S ORDER
15    THAT WOULD HINDER THOSE AUTHORITIES IF -- WE READ THAT AS AN
16    OFF-LIMITS READING AND OUT OF STEP WITH WHAT YOUR COURT'S
17    LETTER AND SPIRIT WOULD SAY.
18            SO GIVEN ALL OF THOSE THAT IS -- JUST TO INFORM THE
19    COURT, YOUR HONOR, THAT IS OUR READING OF YOUR HONOR'S
20    INJUNCTION.  AND WE ASK IF THE COURT DISAGREES OR TAKES
21    EXCEPTION TO THAT TO PLEASE -- WE ASK THAT YOU PLEASE RULE ON
22    THAT AND LET US KNOW RIGHT AWAY TODAY SO WE CAN CONTINUE TO --
23    BECAUSE IT IS VERY IMPORTANT THAT WE KNOW, HAVE CLARITY ON
24    THAT TO COMPLY WITH IT.
25            ABSENT THAT RULING WE WILL CONTINUE -- WE WILL
```

JULY 10, 2018

1    PROCEED ON THAT SORT OF IMPLEMENTATION.  BUT WE DO REQUEST, IF

2    YOUR HONOR DISAGREES WITH ANYTHING ABOUT THAT UNDERSTANDING,

3    THAT YOU LET US KNOW RIGHT AWAY SO WE CAN MAKE SURE WE ARE IN

4    COMPLIANCE FULLY AND CAN ALSO EXPLORE APPROPRIATE OPTIONS,

5    YOUR HONOR.

6            BECAUSE IF WE -- JUST IN THE INTEREST OF FULL

7    INFORMATION, YOUR HONOR, IF WE ARE PUT TO THE CHOICE WHERE WE

8    ARE FORCED TO RELEASE PARENTS WE WILL NEED TO EVALUATE

9    OPTIONS, WE WILL NEED TO POTENTIALLY PURSUE IMMEDIATE APPEAL

10   TO BE ABLE TO PRESERVE OUR AUTHORITIES.

11           IF IT IS A SITUATION WHERE WE HAVE TO RELEASE WE

12   WOULD ALSO ASK THAT YOUR HONOR STAY YOUR ORDER TO THE EXTENT

13   IT WOULD PROHIBIT, YOU KNOW, HAVING PARENTS MAKE THIS CHOICE.

14           BUT I LEAVE THOSE AS OPTIONS AND AS REQUESTS FOR

15   YOUR HONOR JUST OUT OF EMPHASIS THAT IT IS VERY IMPORTANT THAT

16   THE GOVERNMENT HAVE CLARITY IF THE ARTICULATION AND

17   UNDERSTANDING OF YOUR COURT'S ORDER IS INCORRECT SO THAT WE

18   CAN BE SURE TO COMPLY WITH IT AND KNOW HOW TO PROCEED

19   CORRECTLY.

20           AND TO BE CLEAR, YOU KNOW, TO THE EXTENT THAT WE

21   WOULD SEEK ANY STAY, IT IS NOT ON THE REUNIFICATION PIECE, IT

22   IS NOT ON THOSE, WE ARE FULL SPEED AHEAD ON THOSE.  IT IS JUST

23   ON THIS NARROW -- TO THE EXTENT WE WOULD BE REQUIRED TO

24   RELEASE PARENTS UNDER YOUR COURT'S ORDER; WHICH AGAIN I DON'T

25   THINK IS THE RIGHT READING OF YOUR COURT'S ORDER, BUT I RAISE

JULY 10, 2018

```
1    IT OUT OF IMPORTANCE FOR COMPLIANCE.

2              SO THAT IS THE KEY QUESTION, YOUR HONOR, AND THAT'S

3    OUR -- OR THE KEY ISSUE, AND THAT IS THE GOVERNMENT'S

4    UNDERSTANDING.  I HOPE I HAVE BEEN REASONABLY CLEAR.

5              THE COURT:  YES.  IF THERE IS AN APPEAL IT WOULD

6    DIVEST THIS COURT OF JURISDICTION OF ALL OF THE ISSUES, WOULD

7    IT NOT, INCLUDING REUNIFICATION?

8              MR. STEWART:  I DON'T BELIEVE SO, YOUR HONOR.  THIS

9    IS A PRELIMINARY INJUNCTION AND, YOU KNOW, PROCEEDINGS

10   CONTINUE IN THE DISTRICT COURT, YOU KNOW, EVEN AS A PIECE OF A

11   CASE MIGHT GO UP.  AND AGAIN, YOU KNOW --

12             THE COURT:  THIS WOULD BE UNDER RULE 54, A CARVE-OUT

13   AND PIECEMEAL APPEAL, IN THEORY, IF IT IS JUST ON THIS

14   DETENTION OR RELEASE ISSUE?

15             MR. STEWART:  I AM NOT SURE IF -- WHAT THE RIGHT

16   HOOK, ASIDE FROM 1292(A), WOULD BE, YOUR HONOR.  BUT -- AND,

17   YOU KNOW, I WOULDN'T, YOU KNOW, WANT TO SAY SOMETHING TO

18   PREJUDICE OTHER OPTIONS.  BUT RIGHT NOW REALLY WHAT WE ARE --

19   WHAT WE WOULD BE SEEKING A STAY ON BECAUSE, YOU KNOW, IF WE

20   WERE TO PURSUE A FAST APPELLATE STAY, YOU KNOW, WE WOULD WANT

21   -- WE WOULD NEED TO RUN IT BY YOUR HONOR FIRST, IS THAT ALL WE

22   WOULD BE SEEKING A STAY IS ON THIS PIECE.  YOU KNOW, IF WE ARE

23   REQUIRED UNDER YOUR HONOR'S ORDER TO START RELEASING PARENTS

24   BECAUSE, YOU KNOW, WE CAN'T KEEP THEM TOGETHER UNDER FLORES OR

25   SOMETHING LIKE THAT, THAT IS THE PIECE WE WOULD BE SEEKING A
```

JULY 10, 2018

1    STAY ON.

2           AGAIN, YOU KNOW, WE WANT TO GO FULL SPEED AHEAD AND

3    DO THE BEST WE CAN ON REUNIFICATION, AND SEE WHERE WE ARE ABLE

4    TO GO.

5           **THE COURT:**  IF YOU ARE REQUIRED TO RELEASE -- SO

6    THIS IS THE WORST-CASE SCENARIO FOR THE GOVERNMENT.  IF YOU

7    ARE REQUIRED TO RELEASE, WOULDN'T THAT BE UNDER JUDGE GEE'S,

8    FLORES?  DOESN'T HAVE ANYTHING TO DO WITH THIS CASE.

9           **MR. STEWART:**  I DON'T -- IT DEPENDS ON IF WE ARE

10   READING YOUR COURT'S -- IT DEPENDS ON THE RIGHT READING OF, I

11   THINK, THIS COURT'S INJUNCTION, YOUR HONOR.

12          AS JUDGE GEE SAID IN HER ORDER -- AND TO JUST QUOTE

13   THE KEY LANGUAGE -- IS THAT DETAINED PARENTS MAY CHOOSE TO

14   EXERCISE THEIR MS. L. RIGHT TO REUNIFICATION OR TO STAND ON

15   THEIR CHILDREN'S FLORES RIGHTS.

16          SO IT REALLY -- IT DEPENDS ON HOW YOU UNDERSTAND THE

17   MS. L. RIGHT TO REUNIFICATION.  AND AS WE UNDERSTAND THIS

18   COURT'S -- THE RIGHT THAT THIS COURT HAS RECOGNIZED IS THAT IT

19   DOES NOT REQUIRE RELEASE OF PARENTS.

20          YOUR HONOR'S RULING AT THE MOTION TO DISMISS STAGE

21   WAS A DUE PROCESS RULING ABOUT FAMILY INTEGRITY AND WAS --

22   YOUR HONOR VERY CLEARLY EMPHASIZED THAT THE PLAINTIFFS HERE DO

23   NOT CHALLENGE THE GOVERNMENT'S AUTHORITY TO DETAIN.  AND THERE

24   WOULD NOT BE ANY PLAUSIBLE DUE PROCESS ARGUMENT TO FORCE A

25   PARENT TO RELEASE WHEN THAT PARENT, THAT ADULT, IS SUBJECT TO

 1   DETENTION UNDER A LAWFUL AUTHORITY UNDER THE IMMIGRATION LAWS,

 2   8, USC, 1225 OR THE LIKE.

 3          SO, ANYWAY, IT DOES, I THINK -- AGAIN, IT IS A

 4   MATTER OF INTERPRETING THE TWO INJUNCTIONS TOGETHER.  BUT IF I

 5   HAVE UNDERSTOOD YOUR INJUNCTION CORRECTLY, YOUR HONOR, YOU

 6   KNOW, AS KIND OF DRAWN OUT BY YOUR STATEMENTS IN COURT, WE ARE

 7   NOT -- YOUR INJUNCTION DOES NOT FORCE US TO DO THAT RELEASE TO

 8   THOSE PARENTS WHO WE OTHERWISE HAVE VALID AUTHORITY TO KEEP IN

 9   CUSTODY.

10          **THE COURT:**  MR. GELERNT.

11          **MR. GELERNT:**  WE DON'T DISAGREE WITH THAT READING.

12   OUR UNDERSTANDING IS THAT BOTH YOUR HONOR'S RULING AND JUDGE

13   GEE'S RULING ARE FAIRLY STRAIGHTFORWARD.

14          YOUR HONOR WANTS REUNIFICATION, BUT OBVIOUSLY THE

15   TOUCH TONE IS ALWAYS WHAT THE PARENT VIEWS IS THE BEST

16   INTEREST.  SO IF THE PARENT WANTS TO WAIVE THEIR FLORES RIGHTS

17   AND KEEP THEIR CHILD WITH THEM IN FAMILY DETENTION THEY HAVE

18   THAT RIGHT -- I MEAN, SORRY -- OR WAIVE YOUR HONOR'S RULING

19   AND SAY WE WANT TO RELEASE, WE WOULD RATHER OUR CHILD BE

20   RELEASED UNDER FLORES.  I THINK THAT IS WHAT YOU SAID AND WHAT

21   JUDGE GEE SAID VERY CLEARLY, THE PARENT HAS THE RIGHT TO

22   EITHER KEEP THEIR CHILD WITH THEM OR NOT, SO WE AGREE WITH THE

23   GOVERNMENT'S RULING.  ANY RELEASE BY THE PARENT IS GOING TO BE

24   NOT UNDER YOUR RULING AND NOT UNDER JUDGE GEE'S FLORES RULING

25   WHICH APPLIES TO THE CHILDREN, IT IS GOING TO HAVE TO BE SOME

