The Honorable Marsha J. Pechman

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON

STATE OF WASHINGTON, *et al.*,

            Plaintiffs,

    v.

UNITED STATES OF AMERICA, *et al.*,

            Defendants.

No. 2:18-cv-0939 (MJP)

**Supplement to APPENDIX A (Dkt. 21-1)**

      Defendants, by and through their undersigned counsel, respectfully submit the following Supplement to Defendants' Appendix A, Dkt. 21-1, regarding the status of the *Ms. L.*, *et al. v. ICE*, *et al.*, Case No. 18-cv-0428 (S.D. Cal.) class action. Attached hereto as Exhibits 15-22 of Defendants' Supplement to Appendix A, are additional materials from the *Ms. L.* class action that have been filed since the Defendant filed Appendix A on July 11, 2018, including rigorous and ongoing reporting requirements concerning the government's compliance with the injunction in *Ms. L.*

SUPPLEMENT TO APPENDIX A, DEFENDANTS'
RESPONSE IN OPPOSITION TO PLAINTIFFS; MOTION FOR
EXPEDITED DISCOVERY
CASE NO. 2:18-CV-00939-MJP
*STATE OF WASHINGTON, ET AL. V. UNITED STATES, ET AL.*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

1

**INDEX OF SUPPLEMENT TO APPENDIX A (Dkt. 21-1)**

2

| Exhibit | Title |
|---|---|

3

4

15  Dkt 101, Order Following Status Conference, *Ms. L. v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 10, 2018)

5

6

16  Dkt 105, Joint Motion Regarding Scope of the Court's Preliminary Injunction, *Ms. L. v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 13, 2018)

7

8

17  Dkt 105-1, Order Granting Joint Motion Regarding Scope of the Court's Preliminary Injunction, *Ms. L. v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 13, 2018)

9

10

18  Dkt 107, Status Report Regarding Plan for Compliance, *Ms. L. v. U.S. ICE*, No.18-428 (S.D. Cal.) (July 13, 2018)

11

12

19  Dkt 107-1, Declaration of Chris Meekins, *Ms. L. v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 13, 2018)

13

14

20  Dkt 108, Order Following Status Conference, *Ms. L. v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 13, 2018)

15

16

21  Dkt 109, Notice, *Ms. L. v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 15, 2018)

17

18

22  Dkt 109-1, HHS/DHS Unified Plan of Operations For Reunification of 5-17 Year Old Population to Include Flow Chart and Summary of Required Steps, July 14, 2018, *Ms. L. v. U.S. ICE*, No. 18-428 (S.D. Cal.) (July 15, 2018)

19

20

21

22

23

24

25

26

27

28

SUPPLEMENT TO APPENDIX A, DEFENDANTS'
RESPONSE IN OPPOSITION TO PLAINTIFFS; MOTION FOR
EXPEDITED DISCOVERY
CASE NO. 2:18-cv-00939-MJP
*STATE OF WASHINGTON, ET AL. V. UNITED STATES, ET AL.*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

1    DATED: July 16, 2018                    CHAD A. READLER
2                                            Acting Assistant Attorney General

3                                            WILLIAM C. PEACHEY
4                                            Director

5                                            EREZ REUVENI
                                             Assistant Director
6
7                                            /s/ Nicole N. Murley
                                             NICOLE N. MURLEY
8                                            Trial Attorney
                                             JOSHUA S. PRESS
9                                            Trial Attorney
                                             United States Department of Justice
10                                           Civil Division
                                             Office of Immigration Litigation
11                                           District Court Section
                                             P.O. Box 868, Ben Franklin Station
12                                           Washington, DC 20044
                                             Phone: (202) 616-0473
13                                           Nicole.Murley@usdoj.gov
14
15                                           *Attorneys for the United States of America
                                             and the Federal Defendants*
16

17

18

19

20

21

22

23

24

25

26

27

28

SUPPLEMENT TO APPENDIX A, DEFENDANTS'
RESPONSE IN OPPOSITION TO PLAINTIFFS; MOTION FOR
EXPEDITED DISCOVERY
CASE NO. 2:18-cv-00939-MJP
*STATE OF WASHINGTON, ET AL. V. UNITED STATES, ET AL.*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2018, I electronically transmitted the foregoing document to the Clerk's Office using the U.S. District Court for the Western District of Washington's Electronic Document Filing System (ECF), which will serve a copy of this document upon all counsel of record.

By:  */s/ Nicole N. Murley*
NICOLE N. MURLEY
Trial Attorney
United States Department of Justice
Civil Division

SUPPLEMENT TO APPENDIX A, DEFENDANTS'
RESPONSE IN OPPOSITION TO PLAINTIFFS; MOTION FOR
EXPEDITED DISCOVERY
CASE NO. 2:18-CV-00939-MJP
*STATE OF WASHINGTON, ET AL. V. UNITED STATES, ET AL.*

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, OIL-DCS
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
TELEPHONE: (202) 305-0106
FACSIMILE: (202) 305-700

Exhibit 15

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Ms. L.; et al.,

                             Petitioners-Plaintiffs,

v.

U.S Immigration and Customs
Enforcement ("ICE"); et al.,

                          Respondents-Defendants.

Case No.: 18cv0428 DMS (MDD)

**ORDER FOLLOWING STATUS CONFERENCE**

A status conference was held on July 9, 2018, after which the parties submitted two Joint Status Reports. In the first of those Reports, the parties identified some disagreements about the processes to be followed prior to reunification of Class Members and their children, with a particular eye toward the reunifications of children under age 5 by the court-ordered deadline of July 10, 2018. The second Report provided more detailed information about these parents, *i.e.*, those with children under the age of 5, and set out which of those parents were ineligible for reunification, which parents were ineligible for reunification by the July 10, 2018 deadline, how many parents had already been reunified with their children, which parents were eligible for reunification by the July 10, 2018 deadline, and which parents were eligible for reunification, but not by the July 10, 2018 deadline.

1

A follow-up status conference was held on July 10, 2018, to discuss these issues with counsel. During that conference, the Court explained ICE's past procedure for dealing with parents and children who entered ICE custody together. That procedure was geared toward resolving "any doubt about whether they are parent and child, and second, whether there is information that causes a concern about the welfare [of] the child, such as the adult having a significant criminal history." (Decl. of Mario Ortiz in Supp. of Opp'n to Am. Mot. for Prelim. Inj. ¶¶ 3, ECF No. 46-1.)) If there were no "concerns about the family relationship or welfare of the child, the [parent and child would] be detained at a family residential center or, if appropriate, released to a sponsor or non-governmental organization." (*Id.*) If there were concerns, the child would "be transferred to the U.S. Department of Health and Human Services Office of Refugee Resettlement (ORR) for care and placement consideration." (*Id.*) The Court explained this procedure had been in effect for many years, and had been effective in ensuring the safety and well-being of children processed through ICE custody.

The Court contrasted this procedure with the procedure for vetting sponsors for "unaccompanied minors" under the TVPRA. As explained during the hearing, and in previous orders in this case, the TVPRA was promulgated to address a different situation, namely, what to do with alien children who were apprehended *without their parents* at the border or otherwise. In that situation, the lengthy and intricate vetting process makes sense because arguably the Government is not dealing with a parent, but is instead dealing with perhaps another relative or even a foster-type parent. That detailed vetting process was not meant to apply to the situation presented in this case, which involves parents and children who were apprehended together and then separated by government officials. Rather, it appears ICE had a more streamlined procedure for that situation, as set out above.

Both of these procedures, at their core, aim to promote the best interests of the children who are taken into government custody. This Court also seeks to serve that interest, and has attempted to do so by focusing on the two issues set out in ICE's past procedure: Ensuring the adult is the parent of the accompanied child, and ensuring the

18cv0428 DMS (MDD)

parent does not present a danger to the child's welfare. Both of these concepts are built into the definition of the class certified by the Court, as well as the preliminary injunction. And in the context of this case, both of these concerns can be addressed by a process similar to the one previously used by ICE in dealing with parents and children apprehended together. Accordingly, in this case, the Government need not comply with the onerous policies for vetting child sponsors under the TVPRA prior to reunifying Class Members with their children.[1] Rather, the Government need only comply with the more streamlined procedure set out during the hearing.

As explained therein, that procedure allows for DNA testing of adult and child, but only when necessary to verify a legitimate, good-faith concern about parentage or to meet a reunification deadline. To the extent DNA testing is warranted under those circumstances, it should be completed in accordance with Plaintiffs' proposal in the Joint Status Report at pages 7-8. (*See* ECF No. 96.)