```
 1   SEPARATE ACTION WHERE THE PARENT SAYS, I HAVE A DUE PROCESS
 2   RIGHT TO GET OUT OF DETENTION.
 3          I THINK THERE PROBABLY IS THAT DUE PROCESS RIGHT.
 4   JUDGE BOASBERG IN DC JUST TALKED ABOUT THAT, BUT IT DOESN'T
 5   IMPLICATE YOUR RULING OR JUDGE GEE'S RULING.  THE SHORT OF IT
 6   IS WE AGREE WITH THE --
 7          THE COURT:  WHAT IF THE PARENT DOES NOT AGREE TO BE
 8   SEPARATED AND HAVE THE CHILD RELEASED TO O.R.R. AND DOES NOT
 9   AGREE TO JOINT DETENTION IN A FAMILY RESIDENTIAL CENTER.  AS I
10   UNDERSTAND THE ARGUMENT THE GOVERNMENT IS LEFT WITH THE
11   HOBSON'S CHOICE OF THEN HAVING TO RELEASE THE PARENT BECAUSE
12   UNDER FLORES THEY CAN ONLY HOLD THE TWO FOR 20 DAYS IN
13   DETENTION, BUT IF THE PARENT IS SAYING THEY DON'T WANT JOINT
14   DETENTION THEN DO THEY HAVE TO RELEASE THE PARENT.  AND LET'S
15   ASSUME --
16          MR. GELERNT:  YOUR HONOR, I WISH THAT FLORES WENT
17   THAT FAR AND REQUIRED THE RELEASE OF THE PARENT.  IF THE
18   PARENT SAID, I WANT MY CHILD WITH ME UNDER MS. L. AND I DON'T
19   WANT TO BE HERE IN DETENTION LONG-TERM, I WANT TO BE RELEASED;
20   FLORES DOES NOT GIVE THE PARENT THAT RIGHT.
21          IF THE PARENT IS GOING TO GET OUT WITH THEIR -- THEY
22   ARE GOING TO HAVE TO BRING A SEPARATE SUIT.  MAYBE THEY ARE
23   GOING TO WIN, MAYBE THEY ARE NOT UNDER DUE PROCESS.  AND THAT
24   WOULD BE A BASIC CLAIM OF, THE GOVERNMENT CAN ONLY DETAIN ME
25   IF I AM A FLIGHT RISK OR A DANGER.
```

JULY 10, 2018

 1          BUT NOTHING IN FLORES WOULD REQUIRE THE GOVERNMENT

 2   TO RELEASE THAT FAMILY UNIT IF THE MOTHER SAID, I WANT MY

 3   CHILD HERE BUT I DON'T FEEL LIKE BEING IN DETENTION.

 4          **THE COURT:**  OKAY.  THIS MIGHT BE THE HAPPY SITUATION

 5   WHERE, IF I UNDERSTAND YOU CORRECTLY, MR. GELERNT, YOU ARE

 6   AGREEING WITH WHAT THE GOVERNMENT HAS OUTLINED.

 7          SO WHAT I WOULD PROPOSE, BECAUSE THE GOVERNMENT IS

 8   ASKING FOR A DETERMINATION BY THE COURT AS SOON AS POSSIBLE,

 9   IS THAT YOU MEET AND CONFER.  IT SOUNDS LIKE YOU ARE IN

10   AGREEMENT --

11          **MR. GELERNT:**  WE ARE.

12          **THE COURT:**  -- AND SIMPLY SEND ME A JOINT MOTION AND

13   ORDER.

14          **MR. GELERNT:**  THAT'S FINE, YOUR HONOR.  WE WOULD

15   JUST SAY THAT IT WOULD SAY THAT A PARENT CAN ALWAYS WAIVE THE

16   REUNIFICATION RIGHT AND THEY CAN ALWAYS WAIVE THE FLORES RIGHT

17   TO RELEASE; BECAUSE ULTIMATELY OUR VIEW IS, IN BOTH CASES, THE

18   TOUCH TONE IS THE PARENT MAKES THE DECISION, WHERE THEY ARE

19   FIT AND NOT ABUSIVE, FOR THE BEST INTEREST OF THE CHILD.  SO I

20   THINK THAT SHOULD BE ABLE TO BE DONE VERY, VERY QUICKLY TODAY.

21          **THE COURT:**  OKAY.  I WILL BE LOOKING OUT FOR THE

22   JOINT MOTION AND ORDER.

23          **MR. STEWART:**  THANK YOU VERY MUCH, YOUR HONOR.  I

24   APPRECIATE THE OPPORTUNITY TO BE HERE.

25          **THE COURT:**  THANK YOU FOR BEING HERE.


JULY 10, 2018

1          **MR. STEWART:**  I SHOULD APOLOGIZE, YOUR HONOR.  I MAY

2    MISS THE FRIDAY HEARING BECAUSE I HAVE TO GO UP TO SAN

3    FRANCISCO TO ADDRESS ANOTHER UNACCOMPANIED MINOR CASE IN THE

4    NINTH CIRCUIT.  BUT OTHERWISE I WOULD BE HERE TO TRY TO HELP

5    OUT THE COURT AND CONTINUE -- I WILL BE FURTHERING COMPLIANCE

6    WITH THE COURT'S INJUNCTION AS BEST POSSIBLE.

7          **THE COURT:**  VERY GOOD.  THANK YOU.

8          **MR. STEWART:**  THANK YOU, YOUR HONOR.

9          **THE COURT:**  LET'S RECESS.  I WILL LOOK FOR FORWARD

10   TO THE JOINT STATUS REPORT ON THURSDAY, AND THEN WE WILL MEET

11   AGAIN FRIDAY AT 1:00 O'CLOCK.

12         THANK YOU.

13         **MS. FABIAN:**  THANK YOU, YOUR HONOR.

14         **MR. GELERNT:**  THANK YOU, YOUR HONOR.

15

16                          *   *   *

17         I CERTIFY THAT THE FOREGOING IS A CORRECT
           TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
18         IN THE ABOVE-ENTITLED MATTER.

19         S/LEEANN PENCE                      7/10/2018
           LEEANN PENCE, OFFICIAL COURT REPORTER   DATE
20

21

22

23

24

25

JULY 10, 2018

Exhibit W

U.S. Immigration and Customs Enforcement
Enforcement and Removal Operations



**Separated Parent's Removal Form**

**Purpose:** This form is for detained alien parents with administratively final orders of removal who are class members in the *Ms. L. v. I.C.E.*, No. 18-0428, (S.D. Cal. Filed Feb. 26, 2018) lawsuit. Class members are entitled to be reunited with their child(ren) and may choose for their child(ren) to accompany them on their removal or may choose to be removed without their child(ren). Any such decision must be made affirmatively, knowingly, and voluntarily.

**Instructions:** This form must be read to the alien parent in a language that he/she understands. The alien parent should indicate which option he/she is choosing by signing the appropriate box below.

**Parent Name / Nombre de Padre:** _____
**Parent A # / A # de Padre:** _____
**Country of Citizenship / Pais de Ciudadania:** _____
**Detention Facility / El Centro de Detención:** _____

**Child(ren) Name(s) / Nombre de Hijo:**
_____
**Child(ren) A # / A # de Hijo:** _____
**Shelter / Albergue:** _____

---

**English:** *I am requesting to reunite with my child(ren) for the purpose of repatriation to my country of citizenship.*

**Signature / Firma:** _____

---

**English:** *I am affirmatively, knowingly, and voluntarily requesting to return to my country of citizenship without my minor child(ren) who I understand will remain in the United States to pursue available claims of relief.*

**Signature / Firma:** _____

---

### Certificate of Service

I hereby certify that this form was served by me at_____
(Location)

on _____ on _____, and the contents of this
(Name of Alien)          (Date of Service)

notice were read to him or her in the _____ language.
(Language)

_____   _____
Name and Signature of Officer        Name or Number of Interpreter (if applicable)

# Exhibit X

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*\*Admitted Pro Hac Vice*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

Petitioners-Plaintiffs,

vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

Respondents-Defendants.

Case No. 18cv428 DMS MDD

**JOINT STATUS REPORT
REGARDING REUNIFICATION**

On July 9, 2018, this Court held a status conference, and ordered the parties to file a joint report on July 10, 2018, "setting forth how many Class Members have been or will be reunited with their children by the court-imposed deadline, and how many Class Members may not be reunited with their children by the court-imposed deadline due to legitimate logistical impediments that render timely compliance impossible or excusable . . . ." ECF No. 95 at 2. The parties submit this joint status report in accordance with the Court's instruction.

I.      **COMPLIANCE**

        **A. Defendants' Position**

        As previously reported to the Court, Defendants have identified 102 children under age 5 who, upon initial review by the U.S. Department of Health and Human Services ("HHS") were determined potentially to have been separated from a parent, and who therefore were potentially the children of class members. Upon

1

further review, and based on the latest available information at the time of filing, Defendants report the following regarding the reunification scenarios for those 102 children.

### *Not Eligible For Reunification*

- 14 are not eligible for reunification because their parents are not class members.
    - o 8 parents had serious criminal history discovered during background checks (criminal histories identified include child cruelty and narcotics, human smuggling, a warrant for murder, and robbery).
    - o 5 adults were determined not to be the parent of the accompanying child.
    - o 1 parent faces credible evidence of child abuse.

- 2 are not eligible for reunification because their parents are not class members at this time.
    - o 1 parent has been determined to present a danger to the child at this time because an adult in the household where the parent plans to live with the child has an outstanding warrant for aggravated criminal sexual abuse against a 10 year old girl. This determination can be reconsidered if the parent identifies a different living situation.
    - o 1 parent detained in ICE custody is currently being treated for a communicable disease. When the parent no longer has a communicable disease, the reunification process can proceed.

- 10 are not eligible for reunification at this time. They will be assessed for reunification after they are released from criminal custody, provided that Defendants are made aware of that release.
    - o 8 parents are in the custody of U.S. Marshals Service. They will be assessed for reunification after they are released from criminal custody and are transferred to U.S. Immigration and Customs Enforcement ("ICE") custody.
    - o 2 additional parents are in state or county custody. They will be assessed for reunification after they are released from criminal

custody, provided that Defendants are made aware of that release.

- 1 child cannot be reunified at this time because the parent's location has been unknown for more than a year. Defendants are unable to conclusively determine whether the parent is a class member, and records show the parent and child might be U.S. citizens.

*Likely Eligible For Reunification*

- 4 children were reunified with family members before the July 10 deadline.
  - 1 was released to a parent that ICE released into the U.S.
  - 1 was released to a parent in the U.S. with the other parent being deported.
  - 1 was released to a parent in the U.S. with the other parent being still in ICE custody
  - 1 voluntarily departed with the child's adult sibling, with the consent of the parent who is still in ICE custody.

- 51 are eligible for reunification with a parent who is currently in ICE detention.
  - 34 parents have cleared a criminal background check and parentage has been verified through a positive DNA match. They are expected to be reunified on July 10, 2018.
  - 16 parents have cleared a criminal background check but the process for verifying parentage has not yet been completed. They are expected to be reunified on July 10, 2018, or as soon thereafter as parentage can be verified.
  - 1 parent has criminal background check results that are still in question and are being resolved today.

- 20 are eligible for reunification but cannot be reunified by July 10 due to legitimate logistical impediments that render timely compliance impossible or excusable.
  - 12 of those parents were removed from the United States. The Government will work with Plaintiffs' counsel to contact these 12 parents and determine whether they wish to have their child reunified with them in their home country. The parties'

18cv428 DMS MDD

proposals regarding the process to be followed for these individuals are laid out below.
  o 8 parents were previously released into the United States and are undergoing safety and suitability screening in accordance with the TVPRA.

Defendants contend that the above numbers show that Defendants are in compliance with the Court's order. Of the 75 children eligible for reunification, Defendants have already reunified 4, and expect to reunify 34 by the July 10 deadline, and 16 soon thereafter pending confirmation of eligibility. Of the remaining 20, 8 will be reunified as soon as HHS can determine that the parent is not unfit or a danger to the child in accordance with its existing procedures under the TVPRA, and the remaining 12 may be reunified if their parents can be located and if those parents request reunification, and reunification is otherwise proper under the Court's order. Moreover, of the 27 children not currently eligible for reunification, 14 have parents who are not class members, and the remaining 13 may be reunified if and when their parents no longer present a danger, have a communicable disease, or are in criminal custody so long as ICE is aware of their release, and it is otherwise determined that they meet the criteria for reunification. Thus, any children not being reunified by the July 10 deadline are not being reunified because of legitimate logistical impediments that render timely compliance impossible or excusable, and so Defendants are complying with the Court's order.

**B. Plaintiffs' Position**

Plaintiffs do not agree that Defendants have fully complied with the initial reunification deadlines in the Court's preliminary injunction order. Plaintiffs received Defendants' updated numbers within the past hour, and have no independent verification that these numbers are accurate, or that there are not additional children under five who should be on the government's list. Plaintiffs, however, can state the following: By today's deadline, Defendants only plan to reunify about half of the parents with children under five years old. Plaintiffs recognize that Defendants cannot yet reunify the parents who are currently being held in criminal custody. But as to all other Class Members with children under five, the government is not in compliance with the clear deadline ordered by the Court.

1. For the Class Members who were deported without their children, Defendants have not even tried to contact them or facilitate their reunification by today. Their children are stranded in this country because of Defendants' actions, and yet Defendants have apparently done nothing to facilitate their reunification.

2. For the Class Members who have been released from custody, Defendants have not explained why they could not facilitate their reunification by the deadline. Defendants have all of these parents' contact information, and there are apparently only 8 of them. To the extent Defendants have chosen to subject

these parents to ORR's lengthy sponsorship process, Plaintiffs do not believe those procedures are required.  Moreover, even if Defendants believed those procedures would prevent them from reunifying 8 parents in two weeks, they should have informed the Court far earlier than last Friday's status conference, a mere four days before the deadline.

3.    There are Class Members that Defendants do not currently plan to release today, because Defendants have not yet completed their DNA tests. Defendants have not explained why they could not complete these tests or verify parentage through other means by today's deadline.

4.    There is one child for whom Defendants have not even identified a parent.  They have not explained what steps they have taken to find this Class Member.

## II.    DEADLINES

- **Removed Parents:** Defendants have provided to Plaintiffs the date of removal and country of removal for all known removed parents with children under 5. Defendants will provide to Plaintiffs the location of the ICE detention facility where each removed parent was last held. Plaintiffs' counsel will seek to locate those removed parents and provide them with notice of their right to be reunified. If any parent expresses that he or she wishes to be reunified with his or her child then Defendants will facilitate that reunification.

  - <u>Plaintiffs' Position</u>: Plaintiffs believe that once Defendants are notified that a removed parent wishes to be reunified with his or her child, reunification should occur within 7 days.

6

o <u>Defendants' Position</u>: Defendants ask the Court to allow a more flexible time period because there are several issues that may impact the timing of removal for these children. For example, Defendants would need to obtain travel documents for the child, and any ongoing removal proceedings for that child would have to be terminated which might require separate waiver from the parents and/or approval from an immigration judge. Moreover, if the child has already obtained relief and is in lawful status, then Defendants would not have the ability to facilitate reunification with a parent abroad. Because pieces of this process are out of Defendants hands, Defendants request that the Court allow for a flexible schedule for such removals that considers the need to complete these steps prior to removal for reunification.

- **Reunification To Released Parents**: This issue will be determined, at least in part, by the Court's ruling on the parties' joint submission on the procedures to be followed by HHS under the Court's order. Accordingly, the parties will meet and confer following that ruling and will submit a proposal, or respective positions, on this issue for the Court's consideration.

DATED: July 10, 2018

Respectfully submitted,

/s/ Lee Gelernt
Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

18cv428 DMS MDD

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN DIEGO
& IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
          *\*Admitted Pro Hac Vice*

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
Civil Division

18cv428 DMS MDD

U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
sarah.b.fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

18cv428 DMS MDD

# Exhibit Y

We only use cookies that are necessary for this site to function, and to provide you with the best experience. Learn more in our Cookie Statement. By continuing to use this site, you consent to the use of cookies.

27Share

Receive Updates  Enter Email Address   Go





# Fact Sheet: Zero-Tolerance Prosecution and Family Reunification

U.S. Department of Homeland Security sent this bulletin at 06/23/2018 10:17 PM EDT

U.S. DEPARTMENT OF HOMELAND SECURITY

Office of Public Affairs

FOR IMMEDIATE RELEASE
June 23, 2018

### Zero-Tolerance Prosecution and Family Reunification

The Department of Homeland Security (DHS) and Health and Human Services (HHS) have a process established to ensure that family members know the location of their children and have regular communication after separation to ensure that those adults who are subject to removal are reunited with their children for the purposes of removal. The United States government knows the location of all children in its custody and is working to reunite them with their families.

As part of the apprehension, detention and prosecution process, illegal aliens, adults and children, are initially detained by U.S. Customs and Border Protection (CBP) before the children are sent to HHS' Office of Refugee Resettlement (ORR) and parents to Immigration and Customs Enforcement (ICE) custody. Each entity plays a role in reunification.  This process is well coordinated.

**U.S. Customs and Border Protection**

- CBP has reunited 522 Unaccompanied Alien Children (UAC) in their custody who were separated from adults as part of the Zero Tolerance initiative.  The reunions of an additional 16 UAC who were scheduled to be reunited on June 22, 2018 were delayed due to weather affecting travel and we expect they will all be reunited with their parents within the next 24 hours.  There will be a small number of children who were separated for reasons other than zero tolerance that will remain

separated: generally only if the familial relationship cannot be confirmed, we believe the adult is a threat to the safety of the child, or the adult is a criminal alien.

- Because of the speed in which adults completed their criminal proceedings, some children were still present at a United States Border Patrol (USBP) station at the time their parent(s) returned from court proceedings.  In these cases, the USBP reunited the family and transferred them, together, to ICE custody as a family unit.

**U.S. Immigration and Customs Enforcement**

- ICE has dedicated the Port Isabel Service Processing Center as the primary family reunification and removal center for adults in their custody.

- A parent who is ordered removed from the U.S. may request that his or her minor child accompany them. It should be noted that in the past many parents have elected to be removed without their children.

- ICE has posted information in all of its facilities advising detained parents who are trying to locate, and/or communicate with, a child in the custody of HHS to call the Detention Reporting and Information Line for assistance, which is staffed by live operators Monday through Friday from 8 AM to 8 PM.

- The information provided by these parents to the call operators will be forwarded to HHS for action. ICE and HHS will coordinate a review of their custodial data to identify where each child is located, verify the parent/child relationship, and set up regular communication and removal coordination, if necessary.

- Each ICE Field Office has Juvenile Coordinators who manage these cases throughout the immigration court proceedings.

- Further, ICE maintains a publicly available online detainee locator which can be used to locate adults detained by ICE. This site can be accessed at: https://locator.ice.gov/odls/#/index

ICE has completed the following steps toward reunification:

- Implemented an identification mechanism to ensure on-going tracking of linked family members throughout the detention and removal process;
- Designated detention locations for separated parents and will enhance current processes to ensure communication with children in HHS custody;
- Worked closely with foreign consulates to ensure that travel documents are issued for both the parent and child at time of removal; and

- Coordinated with HHS for the reuniting of the child prior to the parents' departure from the United States.

**U.S. Health and Human Services Office of Refugee Resettlement**

- Minors come into HHS custody with information provided by DHS regarding how they illegally entered the country and whether or not they were with a parent or adult and, to the extent possible, the parent(s) or guardian(s) information and location. There is a central database which HHS and DHS can access and update when a parent(s) or minor(s) location information changes.

- As of June 20th HHS has 2,053 separated minors being cared for in HHS funded facilities, and is working with relevant agency partners to foster communications and work towards reuniting every minor and every parent or guardian via well-established reunification processes. Currently only 17% of minors in HHS funded facilities were placed there as a result of Zero Tolerance enforcement, and the remaining 83% percent arrived to the United States without a parent or guardian.

- Parent(s) or guardian(s) attempting to determine if their child is in the custody of the Office of Refugee Resettlement (ORR) in HHS Administration for Children and Families should contact the ORR National Call Center (www.acf.hhs.gov/orr/resource/orr-national-call-center) at 1-800-203-7001, or via email information@ORRNCC.com. Information will be collected and sent to HHS funded facility where minor is located. The ORR National Call Center has numerous resources available for children, parent(s), guardian(s) and sponsors.

- Within 24 hours of arriving at an HHS funded facility minors are given the opportunity to communicate with a vetted parent, guardian or relative. While in HHS funded facilities' care, every effort is made to ensure minors are able to communicate (either telephonic or video depending on the circumstances) with their parent or guardian (at least twice per week). However, reasonable safety precautions are in place to ensure that an adult wishing to communicate with a minor is in fact that minor's parent or guardian.

- Minors in HHS funded facilities are permitted to call both family members and/or sponsors living in the United States and abroad. Attorneys representing minors have unlimited telephone access and the minor may speak to other appropriate stakeholders, such as their consulate, the case coordinator, or child advocate. Additional information on telephone calls, visitation, and mail policies are available in the policy guide.

- Under HHS' publicly available policy guide for Unaccompanied Alien Children, the Office of Refugee Resettlement (ORR) releases minors to sponsors in the following order of preference: parent; legal guardian; an adult relative (brother, sister, aunt, uncle, grandparent or first cousin); an adult individual or entity

designated by the parent or legal guardian (through a signed declaration or other document that ORR determines is sufficient to establish the signatory's parental/guardian relationship); a licensed program willing to accept legal custody; or an adult individual or entity seeking custody when it appears that there is no other likely alternative to long term ORR care and custody.

# # #

Having trouble viewing this message? View it as a webpage.

You are subscribed to updates from the U.S. Department of Homeland Security
Manage Subscriptions   |   Privacy Policy   |   Help

Connect with DHS:
Facebook  |  Twitter  |  Instagram  |  LinkedIn  |  Flickr  |  YouTube

U.S. Department of Homeland Security
www.dhs.gov

Powered by



Privacy Policy | Cookie Statement | Help

# Exhibit Z

CHAD A. READLER
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation (OIL)
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director, OIL District Court Section
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

Attorneys for Federal Respondents-Defendants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

                Petitioners-Plaintiffs,

      vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

                Respondents-Defendants.

Case No. 18cv428 DMS MDD

**DECLARATION OF
JONATHAN WHITE**

I, Jonathan White, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and depose as follows, based on my personal knowledge and information provided to me in the course of my official duties:

1. I am a career officer in the United States Public Health Service Commissioned Corps and have served in the Department of Health & Human Services in three Administrations. I am presently assigned to the Office of the Assistant Secretary for Preparedness and Response, and previously served as the Deputy Director of the Office of Refugee Resettlement for the Unaccompanied Alien Children's Program.

2. I have been involved directly in the actions which HHS has taken to implement Executive Order (EO) 13841 ("Affording Congress an Opportunity to Address Family Separation") and comply with the orders in *Ms. L., et al., v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 18-cv-428 (S.D.Cal.). President Trump issued EO 13841 on June 20, 2018, and the Court issued its orders on June 26, 2018.

## KEY HHS ACTIONS ON REUNIFICATION

3. Focus on Child Safety: The Secretary of Health and Human Services has directed HHS to take all reasonable actions to comply with the Court's orders and to prioritize child safety and well-being when doing so.

4. Deployment of Additional Personnel: On June 22, 2018, the Secretary of Health and Human Services directed ASPR to deploy personnel and resources to help the Office of Refugee Resettlement (ORR) of the Administration for Children and Families (ACF) of HHS reunify children in ORR custody with parents.

5. Determination of Class Members: HHS has worked closely with U.S. Department of Homeland Security (DHS)—including U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE)—to try to determine all individuals who meet the

18cv428 DMS MDD

Court's criteria for class members. The determination of class membership involves real-time, inter-agency collection and analysis of facts and data to: verify parentage; determine location of DHS apprehension and separation; determine parental fitness; and evaluate whether reunification would present a danger to the child. Class membership is not static; it can change due to transfers of putative parents from ICE to the Bureau of Prisons (BOP) (or vice-versa), and newly-acquired information.

6. <u>Facilitation of Regular Communication Between Class Members and Children in ORR Custody</u>: HHS has deployed field personnel to help putative class members communicate with children in ORR care.

**DEPLOYMENT OF ADDITIONAL PERSONNEL**

7. As noted above, on June 22, 2018, the Secretary of Health and Human Services activated ASPR to augment the resources that ORR had already devoted to expeditiously discharge children from ORR care. ORR has had to continue performing core program functions for minors who cross the border without parents (and who far outnumber separated children in ORR care). The augmenting of resources has helped ORR continue performing those core functions.

8. The activating of ASPR included the Secretary's Operation Center (SOC), which is a command center that operates 24 hours per day, 365 days per year. The mission of the SOC is to synthesize critical public health and medical information for the U.S. Government. While typically used for a public health emergency or natural disaster (e.g., Hurricane Maria in Puerto Rico), the SOC can also serve as a communications hub for large, data-intensive, inter-departmental operations.

9. ASPR activated an Incident Management Team. As of July 3, 2018, the Incident Management Team had 33 members (in addition to the permanent staff of the SOC). It works full-time to provide logistical and administrative support.

10. ASPR has also dispatched approximately 115 personnel to the field to engage directly with putative class members in DHS custody. Those personnel—who are organized into four field

teams— are from ACF, ASPR, the US Public Health Service Commissioned Corps, and the National Disaster Medical System's Disaster Medical Assistance Team (DMAT).  The DMAT is a cadre of trained health and medical professionals and para-professionals that augments ASPR's capabilities during public emergencies.

11.     Finally, HHS has executed a contract with BCFS Health and Human Services, Inc. ("BCFS"), to provide an additional 100 reunification case managers, plus approximately 40 staff for logistical and administrative support. HHS has trained the case managers from BCFS, and is deploying them on Thursday, July 5, and Friday, July 6, 2018, to augment existing field operations. They too will engage directly with putative class members in ICE custody.

**DETERMINATION OF CLASS MEMBERS**

12.     ORR has a process for placing unaccompanied alien children (UAC) with parents or other sponsors that is designed to comply with the 1997 Flores Settlement Agreement, the Homeland Security Act of 2002 (HSA), and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), as described in more detail below.  This process ensures the care and safety of children who are apprehended in the United States and then referred to HHS as unaccompanied children.

13.     HHS has modified and expedited its ordinary process so that it can determine class membership using the Court's criteria and, to the extent possible, reunify class members and their children within the Court's deadlines.

14.     Under its modified process, HHS identifies putative class members with children in ORR custody and verifies parentage.  Also, HHS determines the putative class member's immigration history to confirm where they were apprehended and separated from their child.  Finally, HHS collects and analyzes criminal, medical (e.g., communicable disease), and other information to

1  determine the parental fitness of the putative class member and confirm that reunification would not

2  present a danger to the child.  HHS generally performs these checks concurrently.

3      15.    Putative class members who are not verified as parents are not included in the class

4  by HHS.  Putative class members apprehended in the interior, who have relevant criminal history,

5  have a communicable disease, or are otherwise parentally unfit or present a danger to a child, are not

6  included in the class either.

7      16.    In general, HHS knows the names and locations of all children who are in ORR care

8  and custody at all times because ORR maintains that data in its online case management portal.  The

9  ORR portal includes data about each child that DHS provided when DHS transferred the child to

10 ORR custody.  It also includes health and social data collected or entered by ORR personnel, grantees,

11 or contractors.  While the ORR portal may contain some data about the child's parents, the ORR

12 portal was not designed to determine class membership or facilitate reunification under the criteria

13 and deadlines established by the Court's Order.  Some of the data required to determine the class

14 membership of a putative class member resides with DHS, while HHS must collect some data directly

15 from the putative class member.

16     17.    The data collection, sharing, and analysis required to determine class membership is

17 extraordinarily time and resource intensive.  There are myriad reasons for this.  For instance, DHS

18 has different information systems, and those systems were not designed to neatly capture and readily

19 share all of the data required to determine class membership.  The departments must therefore map

20 their data manually.  Also, the class potentially encompasses parents who were separated from their

21 children *before* the Administration implemented the zero-tolerance policy, and those groups may not

22 have received the same family unit identifiers from DHS as the groups separated *after* the

23 Administration implemented the zero-tolerance policy.  Absent reliable and consistent identifiers,

24 HHS must glean the separations of class members and children (and related details) from the case

4

management files on the ORR portal. On top of these variables, a parent's class membership can change if the parent is transferred between ICE and the Bureau of Prisons (BOP), or if information obtained directly from the parent affects the class membership analysis.

18. To ensure that every separated child in ORR custody who belongs to a class member is identified and reunified, HHS has had each grantee at one of ORR's approximately 110 shelters certify the separated children who the grantee reasonably believes are in its care. HHS has also conducted a full manual review of the case management file for each one of the approximate 11,800 children in ORR custody—the substantial majority of whom were not separated from a putative parent at the border—to confirm or rule out any indicia of separation. The manual review was conducted by dozens of HHS personnel working nights and over the weekend. The results of both the manual review and the grantee certifications are undergoing validation.

19. As of July 5, 2018, we have identified approximately 101 minors under age 5, within ORR care, whose records contain indicia of separation. Class membership analysis for putative class members associated with the larger group of minors 5 through 18 is ongoing. Also, some of the identified minors may have been separated prior to crossing the border, or there may be other factors that need to be explored that would not make their parents members of the class. HHS has received confirmation from DHS that approximately 40 parents of children in the under-5 group are in DHS custody and another 9 are in U.S. Marshal's custody. The class membership analysis for putative class members associated with the remaining children in the group of 101 is ongoing.

Verifying Parentage

20. HHS is using DNA testing to try to verify parentage of _all_ putative class members, as well as all children in ORR custody who ORR reasonably believes were separated from a putative class member. HHS is conducting the DNA testing concurrent with collecting and reviewing

documentation of parentage, interviewing putative class members and family members, and observing communications or interactions between putative class members and children.

21. DNA testing is a faster but costlier method for confirming parentage than collecting and assessing documentation and anecdotal information. When ORR implements its safety and suitability policies in the ordinary course of administering its program, it confirms parentage through DNA testing as a last resort. HHS has dual-tracked global DNA testing to ensure child safety and to expedite parentage verifications to try to comply with the deadlines in the Court's order.

22. ORR grantees are swabbing the cheeks of the children in ORR custody, while DHS personnel or the field teams deployed by HHS are swabbing the cheeks of the putative class members in ICE custody. The cheek swabs are then sent to a third-party laboratory services provider to complete the DNA testing. The results are then transmitted electronically to the Incident Management Team at the SOC, which shares them with the grantees. HHS will use the results only for verifying parentage.

23. The DNA testing process takes nearly one week to complete for each putative class member and child. Once HHS has made a data match between a putative class member and child, it may take the field teams and grantees up to two days to further validate the match and swab cheeks. It may then take up to three days for laboratory services provider to collect the sample and conduct the test. Once the laboratory services provider completes the testing, it may take up to 24 hours for the Incident Management Team to receive and transmit the results back to the grantees and field teams.

24. The field teams are concurrently facilitating the completion of reunification applications by putative class members. The packets seek medical and social data that bear on the criteria for class membership, including parentage, parental fitness, and child endangerment. A copy of a blank reunification application is attached at Tab 1.

18cv428 DMS MDD

25. My opinion is that DNA testing is the method of parental verification most likely to protect children from harm given the compressed timeframe imposed by the court's order. The risk of placing children with adults who are not their parents is a real and significant child welfare concern for HHS because the experience of ORR is that children are smuggled across the border or trafficked by adults who fraudulently hold themselves out as parents. The children may not disclose the situation to CBP, ICE, or ORR because they may fear retaliation by the adults who brought them across the border. In some instances, they may fear retaliation by their parents in their home country, who have given them to the smuggler or trafficker so that they may earn money in the United States. My opinion is that DNA testing mitigates the risk of the United States Government placing children back with adults who are not their parents and who would endanger them.

26. If, however, HHS concludes that it can reliably and more quickly determine the parentage of a putative class member based on documentation or anecdotal information collected from the putative class member, then HHS will make that determination to try to comply with the Court's reunification deadlines.

<u>Background Checks for Parental Fitness</u>

27. HHS is assessing the backgrounds of putative class members by reviewing summaries of prior criminal background checks provided by ICE. Already such background check information has come back with two results that show that two putative parents of children under five may endanger the child (charges of kidnapping/rape and child cruelty), and 12 more need to be further assessed.

<u>Parental Fitness and Child Endangerment</u>

28. As discussed below, HHS' ordinary process for placing children with sponsors involves a safety and suitability analysis, as well as a home study in certain circumstances. These checks can sometimes take weeks or months.

18cv428 DMS MDD

29.     HHS has modified and expedited its ordinary process when further assessing parental fitness and potential child endangerment for a potential reunification with a putative class member in DHS custody.  For potential reunifications with putative class members in DHS custody, any further assessment of parental fitness and potential child endangerment involves only the review of the case management records (which includes, for example, case review notes and other electronic files) and the putative class member's completed reunification packet for indicia of child abuse or neglect.  If there are no such indicia, then HHS will not conduct further assessment.

30.     When further assessing parental fitness and potential child endangerment for potential reunifications of putative class members who are no longer in DHS custody, HHS is modifying and expediting its ordinary process on a case-by-case basis to try to comply with court-ordered deadlines in ways that do not endanger child welfare.

31.     For example, when placing a child with a putative parental sponsor who is no longer in DHS custody, HHS would ordinarily verify the potential sponsor's residential address and conduct background checks of adult cohabitants to try to ensure that the potential sponsor is capable of providing shelter and care – and that the potential sponsor's cohabitants do not endanger the child— after placement. To try to comply with the Court's deadlines, HHS will likely need to streamline its address verification process for putative class members.  But HHS does not believe that it can streamline background checks.

32.     UAC sponsors have always included the parents of UACs , and close to half of the sponsors to whom ORR ordinarily releases UACs are parents.

33.     The *Flores* settlement agreement ("FSA") prioritizes release to parents, if they are available, and also specifically provides for ORR to ensure the suitability of such releases, and to protect the child from danger. *See* FSA paragraphs 14-18.

8                                    18cv428 DMS MDD

34.     The FSA describes a variety of criteria to consider before the government releases a UAC to a parent (or other sponsor).  *See* FSA paragraphs 14-18.  These factors include:

- Verifying the identity of the parent;

- Verifying the identity and employment of the individuals offering support to the parent and minor;

- Receiving information from their address and any future change of address;

- Ensuring the parent will provide for the minor's physical, mental, and financial well-being;

- Investigating the living conditions in which the minor would be placed and the standard of care he would receive;

- Interviewing the members of the household where the parent will live with the child, and in some cases a home visit; and

- Requiring the parent to ensure the minor's presence at all future immigration proceedings.

35.     Furthermore, under the HSA and TVPRA, HHS has developed a series of safety and suitability requirements that ensure child welfare, upon release, is protected.  These policies, many of which were refined after Congressional oversight, are contained in Section 2 of the ORR Policy Guide: Children Entering the United States Unaccompanied, available at:

https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.1 .

36.     The policies include identifying the sponsor; submitting the application for release and supporting documentation; evaluating the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child; background checks; and in some cases home studies; and planning for post-release.

9