On the dispute surrounding follow-up background checks of parents, the Court agrees with Plaintiffs that those background checks should not delay reunification. Certainly, if the Government has performed a background check on a parent prior to reunification, and that background check indicates the parent may pose a danger to the child, reunification need not occur unless and until those concerns are resolved. However, the Government must have a good faith belief that further background investigation is warranted before delaying reunification on that basis. In general, background investigations of the type contemplated by the TVPRA are not required here, and the Government's inability to complete that type of background investigation prior to a reunification deadline will not be a valid reason for delaying reunification past a court-imposed deadline. Presumably, the Government has performed or will perform a

---

[1] The Court notes the vetting process and procedure set out by the Government here is a matter of ORR policy. The process and procedure are not mandated by statute or regulation.

18cv0428 DMS (MDD)

background check on all parents who could fall within the Class, and those background checks will be completed well in advance of the reunification deadlines, which will obviate the need for any delays on this ground.

The next dispute concerns background checks on other adults in the household where the Class Member and his or her child will reside. As with the preceding issue, these background checks are part of the TVPRA procedures, and they are not necessary here where the child is being reunited with a parent. As Plaintiffs' counsel pointed out during the hearing, the touchstone here is the interest of the parent in making decisions for their child, and presumably the parent has the child's best interest in mind.

The next dispute concerns "sponsor care plans," which is another procedure contemplated by the TVPRA.[2] As with the procedures discussed above, the Court declines to require Class Members to submit these plans prior to or as a condition of reunification with their children.

Next, the parties dispute whether Class Members must sign "sponsor care agreements" and attend legal orientation programs, again both of which are policies contemplated by the TVPRA. Here, as above, Plaintiffs do not object to executing these agreements or attending these orientation programs, provided those procedures do not delay reunification of Class Members and their children. The Court agrees with Plaintiffs, and thus declines to impose these requirements as a condition to reunification.

The final dispute concerns children who may pose a danger to themselves or others. This concern is not applicable to the children under age 5 who are scheduled for reunification today. To the extent this concern is relevant to the older children, the parties may raise that issue in a further status report.

/ / /

/ / /

_____

[2] The parties indicated there was also a dispute about whether Class Members must provide a proof of address. However, Plaintiffs do not object to that requirement.

18cv0428 DMS (MDD)

With these rulings, the Court anticipates the Government will be reuniting fifty-nine (59) Class Members with their children by the end of the day today. This will be in addition to the four (4) parents and children that have already been reunified.

Counsel shall submit a further joint status report to the Court on or before **3:00 p.m. on July 12, 2018**. That report should provide an update on Defendants' compliance with the reunification deadline for children under age 5, and a status on the efforts to reunify the remaining members of the Class with their children over age 5. A further status conference shall be held at **1:00 p.m.** on **July 13, 2018**. The Court has set up a dial in number for counsel and any members of the news media that wish to attend. ***This number is for counsel and media only***, who should follow the steps below to connect to the conference call. Members of the general public may appear in person.

1. Dial the toll free number: **877-873-8018**;

2. Enter the Access Code: **9911153** (Participants will be put on hold until the Court activates the conference call);

3. Enter the Participant Security Code **07130428** and Press # (The security code will be confirmed);

4. Once the Security Code is confirmed, participants will be prompted to Press 1 to join the conference or Press 2 to re-enter the Security Code.

**IT IS SO ORDERED**.

Dated: July 10, 2018

Hon. Dana M. Sabraw
United States District Judge

18cv0428 DMS (MDD)

# Exhibit 16

1  CHAD A. READLER                         Lee Gelernt*
2  Acting Assistant Attorney General       Judy Rabinovitz*
   SCOTT G. STEWART                        Anand Balakrishnan*
3  Deputy Assistant Attorney General       AMERICAN CIVIL LIBERTIES
4  WILLIAM C. PEACHEY                       UNION FOUNDATION
   Director                                125 Broad St., 18th Floor
5  Office of Immigration Litigation        New York, NY 10004
   U.S. Department of Justice              T:  (212) 549-2600
6  WILLIAM C. SILVIS                        F:  (212) 549-2654
7  Assistant Director                      lgelernt@aclu.org
   Office of Immigration Litigation        jrabinovitz@aclu.org
8  SARAH B. FABIAN                          abalakrishnan@aclu.org
9  Senior Litigation Counsel
   NICOLE N. MURLEY                         Bardis Vakili (SBN 247783)
10 Trial Attorney                          ACLU FOUNDATION OF SAN
11 Office of Immigration Litigation        DIEGO & IMPERIAL COUNTIES
   U.S. Department of Justice              P.O. Box 87131
12 Box 868, Ben Franklin Station           San Diego, CA 92138-7131
13 Washington, DC 20442                    T: (619) 398-4485
   Telephone: (202) 532-4824               F: (619) 232-0036
14 Fax: (202) 616-8962                     bvakili@aclusandiego.org
15
16 ADAM L. BRAVERMAN                        Stephen B. Kang (SBN 292280)
   United States Attorney                  Spencer E. Amdur (SBN 320069)
17 SAMUEL W. BETTWY                         AMERICAN CIVIL LIBERTIES
18 Assistant U.S. Attorney                 UNION FOUNDATION
   California Bar No. 94918                 39 Drumm Street
19 Office of the U.S. Attorney             San Francisco, CA 94111
20 880 Front Street, Room 6293             T:  (415) 343-1198
   San Diego, CA 92101-8893                F:  (415) 395-0950
21 619-546-7125                            skang@aclu.org
22 619-546-7751 (fax)                      samdur@aclu.org
23 Attorneys for Federal Respondents-      Attorneys for Petitioners-Plaintiffs
24 Defendants                              *Admitted Pro Hac Vice
25
26
27
28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

          Petitioners-Plaintiffs,

   vs.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,

          Respondents-Defendants.

Case No. 18cv428 DMS MDD

**JOINT MOTION REGARDING SCOPE OF THE COURT'S PRELIMINARY INJUNCTION**

In accordance with the Court's orders and with the Court's July 10, 2018 status conference, the parties respectfully jointly move the Court to enter the attached Order Regarding Scope of the Court's Preliminary Injunction. This Proposed Order addresses compliance with this Court's preliminary injunction. It would provide that the Court's preliminary injunction order in this case, or subsequent orders implementing that order, does not limit the Government's authority to detain adults in the Department of Homeland Security's ("DHS") custody. Accordingly, when DHS would detain a Class Member together with his or her child in a facility for detaining families, consistent with its constitutional and legal authorities governing detention of adults and families, but the child may be able to assert rights under the *Flores* Settlement Agreement to be released from custody or transferred to a "licensed program" pursuant to that Agreement's terms, then this Court's preliminary injunction and implementing orders permit the Government to require Class Members to select one of the following two options: First, the Class Member may choose to remain in DHS custody together with his or her child, subject to any eligibility for release under existing laws and policies, but

to waive, on behalf of the child, the assertion of rights under the *Flores* Settlement Agreement to be released, including the rights with regard to placement in the least restrictive setting appropriate to the minor's age and special needs, and the right to release or placement in a "licensed program." By choosing this option, the class member is waiving the child's right under the *Flores* Settlement Agreement to be released, including the rights with regard to placement in the least restrictive setting appropriate to the minor's age and special needs, and the right to release or placement in a "licensed program." Second, and alternatively, the Class Member may waive his or her right not to be separated from his or her child under this Court's preliminary injunction and assert, on behalf of the Class Member's child, any such right under the *Flores* Settlement Agreement for the child to be released from custody or transferred to a "licensed program" pursuant to that Agreement's terms— in which circumstance the child would, consistent with this Court's orders, be separated with the parent's consent. In implementing this release or transfer, the government could transfer the child to HHS custody for placement and to be otherwise treated as an unaccompanied child. *See* 6 U.S.C. 279(g)(2).

The Proposed Order provides that in neither circumstance do this Court's orders create a right to release for a parent who is detained in accordance with existing law. If a Class Member is provided these two choices and does not select either one, the Government may maintain the family together in family detention and the Class Member will be deemed to have temporarily waived the child's release rights (including the rights with regard to placement in the least restrictive setting appropriate to the minor's age and special needs, and the right to release or placement in a "licensed program") under the *Flores* Settlement Agreement until the Class Member makes an affirmative, knowing, and voluntary decision as to whether he or she is waiving his or her child's rights under the *Flores* Settlement Agreement.

18cv428 DMS MDD

1    The parties further agree that the Court's orders in this case, and the *Flores*

2    Settlement Agreement, do not in any way prevent the Government from releasing

3    families from DHS custody.  No waiver by any Class Member of his or her rights

4    under this Court's orders, or waiver by the Class Member of his or her child's rights

5    under the *Flores* Settlement Agreement, shall be construed to waive any other rights

6    of the Class Member or Class Member's child to challenge the legality of his or her

7    detention under any constitutional or legal provisions that may apply.