37.     ORR requires all potential sponsors, including parents, to undergo fingerprinting in order to ensure the safety and suitability of release.  The fingerprints are used to run background checks of databases involving criminal history. ORR also checks sexual abuse information, child abuse information, and other public record sources.

38.     ORR also requires that, if there are other adults living in the household with a sponsor (including a parent), those adults also undergo background checks.  This ensures the child will not be endangered if, for example, those household members have a history of child abuse or sexual abuse that ORR must further consider before approving the release.

39.     ORR also requires that sponsors, including parents, identify an alternative caregiver, who will be able to provide care in the event the original sponsor is unavailable.  These adult caregivers must also be identified and undergo background checks.

40.     To ensure safety and suitability for children, ORR considers the following factors when evaluating release of a UAC to parents, other family members, and other potential sponsors in the community:

a.   The nature and extent of the sponsor's previous and current relationship with the child or youth and the unaccompanied alien child's family, if a relationship exists.

b.   The sponsor's motivation for wanting to sponsor the child or youth.

c.   The UAC's parent or legal guardian's perspective on the release to the identified potential sponsor (for cases in which the parent or legal guardian is not  the sponsor).

d.   The child or youth's views on the release and whether he or she wants to be released to the individual.

e.   The sponsor's understanding of the unaccompanied alien child's needs, as identified by ORR and the care provider.

18cv428 DMS MDD

f.   The sponsor's plan to provide adequate care, supervision, access to community resources, and housing.

g.   The sponsor's understanding of the importance of ensuring the unaccompanied alien child's presence at all future hearings or proceedings, including immigration court proceedings, and the sponsor's receipt of Legal Orientation Program for Custodians information that ORR provides to all potential sponsors.

h.   The linguistic and cultural background of the child or youth and the sponsor, including cultural, social, and communal norms and practices for the care of children.

i.   The sponsor's strengths, resources, and mitigating factors in relation to any risks or special concerns of the child or sponsor, such as a criminal background, history of substance abuse, mental health issues, or domestic violence and child welfare concerns.

j.   The unaccompanied alien child's current functioning and strengths in relation to any risk factors or special concerns, such  as children or youth who are victims of human trafficking; are a parent or are pregnant; have special needs, disabilities or medical or mental health issues; have a history of criminal, juvenile justice, or gang involvement; or a history of behavioral issues.

41.   In certain cases, the TVPRA requires a home study, prior to release.  8 U.S.C. § 1232(c)(3)(B) states: "A home study shall be conducted for a child who is a victim of a severe form of trafficking in persons, a special needs child with a disability (as defined in section 12102 of title 42), a child who has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened, or a child whose proposed sponsor clearly presents a risk of abuse, maltreatment, exploitation, or trafficking to the child based on all available objective evidence."  In circumstances in which a home study is not required by the TVPRA or ORR policy, the Case Manager and an independent third party Case

Coordinator may recommend that a home study be conducted if they agree that the home study will provide additional information required to determine that the sponsor is able to care for the health, safety and well-being of the child.

42. ORR does not disqualify potential sponsors on the basis of their immigration status, but does require sponsors (including parents) to complete a sponsor care plan. Among other things, the care plan identifies the adult caregiver who will act for the sponsor, should the sponsor become unavailable, and how such caregiver will be notified of such situation. It also includes a safety plan in some circumstances.

43. Throughout the release process, care providers work with the child and sponsor so that they can plan for the child's after care needs. This involves working with the sponsor and the unaccompanied alien child to prepare them for post-ORR custody, assess the sponsor's ability to access community resources, and provide guidance regarding safety planning, sponsor care plans, and accessing services for the child. The care provider explains the U.S. child abuse and neglect standards and child protective services that are explained on https://www.childwelfare.gov, human trafficking indicators and resources, and basic safety and how to use the 9-1-1 number in emergency situations.

44. Once the assessment is complete and a sponsor has been approved, the sponsor enters into an agreement with the Federal government in which he or she agrees to:

    a. Provide for the physical and mental well-being of the child, including but not limited to, food, shelter, clothing, education, medical care and other services as needed.

    b. Attend a legal orientation program provided under the Department of Justice/Executive Office for Immigration Review's (EOIR) Legal Orientation Program for Custodians (Sponsors), if available where he or she resides.

c. Depending on where the unaccompanied alien child's immigration case is pending, notify the local Immigration Court or the Board of Immigration Appeals within 5 days of any change of address or phone number of the child (Form EOIR-33). (If applicable, file a Change of Venue motion on the child's behalf.10 A "change of venue" is a legal term for moving an immigration hearing to a new location.)

d. Notify the DHS/U.S. Citizenship and Immigration Services within 10 days of any change of address by filing an Alien's Change of Address Card (AR-11) or electronically at http://www.uscis.gov/ar-11.

e. Ensure the unaccompanied alien child's presence at all future proceedings before the DHS/Immigration and Customs Enforcement (ICE) and the DOJ/EOIR.

f. Ensure the unaccompanied alien child reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.

g. Notify local law enforcement or state or local Child Protective Services if the child has been or is at risk of being subjected to abuse, abandonment, neglect or maltreatment or if the sponsor learns that the child has been threatened, has been sexually or physically abused or assaulted, or has disappeared. (Notice should be given as soon as it is practicable or no later than 24 hours after the event or after becoming aware of the risk or threat.)

h. Notify the National Center for Missing and Exploited Children at 1-800-843-5678 if the unaccompanied alien child disappears, has been kidnapped, or runs away. (Notice should be given as soon as it becomes practicable or no later than 24 hours after learning of the child's disappearance.)

13

i.   Notify ICE at 1-866-347-2423 if the unaccompanied alien child is contacted in any way by an individual(s) believed to represent an alien smuggling syndicate, organized crime, or a human trafficking organization. (Notice should be provided as soon as possible or no later than 24 hours after becoming aware of the information.)

j.   In case of an emergency, such as serious illness, destruction of home, etc., temporarily transfer physical custody of the child to another person who will comply with the terms of the Sponsor Care Agreement.

k.   In the event that a sponsor who is not the child's parent or legal guardian is no longer able and willing to care for the unaccompanied alien child and is unable to temporarily transfer physical custody, notify ORR using the ORR National Call Center, at 1-800-203-7001.

45.   If HHS cannot reasonably complete processes that are material to ensuring the welfare of the children presently in ORR custody within the deadlines ordered by the Court, then HHS has no choice but to make class membership determinations with incomplete information.  The use of incomplete information increases the risk of not only incorrect class membership determinations, but also reunifications that endanger the welfare of the children presently in ORR care.

46.   My opinion is that some relaxing of the Court's deadlines is needed to allow HHS, on a case-by-case basis, to complete processes that HHS determines are necessary to make informed class membership determinations and to protect the welfare of the children presently in ORR custody.

## FACILITATION OF CLASS MEMBER COMMUNIATIONS

47.   HHS has facilitated communication between putative class members by helping putative class members connect with case managers.  HHS has directed field staff to help facilitate a conversation between a putative class member and his or her child.  For example, field staff may call

14

a case manager in a minor's shelter and ask the case manager to call or contact the detained parent. In other instances, the detained adult may be given the shelter case manager's telephone number.

48.     The ORR Helpline is a bilingual call center that ordinarily works with ORR grantees to facilitate communications between potential sponsors and the children in the care of the grantees. *See* https://www.acf.hhs.gov/orr/about/ucs/contact-info (last visited July 5, 2018).  Potential sponsors who call the ORR Helpline provide their name, contact information, relationship to the child, and other information to the ORR Helpline representative, who communicates the information to the ORR grantee caring for the child.  The ORR grantee then responds to the potential sponsor and facilitates direct communications with the child and a case worker.  The ORR Helpline does not verify parentage or make determinations regarding parental fitness or child endangerment.

49.     HHS operates with the goal of facilitating communications between putative class members and children in ORR custody twice a week.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 5, 2018.

Jonathan White,

18cv428 DMS MDD

# Exhibit AA

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ms. L.; et al., | Case No.:  18cv0428 DMS (MDD) |
| Petitioners-Plaintiffs, | **ORDER FOLLOWING STATUS** |
| v. | **CONFERENCE** |
| U.S Immigration and Customs Enforcement ("ICE"); et al., | |
| Respondents-Defendants. | |

A status conference was held on July 9, 2018.  Lee Gelernt appeared and argued for Plaintiffs and Sarah Fabian appeared and argued for Defendants.  After consulting with counsel and being advised of the status of the case, IT IS HEREBY ORDERED:

1.     On or before **6:00 p.m.** on **July 9, 2018**, counsel shall submit the following documents to the Court:

a.     A joint status report on the issue of the procedures to be followed for the reunification of children and Class Members who have been released from ICE custody.  To the extent counsel have agreed on the procedures, they should submit a joint motion and proposed order for the Court's review.  To the extent there is disagreement, each side should set out its respective proposal and specify the disagreements that require court resolution

1

b.   A proposed notice to be provided to the Class.

2.   On or before **10:00 a.m.** on **July 10, 2018**, counsel shall submit a joint status report setting forth how many Class Members have been or will be reunited with their children by the court-imposed deadline, and how many Class Members may not be reunited with their children by the court-imposed deadline due to legitimate logistical impediments that render timely compliance impossible or excusable, *e.g.*, detention of the Class Member in criminal custody or removal of the Class Member from the United States.  For the latter group, counsel should explain why reunification may not be completed, and provide a timeframe for those reunifications.

3.   A further status conference shall be held at **11:00 a.m.** on **July 10, 2018**.

4.   The Court has set up a dial in number for counsel and any members of the news media that wish to attend.  ***This number is for counsel and media only***, who should follow the steps below to connect to the conference call. Members of the general public may appear in person.

1.   Dial the toll free number: **877-873-8018**;

2.   Enter the Access Code: **9911153** (Participants will be put on hold until the Court activates the conference call);

3.   Enter the Participant Security Code **07100428** and Press # (The security code will be confirmed);

4.   Once the Security Code is confirmed, participants will be prompted to Press 1 to join the conference or Press 2 to re-enter the Security Code.

 Dated:  July 9, 2018

Hon. Dana M. Sabraw
United States District Judge

2

18cv0428 DMS (MDD)

# Exhibit BB

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L.; et al.,<br><br>               Petitioners-Plaintiffs,<br><br>v.<br><br>U.S Immigration and Customs<br>Enforcement ("ICE"); et al.,<br><br>             Respondents-Defendants. | Case No.: 18cv0428 DMS (MDD)<br><br>**ORDER SETTING FURTHER**<br>**STATUS CONFERENCE** |

     A status conference was held on July 6, 2018. Lee Gelernt appeared and argued for Plaintiffs and Sarah Fabian appeared and argued for Defendants. After consulting with counsel and being advised of the status of the case, IT IS HEREBY ORDERED:

1.     On or before **July 7, 2018**, at **5:00 p.m.**, the Government shall provide to Plaintiffs a list of the 101 children discussed at the conference that identifies each child and explains the status of each child's reunification with his or her parent.

2.     Counsel shall meet and confer about the list, and shall also meet and confer on the ORR policies and procedures in dispute.

3.     To the extent counsel reach an agreement on these issues, they should submit a joint motion and proposed order for the Court's review and signature. Otherwise, counsel

should be prepared to discuss these issues at a further status conference scheduled for **July 9, 2018**, at **10:00 a.m.**

The Court has set up a dial in number for counsel and any members of the news media that wish to attend. ***This number is for counsel and media only***, who should follow the steps below to connect to the conference call:

1. Dial the toll free number: **877-873-8018**;

2. Enter the Access Code: **9911153** (Participants will be put on hold until the Court activates the conference call);

3. Enter the Participant Security Code **07090428** and Press # (The security code will be confirmed);

4. Once the Security Code is confirmed, participants will be prompted to Press 1 to join the conference or Press 2 to re-enter the Security Code.

Dated:  July 6, 2018

Hon. Dana M. Sabraw
United States District Judge

2

# Exhibit CC

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, et al. | NO. 2:18-CV-00939 |
| Plaintiff, | DECLARATION OF FRANCISCO SERRANO IN SUPPORT OF PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY |
| v. | |
| THE UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

I, Francisco Serrano, declare as follows:

1.      I am over the age of 18 and have personal knowledge of the facts herein.  If called as a witness, I could and would testify competently to the matters set forth below.

2.      I reside in the District of Columbia. I live with my wife, my mother, and my two children who are fifteen and seventeen years old.

3.      In May 2018, my niece Maria called me to tell me that she had traveled from El Salvador with a caravan, that she was at the Mexico-United States border and that she was going to cross the border by San Ysidro.  She also told me that she was traveling with her two children, M. who is 7 years old and N. who is 2 years old.

4.      Approximately a week later I received a call from a shelter indicating that the children were going to be separated from Maria, that they were on their way to New York, that Maria had designated me as a sponsor and asking me whether I was willing to be the sponsor.  I

DECLARATION OF FRANCISCO
SERRANO IN SUPPORT OF
PLAINTIFFS' MOTION FOR
EXPEDITED DISCOVERY

1

OFFICE OF THE ATTORNEY GENERAL
STATE OF CALIFORNIA
1300 I Street
Sacramento, CA 95814
916-445-9555

1   told the person that I would be the sponsor and then the person told me that I would be able to

2   talk to the children twice a week.  Attached hereto as <u>Exhibits 1 and 2</u> are the forms I was told

3   to complete in early May 2018 so that I could receive Maria's two sons.

4         5.     I have spoken with the seven-year-old on several occasions since the family

5   arrived. He told me that officials told him that he and his little brother were being taken to a

6   detention center in Washington, D.C. to be closer to me, their uncle. I received a phone call from

7   the seven-year-old who thought he was in Washington, D.C., but he was not. He was in New

8   York. I was told by a social worker that the two young boys are in Lutheran Youth Hostel of

9   New York.

10        6.     To become the sponsor the social worker told me that I had to provide: 1) Maria's

11   mother's birth certificate, 2) Maria's birth certificate, 3) the kids' birth certificates, and 4) my

12   birth certificate, driver's license, passport and proof of citizenship.  In addition to completing the

13   paperwork, I had to provide copies of my identification and police record.  I did not have copies

14   of Maria's mother's, Maria's or the kids' birth certificates so I had to ask persons in El Salvador

15   to send them to me.  This process took 5 days because a friend was in El Salvador and was able

16   to  help me, otherwise the process would have taken 15 to 20 days.

17        7.     The social worker who was working with the kids told me that once I submitted

18   the documents she would get approval within 36 hours and the children would be released within

19   24 hours after that. I did not hear from them within 36 hours, but I assumed that everything was

20   valid because I had completed all of the forms and followed all of the instructions.

21        8.     Approximately one week after I provided the paperwork I was told that I had to

22   be fingerprinted. The next day I took time off work and got fingerprinted.

23        9.     After I submitted all the requested documents the social worker told me that she

24   was very sorry but that she had only been able to get one of the approvals she needed to approve

25   the paperwork.  She said that she did everything she could but it was out of her hands.

26

DECLARATION OF FRANCISCO          2          OFFICE OF THE ATTORNEY GENERAL
SERRANO IN SUPPORT OF                         STATE OF CALIFORNIA
PLAINTIFFS' MOTION FOR                            1300 I Street
EXPEDITED DISCOVERY                            Sacramento, CA 95814
                                                     916-445-9555

10.     In late May 2018, I received a power of attorney from my niece Maria giving me the authorization to care for her two minor sons. A copy of the notarized power of attorney is attached hereto as Exhibit 3. I provided a copy of this power of attorney to the social worker in early June 2018.

11.     About a week later I was asked to complete a certified form for a further background check. On June 1, 2018, I completed the additional form that Lutheran Social Services had provided to me to get authorization to receive Maria's two sons. I had to have the form notarized. A copy of that form is attached hereto as Exhibit 4.

12.     Then I was informed that I passed the background check but they needed one more week to release the kids to me. The seven-year-old boy called me and told me that officials had told him that he and his brother would be released to me in a week.

13.     But then, I was told that they needed to perform a DNA test to confirm that Maria is the children's mom.  Recently, the social worker told me that a few days ago a government employee went to Otay Mesa where Maria was detained to conduct the DNA test but that Maria was not there.  Later, when I spoke to Maria she said that she had been at Otay Mesa the entire time.

14.     On June 22, several weeks after I submitted all of the paperwork, on June 22, 2018, I was told that the paperwork I submitted was wrong, the power of attorney was not valid, and the boys would not be released to me.  She said that there were new forms we had to complete, but she did not send me the forms until Friday, June 29, 2018. Those forms are attached hereto as Exhibits 5 and 6.

15.     On June 27 after borrowing money from family members, I was able to gather $10,000 to post Maria's bond. An immigration agent told me that Maria would come out on June 28, 2018 and that she would be taken to the bus station so she could take the bus to Washington, D.C. So Maria's bus ticket was for June 28. But immigration released her on June 27 and Maria called me because the agents left her in a McDonald's and she did not have

DECLARATION OF FRANCISCO
SERRANO IN SUPPORT OF
PLAINTIFFS' MOTION FOR
EXPEDITED DISCOVERY

3

OFFICE OF THE ATTORNEY GENERAL
STATE OF CALIFORNIA
1300 I Street
Sacramento, CA 95814
916-445-9555

1    any place to go or to sleep. She had to look for someone to take her in for one night and now

2    she in on the way to Washington, D.C.

3         16.    On June 28, 2018, I talked to the social worker who told me that we will have

4    to start the sponsorship process again and that Maria will have to fill the application and

5    request the children because she already was released from immigration detention.

6         17.    I am concerned that now the process for Maria's children to be reunited with my

7    family will have to start all over again. Everyone in my home, including my 78-year-old

8    mother, will have to submit fingerprints, police records, and identification, and we will have to

9    complete a new application form. Because of my mother's age, it is difficult to get her

10   fingerprints, and immigration officials previously told her that she would not have to submit

11   fingerprints again. I was told that my niece Maria will also have to be fingerprinted and will

12   have to submit all the documentation, as well. I am concerned that Maria will not be able to

13   produce the right paperwork to be reunited with her sons. Maria does not have a passport, and

14   all she has is an ID card from El Salvador.

15        18.    All this process has been very difficult for my family:

16            a.    At first when I would talk to M., the 7-year-old, he was very talkative and

17   excited because the social worker told him he would be out within a week. When the time came

18   that M. expected to be released and nothing happened he sounded depressed, he would not say

19   much and wanted to cry. He asked me why I had not picked him up yet. The social worker told

20   me that M. is depressed and asked me for words of encouragement to cheer him up. On June 28,

21   I spoke with him and he is glad because he thinks that soon he is going to be reunited with his

22   mother. I am worried about M.'s mental health when he learns that we have to start the process

23   again and that he is not going to be released soon.

24            b.    Because I am only able to speak on the phone and N. is too young, I have

25   not been able to speak with him at all. M. told me that N. cries all the time, and that the only

26

DECLARATION OF FRANCISCO
SERRANO IN SUPPORT OF
PLAINTIFFS' MOTION FOR
EXPEDITED DISCOVERY

4

OFFICE OF THE ATTORNEY GENERAL
STATE OF CALIFORNIA
1300 I Street
Sacramento, CA 95814
916-445-9555

1 time that the kids see each other is at night. M. told me that they let N. stay with him at night

2 because he is the only one with whom N. won't cry.

3         c.     When I speak with Maria she asks for an update about the children and is

4 speechless when I tell her that I am still waiting for approval. She cries. She has only been able

5 to speak with the kids a few times.

6         d.     The most affected person by all this is my mother. She raised Maria after

7 her mother died when Maria was 8 months old. At first, I did not want to tell my mom what was

8 happening because she is 78 years old and I was concerned that the news would adversely impact

9 her health. I only told her that Maria and the kids had crossed the border but were detained.

10 After watching news, my mom demanded I tell her what was happening. My mom became ill

11 when I told her that the kids had been separated from Maria  Ever since my mom found out about

12 the family separation, she has had an intense headache and I had to take her to see a doctor. I

13 am really concerned about my mom's health. For Maria, the separation from her kids repeats

14 the story as when she lost her mother.

15         e.     On my part, this process has been very depressive and frustrating. When

16 I finally thought that they were going to give me the children they tell me no. I have also had to

17 take time off work to do all that has been asked of me.

18         19.     I am hopeful that Maria, M. and N. will be reunited soon.

19

20         I declare under penalty of perjury under the laws of the State of California and the laws

21 of the United States that the foregoing is true and correct.

22         Dated this 30th day of June 2018 in Washington D.C.

23

24                               [Signature]

                                _____

25                                 FRANCISCO SERRANO

26

DECLARATION OF FRANCISCO        5        OFFICE OF THE ATTORNEY GENERAL
SERRANO IN SUPPORT OF                           STATE OF CALIFORNIA
PLAINTIFFS' MOTION FOR                            1300 I Street
EXPEDITED DISCOVERY                           Sacramento, CA 95814
                                               916-445-9555

CERTIFICATION OF TRANSLATION

Manuel Duran, a translator certified by the Judicial Council of California and the Office of Federal Courts, certifies that he translated/transcribed completely and accurately, and to the best of his ability the English translation of the following Spanish document(s):

**NO. 2:18-CV-00939**

**DECLARATION OF FRANCISCO SERRANO IN SUPPORT OF PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY**

I swear under penalty of perjury that the foregoing is true and correct. Signed on July 2, 2018 in Oceanside, California.



CALIFORNIA
JUDICIAL COUNCIL
CERTIFICATION 300344
July 2, 2018
DATE

Manuel Duran
California Certification No. 300344
Federal Court Certification No. 93-462

DECLARATION OF FRANCISCO
SERRANO IN SUPPORT OF
PLAINTIFFS' MOTION FOR
EXPEDITED DISCOVERY

6

OFFICE OF THE ATTORNEY GENERAL
STATE OF CALIFORNIA
1300 I Street
Sacramento, CA 95814
916-445-9555

1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

8

STATE OF WASHINGTON, et al.,

9

Plaintiff,

10

v.

11

THE UNITED STATES OF AMERICA, et al.,

12

13

Defendants.

NO. 2:18-CV-00939

DECLARACIÓN DE FRANCISCO SERRANO EN APOYO A PETICIÓN DE LOS DEMANDANTES PARA EXHIBICIÓN DE PRUEBAS ACELERADA

14
15

Yo, Francisco Serrano, declaro lo siguiente:

16

1.      Tengo más de 18 años de edad y tengo conocimiento personal de los hechos en

17

este documento. Si se me llamara como testigo, podría y testificaría de manera competente a las

18

cuestiones que se exponen a continuación.

19

2.      Yo resido en el Distrito de Columbia.  Vivo con mi esposa, mi mamá, y mis dos

20

hijos que tienen quince y diecisiete años de edad.

21

3.      En mayo de 2018, mi sobrina María me llamó para decirme que había viajado

22

desde El Salvador con una caravana, que estaba en la frontera de México y los Estados Unidos,

23

y que iba a cruzar la frontera por San Ysidro.  También me dijo que estaba viajando con sus dos

24

niños, M. de 7 años de edad y N. de 2 años de edad.

25

4.      Aproximadamente una semana después recibí una llamada de un albergue

26

diciéndome que los niños iban a ser separados de María, que iban rumbo a Nueva York, que

DECLARATION OF  FRANCISCO
SERRANO IN SUPPORT OF
PLAINTIFFS' MOTION FOR
EXPEDITED DISCOVERY

1

OFFICE OF THE ATTORNEY GENERAL
STATE OF CALIFORNIA
1300 I Street
Sacramento, CA 95814
916-445-9555

1  María me había designado como patrocinador y preguntándome que si yo estaba dispuesto a

2  ser el patrocinador.  Yo le dije a la persona que sería el patrocinador y la persona me dijo que

3  yo podría hablar con los niños dos veces por semana.  Adjunto los <u>Documentos 1 y 2</u> son los

4  formularios que me dijeron que completara a principios de mayo para que pudiera recibir a los

5  niños de María.

6    5.  Yo he hablado con el niño de 7 años en varias ocasiones desde que la familia

7  llegó.  Él me dijo que oficiales le dijeron que a él y a su hermanito los iban a llevar a un centro

8  de detención en Washington, D.C. para estar más cerca de mí, sus tío.  Recibí una llamada del

9  niño de siete años quien pensaba que estaba en Washington, D.C., pero no era así.  Él estaba en

10  Nueva York.  Una trabajadora social me dijo que los dos niños están Lutheran Youth Hostel en

11  Nueva York.

12    6.  Para ser el patrocinador la trabajadora social me dijo que tenía que proveer: 1) el

13  acta de nacimiento de la mamá de María, 2) el acta de nacimiento de María, 3) las actas de

14  nacimiento de los niños, y 4) mi acta de nacimiento, licencia de conducir, pasaporte y pruebas

15  de ciudadanía.  Además de completar el papeleo, tuve que proporcionar copias de mi

16  identificación y registro policial.  Yo no tenía copias de las actas de nacimiento de la mamá de

17  María, de María o de los niños así es que tuve que contactar a personas en El Salvador para que

18  me las enviaran.  Este proceso tomo 5 días porque un amigo estaba en El Salvador y me pudo

19  ayudar, si no, el proceso hubiera durado de 15 a 20 días.

20    7.  La trabajadora social que estaba trabajando con los niños me dijo que cuando yo

21  entregara los documentos ella obtendría aprobación en 36 horas y los niños saldrían 24 horas

22  después de eso.  No escuché de ellos en las próximas 36 horas, pero asumí que todo era válido

23  porque ya había completado todos los formularios y seguido todas las instrucciones.

24    8.  Aproximadamente una semana después que proporcione el papeleo me dijeron

25  que me tenían que tomar la huellas.  El día siguiente pedí tiempo en mi trabajo y me tomaron las

26  huellas.

DECLARATION OF FRANCISCO   2   OFFICE OF THE ATTORNEY GENERAL
SERRANO IN SUPPORT OF         STATE OF CALIFORNIA
PLAINTIFFS' MOTION FOR         1300 I Street
EXPEDITED DISCOVERY         Sacramento, CA 95814
                  916-445-9555

1       9.     Después de que entregué los documentos que me pidieron la trabajadora social

2  me dijo que lo sentía mucho pero que solo había obtenido una de las aprobaciones que necesitaba

3  para aprobar el papeleo.  Ella dijo que hizo todo lo posible pero que estaba fuera de sus manos.

4       10.    A finales de mayo, recibí un poder legal de mi sobrina María dándome la

5  autorización para cuidar de sus dos niños menores.  Una copia del poder legal notariado esta

6  adjunta como Documento 3.  Yo proporcioné el poder legal a la trabajadora social a principios

7  de junio.

8       11.    Aproximadamente una semana después me pidieron que completara una forma

9  certificada para una verificación de antecedentes adicional.  El primero de junio de 2018, yo

10  completé el formulario que me proporciono Lutheran Social Services para obtener la

11  autorización de recibir a los dos hijos de María.  Tuve que certificar el formulario por notario.

12  Una copia del formulario esta adjunto como Documento 4.

13       12.    Luego me informaron que pasé la verificación de antecedentes, pero necesitaban

14  una semana más para entregarme a los niños.  Hablé con el niño de siete años y me dijo que los

15  oficiales le dijeron que a él y su hermano me los iban a entregar en una semana.

16       13.    Pero luego me dijeron que necesitaban hacer una prueba de ADN para confirmar

17  que María es la mamá de los niños.  Recientemente, la trabajadora social me dijo que hace unos

18  días un empleado del gobierno fue a Otay Mesa donde María estaba detenida para tomarle la

19  prueba de ADN pero María no estaba ahí.  Después, cuando hablé con María ella dijo que había

20  estado en Otay Mesa todo el tiempo.

21       14.    El 22 de junio, varias semanas después que entregué todo el papeleo me dijeron

22  que el papeleo que entregué estaba equivocado, que el poder legal no era válido, y que no me

23  iban a entregar a los niños.  Ella dijo que hay formularios nuevos que tenemos que completar,

24  pero no me envió los formularios hasta el viernes, 29 de junio de 2018.  Esos formularios están

25  adjuntos como Documentos 5 y 6.

26

DECLARATION OF FRANCISCO        3        OFFICE OF THE ATTORNEY GENERAL
SERRANO IN SUPPORT OF                   STATE OF CALIFORNIA
PLAINTIFFS' MOTION FOR                   1300 I Street
EXPEDITED DISCOVERY                    Sacramento, CA 95814
                                   916-445-9555

15.     El 27 de junio después de pedir dinero prestado a miembros de mi familia, pude recolectar $10,000 y pagué la fianza de María  Un agente de inmigración me dijo que María saldría el 28 de junio de 2018 y que la llevarían a estación de autobús para que ella pudiera tomar el autobús a Washington D.C.  Así es que el boleto de autobús de María estaba para la fecha del 28 de junio.  Pero inmigración liberó a María el 27 de junio y María me llamó porque los agentes la dejaron en un McDonald's y ella no tenía a donde ir ni dormir.  Ella tuvo que buscar a alguien que la alojara una noche y ahora está en camino hacia Washington D.C.

16.     El 28 de junio de 2018, hablé con la trabajadora social quien me dijo que tendremos que empezar el proceso de y que María tendrá que llenar la aplicación y pedir a los niños porque ya salió de detención de inmigración.

17.     Estoy preocupado que ahora tendremos que empezar de nuevo el proceso para reunir a los niños de María con mi familia.  Todos en mi casa, incluyendo mi mamá de 78 años de edad, tendrán que someter huellas, registro policial, e identificación, y tendremos que completar un nuevo formulario.  Debido a la edad de mi mamá, es difícil tomarle las huellas, y oficiales de inmigración me dijeron anteriormente que ella no tendría que someterse a las huellas de nuevo.  También me informaron que María tendrá que tomarse las huellas y tendrá que presentar toda la documentación.  Estoy preocupado de que María no pueda producir el papeleo necesario para poder reunirse con sus dos hijos.  María no tiene pasaporte, y todo lo que tiene es tu tarjeta de identificación de El Salvador.

18.     Todo este proceso ha sido muy difícil para mi familia:

a.     Al principio cuando hablaba con M., el niño de 7 años, él estaba muy platicador y estaba emocionado porque la trabajadora social le dijo que saldría en una semana. Cuando el tiempo cuando M. esperaba salir llegó y nada pasó, él se escuchaba depresivo, no decía mucho y quería llorar. Me preguntó por qué no he venido por él todavía.  La trabajadora social me dijo que M. estaba depresivo y me pidió palabras para animarlo.  El 28 de junio hablé con él y está contento porque piensa que pronto va a reunirse con su mamá.  Estoy más

DECLARATION OF FRANCISCO
SERRANO IN SUPPORT OF
PLAINTIFFS' MOTION FOR
EXPEDITED DISCOVERY

4

OFFICE OF THE ATTORNEY GENERAL
STATE OF CALIFORNIA
1300 I Street
Sacramento, CA 95814
916-445-9555

1   preocupado por la salud mental de M. cuando se entere que tendremos que empezar el proceso

2   de nuevo y que no va a salir pronto.

3         b.    Porque solo puedo hablar por teléfono y N. es muy pequeño no he podido

4   hablar con él. M. me dijo que N. llora todo el tiempo, y el único momento en que los dos niños

5   se ven es en la noche. M. dijo que dejan que N. se quede con M. por la noche porque es lo único

6   que hará que N. deje de llorar

7         c.    Cuando hablo con María ella me pregunta que está pasando con los niños

8   y se queda sin palabras cuando le digo que todavía estoy esperando la aprobación. Ella llora.

9   Ella solamente ha podido hablar con los niños pocas veces.

10        d.    La más afectada por todo esto es mi mamá. Ella crio a María después que

11  su mamá murió cuando María tenía 8 meses de edad. Al principio, yo no quería decirle a mi

12  mamá lo que estaba pasando porque ella tiene 78 años de edad y estaba preocupado que si le

13  decía se iba a poner mal de salud. Yo solo le dije que María y los niños habían cruzado la

14  frontera, pero estaban detenidos. Después de ver las noticias, mi mamá exigió que le dijera que

15  estaba pasando. Mi mamá se puso mal de salud cuando le dije que los niños habían sido

16  separados de María. Desde que mi mamá se enteró de la separación familiar ha tenido un dolor

17  de cabeza intenso y yo tuve que llevarla al doctor. Estoy muy preocupado por la salud de mi

18  mamá. Para María, la separación de sus niños repite la historia de cuando ella perdió a su mamá.

19        e.    Por mi parte, este proceso ha sido muy depresivo y frustrante. Cuando al

20  fin pensaba que me iban a dar los niños me dicen que siempre no. También he tenido que

21  descansar de mi trabajo para hacer todo lo que me han pedido que haga.

22

23  ///

24

25  ///

26

DECLARATION OF FRANCISCO
SERRANO IN SUPPORT OF
PLAINTIFFS' MOTION FOR
EXPEDITED DISCOVERY

5

OFFICE OF THE ATTORNEY GENERAL
STATE OF CALIFORNIA
1300 I Street
Sacramento, CA 95814
916-445-9555

1    19.    Tengo la esperanza que María, M., y N. se reunirán pronto.

2    Declaro bajo pena de perjurio bajo las leyes del Estado de California y las leyes de los

3    Estados Unidos que lo anterior es verdadero y correcto.

4        Fechado este 30 día de Junio de 2018 en Washington D.C.

5

6                                              FRANCISCO SERRANO

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF FRANCISCO
SERRANO IN SUPPORT OF
PLAINTIFFS' MOTION FOR
EXPEDITED DISCOVERY

6

OFFICE OF THE ATTORNEY GENERAL
STATE OF CALIFORNIA
1300 I Street
Sacramento, CA 95814
916-445-9555

# EXHIBIT 1



**U.S. Department of Health and Human Services**

Office of Refugee Resettlement
Sponsor Care Agreement, Rev. 04/30/2012

### OFICINA DE REUBICACIÓN DE REFUGIADOS
### División de Servicios de Niños
### ACUERDO DE CUIDADO DEL PATROCINADOR

| | |
|---|---|
| **Nombre del menor:** M____ A____ m____ S____ | **Número del menor A:** ____ /10 |
| **Alias (si los tuviera):** | **Fecha de nacimiento del menor:** ____ |
| **Nombre del patrocinador:** Francisco de Tesus Serrano | **Fecha:** 05/10/18 |

Le solicitó a la Oficina de Reubicación de Refugiados (Office of Refugee Resettlement, ORR) patrocinar a un niño extranjero no acompañado en el cuidado y la custodia del gobierno federal conforme al acuerdo extrajudicial estipulado Flores v. Reno, número 85-4544-RJK (Px) (C.D. Cal., 17 de enero de 1997), sección 462 del Homeland Security Act de 2002 y la sección 235 del William Wilberforce Trafficking Victims Protection Reauthorization Act de 2008. Si se aprueba la solicitud de patrocinio, recibirá un formulario de *Verificación de liberación* de ORR y se celebrará un acuerdo de custodia con el gobierno federal en el cual acepta cumplir con las siguientes disposiciones mientras el menor esté en su cuidado:

- Proporcionar el bienestar mental y físico del menor, que incluye, entre otros, alimentos, refugio, vestimenta, educación, atención médica y otros servicios según sea necesario.

- Si no es el tutor legal ni el padre o la madre del menor, haga los mejores esfuerzos por establecer una custodia legal con el tribunal local dentro de un tiempo razonable.

- Asistir a un programa de orientación legal proporcionado por el Departamento de Justicia (Department of Justice, DOJ), o programa de orientación legal para custodios (patrocinadores) de la Oficina Ejecutiva para la Revisión de la Inmigración (Executive Office for Immigration Review, EOIR), si está disponible en el lugar donde reside.

- Según dónde esté pendiente el caso de inmigración del menor, notificar al Tribunal de Inmigración o al Tribunal de Apelaciones de Inmigración local en un período de cinco (5) días de todo cambio de dirección o número de teléfono del menor, usando el formulario de cambio de dirección de extranjeros (formulario EOIR-33). Además, si es necesario, presentar una petición de cambio de competencia territorial a nombre del menor. La petición de cambio de competencia territorial debe contener información especificada por el Tribunal de Inmigración. Tenga en cuenta que la petición de cambio de competencia territorial puede requerir la ayuda de un abogado. Para obtener asesoramiento sobre la "petición de cambio de competencia territorial", consulte el Manual de práctica del Tribunal de Inmigración en http://1.usa.gov/e0H9zL. Para obtener información sobre casos de inmigración, comuníquese con el sistema de información de casos de inmigración de EOIR llamando al 1-800-898-7180. Visite el sitio web de EOIR para obtener información adicional en: http://www.justice.gov/eoir/formslist.htm.

- Notificar al Departamento de Seguridad del Territorio Nacional (Department of Homeland Security, DHS) o a Servicios de Ciudadanía e Inmigración de los Estados Unidos (U.S. Citizenship and Immigration Services) en un período de diez (10) días de todo cambio de dirección, presentando la Tarjeta de Cambio de Dirección de Extranjero (AR-11) o de manera electrónica en http://1.usa.gov/Ac5MP.

- Asegurar la presencia del menor en todos los procedimientos futuros ante DHS o Inmigración y Seguridad de Aduanas (Immigration and Customs Enforcement, ICE) y el Departamento de Justicia (Department of Justice, DOJ) o EOIR. Para obtener información sobre casos de inmigración, comuníquese con el sistema de información de casos de EOIR llamando al: 1-800-898-7180.

- Asegurar que el menor se presente ante ICE para la expulsión de los Estados Unidos si un juez de inmigración emite una orden de expulsión o una orden de salida voluntaria. Se asigna al menor un oficial de deportación para los procedimientos de expulsión.

U.S. Department of Health and Human Services

Office of Refugee Resettlement
Family Reunification Application, Rev. 01/25/2016

**13. ¿Alguno de los ocupantes de su hogar sufre de alguna enfermedad grave y contagiosa (p. ej., TB, SIDA, hepatitis)? Si así fuera, por favor, explíquelo:** *NO*

**14(a). ¿Usted o alguno de los ocupantes de su hogar han sido acusados o condenados por un delito (que no sea una infracción menor de tránsito, p. ej., velocidad excesiva, multa por mal estacionamiento)?**
■ NO  ☐ SÍ

**14(b). ¿Usted o alguna persona en su hogar han sido investigados por abuso físico, sexual, descuido o abandono de un menor?**
■ NO  ☐ SÍ

Si usted respondió "SÍ" a cualquiera de las preguntas 14 (a) o 14(b), sírvase adjuntar una lista a este formulario con la siguiente información para cada cargo/condena:
 (1) Nombre de la persona involucrada; (2) lugar y fecha del incidente; (3) descripción del incidente;
 (4) Resolución sobre el incidente (p. ej., desestimación de cargos, multado, encarcelado, período de prueba); (5) Copia del(de los) registro(s) judicial(es), registro(s) policial(es), y/o registro(s) de la agencia de servicio social gubernamental relacionado(s) con el(los) incidente(s)

**15. Si existiese la posibilidad que usted deba salir de los Estados Unidos, o ser incapaz de cuidar al menor, ¿quién supervisaría al menor en su ausencia?:**
Nombre del posible cuidador adulto: *Marleni del Carmen Velasquez*
Fecha de nacimiento del posible cuidador adulto: ▮ */80*
Información de contacto (dirección y número de teléfono) del posible cuidador adulto: ▮ *washington DC*
Relación con el menor, si hay alguna: *tia politica por ser la pareja del tio*
Resuma su plan de cuidado en caso de que usted tenga que salir de los Estados Unidos o sea incapaz de cuidar al menor:
*dejar los billes pagados como Renta o morgage comida suficiente. dinero por cual guin emergecia et.c*

Declaro y afirmo bajo pena de perjurio que la información contenida en esta solicitud es verdadera y precisa, según mi leal saber y entender. Doy fe de que todos los documentos que presento o las copias de dichos documentos están libres de error y de fraude.

Doy fe además que me atendré a las instrucciones contenidas en el *Acuerdo del Patrocinador sobre el Cuidado*. Velaré por el bienestar físico y mental del menor. También cumpliré con las leyes de mi estado respecto del cuidado de este menor, lo que incluye la inscripción del menor en la escuela, la provisión de atención médica cuando sea necesaria, la protección del menor contra el abuso, descuido y abandono, y cualquier otro requisito no contenido en el presente.

SU FIRMA: ▮▮▮▮▮   FECHA: *05/10/18*



U.S. Department of Health and Human Services

Office of Refugee Resettlement
Family Reunification Application, Rev. 01/25/2016

## OFICINA DE REUBICACIÓN DE REFUGIADOS
### División de servicios para niños
## SOLICITUD DE REUNIFICACIÓN FAMILIAR

| | |
|---|---|
| **1. Nombre del menor:** M███ A███ M███ S███ | **2. Su relación con el menor:** Tio |
| **3. Su nombre (de usted):** Francisco de Jesus Serrano | **4. Cualquier otro nombre que usted haya utilizado:** |
| **5. Su país de origen (de usted):** El Salvador | **6. Su fecha de nacimiento (de usted):** █/7A |
| **7. Número(s) de teléfono donde nos podemos comunicar con usted:** ████ | **8. Su correo electrónico (si lo tiene) o número de fax:** ████ |
| **9. El domicilio donde residirán usted y el menor:** ████ Washington, D.C. | **10. ¿Qué idiomas habla?:** español y un poco ingles |

**11. Información de los ocupantes del hogar. (Si necesita más espacio, sírvase adjuntar una lista de los ocupantes del hogar a este formulario)**

| Nombre | Fecha de Nacimiento | Relación con el menor (p. ej., madre, padre) | Relación con usted (el patrocinador) |
|---|---|---|---|
| Francisco Serrano | █/7A | Tio | soy el patrocinador |
| Marleni Velasquez | █/80 | Tia Politica | esposa |
| Marcos Serrano | █/40 | bisa Abuela | mama |
| J███ S███ | █/01 | Prima | hija |
| K███ S███ | █/03 | Primo | hijo |

**12. Información financiera: Sírvase explicar cómo va a mantener financieramente al menor:**

tanto la bivienda como los alimentos
salud medica Escuela
Sera Igual que mis propios hijos
Amor, cariño Atencion etc



U.S. Department of Health and Human Service

Office of Refugee Resettlement
Family Reunification Checklist for Sponsors, Rev. 04/04/2014

## OFICINA DE REUBICACIÓN DE REFUGIADOS
### División de Servicios para Niños
## LISTA DE VERIFICACIÓN FAMILIAR PARA PATROCINADORES

**Formularios que deberán ser completados, firmados y devueltos a su trabajador social**

■ He completado y firmado la Autorización para la Divulgación de Información

■ He completado y firmado la Solicitud para la reunificación familiar

**Formularios que deberán ser leídos y mantenidos en su poder**

■ He leído la Carta introductoria del Paquete para la Reunificación Familiar

■ He leído el Acuerdo de Cuidado del Patrocinador

■ He leído la Lista de Verificación para Patrocinadores

■ He leído el Programa General de Orientación Legal para Custodios

■ He leído el Manual para el Patrocinador

■ He leído las Instrucciones para la toma de huellas digitales por si tienen que ser sometidas.

■ Carta de Designación del Cuidado de un Menor para el patrocinador que NO es uno de los padres del menor ni su tutor legal.

**Documentos probatorios**

Por favor proporcione una copia de los siguientes documentos que figuran a continuación. Por favor tome en cuenta que tanto la Oficina de Reubicación de Refugiados (Office of Refugee Resettlement, ORR) como la División de Servicios de Niños no Acompañados (Division of Children's Services, DCS) pueden rechazar su solicitud como patrocinador si falta cualquier elemento de la información solicitada o si esa misma está incompleta o no es correcta. En el caso de que no pueda proveer los documentos requeridos, adjunte una explicación, junto con la Solicitud de Reunificación Familiar, en la que indique qué tipo de documentación de respaldo no puede presentar y la razón. Tenga en cuenta que su explicación sobre cualquier documentación faltante quedará sujeta a la aceptación de ORR/DCS.

1. **Prueba de su identidad:**
   - Una copia de una identificación emitida por el gobierno, tal como:
     a. Licencia de conducir o tarjeta de identificación emitida por el estado
     b. Documento de identidad (con foto) de su país de origen (p. ej., cédula)
     c. Pasaporte
   **Y**
   - Una copia de su certificado de nacimiento

2. **Prueba de la identidad del menor:**
   - Una copia del certificado de nacimiento del menor

3. **Prueba de Parentesco:**
   - Entregue copias de certificados de nacimiento, de matrimonio, registros judiciales, registros de la tutoría u otros documentos, a fin de aportar evidencia de la relación entre usted y el menor.

4. **Registros Legales (si corresponde)**
   Si usted respondió "Sí" a las preguntas 14(a) y/o 14(b) en la *Solicitud de Reunificación Familiar*, aporte registros judiciales, policiales, y/o de los servicios sociales gubernamentales relacionados con el/ los incidente(s).

5. Si usted NO es uno de los padres o el tutor legal de este menor, por favor proporcione de uno de los siguientes documentos como comprobante de domicilio. Si usted SÍ es el padre o el tutor legal del menor, no es necesario que entregue un comprobante de domicilio.
   a. Una copia de su renta actual
   b. Una copia del estado de cuenta actual de su hipoteca
   c. Carta del propietario, en la que se confirme su domicilio.
   d. Una copia de su correspondencia, preferiblemente una factura de servicio público dirigida a usted, correspondiendo a los últimos dos meses.

# OFICINA DE REUBICACIÓN DE REFUGIADOS
## División de Servicios de Niños
### AUTORIZACIÓN PARA LA DIVULGACIÓN DE INFORMACIÓN

## INFORMACIÓN REQUERIDA PARA LA INVESTIGACIÓN DE ANTECEDENTES

**NOMBRE DEL MENOR:** M▮ A▮ M▮ S▮  **FECHA DE NACIMIENTO DEL MENOR:** ▮ 2010

### INFORMACIÓN DEL PATROCINADOR:

**FECHA DE NACIMIENTO**

**Apellido** Serrano   **Primer nombre** Francisco   **Nombre del medio (sufijo)** de Jesus   **Mes** ▮ **Día** ▮ **Año** 1978

**SEXO:** ☒ MASC. ☐ FEM.   **Raza** Latino Americano   **Color de ojos** cafe   **NÚMERO DE SEGURO SOCIAL (opcional)** ▮

**Altura** 5-03   **Peso** 131   **Color de pelo** Negro

**LUGAR DE NACIMIENTO:** (Use el código de dos letras para el estado)

**Ciudad** Nueva sansalvador santa tecla   **Estado** La libertad   **País** El Salvador

### OTROS NOMBRES UTILIZADOS Y SUS FECHAS DE USO:

| Nombre | Desde: Mes Año | Hasta: Mes Año | Nombre | Desde: Mes Año | Hasta: Mes Año |
|---|---|---|---|---|---|
| | | | | | |

### RESIDENCIAS EN LOS ÚLTIMOS 5 AÑOS:

| | Domicilio | Apartamento nro. | Ciudad (condado) | Estado | Código postal |
|---|---|---|---|---|---|
| **DESDE:** 03/2004 **HASTA:** Vigente | ▮ | | Washington | D.C. | ▮ |
| **DESDE: HASTA:** | | | | | |
| **DESDE: HASTA:** | | | | | |
| **DESDE: HASTA:** | | | | | |

### CIUDADANÍA DE LOS ESTADOS UNIDOS
Si el patrocinador es ciudadano estadounidense, pero no nació en los EE. UU., brinde información acerca de una o más de las siguientes pruebas de ciudadanía.

**Certificado de naturalización**

| Tribunal | Ciudad | Estado | Número de certificado | Mes/Día/Año de emisión |
|---|---|---|---|---|
| suprime coart | Washington | DC | ▮ | 11/15/16 |

**Certificado de ciudadanía (¿Dónde se emitió el certificado?)**

| Ciudad | Estado | Número de certificado | Mes/Día/Año de emisión |
|---|---|---|---|
| | | | |

**Formulario 240 del Departamento de Estado: Informe del nacimiento en el extranjero de un ciudadano de los Estados Unidos**

| Indique la fecha en que se preparó el formulario y brinde una explicación si fuese necesario. | Mes/Día/Año | Explicación |
|---|---|---|
| | | |

**Pasaporte de los EE. UU.**
Puede ser tanto un pasaporte de los EE. UU. actual como anterior.

| Número de pasaporte | Mes/Día/Año de emisión |
|---|---|
| ▮ | 09/03/2017 |

**DOBLE CIUDADANÍA:** Si el sujeto tiene (o tuvo) doble ciudadanía, de los Estados Unidos y de otro país, indique el nombre de dicho país en el espacio de la derecha.   **País** El Salvador

### EXTRANJERO Si el sujeto es extranjero, indique la siguiente información:

| Lugar de entrada a los Estados Unidos | Ciudad | Estado | Fecha de entrada a los EE. UU. Mes Día Año | Número de registro del extranjero | País de ciudadanía |
|---|---|---|---|---|---|
| | | | | | |

* No es obligatorio indicar el número de Seguro Social. Sin embargo, si no lo indica, es posible que la ORR no pueda realizar la investigación de antecedentes necesaria para el procedimiento de reunificación.

# OFICINA DE REUBICACIÓN DE REFUGIADOS
## División de Servicios de Niños
### AUTORIZACIÓN PARA LA DIVULGACIÓN DE INFORMACIÓN

*Lea cuidadosamente esta autorización, luego fírmela y féchela con tinta negra.*

Autorizo a cualquier investigador, agente especial, empleado, contratista, cesionario u otro representante debidamente autorizado que trabaje en nombre de la Oficina de Reubicación de Refugiados (Office of Refugee Resettlement) que esté llevando a cabo la investigación de mis antecedentes y la evaluación de patrocinio a obtener información a fin de evaluar mi capacidad para brindarle el debido cuidado y lugar a un menor y para proveerle los servicios posteriores a su liberación, según sea necesario. Autorizo a cualquier agencia de justicia penal federal, estatal o local; agencia para el bienestar infantil federal, estatal, local o privada; agencia federal de inmigración o cualquier otra fuente de información, tal como escuelas, tribunales, proveedores de tratamiento, funcionarios de libertad condicional/bajo palabra, profesionales de la salud mental u otras referencias, a divulgar, tanto verbalmente como por escrito, información acerca de todo historial delictivo, cargos o dudas sobre abuso y descuido infantil, situación migratoria pasada y presente, problemas de salud mental, abuso de sustancias, violencia doméstica o cualquier otra información psicosocial recopilada acerca de mi persona.

Autorizo a los custodios de los registros y fuentes de la información sobre mi persona, a divulgar tal información ante la solicitud del investigador, agente especial, empleado, contratista, cesionario u otro representante debidamente acreditado de la Oficina de Reubicación de Refugiados.

Entiendo que la información divulgada por cualquier custodio de mis registros y otras fuentes de la información acerca de mi persona es para uso oficial por parte del gobierno de los EE. UU., sus empleados, cesionarios, contratistas y otro personal delegado para los fines expresados más arriba y que puede ser revelada por el gobierno de los EE. UU. solamente en la forma autorizada por la ley.

Entiendo que esta información se convertirá en propiedad de la Oficina de Reubicación de Refugiados y que puede ser revisada por sus empleados, cesionarios, contratistas y delegados. También entiendo que la Oficina de Reubicación de Refugiados puede compartir esta información con los empleados y contratistas de otras agencias federales.

Por el presente renuncio a cualquier reclamo o derecho en virtud de las leyes de los Estados Unidos contra el gobierno federal, sus empleados, cesionarios, contratistas o delegados por usar legalmente cualquier información recopilada durante la búsqueda de mi historial delictivo, información relativa al bienestar infantil, situación migratoria pasada o presente, cualquier información contenida en mi solicitud de patrocinio y en la documentación de respaldo y la información recopilada de cualquier otra fuente, en forma oral o escrita, relacionada con esta solicitud de patrocinio. Por el presente renuncio a toda demanda o acuerdo previo con cualquier agencia federal estatal, local o privada que pudiera impedirle al delegado oficial de la Oficina de Reubicación de Refugiados obtener la información solicitada.

Las copias de esta autorización que contengan mi firma son tan válidas como el original. Esta autorización es válida por un (1) año a partir de la fecha de su firma.

| Firma (firme con tinta) | Nombre completo (a máquina o en letra de imprenta legible) Francesco de Jesus Serrano | Fecha de la firma 05/10/18 |
|---|---|---|
| Otros nombres que usted haya usado (alias) | Fecha de nac. del patrocinador /197/2 | Número del Seguro Social(opcional)* |
| Domicilio actual  Washington | Estado D.C. | Código postal | Nro. de teléfono de su hogar (incluya el código de área) |

*No es obligatorio indicar su número de Seguro Social. Sin embargo, si no lo indica, es posible que la ORR no pueda realizar la investigación de antecedentes necesaria para el procedimiento de reunificación.

Authorization for Release of Information, Rev. 10/31/2011
ORR UC/FRP-2s
OMB 0970-0278, valid through 10/31/2018

Page 1 of 2

# EXHIBIT 2



U.S. Department of Health and Human Services

Office of Refugee Resettlement
Sponsor Care Agreement, Rev. 04/30/2012

## OFICINA DE REUBICACIÓN DE REFUGIADOS
### División de Servicios de Niños
### ACUERDO DE CUIDADO DEL PATROCINADOR

| | |
|---|---|
| **Nombre del menor:** N A G | **Número del menor A:** |
| **Alias (si los tuviera):** | **Fecha de nacimiento del menor:** IS |
| **Nombre del patrocinador:** Francisco de Jesus Serrano | **Fecha:** 05 /10 /18 |

Le solicitó a la Oficina de Reubicación de Refugiados (Office of Refugee Resettlement, ORR) patrocinar a un niño extranjero no acompañado en el cuidado y la custodia del gobierno federal conforme al acuerdo extrajudicial estipulado Flores v. Reno, número 85-4544-RJK (Px) (C.D. Cal., 17 de enero de 1997), sección 462 del Homeland Security Act de 2002 y la sección 235 del William Wilberforce Trafficking Victims Protection Reauthorization Act de 2008. Si se aprueba la solicitud de patrocinio, recibirá un formulario de *Verificación de liberación* de ORR y se celebrará un acuerdo de custodia con el gobierno federal en el cual acepta cumplir con las siguientes disposiciones mientras el menor esté en su cuidado:

- Proporcionar el bienestar mental y físico del menor, que incluye, entre otros, alimentos, refugio, vestimenta, educación, atención médica y otros servicios según sea necesario.

- Si no es el tutor legal ni el padre o la madre del menor, haga los mejores esfuerzos por establecer una custodia legal con el tribunal local dentro de un tiempo razonable.

- Asistir a un programa de orientación legal proporcionado por el Departamento de Justicia (Department of Justice, DOJ), o programa de orientación legal para custodios (patrocinadores) de la Oficina Ejecutiva para la Revisión de la Inmigración (Executive Office for Immigration Review, EOIR), si está disponible en el lugar donde reside.

- Según dónde esté pendiente el caso de inmigración del menor, notificar al Tribunal de Inmigración o al Tribunal de Apelaciones de Inmigración local en un período de cinco (5) días de todo cambio de dirección o número de teléfono del menor, usando el formulario de cambio de dirección de extranjeros (formulario EOIR-33). Además, si es necesario, presentar una petición de cambio de competencia territorial a nombre del menor. La petición de cambio de competencia territorial debe contener información especificada por el Tribunal de Inmigración. Tenga en cuenta que la petición de cambio de competencia territorial puede requerir la ayuda de un abogado. Para obtener asesoramiento sobre la "petición de cambio de competencia territorial", consulte el Manual de práctica del Tribunal de Inmigración en http://1.usa.gov/e0Jl9zL. Para obtener información sobre casos de inmigración, comuníquese con el sistema de información de casos de inmigración de EOIR llamando al 1-800-898-7180. Visite el sitio web de EOIR para obtener información adicional en: http://www.justice.gov/eoir/formslist.htm.

- Notificar al Departamento de Seguridad del Territorio Nacional (Department of Homeland Security, DHS) o a Servicios de Ciudadanía e Inmigración de los Estados Unidos (U.S. Citizenship and Immigration Services) en un período de diez (10) días de todo cambio de dirección, presentando la Tarjeta de Cambio de Dirección de Extranjero (AR-11) o de manera electrónica en http://1.usa.gov/Ac5MP.

- Asegurar la presencia del menor en todos los procedimientos futuros ante DHS o Inmigración y Seguridad de Aduanas (Immigration and Customs Enforcement, ICE) y el Departamento de Justicia (Department of Justice, DOJ) o EOIR. Para obtener información sobre casos de inmigración, comuníquese con el sistema de información de casos de EOIR llamando al: 1-800-898-7180.

- Asegurar que el menor se presente ante ICE para la expulsión de los Estados Unidos si un juez de inmigración emite una orden de expulsión o una orden de salida voluntaria. Se asigna al menor un oficial de deportación para los procedimientos de expulsión.



**U.S. Department of Health and Human Services**

Office of Refugee Resettlement
Family Reunification Application, Rev. 01/25/2016

## OFICINA DE REUBICACIÓN DE REFUGIADOS
### División de servicios para niños
### SOLICITUD DE REUNIFICACIÓN FAMILIAR

| | |
|---|---|
| **1. Nombre del menor:** <br> N█████ A███ G████ S████ | **2. Su relación con el menor:** tío |
| **3. Su nombre (de usted):** <br> Francisco de Jesus Serrano | **4. Cualquier otro nombre que usted haya utilizado:** |
| **5. Su país de origen (de usted):** El Salvador | **6. Su fecha de nacimiento (de usted):** ██/197█ |
| **7. Número(s) de teléfono donde nos podemos comunicar con usted:** ████████ | **8. Su correo electrónico (si lo tiene) o número de fax:** |
| **9. El domicilio donde residirán usted y el menor:** <br> ████ Washington D.C. ████ | **10. ¿Qué idiomas habla?:** <br> español  y un poco ingles |

**11. Información de los ocupantes del hogar. (Si necesita más espacio, sírvase adjuntar una lista de los ocupantes del hogar a este formulario)**

| Nombre | Fecha de Nacimiento | Relación con el menor (p. ej., madre, padre) | Relación con usted (el patrocinador) |
|---|---|---|---|
| Marlene Velasquez | ████/80 | Tía politica | es posa |
| Marcos Serrano | ████/40 | bisa Abuela | Mama |
| J████ S████ | ████/01 | Prima | hija |
| J████ S████ | ████/08 | Primo | hijo |
| | | | |
| | | | |

**12. Información financiera: Sírvase explicar cómo va a mantener financieramente al menor:**

tanto la belVienda como Los Alimentos
Salud medica Escaela
Sera Igual que misproprios hijos
Amor, cariño Atencion et c

U.S. Department of Health and Human Services

Office of Refugee Resettlement
Family Reunification Application, Rev. 01/25/2016

**13. ¿Alguno de los ocupantes de su hogar sufre de alguna enfermedad grave y contagiosa (p. ej., TB, SIDA, hepatitis)? Si así fuera, por favor, explíquelo:** *NO*

**14(a). ¿Usted o alguno de los ocupantes de su hogar han sido acusados o condenados por un delito (que no sea una infracción menor de tránsito, p. ej., velocidad excesiva, multa por mal estacionamiento)?**
☒ NO   ☐ SÍ

**14(b). ¿Usted o alguna persona en su hogar han sido investigados por abuso físico, sexual, descuido o abandono de un menor?**
☒ NO   ☐ SÍ

Si usted respondió "SÍ" a cualquiera de las preguntas 14 (a) o 14(b), sírvase adjuntar una lista a este formulario con la siguiente información para cada cargo/condena:
 (1) Nombre de la persona involucrada; (2) lugar y fecha del incidente; (3) descripción del incidente;
 (4) Resolución sobre el incidente (p. ej., desestimación de cargos, multado, encarcelado, período de prueba); (5) Copia del(de los) registro(s) judicial(es), registro(s) policial(es), y/o registro(s) de la agencia de servicio social gubernamental relacionado(s) con el(los) incidente(s)

**15. Si existiese la posibilidad que usted deba salir de los Estados Unidos, o ser incapaz de cuidar al menor, ¿quién supervisaría al menor en su ausencia?:**
Nombre del posible cuidador adulto:  *Marleni del Carmen Velasquez*
Fecha de nacimiento del posible cuidador adulto:  ▓▓▓▓ *80*
Información de contacto (dirección y número de teléfono) del posible cuidador adulto:
Relación con el menor, si hay alguna:  *Tia politica porser la pareja del tio*
Resuma su plan de cuidado en caso de que usted tenga que salir de los Estados Unidos o sea incapaz de cuidar al menor:
*dejar los billes pagados como Rienta o morgage comida suficiente.*
*dinero por cualquier emergencia e.t.c.*

Declaro y afirmo bajo pena de perjurio que la información contenida en esta solicitud es verdadera y precisa, según mi leal saber y entender. Doy fe de que todos los documentos que presento o las copias de dichos documentos están libres de error y de fraude.

Doy fe además que me atendré a las instrucciones contenidas en el *Acuerdo del Patrocinador sobre el Cuidado*. Velaré por el bienestar físico y mental del menor. También cumpliré con las leyes de mi estado respecto del cuidado de este menor, lo que incluye la inscripción del menor en la escuela, la provisión de atención médica cuando sea necesaria, la protección del menor contra el abuso, descuido y abandono, y cualquier otro requisito no contenido en el presente.

SU FIRMA: ~~*[firma]*~~          FECHA: *05/10/18*



U.S. Department of Health and Human Service

Office of Refugee Resettlement
Family Reunification Checklist for Sponsors, Rev. 04/04/2014

## OFICINA DE REUBICACIÓN DE REFUGIADOS
### División de Servicios para Niños
### LISTA DE VERIFACIÓN FAMILIAR PARA PATROCINADORES

---

**Formularios que deberán ser completados, firmados y devueltos a su trabajador social**

☒ He completado y firmado la Autorización para la Divulgación de Información

☒ He completado y firmado la Solicitud para la reunificación familiar

---

**Formularios que deberán ser leídos y mantenidos en su poder**

☒ He leído la Carta introductoria del Paquete para la Reunificación Familiar

☒ He leído el Acuerdo de Cuidado del Patrocinador

☒ He leído la Lista de Verificación para Patrocinadores

☒ He leído el Programa General de Orientación Legal para Custodios

☒ He leído el Manual para el Patrocinador

☒ He leído las Instrucciones para la toma de huellas digitales por si tienen que ser sometidas.

☒ Carta de Designación del Cuidado de un Menor para el patrocinador que NO es uno de los padres del menor ni su tutor legal.

---

**Documentos probatorios**

Por favor proporcione una copia de los siguientes documentos que figuran a continuación. Por favor tome en cuenta que tanto la Oficina de Reubicación de Refugiados (Office of Refugee Resettlement, ORR) como la División de Servicios de Niños no Acompañados (Division of Children's Services, DCS) pueden rechazar su solicitud como patrocinador si falta cualquier elemento de la información solicitada o si esa misma está incompleta o no es correcta. En el caso de que no pueda proveer los documentos requeridos, adjunte una explicación, junto con la Solicitud de Reunificación Familiar, en la que indique qué tipo de documentación de respaldo no puede presentar y la razón. Tenga en cuenta que su explicación sobre cualquier documentación faltante quedará sujeta a la aceptación de ORR/DCS.

1. **Prueba de su Identidad:**
   - Una copia de una identificación emitida por el gobierno, tal como:
      a. Licencia de conducir o tarjeta de identificación emitida por el estado
      b. Documento de identidad (con foto) de su país de origen (p. ej., cédula)
      c. Pasaporte
   
   **Y**
   - Una copia de su certificado de nacimiento

2. **Prueba de la identidad del menor:**
   - Una copia del certificado de nacimiento del menor

3. **Prueba de Parentesco:**
   - Entregue copias de certificados de nacimiento, de matrimonio, registros judiciales, registros de la tutoría u otros documentos, a fin de aportar evidencia de la relación entre usted y el menor.

4. **Registros Legales (si corresponde)**
   Si usted respondió "SÍ" a las preguntas 14(a) y/o 14(b) en la Solicitud de Reunificación Familiar, aporte registros judiciales, policiales, y/o de los servicios sociales gubernamentales relacionados con el/ los incidente(s).

5. Si usted NO es uno de los padres o el tutor legal de este menor, por favor proporcione de uno de los siguientes documentos como comprobante de domicilio. Si usted SI es el padre o el tutor legal del menor, no es necesario que entregue un comprobante de domicilio.
   a. Una copia de su renta actual
   b. Una copia del estado de cuenta actual de su hipoteca
   c. Carta del propietario, en la que se confirme su domicilio.
   d. Una copia de su correspondencia, preferiblemente una factura de servicio público dirigida a usted, correspondiendo a los últimos dos meses.

## OFICINA DE REUBICACIÓN DE REFUGIADOS
### División de Servicios de Niños
### AUTORIZACIÓN PARA LA DIVULGACIÓN DE INFORMACIÓN

### INFORMACIÓN REQUERIDA PARA LA INVESTIGACIÓN DE ANTECEDENTES

| NOMBRE DEL MENOR: | FECHA DE NACIMIENTO DEL MENOR: |
|---|---|
| ████████ | ██ 2015 |

**INFORMACIÓN DEL PATROCINADOR:**

| Apellido Serrano | Primer nombre Francisco | Nombre del medio (sufijo) de Jesus | Mes | Día | Año 197█ |
|---|---|---|---|---|---|
| SEXO: ☒ MASC.  ☐ FEM. | Raza latino Americano | Color de ojos cafes | NÚMERO DE SEGURO SOCIAL (opcional)* | | |
| Altura 5-03 | Peso 131 | Color de pelo Negro | ████████ | | |

**LUGAR DE NACIMIENTO:** (Use el código de dos letras para el estado)

| Ciudad Nueva Sansalvador | Condado santa tecla | Estado la libertad | País El Salvador |
|---|---|---|---|

**OTROS NOMBRES UTILIZADOS Y SUS FECHAS DE USO:**

| Nombre | Desde: Mes Año | Hasta: Mes Año | Nombre | Desde: Mes Año | Hasta: Mes Año |
|---|---|---|---|---|---|

**RESIDENCIAS EN LOS ÚLTIMOS 5 AÑOS:**

| | Domicilio | Apartamento nro. | Ciudad (condado) | Estado | Código postal |
|---|---|---|---|---|---|
| DESDE: Mes/Año 03/2007 HASTA: Mes/Año Presente | ████████ | | Washington | D.C. | |
| DESDE: Mes/Año HASTA: Mes/Año | | | | | |
| DESDE: Mes/Año HASTA: Mes/Año | | | | | |
| DESDE: Mes/Año HASTA: Mes/Año | | | | | |

**CIUDADANÍA DE LOS ESTADOS UNIDOS** Si el patrocinador es ciudadano estadounidense, pero no nació en los EE. UU., brinde información acerca de una o más de las siguientes pruebas de ciudadanía.

**Certificado de naturalización**

| Tribunal | Ciudad | Estado | Número de certificado | Mes/Día/Año de emisión |
|---|---|---|---|---|

**Certificado de ciudadanía (¿Dónde se emitió el certificado?)**

| Ciudad Supreme court Washington | Estado D.C. | Número de certificado ████ | Mes/Día/Año de emisión ████ |
|---|---|---|---|

**Formulario 240 del Departamento de Estado: Informe del nacimiento en el extranjero de un ciudadano de los Estados Unidos**

| Indique la fecha en que se preparó el formulario y brinde una explicación si fuese necesario. | Mes/Día/Año | Explicación |
|---|---|---|

**Pasaporte de los EE. UU.**

| Puede ser tanto un pasaporte de los EE. UU actual como anterior. | Número de pasaporte ████████ | Mes/Día/Año de emisión 09/03/2017 |
|---|---|---|

| **DOBLE CIUDADANÍA:** Si el sujeto tiene (o tuvo) doble ciudadanía, de los Estados Unidos y de otro país, indique el nombre de dicho país en el espacio de la derecha. | País El Salvador |
|---|---|

**EXTRANJERO** Si el sujeto es extranjero, indique la siguiente información:

| Lugar de entrada a los Estados Unidos | Ciudad | Estado | Fecha de entrada a los EE. UU. Mes  Día  Año | Número de registro del extranjero | País de ciudadanía |
|---|---|---|---|---|---|

* No es obligatorio indicar el número de Seguro Social. Sin embargo, si no lo indica, es posible que la ORR no pueda realizar la investigación de antecedentes necesaria para el procedimiento de reunificación.

**OFICINA DE REUBICACIÓN DE REFUGIADOS**
**División de Servicios de Niños**
**AUTORIZACIÓN PARA LA DIVULGACIÓN DE INFORMACIÓN**

*Lea cuidadosamente esta autorización, luego fírmela y féchela con tinta negra.*

**Autorizo** a cualquier investigador, agente especial, empleado, contratista, cesionario u otro representante debidamente autorizado que trabaje en nombre de la Oficina de Reubicación de Refugiados (Office of Refugee Resettlement) que esté llevando a cabo la investigación de mis antecedentes y la evaluación de patrocinio a obtener información a fin de evaluar mi capacidad para brindarle el debido cuidado y lugar a un menor y para proveerle los servicios posteriores a su liberación, según sea necesario. Autorizo a cualquier agencia de justicia penal federal, estatal o local; agencia para el bienestar infantil federal, estatal, local o privada; agencia federal de inmigración o cualquier otra fuente de información, tal como escuelas, tribunales, proveedores de tratamiento, funcionarios de libertad condicional/bajo palabra, profesionales de la salud mental u otras referencias, a divulgar, tanto verbalmente como por escrito, información acerca de todo historial delictivo, cargos o dudas sobre abuso y descuido infantil, situación migratoria pasada y presente, problemas de salud mental, abuso de sustancias, violencia doméstica o cualquier otra información psicosocial recopilada acerca de mi persona.

**Autorizo** a los custodios de los registros y fuentes de la información sobre mi persona, a divulgar tal información ante la solicitud del investigador, agente especial, empleado, contratista, cesionario u otro representante debidamente acreditado de la Oficina de Reubicación de Refugiados.

**Entiendo** que la información divulgada por cualquier custodio de mis registros y otras fuentes de la información acerca de mi persona es para uso oficial por parte del gobierno de los EE. UU., sus empleados, cesionarios, contratistas y otro personal delegado para los fines expresados más arriba y que puede ser revelada por el gobierno de los EE. UU. solamente en la forma autorizada por la ley.

**Entiendo** que esta información se convertirá en propiedad de la Oficina de Reubicación de Refugiados y que puede ser revisada por sus empleados, cesionarios, contratistas y delegados. También entiendo que la Oficina de Reubicación de Refugiados puede compartir esta información con los empleados y contratistas de otras agencias federales.

**Por el presente renuncio** a cualquier reclamo o derecho en virtud de las leyes de los Estados Unidos contra el gobierno federal, sus empleados, cesionarios, contratistas o delegados por usar legalmente cualquier información recopilada durante la búsqueda de mi historial delictivo, información relativa al bienestar infantil, situación migratoria pasada o presente, cualquier información contenida en mi solicitud de patrocinio y en la documentación de respaldo y la información recopilada de cualquier otra fuente, en forma oral o escrita, relacionada con esta solicitud de patrocinio. Por el presente renuncio a toda demanda o acuerdo previo con cualquier agencia federal estatal, local o privada que pudiera impedirle al delegado oficial de la Oficina de Reubicación de Refugiados obtener la información solicitada.

Las copias de esta autorización que contengan mi firma son tan válidas como el original. Esta autorización es válida por un (1) año a partir de la fecha de su firma.

| Firma (firme con tinta) | Nombre completo (a máquina o en letra de imprenta legible) Francisco de Jesus Serrano | Fecha de la firma 05/10/18 |
|---|---|---|
| Otros nombres que usted haya usado (alias) | Fecha de nac. del patrocinador /1974 | Número del Seguro Social(opcional)* |
| Domicilio actual Washington | Estado D.C. | Código postal | Nro. de teléfono de su hogar (incluya el código de área) |

*No es obligatorio indicar su número de Seguro Social. Sin embargo, si no lo indica, es posible que la ORR no pueda realizar la investigación de antecedentes necesaria para el procedimiento de reunificación.

Authorization for Release of Information, Rev. 10/31/2011
ORR UC/FRP-2s
OMB 0970-0278, valid through 10/31/2018                                    Page 1 of 2

# EXHIBIT 3

# UNIFORM STATUTORY FORM POWER OF ATTORNEY

(California Probate Code Section 4401)

Notice: The powers granted by this document are broad and sweeping. They are explained in the uniform statutory form power of attorney act (California probate code sections 4400-4465). If you have any questions about these powers, obtain competent legal advice. This document does not authorize anyone to make medical or other health-care decisions for you. You may revoke this power of attorney if you later wish to do so.

LAURA SERRANO

5555 CALZADA DE LA FUENTE

SAN DIEGO, CALIFORNIA  92154

(Your name and address)

Appoint FRANCISCO DE JESUS SERAANO BANOS

WASHINGTON DC

(Name and address of the person appointed or of each person appointed if you want to designate more than one)

as my agent (attorney- in-fact) to act for me in any lawful way with respect to the following initialed subjects:
To grant all of the following powers, initial the line in front of (n) and ignore the lines in front of the other powers.
To grant one or more, but fewer than all, of the following powers, initial the line in front of each power you are granting.
To withhold a power, do not initial the line in front of it. You may but need not cross out each power withheld.

INITIAL INITIAL

| | |
|---|---|
| (A) Real property transactions. | (I) Claims and litigation. |
| (B) Tangible personal property transactions. | N x X (J) Personal and family maintenance. |
| (C) Stock and bond transactions. | (K) Benefits from social security, Medicare, |
| (D) Commodity and option transactions. | Medicaid, or other governmental programs, |
| (E) Banking and other financial institution transactions. | or civil or military service |
| (F) Business operating transactions. | (L) Retirement plan transactions. |
| (G) Insurance and annuity transactions. | (M) Tax matters. |
| (H) Estate, trust, and other beneficiary transactions. | (N) ALL OF THE POWERS LISTED ABOVE. |
| | You need not initial any other lines if you initial line(N) |

## SPECIAL INSTRUCTIONS:

(On the following lines you may give special instructions limiting or extending the powers granted to your agent)
Authorized to care for (medical, dental, school, financial or any act necessary) for my children:

| | | |
|---|---|---|
| ███ ███ S██ | (D.O.B. ███ 2010) | |
| ███ ███ S██ | (D.O.B. ███ 2015 | |

Unless directed otherwise above, this power of attorney is effective immediately and will continue until: **Revoked**

This power of attorney will continue to be effective even though I become incapacitated.
(Strike the preceding sentence if you do not want this power of attorney to continue if you become incapacitated)

## EXERCISE OF POWER OF ATTORNEY WHERE MORE THAN ONE AGENT DESIGNATED

If I have designated more than one agent, the agents are to act _____

1

(If you appointed more than one agent and you want each agent to be able to act alone without the other agent, insert the word "Separately" in the blank space above. If you do not insert any word in the blank space or if you insert the word "jointly", then all of your agent must act or sign together)

I agree that any third party who receives a copy of this document may act under it. Revocation of the power of attorney is not effective as to a third party until the third party has actual knowledge of the revocation. I agree to indemnify the third party for any claims that arise against the third party because of reliance on this power of attorney.

Signed this _____ day of May, 2018

_____
(Your signature)                                  ████████████████
                                                  (Your social security number)

State of California                               County of San Diego

**BY ACCEPTING OR ACTING UNDER THE APPOINTMENT, THE AGENT ASSUMES THE FIDUCIARY AND OTHER LEGAL RESPONSIBILITIES OF AN AGENT.**

**CERTIFICATE OF ACKNOWLEDGEMENT OF NOTARY PUBLIC**

STATE OF CALIFORNIA
COUNTY OF SAN DIEGO

On _____ before me, K.V. FAY

Notary Public personally appeared: MARIA SERRANO

Personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

K V FAY
_____
(SIGNATURE OF NOTARY)

K. V. FAY
Commission # 2090645
Notary Public - California
San Diego County
My Comm. Expires Dec 16, 2018

(Seal)

2

# EXHIBIT 4



STATE OF WASHINGTON
DEPARTMENT OF SOCIAL AND HEALTH SERVICES
CHILDREN'S ADMINISTRATION
PO Box 45710
Olympia WA 98504-5710

## Washington State Child Abuse and Neglect
## Founded Findings Request from Another State

The information provided through this service is limited to the existence of founded findings (substantiated findings) of allegations of child abuse and neglect, and complies with the Adam Walsh Child Protection and Safety Act of 2006 for purposes of approving a prospective adoptive or foster parent. Follow the steps below:

**This form must be typewritten and signed. Any handwritten or incomplete forms will be returned for correction.**

1. Complete one form for each individual for whom a child abuse/neglect findings request is being requested.
2. Include a check or money order in the amount of $20.00, per individual inquiry, made payable to DSHS Children's ADMIN.
3. Mail completed requests to: DSHS Children's Administration ATTN: Fiscal
   PO Box 45710
   Olympia WA 98504-5710

4. See "instructions" for ICPC requests. Call 1-800-562-5624 or email CAFiscal.Bkchecks@dshs.wa.gov with any questions.

### A. Requestor Information

| NAME, LAST | FIRST | TITLE |
|---|---|---|
| **Ramos** | **Cynthia** | **Supervisor** |

| AGENCY OR BUSINESS NAME | WASHINGTON DATABASE NUMBER (DSHS ONLY) |
|---|---|
| **Health and Human Services** | |

| MAILING ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| **5600 Fishers Lane Parklawn Rd #02E70** | **Rockville** | **MD** | **20857** |

| TELEPHONE NUMBER (WITH AREA CODE) | FAX NUMBER (WITH AREA CODE) | E-MAIL ADDRESS |
|---|---|---|
| **301-443-7047** | **301-480-0292** | **cauchecks.oig@hhs.gov** |

### B. Signature of Requestor

| REQUESTED BY (SIGNATURE) | DATE SIGNED |
|---|---|
| | |

### C. Subject of Records Requested

| NAME: LAST | FIRST | MIDDLE | DATE OF BIRTH |
|---|---|---|---|
| Serrano | Francesco | de Jesus | ▮▮▮▮ |

| PREVIOUS NAMES USED (AKA, ALIASES OR MAIDEN) | SEX | SOCIAL SECURITY NUMBER |
|---|---|---|
| | MALE | ▮▮▮▮ |

| LAST WASHINGTON STATE MAILING STREET ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| ▮▮▮▮ | Washington | DC | ▮▮▮▮ |

### D. Authorization BY Subject of Records Requested

By signing below, I authorize the State of Washington Department of Social and Health Services to release confidential information about me regarding any founded findings of child abuse or neglect to the requesting individual or agency identified above.

| SIGNATURE | DATE SIGNED |
|---|---|
| | 06/26/18 |

### Response by the Washington State DSHS Children's Administration

The result of a search of the Children's Administration child welfare records, pursuant to the data provided above is as follows:

☐ Our records do not indicate that the person identified in your inquiry request has been named as a subject in a founded finding of abuse or neglect.

☐ Our records indicate that one or more founded findings exist in which the person identified in your inquiry request was the subject.

| CHECK NUMBER | |
|---|---|
| FISCAL INITIALS | |
| DATE COMPLETED | |
| STAFF INITIALS | |

DSHS 23-041 (REV. 01/2018)

# EXHIBIT 5



# Administración para los niños y la familia
## Oficina de Reubicación de Refugiados

# Solicitud de reunificación familiar

## Cómo completar esta solicitud

**IMPORTANTE:** Si no puede completar estos pasos en el lapso de siete (7) días, infórmeselo al Administrador de su caso.

### ☐ Paso 1

Si todavía no lo ha hecho, debe firmar y devolver de inmediato al Administrador de su caso el formulario de **Autorización de divulgación de información** y una copia de su identificación (ID) con foto emitida por el gobierno.

Si se le pide que presente huellas dactilares, el Administrador de su caso lo ayudará a programar una cita para presentar sus huellas dactilares en el lapso de tres (3) días. Comuníquese con el Administrador de su caso si tiene preguntas.

### ☐ Paso 2

Lea el **Manual del patrocinador** y el **Acuerdo del patrocinador sobre el cuidado** que incluye otra información importante que debe saber acerca de patrocinar a un menor en nuestro programa.

### ☐ Paso 3

Complete y firme la **Solicitud de reunificación familiar** (páginas 3 a 7 de este paquete).

### ☐ Paso 4

Reúna los documentos necesarios que se enumeran en la sección **Documentos probatorios** (páginas 8 a 10 de este paquete).

### ☐ Paso 5

Presente la **Solicitud de reunificación familiar** (esta solicitud) y los documentos probatorios necesarios al Administrador de su caso.

La LEY DE SIMPLIFICACIÓN DE TRÁMITES DE 1995 (Pub. L. 104-13). Se estima que el promedio de las declaraciones públicas obligatorias de esta solicitud de información es de 30 minutos por respuesta, incluido el tiempo para revisar las instrucciones, recolectar y mantener los datos necesarios y revisar la solicitud de información. Una agencia no puede dirigir ni patrocinar y no es necesario que una persona responda a una recopilación de información, a menos que muestre un número de control válido y actual de la Oficina de Administración y Presupuesto (Office of Management and Budget, OMB) Consulte el aviso de privacidad adjunto/Declaración de la Ley de Privacidad para obtener un análisis acerca de (1) la autoridad de la solicitud de información y acerca de si la divulgación es obligatoria o voluntaria, (2) los propósitos principales para los cuales la información está dirigida, (3) otros usos rutinarios para los cuales se puede usar la información y (4) los efectos, si los hay, de no brindar toda o parte de la información solicitada.

# Solicitud de reunificación familiar
## Oficina de Reubicación de Refugiados

# Preguntas frecuentes

### ¿Puedo patrocinar a mi hijo si no tengo documentos?
Sí. La Oficina de Reubicación de Refugiados (ORR, Office of Refugee Resettlement)/División de Servicios de Niños No-Acompañados (Division of Unaccompanied Children's Services, DUCS) prefiere entregar un niño a su madre, padre o tutor legar sin importar la situación migratoria.

### ¿Tiene un costo patrocinar a un niño?
No. No se exigen cargos para completar los requisitos para patrocinar a un niño. Sin embargo, usted puede ser responsable de los costos de viaje y como acompañante del niño.