8    The parties agree a Class Member's waiver under the *Flores* Settlement

9    Agreement or this Court's injunction can be reconsidered after it is made, but

10   disagree about whether there are circumstances when such a waiver cannot be

11   reconsidered.  The parties propose to meet and confer regarding this issue, and

12   provide a joint statement to the Court addressing the results of the meet and confer

13   and, if necessary, providing statements of their respective positions – by 3:00 p.m.

14   on July 20, 2018.

15   DATED: July 13, 2018                   Respectfully submitted,

16

17                                          /s/ Lee Gelernt
                                            Lee Gelernt*

18                                          Judy Rabinovitz*
                                            Anand Balakrishnan*

19                                          AMERICAN CIVIL LIBERTIES UNION
                                            FOUNDATION

20                                          125 Broad St., 18th Floor

21                                          New York, NY 10004

22                                          T:  (212) 549-2660
                                            F:  (212) 549-2654

23                                          *lgelernt@aclu.org*

24                                          *jrabinovitz@aclu.org*
                                            *abalakrishnan@aclu.org*

25

26                                          Bardis Vakili (SBN 247783)

27                                          ACLU FOUNDATION OF SAN DIEGO
                                            & IMPERIAL COUNTIES

28

1
P.O. Box 87131
2
San Diego, CA 92138-7131
T: (619) 398-4485
3
F: (619) 232-0036
4
*bvakili@aclusandiego.org*

5
Stephen B. Kang (SBN 292280)
6
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES UNION
7
FOUNDATION
8
39 Drumm Street
San Francisco, CA 94111
9
T: (415) 343-1198
F: (415) 395-0950
10
*skang@aclu.org*
11
*samdur@aclu.org*

12
*Attorneys for Petitioners-Plaintiffs*
13
*\*Admitted Pro Hac Vice*

14

15
CHAD A. READLER
Acting Assistant Attorney General
16
SCOTT G. STEWART
17
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
18
Director
19
WILLIAM C. SILVIS
Assistant Director
20

21
*/s/ Nicole N. Murley*
NICOLE N. MURLEY
22
Trial Attorney
23
SARAH B. FABIAN
Senior Litigation Counsel
24
Office of Immigration Litigation
25
Civil Division
U.S. Department of Justice
26
P.O. Box 868, Ben Franklin Station
27
Washington, DC 20044

28

(202) 532-4824
(202) 616-8962 (facsimile)
sarah.b.fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

18cv428 DMS MDD

Exhibit 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

                Petitioners-Plaintiffs,

      vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

               Respondents-Defendants.

Case No. 18cv428 DMS MDD

**ORDER GRANTING JOINT MOTION
REGARDING SCOPE OF THE
COURT'S PRELIMINARY
INJUNCTION**

        Before the Court is the parties' Joint Motion Regarding Scope of the Court's Preliminary Injunction. IT IS HEREBY ORDERED that the Court's preliminary injunction order in this case, or subsequent orders implementing that order, does not limit the Government's authority to detain adults in the Department of Homeland Security's ("DHS") custody. Accordingly, when DHS would detain a Class Member together with his or her child in a facility for detaining families, consistent with its constitutional and legal authorities governing detention of adults and families, but the child may be able to assert rights under the *Flores* Settlement Agreement to be released from custody or transferred to a "licensed program" pursuant to that Agreement's terms, then this Court's preliminary injunction and implementing orders permit the Government to require Class Members to select one of the following two options: First, the Class Member may choose to remain in

1  DHS custody together with his or her child, subject to any eligibility for release under
2  existing laws and policies, but to waive, on behalf of the child, the assertion of rights under
3  the *Flores* Settlement Agreement to be released, including the rights with regard to
4  placement in the least restrictive setting appropriate to the minor's age and special needs,
5  and the right to release or placement in a "licensed program." By choosing this option, the
6  class member is waiving the child's right under the *Flores* Settlement Agreement to be
7  released, including the rights with regard to placement in the least restrictive setting
8  appropriate to the minor's age and special needs, and the right to release or placement in a
9  "licensed program." Second, and alternatively, the Class Member may waive his or her
10 right not to be separated from his or her child under this Court's preliminary injunction and
11 assert, on behalf of the Class Member's child, any such right under the *Flores* Settlement
12 Agreement for the child to be released from custody or transferred to a "licensed program"
13 pursuant to that Agreement's terms—in which circumstance the child would, consistent
14 with this Court's orders, be separated with the parent's consent. In implementing this release
15 or transfer, the government could transfer the child to HHS custody for placement and to be
16 otherwise treated as an unaccompanied child. *See* 6 U.S.C. 279(g)(2).

17 In neither circumstance do this Court's orders create a right to release for a parent
18 who is detained in accordance with existing law. If a Class Member is provided these two
19 choices and does not select either one, the Government may maintain the family together in
20 family detention and the Class Member will be deemed to have temporarily waived the
21 child's release rights (including the rights with regard to placement in the least restrictive
22 setting appropriate to the minor's age and special needs, and the right to release or
23 placement in a "licensed program") under the *Flores* Settlement Agreement until the Class
24 Member makes an affirmative, knowing, and voluntary decision as to whether he or she is
25 waiving his or her child's rights under the *Flores* Settlement Agreement.

26 The parties further agree that the Court's orders in this case, and the *Flores* Settlement
27 Agreement, do not in any way prevent the Government from releasing families from DHS
28 custody. No waiver by any Class Member of his or her rights under this Court's orders, or

1     waiver by the Class Member of his or her child's rights under the *Flores* Settlement

2     Agreement, shall be construed to waive any other rights of the Class Member or Class

3     Member's child to challenge the legality of his or her detention under any constitutional or

4     legal provisions that may apply.

5           The parties agree a Class Member's waiver under the *Flores* Settlement Agreement

6     or this Court's injunction can be reconsidered after it is made, but disagree about whether

7     there are circumstances when such a waiver cannot be reconsidered. They are directed to

8     meet and confer regarding this issue, and provide a joint statement to the Court addressing

9     the results of the meet and confer and, if necessary, providing statements of their respective

10     positions – by 3:00 p.m. on July 20, 2018.

11           Dated:

12

13                                     Hon. Dana M. Sabraw

14                                     United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 18

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

             Petitioners-Plaintiffs,

    vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

             Respondents-Defendants.

Case No. 18cv428 DMS MDD

**STATUS REPORT REGARDING
PLAN FOR COMPLIANCE**

### I. STATUS REPORT

Defendants hereby submit this status report to apprise the Court of their current plan for determining and reunifying the remaining class members with their children, by July 26, 2018, as this Court's orders require. The plan is set forth in the Declaration of Chris Meekins, which is attached as Exhibit A. The agencies are putting their plan into operation immediately.

The agencies designed the plan to achieve full compliance with this Court's orders, *i.e.*, reunification of every remaining class member with their child where this Court's orders require reunification by July 26. Meekins Dec. ¶ 28. Reunifications under the plan should begin today and occur on a rolling basis. *Id.* Unlike the plan put into place for the smaller cohort of children aged 0-4, the current plan for children aged 5-17 does not involve DNA testing or full background investigations of purported class members HHS conducts under the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA). *Id.* ¶ 33. Nor does it

require criminal background checks of other adult members of the household where the class member and the child will live, or the submission of sponsor care plans (which may require background checks of other care givers). *Id.*

While the agencies are committed to complying fully with the Court's orders, as explained in the attached declaration, the Department of Health and Human Services (HHS) is concerned that the truncated procedures needed for compliance present significant risks to child welfare. Meekins Dec. ¶¶ 37-49. As the declaration explains, while most children should be safely reunited with their actual parents by the Court's deadline, the class is large and the agencies must proceed rapidly and without the procedures that HHS would ordinarily use to place a child with a parent safely. *Id.* HHS believes that this creates a material risk that dozens of children may be reunited with individuals who falsely claimed to be their parents or placed into situations that may pose a danger to the child. *Id.*

Indeed, the streamlined procedures that HHS used for the under-five cohort identified several instances in which placement of a toddler or infant with a purported parent was inappropriate. In one case, mandatory DNA testing prompted one putative class member to concede her lack of parentage during testing. Meekins Dec. ¶ 11. Another putative class member had a negative DNA match and conceded that he was not a parent. *Id.* ¶ 10. And in another case, HHS conducted a background check of an adult member of the putative class member's household and

18cv428 DMS MDD

identified that the adult had a warrant for sexually abusing a 10-year-old girl.  *Id.*
¶¶ 14-16.