### ¿Necesito un abogado para patrocinar a un niño?
No. No necesita un abogado para completar los requisitos para patrocinar a un niño. Si necesita ayuda para completar los requisitos, el Administrador de su caso lo puede ayudar. Si busca atención adicional, tenga en cuenta que no hay ningún cargo por completar los requisitos para patrocinar a un niño.

### ¿Por qué tengo que presentar mis huellas dactilares?
ORR/DUCS requiere investigaciones de antecedentes para garantizar la seguridad del niño. Si se le pide que presente huellas dactilares, el Administrador de su caso lo ayudará a programar una cita para presentar sus huellas dactilares en el lapso de tres (3) días. Comuníquese con el Administrador de su caso si tiene preguntas.

### ¿Qué información debo proporcionar?
Debe completar la Solicitud de reunificación familiar y los documentos probatorios. También debe responder preguntas del Administrador de su caso sobre su hogar, la relación con el niño y su capacidad de cuidar el bienestar físico y mental del niño. Debe proporcionar prueba de su identidad.

### ¿Cuándo tengo que entregarle estos documentos al Administrador de mi caso?
Debe presentar toda la información necesaria en el lapso de siete (7) días o antes, si es posible. Cuanto antes presente todos los documentos necesarios, con más rapidez ORR tomará una decisión sobre la liberación del niño para su custodia. ORR le informará de inmediato la decisión sobre la liberación del niño para su custodia o le notificará si se necesita una evaluación o información adicional.

¿Necesita ayuda? Comuníquese con el Administrador de su caso.

Página 2 de 10

ORR UAC/FRP-3s [Rev. 05/14/2018]
OMB 0970-0278 [válida hasta el 10/31/2018]
La LEY DE SIMPLIFICACIÓN DE TRÁMITES DE 1995 (Pub. L. 104-13). Se estima que el promedio de las declaraciones públicas obligatorias de esta solicitud de información es de 30 minutos por respuesta, incluido el tiempo para revisar las instrucciones, recolectar y mantener los datos necesarios y revisar la solicitud de información. Una agencia no puede dirigir ni patrocinar y no es necesario que una persona responda a una recopilación de información, a menos que muestre un número de control válido y actual de la Oficina de Administración y Presupuesto (Office of Management and Budget, OMB) Consulte el aviso de privacidad adjunto/Declaración de la Ley de Privacidad para obtener un análisis acerca de (1) la autoridad de la solicitud de información y acerca de si la divulgación es obligatoria o voluntaria, (2) los propósitos principales para las cuales la información está dirigida, (3) otros usos rutinarios para los cuales se puede usar la información y (4) los efectos, si los hay, de no brindar toda o parte de la información solicitada.

# Solicitud de reunificación familiar
## Oficina de Reubicación de Refugiados

# Acerca de usted, el patrocinador y el (los) menor(es)

**1) Nombre(s) del (de los) menor(es)**
Enumere los nombres de todos los niños que solicita patrocinar

**2) Su relación con el (los) menor(es)**
p. ej. madre, tío, amigo de la familia

**3) Su nombre**

**4) Cualquier otro nombre que usted haya utilizado**
Enumere otros nombres que haya usado, como su nombre antes de casarse o sus apellidos maternos (sepárelos con comas)

**5) Su país de origen (de usted)**
Dónde nació

**6) Su fecha de nacimiento (de usted)**
p. ej., 12/31/1979

**7) Números de teléfono**
p. ej., 210-555-1234

Teléfono principal

Teléfono secundario

**8) Su dirección de correo electrónico o número de fax**

**9) Idioma(s) que habla**

¿Necesita ayuda? Comuníquese con el Administrador de su caso.

La LEY DE SIMPLIFICACIÓN DE TRÁMITES DE 1995 (Pub. L. 104-13). Se estima que el promedio de las declaraciones públicas obligatorias de esta solicitud de información es de 30 minutos por respuesta, incluido el tiempo para revisar las instrucciones, recolectar y mantener los datos necesarios y revisar la solicitud de información. Una agencia no puede dirigir ni patrocinar y no es necesario que una persona responda a una recopilación de información, a menos que muestre un número de control válido y actual de la Oficina de Administración y Presupuesto (Office of Management and Budget, OMB) Consulte el aviso de privacidad adjunto/Declaración de la Ley de Privacidad para obtener un análisis acerca de (1) la autoridad de la solicitud de información y acerca de si la divulgación es obligatoria o voluntaria, (2) los propósitos principales para los cuales la información está dirigida, (3) otros usos

# Solicitud de reunificación familiar
## Oficina de Reubicación de Refugiados

# ¿Dónde vivirán usted y el (los) menor(es)?

**10) Domicilio**
Domicilio
(+ número de departamento, si
corresponde)

Ciudad [                    ]   Estado [   ]   Código postal [      ]

**11)  ¿Quién vive actualmente en este domicilio?**

| Nombre del miembro del hogar | Fecha de nacimiento | Relación con usted (el patrocinador) | Relación con el menor |
|---|---|---|---|
| *(EJEMPLO) Miguel Perez* | 12/31/1985 | Hermano | Tío |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

¿Necesita ayuda? Comuníquese con el
Administrador de su caso.

ORR UAC/FRP-3s [Rev. 05/14/2018]
OMB 0970-0278 [válida hasta el 10/31/2018]
La LEY DE SIMPLIFICACIÓN DE TRÁMITES DE 1995 (Pub. L. 104-13). Se estima que el promedio de las declaraciones públicas obligatorias de esta solicitud de información es de 30 minutos por respuesta, incluido el tiempo para revisar las instrucciones, recolectar y mantener los datos necesarios y revisar la solicitud de información. Una agencia no puede dirigir ni patrocinar y no es necesario que una persona responda a una recopilación de información, a menos que muestre un número de control válido y actual de la Oficina de Administración y Presupuesto (Office of Management and Budget, OMB) Consulte el aviso de privacidad adjunto/Declaración de la Ley de Privacidad para obtener un análisis acerca de (1) la autoridad de la solicitud de información y acerca de si la divulgación es obligatoria o voluntaria, (2) los propósitos principales para los cuales la información está dirigida, (3) otros usos

# Solicitud de reunificación familiar
## Oficina de Reubicación de Refugiados

# Adulto que se hará cargo del (de los) menor(es) si usted no puede hacerlo

En el caso de que tenga que irse de los Estados Unidos o no pueda hacerse cargo del (de los) menor(es), ¿quién se hará cargo del (de los) menor(es)?

**12a) Nombre del posible encargado adulto**

**12b) Fecha de nacimiento del posible encargado adulto**

**12c) Información de contacto del posible encargado adulto**

Número de teléfono

Domicilio
(+ número de departamento, si corresponde)

Ciudad

Estado

Código postal

**12d) ¿Cuál es su relación con el (los) menor(es)?**
(abuelo, tía, hermano mayor de 18 años, etc.)

**12e) ¿Cuál es su relación con usted, el patrocinador?**

**12f) ¿Cómo se cuidará al (a los) menor(es) en el caso de que usted se tenga que ir de los Estados Unidos o no pueda cuidarlo(s)?**

ORR UAC/FRP-3s [Rev. 05/14/2018]
OMB 0970-0278 [válida hasta el 10/31/2018]

¿Necesita ayuda? Comuníquese con el Administrador de su caso.

Página 5 de 10

La LEY DE SIMPLIFICACIÓN DE TRÁMITES DE 1995 (Pub. L. 104-13). Se estima que el promedio de las declaraciones públicas obligatorias de esta solicitud de información es de 30 minutos por respuesta, incluido el tiempo para revisar las instrucciones, recolectar y mantener los datos necesarios y revisar la solicitud de información. Una agencia no puede dirigir ni patrocinar y no es necesario que una persona responda a una recopilación de información, a menos que muestre un número de control válido y actual de la Oficina de Administración y Presupuesto (Office of Management and Budget, OMB) Consulte el aviso de privacidad adjunto/Declaración de la Ley de Privacidad para obtener un análisis acerca de (1) la autoridad de la solicitud de información y acerca de si la divulgación es obligatoria o voluntaria, (2) los propósitos principales para los cuales la información está dirigida, (3) otros usos

**Solicitud de reunificación familiar**
Oficina de Reubicación de Refugiados

# Información económica

**13) ¿Cómo mantendrá económicamente al (a los) menor(es)?**
Incluya todas las fuentes y los montos de su ingreso (por ejemplo, cuánto le pagan por semana) y explique cualquier apoyo económico que reciba de otros que lo ayudarán a mantener económicamente al (a los) menor(es).

# Información médica

**14a) ¿Alguno de los ocupantes de su hogar sufre de alguna enfermedad grave y contagiosa (tuberculosis [TB], síndrome de inmunodeficiencia adquirida [SIDA], hepatitis, etc.)? Si así fuera, explíquelo:**

**14b) ¿Sabe de alguna afección médica que el (los) menor(es) pueda(n) tener (discapacidades, alergias, enfermedades, etc.)? Si así fuera, explíquelo:**

¿Necesita ayuda? Comuníquese con el Administrador de su caso.

ORR UAC/FRP-3s [Rev. 05/14/2018]
OMB 0970-0278 [válida hasta el 10/31/2018]
La LEY DE SIMPLIFICACIÓN DE TRÁMITES DE 1995 (Pub. L. 104-13). Se estima que el promedio de las declaraciones públicas obligatorias de esta solicitud de información es de 30 minutos por respuesta, incluido el tiempo para revisar las instrucciones, recolectar y mantener los datos necesarios y revisar la solicitud de información. Una agencia no puede dirigir ni patrocinar y no es necesario que una persona responda a una recopilación de información, a menos que muestre un número de control válido y actual de la Oficina de Administración y Presupuesto (Office of Management and Budget, OMB) Consulte el aviso de privacidad adjunto/Declaración de la Ley de Privacidad para obtener un análisis acerca de (1) la autoridad de la solicitud de información y acerca de si la divulgación es obligatoria o voluntaria, (2) los propósitos principales para los cuales la información está dirigida, (3) otros usos

# Solicitud de reunificación familiar
## Oficina de Reubicación de Refugiados

## Antecedentes penales

Si responde "Sí" a cualquiera de estas preguntas, tendrá que brindar más información. Consulte la página de Documentos probatorios (página 9 de este paquete) para obtener más información.

**15a)  ¿Usted o alguno de los ocupantes de su hogar han sido acusados o condenados por un delito alguna vez (que no sea una infracción menor de tránsito, p. ej., velocidad excesiva, multa por mal estacionamiento, etc.)?**

     ○ Sí    ○ No

**15b)  ¿Usted o alguna persona en su hogar han sido investigados por abuso físico, sexual, descuido o abandono de un menor alguna vez?**

     ○ Sí    ○ No

## Firma y fecha de la solicitud

Declaro y afirmo bajo pena de perjurio que la información contenida en esta solicitud es verdadera y precisa, según mi leal saber y entender.

Doy fe de que todos los documentos que presento o las copias de dichos documentos están libres de error y de fraude.

Doy fe además que me atendré a las instrucciones contenidas en el *Acuerdo del Patrocinador sobre el Cuidado.*

Velaré por el bienestar físico y mental del (de los) menor(es). También cumpliré con las leyes de mi estado respecto del cuidado de este menor, lo que incluye:

- la inscripción de (de los) menor(es) en la escuela;
- la provisión de atención médica cuando sea necesaria;
- la protección del (de los) menor(es) contra el abuso, descuido y abandono;
- y cualquier otro requisito no contenido en el presente.

| SU FIRMA | | FECHA | |
|---|---|---|---|

**ORR UAC/FRP-3s [Rev. 05/14/2018]**
**OMB 0970-0278 [válida hasta el 10/31/2018]**

¿Necesita ayuda? Comuníquese con el Administrador de su caso.

**Página 7 de 10**

LA LEY DE SIMPLIFICACIÓN DE TRÁMITES DE 1995 (Pub. L. 104-13). Se estima que el promedio de las declaraciones públicas obligatorias de esta solicitud de información es de 30 minutos por respuesta, incluido el tiempo para revisar las instrucciones, recolectar y mantener los datos necesarios y revisar la solicitud de información. Una agencia no puede dirigir ni patrocinar y no es necesario que una persona responda a una recopilación de información, a menos que muestre un número de control válido y actual de la Oficina de Administración y Presupuesto (Office of Management and Budget, OMB) Consulte el aviso de privacidad adjunto/Declaración de la Ley de Privacidad para obtener un análisis acerca de (1) la autoridad de la solicitud de información y acerca de si la divulgación es obligatoria o voluntaria, (2) los propósitos principales para los cuales la información está dirigida, (3) otros usos

# Solicitud de reunificación familiar
## Oficina de Reubicación de Refugiados

# Documentos probatorios

Sírvase proveer una copia de los siguientes documentos que figuran a continuación. Si no puede proporcionar los documentos que solicitamos, explique el motivo. Tenga en cuenta que podemos rechazar su solicitud si falta cualquier elemento de la información solicitada, si esta se encuentra incompleta o no es correcta.

## 1) Prueba de identidad de usted y de los miembros del hogar

Una copia de una identificación emitida por el gobierno. Puede presentar una opción de la Lista A o dos o más opciones de la Lista B. Si presenta opciones de la Lista B, al menos una opción debe contar con una fotografía. Se aceptan documentos vencidos.

| Lista A |
| --- |
| Pasaporte de los EE. UU o tarjeta pasaporte de los EE. UU. |
| Pasaporte extranjero que contenga una fotografía |
| Tarjeta de residente permanente o tarjeta de registro de extranjero (Formulario I-551) |
| Documento de Autorización de Empleo que contenga una fotografía (Formulario I-766) |
| Licencia de conducir o tarjeta de identificación de los EE. UU. |

| Lista B |
| --- |
| Certificado de naturalización de los EE. UU. |
| Tarjeta de identificación militar de los EE. UU. |
| Partida de nacimiento |
| Certificado de matrimonio |
| Orden judicial para el cambio de nombre |
| Tarjeta de identificación de extranjero |
| Recibo de renovación del pasaporte del consulado que contenga una fotografía |
| Tarjeta de identificación del consulado de México |
| Licencia de conducir extranjera que contenga una fotografía |
| Tarjeta del registro de votantes extranjeros que contenga una fotografía |
| Tarjeta de cruce fronterizo de Canadá que contenga una fotografía |
| Tarjeta de cruce fronterizo de México que contenga una fotografía con el formulario I-94 válido |
| Documento de viaje del refugiado que contenga una fotografía |
| Otros documentos del gobierno similares |

**ORR UAC/FRP-3s [Rev. 05/14/2018]**
**OMB 0970-0278 [válida hasta el 10/31/2018]**

¿Necesita ayuda? Comuníquese con el
Administrador de su caso.

Página 8 de 10

La LEY DE SIMPLIFICACIÓN DE TRÁMITES DE 1995 (Pub. L. 104-13). Se estima que el promedio de las declaraciones públicas obligatorias de esta solicitud de información es de 30 minutos por respuesta, incluido el tiempo para revisar las instrucciones, recolectar y mantener los datos necesarios y revisar la solicitud de información. Una agencia no puede dirigir ni patrocinar y no es necesario que una persona responda a una recopilación de información, a menos que muestre un número de control válido y actual de la Oficina de Administración y Presupuesto (Office of Management and Budget, OMB) Consulte el aviso de privacidad adjunto/Declaración de la Ley de Privacidad para obtener un análisis acerca de (1) la autoridad de la solicitud de información y acerca de si la divulgación es obligatoria o voluntaria, (2) los propósitos principales para los cuales la información está dirigida, (3) otros usos

# Solicitud de reunificación familiar
## Oficina de Reubicación de Refugiados

**2) Prueba de la identidad del menor**
   Una copia del certificado de nacimiento del menor

**3) Prueba del parentesco**
   Copias de los documentos para brindar pruebas de una relación entre usted y el menor. Se aceptan documentos vencidos.

| Su relación con el menor | Documentos aceptables |
|---|---|
| Padre/madre | <ul><li>Partidas de nacimiento</li><li>Registros judiciales</li><li>Identificación con fotografía del padre/madre emitida por el gobierno</li></ul> |
| Padrastro/madrastra Adoptó legalmente al menor | <ul><li>Partidas de nacimiento</li><li>Identificación con fotografía del padre/madre emitida por el gobierno</li><li>Identificación con fotografía del padrastro/madrastra emitida por el gobierno</li><li>Certificado de matrimonio</li><li>Documentos de una orden judicial que confirman que se estableció la adopción o la tutoría legal</li></ul> |
| Tutor legal | <ul><li>Documentos de una orden judicial que confirman que se estableció la adopción o la tutoría legal</li><li>Partidas de nacimiento</li><li>Identificación con fotografía del tutor legal emitida por el gobierno</li><li>Registros de la tutoría</li><li>Certificados de defunción</li><li>Registros hospitalarios</li></ul> |
| Miembro de la familia | <ul><li>Partidas de nacimiento</li><li>Rastro de certificados de defunción y/o partidas de nacimiento de los familiares que muestren que usted y el menor tienen un parentesco</li><li>Certificados de matrimonio</li><li>Registros hospitalarios</li><li>Registros judiciales</li><li>Registros de la tutoría</li><li>Certificado de bautismo</li></ul> |
| No tiene parentesco con el menor | Comuníquese con el Administrador de su caso |

**¿Necesita ayuda? Comuníquese con el Administrador de su caso.**

ORR UAC/FRP-3s [Rev. 05/14/2018]
OMB 0970-0278 [válida hasta el 10/31/2018]
La LEY DE SIMPLIFICACIÓN DE TRÁMITES DE 1995 (Pub. L. 104-13). Se estima que el promedio de las declaraciones públicas obligatorias de esta solicitud de información es de 30 minutos por respuesta, incluido el tiempo para revisar las instrucciones, recolectar y mantener los datos necesarios y revisar la solicitud de información. Una agencia no puede dirigir ni patrocinar y no es necesario que una persona responda a una recopilación de información, a menos que muestre un número de control válido y actual de la Oficina de Administración y Presupuesto (Office of Management and Budget, OMB) Consulte el aviso de privacidad adjunto/Declaración de la Ley de Privacidad para obtener un análisis acerca de (1) la autoridad de la solicitud de información y acerca de si la divulgación es obligatoria o voluntaria, (2) los propósitos principales para los cuales la información está dirigida, (3) otros usos

## 4) Registros legales (si corresponde)
Si usted respondió "SÍ" a cualquiera de las preguntas 15(a) o 15(b) de este formulario, proporcione la siguiente información para cada cargo/condena:

- Nombre de la persona implicada
- Lugar y fecha del incidente
- Explicación del incidente
- Pronunciamiento del incidente (p. ej., retiro de cargos, aplicación de multa, detención, libertad condicional)
- Copia del (de los) registro(s) judicial(es), registro(s) policial(es), y/o registro(s) de la agencia de servicio social gubernamental relacionado(s) con el (los) incidente(s)

## 5) Evidencia del domicilio
Una copia de al menos un tipo de documentación que verifique su domicilio actual. Los tipos de documentación aceptables incluyen los siguientes:

- Su renta actual con su nombre, y con fecha en los últimos dos meses
- Su estado de cuenta actual con su nombre, y con fecha en los últimos dos meses
- Su estado de cuenta bancario, con fecha en los últimos dos meses
- Su empleador emite un recibo de sueldo oficial, con fecha en los últimos dos meses
- Su ID del estado válida y vigente con su fotografía y domicilio actual
- Correspondencia, en lo posible una factura de servicio público o liquidación de seguros, dirigida a usted a su domicilio actual, con fecha en los últimos dos meses
- Carta de su locador, certificada por notario público, en la que se confirme su domicilio y que contenga su nombre, la fecha en la cual se mudó, la cantidad de dormitorios y la fecha de vencimiento de la renta
- Otros documentos similares que indiquen, de manera confiable, que vive en su domicilio actual, con fecha en los últimos dos meses

¿Necesita ayuda? Comuníquese con el Administrador de su caso.

**ORR UAC/FRP-3s [Rev. 05/14/2018]**
**OMB 0970-0278 [válida hasta el 10/31/2018]**

**Página 10 de 10**

La LEY DE SIMPLIFICACIÓN DE TRÁMITES DE 1995 (Pub. L. 104-13). Se estima que el promedio de las declaraciones públicas obligatorias de esta solicitud de información es de 30 minutos por respuesta, incluido el tiempo para revisar las instrucciones, recolectar y mantener los datos necesarios y revisar la solicitud de información. Una agencia no puede dirigir ni patrocinar y no es necesario que una persona responda a una recopilación de información, a menos que muestre un número de control válido y actual de la Oficina de Administración y Presupuesto (Office of Management and Budget, OMB) Consulte el aviso de privacidad adjunto/Declaración de la Ley de Privacidad para obtener un análisis acerca de (1) la autoridad de la solicitud de información y acerca de si la divulgación es obligatoria o voluntaria, (2) los propósitos principales para los cuales la información está dirigida, (3) otros usos rutinarios para los cuales se puede usar la información y (4) los efectos, si los hay, de no brindar toda o parte de la información solicitada.



# Sponsor Care Agreement
Office of Refugee Resettlement

Le solicitó a la Oficina de Reubicación de Refugiados (Office of Refugee Resettlement, ORR) patrocinar a un niño extranjero no acompañado en el cuidado y la custodia del gobierno federal conforme al acuerdo extrajudicial estipulado Flores v. Reno, número 85-4544-RJK (Px) (C.D. Cal., 17 de enero de 1997), sección 462 del Homeland Security Act de 2002 y la sección 235 del William Wilberforce Trafficking Victims Protection Reauthorization Act de 2008. Si se aprueba la solicitud de patrocinio, recibirá un formulario de *Verificación de liberación* de ORR y se celebrará un acuerdo de custodia con el gobierno federal en el cual acepta cumplir con las siguientes disposiciones mientras el menor esté en su cuidado:

- Proporcionar el bienestar mental y físico del menor, que incluye, entre otros, alimentos, refugio, vestimenta, educación, atención médica y otros servicios según sea necesario.

- Si no es el tutor legal ni el padre o la madre del menor, haga los mejores esfuerzos por establecer una custodia legal con el tribunal local dentro de un tiempo razonable.

- Asistir a un programa de orientación legal proporcionado por el Departamento de Justicia (Department of Justice, DOJ), o programa de orientación legal para custodios (patrocinadores) de la Oficina Ejecutiva para la Revisión de la Inmigración (Executive Office for Immigration Review, EOIR), si está disponible en el lugar donde reside.

- Según dónde esté pendiente el caso de inmigración del menor, notificar al Tribunal de Inmigración o al Tribunal de Apelaciones de Inmigración local en un período de cinco (5) días de todo cambio de dirección o número de teléfono del menor, usando el formulario de cambio de dirección de extranjeros (formulario EOIR-33). Además, si es necesario, presentar una petición de cambio de competencia territorial a nombre del menor. La petición de cambio de competencia territorial debe contener información especificada por el Tribunal de Inmigración. Tenga en cuenta que la petición de cambio de competencia territorial puede requerir la ayuda de un abogado. Para obtener asesoramiento sobre la "petición de cambio de competencia territorial", consulte el Manual de práctica del Tribunal de Inmigración en http://www.justice.gov/eoir/vll/OCIJPracManual/ocij_page1.htm.. Para obtener información sobre casos de inmigración, comuníquese con el sistema de información de casos de inmigración de EOIR llamando al 1-800-898-7180. Visite el sitio web de EOIR para obtener información adicional en: http://www.justice.gov/eoir/formslist.htm.

- Notificar al Departamento de Seguridad del Territorio Nacional (Department of Homeland Security, DHS) o a Servicios de Ciudadanía e Inmigración de los Estados Unidos (U.S. Citizenship and Immigration Services) en un período de diez (10) días de todo cambio de dirección, presentando la Tarjeta de Cambio de Dirección de Extranjero (AR-11) o de manera electrónica en http://i.usa.gov/Ac5MP.

- Asegurar la presencia del menor en todos los procedimientos futuros ante DHS o Inmigración y Seguridad de Aduanas (Immigration and Customs Enforcement, ICE) y el Departamento de Justicia (Department of Justice, DOJ) o EOIR. Para obtener información

Office of Refugee Resettlement
sobre casos de inmigración, comuníquese con el sistema de información de casos de
EOIR llamando al: 1-800-898-7180.

- Asegurar que el menor se presente ante ICE para la expulsión de los Estados Unidos si un juez de inmigración emite una orden de expulsión o una orden de salida voluntaria. Se asigna al menor un oficial de deportación para los procedimientos de expulsión.

- Notificar a la autoridad policial local o a los Servicios de Protección Infantil local o estatal si el menor estuvo o está en riesgo de estar sujeto a abuso, abandono, descuido o maltrato o si se entera de que el menor ha sido amenazado, abusado o agredido sexual o físicamente, o ha desaparecido. Se debe notificar ni bien sea posible o antes de las 24 horas después de ocurrido el acontecimiento, o después de tener conocimiento del riesgo o la amenaza.

- Notificar al Centro Nacional para Niños Perdidos y Explotados (National Center for Missing and Exploited Children) al 1-800-843-5678 si el menor desaparece, fue secuestrado o se escapa. Se debe notificar ni bien sea posible o antes de las 24 horas después de enterarse de la desaparición del menor.

- Notificar a ICE si algún individuo que se crea que represente un sindicato de contrabando de extranjeros, crimen organizado o una organización de tráfico de seres humanos se comunica de alguna forma con el menor. Notificar lo antes posible o antes de las 24 horas después de conocer esta información. Puede llamar a ICE al 1-866-347-2423.


términos de este *Acuerdo de cuidado del patrocinador*.

- Si no es el tutor legal ni el padre o madre del niño, en caso de que ya no pueda y no esté dispuesto a cuidar al menor y no pueda transferir de manera temporal la custodia física y el menor reúna los requisitos de la definición de niño extranjero no acompañado, debe notificar a ORR al 1-800-203-7001.

- La liberación del menor mencionado anteriormente de la Oficina de Reubicación de Refugiados para su cuidado no le otorga al menor ningún estado de inmigración legal y el menor debe presentarse a los procedimientos del tribunal de inmigración.



# Declaración del patrocinador
Oficina de Reubicación de Refugiados

Declaro y afirmo, bajo pena de perjurio, que soy el patrocinador propuesto para el menor y que mi *Solicitud de reunificación familiar* y los documentos usados como respaldo a la solicitud funcionan como evidencia de que tengo la plena intención de proporcionarle cuidado al menor que pretendo patrocinar. Asimismo, no me presento como patrocinador para no tener a un menor a mi cuidado y luego transferir ese menor a otra persona, en incumplimiento de la política de la Oficina de Reubicación de Refugiados (Office of Refugee Resettlement, ORR) y las leyes federales.

Solo puedo transferir a un menor al cuidado de otra persona en las siguientes situaciones:

(1) a los padres biológicos del menor, en caso de que al hacerlo no exponga al niño a un peligro inmediato y que no haya una finalización de los derechos parentales;

(2) en el caso de que no pueda o no desee continuar el patrocinio debido a una dificultad inesperada o en el caso de que deje inminentemente los Estados Unidos, transferiré el cuidado del menor a un cuidador alternativo (y únicamente al cuidador alternativo) identificado en mi respuesta a las Preguntas 12a-e de mi *Solicitud de reunificación familiar*, conforme a lo aprobado por la ORR en mi *Plan de cuidado del patrocinador*, si al hacerlo no expongo al menor a un peligro inmediato;

(3) a funcionarios encargados del cumplimiento de las leyes locales, estatales o federales o funcionarios del Servicio de Protección de Menores (Child Protective Service, CPS), o a las personas designadas del gobierno local o estatal.

Antes de intentar transferir a un menor, debo notificar al Centro de Atención Telefónica Nacional (National Call Center, NCC) de la ORR al 1-800-203-7001. La Oficina de Reubicación de Refugiados puede requerir más información antes de que pueda realizar una transferencia de cuidado o puede requerir una medida correctiva antes de aprobar una transferencia.

Si no notifico a la Oficina de Reubicación de Refugiados sobre una transferencia o si transfiero al menor a una persona no autorizada, entiendo que el gobierno federal puede procesarme por perjuicio, fraude, trata de personas u otros delitos penales establecidos en la ley federal, según corresponda.

Comprendo que la conspiración o la cooperación en la comisión de cualquiera de los siguientes actos constituye un delito:

(1) ingresar o intentar ingresar a un extranjero a los Estados Unidos por un lugar que no sea el puerto de entrada designado u otro lugar designado por el Departamento de Seguridad Nacional (Department of Homeland Security, DHS);

(2) transportar o mover, o intentar transportar y mover, a un extranjero que no tiene una condición legal dentro de los Estados Unidos para apoyar una violación de la ley;

(3) alojar u ocultar, o intentar alojar y ocultar, a un extranjero que no tiene una condición legal dentro de los Estados Unidos; o

(4) incentivar o inducir a un extranjero para que venga a los Estados Unidos si su residencia es o será una violación a la ley.

Además, puedo estar sujeto a tener que asumir una responsabilidad civil derivada de una transferencia del cuidado de un menor a una persona no autorizada de forma negligente o imprudente. La Oficina de Reubicación de Refugiados coopera plenamente con las autoridades encargadas del cumplimiento de las leyes locales, estatales y federales, incluidas las autoridades de inmigración federales o las autoridades de bienestar de menores, para poner en práctica fielmente las leyes que involucran la divulgación de mi información personal en el caso de que un menor sea transferido de una manera no autorizada.

Además, entiendo que, si no soy un ciudadano estadounidense, una transferencia no autorizada de un menor puede afectar mi capacidad de permanecer en los Estados Unidos, independientemente de mi condición legal de inmigración.

Afirmo o certifico que entiendo la advertencia proporcionada en esta declaración.

_____       _____

**Nombre del patrocinador**                    **Fecha**

# Please wait...

If this message is not eventually replaced by the proper contents of the document, your PDF viewer may not be able to display this type of document.

You can upgrade to the latest version of Adobe Reader for Windows®, Mac, or Linux® by visiting  http://www.adobe.com/go/reader_download.

For more assistance with Adobe Reader visit  http://www.adobe.com/go/acrreader.

Windows is either a registered trademark or a trademark of Microsoft Corporation in the United States and/or other countries. Mac is a trademark of Apple Inc., registered in the United States and other countries. Linux is the registered trademark of Linus Torvalds in the U.S. and other countries.

# EXHIBIT 6

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Child and Family Services Agency**



## Request for a Child Protection Register (CPR) Check

The purpose of the Child Protection Register is to protect children and to ensure their safety by maintaining an index of perpetrators of child abuse and neglect in the District of Columbia. This confidential index includes the names of individuals with substantiated and/or inconclusive findings from the investigative reports of the Child Protective Services Unit of the Child and Family Services Agency. Authorized individuals may request background checks to establish whether an individual has a record of substantiated abuse or neglect of a child that occurred in the District of Columbia.

> ▶ To request a local police clearance for the District of Columbia, please visit https://mpdc.dc.gov/node/187552.
> ▶ For information about the Sex Offender Registry, visit: https://mpdc.dc.gov/service/sex-offender-registry.
> ▶ If you are making a request on behalf of a state child welfare agency outside of the District of Columbia and need the history of a family previously living in the District of Columbia, you may call 202-671-SAFE.
> ▶ For other questions, call the CPR Unit at 202-727-8885 between 8:30 am and 4:30 pm Monday through Friday.

### *Read all instructions – incomplete, incorrect or illegible forms will be returned and your request may be delayed*

- Do not complete an old version of the form; get the latest form at https://cfsa.dc.gov/service/background-checks.
- Mail or deliver original application (no photocopies); no faxed, emailed, or scanned applications accepted.

**Part I**
- Schools (other than DCPS), child care facilities, private foster care agencies, and other private, community-based organizations should select "Non-Government Organization" as the Requestor Type.
- CPR check results are not transferrable and cannot be shared from one agency or employer to another.

**Part II**
- If you have no middle name write "no middle name" or if a middle name is an initial, indicate "initial only."
- If the answer to any question is none, write "N/A".

**Part III**
- An individual must sign the form to provide consent for CFSA to release information to an authorized requestor.
- The form must be signed in blue ink; electronic signatures are not permitted.
- An employment request allows access to substantiated reports of child maltreatment, to chief executive officers or directors of day care centers, schools, or any public or private organization working directly with children, for the purpose of making employment decisions.

**Part IV**
- Forms shall be returned if not notarized (*Note: applications for prospective and current CFSA resource parents and kin caregivers need <u>not</u> be notarized, but photo ID must be provided and the form must be signed in the presence of a CFSA employee*).

**Part V**
- Self-check applications must be submitted in person, not by mail.
- Individuals requesting a self-check and CFSA resource parents and kin caregivers must present **one** non-expired, government-issued, photo identification: e.g., driver's license, state identification card, passport, "green card".
- Results of CPR self-checks <u>may not</u> be used for employment purposes. Employers must directly request CPR clearances for prospective or current employees.

| **MAIL or HAND DELIVER completed forms to:** | Attn: Child Protection Register Unit Child and Family Services Agency 200 I Street SE, 3rd Floor Washington, DC 20003 | **Applications accepted between 8:30 am and 4:30 pm Monday through Friday** |
|---|---|---|

Rev. October 2017

**Please** <u>type</u> **or** <u>print</u> **clearly**. Sign the form in <u>**blue**</u> ink, and date where indicated. Thoroughly review and submit to the CFSA CPR office. **Allow up to 30 business days** for results to be processed. Expedited requests will be considered on a case-by-case basis. **Forms will be returned** if incomplete, incorrect, or illegible resulting in a delayed response.

### PART I:  Requesting Organization/Employer Information

| Request Date | | Corrected Application Re-submission Date | |
|---|---|---|---|
| **Requestor Type** | | | |
| ☐ Court | ☐ Government Agency | ☐ Non-Government Organization | ☐ Self (*personal use only*) |
| **Purpose** | | | |
| ☐ Adoption | ☐ Court Request | ☐ Foster/Adoption Licensing | ☐ Kinship Licensing |
| ☐ Visitation | ☐ Current Employee/Volunteer | ☐ New Hire/Volunteer | ☐ Other: |

| **Requesting Organization/Employer Contact Information** (results cannot  be mailed to a P.O. Box) | |
|---|---|
| Requesting Organization | U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, PROGRAM SUPPORT CENTER, DIVISION OF CHILDREN'S SERVICES |
| Attention To | Cynthia Ramos |
| Requestor Address | 5600 FISHERS LANE, ROOM 02E70, ROCKVILLE, MD 20857 |

| Phone Number | (301) 443-7047 | Fax Number | (301) 480-0292 | |
|---|---|---|---|---|
| Preferred method to return CPR check results to the requesting organization | | | ☐ By Mail | ☑ By Fax |

### PART II:  Applicant Information

| Last Name (include suffix if applicable) | First Name | Full Middle Name (write "no middle name" if there is none) | |
|---|---|---|---|
| | | | |
| Date of Birth (MM/DD/YYYY) | Social Security Number (or USCIS/Alien Registration #) | Gender (on birth certificate) | |
| | | ☐ Male | ☐ Female |
| Other Names Used (nicknames, alias, maiden name, previous married name, legal name change, etc.) | | | |
| | | | |
| | | | |
| | | | |

**Household Information.** *List all persons living at the current address with the applicant (including students away at college).*

| Name (first name, middle name, last name) | Date of Birth | Relationship to Applicant |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Previous Residency Information.** *List all addresses (excluding zip code) and the start and end dates, to the best of your ability. Indicate L, W or M in the first column (L = lived, W = worked, M = received mail).*

- Applicants for employment or volunteer purposes must include all addresses of residence and where mail was received for the last five (5) years.
- Applicants for adoption, foster care, and kinship care must provide addresses for residency, receipt of mail and employment from the age of 18, per Title 29 DCMR Chapter 60 § 6009.1.
- To calculate the starting date for the previous addresses, add 18 years to the date of birth (e.g., If you were born in 1970, add 18 so addresses going back to 1988 must be provided).
- To help obtain previous addresses, check the credit report bureaus (Equifax, Experian, TransUnion).

| Current Address (include Street #, Apt #, Quadrant if applicable) | | City | State | Zip |
|---|---|---|---|---|
| | | | | |

| L W M | Previous Address (Include Street # and Apt #) | City | State | Start – End Dates (MM/YYYY – MM/YYYY) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**PART III:  Applicant Consent**

I hereby consent and authorize the D.C. Child and Family Services Agency to provide the Requestor (noted in Part I) information concerning me that is contained in the Child Protection Register ("CPR").

**Printed Name:** _____

**Signature:** _____  **Date:** _____

*Must be signed in blue ink; electronic signatures not permitted*

**PART IV:  Certificate of Acknowledgement of the Applicant before a Notary Public**

*Leave this space blank for Notary seal*

_____

Applicant Name
(Printed)

_____

Applicant Signature
(must be signed in the presence of a Notary)

_____

Date

Subscribed and affirmed or sworn to me, in my presence, on this _____day of _____, 20_____

Signature of Notary Public: _____ in the state of, _____

My commission expires on _____/_____/_____

**PART V: Self Check, CFSA Resource Parent, and CFSA Kinship Caregiver Verification**

*CFSA USE ONLY*:  Identification has been shown to me that I have deemed satisfactorily identifies the applicant:

| Type of ID | | ID # | |
|---|---|---|---|
| CFSA Employee Name (print) | | | |
| CFSA Employee Title (print) | | | |
| CFSA Employee Signature | | | |

# Exhibit DD



July 6, 2018

The Honorable Alex Azar                    The Honorable Kristjen Nielsen
Secretary                                  Secretary
U.S. Department of Health and Human Services    U.S. Department of Homeland Security
200 Independence Avenue SW                 Washington, DC 20528
Washington, DC 20201

Dear Secretary Azar and Secretary Nielsen:

As governors representing states where separated migrant children are being detained, we write to express our growing concern with this Administration's ability to reunify families in accordance with the federal court injunction issued on June 26, 2018. Given recent reports suggesting this process is being carried out chaotically and inconsistently, and in light of your agencies' latest admission that hundreds more separated migrant children are in the custody of the Office of Refugee Resettlement (ORR) than were previously accounted for, we remain deeply concerned that wholly inadequate resources and procedures are in place to ensure children and parents are reunified safely and securely within the court-ordered deadlines.

The U.S. Department of Health and Human Services (HHS) now claims it has as many as 3,000 children in its custody who were removed from their parents at the southern border, as a result of this Administration's outrageous family separation policy. The substantial discrepancy between this number and the 2,047 children who were previously identified by Secretary Azar raises serious questions about this Administration's systems and processes for ensuring these children, including infants and toddlers, can be safely returned to their parents. To date, your agencies have also consistently refused to account for the number of children who are already reunified with their parents or placed with another long-term sponsor.

Let us be clear — the responsibility for these children's plight rests solely in your hands. It is unequivocal that this Administration's harmful "zero-tolerance" policy is to blame for the forcible separation of families at the southern border, not Congress or the courts. That's why each of us forcefully and vocally opposed this destructive approach to immigration enforcement, which has inflicted intentional, gratuitous and permanent trauma on thousands of young children. Although we welcomed the decision to abandon the shameful practice of forced family separation, we strongly object to the omission in the President's executive order on June 20, 2018, of any clear directive or strategy to reunify separated children with their parents.

A federal district court ruled correctly last week that this policy constitutes "irreparable harm" with long-term implications for children's health, safety and well-being, and it ordered the Trump Administration to reunify separated children under the age of five within 14 days and all separated children within 30 days. Unfortunately, it remains entirely unclear whether your agencies have established the necessary protocols or dedicated adequate resources to meet these deadlines without compromising children's safety and welfare.

Perhaps even more troubling is a recent indication by representatives of your agencies that the Trump Administration does not believe separated children must be reunified with their actual parents under the court order. In a meeting with governors' offices on June 29, 2018, these representatives shared that reunification may include the placement of separated children with any long-term sponsor — regardless of whether that placement is with their parents, another family member residing in the U.S., a family member residing in their home country or in a long-term foster care setting. If true, this interpretation appears to blatantly ignore the terms of the court order. The federal government has also recently admitted that reunification is being used as a bargaining chip to induce parents to agree to voluntary deportation.

On behalf of the children residing in our states who have been needlessly traumatized and who remain justifiably frightened for themselves and their families, we ask that you immediately answer the following basic questions:

1. How many separated migrant children in HHS custody have already been reunified? Are there any new children who have been separated from their parents since the President's executive order on June 20, 2018? If so, how many and where are they?

2. Of those children who have already been reunified, how many have been placed with the parents they arrived with at the U.S. southern border? How many were placed with a non-parent family member or other sponsor? Of the children placed with a non-parent family member or sponsor, in which states were they placed?

3. If any were placed with a non-parent sponsor, what policies do your agencies intend to put in place to enable long-term reunification between children and their parents?

4. What steps is the federal government requiring separated parents to comply with before gaining back custody of their children? (For example, must they consent to return to their country of origin, post bond, or submit to DNA testing or finger-printing?)

5. What safeguards are being put in place to ensure the results of any DNA testing of parents and children are not used for any purpose other than familial verification? Are these results de-identified and ultimately destroyed?

6. How many of the separated migrant children in HHS custody have been provided with legal services and representation?

As parents, we are heartbroken by the unimaginable pain inflicted on thousands of unwitting children who have done nothing wrong and parents who often have valid claims for refugee or

asylum status. As governors, we will not stay silent as long as these children remain unjustly detained in our states, separated from their parents simply because of this Administration's unwillingness or ineptitude to govern legally with humanity and compassion.

Sincerely,


Governor Jay Inslee
State of Washington

Governor Andrew Cuomo
State of New York


Governor Dannel P. Malloy
State of Connecticut

Governor Phil Murphy
State of New Jersey


Governor Tom Wolf
State of Pennsylvania

Governor Kate Brown
State of Oregon

# Exhibit EE

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9
10
11
12
13
14

| | |
|---|---|
| STATE OF WASHINGTON *et al*, | NO. 2:18-cv-00939-MJP |
| Plaintiffs, | |
| v. | **DECLARATION OF JENNIFER FLORIAN-VEGA** |
| DONALD TRUMP in his official capacity as President of the United States, et al., | |
| Defendants. | |

15      I, <u>Jennifer Florian-Vega</u>, am over eighteen years of age, have personal
16   knowledge of and am competent to testify regarding the facts contained herein, and
17   declare the following:
18   I am from Guatemala, and I came to the United States with my 11-year-old
19   daughter. We arrived in Texas on the 18th of May, where immigration officers took
20   us to a place they call iceboxes (*hieleras*), because they are very cold, and you
21   freeze in there. When we arrived, we saw other mothers with children who were
22   crying. My daughter asked me why they were crying, and a guard who heard us
23   told us that the same thing was going to happen to us, that we would be separated.
24   My daughter began to cry. We were together until 11 o'clock at night. I covered my
25   daughter with an aluminum blanket so that she would not be cold. The guards
26   called her name, and my daughter asked me, "mommy, why are they calling me?" I

DECLARATION OF JENNIFER FLORIAN-VEGA

Page 1 of 3

OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

told her that everything would be OK. The guards took her to look her over. I could see her through a door with a window. I saw that she was crying. She asked to go to the restroom, she hugged me, and then they took her away. I tried not to cry, even though I had a knot in my throat, so that my daughter would not be scared. I remained in the icebox for three more days without my daughter and without hearing anything from her. They took me to the court. Before entering the court, a lawyer talked to us and told us that we had to declare ourselves guilty, or they would leave us there another 14 days. So, when the judge asked me, I said that I had entered illegally. The judge told us in the group of mothers who were there that we would be able to see our children when we left.

But from there they took me to another icebox and I asked about my daughter, and the guards told me that they didn't know anything, that I would not see her again, and they laughed while we were crying. I was there for two days, then they sent us to Laredo. On June 3rd, they took us to the Federal Prison in Washington. One morning they woke us up and took us to Tacoma. They did not tell us why. That was 15 days ago. Recently, 3 days ago, I was able to speak with my daughter. A mother who is detained here gave me a telephone number of a home in Texas where her daughter is, so that I could try to see if my daughter was also there. When I called, I found her, and I was able to speak with her for 15 minutes.

I told her that I signed my deportation order and that we would go back to Guatemala soon. I renounced my request for asylum because they separated me from my daughter, and the only thing I want is to be with her once more. 43 days passed without me hearing anything from her. Every time I asked officers about her, they did not know where she was.

I declare under penalty of perjury in accordance to the laws of the state of Washington and of the United States of America that the above is true and correct.

| DECLARATION OF JENNIFER FLORIAN-VEGA | Page 2 of 3 | OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON<br>800 Fifth Avenue, Suite 2000<br>Seattle, WA 98104-3188<br>(206) 464-7744 |
| --- | --- | --- |

1

DATED this 5th day of July, 2018 in Tacoma, Washington.

2

[Signature]

3

Name: Jennifer Florian Vega

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF JENNIFER FLORIAN-
VEGA                          Page 3 of 3          OFFICE OF THE ATTORNEY GENERAL OF
                                                              WASHINGTON
                                                        800 Fifth Avenue, Suite 2000
                                                         Seattle, WA  98104-3188
                                                              (206) 464-7744



# CERTIFICATE OF ACCURACY

I certify that the Declaration of <u>Jennifer Florian</u> was translated into <u>English</u> by a translator and editor working for Multilingual Connections who are both competent and qualified to perform translation into this language. These document has not been translated for a family member, friend, or business associate. I attest that the final target file is an accurate and complete translation of the original <u>Spanish</u> version.

Dionna Masciola
Associate Project Manager
Multilingual Connections, LLC

July 10, 2018
Date

THEODORE S. JACKSON
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
January 30, 2022

**American Translators Association**
CORPORATE MEMBER

Multilingual Connections, LLC #255450



Subscribed and sworn to before me this

10 day of JULY, 20 18, in

Evanston, County of Cook, State of Illinois.

Notary Public _Theodore S. Jackson_

WWW.MLCONNECTIONS.COM | 773.292.5500 | 828 DAVIS STREET SUITE 210 | EVANSTON, IL 60201

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

STATE OF WASHINGTON, *et al.*,

        Plaintiffs,

    v.

DONALD TRUMP in his official capacity
as President of the United States, *et al.*,

        Defendants.

NO. 2:18-cv-00939 - MJP

DECLARACIÓN DE

JENNIFER FLORIAN-VEGA

Yo, JENNIFER FLORIAN-VEGA , tengo más de dieciocho años de edad, tengo conocimiento personal y soy competente para testificar sobre los hechos aquí contenidos, y declaro to siguiente:

Soy de Guatemala y vine a los Estados Unidos con mi hija de 11 años Llegamos el 18 de Mayo a Texas, donde los oficiales de Migraciones nos llovaron a un lugar que le dicen hieleras porque son muy fríos y congela allí adentro. Cuando llegamos vimos a otras madres con niños que estaba llorando. Mi hija me preguntó porque lloran, y un guardia que nos escuchó nos dijo dijo que a nosotros

DECLARACIÓN DE
JENNIFER FLORIAN VEGA
2:18-CV-00939 - MJP

Página 1 de 4

OFICINA DEL PROCURADOR GENERAL DE
WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

1  nos iba a pasar lo mismo, que nos iban a
2  sep osar. Mi hija empezó a llorar. Estuvimos
3  juntas hasta las 11 de la noche y o tubría
4  a mi hija con una manta de aluminio para
5  que no tenga frío. Los guardias llamaron
6  su nombre y mi hija me preguntó "mami
7  porque me llaman". Yo le dije que todo iba
8  a estar bien. La llevaron los guardias
9  a revisarla. Yo podía verla a través
10 de una puerta con ventana, vi que ella
11 estaba llorando. Ella pidió entrar al baño,
12 me abrazó y luego la llevaron. Yo trataba
13 de no llorar aunque tenía un nudo en
14 la garganta, para que mi hija no se
15 asuste. Yo permanecí tres días más en la
16 hielera sin mi hija y sin saber de ella.
17 Me llevaron a la Corte. Antes de entrar
18 a la Corte nos habló una abogada y nos
19 dijo que teníamos que declararnos culpables
20 o nos iban a dejar ahí otros 14 días. Entonces
21 cuando el Juez preguntó yo dije que sí había
22 entrado ilegal. El juez nos dijo al grupo de
23 madres que estábamos ahí que íbamos
24 a poder ver a nuestros hijos al salir.
25
26 DECLARACIÓN DE          Página 2 de 4
   JENNIFER FLORIAN VEGA
   2:18-CV-00939 - MJP

OFICINA DEL PROCURADOR GENERAL DE WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

1  Pero de ahí me llevaron a otra hielera y
2  pregunté sobre mi hija y los guardias
3  me decían que ellos no sabían nada,
4  que no la iba volver a ver, y se reían
5  cuando nosotras llorábamos. Dos días estuve
6  ahí y nos enviaron a Laredo. El 3 de junio
7  nos trajeron a la Prisión Federal en Washington.
8  Una mañana nos despertaron y nos trajeron
9  a Tacoma, no nos informaron para qué. De
10 eso ya hace 15 días. Recién hace 3
11 días pude hablar con mi hija. Una
12 madre que está detenida aquí me
13 dio un número de teléfono de un hogar
14 en Texas donde su hija está, para qué
15 yo pruebe a ver si mi hija estaba
16 también ahí. Cuando llamé la encontré
17 y pude hablar con ella 15 minutos.
18 Le conté que firmé mi deportación y
19 que nos íamos a Guatemala pronto. Yo renuncié
20 a mi pedido de asilo porque me separaron
21 de mi hija y lo único que quiero es
22 volver a estar con ella. Pasaron 43 días
23 que no supe nada de ella. Cada vez
24
25
26 DECLARACIÓN DE                   Página 9 de 1
   JENNIFER FLORAN V.
   2:18-CV-00939 - MJP

OFICINA DEL PROCURADOR GENERAL DE
WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

1  que preguntaba a los oficiales por ella no sabian donde

2  estaba.

3

4

5

6

7    Declaro bajo pena de perjurio bajo las leyes del estado de Washington y de los Estados

8  Unidos de América que lo anterior es verdadero y correcto.

9  FECHADO este  05  día de Julio, 2018 en Tacoma, Washington.

10

11

12  Nombre: Jennifer Florian Vega

13

14

15

16

17

18

19

20

21

22

23

24

25

26  DECLARACIÓN DE              Página  4  de  4
   JENNIFER FLORIAN V.
   2:18-CV-00939 - MJP

# Exhibit FF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

STATE OF WASHINGTON *et al*,

        Plaintiffs,

        v.

DONALD TRUMP in his official capacity as President of the United States, et al.,

        Defendants.

NO. 2:18-cv-00939-MJP

**DECLARATION OF IBIS GUZMAN COLINDRES**

    I, <u>Ibis Guzman Colindres</u>, am over eighteen years of age, have personal knowledge of and am competent to testify regarding the facts contained herein, and declare the following:

I am from Honduras and I came to the United States with my only son, aged 5 years. When we arrived, the immigration officers took us to the icebox (*la hielera*). It was very cold. The sandwich they gave us was made with frozen bread. About two hours later, they took my little boy from me. They told me that I should give them the boy, they did not tell me where they were going to take him, but that the law was to separate parents from their children. My son was crying because he did not want to be without me. I asked them to leave him with me, but they did not pay any attention. I was there two more days, then they took me to the dog kennel (*la perrera*), where I was for three more days. I did not hear anything about my son for

OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

the entire time. In the dog kennel, they told us that we should forget about our children, that they were going to stay in the United States. All of the mothers cried when they told us that. From there, they took us to Laredo. I was there for 15 days, with no contact with my son. They transferred us to Washington on June 3rd to Federal Detention. I was there about 15 more days, still without being able to talk with my son. One Wednesday in the morning, they told us that we would be reunited with our children, but they took us here to the Tacoma Detention Center, which was very sad and disheartening. 6 days after arriving, I was finally able to speak with my son after more than a month and a half of not being able to talk with him. But he didn't want to talk when I called him, he is angry and sad, and he tells me that he only wants to be with me now. When he spoke with my sister, he told her that I brought him here to give him away. It makes me feel very bad to think that he believes that I would do that. I left Honduras because of death threats and am requesting asylum in order to live here in safety with my son.

I am very worried for the well-being of my son, and that he would believe that I brought him all the way here just to leave him on his own.

I declare under penalty of perjury in accordance to the laws of the state of Washington and of the United States of America that the above is true and correct.

DATED this 5th day of July, 2018 in Tacoma, Washington.

[Signature]

Name: Ibis Guzman

DECLARATION OF IBIS GUZMAN C.                    Page 2 of 2                    OFFICE OF THE ATTORNEY GENERAL OF
WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

I certify that the Declaration of <u>Ibis Guzman</u> was translated into <u>English</u> by a translator and editor working for Multilingual Connections who are both competent and qualified to perform translation into this language. These document has not been translated for a family member, friend, or business associate. I attest that the final target file is an accurate and complete translation of the original <u>Spanish</u> version.

Dionna Masciola
Associate Project Manager
Multilingual Connections, LLC

<u>July 10, 2018</u>
Date



THEODORE S. JACKSON
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
January 30, 2022

American Translators Association
CORPORATE MEMBER

Multilingual Connections, LLC #255450

Subscribed and sworn to before me this

10 day of July , 20 18 , in

Evanston, County of Cook, State of Illinois.

Notary Public Theodore S. Jackson

WWW.MLCONNECTIONS.COM | 773.292.5500 | 828 DAVIS STREET SUITE 210 | EVANSTON, IL 60201

1

2

3

4

5

6       **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
7                        **AT SEATTLE**

8
STATE OF WASHINGTON, *et al.*,              NO.  2:18-cv-00939 - MJP
9
                    Plaintiffs,             DECLARACIÓN DE
10
                                            IBIS GUZMAN COLINDRES
11      v.

12      DONALD TRUMP in his official capacity
as President of the United States, *et al.*,
13
                    Defendants.
14

15      Yo, ___IBIS GUZMAN COLINDRES___, tengo más de dieciocho años de edad,
tengo conocimiento personal y soy competente para testificar sobre los hechos aquí contenidos,
16      y declaro to siguiente:

17      Soy de Honduras y vine a los Estados Unidos

18      con mi único hijo de 5 años. Cuando

        llegamos los oficiales de Migraciones
19
        nos llevaro a la hielera. Hacía
20
        mucho frío. El sandwich que nos daban
21
        el pan estaba congelado. Como dos
22
        horas después me sacaron a mi niño.
23
        Me dijeron que entregara al niño, no
24
        me dijeron donde lo iban a llevar pero
25

26      DECLARACIÓN DE                    Página  1  de  4      OFICINA DEL PROCURADOR GENERAL DE
        IBIS GUZMAN C.                                                        WASHINGTON
                                                                        800 Fifth Avenue, Suite 2000
        2:18-CV-00939 - MJP                                               Seattle, WA  98104-3188
                                                                               206-464-7744

1 | que era la ley separan a los padres de
2 | sus hijos. Mi hijo lloraba porque no
3 | quería estar sin mí. Yo pedí que me lo
4 | dejen pero no me hicieron caso. Estuve
5 | ahí dos días más y luego me llevaron
6 | a la perrera donde estuve otros tres
7 | días, todo este tiempo sin saber de
8 | mi hijo. En la perrera nos dijeron que
9 | teníamos que olvidarnos de nuestros hijos,
10 | que ellos se iban a quedar en Estados
11 | Unidos. Todas las madres llorábamos, cuando
12 | nos decían esto. De ahí nos llevaron
13 | a Laredo. Ahí estuve 15 días, aún sin
14 | contacto con mi hijo. Nos trasladaron a
15 | Washington el 3 de junio a la Detención
16 | Federal, Estuve ahí como 15 días más
17 | sin poder aún hablar con mi hijo. Un
18 | miércoles a la mañana nos despertaron
19 | y nos dijeron que nos iban a reunificar
20 | con nuestros hijos, pero nos trajeron
21 | aquí a la Detención de Tacoma, lo cual
22 | fue muy triste y desesperanzador. A los
23 | 6 días de llegar pude por fin hablar
24 |
25 |
26 | DECLARACIÓN DE
    JBIS GUZMAN C.
    2:18-CV-00939 - MJP

Página 2 de 4

OFICINA DEL PROCURADOR GENERAL DE
WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

1  con mi hijo. Luego de más de un mes
2  y medio de no poder hablar con él.
3  pero él no quiere habla cuando
4  lo llamo, está enojado y triste y me
5  dice que sólo quiere ya estar conmigo.
6  Cuando él habló con mi hermana le
7  dijo que yo lo traje a él aquí para
8  regalarlo, eso me hace sentir muy
9  mal, que él crea que yo le haría
10 eso yo salí de Honduras por amenazas
11 de muerte y estoy pidiendo asilo,
12 para poder vivir aquí con mi hijo
13 seguros.
14
15
16
17
18
19
20
21
22
23
24
25
26  DECLARACIÓN DE         Página 3 de 4         OFICINA DEL PROCURADOR GENERAL DE
    IBIS GUZMAN C                                        WASHINGTON
    2:18-CV-00939 - MJP                          800 Fifth Avenue, Suite 2000
                                                  Seattle, WA 98104-3188
                                                     206-464-7744

1  - Estoy muy preocupada por el bienestar
2  de mi hijo y que el crea que la
3  traje hasta aquí para dejarlo sólo.
4
5
6
7      Declaro bajo pena de perjurio bajo las leyes del estado de Washington y de los Estados

8  Unidos de América que lo anterior es verdadero y correcto.

9  FECHADO este ___05___ día de Julio, 2018 en Tacoma, Washington.

10                                          Ibis obeyda Guzman
11                                   Nombre: Ibis Guzman
12

13
14
15
16
17
18
19
20
21
22
23
24
25
26  DECLARACIÓN DE                   Página _1_ de _1_        OFICINA DEL PROCURADOR GENERAL DE
    IBIS GUZMANC                                                          WASHINGTON
    2:18-CV-00939 - MJP                                          800 Fifth Avenue, Suite 2000
                                                                 Seattle, WA  98104-3188
                                                                      206-464-7744

Exhibit GG

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

STATE OF WASHINGTON *et al*,

Plaintiffs,

v.

DONALD TRUMP in his official capacity
as President of the United States, et al.,

Defendants.

NO. 2:18-cv-00939-MJP

**DECLARATION OF
DUNIA GARCÍA
RAMÍREZ**

I, <u>Dunia Garcia Ramirez</u>, am over eighteen years of age, have personal knowledge of and am competent to testify regarding the facts contained herein, and declare the following:

I am from Honduras and I came to the United States with my 8-year-old daughter. When we arrived, I told the immigration officers that I left Honduras because of death threats and requested asylum when they took me to the icebox (*hielera*). We were there for one night and then they took us to the place they call the dog kennel (*perrera*). I was there with my daughter for a day until they took me to the court. I told my daughter that I would see her once I came back from the court. But once they separated me from my daughter, the officers in white told me that I would not see my daughter again, that the children were to be given up for adoption. At that point, all of us mothers began to cry out of fear for our children. After the court, I

OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

was in the dog kennel for about two more days. From there, they took me to a jail in Texas, where I spent 9 days without news of my daughter. From there, they transferred me to Washington, to Federal Detention. After being there for a week, I was recently able to speak with my daughter, who is in a home in California. I try to speak with her twice per week so that she feels better. When we speak, she wants to leave where she is and be together once more, she misses me a lot. I am waiting to see what happens with my asylum case, I want to be with my daughter more than anything. My heart aches day and night because I am separated from her. I want for us to be able to live here to have protection and safety for her and for me.

I declare under penalty of perjury in accordance to the laws of the state of Washington and of the United States of America that the above is true and correct. DATED this 5<u>th</u> day of July, 2018 in Tacoma, Washington.

[Signature]

Name: Dunia Sarai Garcia Ramirez

DECLARATION OF DUNIA GARCIA R.          Page 2 of 2

# CERTIFICATE OF ACCURACY

I certify that the Declaration of <u>Dunia Ramirez</u> was translated into <u>English</u> by a translator and editor working for Multilingual Connections who are both competent and qualified to perform translation into this language. These document has not been translated for a family member, friend, or business associate. I attest that the final target file is an accurate and complete translation of the original <u>Spanish</u> version.

Dionna Masciola
Associate Project Manager
Multilingual Connections, LLC

<u>July 10, 2018</u>
Date



THEODORE S. JACKSON
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
January 30, 2022

**ata**
American
Translators
Association
CORPORATE MEMBER

Multilingual Connections, LLC #255450

Subscribed and sworn to before me this

10 day of July , 20 18 , in

Evanston, County of Cook, State of Illinois.

Notary Public Theodore S. Jackson

1

2

3

4

5

6 **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
7 **AT SEATTLE**

8

STATE OF WASHINGTON, *et al.*,          NO.  2:18-cv-00939 - MJP
9
                    Plaintiffs,          DECLARACIÓN DE
10
                                         DUNIA GARCÍA RAMÍREZ
11    v.

12 DONALD TRUMP in his official capacity
as President of the United States, *et al.*,
13
                    Defendants.
14

15    Yo, DUNIA GARCÍA RAMÍREZ, tengo más de dieciocho años de edad,
tengo conocimiento personal y soy competente para testificar sobre los hechos aquí contenidos,
16 y declaro to siguiente:

17    Soy de Honduras y vine a los Estados

18    Unidos con mi hija de 8 años. Cuando

19    llegamos yo conté a los oficiales de

20    migraciones que salí de Honduras por

21    amenazas de muerte y pedir

22    asilo al llegar a la hielera. Estuvimos

23    allí una noche y nos llevaron a lo que

24    llaman perrera. Ahí estuve con mi hija

25    un día hasta que a mí me llevaron a la

26 DECLARACIÓN DE          Página 1 de 3     OFICINA DEL PROCURADOR GENERAL DE
   DUNIA GARCÍA R                            WASHINGTON
   2:18-CV-00939 - MJP                       800 Fifth Avenue, Suite 2000
                                             Seattle, WA  98104-3188
                                             206-464-7744

1  Corte. Yo te dije a mi hija que la iba
2  a volver a ver después de la Corte.
3  Pero luego de separarme de mi hija
4  las oficiales de blanco me dijeron que
5  a mi niña no la iba a volver a ver
6  que a los niños los iban a dar en adopción
7  Todas las madres entonces nos pusimos
8  a llorar preocupadas por nuestros niños.
9  Luego de la corte estuve en la perrera
10 como dos días más. De ahí me llevaron
11 a una cárcel en Texas, donde estuve
12 9 días, sin contacto con mi hija.
13 De ahí me transladaron a Washington,
14 a la Detención Federal. luego de una semana
15 de estar ahí recién pude hablar con
16 mi hija que está en un hogar en California.
17 Trato de hablar con ella dos veces por
18 semana porque ella se siente mejor
19 cuando hablamos Ella ya quiere salir
20 de ahí y estar juntas de nuevo, me
21 extraña mucho. Estoy esperando a
22 ver que sucede con mi caso de asilo, quiero
23 más que nada volver a estar con mi hija

24

25

26  DECLARACIÓN DE                    Página __2__ de __3__          OFICINA DEL PROCURADOR GENERAL DE
    DUNIA GARCIA R                                                                  WASHINGTON
    2:18-CV-00939 - MJP                                              800 Fifth Avenue, Suite 2000
                                                                     Seattle, WA  98104-3188
                                                                     206-464-7744

1  me duele el corazón día y noche por estar separada
2  de ella Aunque que podamos vivir aquí para
3  tener protección y seguridad para ella y
4  para mí.

5

6

7      Declaro bajo pena de perjurio bajo las leyes del estado de Washington y de los Estados

8  Unidos de América que lo anterior es verdadero y correcto.

9  FECHADO este _65_ día de Julio, 2018 en Tacoma, Washington.

10                                    Dunia Garcia

11                        Nombre: Dunia Sarai Garcia Ramirez

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  DECLARACIÓN DE            Página 3 de 3            OFICINA DEL PROCURADOR GENERAL DE
     DUNIA GARCIA R                                              WASHINGTON
     2:18-CV-00939 - MJP                                   800 Fifth Avenue, Suite 2000
                                                              Seattle, WA  98104-3188
                                                                  206-464-7744

# Exhibit HH

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

STATE OF WASHINGTON *et al*,

           Plaintiffs,

        v.

DONALD TRUMP in his official capacity
as President of the United States, et al.,

           Defendants.

NO.2:18-cv-00939-MJP

**DECLARATION OF**
SINDY ROSALES-
COREAS

I, <u>Sindy Rosales-Coreas</u>, am over eighteen years of age, have personal knowledge of and am competent to testify regarding the facts contained herein, and declare the following:

I am from El Salvador and I came to the United States with my 9-year-old son. We arrived in Texas on May 16th. The immigration agents took me to the icebox (*hielera*), where it was very cold. There was no water to drink, just the tap in the bathroom, or they gave frozen ice water and the bread was also frozen. A few hours later they took us away to take our information. Then they took me and left him in another room, and since then I have not seen him again. They did not let me say goodbye to him. The immigration officers told me that they were going to give my son up for adoption and that I would not see him again. Then, they took me to a place that is called the dog kennel (*perrera*) for 5 days. There, I asked for my son,

DECLARATION OF SINDY ROSALES-
COREAS

Page 1 of 2

OFFICE OF THE ATTORNEY GENERAL OF
WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1 | and the officers told me once more that they were going to deport me and that they
2 | would give him up for adoption. From there, they took me to Laredo, where I was
3 | until the 3rd of June. After being there for a week, I was able to talk to my son for
4 | about 15 minutes. He is in a home in Arizona. He sounded very sad, and that
5 | worries me. On the 3rd of June, they took me to Washington and I was only able to
6 | speak with him one more time. The social worker told me that I can only talk to my
7 | son once per week. I tried to call him again several times and there was no
8 | response. I am requesting asylum because I fled El Salvador because of death
9 | threats. I hope to be able to stay here with my son so we can live in safety, but they
10 | have not yet told me when I can be with him.

11 |     I declare under penalty of perjury in accordance to the laws of the state of
12 | Washington and of the United States of America that the above is true and correct.
13 | DATED this 5th day of July, 2018 in Tacoma, Washington.

14 | [Signature]
15 | Name: Sindy Rosales

DECLARATION OF SINDY ROSALES-
COREAS                          Page 2 of 2                          OFFICE OF THE ATTORNEY GENERAL OF
                                                                     WASHINGTON
                                                                     800 Fifth Avenue, Suite 2000
                                                                     Seattle, WA  98104-3188
                                                                     (206) 464-7744

# CERTIFICATE OF ACCURACY

I certify that the Declaration of <u>Sindy Rosales</u> was translated into <u>English</u> by a translator and editor working for Multilingual Connections who are both competent and qualified to perform translation into this language. These document has not been translated for a family member, friend, or business associate. I attest that the final target file is an accurate and complete translation of the original <u>Spanish</u> version.

Dionna Masciola
Associate Project Manager
Multilingual Connections, LLC

<u>July 10, 2018</u>
Date

THEODORE S. JACKSON
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
January 30, 2022

**American Translators Association**
CORPORATE MEMBER

Multilingual Connections, LLC #255450

Subscribed and sworn to before me this

10 day of JULY , 20 18 , in

Evanston, County of Cook, State of Illinois.

Notary Public 

WWW.MLCONNECTIONS.COM | 773.292.5500 | 828 DAVIS STREET SUITE 210 | EVANSTON, IL 60201

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

STATE OF WASHINGTON, *et al.*,

        Plaintiffs,

    v.

DONALD TRUMP in his official capacity
as President of the United States, *et al.*,

        Defendants.

NO. 2:18-cv-00939 - MJP

DECLARACIÓN DE

SINDY ROSALES - COREAS

Yo, SINDY ROSALES-COREAS , tengo más de dieciocho años de edad, tengo conocimiento personal y soy competente para testificar sobre los hechos aquí contenidos, y declaro to siguiente:

soy de El Salvador y vine a los Estados Unidos con mi hijo de 9 años. Llegamos el 16 de Mayo a Texas. Los agentes de Migraciones nos llevaron a la hielera donde hacía mucho frío. No había agua para beber, solo del grifo en el baño. O nos daban agua con hielo congelado y el pan también congelado. Unas horas después nos sacaron para tomarnos

DECLARACIÓN DE
SINDY ROSALES
2:18-CV-00939 - MJP

Página 1 de 3

OFICINA DEL PROCURADOR GENERAL DE WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
206-464-7744

1  nuestros datos. Luego me sacaron a mí
2  y lo dejaron a él en otro cuarto
3  y desde ahí no lo volví a ver.
4  No me dejaron despedir de él.
5  Los oficiales de Migración me
6  dijeron que a mi hijo lo iban
7  a dar en adopción y no lo
8  iba a volver a ver. De ahí me
9  llevaron a un lugar que le dicen "perrera"
10 por 5 días. Pregunté ahí por mi
11 hijo y otra vez los oficiales me
12 dijeron que a mí me iban a deportar
13 y mi hijo se iba a quedar aquí y
14 lo iban a dar en adopción. De
15 ahí me llevaron a Laredo donde
16 estuve hasta el 3 de junio. Luego
17 de una semana de estar ahí pude hablar
18 con mi hijo como por 15 minutos. Él
19 está en un lugar en Arizona. Lo escuché
20 muy triste y eso me preocupa. El 3 de junio me
21 trasladaron a Washington y aquí
22 sólo una vez más pude hablar con él
23 lo trabajadora social me dijo que le puedo hablar
24 a mi hijo sólo una vez por semana. Yo

DECLARACIÓN DE
SINDY ROSALES
2:18-CV-00939 - MJP

Página 2 de 3

OFICINA DEL PROCURADOR GENERAL DE WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

1  intenté volver a llamarlo varias veces y no contestan. Yo

2  estoy pidiendo asilo porque huí de El Salvador por

3  amenazas de muerte. Espero poder quedarme

4  aquí con mi hijo para vivir seguros pero no me han

5  dicho aún cuando voy a poder estar con él.

6  _____

7      Declaro bajo pena de perjurio bajo las leyes del estado de Washington y de los Estados

8  Unidos de América que lo anterior es verdadero y correcto.

9  FECHADO este ____05____ día de Julio, 2018 en Tacoma, Washington.

10

11                                    _____

12                                    Nombre: Sindy Rosales

13

14

15

16

17

18

19

20

21

22

23

24

25

26  DECLARACIÓN DE              Página _3_ de _3_       OFICINA DEL PROCURADOR GENERAL DE
    SINDY ROSALES                                      WASHINGTON
    2:18-CV-00939 - MJP                                800 Fifth Avenue, Suite 2000
                                                       Seattle, WA  98104-3188
                                                       206-464-7744

Exhibit II

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

STATE OF WASHINGTON *et al*,

            Plaintiffs,

      v.

DONALD TRUMP in his official capacity
as President of the United States, et al.,

           Defendants.

NO. 2:18-cv-00939-MJP

**DECLARATION OF
LESLY MARTINEZ
SORIANO**

    I, <u>Lesly Martinez Soriano</u>, am over eighteen years of age, have personal knowledge of and am competent to testify regarding the facts contained herein, and declare the following:

I am from Honduras and I came to the United States with my two children: my ten-year-old daughter and my 6-year-old son. We decided to leave Honduras because I was being threatened with death and on one occasion people tried to run me over. We arrived in the USA on May 16th. The immigration officers took us to the icebox (*hielera*) where we were for 5 days. We slept on the floor because there were no mattresses, just some aluminum blankets. We were unable to bathe or brush our teeth. An officer said that we stank. We were given bread and ham that was frozen. It was incredibly cold there. The place was full of people, so many that we couldn't lie down. We slept in the bathroom because there was no space. I was taken to

DECLARATION OF LESLY MARTINEZ
SORIANO

Page 1 of 2

OFFICE OF THE ATTORNEY GENERAL OF
WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

court with my hands and feet cuffed and with a chain around my waist. My children saw all this. My son became afraid and asked me "mommy, are they going to kill you?", while crying. It hurts me so much to remember that moment, the trauma my son went through, remembering his voice crying out of fear. Since that day, May 21st, I have not seen them again. From there, they took me to McCali (tr: McAllen), Texas, then from there to detention in Laredo, where I was for more than 30 days without being able to speak to my children. I tried to call them, but in the home where they told me they were, in New York, no one answered. From Laredo, they took me to Washington at the beginning of June, to Federal Detention. I was there until June 20th, still unable to speak with my children. They woke us up one Wednesday and told us that they were going to reunite us with our children, but they took us here to Tacoma and [the children] weren't here. It was a complete lie. One week ago, I was able to speak with my daughter for the first time, for about 10 minutes. I couldn't speak with my son. My daughter told me that he didn't want to be there anymore, that he was just crying and crying and couldn't speak anymore. They are in a home in New York. I also want to say that in Laredo, in the Detention, the officers treated us very badly. They yelled at us, they gave us dirty clothing. Now, what I want more than anything is to be with my children and to continue with my asylum case to be able to live here in safety, since I am afraid of going back to Honduras. I fear for my life and that of my children if we go back.

I declare under penalty of perjury in accordance to the laws of the state of Washington and of the United States of America that the above is true and correct. DATED this 5th day of July, 2018 in Tacoma, Washington.

[Signature]

Name: Lesly Martinez

DECLARATION OF LESLY MARTINEZ
SORIANO

OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

# CERTIFICATE OF ACCURACY

I certify that the Declaration of <u>Lesly Soriano</u> was translated into <u>English</u> by a translator and editor working for Multilingual Connections who are both competent and qualified to perform translation into this language. These document has not been translated for a family member, friend, or business associate. I attest that the final target file is an accurate and complete translation of the original <u>Spanish</u> version.

Dionna Masciola
Associate Project Manager
Multilingual Connections, LLC

<u>July 10, 2018</u>
Date



THEODORE S. JACKSON
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
January 30, 2022

Subscribed and sworn to before me this

10 day of July , 20 18 , in

Evanston, County of Cook, State of Illinois.

Notary Public Theodore S. Jackson

**ata**
American
Translators
Association
CORPORATE MEMBER

Multilingual Connections, LLC #255450

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

STATE OF WASHINGTON, *et al.*,

    Plaintiffs,

    v.

DONALD TRUMP in his official capacity
as President of the United States, *et al.*,

    Defendants.

NO.  2:18-cv-00939 - MJP

DECLARACIÓN DE

LESLY MARTINEZ SORIANO

9
10
11
12
13
14

Yo, LESLY MARTINEZ SORIANO , tengo más de dieciocho años de edad,
tengo conocimiento personal y soy competente para testificar sobre los hechos aquí contenidos,
y declaro to siguiente:

Soy de Honduras y vine a los Estados
Unidos con mis dos hijos; mi hija de diez
años y mi hijo de 6 años. Decidimos salir
de Honduras porque me estaban amenazando
de muerte e incluso una vez intentaron
atropellarme. Llegamos a EE.UU. el 16 de
mayo. Los oficiales de Migraciones nos
llevaron a la hielera donde estuimos 5
días. Dormíamos en el piso porque

DECLARACIÓN DE
LESLY MARTINEZ SORIANO
2:18-CV-00939 - MJP

Página 1 de 4

1  no habían colchones, solo unas mantas
2  de aluminio. No nos podíamos bañar ni
3  lavar los dientes. Una oficial nos decía
4  apestosos. Nos daban pan con mortadela
5  congelada. Hacía muchísimo frío. El lugar
6  estaba repleto de gente, tanto que no
7  podíamos acostarnos. Dormíamos en el
8  baño porque no había espacio. A mí
9  me llevaron a la Corte. me pusieron esposas
10 en las manos, pies y una cadena en la
11 cintura. Mis hijos vieron todo esto. Mi
12 hijo se asustó y me pregunto "mami,
13 te van a matar", mientras lloraba,
14 Me duele demasiado acordarme de
15 ese momento, del trauma por el que habrá
16 pasado mi hijo, acordarme de su voz llorando con
17 miedo, él es demasiado pequeño para pasar
18 por eso. Desde ese día 21 de mayo,
19 ya no los volví a ver. De ahí a mí
20 me llevaron a McCali, Texas. De ahí
21 me llevaron a la Detención en Laredo
22 donde estuve más de 30 días, sin
23 poder hablar con mis hijos. Intenté
24 llamarlos pero en el hogar que me

26 DECLARACIÓN DE
   LESLY MARTINEZ SORIANO
   2:18-CV-00939 - MJP

   Página 2 de 7

   OFICINA DEL PROCURADOR GENERAL DE
   WASHINGTON
   800 Fifth Avenue, Suite 2000
   Seattle, WA  98104-3188
   206-464-7744

1 | dijeron estaban en Nueva York no contestaba
2 | nadie. De Laredo me trajeron a
3 | Washington a inicios de junio a
4 | la Detención Federal. Ahí estuve
5 | hasta el 20 de junio, aún sin poder
6 | hablar con mis hijos. Nos despertaron
7 | un miércoles y nos dijeron que nos
8 | iban a reunir con nuestros hijos pero
9 | nos trajeron aquí a Tacoma y no estaban,
10 | eran puras mentiras. Hace una semana
11 | pude hablar con mi hija pa primera
12 | vez, como unos 10 minutos, con mi hijo
13 | no pude hablar. Mi hija me dijo que
14 | ya no quería estar ahí y sólo lloraba
15 | y lloraba ya no podía hablar. Están
16 | en un Hogar en Nueva York. También
17 | quiero decir que en Laredo en la Detención
18 | nos trataban muy mal las oficiales, nos
19 | gritaban, nos daban ropa sucia. Ahora
20 | lo que más quiero es estar con mis
21 | hijos, y poder continuar con mi caso
22 | de asilo para poder vivir aquí
23 | seguros y a que tengo miedo
24 |
25 |
26 | DECLARACIÓN DE

LESLY MARTINEZ SORIANO
2:18-CV-00939 - MJP

Página 3 de 4

1   de volver a Honduras. Temo por mi vida
2   y la de mis hijos si regresamos.
3
4
5
6
7       Declaro bajo pena de perjurio bajo las leyes del estado de Washington y de los Estados
8   Unidos de América que lo anterior es verdadero y correcto.
9   FECHADO este ___05___ día de Julio, 2018 en Tacoma, Washington.
10                                          Lesly Martines
11                                  Nombre: Lesly Martinez
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26  DECLARACIÓN DE                Página _4_ de _4_        OFICINA DEL PROCURADOR GENERAL DE
    LESLY MARTINEZ XXXXXX                                              WASHINGTON
    2:18-CV-00939 - MJP                                        800 Fifth Avenue, Suite 2000
                                                                Seattle, WA  98104-3188
                                                                    206-464-7744

# Exhibit JJ

Exhibit JJ

Case 2:18-cv-00939-MJP   Document 27-2   Filed 07/13/18   Page 42 of 107

# The New York Times

# Sponsors of Migrant Children Face Steep Transport Fees and Red Tape

**By Miriam Jordan**

July 1, 2018

LOS ANGELES — Marlon Parada, a construction worker in Los Angeles, already was worried when he got an urgent call from his cousin in Honduras, asking if he would agree to take in the cousin's 14-year-old daughter. She'd been taken from her mother while attempting to cross the border and detained in Houston, he said. She couldn't be released unless a family member agreed to take her in.

Mr. Parada, an immigrant himself who is supporting his wife and three daughters on $3,000 a month, wondered how he could afford to take on another responsibility. Then he learned that he would have to pay $1,800 to fly Anyi and an escort from Houston to Los Angeles.

"It caught me by surprise when they demanded all that money. I asked them to just put her on a bus, but they wouldn't," said Mr. Parada, who scrambled to amass the cash from friends and wired it to the operator of the migrant shelter where Anyi was being held.

But that was only one of the hurdles he would have to surmount to take custody of the girl. Families hoping to win release for the thousands of migrant children being held by federal immigration authorities are finding they have to navigate an exhausting, intimidating — and sometimes expensive — thicket of requirements before the youngsters can be released.