Defendants believe they are now taking all operationally feasible steps under
the Court's orders to reunify hundreds of class members and children safely.  But
going forward, HHS will not be able to do the same rigorous vetting that has already
prevented the placement of toddlers and infants with adults who were not their
parents or would have endangered them.  Meekins Dec. ¶¶ 37-49.  The Court's
restriction of vetting of putative class members for the 5-and-up cohort will likely
mean that some children in that cohort will be at risk of improper placements.  *Id.*
Given the agencies' reported figures on the size of the 5-and-up cohort
(approximately 2,500 children), the number of placements of children with adults
who are not their parents or who might endanger them could be significant.  *Id.* ¶ 47.
Defendants hope that such risks will not materialize, or do so as rarely as possible,
and the covered families will be reunited safely.

1 | DATED: July 13, 2018        Respectfully submitted,

2

3             CHAD A. READLER
            Acting Assistant Attorney General
            SCOTT G. STEWART

4             Deputy Assistant Attorney General

5             WILLIAM C. PEACHEY
            Director

6             WILLIAM C. SILVIS

7             Assistant Director

8             */s/ Sarah B. Fabian*

9             SARAH B. FABIAN
            Senior Litigation Counsel

10            NICOLE MURLEY

11            Trial Attorney
           Office of Immigration Litigation

12            Civil Division

13            U.S. Department of Justice
           P.O. Box 868, Ben Franklin Station

14            Washington, DC 20044

15            (202) 532-4824
           (202) 616-8962 (facsimile)

16            sarah.b.fabian@usdoj.gov

17

18            ADAM L. BRAVERMAN
           United States Attorney

19            SAMUEL W. BETTWY

20            Assistant U.S. Attorney

21            *Attorneys for Respondents-Defendants*

22

23

24

25

26

27

28

                                4                       18cv428 DMS MDD

Exhibit 19

CHAD A. READLER
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation (OIL)
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director, OIL District Court Section
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

Attorneys for Federal Respondents-Defendants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al., | Case No. 18cv428 DMS MDD |
| Petitioners-Plaintiffs, | |
| vs. | **DECLARATION OF CHRIS MEEKINS** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

I, Chris Meekins, declare under penalty of perjury, pursuant to 28 U.S.C. § 1745, that my testimony below is true and correct.

1.     I am the Deputy Assistant Secretary for Preparedness and Response, and the Chief of Staff for the Office of the Assistant Secretary for Preparedness and Response (ASPR) at the U.S. Department of Health and Human Services (HHS).  ASPR leads HHS' medical and public health preparedness for, response to, and recovery from health emergencies.  ASPR collaborates with federal agencies, state and local governments, healthcare providers, and other stakeholders on responses to such emergencies.

2.     I have been involved directly in the actions which HHS has taken to implement Executive Order (EO) 13841 ("Affording Congress an Opportunity to Address Family Separation") and comply with the orders in *Ms. L., et al., v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 18-cv-428 (S.D.Cal.).  President Trump issued EO 13841 on June 20, 2018, and the Court issued its orders on June 26, 2018.

3.     My testimony is based on my personal knowledge, information acquired by me in the course of my employment, and information supplied by or contained in the records of federal government entities, grantees, or contractors.

## HHS ACTIONS TO REUNIFY CHILDREN UNDER AGE 5

4.     Before the Court issued its order on July 10, 2018, HHS determined class membership—namely, parentage, parental fitness, and child safety—by streamlining its ordinary safety and suitability assessment under the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA).  Those streamlined processes are described in the

declaration executed by Jonathan White on July 5, 2018. They included reviews of summaries of criminal background checks of putative class members furnished by U.S. Immigration and Customs Enforcement (ICE).

5. After the Court issued its order on July 10, 2018, HHS truncated its streamlined processes for determining class membership to align with the Court's instructions on vetting procedures for class members, and to comply with the Court's deadlines for reunifying class members with children under 5.

6. HHS, for example, suspended further efforts to affirmatively verify the parentage of putative class members with children under 5. And while HHS continued reviewing summaries of criminal background checks, HHS generally stopped collecting and analyzing additional background information on class members for the under-5 cohort—as well as background information on those class members' cohabitants— through the completion of family reunification packets. Unless the records available to HHS at the time suggested that parentage was lacking, or that the individual putative class member was unfit or presented a danger to the child, HHS reunified.

7. In their status report dated July 10, 2018, Defendants identified 102 children under age 5 who, upon initial review by HHS, were determined potentially to have been separated from a parent, and who therefore were potentially the children of class

members.  Details about parental class membership, the eligibility of class members for reunification, and completed reunifications for those 102 children are set forth below.[1]

*Ten Putative Class Members Ineligible Due to Criminal History*

8.    HHS found that 10 putative class members—one of whom is the parent of two of the 102 children—had criminal histories that made them unfit or presented a danger to the child.  Specifically:

- One of the adults is wanted in Guatemala for murder.

- One of the adults has a criminal warrant for their arrest in El Salvador, which implicates kidnaping and gang related activity.

- One of the adults has child cruelty and narcotics convictions.

- One of the adults has criminal charges including human smuggling.

- Two of the adults have domestic violence charges.

- One of the adults has an outstanding warrant in Florida for a DUI.

- Three of the adults have other disqualifying criminal histories.

*Seven Putative Class Members Ineligible for Lack of Parentage*

9.    HHS determined that three putative class members were not parents because these individuals stated that they were relatives and not parents of the children.

10.    HHS determined that one putative class member was not a parent through a negative DNA match.  The adult also indicated that he is not the child's parent.

---

[1] Defendants' status report dated July 12, 2013 identified a 103rd child.  The status of that specific child is not addressed here.

11. HHS determined that one putative class member was not a parent because she disclosed during DNA testing that she was not the child's mother.

12. HHS determined that one putative class member had a negative DNA match and is presently ineligible. HHS is still investigating parentage.

13. HHS determined that one putative class member was ineligible for reunification because she presented HHS with a false birth certificate for the child. HHS is still investigating the parentage of the child.

*One Putative Class Member Ineligible Due to Cohabitant's Criminal History*

14. Before the Court issued its order on July 10, 2018, HHS conducted streamlined safety and suitability assessments of putative class members who were released into the interior of the United States by the U.S. Department of Homeland Security (DHS). The assessments included reviews of completed family reunification packets, which sought information on other adults in the household where the putative class member planned to live with the child. The packets required that those cohabitants submit their fingerprints so HHS could run background checks on them.

15. HHS obtained a completed family reunification packet from one of the putative class members in the interior, and conducted background checks on her adult cohabitants. The background check of one cohabitant showed that he has an outstanding warrant from Illinois for aggravated criminal sexual abuse committed against a 10-year-old girl. HHS has since reviewed copies of the police report and court records.

16.    HHS determined that the putative class member presented a danger to the child—and was ineligible for reunification—given her expressed intent for her child to live in the same household as someone with an outstanding warrant for committing aggravated criminal sexual abuse against a 10-year-old girl.

*One Putative Class Member Ineligible Due to Allegations of Abuse*

17.    HHS determined that one putative class member is ineligible because the child made credible allegations of abuse against the putative class member.

*One Putative Class Member Ineligible Due to Communicable Disease*

18.    HHS determined that one putative class member is ineligible (at least for now) because that putative class member is undergoing treatment for a communicable disease in ICE custody.

*Twenty-Two Putative Class Members Could not be Reunified*

19.    Twelve putative class members were deported, 7 were in the custody of the U.S. Marshals Service (two of whom were each a parent of 2 of 102 children), 2 were in state jails, and 1 could not be reunified for other reasons.

*HHS Reunified 8 Class Members in the Interior Using Truncated Vetting*

20.    As of July 10, 2018, an additional 8 class members who had been released into the interior had not submitted information and fingerprints from adult cohabitants. Nor had they submitted a sponsor care plan outlining their ability to provide for the child's welfare and identifying an alternative care giver in the event they were removed from the

18cv428 DMS MDD

country for immigration violations.[2]  The process for affirmatively verifying parentage through either documents or DNA testing was not complete either.

21.    HHS nevertheless complied with the Court's order—and reunified those 8 class members in the interior with their 8 children—because the records available to HHS at the time did not provide HHS with a basis to question the class member's parentage, parental fitness, or child safety.

*HHS Reunified 47 Class Members in ICE Custody Using Truncated Vetting*

22.    HHS used the available results from DNA tests performed before July 10, 2018 to determine the class membership of the remaining 47 adults in ICE custody.  DNA test results were available for only 35 of those 47 adults.  HHS also considered any available documents related to parentage (*e.g.*, birth certificates) when determining class membership.  Documents related to parentage, however, were unavailable for some of the 49 adults when HHS determined class membership.