Candidates for sponsorship must produce a plethora of documents to prove they are legitimate relatives and financially capable sponsors, including rent receipts, utility bills and proof of income. Home visits are increasingly common as part of the process. And once those conditions are met, many families must pay hundreds or even thousands of dollars in airfare to bring the children home.

"The government is creating impossible barriers and penalizing poverty," said Neha Desai, director of immigration at the National Center for Youth Law in Oakland.

An estimated 11,000 children and teenagers apprehended after crossing the border are currently housed in up to 100 government-contracted facilities across the country. Their numbers have grown in recent weeks as the Trump administration has imposed a "zero-tolerance" policy on border enforcement, purporting to end the strategy of "catch and release" under which migrants were often allowed to go free pending hearings in the immigration courts.

Under the most controversial part of the new strategy, more than 2,300 children were separated from their families and placed in shelters occupied mainly by young people who had made their way across the border alone. President Trump relented last week and ordered that families be kept together whenever possible, but authorities now are struggling to process the estimated 2,000 separated children still remaining in federal facilities.

The Office of Refugee Resettlement, which has official custody of migrant children under detention and establishes conditions for releasing them, has made it clear that the requirements are intended to make sure children are not released to traffickers, and will be well cared for in their new homes.

In testimony to the Senate in late April, Steven Wagner, the acting assistant secretary of health and human services, said that in assessing a sponsor's suitability, the agency "evaluates the sponsor's ability to provide for the child's physical and mental well-being, but also the sponsor's ability to ensure the child's presence at future immigration proceedings."



Marlon Parada with Anyi at the Esperanza Immigrant Rights Project in Los Angeles.
Rozette Rago for The New York Times

The requirement for sponsors to pay transportation costs has long been part of the agency's procedures and was not initiated by the Trump administration, officials said.

Immigrant advocates say that migrant families often have spent their entire savings to reach the United States border, and their relatives in the United States may not have much money, either.

One potential sponsor was rejected recently because authorities decided she could not afford the child's medication, Ms. Desai said. A mother of two was told that her house was not large enough to accommodate a third child. Another was told that she had to move to a better neighborhood if she wanted to be approved.

A new condition requires that all adults in the household where a migrant child will reside submit fingerprints to Immigration and Customs Enforcement. Such a requirement has intimidated many undocumented immigrants, who represent the majority of sponsors but fear being targeted for deportation themselves.

"Previously, people readily identified themselves" to sponsor a child, said Lisa Rivera, managing attorney at the New York Legal Assistance Group. But, she added, "This is not an environment where someone is going to call and say, 'I want to take my child, niece or nephew.' They have to find someone who has legal status."

A Guatemalan immigrant in New York dreaded submitting her fingerprints in order to sponsor two teenage family members being detained at a shelter in Texas, but felt she had no choice.

"I wouldn't even be able to ask someone else to be their sponsor. All my family and friends are undocumented and afraid," said the woman, who declined to be identified by name because she fears attracting the attention of authorities.

The last straw: She had to borrow money to pay the $2,500 to fly them earlier this year from Texas to New York, where she lives.

"It was a nearly impossible amount for a single mother earning $200 a week," said Crystal Fleming, the lawyer at the Legal Assistance Group representing the teenagers.

Brenda, a Salvadoran migrant who was separated from her 7-year-old son Kevin at the border on May 27, was charged $576.20 to cover the boy's airfare from Miami to Virginia. His escort collected the money order at Washington Dulles airport on Friday upon handing over the child to his mother.

"I was shocked that they had to pay for the boy's airfare," said Astrid Lockwood, the lawyer for the mother and child, who had been held at a shelter in Florida. Ms. Lockwood said that in a decade of practicing immigration law she had never seen this requirement, but noted that she also had not encountered children placed in facilities thousands of miles from their ultimate destination, as has occurred in recent weeks.

Brenda Garcia and Kevin leave Dulles Airport with their family on Friday.
Ryan Christopher Jones for The New York Times

Under the policy manual of the Office of Refugee Resettlement, sponsors are responsible for paying transportation costs for both the child and any escort, along with fees charged by airlines for handling transport of unaccompanied minors.

The payment requirement was also in place during the Obama administration, though in 2016, when a surge of families crossing the border created large populations in migrant shelters, it was waived. Shelter operators were instructed to pay for transportation to enable families to reunite more quickly, and were then reimbursed by the government, said Bob Carey, who led the refugee resettlement office during the Obama administration.

The thinking was, "It's counterintuitive to keep a child in care," he said.

"The human cost incurred aside," he added, "the financial cost for the government is significant. One day of care could cover transportation costs."

Each day that a child remains in a facility costs the government upwards of $600 a day, and costs can rise to as much as $1,000 daily if a provider has to absorb new children on short notice, Mr. Carey said.

On a case-by-case basis, immigrant families sometimes get help with transport costs. Nonprofits may help cover the airfare. Sometimes lawyers and other advocates convince a child's case manager to reduce the travel fee or waive it altogether due to hardship.

A shelter in South Texas asked a Salvadoran woman for $4,000 to fly her niece, 12, and nephew, 10, with an escort to California. They were there a month, until she convinced them that she could not pay, said Fred Morris, president of the San Fernando Valley Refugee Children Center, a nonprofit that helped her locate the children. The siblings arrived in Los Angeles on Saturday.

It took Oscar Garcia of Anaheim, Calif., a month to complete the paperwork to sponsor his nephew, Diego, 11, who was held at a facility in southern Texas after crossing the border from El Salvador. As part of the process, Mr. Garcia, a father of three who does remodeling work on homes, sent pictures of his two-bedroom house to the case manager via Whatsapp. He also submitted fingerprints for a background check.

"When everything was done, they told me it would cost $1,400 to bring the boy here," he recalled. He borrowed $900 from his brother-in-law and depleted his $500 in savings to afford tickets for the boy and an escort. The child landed in Los Angeles in May.

"I didn't want to leave him stuck there," said Mr. Garcia.

In the case of the Parada family in Los Angeles, Mr. Parada said both Anyi and her mother had been through a lot in their journey and subsequent detention, and he knew it was important to get the girl out of the shelter as quickly as he could.

Mother and daughter had traveled over land by bus and car to reach the southwest border in early May. After wading through the Rio Grande to reach Texas, they were promptly intercepted by the Border Patrol, Anyi told her family. They were then separated: Anyi's mother was transferred to a detention center in Seattle; the girl was transported to Casa Quetzal, a shelter for minors in Houston that is operated by Southwest Key, one of the country's largest shelter operators for minors.

The separation prompted Anyi's father in Honduras to reach out to his cousin in California.

After compiling dozens of documents and submitting his fingerprints for a background check, Mr. Parada learned that he would have to pay the $1,800 in airfare: one way for the girl, round trip for her escort.

"They notified me a day before her release," he said. "I had no choice."

A version of this article appears in print on June 30, 2018, on Page A19 of the New York edition with the headline: To Retrieve Detainee, Enter Mess of Red Tape And Buy $2,500 Flight

# Exhibit KK

CHAD A. READLER
Acting Assistant Attorney
General
SCOTT G. STEWART
Deputy Assistant Attorney
General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal
Respondents-Defendants*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF
SAN DIEGO & IMPERIAL
COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-
Plaintiffs*
*Admitted Pro Hac Vice*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

        Petitioners-Plaintiffs,

vs.

U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT, et
al.,

        Respondents-Defendants.

Case No. 18cv428 DMS MDD

**JOINT STATUS REPORT
REGARDING REUNIFICATION**

On July 10, 2018, this Court held a status conference, and ordered the parties to file a joint report on July 112, 2018 regarding the ongoing reunification process. The parties submit this joint status report in accordance with the Court's instruction.

I. **DEFENDANTS' POSITIONS**

  A. **Defendants are in Compliance With The Court's Order**

    Defendants are in compliance with the Court's order. Defendants have now reunified 57 children identified by Defendants and this Court as eligible for reunification at the status conference on July 10, 2018. Of the 63 identified by the Court, 6 were ultimately determined not to be eligible for reunification after further information was obtained regarding either parentage or the criminal background of the parent. Additionally, Defendants identified one additional family with a child

1

18cv428 DMS MDD

under age 5 that was eligible for reunification, and was able to reunify that family

as well.

For these children, cases were resolved as follows:

- 6 were determined not to be eligible for reunification following completion of parentage and background checks:
  - 3 had parents with serious criminal history
  - 1 was excluded because the accompanying adult was not the parent of that child
  - 1 was excluded on suspicion of not being the parent or of posing a risk to the child, because the accompanying adult presented a false birth certificate
  - 1 had a parent who was determined to be in the custody of the U.S. Marshals, not in ICE custody as previously believed

- 38 were reunified on or before July 10, 2018

- 19 were reunified on July 11, 2018 (this number includes one additional child who was identified by Defendants since their last submission to this Court)

- 1 was reunified by 6:00 a.m. local time on July 12, 2018.

For the 20 children who were reunified on July 11 and 12, 2018,

transportation arrangements had been made on July 10, but could not be completed

for logistical reasons specific to each case until July 11 and July 12.  Defendants

detail below the reasons for any delay in reunification, as well as the reasons why

21 of the parents of children originally believed to be class members were

ultimately determined not to be members of the class due to criminal history,

danger to the child, or not being the parent.

**Criminal background of adults excluded from the class**:

1. Warrant for murder in Guatemala
2. Child cruelty and narcotics convictions
3. Suspected transnational criminal organization involvement and human trafficking
4. Outstanding criminal warrant in El Salvador
5. 2 DUI convictions
6. Significant criminal history including assault conviction
7. Outstanding warrant in Florida for DUI
8. DUIs, assault, stolen vehicle
9. Robbery conviction
10. Wanted by El Salvador
11. Criminal charges including assault

**Not a parent or parentage in question**:

12. Adult said he is uncle, not father
13. Negative DNA match, adult indicated he is not the child's father
14. Adult said she is grandmother, not mother
15. During DNA testing, adult disclosed she is not the child's mother
16. Negative DNA match, still under investigation
17. Adult disclosed that she is grandmother, not the parent
18. Adult presented false birth certificate, still under investigation

**Release presents danger to the child**:

19. Before court order, adult was required to submit information and fingerprints of other adults in household where she will live with the child; background check on adult male in household shows an active warrant for aggravated criminal sexual assault of a 10-year-old female.
20. Child made allegations of abuse against adult

**Communicable Disease**

21. Parent is being treated for communicable disease in ICE custody

**Reunifications completed on July 11 and 12**:

1. Reunification in ICE custody completed at midnight Pacific time on 7/10, 3:00 a.m. Eastern on 7/11
2. Reunification was scheduled for 10:30 p.m. Pacific time on 7/10, 12:30 am Central time on 7/11

3

18cv428 DMS MDD

3. Reunification was scheduled for 10:30 p.m. Pacific time on 7/10, 12:30 am Central time on 7/11

4. Parental verification was not complete; adult and child were in distant locations in New York state, reunification occurred before noon on 7/11.

5. Reunification was scheduled for 10:30 p.m. Pacific time on 7/10, 12:30 am Central time on 7/11

6. Reunification was scheduled for 10:30 p.m. Pacific time on 7/10, 12:30 am Central time on 7/11

7. Reunification in ICE custody completed at midnight Pacific time on 7/10, 3:00 a.m. Eastern on 7/11

8. Reunification was scheduled for 10:30 p.m. Pacific time on 7/10, 12:30 am Central time on 7/11

9. Parental verification was not complete; child placed on flight at 9:55 p.m. Pacific time 7/10, reunification occurred at 5:35 a.m. Eastern 7/11

10. Parental verification was not complete; Texas, reunification complete 7/11

11. Parental verification was not complete; adult was in Texas and child was in Maryland, reunification completed on 7/11

12. Parental verification was not complete; Texas, reunification complete 7/11

13. Parental verification was not complete; Texas, reunification complete 7/11

14. Parental verification was not complete; parent was in Louisiana and child in New York, reunification completed 6:00 a.m. on 7/12

15. Parental verification was not complete; parent was in Texas and child in Arizona, reunification completed on 7/11

16. Parental verification was not complete; child was in New York and parent was released to the interior, reunification in Georgia complete 7/11

17. Parental verification was not complete; discharge was coordinated with discharge of sibling 5 years of age or older, reunification completed on 7/11

18. Parental verification was not complete; child was in New York and parent was released to the interior, reunification in Georgia complete 7/11

19. Parental verification was not complete; child was in New York and parent was released to the interior in Texas, reunification complete in Texas 7/11

20. Parental verification was not complete; child was in Illinois and parent was released to the interior, reunification in Texas complete 7/11

The 23 remaining children aged 0–4, who HHS originally listed as possible candidates for reunification under the Court's order, cannot currently be reunified with their parents because: their parents are in criminal custody (11), or their

parents have been removed (12) and they will be considered for reunification on a timetable to be determined as Plaintiffs and Defendants work together to locate those parents and determined if they wish to be reunified. One child on the original list has a parent who may or may not be a United States citizen (insufficient information is available to make this determination, and the parent and others are not available to provide that information). The child was separated from her parent in 2015 when her parent was arrested on an outstanding warrant by the U.S. Marshals Service. Defendants have not been aware of the parent's location since then and they remain unable to locate that parent. Because the parent is not available, it is not possible to reunite the child with the parent. Unless the parent is located, HHS will provide care and seek placement for the child using its ordinary programs and procedures.

**B. HHS Truncated Processes to Comply With the July 10, 2018 Order**

In its July 10, 2018 ruling and order, the Court instructed Defendants to release children on Defendants' list who Defendants associated with adults in ICE custody, and whose affirmative parental verification, including DNA testing, had not yet been completed. The Court also instructed that reunification should not be delayed for HHS to affirmatively verify parental status.

There were 16 such adults in ICE custody. Of those: 1 was found to be in Marshal's custody, not in ICE custody; 1 DNA test result came back negative prior

to the Court's deadline, causing good faith concern about parentage and risk to the child; and 1 was found to have presented a false birth certificate, also causing good faith concern about parentage and risk to the child. For the other 13 adults, HHS transferred the children to ICE for reunification with those adults without further parental verification process.

The Court's order also required Defendants, by the Court's deadline, to reunify 8 children who Defendants had associated with adults previously released to the interior of the United States. At the time of the Court's order, HHS had not yet completed parental verification of those purported parents, nor had HHS received all biographical or fingerprint information that it requested for any other adults who would be living in the same household upon release of the child.[1] HHS was able to confirm parentage of 1 of the 8 adults prior to the deadline. For the remaining 7 of the 8 adults, in compliance with the Court's order, HHS released the children to the adults despite not having completed its affirmative verification that those adults were the parents. HHS also did not complete any background checks on other adults living in the same households as the children upon release.

## C. Reunification With Removed Parents

---

[1] In at least one instance where background investigations of cohabitants were completed prior to the Court's deadline, HHS found that an adult in the household had an outstanding warrant for aggravated sexual abuse of a 10-year-old child.

With regard to those children whose parents are removed, Defendants are working with Plaintiffs' counsel to locate those parents and to provide them notice to determine if they wish to be reunified with their children. It is difficult to determine how much time will be necessary for those reunification until the parents are contacted and it can be determined what those reunifications would entail. Defendants ask the Court to allow those reunifications to occur on a flexible schedule, and propose that for each such child for whom reunification is requested, once the parent is located and the request for reunification is made, Defendants will work with Plaintiffs' counsel to identify the steps that need to be taken for reunification and determine a reasonable amount of time to complete that process. If the Court is inclined to set a definitive timeframe, Defendants request that any deadline begin on the date that Defendants receive travel documents for the child.

## C. Individuals in State Custody

Defendants understand that Plaintiffs will reach out to class members in state criminal custody to ensure that they contact ORR following their release if they wish to be reunified with their child. Defendants will provide Plaintiffs with any information they have about class members who are sent to state criminal custody to assist in these communications.

18cv428 DMS MDD

**D. Reporting:**

Defendants agree that no later than July 13, 2018, they will provide Plaintiffs' counsel with a list of identified class members in ICE custody. Defendants also agree that no later than July 13, 2018, they will provide Plaintiffs' counsel with a list of identified children of class members. Defendants agree to meet and confer with Plaintiffs about the provision of additional information. Defendants are aware that Plaintiffs are requesting to receive a chart with the level of detail that was provided regarding the minors under-age-5, however the compilation of that information took a significant amount of time on the part of operators whose time would be better spent facilitating reunification and production of the same level of detail on a much larger scale is not operationally feasible under the current timeframes. Defendants request the opportunity to continue to meet and confer with Plaintiffs to see if there is an option that would provide Plaintiffs with the information that they need while minimizing demands on the part of agency operators.

**II.    PLAINTIFFS' POSITIONS**

**A. Reunifications of Children Under Five**

1.  As of today, Defendants represent that they have reunified 58 Class Members.  Of the 103 Class Members Defendants initially identified, apparently 10 remain in criminal custody, 12 were deported, and 23 have apparently dropped out of the class or are not eligible for reunification at this time, either because they

had criminal histories, evidence of abuse, communicable diseases, or they were not actually the parents.

2. Plaintiffs have not yet received any specific information about most of the 23 individuals who Defendants claim have dropped out of the class or are ineligible for reunification. Plaintiffs have therefore not been able to verify whether those parents are, indeed, Class Members eligible for reunification at this time. Plaintiffs have also not been able to determine whether any criminal convictions those parents have render them a danger to their children—and therefore not entitled to reunification at all—or merely not Class Members.

3. As for the 58 parents whom Defendants have apparently reunified, Plaintiffs have no independent verification that these 58 parents have in fact been reunited with their children. During the meet and confer process leading up to July 10, Defendants claimed that they would provide Plaintiffs' counsel with notice of the time and place for each reunification, so that Plaintiffs' counsel could arrange for private and NGO service providers to assist the families and verify reunification. This did not happen. Defendants did not provide specific time and place information for a single Class Member. Instead, Defendants only provided a general prediction about how most Class Members would be reunified.

Defendants' lack of communication about reunification logistics caused significant problems over the last three days. Plaintiffs are now hearing about a number of troubling situations from service providers and attorneys for Class Members and their children. These problems include:

- ICE left one Class Member alone at a bus stop with her children, one of whom was six months old. Through a series of phone calls between the Class Member, her attorney, and another advocate, the Class Member finally obtained a bus ticket on Tuesday around midnight.

- One Class Member was transported through a series of ICE facilities in New Jersey and Michigan in a matter of days, with no prior notice to his counsel. ICE refused access to his counsel while he was detained in Michigan. Despite repeated requests by both the Class Member and his lawyer, ICE did not allow his counsel to be present at the point of reunification.

- A Class Member was kept in an ICE office for most of the day of her originally-scheduled reunification. ORR had processed her children for release that day. ICE officers attempted to process her for release on an ankle monitor. Due to an apparent computer malfunction, the officers were unable to complete the process. At the end of the business day, the ICE officers ceased their attempts and told the mother that she would be sent back to detention without her children.

**B. Parents Deported Without Their Children**

1. Twelve Class Members with children under 5 remain separated, because they have already been deported. Plaintiffs and their NGO partners are in the process of trying to contact these parents. For those deported Class Members who choose to be reunited with their children, Plaintiffs propose that the Court order Defendants to reunify them within 7 days after the parent obtains travel documents for the child. This deadline will ensure that these Class Members are promptly reunified, and that any delay in obtaining travel documents does not affect Defendants' obligations.

2. Defendants have represented that case-specific complications might necessitate further delay. In that situation, Plaintiffs propose that the parties meet and confer about any individual case where the government presents specific, concrete reasons why 7 days is not sufficient. If any disputes remain, the parties can submit the dispute to the Court for a ruling. But the Court should reject any

18cv428 DMS MDD

request from Defendants to extend or avoid setting a deadline, which may lead to indefinite delay. Indeed, to date, Plaintiffs are not aware of any specific steps Defendants have taken even to locate these 12 Class Members.

### C. Costs of Reunification

Plaintiffs' counsel have heard reports that some Class Members have been asked to pay for the costs of reunification, such as transportation costs (and possibly DNA testing). For example, Plaintiffs' counsel was informed that one Class Member was initially told to wire around $1,900 to Western Union to pay for reunification; another Class member arranged to pay for a plane ticket before being told to cancel the ticket because someone else was purchasing a flight for the child.

It is not acceptable for Defendants to make compliance with this Court's injunction contingent on Class Members paying thousands of dollars to reunify with their children. Plaintiffs therefore ask the Court to order Defendants not to charge Class Members for any of the costs of reunification, including DNA testing and air travel, and to reimburse any individuals who were in fact charged.

### D. Remedies for Non-Compliance

Defendants claim that only 58 parents were eligible for reunification as of the July 10 deadline. As noted above, Plaintiffs have not been given sufficient information to verify the accuracy of that eligibility number.

In any event, Defendants concede that they did not meet the July 10 deadline even for these 58 Class Members. This morning, Defendants informed Plaintiffs' counsel that only 38 Class Members were reunified by the Court's deadline. The other 20 children were not returned to their parents until after July 10. In light of this non-compliance, Plaintiffs propose specific remedies in order to ensure that Defendants do not miss future deadlines. *See infra* Section E.

### E. Class Members with Children 5 and Older

As noted above, Plaintiffs believe that open communication and planning in advance are critical to ensure that Defendants do not miss the future deadlines ordered by the Court.

The past week has highlighted these concerns. Plaintiffs wrote to government counsel on July 2 to ask for a list of class members and reunification plans. The government did not provide any of this information before the July 6 status conference, when the Court ordered Defendants to produce the list the next day. That list, however, did not contain the parents' names or A numbers. Defendants did not provide that critical information necessary to locate and track Class Members until the next day—two days before the deadline.

When the deadline arrived, Defendants had not completed parentage verification or background checks for many of the class members with children under 5. The failure to complete these steps in advance delayed reunification for more than a dozen class members until after the deadline. And despite promising to provide advance notice of the time and place for each reunification, Defendants provided no specific information to Plaintiffs' counsel. As a result, Class Members' individual lawyers and service providers were left frantically scrambling to find their clients and provide support.

The following seven (7) steps are designed to address each of these failures:

1. Defendants must provide Plaintiffs with a Class List for the remaining Class Members by Monday, July 16, with all of the information that Defendants provided for the children under 5. To ensure that reunification plans are not formulated haphazardly at the last minute, this Class List should also contain complete information regarding Defendants' plans for reunifying each Class Member, which was not provided for the children under 5.

2. Defendants must complete all parentage verifications and background checks by Thursday, July 19. These steps, which must be completed prior to

18cv428 DMS MDD

reunification, should already be in progress or completed. One week from today should be more than enough time to complete them.

3. Starting Tuesday, July 17—the day after Defendants must provide the Class List (see above, item 1)—Defendants should file with the Court a daily report regarding the number of reunifications that have occurred that day.

4. Defendants must provide Plaintiffs' counsel, as well as Class Members' immigration lawyers (if any), with at least 24 hours advance notice of the time, place, and location of reunification. Defendants should also allow Class Members' immigration counsel access to the site of reunification.

5. For separated parents whom Defendants determine are not Class Members, Defendants must provide Plaintiffs' counsel with detailed reasons why a putative Class Member was excluded from the Class List, including, at a minimum: any criminal convictions or charges; any allegations of abuse or unfitness; or the specific reasons why parentage could not be verified.

6. If Defendants choose to reunite Class Members in family detention facilities, they should provide immediate access to immigration lawyers who can advise the Class Members of their rights. DHS facilities frequently place unwarranted restrictions on counsel access, such as limiting the rooms available to meet with lawyers, or adopting restrictive phone policies. Any lawyer seeking to meet with a Ms. L. Class Member should be provided immediate access to a private facility where the Class Member can be counseled on his or her rights. This is particularly important if that Class Member has received a removal order.

7. Defendants must establish a fund to pay for professional mental health counseling, which will be used to treat children who are suffering from severe trauma as a result of their forcible separation from their parents. The amount can be set at a later time, subject to further negotiations between the parties and rulings from the Court. Although many medical professionals have graciously offered pro

1  bono services for the children, who plainly are in desperate need of counseling,

2  these medical professionals should not have to assume the costs associated with the

3  government's policy, especially not their out-of-pocket expenses.

DATED: July 13, 2018                Respectfully submitted,

/s/ Lee Gelernt
Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN DIEGO
& IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*\*Admitted Pro Hac Vice*

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
    NICOLE MURLEY
    Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
sarah.b.fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

16

Exhibit LL

Trump's Office of Refugee Resettlement is budgeting for a surge in child separations.    Page 1 of 10

Case 2:18-cv-00939-MJP    Document 27-2    Filed 07/13/18    Page 68 of 107



$135.99

JURISPRUDENCE

## Trump's Office of Refugee Resettlement Is Budgeting for a Surge in Child Separations

The agency is planning to move funds for refugees and HIV/AIDS patients to cover the possible costs.

By MARK JOSEPH STERN
JULY 10, 2018 • 2:57 PM

 TWEET

 SHARE

💬 COMMENT



View of a temporary detention center for illegal underage immigrants in Tornillo, Texas, on June 18.
Herika Martinez/AFP/Getty Images

The Office of Refugee Resettlement is preparing for the possibility of another surge in family separations. Internal documents obtained by Slate show that ORR has modeled a scenario in which the Trump administration's border policies could require the detention of thousands more immigrant children.

ORR—an agency within the Administration for Children and Families, which is itself a division of the Department of Health and Human Services—was caught off guard by the family separation policy, the documents reveal. In April, Attorney General Jeff Sessions announced that the Department of Justice would henceforth have "zero tolerance" for immigrants who cross the border without authorization. He expanded the policy in May by partnering with the Department of Homeland

Security to prosecute immigrants for unlawful border crossing, a misdemeanor. Under zero tolerance, parents are imprisoned, and children are placed in ORR shelters, sometimes far from the border.

There are currently about 11,800 children in ORR's care. Alex Azar, the secretary of the Department of Health and Human Services, has stated that somewhere between 2,000 and 3,000 of those children were separated from their parents at the border. The remaining children in ORR custody are unaccompanied minors—children who crossed the border without a parent or guardian.

ADVERTISEMENT

In the documents obtained by Slate, ORR officials describe the budget implications of a potential surge in immigrant minors over the next three months. The ORR's budgeting exercise is premised on the possibility that the agency could need as many as 25,400 beds for immigrant minors by the end of the calendar year. The documents do not indicate that ORR officials have specific knowledge that family separations will increase but do show that the agency is preparing for the possibility.

The internal documents estimate that if 25,400 beds are needed, ORR would face a budget shortfall of $585 million for ORR in fiscal year 2018, which ends on Sept. 30. Under this scenario, that shortfall would increase to $1.3 billion in the first quarter of fiscal year 2019, adding up to a total shortfall of $1.9 billion for the period between Oct. 1, 2017, and Dec. 31, 2018. The documents stress that these budget estimates represent maximum possible expenditures and that actual expenses may be lower. The Department of Health and Human Services did not respond to multiple requests for comment about these figures or anything else relating to the documents.

ADVERTISEMENT

inRead invented by Teads

To help cover these potential costs, the documents say, HHS will seek supplemental appropriations from Congress. The documents also indicate that HHS plans to pay for child separation by reallocating money from the Ryan White HIV/AIDS Program, which, according to its website, "provides a comprehensive system of care that includes primary medical care and essential support services for people living with HIV who are uninsured or underinsured." Per the documents, the process of transferring those HIV/AIDS funds has already begun.

In addition, HHS plans to reallocate $79 million from programs for refugee resettlement, a move that could imperil social services, medical assistance, and English language instructions for refugees in the U.S., as well as programs for torture survivors.

Trump's Office of Refugee Resettlement is budgeting for a surge in child separations.    Page 3 of 10

Case 2:18-cv-00939-MJP    Document 27-2    Filed 07/13/18    Page 70 of 107

ORR's budgeting exercise does not account for a federal court decision ordering the administration to reunify separated parents and children within 30 days, or within 14 days if those children are younger than 5 years old. Azar has stated publicly that he will attempt to comply with these deadlines.

The documents do, however, take into account the executive order that Trump signed on June 20 that purports to end family separation—and reveal that ORR does not seem to be operating on the assumption that the separation policy has truly ended. The budgeting exercise assumes that Trump's order created a 20-day pause on family separations and that referrals would increase after that 20-day period—that is, after July 10—to 325 immigrant children per day for four weeks. If that estimate is correct, that means an additional 9,100 immigrant children would be detained and housed by the U.S. government in the four weeks beginning Tuesday.

ADVERTISEMENT

At the end of those four weeks, the agency documents assume, the deterrent effect of family separation would again reduce referrals—that is, the number of immigrant children in government detention. There is no evidence that a resumption of family separation will deter parents from crossing the border with their children; the number of families apprehended at the border stayed flat between May and June as the U.S. government implemented the zero-tolerance policy.

The timeline laid out in these internal documents reflects a debatable reading of Trump's executive order. ORR officials appear to think that the order allowed families and children to be detained together temporarily but that under the Flores settlement these children must be transferred to ORR's custody after 20 days. Under this interpretation of the executive order, all children who are separated from a parent or guardian from this point forward must first be detained with that parent or guardian for 20 days.

ADVERTISEMENT



inRead invented by Teads

While the executive order is ambiguous on this point, ORR's interpretation is plausible. Moreover, not all of the referrals—ORR's term for minors placed in its care—that are accounted for in ORR's budgeting exercise would be children separated from their parents. Some of the additional beds would presumably go to minors who arrive at the border unaccompanied by a parent or guardian. But given the claim in the documents that referrals would increase after a pause on family separations, it appears ORR believes a substantial number of those beds would indeed go to children separated from their parents.

Mark Greenberg, a senior fellow at the Migration Policy Institute who led the Administration for Children and Families—the division of HHS that includes the Office of Refugee Resettlement—from 2013 to 2015, told Slate the plans indicate an "enormous increase" in the number of minors that will be held in custody. "This envisions having further family separation cases coming to HHS—a lot of them," he said. Greenberg also noted that the documents suggest the possibility of a vast expansion of federal expenditures on unaccompanied minors. "The entire appropriation for unaccompanied alien children this year was $1.3 billion," he said. Now ORR is "seeking an additional $1.3 billion" for just the last three months of 2018.

Trump's Office of Refugee Resettlement is budgeting for a surge in child separations.    Page 4 of 10

Case 2:18-cv-00939-MJP   Document 27-2   Filed 07/13/18   Page 71 of 107

ADVERTISEMENT

Bob Carey, who served as director of ORR under President Barack Obama, told Slate that the documents also reflect the possibility that the agency may "keep children for much longer periods of time." Under Obama, the average minor in federal custody remained in ORR's care for 33 days before being released to a sponsor, usually a family member. Under Trump, that average has increased to 55 days, and stints in detention could grow longer as the administration creates higher barriers to sponsorship. Carey said the Trump administration has implemented processes that have a "deterrent effect" on sponsors. For instance, ORR now shares information about potential sponsors with Immigration and Customs Enforcement. That policy could dissuade undocumented family members from sponsoring minors, potentially keeping children languishing in ORR's care for months.

"That tactic represents muddying of mission," Carey said. "ORR shelters were not established to care for children on a long-term basis. They were set to keep kids for as short a period of time as possible until the child could be released to a parent or other sponsor. Clearly [the agency] is creeping away from that."

## One more thing

The Trump administration poses a unique threat to the rule of law. That's why Slate has stepped up our legal coverage—watchdogging Jeff Sessions' Justice Department, the Supreme Court, the crackdown on voting rights, and more.

Our work is reaching more readers than ever—but online advertising revenues don't fully cover our costs, and we don't have print subscribers to help keep us afloat. So we need your help.

If you think Slate's work matters, become a Slate Plus member. You'll get exclusive members-only content and a suite of great benefits—and you'll help secure Slate's future.

**Join Slate Plus**

Tweet        Share        Comment

Children     Immigration     Refugees

ADVERTISEMENT

inRead invented by Teads

Trump's Office of Refugee Resettlement is budgeting for a surge in child separations.    Page 5 of 10

Case 2:18-cv-00939-MJP    Document 27-2    Filed 07/13/18    Page 72 of 107

ADVERTISEMENT

## MOST RECENT

VIEW ALL

14M AGO
JOSHUA KEATING
**Schumer Calls on Trump to Cancel Putin Summit. Good Luck With That.**

1H AGO
APRIL GLASER
**We Wouldn't Need Facebook to Ban Infowars if We Hadn't Let Facebook Get So Massive**

1H AGO
BEN MATHIS-LILLEY
**Mueller Indicts Twelve Russians for Hacking Democrats Just Days Before Scheduled Trump-Putin Meeting**

1H AGO
CARMEN RUSSO
**Watch Saoirse Ronan and Margot Robbie Battle in New *Mary Queen of Scots* Trailer**

1H AGO
MATTHEW DESSEM
**Ted Koppel Escaped His Sacha Baron Cohen Interview Just by Knowing Night From Day**

1H AGO
CARMEN RUSSO
***The Big Bang Theory* Gets Belated Emmy Nomination Thanks to New Rule**

2H AGO
SOFIE WERTHAN
**Black Resident Ordered to Leave Pool at His Own Apartment Complex for No Apparent Reason**

2H AGO
FRANK BOWMAN
**Trump's Foreign Policy Carnage Is an Impeachable Offense**

2H AGO
JOSHUA KEATING
**Trump Has All But Pledged Allegiance to the European Far Right**

2H AGO
BEN MATHIS-LILLEY

Trump's Office of Refugee Resettlement is budgeting for a surge in child separations.    Page 6 of 10

Case 2:18-cv-00939-MJP    Document 27-2    Filed 07/13/18    Page 73 of 107

**Trump Denounces His Own Attack on Theresa May as, Yes, "Fake News"**

2H AGO
FELIX SALMON
**Kylie Jenner Isn't a Billionaire but Isn't *Not* a Billionaire Because "Billionaire" Has Lost All Meaning**

2H AGO
JEAN-MARIE POTTIER