23.    HHS determined that all 47 adults were class members under the Court's orders.  This included the 35 adults with affirmative verification of parentage through positive DNA test results.  It also included the 12 adults for whom there were no DNA test results, since the records available to HHS at the time did not provide a basis for questioning the adult's assertion of parentage, parental fitness, or child safety.

---

[2] HHS performs background checks on adult care givers or alternate care givers that that are identified in a sponsor care plan.

*HHS Previously Reunified Two Additional Class Members*

24.    HHS reunified a class member with their child immediately prior to removal. HHS also reunified a class member with their child by discharging their child to them.

**HHS' PRIOR ACTIONS TO REUNIFY CHILDREN AGES 5 AND UP**

25.    Before July 10, 2018, HHS took the actions to determine class membership that Jonathan White described in Paragraphs 7 through 29 of his declaration. HHS prioritized class membership determinations for the under-5 cohort.

26.    The Incident Management Team (IMT) for the Secretary's Operation Center (SOC) drove those actions. Specifically, the IMT:

- Directed field teams to interview putative class members in DHS custody, help the putative class members complete family reunification packets, and conduct sponsor assessments;

- Consolidated and analyzed background check and child safety information gathered from ICE, putative class members, and other sources;

- Ordered and compiled results of DNA tests to confirm parentage;

- Worked with ICE and ORR to coordinate movements of class members and children around the country for physical reunification; and

- Developed and implemented an operational plan for the physical reunification of families, considering logistical and child safety issues.

Again, the IMT's primary focus was on the under-5 cohort.

27.    The field teams worked with putative class members for both cohorts daily. Each field team had a geographic focus based on specific DHS detention sites. The IMT provided a daily list of putative class members for the under-5 cohort to each field team.

18cv428 DMS MDD

If the field team completed its work on that list, then they shifted to performing similar work with the 5-and-up cohort for the balance of the day. Consequently, as of July 10, 2018, the IMT had received from the field teams approximately 471 completed family reunification applications, approximately 203 letters of designation,[3] approximately 243 sponsor declarations, and approximately 521 sponsor assessments for putative class members for the 5-and-up cohort.

28. As of July 10, 2018, the IMT had received summaries of criminal background checks for approximately 2,300 putative class members from ICE. HHS has completed its preliminary review of those ICE summaries and is now conducting further vetting based on concerns that surfaced during the review.

29. As of July 10, 2018, HHS had reviewed the case management records for all children in the 5-and-up cohort. The information in those records bears on class membership. Because the records change daily, the review is continuous.

30. Since the Court issued its order on July 10, 2018, HHS has stopped DNA testing of putative class members notwithstanding the value of DNA testing as an objective tool for verifying biological parentage.

31. While the Court's order would apparently allow for DNA testing of at least some putative class members, my opinion is that the use of DNA testing to verify parentage for the 5-and-up cohort is not practicable. As Jonathan White indicated in his

---

[3] A letter of designation is one in which a parent designates another adult to care for their child.

8                                                    18cv428 DMS MDD

1  declaration, the lead time required to complete DNA testing in a single case may be

2  between five and seven days. This assumes that the locations of both the putative class

3

4  member and the child are static, and that the appropriate agency personnel or contractors

5  can be physically present to swab them. Those assumptions are not reasonable under the

6  present circumstances because, as explained below, HHS and DHS must move hundreds

7

8  of class members and children towards the same physical locations for reunification each

9  day. The logistics of obtaining cheek swabs—and the time required to receive and assess

10  each DNA test result, and take any additional steps necessary to determine legal parentage

11

12  following a negative DNA test result—are not compatible operationally with daily, rolling

13  reunifications of hundreds of class members. The use of widespread DNA testing for the

14  5-and-up cohort would likely increase the risks of operational failure, and likely prevent

15

16  the agencies from complying fully with the Court's reunification deadline. My tentative

17  estimate is that widespread DNA testing for the 5-and-up cohort would stretch the time

18  required to comply by months (not just days or weeks).

19

20  32.    HHS policy has been to not charge class members or putative class members

21  for DNA testing. HHS has instructed its laboratory services vendor to not charge class

22  members or putative class members for DNA testing.

23

24  33.    Since July 10, 2018, HHS has also suspended further mandatory document

25  collection from putative class members (*e.g.*, document collection for family reunification

26  packets), as review of these records is incompatible with the Court's instructions or

27  deadlines for reunification.

28

**HHS AND DHS' CURRENT REUNIFICATION PLAN**

34.    Since the Court issued its order on July 10, 2018 and truncated the vetting process for putative class members, HHS and DHS have amended their plan to complete reunifications of the remaining class members on or before the Court's deadline of July 26, 2018.  They have started operationalizing that amended plan today.

35.    The crux of the amended plan is:

- ICE identifies between six to eight locations for reunification.

- HHS conducts truncated vetting of the putative class members consistent with the Court's order.  As HHS confirms putative class membership, HHS creates and continually updates a list of putative class members for ICE.

- If necessary, ICE moves the putative class members to those locations for reunification.

- HHS field teams conduct further interviews of the putative class members at ICE locations to complete the truncated vetting process for class membership.

- HHS anticipates that interviews will last approximately 15 minutes.  During interviews, HHS seeks verbal confirmation from the putative class member of parentage as well as the desire to reunify with the child.

- Once the HHS field team confirms class membership under the truncated vetting process and based on the available records, the HHS IMT executes a logistical plan to move the class member's child to the same location as the parent within 24-48 hours.

- When the child arrives at the ICE location, HHS transfers custody and jurisdiction over the child to ICE, which completes the reunification.

36.    The truncated vetting of putative class members consists of two basic checks.  First, HHS confirms that the putative class member has no disqualifying criminal history based on the ICE summaries and any other available information.  Second, HHS reviews

18cv428 DMS MDD

the available records to confirm that they raise no questions regarding parentage, parental fitness, or child safety. The available records for a putative class member will typically consist of the case management records for the child (which are kept on the online portal maintained by the Office of Refugee Resettlement (ORR)), plus any records collected by the IMT or the HHS field teams on or before July 10, 2018, plus any records provided by the class member voluntarily.

37. If truncated vetting raises concerns regarding parentage, parental fitness, or child safety, then HHS conducts further assessment within the parameters of the Court's orders to determine class membership.

38. If truncated vetting triggers the home study requirement under 8 U.S.C. § 1232(c)(3)(B), then HHS conducts a home study.

39. Consistent with the Court's orders, truncated vetting will **_not_** include:

- Affirmative verification of parentage, unless available records suggest that the putative class member's documentation or representation of parentage is inaccurate or fraudulent based on a time-limited review;

- DNA testing;

- Full background investigations of putative class members under the TVPRA (including the completion of family reunification packets);

- Background investigations of potential adult cohabitants;

- Review of sponsor care plans, or background investigations of any alternative care givers who might ordinarily be identified in such plans; or

- Further mandatory collection and review of documents or information from putative class members or their relatives or home countries.

40.     Once the current plan is fully operationalized, HHS will seek to move up to approximately 200 children per day for reunification with class members.

41.     HHS and DHS expect to modify the current plan as appropriate based on operational considerations and any instructions from the Court.

42.     My opinion is that the current plan is the best available option for completing reunifications in compliance with the truncated vetting and deadlines required by the Court.  In many cases, reunification under the Court's orders will be swift, but it does involve increased risks to child welfare.  Those risks are detailed below.

### INCREASED RISKS TO CHILD WELFARE

43.     My opinion is that complying with the Court's orders involves increased risks to child welfare in at least four respects.  First, there is an increased risk that HHS will place a child with someone who falsely claimed to be a parent but is not (and could be a single adult bundled with the child by a human smuggler or trafficker).  Second, there is an increased risk that HHS will place a child with a parent who has no disqualifying criminal history but nevertheless presents a danger to the child.  Third, there is an increased risk that HHS will place a child with a parent who resides with a cohabitant who presents a danger to the child.  Fourth, there is an increased risk that HHS will place a child with a parent who may rely on alternative care givers who are abusive.

*Increased Risk of Placement with Adults who are not Parents*

44.     The risk of placing children with adults who are not parents is material under the Court's orders because HHS will generally have to accept representations of parentage

18cv428 DMS MDD

by putative class members at face value.  Only if the available records raise questions about parentage will HHS be able to probe those representations.  And even then, resolution of parentage through an adequate review of documentation or DNA testing will be operationally impracticable in most, if not all cases.

45.  The Court suggested in its Order that HHS may rely on parentage assessments conducted by ICE during the intake process.  While it is true that ICE assesses aliens for parentage, the vast majority of the class members were separated from children at the border and sent directly to HHS by U.S. Customs and Border Protection (CBP).  To my knowledge, CBP does not have a process for assessing parentage in the same way that HHS or even ICE does.  When CBP processes a group of aliens holding themselves out as a family unit, absent some indication that the representation is false, CBP typically notes that representation in its file, which then flows into the ORR case management record for the child.  If CBP has a reason to question parentage at the time of separation, then it might note that question in the file.