**What a World Cup Win Would Mean for France**

ADVERTISEMENT

## MOST READ

Trump's Office of Refugee Resettlement is budgeting for a surge in child separations. Page 7 of 10

Case 2:18-cv-00939-MJP   Document 27-2   Filed 07/13/18   Page 74 of 107



GRAHAM STARR

**I Made a Don Jr. Shadow Instagram Account to Mimic What He Likes and Follows. It Was Scary.**

Trump's Office of Refugee Resettlement is budgeting for a surge in child separations.    Page 8 of 10

Case 2:18-cv-00939-MJP    Document 27-2    Filed 07/13/18    Page 75 of 107



ISAAC CHOTINER
**We're Not Headed for Nazi Germany, but We're Also Not Headed Anywhere Good**

CHRISTINA CAUTERUCCI
**How the Trump Administration Deploys Female Pain as Punishment**

Trump's Office of Refugee Resettlement is budgeting for a surge in child separations.          Page 9 of 10

Case 2:18-cv-00939-MJP   Document 27-2   Filed 07/13/18   Page 76 of 107



BEN MATHIS-LILLEY

**Facebook Says InfoWars, Which Reported That NASA Has a Slave Colony on Mars, Is a Valid Source of "Opinion and Analysis"**

JOSHUA KEATING

**Trump Contradicts His Entire Worldview in Weird Remark About Africa**

Case 2:18-cv-00939-MJP    Document 27-2    Filed 07/13/18    Page 77 of 107

Reprints

Advertise: Site / Podcasts

Commenting

Contact / Feedback

Pitch guidelines

Corrections

About us

Work with us

User agreement

Privacy policy

AdChoices

FOLLOW US

**Facebook**

**Twitter**

**Instagram**

Slate is published by The Slate Group, a Graham Holdings Company.
All contents © 2018 The Slate Group LLC. All rights reserved.

Exhibit MM

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

*Attorneys for Petitioner-Plaintiff*          *\*Admitted Pro Hac Vice*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L. and Ms. C., | Case No. 18-cv-00428-DMS-MDD |
| *Petitioner-Plaintiff,* | |
| v. | Date Filed: July 3, 2018 |
| U.S. Immigration and Customs Enforcement ("ICE"); U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border Protection ("CBP"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Thomas Homan, Acting Director of ICE; Greg Archambeault, San Diego Field Office Director, ICE; Joseph Greene, San Diego Assistant Field Office Director, ICE; Adrian P. Macias, El Paso Field Director, ICE; Frances M. Jackson, El Paso Assistant Field Office Director, ICE; Kirstjen Nielsen, Secretary of DHS; Jefferson Beauregard Sessions III, Attorney General of the United States; L. Francis Cissna, Director of USCIS; Kevin K. McAleenan, Acting Commissioner of CBP; Pete Flores, San Diego Field Director, CBP; Hector A. Mancha Jr., El Paso Field Director, CBP; Alex Azar, Secretary of the Department of Health and Human Services; Scott Lloyd, Director of the Office of Refugee Resettlement, | **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>CLASS ACTION |
| *Respondents-Defendants.* | |

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

**INTRODUCTION**

1.      This case challenges the United States government's forcible separation of parents from their young children for no legitimate reason and notwithstanding the threat of irreparable damage that separation has been universally recognized to cause young children.

2.      Plaintiff Ms. L. is the mother of a seven (7) year-old daughter, who was ripped away from her, and then sent halfway across the country to be detained alone. Plaintiff Ms. C. is the mother of a fourteen (14) year-old son, who was also forcibly separated from his mother and detained more than a thousand miles away.

3.      Ms. L. and Ms. C. bring this action on behalf of themselves and thousands of other parents whom the government has forcibly separated from their children. Like Ms. L. and Ms. C., many of these individuals have fled persecution and are seeking asylum in the United States. Without any allegations of abuse, neglect, or parental unfitness, and with no hearings of any kind, the government is separating these families and detaining their young children, alone and frightened, in facilities often thousands of miles from their parents.

4.      Forced separation from parents causes severe trauma to young children, especially those who are already traumatized and are fleeing persecution in their home countries. The resulting cognitive and emotional damage can be permanent.

5.      Defendants have ample ways to keep Plaintiffs together with their children, as they have done for decades prior to their current practice. There are shelters that house families (including asylum-seekers) while they await the final adjudication of their immigration cases. If, however, the government lawfully continues detaining these parents and young children, it must at a minimum detain them together in one of its immigration family detention centers.

1

6. The Due Process Clause of the Fifth Amendment does not permit the government to forcibly take young children from their parents, without justification or even a hearing. That separation also violates the asylum statutes, which guarantee a meaningful right to apply for asylum, and the Administrative Procedure Act (APA), which prohibits unlawful and arbitrary government action.

## JURISDICTION

7. This case arises under the Fifth Amendment to the United States Constitution, federal asylum statutes, and the APA. The court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 2241 (habeas jurisdiction); and Art. I., § 9, cl. 2 of the United States Constitution ("Suspension Clause"). Plaintiffs are in custody for purposes of habeas jurisdiction.

## VENUE

8. Venue is proper under 28 U.S.C. § 1391(e) because Ms. L. was detained in this District when this action commenced, Defendants reside in this District, and a substantial portion of the relevant facts occurred within this District, including the Defendants' implementation of their practice of separating immigrant parents from their children for no legitimate reason.

## PARTIES

9. Plaintiff Ms. L. is a citizen of the Democratic Republic of the Congo (the "Congo" or "DRC"). She is the mother of 7 year-old S.S.

10. Plaintiff Ms. C. is a citizen of Brazil. She is the mother of 14 year-old J.

11. Defendants U.S. Department of Homeland Security ("DHS") has responsibility for enforcing the immigration laws of the United States.

12. Defendant U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

13.     Defendant U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens who are apprehended near the U.S. border.

14.     Defendant U.S. Department of Health and Human Services (HHS) is a department of the executive branch of the U.S. government which has been delegated authority over "unaccompanied" noncitizen children.

15.     Defendant Office of Refugee Resettlement ("ORR") is the component of HHS which provides care of and placement for "unaccompanied" noncitizen children.

16.     Defendant Thomas Homan is sued in his official capacity as the Director of ICE, and is a legal custodian of Plaintiffs.

17.     Defendant Greg Archambeault is sued in his official capacity as the ICE San Diego Field Office Director, and is a legal custodian of Plaintiff Ms. L.

18.     Defendant Joseph Greene is sued in his official capacity as the ICE San Diego Assistant Field Office Director for the Otay Mesa Detention Center, and is a legal custodian of Plaintiff Ms. L.

19.     Defendant Adrian P. Macias is sued in his official capacity as the ICE El Paso Field Office Director, and is a legal custodian of Plaintiff Ms. C.

20.     Defendant Frances M. Jackson is sued in his official capacity as the ICE El Paso Assistant Field Office Director for the West Texas Detention Facility, and is a legal custodian of Plaintiff Ms. C.

21.     Defendant Kirstjen Nielsen, is sued in her official capacity as the Secretary of the Department of Homeland Security. In this capacity, she directs each of the component agencies within DHS: ICE, USCIS, and CBP. As a result, Respondent Nielsen has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, is empowered to grant asylum or other relief, and is a legal custodian of the Plaintiffs.

22.     Defendant Jefferson Beauregard Sessions III is sued in his official capacity as the Attorney General of the United States. In this capacity, he has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office of Immigration Review, is empowered to grant asylum or other relief, and is a legal custodian of the Plaintiffs.

23.     Defendant L. Francis Cissna is sued in his official capacity as the Director of USCIS.

24.     Defendant Kevin K. McAleenan is sued in his official capacity as the Acting Commissioner of CBP.

25.     Defendant Pete Flores is sued in his official capacity as the San Diego Field Director of CBP.

26.     Defendant Hector A. Mancha Jr. is sued in his official capacity as the El Paso Field Director of CBP.

27.     Defendant Alex Azar is sued in his official capacity as the Secretary of the Department of Health and Human Services.

28.     Defendant Scott Lloyd is sued in his official capacity as the Director of the Office of Refugee Resettlement.

## **FACTS**

29.     Over the past year, the government has separated thousands of migrant families for no legitimate purpose.  The government's true purpose in separating these families was to deter future families from seeking refuge in the United States.

30.     Many of these migrant families fled persecution and are seeking asylum. Although there are no allegations that the parents are unfit or abusing their children in any way, the government has forcibly separated them from their young children and detained the children, often far away, in facilities for "unaccompanied" minors.

31.     There is overwhelming medical evidence that the separation of a young child from his or her parent will have a devastating negative impact on the

child's well-being, especially where there are other traumatic factors at work, and that this damage can be permanent.

32.     The American Association of Pediatrics has denounced the Administration's practice of separating migrant children from their parents, noting that: "The psychological distress, anxiety, and depression associated with separation from a parent would follow the children well after the immediate period of separation—even after the eventual reunification with a parent or other family."

33.     Prior Administrations detained migrant families, but did not have a practice of forcibly separating fit parents from their young children.

34.     There are non-governmental shelters that specialize in housing and caring for families—including asylum seeking families—while their immigration applications are adjudicated.

35.     There are also government-operated family detention centers where parents can be housed together with their children, should the government lawfully decide not to release them. The government previously detained, and continues to detain, numerous family units at those facilities.

36.     In April 2018, the New York Times reported that more than "700 children have been taken from adults claiming to be their parents since October [of 2016], including more than 100 children under the age of 4." Caitlin Dickerson, *Hundreds of Children Have Been Taken from Parents at U.S. Border*, N.Y. Times, Apr. 20, 2018.

37.     On May 7, 2018, Defendant Sessions announced "a new initiative" to refer "100 percent" of immigrants who cross the Southwest border for criminal immigration prosecutions, also known as the "zero-tolerance policy." Defendant Sessions stated that as part of that prosecution, all parents who are prosecuted would be separated from their children. U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks to the Association of State Criminal Investigative Agencies 2018 Spring Conference (May 7, 2018).  The purpose of this new policy

was to separate families in the hope that it would deter other families from seeking refuge in the United States.

38.  At a Senate Judiciary Committee hearing in May, a deputy chief of Defendant U.S. Customs and Border Protection testified that between May 6 and May 19 alone, a total of 658 children were separated from their family members pursuant to this policy. The Washington Post reported that in the city of McAllen, Texas, 415 children were taken from their parents during a two week period.[1] And in June 2018, the Department of Homeland Security reported that in the six weeks between April 19 and May 31, the administration took almost 2,000 children away from their parents.[2]

39.  Defendant Sessions and other government officials, including Defendant Nielsen, have repeatedly defended the separation of children from their parents in speeches and interviews with various media outlets. Among other justifications for the practice, they have stated that separating families would be a way to "discourage parents from bringing their children here illegally,"[3] and that it would help "deter more movement" to the United States by asylum seekers and other migrants.[4]  Administration officials told the New York Times in May, "[t]he president and his aides in the White House had been pushing a family separation policy for weeks as a way of deterring families from trying to cross the border illegally."[5]

---

[1] https://www.washingtonpost.com/world/national-security/trumps-zero-tolerance-at-the-border-is-causing-child-shelters-to-fill-up-fast/2018/05/29/7aab0ae4-636b-11e8-a69c-b944de66d9e7_story.html?utm_term=.d52d94c37d05.

[2] https://ca.reuters.com/article/topNews/idCAKBN1JB2SF-OCATP.

[3] http://transcripts.cnn.com/TRANSCRIPTS/1801/16/cnr.04.html.

[4] https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/

[5] https://www.nytimes.com/2018/05/10/us/politics/trump-homeland-security-secretary-resign.html

40.     Even if the separated child is released from custody and placed in a community setting or foster care, the trauma of the ongoing separation continues.

41.     By taking away their children, Defendants are coercing class members into giving up their claims for asylum and other legal protection. Numerous class members have been told by CBP and ICE agents that they will see their children again sooner if they withdraw their asylum applications and accept earlier deportation.[6]

42.     Many class members have given up their asylum claims and stipulated to removal as a way to be reunited with their children faster.

43.     For class members who have not been coerced into giving up their asylum claims, separation from their children has made those applications much more difficult. Separation prevents parents from helping their children apply for asylum and navigate removal proceedings. Separation also makes it harder for parents to present facts involving their children which support their own asylum claims.

44.     The trauma of separation also renders asylum-seeking class members too distraught to effectively pursue their asylum applications. *See, e.g.*, Angelina Chapin, *Separated Parents Are Failing Asylum Screenings Because They're So Heartbroken*, Huffington Post (June 30, 2018).[7]

---

[6] This practice has been widely reported. *See, e.g.*, Dara Lind, *Trump Will Reunite Separated Families—But Only if They Agree to Deportation*, Vox.com (June 25, 2018), https://www.vox.com/2018/6/25/17484042/children-parents-separate-reunite-plan-trump; Jay Root & Shannon Najmabadi, *Kids in Exchange for Deportation: Detained Migrants Say They Were Told They Could Get Kids Back on Way Out of U.S.*, Texas Tribune (June 24, 2018), https://www.texastribune.org/2018/06/24/kids-exchange-deportation-migrants-claim-they-were-promised-they-could/?utm_campaign=trib-social&utm_medium=social&utm_source=twitter&utm_content=1529859032.

[7] https://www.huffingtonpost.com/entry/separated-parents-too-grief-stricken-to-seek-asylum-experts-say_us_5b379974e4b08c3a8f6ad5d9.

45.     Defendants have deported class members without their separated children. Their children are now stranded in the United States alone. Many of these parents are now struggling to make contact with their children, who are being detained thousands of miles away across multiple international borders. *See* Miriam Jordan, *"I Can't Go Without My Son," a Mother Pleaded as She Was Deported to Guatemala*, N.Y. Times (June 17, 2018).[8]

46.     On June 20, 2018, President Trump signed an Executive Order ("EO") purporting to end certain family separations going forward.[9] The EO directs DHS to "maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings."

47.     The EO directs DHS to separate families any time DHS determines that separation would protect "the child's welfare."  It does not, however, set forth how that standard will be applied.  In prior cases the government has applied that standard in a manner that is inconsistent with the child's best interest, including in Ms. L's case.

48.     The EO makes no provision for reunifying the thousands of families who were separated prior to its issuance.

49.     The EO makes no provision for returning separated children to parents who have been already been deported without their children.

## **NAMED PLAINTIFFS**

50.      Ms. L. and her daughter S.S. are one of the many families that have recently been separated by the government.

---

[8] https://www.nytimes.com/2018/06/17/us/immigration-deported-parents.html. *See also* Nelson Renteria, *El Salvador Demands U.S. Return Child Taken from Deported Father*, Reuters (June 21, 2018), https://www.reuters.com/article/us-usa-immigration-el-salvador/el-salvador-demands-us-return-child-taken-from-deported-father-idUSKBN1JH3ER.

[9] https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation/.

51.    Ms. L. and her daughter are seeking asylum in the United States.

52.    Ms. L. is Catholic and sought shelter in a church until she was able to escape the Congo with S.S.

53.    Upon reaching the United States, Ms. L. and S.S. presented themselves at the San Ysidro, California Port of Entry on November 1, 2017.  Although their native language is Lingala, they were able to communicate to the border guards that they sought asylum.

54.    Based on her expression of a fear of returning to the Congo, Ms. L. was referred for an initial screening before an asylum officer, called a "credible fear interview." She subsequently passed the credible fear screening but, until March 6, 2018, remained detained in the Otay Mesa Detention Center in the San Diego area.

55.    On or about November 5, immigration officials forcibly separated then-6 year-old S.S. from her mother and sent S.S. to Chicago. There she was housed in a detention facility for "unaccompanied" minors run by the Office of Refugee Resettlement (ORR).

56.    When S.S. was taken away from her mother, she was screaming and crying, pleading with guards not to take her away from her mother. While detained, Ms. L. spoke to her daughter approximately 6 times by phone, never by video.  For months she was terrified that she would never see her daughter again. The few times Ms. L. was able to speak to her daughter on the phone, her daughter was crying and scared.

57.    In December, S.S. turned 7 and spent her birthday in the Chicago facility, without her mother.

58.    In detention, Ms. L. was distraught and depressed because of her separation from her daughter. As a result, she did not eat properly, lost weight, and was not sleeping due to worry and nightmares.

59.    In one moment of extreme despair and confusion, Ms. L. told an immigration judge that she wanted to withdraw her application for asylum,

realizing her mistake only a few days later. She is seeking to reopen her case before the Board of Immigration Appeals.

60.     The government had no legitimate interest in separating Ms. L. and her child.

61.     There has been no evidence, or even accusation, that S.S. was abused or neglected by Ms. L.

62.     There is no evidence that Ms. L. is an unfit parent or that she is not acting in the best interests of her child.

63.     After Ms. L. filed this lawsuit and moved for a preliminary injunction, Defendants abruptly released her from custody on March 6, 2018, due to the filing of the lawsuit. Defendants informed her that she would be released mere hours in advance, with no arrangements for where she would stay. S.S. was released to Ms. L.'s custody several days later. Both are now pursuing their claims for legal protection.

64.     Ms. C. and her 14 year-old son, J., are another one of the families who have been separated by the government. Like Ms. L. and her daughter, Ms. C. and her son are seeking asylum in the United States.

65.     Ms. C. and J. fled Brazil and came to the United States to seek asylum. A few feet after Ms. C. entered the United States, a border guard approached her, and she explained that she was seeking asylum. Ms. C. subsequently passed a credible fear interview, and was put in removal proceedings, where she is applying for asylum.

66.     Despite having communicated her fear of persecution to border guards, the government prosecuted Ms. C. for entering the country illegally, took her son J. away from her, and sent him to a facility for "unaccompanied" children in Chicago.

67.     The government continued to separate Ms. C. from her son even after she completed serving her criminal misdemeanor sentence on September 22, 2017, and was sent to an immigration detention facility, the El Paso Processing Center. In

early January 2018, she was transferred again, to another immigration facility, the West Texas Detention Facility (also known as Sierra Blanca), but still was not reunited with her son. Even after Ms. C was released from immigration detention on April 5, 2018, the government did not reunify her with her son for another two months, until June 9.

68.    While separated from J., Ms. C. was desperate to be reunited with him. She worried about him constantly and did not know when she would be able to see him. They spoke on the phone only a handful of times while they were separated by Defendants.

69.    J. had a difficult time emotionally during the months he was separated from his mother.

70.    The government had no legitimate interest for the separation of Ms. C. and her child.

71.    There is no evidence, or even accusation, that J. was abused or neglected by Ms. C.

72.    There is no evidence that Ms. C. is an unfit parent or that she is not acting in the best interests of her child.

## CLASS ALLEGATIONS

73.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) on behalf of themselves and a nationwide class of all other persons similarly situated.

74.    Plaintiffs seek to represent the following class:

All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child.

75.    Ms. L. and Ms. C. are each adequate representatives of the proposed class.

76.    The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable. There are at a minimum hundreds of parents who fit within the class.

77.    The class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). The members of the class are subject to a common practice: forcibly separating detained parents from their minor children absent any determination that the parent is unfit or presents a danger to the child. By definition, all class members have experienced that practice, and none has been given an adequate hearing regarding the separation. The lawsuit raises numerous questions of law common to members of the proposed class, including: whether Defendants' family separation practice violates class members' substantive due process right to family integrity; whether the practice violates class members' procedural due process rights; whether the practice violates the federal asylum statute; and whether these separations are unlawful or arbitrary and capricious under the APA.

78.    The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3), because the claims of the representative Plaintiffs are typical of the claims of the class. Ms. L., Ms. C., and the proposed class members are all individuals who have had or will have their children forcibly taken away from them despite there being no proven allegations of abuse, neglect, or any other danger or unfitness. Plaintiffs and the proposed class also share the same legal claims, which assert the same substantive and procedural rights under the Due Process Clause, the asylum statute, and the APA.

79.    The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). The representative Plaintiffs seek the same relief as the other members of the class—namely, an order that they be reunified with their children, whether through release or in family detention facilities. In defending their

own rights, Ms. L. and Ms. C. will defend the rights of all proposed class members fairly and adequately.

80.     The proposed class is represented by counsel from the American Civil Liberties Union Immigrants' Rights Project and the ACLU of San Diego and Imperial Counties. Counsel have extensive experience litigating class action lawsuits and other complex cases in federal court, including civil rights lawsuits on behalf of noncitizens.

81.     The members of the class are readily ascertainable through Defendants' records.

82.     The proposed class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the class by unlawfully separating parents from their young children. Injunctive and declaratory relief is thus appropriate with respect to the class as a whole.

## CAUSES OF ACTION

### COUNT I

### (Violation of Due Process: Right to Family Integrity)

83.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

84.     The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and thus applies to Ms. L., Ms. C., their children S.S. and J., and all proposed class members.

85.     Plaintiffs, their children, and all class members have liberty interests under the Due Process Clause in remaining together as families.

86.     The separation of the class members from their children violates substantive due process because it furthers no legitimate purpose and was designed to deter.

87.     The separation of the class members from their children also violates procedural due process because it was undertaken without any hearing.

13

# COUNT II

## (Administrative Procedure Act: Arbitrary and Capricious Practice)

88.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

89.     The APA prohibits agency action that is arbitrary and capricious or violates a person's legal or constitutional rights.

90.     Defendants' separation practice is final agency action for which there is no other adequate remedy in a court. Defendants' decision to separate parents is not tentative or interlocutory, because Defendants have *already* separated thousands of families and continue to do so, and the policy was announced by high-level officials. And Defendants' decision to separate gravely impacts class members' rights to remain together as families.

91.     Defendants' separation of Ms. L., Ms. C., and the other class members from their children without any explanation or legitimate justification is arbitrary and capricious and accordingly violates the APA. 5 U.S.C. § 706.

92.     Among other things, Defendants failed to offer adequate reasons for adopting their unprecedented new separation practice; they failed to explain why they were not using alternatives to separation, including supervised release and family detention; and for parents like Ms. L., Defendants have never explained why they cannot verify parentage *before* imposing traumatic separation on both parent and child.

# COUNT III

## (Violation of Right to Seek Protection Under the Asylum and Withholding of Removal Statutes, and the Convention Against Torture)

93.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

94.     Under United States law, noncitizens with a well-founded fear of persecution shall have the opportunity to apply for asylum in the United States. 8

14

U.S.C. § 1158(a). In addition, noncitizens have a mandatory statutory entitlement to withholding of removal where they would face a probability of persecution if removed to their country of nationality, 8 U.S.C. § 1231(b)(3), or withholding or deferral of removal where they would face a probability of torture.  Foreign  Affairs Reform and Restructuring Act ("FARRA"), Pub. L. No. 105-277, Div. G., Title XXII, § 2242, 112 Stat. 2681-822 (Oct. 21, 1998) (codified as Note to 8 U.S.C.§ 1231).

95.    Class members have a private right of action to challenge violations of their right to apply for asylum under § 1158(a). That right is not barred by 8 U.S.C. § 1158(d)(7), which applies to only certain procedural requirements set out in Section 1158(d).

96.    Defendants' separation of families violates federal law that provides for asylum and other protection from removal, as well as their due process right to seek such relief.  Separation severely impedes their ability to pursue their asylum and other protection claims in a number of ways, including by denying them the ability to coordinate their applications with their children, present facts related to their children, and creating trauma that hinders their ability to navigate the complex process.

97.    The government is also using the trauma of separation to coerce parents into giving up their asylum and protection claims in order to be reunited with their children.

## **PRAYER FOR RELIEF**

Plaintiffs request that the Court enter a judgment against Defendants and award the following relief:

A. Certify a class of all adult parents nationwide who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or

1  DHS custody, absent a determination that the parent is unfit or presents a danger to

2  the child.

3      B. Name Ms. L. and Ms. C. as representatives of the class, and appoint

4  Plaintiffs' counsel as class counsel;

5      C. Declare the separation of Ms. L., Ms. C., and the other class members

6  from their children unlawful;

7      D. Preliminarily and permanently enjoin Defendants from continuing to

8  separate the class members from their children;

9      E. Order Defendants either to release class members along with their

10  children, or to detain them together in the same facility;

11      F. Enjoin Defendants from removing any class members from the country

12  who have received final removal orders until they are reunited with their children,

13  unless the class members knowingly and voluntarily decide that they do not want

14  their children removed with them;

15      G. Enjoin Defendants from removing any class member who received a final

16  removal order prior to the issuance of this Court's preliminary injunction on June

17  26, 2018, or prior to receiving notice of their rights under the injunction, until they

18  have had an opportunity to consult with class counsel, or a delegate of class

19  counsel, to insure that these class members have knowingly and voluntarily chosen

20  to forego any further challenges to removal, rather than feeling coerced into doing

21  so as a result of separation from their children.

22      H.  Require Defendants to pay reasonable attorneys' fees and costs;

23      I. Order all other relief that is just and proper.

24

25  Dated: July 3, 2018                Respectfully Submitted,

26  Bardis Vakili (SBN 247783)        */s/Lee Gelernt*
   ACLU FOUNDATION OF SAN      Lee Gelernt*

27  DIEGO & IMPERIAL COUNTIES     Judy Rabinovitz*
   P.O. Box 87131                   Anand Balakrishnan*

28  San Diego, CA 92138-7131       AMERICAN CIVIL LIBERTIES
                                    UNION FOUNDATION

T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2616
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Exhibit NN

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE N. MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-
Defendants*

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*jrabinovitz@aclu.org*
*abalakrishnan@aclu.org*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*Admitted Pro Hac Vice*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

           Petitioners-Plaintiffs,

    vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

           Respondents-Defendants.

Case No. 18cv428 DMS MDD

**JOINT MOTION REGARDING
SCOPE OF THE COURT'S
PRELIMINARY INJUNCTION**

In accordance with the Court's orders and with the Court's July 10, 2018 status conference, the parties respectfully jointly move the Court to enter the attached Order Regarding Scope of the Court's Preliminary Injunction. This Proposed Order addresses compliance with this Court's preliminary injunction.  It would provide that the Court's preliminary injunction order in this case, or subsequent orders implementing that order, does not limit the Government's authority to detain adults in the Department of Homeland Security's ("DHS") custody. Accordingly, when DHS would detain a Class Member together with his or her child in a facility for detaining families, consistent with its constitutional and legal authorities governing detention of adults and families, but the child may be able to assert rights under the *Flores* Settlement Agreement to be released from custody or transferred to a "licensed program" pursuant to that Agreement's terms, then this Court's preliminary injunction and implementing orders permit the Government to require Class Members to select one of the following two options: First, the Class Member may choose to remain in DHS custody together with his or her child, subject to any eligibility for release under existing laws and policies, but

1   to waive, on behalf of the child, the assertion of rights under the *Flores* Settlement
2   Agreement to be released, including the rights with regard to placement in the least
3   restrictive setting appropriate to the minor's age and special needs, and the right to
4   release or placement in a "licensed program." By choosing this option, the class
5   member is waiving the child's right under the *Flores* Settlement Agreement to be
6   released, including the rights with regard to placement in the least restrictive setting
7   appropriate to the minor's age and special needs, and the right to release or
8   placement in a "licensed program." Second, and alternatively, the Class Member
9   may waive his or her right not to be separated from his or her child under this Court's
10  preliminary injunction and assert, on behalf of the Class Member's child, any such
11  right under the *Flores* Settlement Agreement for the child to be released from
12  custody or transferred to a "licensed program" pursuant to that Agreement's terms—
13  in which circumstance the child would, consistent with this Court's orders, be
14  separated with the parent's consent. In implementing this release or transfer, the
15  government could transfer the child to HHS custody for placement and to be
16  otherwise treated as an unaccompanied child. *See* 6 U.S.C. 279(g)(2).

17      The Proposed Order provides that in neither circumstance do this Court's
18  orders create a right to release for a parent who is detained in accordance with
19  existing law. If a Class Member is provided these two choices and does not select
20  either one, the Government may maintain the family together in family detention
21  and the Class Member will be deemed to have temporarily waived the child's release
22  rights (including the rights with regard to placement in the least restrictive setting
23  appropriate to the minor's age and special needs, and the right to release or
24  placement in a "licensed program") under the *Flores* Settlement Agreement until the
25  Class Member makes an affirmative, knowing, and voluntary decision as to whether
26  he or she is waiving his or her child's rights under the *Flores* Settlement Agreement.

27
28

18cv428 DMS MDD

1   The parties further agree that the Court's orders in this case, and the *Flores*

2   Settlement Agreement, do not in any way prevent the Government from releasing

3   families from DHS custody.  No waiver by any Class Member of his or her rights

4   under this Court's orders, or waiver by the Class Member of his or her child's rights

5   under the *Flores* Settlement Agreement, shall be construed to waive any other rights

6   of the Class Member or Class Member's child to challenge the legality of his or her

7   detention under any constitutional or legal provisions that may apply.

8   The parties agree a Class Member's waiver under the *Flores* Settlement

9   Agreement or this Court's injunction can be reconsidered after it is made, but

10  disagree about whether there are circumstances when such a waiver cannot be

11  reconsidered.  The parties propose to meet and confer regarding this issue, and

12  provide a joint statement to the Court addressing the results of the meet and confer

13  and, if necessary, providing statements of their respective positions – by 3:00 p.m.

14  on July 20, 2018.

15  DATED: July 13, 2018                    Respectfully submitted,

16

17                                          /s/ Lee Gelernt
                                            Lee Gelernt*
18                                          Judy Rabinovitz*
                                            Anand Balakrishnan*
19                                          AMERICAN CIVIL LIBERTIES UNION
                                            FOUNDATION
20                                          125 Broad St., 18th Floor
21                                          New York, NY 10004
                                            T:  (212) 549-2660
22                                          F:  (212) 549-2654
23                                          *lgelernt@aclu.org*
                                            *jrabinovitz@aclu.org*
24                                          *abalakrishnan@aclu.org*
25

26                                          Bardis Vakili (SBN 247783)
                                            ACLU FOUNDATION OF SAN DIEGO
27                                          & IMPERIAL COUNTIES

28

P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
*bvakili@aclusandiego.org*

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*skang@aclu.org*
*samdur@aclu.org*

*Attorneys for Petitioners-Plaintiffs*
*\*Admitted Pro Hac Vice*


CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Nicole N. Murley*
NICOLE N. MURLEY
Trial Attorney
SARAH B. FABIAN
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

18cv428 DMS MDD

1  (202) 532-4824
2  (202) 616-8962 (facsimile)
   sarah.b.fabian@usdoj.gov
3
4  ADAM L. BRAVERMAN
   United States Attorney
5  SAMUEL W. BETTWY
   Assistant U.S. Attorney
6
7  *Attorneys for Respondents-Defendants*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18cv428 DMS MDD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

                 Petitioners-Plaintiffs,

     vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

                 Respondents-Defendants.

Case No. 18cv428 DMS MDD

**ORDER GRANTING JOINT MOTION
REGARDING SCOPE OF THE
COURT'S PRELIMINARY
INJUNCTION**

Before the Court is the parties' Joint Motion Regarding Scope of the Court's Preliminary Injunction. IT IS HEREBY ORDERED that the Court's preliminary injunction order in this case, or subsequent orders implementing that order, does not limit the Government's authority to detain adults in the Department of Homeland Security's ("DHS") custody. Accordingly, when DHS would detain a Class Member together with his or her child in a facility for detaining families, consistent with its constitutional and legal authorities governing detention of adults and families, but the child may be able to assert rights under the *Flores* Settlement Agreement to be released from custody or transferred to a "licensed program" pursuant to that Agreement's terms, then this Court's preliminary injunction and implementing orders permit the Government to require Class Members to select one of the following two options: First, the Class Member may choose to remain in

DHS custody together with his or her child, subject to any eligibility for release under existing laws and policies, but to waive, on behalf of the child, the assertion of rights under the *Flores* Settlement Agreement to be released, including the rights with regard to placement in the least restrictive setting appropriate to the minor's age and special needs, and the right to release or placement in a "licensed program." By choosing this option, the class member is waiving the child's right under the *Flores* Settlement Agreement to be released, including the rights with regard to placement in the least restrictive setting appropriate to the minor's age and special needs, and the right to release or placement in a "licensed program." Second, and alternatively, the Class Member may waive his or her right not to be separated from his or her child under this Court's preliminary injunction and assert, on behalf of the Class Member's child, any such right under the *Flores* Settlement Agreement for the child to be released from custody or transferred to a "licensed program" pursuant to that Agreement's terms—in which circumstance the child would, consistent with this Court's orders, be separated with the parent's consent. In implementing this release or transfer, the government could transfer the child to HHS custody for placement and to be otherwise treated as an unaccompanied child. *See* 6 U.S.C. 279(g)(2).

In neither circumstance do this Court's orders create a right to release for a parent who is detained in accordance with existing law. If a Class Member is provided these two choices and does not select either one, the Government may maintain the family together in family detention and the Class Member will be deemed to have temporarily waived the child's release rights (including the rights with regard to placement in the least restrictive setting appropriate to the minor's age and special needs, and the right to release or placement in a "licensed program") under the *Flores* Settlement Agreement until the Class Member makes an affirmative, knowing, and voluntary decision as to whether he or she is waiving his or her child's rights under the *Flores* Settlement Agreement.

The parties further agree that the Court's orders in this case, and the *Flores* Settlement Agreement, do not in any way prevent the Government from releasing families from DHS custody. No waiver by any Class Member of his or her rights under this Court's orders, or

waiver by the Class Member of his or her child's rights under the *Flores* Settlement Agreement, shall be construed to waive any other rights of the Class Member or Class Member's child to challenge the legality of his or her detention under any constitutional or legal provisions that may apply.

The parties agree a Class Member's waiver under the *Flores* Settlement Agreement or this Court's injunction can be reconsidered after it is made, but disagree about whether there are circumstances when such a waiver cannot be reconsidered. They are directed to meet and confer regarding this issue, and provide a joint statement to the Court addressing the results of the meet and confer and, if necessary, providing statements of their respective positions – by 3:00 p.m. on July 20, 2018.

Dated:

Hon. Dana M. Sabraw
United States District Judge