46.  The review of home country documents (*e.g.*, birth certificates) is not a viable method for quickly resolving parentage questions for hundreds of putative class members and children.  This is because very few putative class members cross the border with documents.  And the consulates of their home countries have only limited capacity to collect and provide documents relevant to parentage.  Obtaining such documentation through consulates is a process that typically takes months—not days—for a single alien.  And even then, the documentation obtained through consulates is often sparse.  My

opinion is that it is not practicable to resolve parentage questions for large numbers of putative class members through a review of home country documents.

47. As discussed previously, it is likewise impracticable to quickly resolve parentage questions for large numbers of putative class members through DNA testing.

48. My opinion is that if HHS had applied truncated vetting of parentage to the entire under-5 cohort, HHS likely would have placed up to 7 of 102 children (6.86%) with adults who were not their parents. If that ratio holds true for the 5-and-up cohort—which encompasses approximately 2,551 putative class members—then truncated vetting for class membership would result in HHS placing up to approximately 175 children with adults who are not their parents in the next 13 days.

### *Increased Risk of Placement with an Abusive Parent*

49. The experience of HHS is that information gathered about a parent during safety and suitability assessments under the TVPRA sometimes reveals abusive conduct that disqualifies the parent from serving as a sponsor for their child. This occurs even if the parent has no disqualifying history in a criminal background check.

50. Before July 10, 2018, HHS did not identify indicia of abuse in the information that it was able to gather directly from putative class members in the under-5 cohort with no disqualifying criminal history.

51. Nevertheless, my opinion is that the Court's necessary truncating of the vetting process for class membership—including the suspension of critical information-

18cv428 DMS MDD

gathering through mandatory completion of family reunification packets—materially increases the risk that HHS will reunify a child with a parent who will abuse them.

### *Increased Risk of Placement with an Abusive Cohabitant*

52.     As previously discussed, HHS investigated the cohabitants of a putative class member, and learned that one of them had an outstanding warrant for sexually abusing a 10-year old girl.  HHS would not have discovered the danger presented by that cohabitant under the Court's truncated vetting process for class membership because HHS could not have required the completion of the family reunification packet, much less conducted background investigations of the putative class member's cohabitants.

53.     While this case represented approximately 1% of the under-5 cohort, it nevertheless raises significant concerns about the risks of placing children in the 5-and-up cohort into households with dangerous adult cohabitants within the next 13 days.

### *Increased Risk of Harm Due to Parental Limitations or Abusive Care Givers*

54.     The experience of HHS is that information gathered about parents and alternative care givers through sponsor care plans under the TVPRA sometimes reveals materials risks of harm to children.  Those risks include the lack of an alternative care giver in the instance the parent is removed from the country (and voluntarily, knowingly, and affirmatively declines to be removed with their child), and the involvement of an alternative care giver who has a disqualifying criminal history or is otherwise dangerous.

55.     My opinion is that the Court's truncating of the vetting process for class membership—including the elimination of the critical requirement for sponsor care plans—materially increases the risk of harm to children.

***

56.     I recognize that the likely result of implementing the Court's order through the current inter-departmental reunification plan will be faster reunifications of a significant number of children with their parents.  At the same time, however, that process will likely result in the placing of children with adults who falsely claimed to be their parents or into potentially abusive environments. While I am fully committed to complying with this Court's order, I do not believe that the placing of children into such situations is consistent with the mission of HHS or my core values.


This 13th day of July, 2018.


Christopher Meekins

16                                                    18cv428 DMS MDD

Exhibit 20

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Ms. L.; et al.,

                   Petitioners-Plaintiffs,

v.

U.S Immigration and Customs
Enforcement ("ICE"); et al.,

                 Respondents-Defendants.

Case No.:  18cv0428 DMS (MDD)

**ORDER FOLLOWING STATUS CONFERENCE**

     Over two weeks ago, this Court certified for class treatment Plaintiffs' claim that their due process rights to family integrity had been violated as a result of Defendants' policy and practice of separating families apprehended at or between ports of entry, and placing minor children who were separated from their parents in government facilities for "unaccompanied minors" run by the Department of Health and Human Services ("HHS"). The Court also issued a preliminary injunction ordering Defendants to reunify all Class Members with their minor children under the age of five by July 10, 2018, and to reunify all Class Members with their minor children age five and over by July 26, 2018.  In the class certification order, the Court was mindful of the safety of the children—stating it to be a paramount consideration—in limiting the Class to "adult parents," and carving out of the Class "migrant parents with criminal history or communicable disease" and parents

who were "unfit or present[ed] a danger to the child." The Court reiterated these concerns in its preliminary injunction by creating exceptions to reunification for parents who are "unfit or present[ ] a danger to the child."

In a filing late this afternoon and after the in-court status conference, Defendants called into question this Court's concern for the safety, welfare and well-being of the children Defendants separated from their parents, and who are now being reunited with their parents pursuant to this Court's injunction. Christopher Meekins, the Deputy Assistant Secretary for Preparedness and Response, and the Chief of Staff for the Office of the Assistant Secretary for Preparedness and Response at HHS, states, "While I am fully committed to complying with this Court's order, I do not believe that the placing of children into such situations is consistent with the mission of HHS or my core values." (Decl. of Christopher Meekins in Supp. of Status Report ("Meekins Decl.") ¶ 56, ECF No. 107-1.) It is clear from Mr. Meekins's Declaration that HHS either does not understand the Court's orders or is acting in defiance of them. At a minimum, it appears he is attempting to provide cover to Defendants for their own conduct in the practice of family separation, and the lack of foresight and infrastructure necessary to remedy the harms caused by that practice.

Following the July 10 status conference, the Court issued an order setting out ICE's previous procedures—which had apparently been in place for years—for dealing with parents and children who entered ICE custody together. Those government procedures, which the Court noted appeared to have been successful in ensuring child safety and welfare, involved ICE personnel (1) resolving "any doubt about whether they are parent and child," and (2) investigating "whether there is information that causes a concern about the welfare [of] the child, such as the adult having a significant criminal history." (Decl. of Mario Ortiz in Supp. of Opp'n to Am. Mot. for Prelim. Inj. ¶¶ 3, ECF No. 46-1.) If there were no "concerns about the family relationship or welfare of the child, the [parent and child would] be detained at a family residential center or, if appropriate, released to a sponsor or non-governmental organization." (*Id.*) If there were concerns, the child would "be transferred to the U.S. Department of Health and Human Services Office of Refugee

Resettlement (ORR) for care and placement consideration." (*Id.*) It was the Court's intent that the reunification of Class Members and their children would proceed along these lines, lines the Government itself had used prior to the implementation of the recent family separation policy.

Because the facts of this case presented a situation wholly different from those underlying the Trafficking Victims Protection and Reauthorization Act, Pub. L. No. 110-457 (Dec. 23, 2008), the Court found Defendants did not have to go through all of ORR's policies and procedures prior to reunifying Class Members and their children. Indeed, it appears HHS, on its own, had modified those procedures prior to the Court's July 10, 2018 Order. (*See* Decl. of Jonathan White in Supp. of Notice of Compliance ¶ 13, ECF No. 86-1) ("HHS has modified and expedited its ordinary process so that it can determine class membership using the Court's criteria and, to the extent possible, reunify class members and their children within the Court's deadlines.") The Court's July 10, 2018 Order allowed for further modification of those procedures to ensure the safe reunification of Class Members and their children by the court-imposed deadline, but it did not go as far as HHS has apparently taken it.

For instance, and despite Defendants' joint statement that reunification had occurred after "careful vetting procedures[,]" Press Release, U.S. Department of Homeland Security, Trump Administration Completes Reunification for Eligible Children Under Age 5 (July 12, 2018), Mr. Meekins states HHS has "suspended further efforts to affirmatively verify the parentage of putative class members with children under 5." (Meekins Decl. ¶ 6.) He also states "HHS has stopped DNA testing of putative class members notwithstanding the value of DNA testing as an objective tool for verifying biological parentage." (*Id.* ¶ 30.) Both of these statements are categorically inconsistent with the Court's oral and written rulings, which explicitly require Defendants to make parentage determinations prior to reunification, and to use DNA testing, if necessary, to make those determinations. Other statements in Mr. Meekins's Declaration are also categorically inconsistent with this Court's rulings requiring Defendants to make determinations about parental fitness and

18cv0428 DMS (MDD)

danger to the child prior to reunification. Unfortunately, HHS appears to be operating in a vacuum, entirely divorced from the undisputed circumstances of this case: family separation by Defendants, this Court's order finding a likelihood of success on Plaintiffs' due process claim, the President of the United States declaring the Government is in favor of maintaining family unity, and the joint statement of three Cabinet Secretaries that they are in full compliance with the Court's orders and are acting in good faith and will continue to do so. Press Release, U.S. Department of Homeland Security, Trump Administration Completes Reunification for Eligible Children Under Age 5 (July 12, 2018). Mr. Meekins's Declaration is entirely inconsistent with explicit pronouncements from the highest levels of the Government and this Court's orders.

To be clear, determinations of parentage, fitness and danger must be made before any Class Members are reunited with their children. All of these determinations are incorporated in the class definition and the preliminary injunction, and until Mr. Meekins's Declaration was filed, it appeared the parties were in agreement that these determinations were necessary prior to any reunifications of Class Members and their children. Mr. Meekins's Declaration casts doubt on what the Court believed was a mutual understanding, and calls into question the Court's previous statements that Defendants are acting in good faith in their attempts to reunify Class Members by the currently imposed deadlines.

As the Court stated in the 5:30 p.m. telephonic status conference with counsel held after the submission of Mr. Meekins's Declaration—safe and timely reunification of Class Members and their children can, and will, be done by the Court's deadline. There is no reason why one of these goals must be sacrificed for the other given the vast amount of resources available to the federal government. The task is laborious, but can be accomplished in the time and manner prescribed. Defendants were substantially compliant with reunifying parents with children under age five, and the Court fully expects Defendants will be compliant with reunifying Class Members and their minor children age five and over, notwithstanding Mr. Meekins's Declaration.

/ / /

Accordingly, IT IS HEREBY ORDERED:

1.      The parties shall continue to meet and confer on the possibility of reunification for (1) the parents of children under age 5 that Defendants excluded from the Class and (2) Class Members who are not currently eligible for reunification with their children under age 5.

2.      On or before **July 13, 2018**, Defendants shall provide to Plaintiffs and the Court a list of all Class Members currently in ICE custody, and a list of all children in ORR custody currently subject to reunification with Class Members.

3.      On or before **9:00 a.m.** on **July 16, 2018**, Defendants shall provide to Plaintiffs and the Court the names, A-file numbers and locations of all Class Members and children on the July 13, 2018 lists, and for the children, Defendants shall also provide the age of each child.

4.      Absent a showing of good cause, Defendants shall complete their parentage determinations for Class Members in ICE custody, to include DNA testing, if necessary, on or before **July 19, 2018**. Defendant shall also provide to Plaintiffs and the Court a list of parents in ICE custody who are ineligible for reunification.

5.      For all reunifications that occur pursuant to the Court's order, Defendants shall provide Plaintiffs with 12 hours notice of each reunification.

6.      A further status conference will be held on **July 16, 2018**, **at 9:30 a.m.** As discussed during the evening status conference on **July 13, 2018**, Defendants shall have a representative from HHS personally appear at this conference.

7.      The parties shall submit a further status report on or before **3:00 p.m.** on **July 19, 2018**. A further status conference shall be held on **July 20, 2018**, at **1:30 p.m.**

8.      The parties shall submit a further status report on or before **3:00 p.m.** on **July 23, 2018**, and further status conference shall be held on **July 24, 2018**, at **4:00 p.m.**

9.      The parties shall submit a final status report on or before **3:00 p.m.** on **July 26, 2018**, and a further status conference shall be held on **July 27, 2018**, at **1:30 p.m.**

18cv0428 DMS (MDD)

10.     The dial in number for counsel and any members of the news media that wish to attend the July 16, 2018 status conference is as follows:

    1.     Dial the toll free number: **877-873-8018**;

    2.     Enter the Access Code: **9911153** (Participants will be put on hold until the Court activates the conference call);

    3.     Enter the Participant Security Code **07160428** and Press # (The security code will be confirmed);

    4.     Once the Security Code is confirmed, participants will be prompted to Press 1 to join the conference or Press 2 to re-enter the Security Code.

Members of the general public may appear in person.

    **IT IS SO ORDERED**.

Dated:  July 13, 2018

Hon. Dana M. Sabraw
United States District Judge

6

18cv0428 DMS (MDD)

Exhibit 21

1   CHAD A. READLER
2   Acting Assistant Attorney General
    SCOTT G. STEWART
3   Deputy Assistant Attorney General
4   WILLIAM C. PEACHEY
    Director
5   Office of Immigration Litigation
    U.S. Department of Justice
6   WILLIAM C. SILVIS
7   Assistant Director
    Office of Immigration Litigation
8   SARAH B. FABIAN
9   Senior Litigation Counsel
    NICOLE MURLEY
10   Trial Attorney
11   Office of Immigration Litigation
    U.S. Department of Justice
12   Box 868, Ben Franklin Station
13   Washington, DC 20442
    Telephone: (202) 532-4824
14   Fax: (202) 616-8962
15
    ADAM L. BRAVERMAN
16   United States Attorney
17   SAMUEL W. BETTWY
    Assistant U.S. Attorney
18   California Bar No. 94918
19   Office of the U.S. Attorney
    880 Front Street, Room 6293
20   San Diego, CA 92101-8893
21   619-546-7125
22   619-546-7751 (fax)

23   *Attorneys for Federal Respondents-Defendants*

24

25

26

27

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MS. L, et al.,

         Petitioners-Plaintiffs,

    vs.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

         Respondents-Defendants.

Case No. 18cv428 DMS MDD

**NOTICE**

      Defendants hereby submit this notice in response to the Court's order of July 13, 2018, including its modifications to the June 26, 2018, order. Defendants are devoting extraordinary resources to comply fully with this Court's orders, and to do so in good faith. Through this extraordinary effort, HHS was able to substantially comply with this Court's July 12, 2018, deadline with respect to children aged four and under. See July 13 Order at 4. HHS is also committed to meeting the Court's July 26, 2018, deadline for the children who are aged five and over. In response to the Court's concerns, set forth below is a clarification of some points of potential confusion about how the reunification plan works. A plan document itself ("Plan") is attached. Under the reunification plan, and consistent with the Court's orders, Defendants will not reunify a child without first making "determinations of parentage, fitness and danger." *Id.*

      In particular, under the plan, the Department of Health and Human Services (HHS) makes determinations of parentage based on information that goes beyond

what U.S. Immigration and Customs Enforcement (ICE) or U.S. Customs and Border Protection (CBP) would typically have available to them. First, unlike a typical alien child in HHS custody who arrives alone, here there is preexisting evidence of parentage: The adult arrived at the border and presented as a family, with the child; the putative parent said they were a family; and CBP treated them as a family unit. See Meekins Dec. ¶ 45.

Second, the children have now been in the care of HHS Office of Refugee Resettlement (ORR) for several weeks. While CBP and ICE are tasked with enforcing the immigration laws, 8 U.S.C. 1103(a); 6 U.S.C. 211(c)(8), 251, ORR's mission is to protect children, including unaccompanied alien children in its care, 6 U.S.C. 279(b); 8 U.S.C. 1232(c)(1). The personnel at ORR shelters have had many opportunities, over a considerable span of time, to interact with the children and make notes in their files, including of risks of smuggling or abuse. See Meekins Dec. ¶ 36.

Third, by definition, this cohort of children is older (aged 5 and over), and thus can communicate. A child thus could potentially tell ORR staff, for example, that the adult who they arrived with is not their parent but an adult they were bundled or trafficked with, without the adult standing right there. Finally, the file may also include documentation voluntarily provided by the adult or plaintiff's counsel. See Meekins Dec. ¶ 36.

Under the plan, HHS reviews the files for each child—including all the information mentioned above—before proceeding with reunification. See Plan at 2; Meekins Dec. ¶ 36. HHS believes that in the large majority of cases, there will be no such indicia of trafficking in the records, and the constellation of evidence above will support the adult's assertion of parentage. See Plan at 2; Meekins Dec. ¶¶ 36-37. If so, HHS will determine that the adult is a parent, thus proceeding with the swift reunification plan. *Id*. Finally, HHS also conducts a final 15-minute interview of the parent at the ICE facility, which can provide further confirmation of that determination. See Plan at 3; Meekins Dec. ¶ 35. Absent a red flag, HHS will then transfer the child to ICE custody, completing the reunification. *Id.* But if the interview raises a red flag (or if a red flag caused HHS not to proceed to the interview in the first place) then, consistent with the order, reunification will not be completed and instead HHS undertakes additional scrutiny. See Plan at 2-3; Meekins Dec. ¶ 37. HHS thus will reunify families if and only if HHS has made a determination of parentage. See Plan at 1; Meekins Dec. ¶ 42.

This plan does not include, however, "affirmative verif[ication]" of parentage for each adult in the manner HHS does in its ordinary operations under the TVPRA. Meekins Decl. ¶ 39. Affirmative verification is different from the determination described above. In its ordinary operations, HHS affirmatively verifies parentage using documentary evidence (*e.g.*, birth certificates), which are typically obtained

through consular channels. *Id.* ¶ 46. That process can take months, and thus much too long to comply with the Court's reunification deadline. *Id.* HHS may also use DNA testing to affirmatively verify that an adult is a biological parent, as it did with the four-and-under cohort. See *id.* ¶ 23. (A negative DNA test, however, does not conclusively disprove legal parentage, but instead triggers further inquiry.) HHS views those processes as allowing for conclusive verification that an adult is a parent, without relying on other evidence, at the highest degree of accuracy. See *id.* ¶¶ 44-48**.** But DNA testing of all or virtually all the remaining parents and children here would be inconsistent with the Court's orders, see July 10 Order at 3, and HHS estimates it would "stretch the time required to comply by months," Meekins Dec. ¶ 31. HHS thus has instead determined that it need not perform DNA testing when it can make a determination of parentage based on the significant information described above. See Plan at 1-3.

   As Defendants have explained in prior filings, there is an unavoidable difference between the accuracy of using HHS's ordinary processes for affirmatively verifying parentage in the absence of other information for every adult, and the accuracy of determining that an adult is a parent based on the information available via this process. See Meekins Dec. ¶¶ 43-48. Those concerns remain, as do risks associated with that difference. See *id.* But Defendants have been striving to comply with the Court's orders in good faith, and the plan indeed requires HHS to make a

18cv428 DMS MDD

determination of parentage, based on the information available to it, before reunifying families within the deadlines.

This Court's order of July 13, 2018, imposes two new requirements, however: (1) that, absent a showing of good cause, Defendants shall complete the determination of parentage by a new, earlier deadline (July 19, 2018), to include DNA testing, if necessary; and (2) that Defendants shall provide Plaintiffs with 12 hours' notice of each reunification. July 13 Order at 5. In response to that order, Defendants have already added to the plan the use of DNA testing as a method for resolving red flags about parentage. See Plan at 3. Defendants are currently considering what additional modifications they need to make to the plan to comply with the Court's new requirements, as well as its prior deadlines and orders, and whether Defendants will seek further clarification or partial relief. We will also seek guidance from the Court to ensure that the current plan is consistent with the Court's orders.

18cv428 DMS MDD

1  DATED: July 15, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
sarah.b.fabian@usdoj.gov

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney

*Attorneys for Respondents-Defendants*

18cv428 DMS MDD

# Exhibit 22

# HHS/DHS UNIFIED PLAN OF OPERATIONS

### FOR REUNIFICATION OF 5-17 YEAR OLD POPULATION TO INCLUDE FLOW CHART AND SUMMARY OF REQUIRED STEPS

### 14 JULY 2018

## OPERATIONAL SCOPE:

1. Swift reunification of adults and children from age group 5-17 subsequent to separation, after determination of parentage, fitness, and danger.

2. There will be a total of eight ICE locations that will operate for as long as necessary to effect efficient reunification of children with parents. There will be a population of no more than 50 (estimated) children that will require transport to locations outside of the three ICE AORs for individual reunification. This will be coordinated with the HHS IMT and the ICE LNOs on site at HHS.

## LOGISTICS AND POTENTIAL LIMITING FACTORS:

1. Strict coordination and adherence to agreed upon planning and operational factors by all involved.

2. The requirement for HHS to transfer and ICE to receive high volumes of children at pre-designated sites. EXTENDED HOURS OF OPERATIONS OR 24/7 OPERATIONAL PERIODS MAY BE REQUIRED, AS INDICATED.

3. ICE will incur all costs for the transportation of the adult population and HHS will incur the cost of moving the child (to pre-designated location). ICE will transport the reunited families, adults and minors as necessary, following reunification.

# HHS/DHS UNIFIED PLAN OF OPERATIONS

### FOR REUNIFICATION OF 5-17 YEAR OLD POPULATION TO INCLUDE FLOW CHART AND SUMMARY OF REQUIRED STEPS

### 14 JULY 2018 (Page 2)

**OPERATIONAL REQUIREMENTS AND PLANNING EFFORTS:**

A. **ICE will provide NCIC background information. ORR to review and assess for criminal concerns.  ICE will provide additional category of "convicted" vs. "charged" for the adult population identified with concerns from the NCIC review (step 1 in the process flow).  ICE will be responsive to all requests for additional information to expedite "clearance" or "removal" of adult from the certification list for reunification.**

B. *ORR to review case file to identify any pertinent "red flags",  eg: the child was not accompanied by a parent, was smuggled, or would otherwise be subject to safety/security concerns.  **Home studies are performed only in the following cases:***

   (1)   **a child who is a victim of a severe form of trafficking in persons;**

   (2)   **a special needs child with a disability;**

   (3)   **a child who has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened; or**

   (4)   **or a child whose proposed sponsor clearly presents a risk of abuse, maltreatment, exploitation, or trafficking to the child based on all available objective evidence.**

C. **If red flags, ORR will undertake further review and action as appropriate.  If ORR finds no red flags, proceed towards reunification on track below.**

D. **ORR will create and publish daily updated lists of "request to interview" (RTI) adults for reunification.**

E. **ICE Field Offices will review the A#'s submitted by ORR using EARM and flag if any adults have an executable Final Order.**

F. **ICE will notify HHS/ORR/SOC immediately if the adult elects to be removed without the child (and all supporting paperwork MUST be forwarded to HHS/ORR/SOC or be made immediately available through electronic links between HHS and ICE.**

G. **ICE to move selected adult population to identified sites for Field Team Interview (there will be a few isolated individuals outside of the three selected ICE AORs who are currently closer to their minor child in ORR care).**

## HHS/DHS UNIFIED PLAN OF OPERATIONS

### FOR REUNIFICATION OF 5-17 YEAR OLD POPULATION TO INCLUDE FLOW CHART AND SUMMARY OF REQUIRED STEPS

### 14 JULY 2018 (Page 3)

H. ICE will NOT transfer any pending adults for reunification outside or away from the three ICE AORs.  ICE will transfer all non-executable Final Orders and litigation pending cases (except PHO, ELP, SNA, to SNA AOR – *but will not do so, as stated above, if children are already in the same AOR as the adult.*

I. HHS contractor to perform intake of adult (15 min interview).

J. If HHS contractor finds red flags, undertake further review and action as appropriate.  If HHS contractor finds no red flags, complete reunification as below.

K. ICE will support HHS/ORR authorized personnel at reunification sites for parental screening procedures.

L. Contractor to notify IMT of "green" status of adult population (from list) and IMT to execute logistical plan for child to move to designated location within 06-48 hours of notification of final clearance.

M. ICE will conduct final check and confirm "greenlight" on reunification (with ORR).

N. Child is transported to designated location.

O. Paperwork exchange, transfer of responsibility between agencies and reunification occurs.

P. ICE to coordinate with MVM to dispatch reunited family to a pre-identified NGO release location. To request assistance through this program, email the MVM Command Center at **mvmcommandcenter@mvminc.com**.  Also copy Supervisory Detention and Deportation Officer Roberto R. Salazar, at **Roberto.R.Salazar@ice.dhs.gov**.  MVM may also be contacted via phone at (956) 621-7920

## PLEASE SEE FLOW CHART ON THE FOLLOWING PAGE

UAC Reunification Process
UAC Population 5-17 years old
NCIC Check/ICE A # Categorization of Conviction
Conducted Concurrently
Red Flags?
YES
A# & Name to ICE for determination of conviction
ICE Review of conviction w/determination of proceedings
NO
ORR Case Manager Review (Significant child safety concern or indications of non parentage)
Cleared by ICE?
NO
Red Flags?
YES
DNA Test for Adult and Child
DNA Match?
NO
NO
YES
ACLU & ICE receives request for interview (RFI) from HHS. ICE returns executable Final Order list allowing interviews
ORR performs statutory requirements and determination
ICE notifies ORR/SOC if parent elects to not be removed w/child and update list
Sponsorship Verification @ ICE Designated Locations Reunification Decision
YES
Cleared by ORR?
NO
Red Flags?
YES
Parent available?
NO
NO
YES
ICE identifies and hold adults w/children in same area of responsibility.
Parent desires reunification?
NO
YES
ORR Transfers Child to Target Detention Facility
NO
Did child become ill in ORR Care?
YES
Reunification within 24-48 Hours
YES
Illness resolved?
NO
Child remains in ORR Care for placement
ICE to Coord w/MVM to dispatch reunited family to pre-identified release location
Due Diligence Actions in the Interest of the Child

